## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ENDURANCE ASSURANCE CORPORATION, LEXON INSURANCE COMPANY, PENNSYLVANIA INSURANCE COMPANY, U.S. SPECIALTY INSURANCE COMPANY, AND UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO. 4:24-CV-3047** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

W&T Offshore, Inc. ("W&T Offshore") and W&T Energy VI, LLC ("W&T Energy," and collectively with W&T Offshore, "W&T") file this First Amended Complaint to seek declaratory relief and damages not only against Endurance Assurance Corporation ("Endurance") and Lexon Insurance Company ("Lexon," and collectively with Endurance and Lexon, the "Sompo Sureties" or "Sompo"), but also against Pennsylvania Insurance Company a/k/a Applied Surety Underwriters ("Applied"), U.S. Specialty Insurance Company ("U.S. Specialty"), and United States Fire Insurance Company ("U.S. Fire") (collectively, the "Other Sureties," and, with the Sompo Sureties, the "Sureties" or "Defendants"), whose cases were consolidated into this action.[1]

---

[1]    Civil Action Nos. 4:24-cv-04113, 4:24-cv-04400, and 4:24-cv-04395 were consolidated into this action on November 22, 2024. (*See* Dkt. 33.)  Thus, these parties are already joined in this action.

## I.    SUMMARY

1.    In a scheme to force W&T to make unprecedented and impossible collateral payments, W&T's sureties have colluded to combine their leverage and jointly demand roughly $250 million in immediate collateral from W&T without any historical, contractual, or financial justification.  The Sureties in this lawsuit, and their co-conspirators, must be stopped.

2.    Years ago, W&T obtained government-mandated and private bonds from the Sureties to secure *potential* decommissioning obligations that W&T may have with respect to oil and gas assets on the Outer Continental Shelf.  For years, W&T has complied with its indemnity agreements (which were non-negotiable and offered on a take-it-or-leave-it basis) and paid all required and negotiated premiums. W&T has remained solvent and capable of meeting its financial obligations.

3.    However, in 2024, the Sureties conspired to use a change in government rules as a pretext to extract outrageous sums from smaller oil and gas companies like W&T.  The new rules arguably required supplemental surety bonds for certain companies who were not deemed investment-grade.  The rule *did not* alter existing bonds previously issued to W&T by the Sureties nor alter the underlying contract terms.  The rule also *did not* require the Sureties to demand immediate collateral from W&T.

4.    Yet, the Sureties devised an illegal scheme to jointly demand extremely high collateral for the very first time.  The Sureties met and agreed to "collectively" change their "analysis" and "terms" for smaller companies like W&T.  By locking arms, these competing Sureties agreed to greatly increase their leverage, restrict competition, and thereby attempt to: (1) jointly squeeze their targets' assets; (2) jointly force their targets to accept commercially

2

unreasonable terms; and (3) jointly increase premiums, collateral, and bonding costs against their targets.

5.      In the spring of 2024, the Sureties, led by Sompo, began implementing their strategy.  Sompo and its co-conspirators, in concerted rapid succession, began demanding immediate crippling deposits of collateral on W&T's outstanding bonds, all for the very first time. Even though the Sureties' demands were not supported by their contracts, W&T, in good faith, offered to provide the Sureties collateral in forms other than cash or letters of credit. The Sureties refused these offers in bad faith—continuing to insist on commercially unreasonable terms and attempting to permanently change the parties' rights for the Sureties' sole benefit.

6.      The Sureties' scheme violates not only the parties' contracts, but also federal and Texas antitrust law.  Accordingly, W&T seeks damages from the Sureties and declaratory relief to end their scheme, not only for W&T, but also for any of the Sureties' other targets.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 43 U.S.C. § 1349, as this dispute arises out of and would not exist but for operations conducted on the Outer Continental Shelf.  The surety bonds and related indemnity agreements that are at issue in this civil action were issued in connection with operations conducted on the Outer Continental Shelf.

8.      The Court also has jurisdiction over this civil action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because this action arises under the antitrust laws of the United States.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).  The relevant agreement between W&T and the Sompo Sureties provides that: (i) the place of performance is

198452608_11

Harris County, Texas; and (ii) the exclusive venue and jurisdiction for any disputes arising under that agreement lies with the federal and state courts sitting in Harris County, Texas. The relevant agreement between W&T and Applied provides that jurisdiction for any legal proceeding related thereto shall be Texas, or any state where W&T resides, has property, or performs, which includes Texas. The relevant agreement between W&T and U.S. Specialty provide for mandatory venue in Texas and/or Harris County. In any case, venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to W&T's claims occurred in this District. All parties have consented to the consolidation of the parties' lawsuits in this District.

10.    Among other things, this civil action seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure for the purpose of determining questions of actual controversy between W&T and the Sureties.

### III.    THE PARTIES

11.    W&T Offshore is a corporation organized under the laws of the State of Texas with its principal place of business located in Houston, Texas.

12.    W&T Energy is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Houston, Texas.

13.    Endurance is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Mt. Juliet, Tennessee.

14.    Lexon is a corporation organized under the laws of the State of Texas, with its principal place of business located in Mt. Juliet, Tennessee.

15.    Applied is a corporation organized under the laws of the State of New Mexico with its principal place of business located in Santa Fe, New Mexico.

4

16.     U.S. Specialty is a Texas corporation with its principal place of business in the State of Texas.

17.     U.S. Fire is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate headquarters located in Morristown, New Jersey.

18.     Other sureties who, on information and belief, are potential co-conspirators with the Sureties' scheme described herein, include Philadelphia Indemnity Insurance Company, and others who will become known during discovery.

## IV.     INTERSTATE COMMERCE

19.     The Sureties, who are federally certified, issued bonds to W&T for its operations on the federally controlled Outer Continental Shelf. The Sureties, who are organized and operate across many states, including Delaware, Tennessee, Texas, New Mexico, and New Jersey, issue bonds to companies like W&T throughout the United States.

