IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Plaintiffs, | |
| v. | | Civil Action No. 4:24-CV-03047 |
| ENDURANCE ASSURANCE CORPORATION AND LEXON INSURANCE CO., | | |
| | Defendants. | |

| | | |
|---|---|---|
| U.S. SPECIALTY INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04113 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |

| | | |
|---|---|---|
| UNITED STATE FIRE INSURANCE COMPANY, | | |
| | Plaintiff | |
| v. | | Civil Action No. 4:24-CV-04395 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |

| | | |
|---|---|---|
| PENNSYLVANIA INSURANCE COMPANY, | | |
| | Plaintiff | |
| v. | | Civil Action No. 4:24-CV-04400 |
| W&T OFFSHORE, INC., | | |
| | Defendant. | |

**UNITED STATES FIRE INSURANCE COMPANY AND PENNSYLVANIA INSURANCE COMPANY'S JOINT MOTION TO DISMISS PLAINTIFFS W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC'S FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    EXECUTIVE SUMMARY ………………………………………..…... 1

II.   FACTUAL BACKGROUND AND TIMELINE …………………………..... 3

III.  STANDARD OF REVIEW ………………………………………… 6

IV.   ARGUMENTS AND AUTHORITIES …………………………………..… 7

    A.    W&T's Antitrust Claims Should be Dismissed in their Entirety …………..…... 7
        1.    W&T Lacks Standing …………………………………............. 8
        2.    W&T Fails to Allege Antitrust Injury ……………………………… 9
        3.    W&T Fails to Allege an Agreement ……………………………… 11
            a.    No Direct Evidence of an Agreement ………............................ 12
            b.    No Circumstantial Evidence of Collusion ………………………… 12
        4.    W&T Fails to Properly Define the Relevant Market …………….......... 15
        5.    W&T's Price-Fixing Theory is Unfounded …………………………. 16

    B.    W&T Fails to State a Claim for Declaratory Judgment ………………………... 17
        1.    Declaratory Judgment Cannot Be Used as a Defense Disguised as a Cause of Action ……………………………………………… 18
        2.    W&T's Claims Fails to Present a Justiciable Controversy …………….. 19
        3.    The Court Should Decline Jurisdiction Over W&T's Declaratory Judgment Claim ………………………………………..…. 19

    C.    W&T's Claims under the Texas Insurance Code Should Also Be Dismissed …. 20
        1.    Suretyship is Not Insurance-Chapter 541 Does Not Apply to Sureties …. 20
        2.    W&T's Reliance on Chapter 101 is Misplaced …………………..…… 21
        3.    W&T's Chapter 541 Claim Fails Because the Sureties Did Not Issue Insurance Policies ………………………………………….... 22

    D.    W&T Fails to Allege a Claim for Tortious Interference .………………………. 22

    E.    W&T Does Not Plausibly Allege Civil Conspiracy Among the "Disparate Sureties" and their "Conflicting" Demands ..……………………………….... 24

    F.    W&T Should Not be Rewarded for their Attempts to Avoid their Contractual Obligations ………………………………..………………………… 25

V.    PRAYER ……………………………………………………..... 26

## __TABLE OF AUTHORITIES__

**Cases**

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002) ……………………………………………………………………………… 6

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ……………………………………….. 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ………………………………….. 6,7,11

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015)  7,11

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) ……... 8,15

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) …………………… 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ……………... 8,10,16

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998) ………………………………… 9

*Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979) …….. 9

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) …………………... 10

*Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014) …………………… 10

*Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) ……………… 12

*In Re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2025) ……………………………………………………………………………… 12

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016) ……………………………………………………………………………… 13

*JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585 (S.D. Tex. 2022) ….. 13,14,22

*Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 597 (E.D. La. 2007) …... 14

*Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019) …………………… 14

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) ……………….. 16

*SKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) ... 16

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ………………..… 17

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992) ............... 17

*Burlington Ins. Co. v. Ranger Specialized Glass, Inc.*, No. 4:12-cv-1759, 2012 WL 6569774, at 2 (S.D. Tex. Dec. 17, 2012) ...................................................... 18

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ...................... 18

*Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) ............................................. 18

*Great Am. Ins. Co. v. Goin*, No. 3:15-CV-75-L, 2017 WL 4238698, at *4 (N.D. Tex. Sept. 25, 2017) ...................................................................... 18

*Texas v. West Publ'g Co.*, 882 F.2d 171, 175 (5th Cir. 1989) .............................. 19

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) ........................... 19

*Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ............................................. 19

*Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2007 WL 1791252 (N.D. Tex. June 21, 2007) ..................................................................... 19,20

*Landscape Design & Constr., Inc. v. Transport Leasing/Contract, Inc.*, No. 3:00-CV-0906-D, 2002 WL 257573, at *10 (N.D. Tex. Feb. 19, 2002) .............................. 19

*Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ..................................... 20

*Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991) ............................... 20

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140 n.19 (1962) ......................... 20,21

*Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415 (Tex. 1995) 21,22

*Tacon Mech. Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir. 1995) .......................................................................... 21

*Dallas Fire Ins. Co. v. Tex. Contractors Sur. & Cas. Agency*, 159 S.W.3d 895, 897 (Tex. 2004) ........................................................................ 21

*Combs v. STP Nuclear Operating Co.*, 239 S.W.3d 264, 270 (Tex. App.—Austin 2007, pet. denied) ....................................................................... 21

*ProTradeNet, LLC v. Predictive Profiles, Inc.*, 369 F. Supp. 3d 788, 791 (W.D. Tex. 2019) ............................................................................. 23

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) .................. 24

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009) ……………………………………………………………………………… 24

*Robinson v. Castle*, No. H-11-649, 2011 WL 3813292, at *10 (S.D. Tex. 2011) ….. 24,25

**Federal Statutes & Regulations**

30 C.F.R. § 585.525 …………………………………………………………………... 9

**Federal Rules**

FED. R. CIV. P. 12(b)(6) …………………………………………………………1,6

FED. R. EVID. 201(b)(2) ………………………………………………………… 15

**State Statutes and Rules**

TEX. INS. CODE § 541.002(2) ………………………………………………….. 21

TEX. INS. CODE § 541.151 ……………………………………………………… 21

TEX. INS. CODE § 101.001(c) ..………………………………………………… 21

TEX. INS. CODE § 541.051(1) ..………………………………………………… 22

**Other Authorities**

W&T Offshore, Inc., Annual Report (Form 10-K) (Mar. 6, 2024), https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.htm ………………………………………………………………………… 3,10

