**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| W&T OFFSHORE, INC., AND<br>W&T ENERGY VI, LLC, | |
| Plaintiffs, | |
| v. | Civil Action No. 4:24-CV-03047 |
| ENDURANCE ASSURANCE CORPORATION,<br>AND LEXON INSURANCE CO. | |
| Defendants. | |

---

| | |
|---|---|
| U.S. SPECIALTY INSURANCE<br>COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 4:24-CV-04113 |
| W&T OFFSHORE, INC., AND<br>W&T ENERGY VI, LLC, | |
| Defendants. | |

---

| | |
|---|---|
| UNITED STATES FIRE INSURANCE<br>COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 4:24-CV-04395 |
| W&T OFFSHORE, INC., AND<br>W&T ENERGY VI, LLC, | |
| Defendants. | |

---

| | |
|---|---|
| UNITED STATES PENNSYLVANIA INSURANCE<br>COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 4:24-CV-04400 |
| W&T OFFSHORE, INC., | |
| Defendant. | |

---

**PLAINTIFFS' RESPONSE TO UNITED STATES PENN INSURANCE COMPANY
AND UNITED STATES FIRE INSURANCE COMPANY'S MOTION TO DISMISS**

Plaintiffs W&T Offshore, Inc. ("W&T Offshore") and W&T Energy VI, LLC ("W&T Energy") (collectively, "W&T") file this Response to United States Pennsylvania Insurance Company's ("Penn Insurance") and United States Fire Insurance Company's ("Fire Insurance") (collectively, "Defendants") Joint Motion to Dismiss ("Response"). W&T respectfully requests that this Court deny Penn and Fire Insurance's Motion to Dismiss ("Motion") (Dkt. 63).

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

SUMMARY OF THE ARGUMENT ..................................................................... 3

STANDARD OF REVIEW .................................................................................... 4

ARGUMENT AND AUTHORITIES ..................................................................... 5

I.   W&T Has Sufficiently Pleaded Its Antitrust Claims ...................................... 5

  A.   Defendants' Motion Improperly Conflates the Standards Governing When There is an Antitrust Violation and Who Has Antitrust Standing Despite the Fifth Circuit's Guidance Distinguishing the Two ...................................... 5

  B.   As a Victim Injured by Per Se Unlawful Anticompetitive Conduct, W&T Has Standing to Bring Its Antitrust Claims ...................................... 6

    1.   W&T Has Suffered Actual and Threatened Injury-in-Fact .................................... 6

    2.   W&T's Actual and Threatened Injuries Are the Type That the Antitrust Laws Are Intended to Prevent ...................................... 8

  C.   W&T Has Plausibly Alleged Concerted Action ............................................. 9

    1.   W&T Has Alleged Direct Evidence of Concerted Action Among Sureties to Collectively Demand Increased Prices and More Onerous Financial Terms from Offshore Oil and Gas Companies Like W&T ...................................... 10

    2.   Alternatively, W&T Has Also Alleged Sufficient Circumstantial Evidence of Concerted Action ...................................... 13

      a.   Demands for Collateral and Price Increases Would Be Against Defendants' Self-Interest Acting Independently ...................................... 15

      b.   Defendants' Common Motive ...................................... 15

      c.   Defendants' Pretextual Reasons for Their Conduct ...................................... 16

      d.   Offshore Surety Market Is Highly Concentrated with Ample Opportunities for Sellers to Collude and High Barriers to Entry to Keep New Participants Out ...................................... 17

  D.   W&T Has Properly Alleged Price Fixing, Which Is a Per Se Unreasonable Restraint of Trade ...................................... 19

    1.   W&T Is Not Required to Define a Market or Establish Market Power for a Price-Fixing Claim ...................................... 21

    2.   Even if Required, W&T Has Properly Alleged a Market ...................................... 22

II.   W&T has Properly Pled a Claim for Declaratory Judgment ...................................... 23

III.  W&T has Properly Pled a Claim for Tortious Interference ...................................... 24

IV.  W&T has Properly Pled a Civil Conspiracy Claim ...................................... 25

CONCLUSION ...................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*,
   2014 WL 12497080 (W.D. Tex. Sept. 8, 2014).........................................................13

*Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem.
   Co.*,
   2020 WL 4050243 (E.D. La. Jul. 17, 2020) ...............................................18, 19, 23

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016)...............................................................................8

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)............................................................................................5

*Am. Tobacco Co. v. United States*,
   328 U.S. 781 (1946)..........................................................................................10

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012).........................................................................14, 19

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982).....................................16

*Apani Southwest, Inc. v. Coca-Cola Enters.*,
   300 F.3d 620 (5th Cir. 2002) ............................................................................22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................4, 13

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
   441 U.S. 1 (1979).................................................................................................9

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................................5, 8

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980).......................................................................................20, 21

*In re Cathode Ray Tube (Crt) Antitrust Litig.*,
   2016 WL 5871243 (N.D. Cal. Oct. 7, 2016).......................................................19

*City of Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ...................................................................7

*Cont'l Ore Co. v. Union Carbide Corp.*,
   370 U.S. 690 (1962)...................................................................................10

*Cuvillier v. Taylor*,
   503 F.3d 397 (5th Cir. 2007) ......................................................................4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)........................................................................8

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   961 F.2d 1148 (5th Cir. 1992) ...................................................................13

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*,
   123 F.3d 301 (5th Cir. 1997) ...............................................................3, 5, 8

*FTC v. Superior Court Trial Lawyers Ass'n*,
   493 U.S. 411 (1990)...................................................................................19

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) .......................................................18

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
   343 F.3d 1000 (9th Cir. 2003) ....................................................................8

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) .....................................................................10

*Hernandez v. W. Tex. Treasures Est. Sales, L.L.C.*,
   79 F.4th 464 (5th Cir. 2023) .....................................................................25

*Hyland v. HomeServices of Am., Inc.*,
   771 F.3d 310 (6th Cir. 2014) .....................................................................18

*Indest v. Freeman Decorating, Inc.*,
   164 F.3d 258 (5th Cir. 1999) .....................................................................25

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010).......................................................................13

*Interstate Circuit, Inc. v. United States*,
   306 U.S. 208 (1939)..............................................................................10, 12

*Jebaco, Inc. v. Harrah's Operating Co.*,
   587 F.3d 314 (5th Cir. 2009) ......................................................................6