20.     The Sureties' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## V.     BACKGROUND

**A. The U.S. Offshore Regulatory Environment and Offshore Surety Market.**

21.     In 1953, the United States Congress enacted the Outer Continental Shelf Lands Act ("OCSLA" or the "OCS Lands Act").  43 U.S.C. § 1331 *et seq.*

22.     In the OCS Lands Act, Congress affirmed that the United States has exclusive control over the Outer Continental Shelf.  OCSLA defines the Outer Continental Shelf to be "all submerged lands" beyond the lands reserved to the States, in the Submerged Lands Act, 43 U.S.C. § 1301 *et seq.*, up to the edge of the jurisdiction of the United States.  *Id.* § 1331 (a).

5

23.    The OCS Lands Act sets forth a comprehensive scheme for the leasing and development of resources on the Outer Continental Shelf.  43 U.S.C. §§ 1334.

24.    OCSLA specifically authorizes the Secretary of the United States Department of the Interior (the "Secretary") to issue regulations to administer the Outer Continental Shelf for mineral development.  43 U.S.C. § 1334.

25.    Compliance with the regulations issued by the Secretary is a condition of "[t]he issuance and continuance of any OCSLA lease."  43 U.S.C. § 1334 (b).

26.    The Secretary established the Bureau of Ocean Energy Management ("BOEM") to carry out conventional and renewable energy-related functions on the Outer Continental Shelf. Dep't of the Interior Secretarial Ord. 3299 (May 19, 2010).

27.    Order 3299 also established the Bureau of Safety and Environmental Enforcement ("BSEE").  Dep't of the Interior Secretarial Ord. 3299 (May 19, 2010).

28.    BSEE and BOEM work together to protect the United States from incurring financial losses associated with the decommissioning facilities and other structures on the Outer Continental Shelf in conjunction with the development of mineral and/or energy resources.

29.    BOEM is responsible for managing the development of offshore energy and mineral resources in an environmentally and economically responsible manner.

30.    BSEE provides estimates to BOEM regarding the financial assurance needed to cover decommissioning costs.

31.    BOEM's predecessor, the Minerals Management Service ("MMS"), established the financial requirements applicable to Outer Continental Shelf leases and pipeline rights of way in 1997.  62 Fed. Reg. 27948 (May 22, 1997).

32.    The MMS regulations also provided a mechanism for the government to require supplemental financial assurance based on the regulatory agency's interpretation of the financial health of the lessees.

33.    The MMS issued regulations providing a mechanism for the government to require Outer Continental Shelf oil and gas lessees to post bonds.  62 Fed. Reg. 27948 (May 22, 1997).

34.    BOEM continues to require Outer Continental Shelf lessees to post bonds as a condition of lease issuance and/or continuance.  *See* 89 Fed. Reg. 31544 (Apr. 24, 2024).

35.    The offshore surety market in the United States is heavily concentrated and controlled by the Sureties and other key players.  For instance, they are all part of and/or actively support similar trade associations, including The Surety & Fidelity Association of America ("SFAA"), based in Washington, D.C.[2]  According to SFAA's website, their goals are to, among other things, provide "a clear, strong and unified voice for the industry" and "[t]racking and responding to any threats to the industry."[3]

36.    The offshore surety market is united in their strategic plan and their leaders often work for multiple sureties in their career.  They also participate in regular meetings around the nation to respond to industry threats and jointly influence government decisions.[4]  For example, in February 2024, SFAA and another surety trade association hosted a "2024 Legislative 'Fly-in'" in Washington, D.C. The Fly-in "enabled surety professionals from across the country to educate members of Congress and staff about the value of construction surety bonds and advocate for their

---

[2]    *See* SFAA, "Membership List," https://surety.org/wp-content/uploads/2024/01/Membership-Directory-01-29-24.pdf (last visited Dec. 11, 2024).

[3]    *See* SFAA, "Advocacy and Policy," https://surety.org/advocacy-policy/ (last visited December 11, 2024).

[4]    *See* SFAA, "Meetings & Events," https://surety.org/press-releases/sfaa-meetings-events/ (last visited December 11, 2024); NASBP "2024 Annual Meeting," https://www.nasbp.org/events/annualmeeting/2024amhighlights (last visited December 11, 2024).

198452608_11

legislative priorities."  By their own words, "[i]n over 100 meetings, construction bonding experts met with their elected representatives and their staff to educate them on surety bonds' significant role in advancing and protecting public infrastructure projects."

37.    The Sureties use the same collective influence in the offshore surety market.  For example, in 2024, representatives of the Sureties and co-conspirators met to discuss their collective response to the BOEM rule and agreed to collectively change their analysis and terms at the expense of smaller companies like W&T.  The Sureties' opportunities for collusion continues through major annual events, conferences, and meetings each year, with companies like Sompo and Applied entrenched in trade associations and actively seeking to influence other sureties to follow their lead.

**B.  Insurance Regulations.**

38.    Sureties are regulated by the Texas Insurance Code. *See* Tex. Ins. Code §§ 3503.001 – 3503.204.

39.    The Texas Insurance Code definition of the "Business of Insurance" includes the making of a surety contract. Tex. Ins. Code § 101.051(b)(2).

40.    Chapter 541 regulates unfair methods of competition and unfair or deceptive acts or practices in the Business of Insurance. Tex. Ins. Code §§ 541.001 – 541.454.

41.    Chapter 541 permits a private cause of action for damages. Tex. Ins. Code § 541.151.

**C.  The Relationship Between Sompo and W&T.**

42.    W&T Offshore is an independent oil and natural gas producer—exploring, developing, and acquiring oil and natural gas in the Gulf of Mexico, subject to the jurisdiction of the United States Department of Interior.

8

43. W&T Energy is a subsidiary of W&T Offshore that explores, develops, acquires, and operates oil and natural gas properties in the Gulf of Mexico, also subject to the jurisdiction of the United States Department of Interior.

44. Endurance is a foreign insurer that issues surety bonds required by BOEM with respect to operations conducted on the Outer Continental Shelf.

45. Lexon is a Texas domestic insurer that issues surety bonds required by BOEM with respect to operations conducted on the Outer Continental Shelf.

46. In accordance with the regulations issued by BOEM, W&T was required to post bonds in favor of the United States.

47. W&T obtained surety bonds from, among others, both Endurance and Lexon. ("Bonds").

48. W&T is the principal under the Bonds.

49. Pursuant to the terms of the Bonds, all "obligations and liabilities of Principal to abandon, restore and remediate the Properties" subject to the Bond are set forth in the "P&A Obligations." As such, the P&A Obligations form part of the Bonds.