W&T Offshore, Inc., Quarterly Report (Form 10-Q) (November 7, 2024), https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.htm ……………………………………………………………………….. 5,6,9,23

*See* Quarterly Countrywide Surety Top 100 Writers https://surety.org/wp-content/uploads/2023/06/Top-100-Quarterly-Results-Surety-Website-Final.pdf. (last publicly available report as of March 31, 2023) ……………………………………….. 15

U.S. Dep't of the Treasury, Circular 570 (July 1, 2024), available at http://www.fiscal.treasury.gov/surety-bonds/circular-570.html ..................................... 15

**UNITED STATES FIRE INSURANCE COMPANY AND PENNSYLVANIA INSURANCE COMPANY'S JOINT MOTION TO DISMISS PLAINTIFFS W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC'S FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

United States Fire Insurance Company ("US Fire") and Pennsylvania Insurance Company ("Penn") (collectively, the "Sureties") jointly file this Motion to Dismiss Plaintiffs' W&T Offshore, Inc. and W&T Energy VI, LLC (collectively, "W&T") First Amended Complaint for Declaratory Relief and Damages (hereinafter, the "Amended Complaint") [Dkt. 36] under FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), and respectfully shows the Court the following:

## I.     EXECUTIVE SUMMARY

Judicial admissions by W&T severely undermine its ability to seek affirmative relief against their sureties.

This case originated as a lawsuit by W&T against two of its sureties, Endurance Assurance Corporation and Lexon Insurance Co. (collectively, "Sompo"), wherein W&T acknowledged critical facts that contradict its current claims of conspiracy and antitrust violations. First, W&T admitted the sureties were not acting in concert, stating: "The discussions with the Other Sureties have revealed that any agreement regarding alternative collateral will depend on W&T not providing cash or a letter of credit to any other surety." Complaint for Declaratory Relief (hereinafter, the "Original Complaint"), Dkt. 1, ¶ 61. W&T further admitted that Sompo's demand for collateral was based on "a change in the regulatory environment and the Sompo Sureties' changed business model." Original Complaint, Dkt. 1, ¶ 66.

Given these admissions, W&T's current allegations of a conspiracy among the sureties ring hollow, particularly in light of its August 2024 pleading acknowledging the "disparate actions of the" sureties.

After receiving over $450 million in surety bonds, W&T made its own business decision

to sue one of its sureties—Sompo. The resulting collateral demands from other sureties are neither surprising nor actionable. These demands represent legitimate efforts by the sureties to mitigate their financial exposure, consistent with standard industry practice and the terms of the indemnity agreements W&T willingly signed.

Additionally, W&T fails to address a crucial fact: it was given a significant opportunity to mitigate its collateral obligations. US Fire and Penn each requested that W&T replace and release the bonds, which would have entirely negated the need to post any collateral. Yet, W&T's pleadings fail to allege that it even attempted to secure replacement bonds. Whether W&T chose not to pursue replacement or it was unable to do so due to the *change in the regulatory environment*, the outcome is the same—W&T's claims fail.

Judicial admissions, public filings, and contractual obligations fatally undermine W&T's claims against the sureties. Its allegations are contradicted by prior statements acknowledging the disparate and individualized actions of the sureties. W&T's failure to mitigate its obligations or pursue alternatives further highlights the implausibility of its claims. The speculative nature of its alleged harm, coupled with the absence of any market-wide injury, leaves W&T without standing to even pursue these claims.

W&T's derivative tortious interference and civil conspiracy claims similarly fail. The tortious interference claims depend on meritless antitrust allegations and lack any identified contract or prospective business relationship. The civil conspiracy claim lacks any allegation of a "meeting of the minds" among the "disparate sureties" and must also be dismissed.

For these reasons, the Court should dismiss W&T's Amended Complaint in its entirety.

## II.    FACTUAL BACKGROUND AND TIMELINE

> "When someone shows you who they are, believe them the first time."
> — Maya Angelou

At the outset, W&T has represented to its investors, advisors, and regulators that the right to demand collateral is within the sureties' sole discretion explicitly stating that "Pursuant to the terms of our agreements with various sureties under our existing bonding arrangements, or under any future bonding arrangements we may enter into, we may be required to post collateral at any time, on demand, at the surety's sole discretion." W&T Offshore, Inc., Annual Report (Form 10-K) (Mar. 6, 2024), p. 24, https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.htm (hereinafter, the "2023 Annual Report").

Additionally, with respect to W&T's ability to sufficiently collateralize the sureties, W&T publicly stated, "We cannot provide assurance that we will be able to satisfy collateral demands for current bonds or for future bonds." *Id*. In its Amended Complaint, W&T bases its lawsuit on a scheme allegedly derived in the "spring of 2024":

> In the spring of 2024, the Sureties, led by Sompo, began implementing their strategy. Sompo and its co-conspirators, in concerted rapid succession, began demanding immediate crippling deposits of collateral on W&T's outstanding bonds, all for the very first time. Even though the Sureties' demands were not supported by their contracts, W&T, in good faith, offered to provide the Sureties collateral in forms other than cash or letters of credit. The Sureties refused these offers in bad faith—continuing to insist on commercially unreasonable terms and attempting to permanently change the parties' rights for the Sureties' sole benefit.
>
> The Sureties' scheme violates not only the parties' contracts, but also federal and Texas antitrust law.

*See* Amended Complaint, Dkt. 36, ¶¶ 5-6.

W&T alleges, without support, that "Sompo apparently encouraged and enlisted the support of other sureties, in rapid succession, to demand additional collateral, including US Specialty, [Penn], and US Fire." *Id*. ¶ 86. Yet in its Original Complaint, W&T told this Court

that the sureties were working against each other:

> The discussions with the Other Sureties have revealed that any agreement regarding alternative collateral will depend on W&T not providing cash or a letter of credit to any other surety. . .