*Jeffrey v. Sw. Bell*,
   518 F.2d 1129 (5th Cir. 1975) ...................................................................................6

*JSW Steel (USA) Inc. v. Nucor Corp.*,
   586 F. Supp. 3d 585 (S.D. Tex. 2022) .....................................................................15

*Kjessler v. Zaappaaz, Inc.*,
   2019 WL 3017132 (S.D. Tex. Apr. 24, 2019) ..............................................9, 13, 18

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959).....................................................................................................3

*Lane v. Halliburton*,
   529 F.3d 548 (5th Cir. 2008) ......................................................................................4

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ......................................................................................4

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
   751 F.3d 368 (5th Cir. 2014) ...................................................................................4, 8

*MM Steel, LP v. JSW Steel (USA) Inc.*,
   806 F.3d 835 (5th Cir. 2015) ......................................................................................7

*N. Pac. Ry. v. United States*,
   356 U.S. 1 (1958).......................................................................................5, 6, 19, 21

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)...............................16

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018).............................................................................................5, 21

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993)....................................................................................13

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
   988 F. Supp. 2d 696 (E.D. La. 2013)........................................................................19

*In re Processed Egg Prods. Antitrust Litig.*,
   206 F. Supp. 3d 1033 (E.D. Pa. 2016), *aff'd*, 962 F.3d 719 (3d Cir. 2020)..............19

*Pulse Network, L.L.C. v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) ...................................................................................5, 6

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ...............................................................................13, 14

*Sugar Institute v. United States*,
   297 U.S. 553 (1936)...................................................................................................20

*United States v. All Star Indus.*,
962 F.2d 465 (5th Cir. 1992) ...................................................................9

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)....................................................................16

*United States v. Cadillac Overall Supply Co.*,
568 F.2d 1078 (5th Cir. 1978) .........................................................16, 22

*United States v. Gasoline Retailers Ass'n*,
285 F.2d 688 (7th Cir. 1961) .................................................................20

*United States v. Kemp & Assocs., Inc.*,
907 F.3d 1264 (10th Cir. 2018) .............................................................22

*United States v. Koppers Co.*,
652 F.2d 290 (2d Cir. 1981) ..................................................................19

*United States v. McKesson & Robbins, Inc.*,
351 U.S. 305 (1956)...............................................................................21

*United States v. MMR Corp.*,
907 F.2d 489 (5th Cir. 1990) .............................................................9, 10

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)...........................................................3, 16, 19, 20, 21

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)...............................................................................21

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..................................................................................1

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)........................................................................9

*Walter v. Ports Am.*,
2011 WL 5415176 (S.D. Tex. Nov. 8, 2011) ...........................................4

*Wells Fargo Bank Minnesota v. Wachovia Bank*,
2004 WL 2826773 (N.D. Tex. Dec. 9, 2004) ...................................23, 24

*WesternGeco L.L.C. v. Ion Geophysical Corp.*,
2011 WL 3608382 (S.D. Tex. Aug. 16, 2011) .........................................4

**Federal Statutes**

15 U.S.C. § 1 ...........................................................................4, 5, 6, 7, 9, 10

v

15 U.S.C. § 26 ..............................................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................4, 12, 19, 24

**Other Authorities**

ABA Model Jury Instructions in Criminal Antitrust Cases, Chapter 3.D,
    Conspiracy Explained ...........................................................................................12

## INTRODUCTION

Collusion between horizontal competitors is the "supreme evil" that antitrust laws seek to prevent. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). That is precisely what Defendants have done here—they have agreed with each other to coordinate rates and other financial terms on which they would offer surety bonds to W&T and similarly situated companies. That is price fixing.

Oil-and-gas companies that explore and develop oil-and-gas resources on federal leases on the Outer Continental Shelf are required to decommission wells at the end of their life. Most independent oil-and-gas companies like W&T are required by federal regulations to obtain surety bonds to secure these potential decommissioning obligations for wells in which they hold an interest. Dkt 36 ¶¶ 2, 30–34, 126.

But only a limited number of sureties are certified by the federal government to issue the required surety bonds. *Id*. ¶¶ 19, 35. Due to the large capital requirements and government regulations that sureties must satisfy to be federally certified, there are substantial barriers preventing new sureties from entering the market. *Id*. ¶ 128. This consolidated nature of the offshore surety market makes it more susceptible to collusion—particularly where the industry participants know each other and meet with each other regularly at industry events. The conditions were ripe—the only thing needed was a motive to collude. And when faced with declining profits over the past few years, *id.* ¶ 121, rather than compete for additional business, the Defendants chose to band together to raise their premiums and demand that their customers (including W&T) post hundreds of millions of dollars of additional collateral for already existing surety bonds. *Id*. ¶¶ 106–107, 114, 117–18, 121–22.

W&T's complaint alleges that the Defendants joined together to collectively increase prices on the offshore oil-and-gas companies who were their customers and refuse to write new

bonds for those who did not agree to increased terms. This would freeze companies like W&T out of new business opportunities.

These allegations are not speculative—they are based on specific, well-documented events. Defendants' demands to their customers began shortly after industry events where Defendants' executives all met. *Id*. ¶¶ 120–124. Shortly after Sompo demanded higher premiums and called for collateral for their existing surety bonds, other Defendants did as well. *Id*. ¶¶ 97–101 (Applied), 103 (U.S Specialty), 104–105 (U.S Fire). Not only did Defendants' demands begin shortly after they all met, they attempted to conceal the true nature of their actions by giving pretextual excuses for doing so based on a then-new federal regulation. *Id.* ¶¶ 3, 110–14. It is this same regulation that the sureties later admitted is inapplicable to the bonds they demanded their customers (like W&T) pay higher premium for and post hundreds of millions of dollars of additional collateral. *Id.* ¶¶ 115–16. In a further admission, in a presentation on November 12, 2024, representatives of Defendants Sompo and Applied admitted that they had met to discuss recent financial losses they had suffered and had agreed to pursue a "collective" strategy to stop the downward slide in their profits. *Id.* ¶ 121.

## SUMMARY OF THE ARGUMENT

Defendants' motion displays their misunderstanding of antitrust laws, both in terms of what is required to plead a *violation* and what is required to have *standing*. It is beyond dispute that an agreement between competitors regarding the price charged to a customer constitutes anticompetitive harm, and the very customer that is the target of that anticompetitive agreement has standing to bring an antitrust claim. Even a single plaintiff who has suffered an injury or threatened injury because of an unlawful anticompetitive conduct has standing—there is no requirement that W&T must sue on behalf of all similarly-situated companies, or demonstrate injury to the "market" as a whole, to have antitrust standing. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997).