50. The rights and obligations of W&T and the Sompo Sureties are stated in their Payment and Indemnity Agreement No. 1380 effective as of September 14, 2020 (the "Sompo Indemnity Agreement").

51. The Sompo Indemnity Agreement was executed by W&T Offshore, as Principal, and U.S. Specialty Insurance Company, as Surety, "in connection with any bond or bonds executed or to be executed on behalf of any principal and to induce the Surety to execute or procure of the execution of such bond(s) and any extensions, modifications, or renewals thereof, additions thereto, or substitutions therefor."

52.     A true and correct copy of the Sompo Indemnity Agreement is attached hereto as

Exhibit "A." The Sompo Indemnity Agreement provides, in paragraph 3 entitled "Security":

> The Surety may at any time and from time to time hereafter, in its
> sole and absolute discretion, require the Principals to provide
> collateral, in form and amounts acceptable to the Surety (such
> amounts not to exceed the aggregate penalty sum of all then-issued
> Bonds) to secure the Principals' obligations to the Surety hereunder
> and/or to establish reserves ***to cover any actual or potential liability,
> claim, suit, or judgment under any Bond***.
>
> Within thirty (30) days after the Surety has made written demand on
> Principals, each Principal shall execute such documents and take
> such further action as may be necessary in order to provide such
> collateral. Each Principal hereby grants to the Surety a security
> interest in all money and other property now or hereafter delivered
> by such Principal to the Surety, and all income (if any) thereon.
>
> If a Principal provides the Surety with a letter of credit or similar
> instrument, such Principal agrees that the Surety has the right to call
> on the same from time to time, in whole or in part and for any reason
> or no reason, and to hold the proceeds thereof as collateral for the
> obligations of the Principals hereunder. Any collateral provided at
> any time by any Principal shall be available, in the discretion of the
> Surety, as collateral security on any or all Bonds heretofore or
> hereafter executed for or at the request of such Principal or any other
> Principal.

(Ex. A at Sec. 3 (emphasis added).)

53.     Paragraph 5 of the Sompo Indemnity Agreement, entitled "Additional Sureties," is

a risk-shifting mechanism that permits Sompo to move some bond obligations to other entities.  It

provides that, should the Surety "procure any other company or companies including but not

limited to . . . Endurance Assurance Corporation . . . Lexon Insurance Company . . . to execute or

join with it in the executing, or to reinsure any Bond, this Agreement shall inure to the benefit of

such other company or companies, its or their successors and assigns, so as to give it or them a

direct right of action against the Principals to enforce the provisions hereof."

54.    However, nothing in the Agreement states that Sompo can collude with such "Additional Sureties" or jointly demand immediate payments of collateral.

55.    Endurance joined in and issued bonds covered by the Sompo Indemnity Agreement.

56.    Accordingly, the Sompo Indemnity Agreement governs the relationship between W&T and Endurance.

57.    Lexon joined in and issued bonds covered by the Sompo Indemnity Agreement.

58.    Accordingly, the Sompo Indemnity Agreement governs the relationship between W&T and Lexon.

59.    Other surety companies also joined in and issued bonds covered by the Sompo Indemnity Agreement.

**D. The Sompo Sureties Issue BOEM-Required Bonds on W&T's Behalf.**

60.    Pursuant to and in accordance with the Sompo Indemnity Agreement, Endurance issued the following bonds in connection with W&T's obligations to BOEM:

| Bond No. | Form | Amount |
|---|---|---|
| ZEACX226000039 | BOEM -2028A | $3,830,148.00 |
| ZEACX226000040 | BOEM -2028A | $13,126,457.00 |
| ZEACX226000038 | BOEM -2028A | $1,482,000.00 |
| EACX226000025 | BOEM -2028A | $3,000,000.00 |
| EACX226000047 | BOEM -2028A | $2,285,584.00 |
| EACX226000044 | BOEM -2028A | $3,000,000.00 |
| EACX226000022 | BOEM -2028A | $1,461,000.00 |

61.    True and correct copies of the above bonds are attached hereto as Exhibit "B".

62.    Endurance also issued the following bonds to nongovernmental parties. These bonds were also issued in conjunction with W&T's operations on the Outer Continental Shelf:

| Bond No. | Form | Amount |
|---|---|---|
| EACX226000043 | N/A | $7,000,000.00 |

63.    A true and correct copy of the above bond is attached as Exhibit "C."

11

198452608_11

64.    Endurance also issued a bond in favor of the Texas Railroad Commission:

| Bond No. | Form | Amount |
|---|---|---|
| EACX226000045 | P-5PB | $125,000.00 |

65.    A true and correct copy of the above bond is attached as Exhibit "D."

66.    Lexon also issued the following bonds in connection with W&T's obligations to BOEM:

| Bond No. | Form | Amount |
|---|---|---|
| 1156846 | BOEM -2028A | $5,000,000.00 |
| 1136949 | ONRR -4435 | $1,166,860.00 |
| 1136950 | ONRR -4435 | $117,279.00 |
| 1159776 | BOEM -2028A | $3,000,000.00 |
| 1097677 | BOEM -2028A | $9,000,000.00 |

67.    True and correct copies of the above bonds are attached as Exhibit "E".

68.    Lexon also issued the following bonds to nongovernmental parties.  These bonds were also issued in conjunction with W&T's operations on the Outer Continental Shelf:

| Bond No. | Form | Amount |
|---|---|---|
| 1152011 | N/A | $376,688.00 |
| 1152010 | N/A | $1,931,562.00 |

69.    A true and correct copy of the above bonds are attached hereto as Exhibit "F."

**E.  Sompo's Bad Faith Collateral Demands**

70.    Under the Sompo Indemnity Agreement, the Sompo Sureties could each individually demand collateral **only** "to cover any actual or potential liability, claim, suit, or judgment under any Bond."  (Ex. A at ¶ 3.)

71.    The Sompo Indemnity Agreement does not contemplate or otherwise permit the Sureties to act jointly in demanding additional collateral from W&T.

72.    To date, no "actual or potential" liability, claim, suit, or judgment exists "under any Bond."

73.     At all times, W&T has complied with the Sompo Indemnity Agreement and paid all premiums for all bonds issued by the Sompo Sureties. W&T has also remained solvent and capable of meeting its financial obligations.