*See* Original Complaint, Dkt. 1, ¶ 61.

W&T went even further, suggesting that such conflicting demands and "disparate actions of the Sompo Sureties, on the one hand, and the Other Sureties, on the other hand, place W&T in an impossible position, as compliance with one's demand ensures a breach of obligations to the other." *Id.* at ¶ 72.

Through its Original Complaint, W&T blames Sompo's demand "on a change in the regulatory environment," with such changes being so significant in the industry as to warrant an alleged desire by Sompo to "exit the market for surety bonds related to the Outer Continental Shelf." *Id.* at ¶¶ 66, 64.

Yet the significant regulatory changes referenced throughout the Original Complaint are merely replaced with accusations towards the sureties in the Amended Complaint. *See, e.g.,* Amended Complaint, Dkt. 36, ¶ 100 ("Further, to the extent there has been an adverse change impacting [Penn's] rights under the bonds, which W&T denies, the agents of such change are the Sureties—not W&T—and the change was one collectively fabricated by the Sureties.")

Similar contradictions are peppered throughout W&T's briefing. For example:

| **W&T's Original Complaint, Dkt. 1, ¶ 63** | **W&T's Amended Complaint, Dkt. 36, ¶ 89** |
|---|---|
| The only material change regarding the bonds involves not W&T, but the regulatory environment established by the United States Department of Interior. | The only material change regarding the bonds involves not W&T, but the Sureties' agreements and strategy of collusion. |

On October 1, 2024, Penn requested to be released from its bonds pursuant to Paragraph 12 of its Indemnity Agreement. If W&T failed or refused to obtain replacement bonds, Penn

demanded that W&T post $11,343,949.00 in collateral, representing the unreleased liability under the Bonds. [Case No. 4:24-cv-04400, Dkt. 1, ¶ 24]. Similarly, on October 14, 2024, US Fire demanded that W&T obtain releases for its open bonded liability, or provide US Fire with "a clean Letter of Credit" or "cash collateral equal to the penal sum of all then outstanding bonds." If W&T failed or refused, US Fire demanded that W&T deposit $89,501,222.00 in cash as collateral. US Fire later increased its demand to $93,665,179 based on releases requested on four additional bonds. [Case No. 4:24-cv-04395, Dkt. 5, ¶¶ 19-20].

On November 7, 2024, W&T filed its Quarterly Report, detailing not only the Sompo lawsuit, but the October 21, 2024, lawsuit filed by U.S. Specialty Insurance Company. With respect to the various collateral demands it had received to date, W&T provided as follows:

> . . . the Sompo Sureties have issued written demands to the Company requesting the Company provide certain collateral to the Sompo Sureties, **which are inconsistent with the requests of other surety entities who are not party to the Complaint**.

W&T Offshore, Inc., Quarterly Report (Form 10-Q) (November 7, 2024), https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.htm (emphasis added) (hereinafter, the "November 2024 10-Q").

Again W&T noted the apparent conflict between the various' sureties' conflicting demands:

> In each of the above cases, [W&T] believes that compliance with the collateral demands of the applicable surety entity would be contrary to the demands of other entities that provide government-required surety bonds to [W&T].

*Id*.

While noting the conflicting demands, W&T recognized that they cannot be viewed in a vacuum, that compliance with one demand may alter its liquidity analysis from other sureties: In addition, W&T believes compliance with these collateral demands could prompt escalating

collateral requirements. *Id.*

While in its Amended Complaint W&T alleges that the market is unlawfully controlled by the surety defendants, in its November 2024 10-Q W&T notified regulators that other options exist in the marketplace:

> As a result of the foregoing litigation, [W&T] may be required to provide the collateral demanded by the surety entities, or . . . **[W&T may] choose to replace the surety bonds provided by the applicable surety with surety bonds from different surety entities**.

*Id.* (emphasis added).

Despite receipt of the sureties' demands for replacement bonds and/or collateral at the time of its report, W&T concluded this section not by alarming its investors of a conspiracy, but by assuring them of its plan to work through the competing, conflicting collateral demands:

> The Company is seeking to negotiate a reasonable resolution with respect to collateral provision [sic] amongst the surety entities and other surety entities with conflicting or different collateral requests.

*Id.*

## III.    <u>STANDARD OF REVIEW</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint and is appropriate when a plaintiff fails to state a legally cognizable claim. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). To survive dismissal, a complaint must plead sufficient facts to establish a "plausible" claim for relief, rather than one based on speculation or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Supreme Court has made clear that labels, conclusions, and formulaic recitations of legal elements are insufficient. *Iqbal*, 556 U.S. at 678. A complaint must contain more than threadbare recitals of a cause of action, supported only by conclusory statements. *Id.* at 679.

While legal conclusions may frame a complaint, they must be supported by well-pled factual allegations to be given any weight. If the allegations fail to meet this threshold, dismissal is warranted.

## IV.    ARGUMENTS AND AUTHORITIES[1]

### A.    W&T's Antitrust Claims Should be Dismissed in their Entirety

W&T's claims under Section 1 of the Sherman Act fail as a matter of law and should be dismissed for multiple independent reasons, each of which is sufficient to warrant dismissal.

First, W&T lacks standing to bring an antitrust claim because its alleged injury is purely speculative and stems from private contractual disputes rather than harm to competition. Antitrust laws are designed to protect market-wide competition, not individual businesses from unfavorable contractual outcomes.

Second, W&T has not alleged antitrust injury. To state a claim, W&T must demonstrate harm to the competitive process, not just its own financial position. Yet, W&T's allegations focus solely on its own difficulties in obtaining surety bonds and fail to identify any market-wide impact, such as reduced competition, increased prices, or exclusion of competitors.

Third, W&T does not allege an agreement among the Sureties. A fundamental requirement of a Section 1 claim is concerted action—a "meeting of the minds" or a "conscious commitment to a common scheme." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015). W&T offers neither direct nor circumstantial evidence of collusion and instead relies on conclusory assertions that certain Sureties acted similarly in response to market conditions. Parallel conduct, without more, does not violate antitrust law. *Twombly*, 550 U.S. at 557.