W&T's First Amended Complaint sets forth substantial facts describing how a group of sureties, including Defendants, conspired to change the financial terms on which they would deal with W&T and other smaller offshore oil-and-gas companies. The sureties do not dispute that they are horizontal competitors to each other. Whether this conduct is characterized as price fixing, or a group boycott, it is per se unlawful under the antitrust laws. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) ("Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act . . . ."); *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213 (1959) (group boycott "is not to be tolerated merely because the victim is just one merchant").

Defendants' argument that their contracts allowed them to demand collateral is no defense. To put it simply—a business may respond to a market event by instituting a contractual price increase if it acts alone in its independent business judgment, but it cannot join together with a competitor and agree that each of them will institute a price increase. Yet, that is what happened here—collective action by competitors on financial terms; and it is a classic antitrust claim.

## STANDARD OF REVIEW

In assessing a Rule 12(b)(6) motion, courts must accept the complaint's factual assertions as true and draw all reasonable inferences in favor of the claimant. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 2011 WL 3608382, at *3 (S.D. Tex. Aug. 16, 2011) (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

Thus, a claimant need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Dismissal is proper only where "it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane*, 529 F.3d at 557 (citing *Twombly*, 550 U.S. 544). For that reason, this Court has recognized that "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Walter v. Ports Am.*, 2011 WL 5415176, at *3 (S.D. Tex. Nov. 8, 2011) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009)).

Antitrust claims are not subject to any heightened pleading standard; a plaintiff need only plead facts to state a plausible claim. *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.").

### ARGUMENT AND AUTHORITIES[1]

I.    **W&T Has Sufficiently Pleaded Its Antitrust Claims**

A.    **Defendants' Motion Improperly Conflates the Standards Governing When There is an Antitrust Violation and Who Has Antitrust Standing Despite the Fifth Circuit's Guidance Distinguishing the Two**

A claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires two key elements: (1) "concerted action" (2) that "unreasonably restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010). Concerted action can be unreasonable in one of two alternative ways—(1) the agreement falls within a category that courts have deemed "per se" unreasonable and therefore unlawful without further inquiry, *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958), or (2) the agreement is deemed unreasonable after a detailed factual analysis under the "rule of reason" that examines the anticompetitive effects and any procompetitive justifications, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018).

The Fifth Circuit has made clear that for purposes of analyzing standing, courts should presume that the antitrust violation has been established. *See Doctor's Hosp. of Jefferson*, 123 F.3d at 305–306 (explaining that courts should assume that an antitrust violation has occurred when analyzing standing and cautioning against dismissing "classical" antitrust cases on standing grounds). To have standing to sue for an antitrust violation, a private plaintiff must plead an injury-in-fact of the type that the antitrust laws were intended to prevent. *See Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). Defendants' motion, citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (Dkt. 63 at p. 8), however, confuses the standards governing when there is a violation under the Sherman Act and antitrust standing under

---

[1] Defendant's motion to dismiss purports to "concur with and adopt the arguments and authorities set forth in Sompo's Partial Motion to Dismiss [Dkt. 57]." (Dkt. 63 at p. 7, n.1) Because of the Court's stay, Dkt. 60, W&T's response to that motion is now due on March 31, 2025. To the extent that Defendants are permitted to incorporate arguments in that motion, W&T requests that its opposition to that motion, once filed, be incorporated by reference here as well.

the Clayton Act.  *Brunswick*'s discussion of anticompetitive harm, which Defendants refer to as "harm to market-wide competition" (*id.*), is part of the *violation*, not standing.  As noted above, the per se rule shortcuts the analysis of anticompetitive harm—it is presumed for conduct that falls within those categories like price fixing.  *N. Pac. Ry.*, 356 U.S. at 5.  In other words, "market harm" is not a standing requirement at all, it is an element of the substantive Section 1 claim under the Sherman Act.  In a horizontal price-fixing case like this one, market harm is presumed.

### B.     As a Victim Injured by Per Se Unlawful Anticompetitive Conduct, W&T Has Standing to Bring Its Antitrust Claims

#### 1.     W&T Has Suffered Actual and Threatened Injury-in-Fact

There is no doubt that a consumer who has been charged higher prices because of price fixing has been injured and that the injury flows from the antitrust violation.  W&T's injury is no different—the sureties' price-fixing conspiracy and group boycott have injured its business, its reputation, and its future viability.

A plaintiff satisfies the injury-in-fact requirement for antitrust by showing "an injury to the plaintiff proximately caused by the defendants' conduct."  *Pulse Network, L.L.C.*, 30 F.4th at 488.  Injury-in-fact may be demonstrated by economic damages.  *Id.* at 489 n.9.  Moreover, plaintiffs who also seek injunctive relief, as W&T does here,[2] have a separate and additional basis for standing based on threatened injury that would result from the antitrust violation.  *See Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 319 n.10 (5th Cir. 2009) (explaining that for injunctive relief "[t]he injury alleged is not limited to business or property; damages can be simply threatened;

---

[2] Dkt. 36 ¶ 8 (citing 15 U.S.C. § 26, which provides a right of action for injunctive relief); *id.* at Prayer ¶ 9 (seeking equitable relief); *see also Jeffrey v. Sw. Bell*, 518 F.2d 1129, 1132 (5th Cir. 1975) (while the equity "petitioner must demonstrate that he is threatened with loss or injury proximately resulting from the antitrust violation," courts take a "less constrained view of standing in suits involving injunctive relief than in those demanding treble damages").

and fear of duplicative or speculative recovery will not preclude relief" (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 & n. 6 (1986))).

W&T alleges both economic damages and threatened harm.  Dkt. 36 ¶¶ 4–6; ¶ 98 (demands for premium increases); ¶¶ 106–107 (collateral demands up to $250 million); ¶ 129 (W&T could have maintained bonds on economically feasible terms but for the conspiracy); ¶¶ 143, 149 (W&T has been injured in its business and property).  Defendants press the argument that W&T's injury is a contractual one, and not an antitrust one.  Dkt. 63 at p. 8–9, 17.  But if anything, this point concedes that W&T has been injured in fact.