74.     Despite its consistent financial health, in 2024, W&T became one of Sompo's first targets in its scheme with other sureties when W&T refused to accept Sompo's demands involving non-W&T bonds.

75.     Specifically, Sompo had previously issued bonds to a company unrelated to W&T, Fieldwood Energy LLC ("Fieldwood"), which had filed for bankruptcy in 2020.  Quarter North Energy ("QNE") subsequently acquired a portion of Fieldwood's assets, some of which were later sold to W&T.

76.     As part of that transaction, W&T purchased private bonds of roughly $11 million from Applied (not from Sompo) to benefit QNE and guarantee W&T's decommissioning obligations.

77.     W&T had no obligation to assume Sompo's separate financial exposure caused by the separate Fieldwood bankruptcy.  But that is exactly what Sompo demanded from W&T.

78.     On April 19, 2024, Sompo demanded that W&T replace the Fieldwood bonds despite W&T's total lack of liability.  Sompo wanted W&T to bail it out of its obligations for Sompo's benefit alone. Sompo and its representative, Patrick Hennesy, claimed they could not "retain bonds in the name of Fieldwood and continue to pursu[e] legal action in relation to the Fieldwood Case."  (Fieldwood Emails, attached as Exhibit "G".)

79.     Sompo also claimed that the replacement bonds would be cheap and wouldn't affect W&T's costs with Sompo across the board: "In order to facilitate the replacement, Sompo is offering to replace the bonds on Lexon paper at a nominal rate that will be offset elsewhere in the

13

portfolio. … [Patrick Hennesy] said he needs to do some Chinese algebra to confirm the rate, but assures that it will be cost neutral when balanced across the current program." (*Id.*)

80.     Sompo tried to force W&T to accept a new bond amount of $7,745,000.

81.     W&T's broker reiterated Sompo's power in the offshore surety market, particularly given the new BOEM rule:

> We feel this is a good deal for W&T, as it preserves an ***important relationship in Sompo***, and ***allows W&T to procure favorable terms on assuming bonds we believe BOEM will force W&T to post once the rule is in place***.
>
> I recommend we move on this quickly to capture these terms before they change and ***create goodwill prior to the Sompo meeting*** in the coming weeks.

(*Id.* (emphasis added).)

82.     W&T did not want to take on unnecessary liabilities and was shocked by Sompo's attempted blackmail.

83.     On April 29, 2024, W&T informed Sompo that it did not wish to take on Sompo's other bonds or exposure.

**F. Sompo Causes the Sureties To Jointly Pursue Unreasonable Collateral Demands.**

84.     Upon information and belief, following the events of April 2024, Sompo began conspiring with others in the offshore surety market to retaliate against W&T, interfere with its contracts and business relationships, and force W&T back into submission at any cost.

85.     During this conspiracy, on July 9, 2024, Endurance and Lexon, through Sompo, demanded that W&T immediately pay collateral of $7.5 million in cash without any support or explanation (Sompo's Demand, July 9, 2024, attached as Exhibit "H".)  Sompo intended to use this money for Sompo's unrelated Fieldwood liability and, if not paid, Sompo would then demand

the full $55.9 million from W&T.  Notably, Sompo's surprise demand was roughly the same amount as Sompo's replacement bonds it had tried to extort from W&T.

86.    As part of its scheme, upon information and belief, Sompo apparently encouraged and enlisted the support of other Sureties, in rapid succession, to demand additional collateral, including U.S. Specialty, Applied, and U.S. Fire.

87.    W&T sought to resolve the Sureties' demands in good faith.  For example, W&T offered to provide collateral to the Sureties in forms other than cash or letter of credit.  But the Sureties held fast and jointly refused all overtures from W&T.

88.    As noted above, W&T's financial status has remained substantially the same since the Sureties issued bonds to W&T, making it abundantly evident the Sureties' call for collateral was made for nefarious purposes.

89.    The only material change regarding the bonds involves not W&T, but the Sureties' agreements and strategy of collusion.

90.    The Sureties have decided to alter their business model by jointly squeezing smaller oil and gas companies like W&T.  Sompo's own representative admittedly met with other sureties in 2024 to "collectively" change their "analysis" and "terms" for these companies.  Part of this agreement was jointly restructuring their strategy for collateral calls.  Essentially, the Sureties jointly demand extreme and unprecedented collateral amounts, requiring joint submission to all Sureties. Sompo readily admits that, as part of its scheme, it tried to convince W&T "to establish a shared collateral escrow account [for all sureties] to [also] satisfy Lexon's need for collateral." (Dkt. 30 at 16.).

91.    The Sureties' unjustified and unprecedented demands in collateral and their continued collusion cannot be permitted by this Court.

**G. Sureties Try to Cripple W&T with Baseless Claims.**

92.    The Other Sureties' execution of their collateral strategy mirrored Sompo's.

93.    Like Sompo, Applied is a foreign insurer, which issues surety bonds with respect to operations conducted on the Outer Continental Shelf.

94.    W&T obtained surety bonds from Applied.

95.    The rights and obligations of W&T and Applied are stated in a General Indemnity Agreement dated February 2, 2023 (the "Applied Indemnity Agreement"). The Applied Indemnity Agreement is attached as Exhibit "I."

96.    Similar to the Sompo Indemnity Agreement, the Applied Indemnity Agreement requires a request for collateral to be related to actual or potential liability or claims against the Surety—Applied cannot demand collateral based on speculation or collusion:

> [T]he Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, *as soon as liability exists or is asserted against the Surety*, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient *to discharge any Losses or to protect it from any potential or anticipated Losses*.

(Ex. I at ¶ 4 (emphasis added).)

97.    Applied has never had the right to demand collateral from W&T because: (1) no actual or potential liability against Applied exists; (2) no actual or potential loss to Applied exists; and (3) there are no actual or anticipated claims against the Applied Bonds.

98.    However, in 2024, Applied tried to unilaterally increase W&T's premium payments without justification, seeking $276,000 more from W&T.  When W&T would not agree to the attempted extortion, Applied demanded that W&T either release it from the bonds within 30 days or provide Applied "collateral in the amount of 100% of all unreleased liability" under the bonds: $11,343,949.00. (Applied Demand, attached as Exhibit "J".)