---

[1] For purposes of judicial economy, US Fire and Penn hereby concur with and adopt the arguments and authorities set forth in Sompo's Partial Motion to Dismiss [Dkt. 57].

Fourth, W&T fails to define a relevant market or establish market power. To state a valid antitrust claim, W&T must allege a clearly defined market and show that the Sureties possess sufficient control over it to restrain competition. Instead, W&T vaguely references the "surety bond market for offshore oil and gas producers" without providing any meaningful details about market participants, concentration, or competitive dynamics. Courts routinely dismiss claims where plaintiffs fail to define a relevant market with specificity. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

Finally, W&T's price-fixing theory is unsupported and implausible. It fails to specify what, if anything, was actually "fixed," how that led to reduced competition, or why any coordinated action would have been in the Sureties' self-interest. Price-fixing requires an agreement to artificially raise, lower, or stabilize prices, yet W&T does not allege any specific pricing coordination, common pricing formula, or agreement among the Sureties. Mere similarity in pricing or business decisions—particularly when dictated by individual risk assessments—is not enough to state a claim. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940).

Each of these deficiencies is independently fatal to W&T's claims. If the Court agrees with the Sureties on any one of these points, dismissal is proper.

## 1. W&T Lacks Standing

W&T cannot establish antitrust standing because its alleged harm arises not from anticompetitive conduct, but from contractual obligations it voluntarily assumed. To bring an antitrust claim, a plaintiff must show (1) a concrete and particularized injury, (2) a direct causal link to the alleged anticompetitive conduct, and (3) harm to market-wide competition, not just itself. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Here, W&T fails all three prongs. It has not suffered an actual injury beyond speculative harm arising from collateral demands it has neither paid nor suffered damages from. In fact, its

own prior pleadings and public filings confirm that it always knew collateral demands could be made.

W&T's claim is also fundamentally a contract dispute, not an antitrust claim. The Sureties' collateral demands were lawful exercises of their contractual rights under indemnity agreements W&T freely entered into. The Supreme Court has made clear that enforcing a contractual obligation is not an antitrust violation. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998). Even if W&T now disagrees with the Sureties' interpretation of the agreements, such disputes belong in contract law—not antitrust law. *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979).

Further, W&T's own statements contradict any claim that it has suffered exclusion from the market. In its November 2024 10-Q, W&T admitted that it still has the ability to replace its surety bonds with bonds from other providers, stating:

> As a result of the foregoing litigation, [W&T] may be required to provide the collateral demanded by the surety entities, or . . . [W&T may] choose to replace the surety bonds provided by the applicable surety with surety bonds from different surety entities.

*See* November 2024 10-Q.

This admission eliminates any argument that W&T was foreclosed from the market or unable to obtain surety bonds. If W&T can still secure bonds from alternative providers, there is no basis for standing.[2]

### 2.    W&T Fails to Allege Antitrust Injury

Even if W&T could establish standing, its claims fail because it has not alleged antitrust

---

[2] W&T's assertion that the Sureties' contractual right to demand collateral renders the agreements illusory ignores the fact that W&T was never required to obtain surety bonds in the first place. BOEM regulations expressly allow for other forms of financial assurance, including Treasury securities, letters of credit, and third-party guarantees. *See* 30 C.F.R. § 585.525. W&T could have pursued these alternatives but instead voluntarily entered into surety arrangements that required indemnification and potential collateralization. Having made this choice, it cannot now claim that enforcement of those contractual rights is unfair or anticompetitive.

injury, which requires harm to the competitive process itself—not just harm to an individual market participant. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990). Courts have consistently held that a financial burden on a single company does not equate to antitrust injury unless it results from conduct that harms competition market-wide. *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014).

W&T's allegations focus entirely on its own financial difficulties in potentially obtaining future surety bonds, and the Amended Complaint does not identify any competitive harm in the broader market. It does not allege that market-wide prices have increased, that competitors have been excluded, or that supply has been artificially constrained. Instead, it argues that the Sureties' collateral demands were unfair to W&T, which is legally insufficient. *Brunswick Corp.*, 429 U.S. at 488-89.

W&T's own SEC filings further undermine its claims. In its 2023 Annual Report, W&T acknowledges that its ability to secure surety bonds depends on financial strength, not collusion among sureties:

> Companies with larger financial resources may have a significant advantage in meeting any potential new bonding requirements. If we are unable to compete successfully in these areas in the future, our future revenues and growth may be diminished or restricted.

*See* 2023 Annual Report, p. 33.

This statement confirms that financial capability—not any alleged anticompetitive conduct—dictates access to surety bonds. Courts have consistently rejected antitrust claims where the plaintiff's alleged harm is based on financial constraints rather than actual exclusion from the market.

Further, W&T does not allege any traditional indicators of competitive harm, such as reduced output, increased prices, or a decline in the number of market participants. Instead, its

allegations rest on conclusory assertions that the Sureties engaged in a "collective boycott." However, courts have rejected similar claims where the plaintiff fails to show how the alleged conduct resulted in a competitive injury rather than an individual business dispute. *Twombly*, 550 U.S. at 556-57.

Without allegations of harm to competition itself, W&T cannot establish antitrust injury, and its claims must be dismissed.

Therefore, even if W&T could establish standing, its claims still fail because it has not alleged antitrust injury. Its allegations focus solely on its own financial condition rather than harm to competition, and its own SEC filings confirm that alternative bonding options remain available. Because W&T has not pled facts showing harm to competition rather than to itself, its claims should be dismissed.

### 3.    W&T Fails to Allege an Agreement

W&T's claim under Section 1 of the Sherman Act is fundamentally deficient because it fails to establish the core requirement of an anticompetitive agreement among the Sureties. Liability under Section 1 does not attach to independent business decisions or mere parallel conduct—a plaintiff must plausibly allege a "meeting of the minds" or a "common design and understanding." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015). Instead of alleging facts demonstrating a conspiracy, W&T offers speculation and conclusory statements, falling well short of the pleading standard established in *Twombly*.