Further, that W&T *also* has a breach-of-contract claim does not preclude recovery for its antitrust injury.  *See, e.g.*, *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843, 853 (5th Cir. 2015) (affirming judgment against JSW, which was found to have both violated Section 1 of the Sherman Act and breached their contract with the plaintiff).  The case Defendants cite stands for the unremarkable proposition that a plaintiff cannot recover antitrust damages for an injury not caused by an antitrust violation.  Dkt. 63 at p. 9.  But antitrust liability may be predicated on conduct that also creates a contract dispute:

> Vernon is not simply claiming that Edison breached its contract.  Instead, Vernon is claiming that by preventing the purchase of electricity from Nevada Power, Edison acted anticompetitively and without a legitimate business reason.  The fact that Vernon and Edison have a contract allowing Edison to interrupt transmission "for any reason" is beside the point.  The contractual right to interrupt service does not grant Edison the freedom to act anticompetitively.

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992).  That is what W&T has alleged.  Defendants' suggestion that "[i]f W&T can still secure bonds from alternative providers, there is no basis for standing," Dkt. 63 at p. 9, is wrong—it has never been the law that a victim of price fixing cannot sue because he could have bought cheaper goods elsewhere.

### 2.   W&T's Actual and Threatened Injuries Are the Type That the Antitrust Laws Are Intended to Prevent

As explained above, Defendants have fundamentally confused the concept of antitrust injury (an element of standing) with anticompetitive harm (an element of the violation). Defendants cite *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014), which does not address the standing requirement at all.   The Fifth Circuit has explained this common error:

> Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability. . . . And in 1984, this court explained, albeit in a motion for rehearing, that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing.

*Doctor's Hosp. of Jefferson*, 123 F.3d at 305 (citations omitted).   "[A]ntitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Id.*; *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("[C]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.").

From that proper perspective, W&T has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489.   Being "forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct" is an injury that "plainly is 'of the type the antitrust laws were intended to prevent.'"   *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick*, 429 U.S. at 489)).   Likewise, a customer suffers antitrust injury when they are "directly driven from the market by an agreement in restraint of trade." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1014 (9th Cir. 2003).   This is exactly the harm that W&T has alleged: that its business is threatened to be destroyed due to a coordinated effort

by the sureties to demand higher prices in the form of increased premiums and tens of millions of dollars in collateral.  *E.g.*, Dkt. 36 ¶¶ 1, 5, 85, 98, 103–107, 122, 129, 168.

### C. W&T Has Plausibly Alleged Concerted Action

A business may respond to a market event by increasing a contractual price if it acts alone based on its independent business judgment.  But when that business agrees with its competitors that they will each institute a price increase, that violates the antitrust laws.  *See United States v. All Star Indus.*, 962 F.2d 465, 469 (5th Cir. 1992) ("Agreements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the *per se* category." (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8 (1979))); *see also id.* at 469 n.8 (citing cases).  That is what happened here—collective action among competitors to raise rates and financial terms upon which they would do business with W&T and other offshore oil-and-gas companies.

As set forth above, a violation of Section 1 of the Sherman Act requires (1) concerted action (2) that unreasonably restrains trade.  Because price fixing is a *per se* unlawful offense, it is sufficient to allege that two or more competitors have joined a price-fixing conspiracy.  *See, e.g., United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990) (where defendants were charged with a per se violation of the Sherman Act, "it is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining trade" (citation omitted)).  When there is direct evidence of concerted action, a claimant does not need any additional allegations of circumstantial evidence or plus factors.  *See Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, at *10 (S.D. Tex. Apr. 24, 2019) ("If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." (quoting *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010))).

1.      **W&T Has Alleged Direct Evidence of Concerted Action Among Sureties to Collectively Demand Increased Prices and More Onerous Financial Terms from Offshore Oil and Gas Companies Like W&T**

Contrary to what Defendants suggest, W&T's complaint provides direct evidence of concerted action by the Defendants. "Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a conspiracy claim." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). When analyzing conspiracy allegations, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962).

Here, W&T alleges direct (and circumstantial) evidence of concerted action by the sureties to collectively increase the financial terms on which they would do business with W&T and other smaller offshore oil-and-gas companies—whether through calls for additional collateral, increased rates, or both—to the detriment of the oil-and-gas companies. *See, e.g.*, Dkt. 36 ¶¶ 3, 4, 37, 74, 90, 110. Concerted action under the Sherman Act can range from a written contract to a tacit agreement. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy. . . . The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in any exchange of words."); *United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990) (holding there is no requirement to prove "a formal, express agreement with all the terms precisely set out and clearly understood by the conspirators"). Indeed, an invitation for collective action followed by conduct showing acceptance is sufficient to establish concerted action under Section 1. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939).

Defendants ignore the direct evidence that W&T has alleged about an agreement among the sureties by attempting to gloss over it as "ordinary business interactions." Dkt. 63 at p. 12. But the sureties' own words and actions describe the sureties' ongoing agreement to collectively demand increased financial terms from W&T and other offshore oil-and-gas companies.

For example, W&T alleges the overarching nature of the conspiracy and that the participants met to discuss their plan to collectively increase premiums, increase their collateral demands, and change the terms on which they would do business with their customers:

- "[I]n 2024, representatives of the Sureties and co-conspirators met to discuss their collective response to the BOEM rule and agreed to collectively change their analysis and terms at the expense of smaller companies like W&T." Dkt. 36 ¶37.

- "Sompo formulated a scheme with all other sureties of W&T to demand roughly $250 million in collateral. Through their demand, the Sureties planned to: (1) jointly squeeze their targets' assets; (2) jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual; and (3) jointly increase premiums, collateral, and bonding costs against their targets." *Id*. ¶ 122.

- Sompo "encouraged and enlisted the support of other Sureties, in rapid succession, to demand additional collateral, including U.S. Specialty, Applied, and U.S. Fire." *Id*. ¶ 86.

- "Sompo's own representative admittedly met with other sureties in 2024 to 'collectively' change their 'analysis' and 'terms' for these companies." *Id*. ¶ 90.

- "[T]he Sureties met one or more times in 2024 to jointly increase their premiums, expedite their collateral demands, and change the terms of their contracts and dealings." *Id*. ¶ 119.

- "The Sureties and their representatives, including Mr. Hennesy and Mr. Kilpatrick, continued meeting throughout 2024 to further plan and execute their scheme." *Id.* ¶ 124.