16

99.     Without support, Applied asserted that it "has determined, in its sole discretion, that [W&T Offshore's] financial condition has been or is believed to be deteriorating and/or that there has been or is believed to be other changes adversely impacting the Surety's rights under the Bonds." (*Id.*)

100.    Again, W&T's financial status has remained substantially the same since the execution of the Applied Indemnity Agreement and the issuance of the bonds thereunder.  Further, to the extent there has been an adverse change impacting Applied's rights under the bonds, which W&T denies, the agents of such change are the Sureties—not W&T—and the change was one collectively fabricated by the Sureties.

101.    Applied asked W&T to comply with an unreasonable demand (for release) or, in the alternative, a more unreasonable demand (for collateral) as part and parcel of the Sureties' scheme.

102.    Applied is not the only surety who has joined the conspiracy.

103.    On July 31, 2024, U.S. Specialty demanded that W&T immediately deposit $23,000,000 in collateral, based on the parties' Payment and Indemnity Agreement No. 1380 ("U.S. Specialty Indemnity Agreement"). (U.S. Specialty Demand, attached as Exhibit "K".)  The U.S. Specialty Indemnity Agreement, the same form as the Sompo Indemnity Agreement (Ex. A), did not give U.S. Specialty the ability to demand collateral without actual or potential liability. However, on October 25, 2024, U.S. Specialty filed suit seeking immediate payment of the $23,000,000 from W&T.

104.    Similarly, on October 14, 2024, U.S. Fire demanded that W&T immediately deposit $89,501,222.00 as collateral based on the Rider To General Indemnity Agreement ("U.S. Fire

17

Indemnity Agreement"). (U.S. Fire Demand, attached as Exhibit "L".) A true and correct copy of the U.S. Fire Indemnity Agreement is attached as Exhibit "M."

105.    Like the other indemnity agreements, the U.S. Fire Indemnity Agreement does not give U.S. Fire the ability to demand collateral without actual or potential liability. And like the Sompo Indemnity Agreement, the U.S. Fire Indemnity Agreement allows for a demand for collateral solely to address an existing liability or claim. (*See id.* at ¶ 4 (allowing a demand for collateral to "in the amount of any reserve Surety establishes for any *existing liability or claim*" (emphasis added).) However, on November 8, 2024, U.S. Fire filed suit against W&T, increasing its collateral demand to $93,492,509.00.

106.    The Sureties' collateral demands against W&T total $183,739,036:

| Surety | Collateral Demand |
|---|---|
| Sompo Sureties | $55,902,578.00 |
| Applied | $11,343,949.00 |
| U.S. Specialty | $23,000,000.00 |
| U.S. Fire | $93,492,509.00 |
| **Total** | **$183,739,036.00** |

107.    Even worse, the above total only includes demands from the Sureties in this lawsuit. The total amount jointly demanded from all surety co-conspirators is roughly $250 million—more than W&T's cash reserves.[5] Upon information and belief, the Sureties are still meeting with other co-conspirators to increase their joint demands and interfere with W&T's contracts and business relationships.

---

[5]    On July 2, 2024, Philadelphia Indemnity Insurance Company ("PIIC") demanded collateral of $31 million. On November 13, 2024, PIIC increased their collateral demand to $71 million.

### H. The Sureties' Joint Demands Are Part of an Illegal Conspiracy.

108.    As discussed above, ***W&T has complied with its indemnity agreements and paid all required and negotiated premiums.*** W&T is and has remained, since execution of its indemnity agreements, solvent and capable of meeting its financial obligations. *Id.*

109.    W&T has not advised the Sureties that it was unwilling or unable to post collateral. Contrary to their contention, W&T's financial status has not deteriorated—in fact, W&T is in an *improved* financial position as compared to September 2020.

110.    Seeking to combine their leverage to extract the maximum amount of collateral from their principals, even if it requires their liquidation, the Sureties have conspired to participate in an unlawful scheme against smaller oil and gas companies like W&T.  And the Sureties found the ideal pretext to execute their collective scheme.

111.    Specifically, in 2020, BOEM had announced a Proposed Rule (the "2020 Proposed Rule") that required supplemental bonds only for sole-liability properties, which are leases without an investment-grade party—typically a major company, such as Shell—in the chain of title either as a predecessor or co-lessee.

112.    However, last June, the BOEM abandoned this 2020 Proposed Rule and, instead, issued a 2023 Proposed Rule, under which the 2020 Proposed Rule's financial assurance criteria applied even to leases with an investment-grade company in the chain of title.

113.    BOEM's new rule, if enforced, would not require companies with an investment-grade credit rating to provide supplemental bonds. But independent producers like W&T overwhelmingly do not have the investment-grade credit rating. Importantly, though, this rule does not alter *existing* bonds issued by sureties or their respective indemnity agreements.  Simply put,

neither this rule—nor the contracts under which the sureties issued bonds to W&T—provide a standalone rationale for a surety to demand additional collateral for an existing surety obligation.

114.    Despite the preceding, the Sureties nevertheless used BOEM's rule as a pretext to collectively and in concerted fashion demand nearly $250 million from W&T. (Doc. 30 at 15 ("[A]nother factor in Lexon's decision to demand additional collateral was a new rule, finalized in April 2024, to determine if and how much supplemental financial assurance is required for offshore operations on the OCS. The Risk Management and Financial Assurance for OCS Lease and Grant Obligations rule toughens the supplemental financial assurance requirements for offshore operations on the OCS and imposes additional obligations upon a principal.").

115.    The Sureties cannot use the new rule to demand what, in effect, are ransoms.  First, the Rule does not permit the Sureties to collude or violate antitrust law.  Second, the Rule itself is being challenged by several entities and may become void. *State of Louisiana, et al. v. Haaland, et al.*, No. 2:2024-cv-00820 (W.D. La.) (the "Louisiana Lawsuit").  In fact, in the Louisiana Lawsuit, the Texas Attorney General specifically cites W&T (and this case) as an example of how BOEM's rule can be misused to irreparably harm companies like W&T.  (*Id.* at Dkt. 76 at 4 – 5) (Texas Attorney General's Office recognizing that the Sureties' joint unjustified request for collateral can be "economically devastating" to companies like W&T).