The weakness of W&T's claim is again underscored by its own prior admissions. In its Original Complaint, W&T explicitly acknowledged that the Sureties were not acting in concert, stating that "any agreement regarding alternative collateral will depend on W&T not providing cash or a letter of credit to any other surety." Original Complaint, Dkt. 1, ¶ 61. Similarly, W&T previously asserted that the Sureties' collateral demands were based on a change in the

regulatory environment and shifting business models—not collusion. These admissions directly contradict the conspiracy theory advanced in W&T's Amended Complaint and reinforce the conclusion that each surety acted unilaterally based on its own assessment of risk.

### a.    No Direct Evidence of an Agreement

W&T's Amended Complaint does not allege a single instance of direct evidence—no communication, no document, no recorded discussion—showing that the Sureties actually coordinated their collateral demands. Courts have made clear that direct evidence of an antitrust conspiracy must explicitly refer to an understanding between the alleged conspirators and must not require additional inferences. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002).

Instead of presenting direct evidence, W&T misconstrues ordinary business interactions and industry events as evidence of collusion. It claims, for instance, that some surety representatives attended a trade association event where they allegedly discussed the potential for regulatory changes under the Trump administration. Amended Complaint, Dkt. 36, ¶¶ 116-17. However, there is no allegation that these discussions resulted in an agreement. Nor could there be, since the referenced regulatory changes had no bearing on the Sureties' contractual right to demand collateral under the indemnity agreements that W&T had already signed. The mere fact that industry participants discuss market conditions does not transform lawful conduct into a conspiracy. *In Re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2025).

### b.    No Circumstantial Evidence of Collusion

Because W&T has no direct evidence, it must rely on circumstantial evidence to infer an agreement. However, to do so, it must establish both parallel conduct among the Sureties and the

presence of "plus factors" that indicate collusion rather than independent decision-making. *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016). W&T fails on both fronts.

First, mere similarity in business decisions does not imply collusion unless there is no independent economic rationale for the conduct. *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022). W&T alleges that the Sureties made collateral demands in close succession, but it ignores the most obvious explanation: each surety independently evaluated W&T's financial condition and determined its own exposure to risk. The predictable consequence of W&T initiating litigation against Sompo was that other sureties would take steps to secure their own financial positions. This was not a coordinated effort but a rational response to W&T's decision to challenge a surety's contractual rights in court.

This situation is no different from a run on a bank. If a bank publicly disputes a customer's right to withdraw funds, other depositors will naturally take notice and rush to withdraw their own money—not because they have conspired with one another, but because each is acting in its own rational self-interest to protect its assets. Likewise, once W&T publicly challenged Sompo's right to demand collateral, the other Sureties had a clear incentive to act immediately and independently to secure their own financial positions before facing similar risks. That kind of predictable, risk-based decision-making is not collusion—it is basic financial prudence.

Even if W&T could establish parallel conduct, it must also demonstrate "plus factors" that differentiate independent business decisions from a coordinated conspiracy. Courts have identified several such plus factors, including whether the alleged conduct was contrary to the defendants' independent self-interest, whether there was a motive to conspire, whether there

were opportunities to conspire, or whether the explanations provided for the conduct were pretextual. *JSW Steel*, 586 F. Supp. 3d at 596. W&T establishes none.

The most critical plus factor—whether the Sureties' conduct was against their own self-interest absent an agreement—strongly refutes W&T's claims. The Sureties had every economic incentive to demand collateral based on W&T's deteriorating financial condition. Their indemnity agreements explicitly allowed them to demand collateral at any time, and adjusting their financial risk exposure in response to market conditions is a lawful and rational business practice. *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 597 (E.D. La. 2007).

Moreover, W&T's assertion that the Sureties had a motive to conspire is economically irrational. If W&T were forced into financial distress, the Sureties themselves would be left exposed on hundreds of millions of dollars in bonded obligations. Sureties do not profit from driving their principals into insolvency; their business model relies on ensuring that the bonded entity remains financially stable enough to fulfill its obligations. W&T's claim that the Sureties sought to impose "impossible collateral payments" that would "cripple" it is both economically illogical and unsupported by any factual allegations.

Nor does W&T establish that the Sureties had an opportunity to conspire. It points to trade association meetings, but courts have long held that mere participation in industry groups is not evidence of an agreement. *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019). W&T offers no factual allegations about who attended these meetings, what was said, or what was allegedly agreed upon. A coincidence is not a conspiracy, and speculative claims based on industry gatherings are insufficient to sustain an antitrust violation.

At its core, W&T's Section 1 claim is built on speculation rather than factual allegations of an agreement. There is no direct evidence of collusion, no meaningful parallel conduct, and no

plus factors supporting an inference of conspiracy. Its own allegations and prior admissions contradict its claim, and its attempt to assert a price-fixing theory falls apart upon scrutiny.

Because W&T has failed to plead concerted action or a plausible conspiracy, its Section 1 claim must be dismissed.

### 4.    W&T Fails to Properly Define the Relevant Market

Fourth, W&T's antitrust claims are legally deficient because they fail to adequately define the relevant market**,** a fundamental requirement for assessing competitive harm under both the Sherman Act and the Texas Free Enterprise and Antitrust Act (TFEAA). Courts consistently hold that a plaintiff's failure to plead a specific and plausible market definition is fatal to its antitrust claims. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

Rather than offering a well-defined market with identifiable boundaries, W&T vaguely refers to the "surety bond market for offshore oil and gas producers" without providing essential details such as geographic scope, competitive dynamics, or the identities of market participants. A properly defined market must establish where competition occurs and who competes within it. W&T's failure to do so leaves the Court without a basis to assess whether competition has actually been harmed.

Even assuming W&T's alleged market is the proper one, the surety defendants collectively control only approximately 8% of it.[3] This percentage is far too low to plausibly suggest market power or the ability to restrain trade. Courts routinely dismiss claims where

---

[3] *See* Quarterly Countrywide Surety Top 100 Writers https://surety.org/wp-content/uploads/2023/06/Top-100-Quarterly-Results-Surety-Website-Final.pdf. (last publicly available report as of March 31, 2023). The Court may take judicial notice of the Surety & Fidelity Association of America (SFAA) Top 100 Surety Market Rankings Report as it is publicly available on the SFAA's website and relied upon by regulators, industry participants, and government agencies to assess market share and industry competition. *See* FED. R. EVID. 201(b)(2) (judicial notice appropriate for facts "accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Additionally, the U.S. Department of the Treasury publishes a list of approved sureties authorized to issue bonds on behalf of the U.S. Government, further demonstrating the broad and competitive nature of the surety market. *See* U.S. Dep't of the Treasury, Circular 570 (July 1, 2024), available at http://www.fiscal.treasury.gov/surety-bonds/circular-570.html.

defendants lack sufficient control over the alleged market to meaningfully impact competition. *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). Without market power, there can be no antitrust violation, as defendants must have the ability to raise prices, reduce output, or otherwise distort competition.