- "As admitted during the [November 12, 2024] Sompo-Applied Presentation, Sompo's and Applied's representatives . . . agree[d] to fix new terms against companies like W&T, and pursue a 'collective' strategy to benefit the surety industry. According to Applied, '[E]veryone started generating heartburn trying

to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?" *Id*. ¶ 121.

- The November 2024 meeting "was not the first time W&T's sureties met to discuss their scheme, nor their last: they meet regularly to collude and profit against companies like W&T, including through NASPB's and SFAA's events." *Id*.

Moreover, W&T not only provides facts regarding the parties' agreement, it also alleges the dates the Defendants discussed their plan for concerted action as well as the specific dates they carried out their plans:

- February 29, 2024 SFAA-NASBP Legislative Meeting. *Id*. ¶¶ 121, 124.

- April 30-May 3, 2024 NASBP Annual Meeting. *Id*.

- May 9, 2024 SFAA Annual Meeting. *Id*.

- July 2, 2024 Philadelphia Insurance Company demands collateral. *Id*. ¶ 107. n.5.

- July 9, 2024 Sompo demands collateral. *Id*. ¶ 85.

- July 31, 2024 U.S. Specialty demands collateral. *Id*. ¶ 103.

- October 1, 2024 Applied demands collateral and increased premiums. *Id*. ¶ 98 & Ex. J.

- October 14, 2024 U.S. Fire demands collateral. *Id*. ¶ 104.

That the sureties did not make their collateral demands in perfect unison is irrelevant (particularly in the context of a Rule 12(b)(6) motion). "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. Nor is it relevant that individual acts viewed in isolation may be unremarkable or lawful—it is black letter conspiracy law that "[a]cts that are by themselves wholly innocent acts may be part of the sum of the acts that make up a conspiracy to restrain trade in violation of the Sherman Act." ABA Model Jury Instructions in Criminal Antitrust Cases, Chapter 3.D, Conspiracy Explained.

W&T's specific, well pled, factual allegations about meetings, statements, and coordinated demands are more than parallel conduct—they are direct evidence of invitation, acceptance, and ongoing agreement among the sureties. *See, e.g.*, *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) (holding that plaintiffs' pleadings were sufficient because in addition to simply alleging that a conspiracy existed, the complaint indicated that the defendants met and collectively agreed on a method of manipulating the relevant market); *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, 2014 WL 12497080, at *4 (W.D. Tex. Sept. 8, 2014) ("Here, however, Plaintiffs have alleged more than parallel conduct. They allege particular discussions, meetings, agreements, and joint undertakings among Defendants related to the development of a 'standard of care' and the advocacy of that 'standard of care' to primary care physicians and third-party payors.").

### 2.    Alternatively, W&T Has Also Alleged Sufficient Circumstantial Evidence of Concerted Action

Because W&T's direct evidence is sufficient to establish concerted action, there is no need to evaluate the existence of any "plus factors" under *Twombly*. "[P]lus factors need be pled only when a plaintiff's claims of conspiracy rests on parallel conduct." *Kjessler*, 2019 WL 3017132, at *10 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).

But even if viewed through this lens, W&T has provided sufficient allegations to plausibly establish a conspiracy. Given the direct evidence of the conspiracy, one would expect to also find evidence of parallel conduct. And there is. As W&T has alleged, the sureties demanded unprecedented, excessive collateral or increased premiums around the same time in mid-2024. *E.g.*, Dkt. 36 ¶¶ 5, 85, 87, 90, 92, 98, 101, 103–107; *see SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"); *Petruzzi's IGA Supermarkets, Inc. v. Darling-*

13

*Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993) (affirming that parallel behavior was established through similar conduct even where "the defendants did not use the same prices or run their internal business operations identically"). These demands are directly tied to the conspiracy's entire purpose: to impose higher prices and more onerous financial terms on their customers via the sureties' agreement not to compete against one another on price or terms. As W&T has alleged, the sureties were motivated by declining profits to use a new rule from the Bureau of Ocean Energy Management ("BOEM Rule") as a pretext for them to collectively impose higher prices and more onerous collateral terms on oil-and-gas companies like W&T. Dkt. 36 ¶¶ 86, 90, 112, 114, 116-118; 121.

That some sureties may have chosen different mechanisms and followed slightly different timing to effectuate their coordinated demands for payment does not undermine the plausibility of the alleged agreement. *See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (disagreeing with the district court's holding that the plaintiff's "conspiracy claim was implausible because [the] defendants had a variety of reactions" and instead finding that "the key parallel conduct allegation was that all of the publisher and distributor defendants ceased doing business with [the plaintiff]" (alterations added; quotation marks, emphasis, and citation omitted)); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) ("[T]he Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct."). Indeed, slight differences in timing or methods can reflect consciousness of guilt and an attempt to conceal the conspiracy. *See SD3, LLC*, 801 F.3d at 428 (noting "if the defendants employed different courses of action, then their conspiracy might better avoid detection").

Although unnecessary given the direct evidence of Defendants' unlawful conduct, W&T's complaint also alleges multiple "plus factors" that demonstrate that the sureties' acts were not mere

14

parallel conduct.  The plus factors present here include the sureties taking actions that would be against the Defendants' individual self-interest if they were acting independently, but consistent with their self-interest if they were acting in concert; a common motive; pretextual reasons; and a small market with high barriers to entry and opportunities to collude.  *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022).

### a. Demands for Collateral and Price Increases Would Be Against Defendants' Self-Interest Acting Independently

The sureties would lose business if they demanded collateral or raised prices unilaterally. This is because other federally certified sureties could then undercut them by offering better terms. But the sureties knew that because they dominated the offshore surety market, they could reap higher profits if they joined forces.  Dkt No. 36 ¶ 122 (attempting to "jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual"); *id.* ¶ 128 ("[Defendants] claim they can 'collectively' make more money and remain profitable by 'collectively' agreeing to change their 'analysis' and 'terms' against companies like W&T.").

### b. Defendants' Common Motive

The Defendants had a common motive—stopping the decline of their profits.  During the same November 2024 presentation by Sompo and Applied where it was admitted "that Sompo's and Applied's representatives had previously met to discuss recent bankruptcies and the BOEM rule, agree to fix new terms against companies like W&T, and pursue a 'collective' strategy to benefit the surety industry," Applied also noted that "everyone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not.  So how do we move forward on this space?'  *Id.* ¶ 121.  Or as W&T alleged, the sureties "claim they can 'collectively' make more money and remain profitable by 'collectively' agreeing to change their 'analysis' and 'terms' against companies like W&T."  *Id.* ¶ 128.