116.    The Sureties **know** the BOEM rule does not support their scheme, but they seek to deceive the market and this Court. The Sureties and their cohorts recently admitted as much during a presentation on November 12, 2024, led by representatives of Sompo and Applied, including Mr. Hennesy and Mr. Jason Kilpatrick ("Sompo-Applied Presentation"). Discussing the imminent change of administration from President Biden to President Trump, the Sompo-Applied Presentation represented that the BOEM rule would most likely be withdrawn, as similar rules

20

were withdrawn during the change of administration from President Obama to President Trump. The Sompo-Applied Presentation acknowledged that any concern about the BOEM rule "could all be for nothing," and Sompo acknowledged the lower "magnitude of impact as a result of the new President Elect coming into office." By the Sureties' own admissions, the BOEM rule provides no basis for their collusion and changed course of dealing against smaller companies like W&T.

117.    The Sureties also **<u>know</u>** their demands for punitive collateral amounts from W&T are unprecedented and wrong. During the Sompo-Applied Presentation, Mr. Hennesy stated:

> "[The decommissioning work] ***doesn't just come at once***. You have … a number of different assets that have different lives and different costs and ***different timing*** of plugging and abandonment and decommissioning. So as you're working through that portfolio of assets and liabilities you have collateral and/or performance of the decommissioning that could come into play as well. So it's a little bit of a perform or pay - perform or fund ***collateral as you go along for your long-term deal***."

118.    As a result of the "different timing" of "decommissioning" as the parties "go along for [their] long term deal," Sompo represented that sureties should "work with operators and provide surety support by setting out reasonable time frames to achieve the funding of decommissioning and/or the performance of decommissioning, which is ultimately … what we're guaranteeing."

119.    Against companies like W&T, however, the Sureties agreed to depart from their custom of "work[ing] with operators" and "reasonable time frames" for requesting collateral. Instead, upon information and belief, the Sureties met one or more times in 2024 to jointly increase their premiums, expedite their collateral demands, and change the terms of their contracts and dealings.

120.    The Sureties were able to meet and agree to this scheme based, in part, on their engagement in similar trade associations, including SFAA. For example, Patrick Hennesy, Sompo's National Underwriting Officer, is entrenched in the SFAA. In fact, Mr. Hennesy is the

Chairman of the SFAA Energy Subcommittee. And his cohort, Mr. Kilpatrick, works for Sompo's co-conspirator and co-Defendant, Applied. They even worked together for another potential co-conspirator and W&T surety, RLI Insurance. Mr. Hennesy and Mr. Kilpatrick are also well-connected with surety associations like the National Association of Surety Bond Producers ("NASBP"), which hosted the Sompo-Applied Presentation.

121.    As admitted during the Sompo-Applied Presentation, Sompo's and Applied's representatives had previously met to discuss recent bankruptcies and the BOEM rule, agree to fix new terms against companies like W&T, and pursue a "collective" strategy to benefit the surety industry. According to Applied, "[E]veryone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?" Upon information and belief, this was not the first time W&T's sureties met to discuss their scheme, nor their last: they meet regularly to collude and profit against companies like W&T, including through NASBP's and SFAA's events.

122.    Upon information and belief, through Mr. Hennesy's influence, Sompo chose W&T as an early target of the Sureties' scheme. Sompo formulated a scheme with all other sureties of W&T to demand roughly $250 million in collateral. Through their demand, the Sureties planned to: (1) jointly squeeze their targets' assets; (2) jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual; and (3) jointly increase premiums, collateral, and bonding costs against their targets.

123.    Sompo, Mr. Hennesy, Mr. Kilpatrick, and Applied were able to collude with others based on several features of the offshore surety market. First, the market has high barriers to entry and high concentration due to capital requirements, risk tolerance, and government relations. Second, members in the market have extensive social ties between key personnel, encouraging

trust and cooperation among competitors. Third, members often work for multiple sureties in their career, uniting their strategies. This is further illustrated by (1) Mr. Hennesy (Sompo's National Underwriting Officer), who had worked for *two other* co-conspirators—Philadelphia Insurance Companies (from 2007 to 2008) and RLI Insurance (2008 to 2016); and (2) Mr. Kilpatrick (Applied's Senior Vice President) who had also worked for RLI Insurance (from 2010 to 2017). Fourth, the Sureties have opportunities to collude at industry events and social events with key decision-makers and industry leaders. This is further illustrated by the co-conspirators' extensive influence over surety trade associations like SFAA and NASBP, including through Mr. Hennesy, Chairman of SFAA's Energy Subcommittee, and Mr. Kilpatrick, a member of and contributor to SFAA and NASBP.

124.    Upon information and belief, the co-conspirators had opportunities and motives to collude, and did in fact collude, in connection with several surety industry events. These events include but are not limited to the SFAA-NASBP Legislative Fly-In on February 29, 2024, the NASBP Annual Meeting & Expo from April 30-May 3 in Austin, Texas, and the SFAA Annual Meeting on May 9, 2024. Coincidentally, these events were held soon before the Sureties began jointly demanding immediate collateral from W&T in rapid succession. The Sureties and their representatives, including Mr. Hennesy and Mr. Kilpatrick, continued meeting throughout 2024 to further plan and execute their scheme.

## I.   The Sureties Have Market Power in a Relevant Product and Geographic Market That Has Been Harmed by Sureties' Anticompetitive Conduct.

125.    The relevant market is the market for the provision of federally certified surety bonds for offshore oil and gas producers.

126.    Non-investment-grade offshore oil and gas producers often need to obtain surety bonds from federally certified sureties to conduct oil and gas operations on the Outer Continental

Shelf and there are no close economic and/or functional substitutes for these federally certified surety bonds.

127.    The relevant geographic market is the United States.  Non-investment-grade oil and gas producers that conduct operations on the Outer Continental Shelf rely on sureties that are certified by the United States' federal government and conduct business in the United States.

128.    The Sureties have had power in the relevant market during the entire relevant time due to their substantial share of this market and substantial barriers such as capital requirements and government regulations that prevent others from readily entering the relevant market.  The Sureties and their cohorts claim they have the power to "say no," even to the federal government. They claim they can jointly decide to not write a "single new bond" in the Gulf of Mexico. They claim they can "collectively" make more money and remain profitable by "collectively" agreeing to change their "analysis" and "terms" against companies like W&T.