W&T's own admissions further undermine its claim that the Sureties have market power. In its public filings, W&T acknowledges that it can obtain replacement bonds from other sureties. This availability of alternative providers directly contradicts any assertion that the surety defendants foreclosed competition or blocked W&T from participating in the market. The presence of viable substitutes is a crucial factor in determining whether a defendant's conduct harmed competition, and here, W&T itself concedes that alternatives exist. *SKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010).

Beyond failing to define the market or establish market power, W&T's Amended Complaint again lacks any allegations of classic anticompetitive effects such as barriers to entry, reduced output, or higher prices. Instead, W&T focuses exclusively on its own alleged harm, rather than harm to the competitive process. The Sherman Act does not protect individual businesses from economic difficulties—it protects the broader structure of competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). W&T does not allege that surety bond prices have increased market-wide, that competitors have been driven out, or that supply has been artificially constrained. Without such allegations, its claim cannot proceed.

Because W&T has failed to define the relevant market with specificity and has not demonstrated that the Sureties possess market power or caused competitive harm, its antitrust claims cannot survive. This Court should dismiss W&T's antitrust claims with prejudice.

### 5.    W&T's Price-Fixing Theory is Unfounded

W&T attempts to assert a price-fixing claim under Section 1 but fails to allege that the

Sureties actually fixed the price of anything. Under well-established law, price-fixing occurs when competitors agree to set a price, a pricing formula, or a price range. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940). Here, W&T does not allege that the Sureties agreed to fix premiums, collateral levels, or any other pricing term. Instead, it concedes that each surety demanded unique collateral payments based upon the terms of their unique, separate preexisting contracts, contradicting any claim of a coordinated pricing scheme.

More fundamentally, a collateral demand is not a "price" that can be "fixed" under antitrust law. The Sureties did not create a new charge, fee, or price adjustment in response to market conditions; rather, W&T was contractually required to post collateral to match any undischarged liability under its indemnity agreements. That obligation was neither negotiable nor a new financial demand—it existed from the moment W&T executed its indemnity agreements. The Sureties' decisions to enforce these obligations at different times within the confines of their indemnity agreements reflect individual risk assessments, not collusion.

Further, W&T alleges that the Sureties insisted on "commercially unreasonable terms" in an attempt to change contractual rights, but courts have repeatedly held that a claimed breach of contract—without harm to competition—does not give rise to antitrust liability. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992). Even assuming W&T disagrees with the Sureties' interpretation of their contractual rights, contract disputes belong in contract law, not in antitrust litigation.

## B.    W&T Fails to State a Claim for Declaratory Judgment

W&T's claim for declaratory judgment is legally improper and should be dismissed under Rule 12(b)(6) because it does not present an independent cause of action. Rather than seeking a legitimate determination of rights, W&T's claim is a procedural maneuver to

preemptively litigate defenses against the Sureties' enforcement of their contractual rights—rights that are already at issue in this consolidated action. Courts routinely reject such attempts to use declaratory judgment as a defensive tool disguised as an affirmative claim. *Burlington Ins. Co. v. Ranger Specialized Glass, Inc.*, No. 4:12-cv-1759, 2012 WL 6569774, at 2 (S.D. Tex. Dec. 17, 2012) ("If a request for a declaratory judgment adds nothing to an existing lawsuit, it need not be permitted.").

### 1.    Declaratory Judgment Cannot Be Used as a Defense Disguised as a Cause of Action

The Declaratory Judgment Act (28 USC. § 2201) does not create an independent right of action but instead provides a procedural mechanism for clarifying legal rights where an actual, unresolved controversy exists. The Supreme Court has held that declaratory judgment claims that merely anticipate and seek to undermine a defendant's expected claims are improper. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Courts consistently dismiss declaratory judgment actions when they serve no legitimate purpose other than adjudicating defenses that could be raised in an ongoing lawsuit. *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (dismissing declaratory judgment action that sought to determine issues already presented in related litigation).

Here, W&T does not assert a claim that requires judicial resolution. Instead, it seeks a declaration invalidating the Sureties' collateral demands and enforcement rights—issues that are already at the center of the Sureties' own claims in this litigation. W&T's claim does not introduce any new substantive legal question but instead mirrors its anticipated defenses to the Sureties' contractual enforcement actions. Courts have routinely dismissed such redundant declaratory judgment claims as procedurally improper. *Great Am. Ins. Co. v. Goin*, No. 3:15-CV-75-L, 2017 WL 4238698, at *4 (N.D. Tex. Sept. 25, 2017) (rejecting declaratory judgment action

that was duplicative of pending claims); *Texas v. West Publ'g Co.*, 882 F.2d 171, 175 (5th Cir. 1989) (declining jurisdiction over declaratory claim that was merely an affirmative defense in disguise).

### 2. W&T's Claim Fails to Present a Justiciable Controversy

A valid declaratory judgment claim must present an actual, immediate, and concrete legal dispute that requires judicial intervention. Hypothetical or anticipatory claims do not qualify. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Courts dismiss declaratory judgment actions where the alleged dispute is not independent but instead merely anticipates issues in an ongoing case. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

W&T's declaratory judgment claim fails this test because it is not based on an independent legal controversy but is entirely reactive to the Sureties' enforcement of contractual obligations. Rather than presenting a distinct legal issue, the claim arises solely in response to the Sureties' efforts to exercise their contractual rights. This Court, like others before it, should dismiss such redundant declaratory relief claims. *Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2007 WL 1791252, at *3 (N.D. Tex. June 21, 2007) (rejecting declaratory judgment claim where issues were already central to existing litigation); *Landscape Design & Constr., Inc. v. Transport Leasing/Contract, Inc.*, No. 3:00-CV-0906-D, 2002 WL 257573, at *10 (N.D. Tex. Feb. 19, 2002) (declining declaratory judgment jurisdiction where the claim merely restated defenses in an active lawsuit).