It is well established that it is no defense to price fixing for Defendants to claim they did it to protect their investments from losses, *see United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088 (5th Cir. 1978), nor to prevent "ruinous competition," *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 346 (1982) (quoting *Socony–Vacuum Oil*, 310 U.S. at 221).   In fact, any "attempt to justify a conspiracy to raise prices 'on the basis of the potential threat that competition poses . . . is nothing less than a frontal assault on the basic policy of the Sherman Act.'" *United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)).

### c.    Defendants' Pretextual Reasons for Their Conduct

Moreover, to conceal their illegal scheme motivated by their desire to gain profits through price fixing, the Defendants gave pretextual reasons for their conduct.   Dkt 36 ¶ 114 ("the Sureties nevertheless used BOEM's rule as a pretext to collectively and in concerted fashion demand nearly $250 million from W&T").   In particular, the Defendants claimed that the BOEM Rule (which only applied to newly issued surety bonds) somehow authorized them to increase premiums and demand additional collateral for existing bonds.   *Id*.

It is obvious that the BOEM Rule does not authorize or excuse collusion among competitors, but additionally, as some Defendants have admitted, the BOEM Rule did not authorize calls for collateral or rate increases at all.   At a November 12, 2024 trade-group meeting for sureties, representatives of Defendants Sompo and Applied specifically discussed requiring collateral and acknowledged that neither the BOEM rule nor their contracts provided a basis for those demands.   *Id*. ¶¶ 116–18; *see also id*. ¶¶ 52–54, 70–74, 85–89, 96–101, 103, 105, 108–109, 112–115.   Thus, not only is Defendants' reliance on the BOEM Rule pretextual for the increases themselves, but it also demonstrates the existence of an initial coordinated pretextual narrative to conceal the conspiracy's existence.

> **d.**     **Offshore Surety Market Is Highly Concentrated with Ample Opportunities for Sellers to Collude and High Barriers to Entry to Keep New Participants Out**

Moreover, the "offshore surety market in the United States is heavily concentrated and controlled by the Sureties and other key players." *Id.* ¶ 35.  The market for federally certified offshore surety bonds "has high barriers to entry and high concentration due to capital requirements, risk tolerance, and government relations." *Id.* ¶ 123.  "The Sureties have had power in the relevant market during the entire relevant time due to their substantial share of this market and substantial barriers such as capital requirements and government regulations that prevent others from readily entering the relevant market." *Id.* ¶ 128.  The Sureties and their cohorts claim they can "'say no,' even to the federal government.  They claim they can jointly decide to not write a 'single new bond' in the Gulf of Mexico." *Id.*  And "there are no close economic and/or functional substitutes for these federally certified surety bonds." *Id.* ¶ 126.

And not only is the market consolidated, but the overlapping associations, meetings, and relationships make collusion plausible.  *Id.* ¶ 35 (the sureties "are all part of and/or actively support similar trade associations, including The Surety & Fidelity Association of America ('SFAA')"); ¶ 36 (sureties "participate in regular meetings around the nation to respond to industry threats and jointly influence government decisions"); ¶ 37 ("The Sureties' opportunities for collusion continue[] through major annual events, conferences, and meetings each year, with companies like Sompo and Applied entrenched in trade associations and actively seeking to influence other sureties to follow their lead."); ¶¶ 123–24 (the Sureties have opportunities to collude at industry events and social events with key decision-makers and industry leaders (discussing examples); also listing meetings held "soon before the Sureties began jointly demanding immediate collateral from W&T in rapid succession"; influence over surety trade associations like SFAA and NASBP,

including through Mr. Hennesy, Chairman of SFAA's Energy Subcommittee, and Mr. Kilpatrick, a member of and contributor to SFAA and NASBP).

Defendants attempt to dismiss the allegations regarding the defendants' associations, meetings, and relationships as mere membership in trade associations. But to the contrary, W&T's allegations describe in detail the collusion that occurred at one of those trade association meetings—the November NASBP meeting. *Id.* ¶¶ 116–18; 121. With this additional insight into what was discussed, the additional meetings *of the same trade association* close in time to the collateral demands take on far more significance than "mere membership." In any event, the opportunities to conspire are just one among several plus factors.

These allegations are sufficient to show the "plus factors" that indicate that the sureties' behavior is not merely parallel conduct. *See, e.g.*, *Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, at *11 ("Kurji's January 2016 statement recognizing the declining profits in the CPP industry suggests Defendants shared a common motive to conspire."); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 450 (E.D. Pa. 2018) ("Declining prices or profits in a market make price competition more than usually risky and collusion more than usually attractive." (internal quotation marks omitted)); *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320 (6th Cir. 2014) (showing that "the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy" is a plus factor); *Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.*, 2020 WL 4050243, at *7 (E.D. La. Jul. 17, 2020) (plausible allegations of collusion where insurers acted against self-interest to ensure that the dominant players in each market were denying claims to limit reimbursement expenses with minimal loss of customers).

At this stage, the Defendants' alternative explanations about economic rationales cannot overcome what W&T alleged in its complaint. Dkt. 63 at p. 13–14. "'The question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" *Acad. of Allergy & Asthma in Primary Care*, 2020 WL 4050243, at *7 (quoting *Anderson News*, 680 F.3d at 189). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* (quoting *Anderson News*, 680 F.3d at 185). "The Court must accept the plaintiff's version of events, so long as that version is plausible, and it may not dismiss the complaint 'merely because [it] finds a different version more plausible.'" *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013) (quoting *Anderson News*, 680 F.3d at 185).

### D.    W&T Has Properly Alleged Price Fixing, Which Is a Per Se Unreasonable Restraint of Trade

Having adequately pleaded concerted action by the sureties, the complaint sufficiently sets forth the second element of an antitrust violation—an unreasonable restraint of trade. Both claims that W&T has alleged—horizontal price fixing and group boycott—are per se unlawful.[3] *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) (price fixing per se unlawful); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 434–36 (1990) (group boycott involving horizontal competitors per se unlawful). The per se rule shortcuts the analysis of anticompetitive harm—anticompetitive harm is presumed for conduct that falls within a per se category. *N. Pac. Ry.*, 356 U.S. at 5; *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir.