129.    The Sureties' illegal conspiracy has harmed W&T and other offshore oil and gas producers that rely on robust competition in the provision of federally certified surety bonds to make offshore oil and gas drilling economically feasible.  But for the Sureties' conspiracy, W&T and other offshore oil and gas producers would have been able to continue to obtain and maintain the surety bonds on economically feasible terms.

## VI.    CAUSES OF ACTION

### COUNT ONE – DECLARATORY RELIEF

130.    W&T incorporates the allegations contained in the above paragraphs of this Amended Complaint as if set forth fully herein.

131.    A justiciable controversy exists between W&T and the Sureties.

132.    The parties are governed by and bound to comply with their respective indemnity agreements.

24

198452608_11

133.    While the Sureties' indemnity agreements impose certain obligations on W&T, they also impose obligations on the Sureties, including the obligation of good faith, fair dealing, and to not abuse rights granted under the agreements.

134.    The Sureties have acted to try to cripple W&T rather than exercise any valid contractual right.

135.    The Sureties have acted to put W&T in an impossible position, as compliance with one indemnification demand ensures a breach of obligations to the other.

136.    The Sureties' demands for collateral are unreasonable in that they are not based on any need of the Sureties other than a change in their business model or scheme and they conflict with the terms of the parties' indemnity agreements.

137.    W&T is entitled to a judgment declaring the rights of the parties including, without limitation, the following

a.    the Sureties may not enforce their indemnity agreements such that their actions constitute an abuse of right;

b.    the Sureties' interpretation of the indemnity agreements render the agreements illusory;

c.    the Sureties may not make an unreasonable demand for collateral;

d.    the Sureties must accept reasonable collateral as offered by W&T;

e.    no additional collateral is required of W&T;

f.    the Sureties may not make demands for collateral that are inconsistent such that W&T cannot comply with each others' demands; and

g.    the Sureties' changed business model and scheme are not legitimate grounds to demand further collateral beyond that offered by W&T.

## COUNT TWO – VIOLATION OF THE SHERMAN ANTITRUST ACT
## (GROUP BOYCOTT)

138.    W&T incorporates the allegations contained in the above paragraphs of this Amended Complaint as if set forth fully herein.

139.    The Sureties, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1.

140.    Specifically, the Sureties engaged in a conspiracy not to deal with smaller oil and gas companies, including W&T, by demanding collateral terms that would effectively prevent them from obtaining government-mandated bonding that is essential to engage in offshore oil and gas production. This agreement was a *per se* violation of 15 U.S.C. § 1. However, even if the Sureties' agreement were viewed through the quick-look or rule-of-reason lens, the anticompetitive effects of the agreement render it unlawful.

141.    The relevant product or service market is the market for the provision of federally certified surety bonds for offshore oil and gas producers, and the relevant geographic market is the United States.

142.    The Sureties' collectively possess market power in the relevant market. The Sureties and co-conspirators together control a substantial and controlling percent of the relevant market.

143.    W&T has been injured and will continue to be injured in its business and property as a result of the Sureties' conspiracy, which has virtually eliminated competition in the offshore surety market.

26

**COUNT THREE – VIOLATION OF THE SHERMAN ANTITRUST ACT**
**(PRICE-FIXING)**

144.    W&T incorporates the allegations contained in the above paragraphs of this
Amended Complaint as if set forth fully herein.

145.    The Sureties, by and through their officers, directors, employees, or other
representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint
of trade, in violation of 15 U.S.C. § 1.

146.    Specifically, the Sureties engaged in a conspiracy to artificially increase the cost,
premiums, and collateral requirements of their bonds through inflated and extortionate collateral
demands.  As a result of the Sureties' conduct, prices were actually raised, fixed, maintained, and
stabilized in the market.  This agreement was a *per se* violation of 15 U.S.C. § 1.  However, even
if the Sureties' agreement were viewed through the quick-look or rule-of-reason lens, the
anticompetitive effects of the agreement render it unlawful.

147.    The relevant product or service market is the market for the provision of federally
certified surety bonds for offshore oil and gas producers, and the relevant geographic market is the
United States.

148.    The Sureties collectively possess market power in the relevant market.  The Sureties
and co-conspirators together control a substantial and controlling percent of the relevant market.

149.    W&T has been injured and will continue to be injured in its business and property
as a result of the Sureties' conspiracy, which has virtually eliminated competition in the offshore
surety market.

**COUNT FOUR – VIOLATION OF THE TEXAS FREE ENTERPRISE AND**
**ANTITRUST ACT (TEX. BUS. & COM. CODE § 15.05)**

150.    W&T incorporates the allegations contained in the above paragraphs of this
Amended Complaint as if set forth fully herein.

27

151.    Section 15.05(a) of the Texas Business and Commerce Code, provides "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." TEX. BUS. & COMM. CODE §15.05(a).

152.    The Sureties have engaged in boycotting, price-fixing, market allocation, and other anticompetitive conduct that has harmed trade, commerce, and competition in the oil and gas industry and federal certified surety industry in Texas.

153.    Beginning in early 2024 and continuing through the present, the Sureties entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade by artificially increasing the costs and premiums of their bonds and reducing or eliminating alternatives through impossible collateral demands.

154.    In particular, the Sureties combined and conspired to raise, fix, maintain, or stabilize the availability, price, and bargaining power for surety bonds and federally certified sureties. As a result of the Sureties' conduct, prices were actually raised, fixed, maintained, and stabilized in the industry.

155.    Specifically, the Sureties engaged in a scheme to exclude smaller oil and gas companies, like W&T, from the offshore energy industry and from government-mandated bonding in the surety industry.

156.    The Sureties also engaged in a scheme to punish or control smaller oil and gas companies, like W&T, who would not agree to their commercially unreasonable terms and demands. The Sureties' conspiracy has harmed competition in the offshore surety market and W&T has likewise been harmed by this illegal conduct.

157.    Pursuant to Section 15.21(a)(1) of the Texas Business and Commerce Code, the Sureties' unlawful conduct has been willful and flagrant which requires the Court to treble the

28

damages awarded in connection with its violations of Section 15.05(a). *See* TEX. BUS. & COMM. CODE §15.21(a)(1).  W&T is also entitled to recover its costs and reasonable attorneys' fees.