### 3. The Court Should Decline Jurisdiction Over W&T's Declaratory Judgment Claim

Even if W&T's claim was legally viable (which it is not), this Court should exercise its discretion to decline jurisdiction under the Declaratory Judgment Act. Federal courts are not required to entertain declaratory judgment actions and may decline jurisdiction where doing so

serves no useful purpose. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995); *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).

When a declaratory judgment claim is duplicative of other pending claims, courts routinely dismiss it to prevent unnecessary litigation. *Xtria LLC v. Tracking Sys., Inc.*, 2007 WL 1791252, at *3. In this case, allowing W&T's claim to proceed would add no value because it seeks nothing more than a ruling negating the Sureties' contractual rights—an issue already before the Court. Rather than clarifying legal relations, W&T's declaratory judgment claim complicates litigation and wastes judicial resources.

W&T's claim for declaratory judgment is not a proper cause of action but an attempt to litigate a defense in disguise. The claim fails to present a standalone legal dispute, merely duplicates issues already being adjudicated, and does not serve any useful purpose.

Because W&T's declaratory judgment claim is legally deficient, procedurally improper, and warrants discretionary dismissal, the Court should dismiss Count One of W&T's Amended Complaint with prejudice.

## C.    W&T's Claims under the Texas Insurance Code Should Also Be Dismissed

W&T's claim under Chapter 541 of the Texas Insurance Code fails for multiple reasons, each independently warranting dismissal. First, sureties are not "engaged in the business of insurance" and are therefore not subject to liability under Chapter 541. Second, the Sureties did not issue insurance policies to W&T, and the conduct W&T challenges does not fall within the scope of Chapter 541's prohibitions.

### 1.    Suretyship Is Not Insurance–Chapter 541 Does Not Apply to Sureties

Texas law is clear: sureties are not engaged in the business of insurance within the purview of a Chapter 541 claim. The United States Supreme Court has long recognized this distinction, holding that "suretyship is not insurance." *Pearlman v. Reliance Ins. Co.*, 371 U.S.

132, 140 n.19 (1962). Texas courts, including the Texas Supreme Court and the Fifth Circuit, have repeatedly reaffirmed this principle, emphasizing the fundamental differences between insurance and suretyship. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418 (Tex. 1995).

Under Texas law, Chapter 541 applies only to entities "engaged in the business of insurance." TEX. INS. CODE §§ 541.002(2), 541.151. Several courts have confirmed that sureties do not fall within this category. In *Tacon Mech. Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir. 1995), the Fifth Circuit held that Chapter 541 claims against sureties are "not available under Texas law." The Texas Supreme Court has reached the same conclusion, stating unequivocally that Texas law "leaves no room for applying [Chapter 541] to the surety business." *Dallas Fire Ins. Co. v. Tex. Contractors Sur. & Cas. Agency*, 159 S.W.3d 895, 897 (Tex. 2004).

W&T's own pleadings concede that the Sureties are sureties rather than insurers. Amended Complaint, Dkt. 36, ¶ 47. That fact alone is fatal to W&T's claim. Texas courts have uniformly held that sureties are not subject to liability under Chapter 541, and W&T offers no legal basis for departing from that well-established precedent.

### 2. W&T's Reliance on Chapter 101 Is Misplaced

In an attempt to bypass Texas law, W&T cites Chapter 101 of the Texas Insurance Code and its definition of the "business of insurance" to argue that Chapter 541 applies to surety contracts. This argument is legally flawed. Chapter 101 is a jurisdictional statute designed to establish Texas regulatory authority over certain insurers and entities, particularly for taxation and compliance purposes. It does not expand the scope of Chapter 541's private cause of action. TEX. INS. CODE § 101.001(c); *Combs v. STP Nuclear Operating Co.*, 239 S.W.3d 264, 270 (Tex. App.—Austin 2007, pet. denied).

The Texas Supreme Court has expressly rejected the application of Chapter 101's definition to Chapter 541 claims. In *Great Am. Ins. Co.*, the court stated: "The express inclusion …. of suretyship as the 'business of insurance' in other sections of the Code is not determinative of the scope of [Chapter 541]." 908 S.W.2d at 424.

This precedent forecloses W&T's argument. The mere fact that suretyship is referenced elsewhere in the Insurance Code for regulatory purposes does not mean that it falls within Chapter 541's private right of action. Because W&T's invocation of Chapter 101 fails to establish a legal basis for its claim, its Chapter 541 claim should be dismissed.

### 3. W&T's Chapter 541 Claim Fails Because the Sureties Did Not Issue Insurance Policies

Even if W&T could somehow overcome the fundamental distinction between suretyship and insurance (which it cannot), its Chapter 541 claim fails for the independent reason that the Sureties never issued an insurance policy to W&T. Chapter 541 applies only to misrepresentations regarding the terms and benefits of an insurance policy. TEX. INS. CODE § 541.051(1). W&T, however, does not allege that it ever held any insurance policies with the Sureties.

Because Chapter 541 applies only to the misrepresentation of insurance policy terms, and W&T does not (and cannot) allege that the Sureties issued any such policy, its Chapter 541 claim is legally deficient and should be dismissed with prejudice.

### D. W&T Fails to Allege a Claim for Tortious Interference

W&T's tortious interference claims fail as a matter of law because they rely entirely on W&T's defective antitrust allegations.[4] Courts have made clear that when a plaintiff's state law

---

[4] In the interest of judicial economy, the Sureties' hereby incorporate the arguments and authorities of Sompo's Partial Motion to Dismiss W&T's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Dkt. 57] in Part VI, C, pp. 22-24.

claims are tied to unsubstantiated antitrust claims, those claims "rise and fall together." *JSW Steel*, 586 F. Supp. 3d at 601. Since W&T's antitrust claims are legally insufficient, its tortious interference claims necessarily fail as well. Even setting aside W&T's reliance on its deficient antitrust claims, the Amended Complaint does not plead the elements required to establish tortious interference with either existing contracts nor a prospective business relationships.