---

[3] W&T alternatively included allegations to support those claims if they were evaluated under the rule of reason. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051 (E.D. Pa. 2016) (plaintiff who unsuccessfully pleads a per se claim has not waived his right to pursue a rule of reason claim), *aff'd*, 962 F.3d 719 (3d Cir. 2020); *In re Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 5871243, at *5 n.8 (N.D. Cal. Oct. 7, 2016) ("Plaintiffs in such cases often plead in the alternative by claiming that defendants' conduct ought to be considered illegal per se, but even if it is not, that it is illegal under the rule of reason.").

1981) (explaining that through the per se rule, "the Supreme Court declared what must automatically be treated as unreasonable").

Notably, Defendants have not argued that, as a matter of law, price fixing does not fall under the per se rule—their only challenge is that there is no allegation "that the Sureties actually fixed the price of anything." Dkt. 63 at p. 16–17. But alleging a specific set price is not required for price fixing and thus does not provide a basis for dismissal. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648–49 (1980) (explaining that "an agreement to adhere to previously announced prices and terms of sale, even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement" is unlawful (citing *Sugar Institute v. United States*, 297 U.S. 553, 601–02 (1936))).

As Defendants acknowledge, "[u]nder well-established law, price-fixing occurs when competitors agree to set a price, a pricing formula, or a price range." Dkt. 63 at p. 17 (citing *Socony-Vacuum Oil Co*., 310 U.S. at 222). But the Supreme Court has explained that neither "price" nor "fixing" should be read narrowly or literally. Unlawful agreements that relate to any terms or conditions affecting the pricing structure of a product or service fall within the category of price fixing. *Socony-Vacuum Oil Co.*, 310 U.S. at 221 ("Any combination which tampers with price structures is engaged in an unlawful activity."); *see also Catalano*, 446 U.S. at 648–49 (elimination of credit terms); *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 690–91 (7th Cir. 1961) (agreement among gasoline retailers not to give trading stamps).

Similarly, "fixed" does not mean that the agreement must be identical, uniform, or simultaneous in its terms—terms are "fixed because they are agreed upon." *Socony-Vacuum Oil Co.*, 310 U.S. at 222. It does not matter "that the prices . . . were not fixed in the sense that they

were uniform and inflexible." *Id.* And the precise "machinery employed by a combination for price-fixing is immaterial." *Id.* at 223.

Here, the sureties' collective demands to raise rates and/or for additional collateral relate to their product's price structure. Indeed, the sureties emphasize that their surety product is "financing." Dkt. 57 at p. 1, 15. Agreements between competitors related to financing, like credit terms, are squarely within the definition of price fixing. In *Catalano*, the Supreme Court held that an "agreement to terminate the practice of giving credit" is characterized as a price-fixing agreement because "[i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time." 446 U.S. at 648. The same logic applies to an agreement to demand millions of dollars in additional collateral—it is tantamount to increasing the price the principal must pay for bonds. Dkt. 36 ¶¶ 1, 4, 90, 114, 119, 122 (alleging that the Sureties jointly demanded unprecedented and excessive collateral not based on actual or potential liability).

### 1.    W&T Is Not Required to Define a Market or Establish Market Power for a Price-Fixing Claim

Because W&T's claim is a well-established per se claim, Defendants' objections related to market definition, market power, and harm to competition are irrelevant. If the per se rule applies, the court presumes that the practice is unreasonable as a matter of law "'without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use.'" *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972) (quoting *N. Pac. Ry. Co.*, 356 U.S. at 5). Because per se illegal restraints "involve agreements between competitors not to compete in some way," there is no need "to precisely define the relevant market to conclude that these agreements were anticompetitive." *Am. Express Co.*, 585 U.S. at 544 n.7. It does not matter whether they possess market power. *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 310 (1956) (holding

that, in a per se conspiracy, "[i]t makes no difference . . . whether the participants possess market control"). It does not matter how many customers were affected. *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018) (explaining that it does not "matter that the alleged agreement would only affect a small number of potential customers"). And it is irrelevant whether Defendants' financial concerns were valid—business justifications or necessity is no defense. *See Cadillac Overall Supply Co.*, 568 F.2d at 1088–90.

### 2.    Even if Required, W&T Has Properly Alleged a Market

Defendants' motion does not address the rule of reason.[4] And as set forth above, the per se rule applies to W&T's antitrust claims. But even if Defendants' vague argument about market definition were construed as challenging W&T's alternative pleading under the rule of reason, *see* n.3 *supra*, W&T's allegations about the market and the sureties' market power are sufficient.

Defendants suggest that the surety market is broad, asking the Court to take judicial notice of the Treasury Department's Circular 570. Dkt. 63 at p. 15 n.3. But W&T has not alleged Defendants restrained the surety market writ large—W&T has alleged a relevant market for "federally certified surety bonds for offshore oil and gas producers," Dkt. 36 ¶ 125, which is comprised of a much smaller number of companies who actually write bonds for offshore oil and gas than the broad list in Circular 570. And it is only these federal certified surety bond companies that can issue the bonds required for offshore oil-and-gas companies like W&T. *Id.* ¶ 126.

Additionally, W&T has alleged the Sureties have a dominant market share and that entry barriers are high. *See, e.g.*, *id.* ¶¶ 35, 81, 123, 125–28. W&T has alleged that the sureties possess market power—"the Sureties and their cohorts claim they have the power to 'say no,' even to the

---

[4] Defendants cite *Apani Southwest, Inc. v. Coca-Cola Enters.*, 300 F.3d 620 (5th Cir. 2002), (Dkt. 63 at p. 15), which discusses the rule of reason standard. *Id.* at 627 ("As an initial matter, Apani does not contend on appeal that CCE's actions were per se illegal. Thus, the rule of reason analysis is applicable to Apani's claim.").

federal government. They claim they can jointly decide to not write a 'single new bond' in the Gulf of Mexico." *Id.* ¶ 128. The Defendants' objection to the market definition is not a basis for dismissal—that is a classic issue for resolution after discovery. *See Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, 2020 WL 4050243, at *9 (holding that "dismissal of an antitrust claim at the motion to dismiss stage for failure to plead the relevant market adequately should not be done lightly because market definition is a fact-intensive inquiry.").