**COUNT FIVE –VIOLATION OF THE**
**TEXAS INSURANCE CODE SECTION 541**

158.    W&T incorporates the allegations contained in the above paragraphs of this Amended Complaint as if set forth fully herein.

159.    Pursuant to Texas Insurance Code Section 541.051 (1), making statements misrepresenting the terms and benefits of a policy constitute an unfair method of competition and an unfair or deceptive act or practice in the business of insurance.

160.    The Sureties' extortion, blackmail, and demands for additional collateral misrepresent the language of the P&A Obligations in the absence of any change in the financial strength of W&T and in the absence of any pending claims under the surety bonds.

161.    As a result of the Sureties' unfair and deceptive acts, W&T has incurred damages.

162.    Pursuant to Section 541 of the Texas Insurance code, W&T is entitled to recover:

      a.    The amount of actual damages, courts and reasonable and necessary attorney's fees.

      b.    An order enjoining the Sureties from persisting with their unfair and deceptive demands regarding the payment of additional collateral.

      c.    An award of treble damages for the amount of actual damages.

**COUNT SIX – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS AND**
**PROSPECTIVE BUSINESS RELATIONSHIPS**

163.    W&T incorporates the allegations contained in the above paragraphs of this Amended Complaint as if set forth fully herein.

29

164.    As described in this Complaint, W&T has valid existing contracts and/or business relationships with its sureties.  The Sureties have willfully and intentionally interfered with these contracts and prospective business relationships.

165.    The Sureties, including Sompo, have induced, or attempted to induce, W&T's sureties, creditors, and other financial partners to reduce or negatively alter their business relationship with W&T.

166.    The Sureties' acts are independently tortious in that, among other things, these acts constitute violations of antitrust law, insurance law, and civil conspiracy.

167.    The Sureties did such acts knowing that their interference with W&T's existing contracts and prospective business relationships was certain, or substantially certain, to occur as a result of their conduct. As discussed herein, the Sureties also acted to take W&T's business hostage and control its capital, including through unlawful demands that had no contractual or financial justification.

168.    The Sureties interference is not privileged or justified. As a result of the Sureties interference with W&T's existing contracts and prospective business relationships, W&T has suffered actual damages and irreparable damages, including, among other things, loss of goodwill, damage to its reputation, and other pecuniary loss. Based on the Sureties' unlawful interference, W&T is entitled to all proximately caused, actual damages.

169.    Additionally, W&T is entitled to exemplary damages because the Sureties' acts of interference were willful and malicious.

**COUNT SEVEN – CONSPIRACY**

170.    W&T incorporates the allegations contained in the above paragraphs of this Amended Complaint as if set forth fully herein.

30

171.    The Sureties have knowingly encouraged, participated in, and benefited from the wrongful conduct described in this Complaint.

172.    A civil conspiracy exists under the facts of this case because two or more persons have acted in collusion to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, joint communications, and joint meetings.

173.    The Sureties have engaged in a civil conspiracy to violate antitrust law, insurance law, and other Texas common law.

174.    The Sureties have associated together through a meeting of their minds and for a common purpose of engaging in a course of conduct, and as an ongoing and continuing organization or unit, to conduct the unlawful and tortious activities described in this Complaint.

175.    The Sureties have secretly conspired among themselves, and possibly with others to be uncovered in discovery, to devise and implement, and the Sureties have devised and implemented, wrongful and unlawful schemes to harm W&T.

176.    The Sureties have conspired and aided and abetted each other in furtherance of these unlawful schemes. This conduct was caused, permitted, aided and abetted, and assisted by each of the Sureties in order to maintain their pattern of unlawful activity.

177.    Accordingly, W&T has been, and continues to be, damaged in its business. W&T is entitled to all damages caused by this conspiracy.

## VII.    <u>PRAYER</u>

WHEREFORE, W&T Offshore, Inc., and W&T Energy VI, LLC, pray that, after due proceedings are had, this Court enter judgment in their favor and against the Sureties:

1.  Declaring that:

198452608_11

a. the Sureties are bound by the terms of their indemnity agreements with W&T;

b. the Sureties may not enforce their indemnity agreements such that their actions constitute an abuse of right;

c. the Sureties' interpretation of the indemnity agreements render the agreements illusory;

d. the Sureties may not make an unreasonable demand for collateral;

e. the Sureties must accept reasonable collateral as offered by W&T;

f. no additional collateral is required of W&T;

g. the Sureties may not make joint demands for collateral that are inconsistent with those of each other such that W&T cannot comply with each demand;

h. the Sureties' changed business model and desire to boycott companies like W&T are not legitimate grounds to demand further collateral beyond that offered by W&T;

2. Finding that the Sureties' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3. Finding that the Sureties' actions constitute unfair and deceptive practices under Tex. Ins. Code Section 541;

4. Finding that the Sureties' actions constitute tortious interference with existing contracts and prospective business relationships;

5. Finding that the Sureties' actions constitute a conspiracy;

6.   Awarding W&T damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a) and Tex. Ins. Code Section 541.152;

7.   Awarding W&T its pre- and post-judgment interest at the highest legal rate;

8.   Awarding W&T all costs of this proceeding, including attorneys' fees; and

9.   Granting all other legal and equitable relief to which W&T may be entitled.

*[Remainder of page intentionally left blank.]*

Dated: December 11, 2024

Respectfully submitted,

McGuireWoods LLP

*/s/ Yasser A. Madriz*

Yasser A. Madriz
***Attorney-in-Charge***
Texas State Bar No. 24037015
S.D. Texas Bar No. 39080
ymadriz@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile

**ATTORNEYS FOR W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC**

**OF COUNSEL:**
**Jason Huebinger**
Texas State Bar No. 24065460
S.D. Texas Bar No. 1717237
jhuebinger@mcguirewoods.com
**Miles O. Indest**
Texas State Bar No. 24101952
S.D. Texas Bar No. 3070349
mindest@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002

and

**J. Brent Justus** (*phv forthcoming*)
bjustus@mcguirewoods.com
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219

34

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 11, 2024, the foregoing pleading was filed electronically using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

*/s/ Miles O. Indest*
Miles O. Indest