W&T fails to identify a single contract with which the Sureties allegedly interfered. To the extent W&T argues that the Indemnity Agreement is the contract, Texas law is clear that a tortious interference claim can only be brought against a third party, not a contracting party. *ProTradeNet, LLC v. Predictive Profiles, Inc.*, 369 F. Supp. 3d 788, 791 (W.D. Tex. 2019) (holding that a defendant "must be a stranger to a contract to tortiously interfere with it").

With regard to prospective business relationships, W&T's own statements contradict the foundation of this claim. In its November 2024 10-Q, W&T admitted that, despite its disputes with the Sureties, it still had the ability to replace its surety bonds with bonds from other providers. Specifically, W&T informed investors:

> As a result of the foregoing litigation, [W&T] may be required to provide the collateral demanded by the surety entities, or . . . [W&T may] choose to replace the surety bonds provided by the applicable surety with surety bonds from different surety entities.

*See* November 2024 10-Q.

This admission directly contradicts W&T's allegation that the Sureties interfered with its prospective business relationships. If W&T can secure replacement surety bonds elsewhere, it has not lost any business relationships as a result of the Sureties' alleged conduct.

Even if W&T could point to specific contracts, the Amended Complaint fails to allege any specific actions the Sureties took to interfere with those agreements. Further, because W&T admits that it can still obtain replacement surety bonds elsewhere, it has not suffered any harm to

its prospective business relationships. Without an actual loss or a plausible allegation of the

Sureties' intent to interfere, this tortious interference claim must be dismissed.

**E.    W&T Does Not Plausibly Allege Civil Conspiracy Among the "Disparate Sureties" and their "Conflicting" Demands**

W&T's civil conspiracy claim is legally defective because it is entirely derivative of its

other claims—all of which fail. Under Texas law, civil conspiracy is not a standalone cause of

action. Instead, it depends on the existence of an underlying unlawful act. *Meadows v. Hartford*

*Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) ("If a plaintiff fails to state a separate underlying

claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails.").

Since W&T has failed to plead any valid underlying claim, its civil conspiracy claim necessarily

fails as well.

Even setting aside its derivative nature, W&T's conspiracy claim is inadequately pled. To

establish civil conspiracy, a plaintiff must show (1) two or more persons, (2) a common objective

to be accomplished, (3) a meeting of the minds regarding that objective, (4) one or more

unlawful, overt acts in furtherance of the conspiracy, and (5) resulting damages. *In re Enron*

*Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 809 (S.D. Tex. 2009).

W&T's claim fails because it does not plausibly allege a "meeting of the minds." Texas

law requires more than vague assertions of coordinated action; it demands "a preconceived plan

and unity of design and purpose," meaning the defendants must have agreed either to pursue an

unlawful objective or to achieve a lawful objective through unlawful means. *In re Enron Corp.*

*Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d at 809.

W&T does not allege when, where, or how the Sureties reached any agreement. Courts

have repeatedly dismissed conspiracy claims where the plaintiff fails to specify how the

defendants came to work together or what the nature of their agreement was. *Robinson v. Castle*,

H-11-649, 2011 WL 3813292, at *10 (S.D. Tex. 2011).

W&T's Amended Complaint offers nothing more than vague and conclusory allegations that the Sureties "associated together through a meeting of their minds and for a common purpose of engaging in a course of conduct." Amended Complaint, Dkt. 36, ¶ 174. However, it provides no factual support regarding any actual agreement.

Each alleged conspiratorial act—such as demanding collateral payments—aligns entirely with unilateral business decisions that reflect the Sureties' independent assessments of financial risk. W&T's failure to plead any specific details of a coordinated agreement is fatal to its claim. Because the Amended Complaint does not establish either an underlying unlawful act or a meeting of the minds, W&T's civil conspiracy claim must be dismissed.

## F.      W&T Should Not be Rewarded for their Attempts to Avoid their Contractual Obligations

W&T's claims are unsupported, legally deficient, and transparently aimed at delaying the Sureties' enforcement of their clear contractual rights. By asserting baseless claims, W&T seeks to prolong these proceedings, stall its contractual obligations, and frustrate the Sureties' right to collateral. But delay is not a defense, and speculation is not a substitute for plausible allegations.

This Court should not allow W&T to use litigation as a tool to evade its indemnity obligations and continue harming the Sureties through unnecessary reputational and financial costs. The Sureties are entitled to the collateral they bargained for, and this litigation should not be weaponized to avoid those obligations. Even if the Court declines to dismiss all of W&T's claims, that should not alter the Sureties' contractual entitlement to collateral. Any claims W&T wishes to pursue would be fully protected by an injunction bond, ensuring that W&T's interests are protected without depriving the Sureties of their bargained-for rights in the interim.

## V.    PRAYER

WHEREFORE PREMISES CONSIDERED, UNITED STATES FIRE INSURANCE COMPANY and PENNSYLVANIA INSURANCE COMPANY hereby jointly request that the Court set this Motion for hearing and, after the hearing, grant the Motion and dismiss claims asserted by W&T in this matter against US Fire and Penn with prejudice and further requests such other and further relief, both at law and equity, to which US Fire and Penn may show itself to be justly entitled.

RESPECTFULLY SUBMITTED this 12th day of February, 2025.

/s/ Ryan D. Dry
_____

Ryan D. Dry
Texas Bar No. 24050532
S.D. Tex. Bar No. 618363
Steven K. Cannon
Texas Bar No. 24086997
S.D. Tex Bar No. 3356957
**DRY LAW, PLLC**
909 18th Street
Plano, TX 75074
(972) 797-9510 Tele/Fax
rdry@drylaw.com
scannon@drylaw.com

**ATTORNEYS FOR UNITED STATES FIRE INSURANCE COMPANY and PENNSYLVANIA INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that, on February 12, 2025 a true and correct copy of the foregoing document was filed and served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas on those parties registered to receive electronic notice.

/s/ Ryan D. Dry
_____

Ryan D. Dry