## II.    W&T has Properly Pled a Claim for Declaratory Judgment

Defendants' arguments regarding W&T's declaratory judgment claim fail to recognize that W&T seeks declarations that go beyond what W&T' may receive otherwise. This is not a situation where W&T's claims serve "no legitimate purpose other than adjudicating defenses that could be raised in an ongoing lawsuit." Dkt. 63 at p. 18. Rather, W&T asks the Court to make declarations that will clarify the Parties' relationship going forward. W&T asks that the Court find: (1) Defendants' arguments would render the Indemnity Agreement illusory; (2) Defendants cannot make unreasonable demands for collateral and must accept W&T's reasonable offers of collateral; and (3) Defendants' business models are not legitimate bases to demand additional collateral. *Id.* at p. 25. There is no defense W&T can raise that would entitle them to such declarations.

*Wells Fargo Bank Minnesota v. Wachovia Bank*, 2004 WL 2826773, *4 (N.D. Tex. Dec. 9, 2004) is analogous. In *Wells Fargo*, Wachovia sold mortgage loans pursuant to a purchase agreement. *Id.* The loans were contributed to a trust by the purchaser pursuant to a pooling agreement. *Id.* Plaintiff Wells Fargo was the original trustee, and Wachovia was the original "Master Servicer" of the loans. Plaintiff Orix later became the "Special Servicer" to deal with loans in the trust requiring special servicing. *Id.*

After Wachovia refused to produce documents relating to the contributed loans, Orix sued Wachovia. *Id.* Wachovia filed a declaratory-judgment counterclaim seeking: (1) a declaration

23

that Wachovia's "internal credit analysis of the Seller" did not have to be turned over to Orix under the purchase agreement; and (2) indemnification for legal fees and costs, pursuant to a separate contract. *Id.* Orix sought dismissal based on the same arguments made by Defendants. *Id.*

The court disagreed. First, it found a justiciable conflict existed: because a "substantial controversy" existed "between the parties over the interpretation of Wachovia's responsibilities under the [pooling agreement] and [purchase agreement]." *Id.* The court then found that "the relief requested by Wachovia goes beyond that which it would receive from a resolution of ORIX's claims." *Id.* Here, as in *Wells Fargo*, a justiciable conflict exists, and W&T asks for declarations that go beyond what it could receive absent such a claim. Defendants' request to dismiss W&T's declaratory judgment claim should be denied.

## III. W&T has Properly Pled a Claim for Tortious Interference

W&T's antitrust claims are not "unsubstantiated." As discussed above, W&T's antitrust claims against Defendants are detailed and more than plausible (which is all that is required at the Rule 12(b)(6) stage). Further, Defendants argue that W&T has not identified an agreement with which Defendants interfered, and that the Indemnity Agreement cannot be the contract since Defendants are not "strangers" to it. Dkt. 63 at p. 23. Defendants' arguments miss the mark— W&T does not argue that any Defendant interfered with its own contracts with W&T. Rather, W&T alleges that each Defendant interfered with W&T's contracts with the other sureties. Though the various indemnity agreements at issue often possess similar terms (which the sureties imposed using their market power), they are, without a doubt, exclusively between W&T and those individual entities. Thus, Defendants were "strangers" to these agreements.

Indeed, Defendants' arguments give further credence to W&T's antitrust claims. Defendants' arguments show that they view themselves as a collective unit with the other sureties,

to the point Defendants do not even believe they are "strangers" to those separate agreements. With this mentality, it is no surprise the Defendants conspired to violate the antitrust laws.

Defendants also argue W&T made certain representations to investors that contradict W&T's argument that Defendants interfered with W&T's prospective business relationships. Defendants' arguments are baffling—even if W&T could replace Defendants' bonds, Defendants' tortious interference greatly affected the potential *terms* of these agreements.  Regardless, this argument is irrelevant—Defendants are bound by the four corners of W&T's amended complaint. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999).

## IV.    W&T has Properly Pled a Civil Conspiracy Claim

Despite Defendants' assertions, W&T does not proffer a "derivative" conspiracy because W&T's counterclaims are valid: "The Sureties have engaged in a civil conspiracy to violate antitrust law, insurance law, and other Texas common law."  If anything, Defendants' arguments are derivative of their antitrust arguments: as explained *above*, W&T has identified (1) two or more persons, (2) a common objective to be accomplished, (3) a meeting of the minds regarding that objective, (4) one or more unlawful, overt acts in furtherance of the conspiracy, and (5) resulting damages.  Therefore, W&T has pled a claim for civil conspiracy.

## CONCLUSION

W&T has sufficiently pled an antitrust violation and antitrust standing.  W&T has further adequately pleaded facts supporting W&T's (1) tortious interference claim; (2) declaratory judgment claim; and (3) civil conspiracy claim.  Defendants' motion to dismiss should therefore be denied.[5]  W&T further requests all other relief to which it is entitled.

---

[5] Defendants suggest that W&T's claims should be dismissed with prejudice.  There is no basis to do so.  If the court finds the factual allegations in the complaint deficient in any way, W&T requests leave to amend.  *See Hernandez v. W. Tex. Treasures Est. Sales, L.L.C.*, 79 F.4th 464, 468 (5th Cir. 2023) ("[L]eave to amend should be liberally granted, when the plaintiff might be able to state a claim based on the underlying facts and circumstances.").

Dated: March 24, 2025

Respectfully submitted,

McGuireWoods LLP


*/s/ Yasser A. Madriz*
Yasser A. Madriz
***Attorney-in-Charge***
Texas State Bar No. 24037015
S.D. Texas Bar No. 39080
ymadriz@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile

**ATTORNEYS FOR W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC**

**OF COUNSEL:**
**Jason Huebinger**
Texas State Bar No. 24065460
S.D. Texas Bar No. 1717237
jhuebinger@mcguirewoods.com
**Miles O. Indest**
Texas State Bar No. 24101952
S.D. Texas Bar No. 3070349
mindest@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002


and

**J. Brent Justus**
bjustus@mcguirewoods.com
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219

**Megan Lewis**
*Pro Hac Vice Forthcoming*
mlewis@mcguirewoods.com

McGuireWoods LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

## CERTIFICATE OF SERVICE

I certify that on March 24, 2025, the foregoing pleading was filed electronically using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

*/s/ Yasser A. Madriz*
Yasser A. Madriz