**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Plaintiffs, | |
| v. | | Civil Action No. 4:24-CV-03047 |
| ENDURANCE ASSURANCE CORPORATION, AND LEXON INSURANCE CO. | | |
| | Defendants. | |
| U.S. SPECIALTY INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04113 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |
| UNITED STATES FIRE INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04395 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |
| UNITED STATES PENNSYLVANIA INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04400 |
| W&T OFFSHORE, INC., | | |
| | Defendant. | |

**PLAINTIFFS' RESPONSE TO ENDURANCE ASSURANCE CORPORATION AND**
**LEXON INSURANCE COMPANY'S PARTIAL MOTION TO DISMISS**

Plaintiffs W&T Offshore, Inc. ("W&T Offshore") and W&T Energy VI, LLC ("W&T Energy") (collectively, "W&T") file this Response to Endurance Assurance Corporation and Lexon Insurance Company's (collectively, "Lexon," "Sompo," or "Defendants") Partial Motion to Dismiss ("Response"). W&T respectfully requests that this Court deny Lexon's Partial Motion to Dismiss ("Motion") (Dkt. 57).

# TABLE OF CONTENTS

**Page**

Introduction ......................................................................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................................ 5

STANDARD OF REVIEW ............................................................................................... 6

ARGUMENT AND AUTHORITIES ................................................................................ 7

I.   W&T Has Sufficiently Pleaded Its Antitrust Claims .............................................. 7

    A.   Defendants' Motion Erroneously Conflates the Standards Governing When There Is an Antitrust Violation and Who Has Antitrust Standing Despite the Fifth Circuit's Guidance Distinguishing the Two ................................................................................. 7

    B.   As a Victim Injured by *Per Se* Unlawful Anticompetitive Conduct, W&T Has Standing to Bring Its Antitrust Claims ......................................................................... 9

    C.   W&T Has Plausibly Alleged Concerted Action ............................................ 11

        1.   W&T Has Alleged Sufficient Direct Evidence of Concerted Action ................... 13

        2.   W&T Has Also Alleged Sufficient Circumstantial Evidence of Concerted Action ................................................................................................................... 15

            a.   Demands for Collateral and Price Increases Would Be Against Defendants' Self-Interest Acting Independently ............................................................... 17

            b.   Defendants' Common Motive ...................................................................... 18

            c.   Defendants' Pretextual Reasons for Their Conduct ..................................... 18

            d.   Offshore Surety Market Is Highly Concentrated with Ample Opportunities for Sellers to Collude and High Barriers to Entry to Keep New Participants Out ................................................................................................................. 19

    D.   W&T Has Properly Alleged Price Fixing, Which Is a *Per Se* Unreasonable Restraint of Trade .......................................................................................................... 21

II.  W&T Has Properly Pled a Claim for Tortious Interference ................................... 24

III. W&T Has Properly Pled a Civil Conspiracy Claim .............................................. 25

CONCLUSION ................................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
    776 F.3d 321 (5th Cir. 2015) .......................................................7

*Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy,*
    2014 WL 12497080 (W.D. Tex. Sept. 8, 2014).....................................15

*Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.,*
    2020 WL 4050243 (E.D. La. Jul. 17, 2020) ........................................21

*In re Aluminum Warehousing Antitrust Litig.,*
    833 F.3d 151 (2d Cir. 2016)........................................................9

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010)................................................................7

*Am. Tobacco Co. v. United States,*
    328 U.S. 781 (1946)...............................................................12

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012)................................................16, 21, 22

*Arizona v. Maricopa Cnty. Med. Soc'y,*
    457 U.S. 332 (1982)...............................................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................7, 16

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979)................................................................11

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ...............................................17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).............................................................9, 10

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980)...........................................................23, 24

*In re Cathode Ray Tube (Crt) Antitrust Litig.,*
    2016 WL 5871243 (N.D. Cal. Oct. 7, 2016).........................................8

*City of Vernon v. S. Cal. Edison Co.,*
  955 F.2d 1361 (9th Cir. 1992) ............................................................................11

*Cont'l Ore Co. v. Union Carbide Corp.,*
  370 U.S. 690 (1962)............................................................................................12

*Cuvillier v. Taylor,*
  503 F.3d 397 (5th Cir. 2007) ................................................................................7

*In re DDAVP Direct Purchaser Antitrust Litig.,*
  585 F.3d 677 (2d Cir. 2009)................................................................................10

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  961 F.2d 1148 (5th Cir. 1992) ............................................................................15

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance,*
  123 F.3d 301 (5th Cir. 1997) ......................................................................5, 8, 9

*FTC v. Superior Court Trial Lawyers Ass'n,*
  493 U.S. 411 (1990).............................................................................................8

*In re Generic Pharms. Pricing Antitrust Litig.,*
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ................................................................21

*Glen Holly Ent., Inc. v. Tektronix Inc.,*
  343 F.3d 1000 (9th Cir. 2003) ............................................................................10

*Golden Bridge Tech., Inc. v. Motorola, Inc.,*
  547 F.3d 266 (5th Cir. 2008) ..............................................................................12

*Hernandez v. W. Tex. Treasures Est. Sales, L.L.C.,*
  79 F.4th 464 (5th Cir. 2023) ..............................................................................25

*Hood v. Tenneco Texas Life Ins. Co.,*
  739 F.2d 1012 (5th Cir. 1984) ..............................................................................9

*Hyland v. HomeServices of Am., Inc.,*
  771 F.3d 310 (6th Cir. 2014) ..............................................................................21

*In re Ins. Brokerage Antitrust Litig.,*
  618 F.3d 300 (3d Cir. 2010)................................................................................16

*Interstate Circuit, Inc. v. United States,*
  306 U.S. 208 (1939)................................................................................5, 13, 15

*JSW Steel (USA) Inc. v. Nucor Corp.,*
  586 F. Supp. 3d 585 (S.D. Tex. 2022) ...............................................................17

*Kjessler v. Zaappaaz, Inc.*,
   2019 WL 3017132 (S.D. Tex. Apr. 24, 2019) ........................................................12, 16, 21

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959)..................................................................................................................8

*Lane v. Halliburton*,
   529 F.3d 548 (5th Cir. 2008) ...............................................................................................6, 7

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ....................................................................................................7

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
   751 F.3d 368 (5th Cir. 2014) ...............................................................................................7, 9

*MM Steel, LP v. JSW Steel (USA) Inc.*,
   806 F.3d 835 (5th Cir. 2015) ..................................................................................................10

*N. Pac. Ry. v. United States*,
   356 U.S. 1 (1958)........................................................................................................5, 8, 9, 22

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978)................................................................................................................18

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)..................................................................................................................8

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993)..................................................................................................16

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
   988 F. Supp. 2d 696 (E.D. La. 2013)......................................................................................22

*In re Processed Egg Prods. Antitrust Litig.*,
   206 F. Supp. 3d 1033 (E.D. Pa. 2016) .....................................................................................8

*Pulse Network, L.L.C. v. Visa, Inc.*,
   30 F.4th 480 (5th Cir. 2022) .....................................................................................................8

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*,
   48 F.3d 39 (1st Cir. 1995).......................................................................................................11

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .............................................................................................16, 17

*Sugar Institute v. United States*,
   297 U.S. 553 (1936)................................................................................................................23

*United States v. All Star Indus.*,
  962 F.2d 465 (5th Cir. 1992) ................................................11

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)................................................18

*United States v. Cadillac Overall Supply Co.*,
  568 F.2d 1078 (5th Cir. 1978) ............................................18

*United States v. Foley*,
  598 F.2d 1323 (4th Cir. 1978) ............................................13

*United States v. Gasoline Retailers Ass'n*,
  285 F.2d 688 (7th Cir. 1961) ..............................................22

*United States v. Koppers Co.*,
  652 F.2d 290 (2d Cir. 1981)................................................22

*United States v. MMR Corp.*,
  907 F.2d 489 (5th Cir. 1990) ........................................11, 13

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)...........................................6, 8, 18, 22

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).............................................................1

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010)..................................................12

*Walter v. Ports Am.*,
  2011 WL 5415176 (S.D. Tex. Nov. 8, 2011) .........................7

*WesternGeco L.L.C. v. Ion Geophysical Corp.*,
  2011 WL 3608382 (S.D. Tex. Aug. 16, 2011) .......................7

**Federal Statutes**

Sherman Act Section 1, 15 U.S.C. § 1.....................5, 7, 9, 10, 11, 12, 23

**State Statutes**

Texas Free Enterprise and Antitrust Act, Tex. Bus. & Com. Code § 15.01 *et seq.*...................7, 8

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................6, 7, 15, 21, 24

v

**Regulations**

*Unleashing American Energy*, 90 Fed. Reg. 8,353 (January 29, 2025) ..........................................1

## INTRODUCTION

W&T is facing an existential threat to its business—not because of financial issues or other infirmity of its own. It is in this predicament because it is the target of a coordinated effort by surety companies—led by their ringleader Lexon—to change the rules in the offshore oil and gas industry to their advantage and for their own profits. If the sureties succeed, they will drive W&T and other similarly situated independent oil and gas producers out of the market, leaving a significant source of domestic capacity for energy untapped and unavailable for American consumers. W&T's claims against the sureties lay bare their scheme to use a proposed federal rule change as a pretext to cover their collusion with their horizontal competitors, and to coordinate increased premium rates and other financial terms on which they would now offer surety bonds to W&T and other offshore producers. That is price fixing, and it is one of the "supreme evil[s]" that antitrust laws seek to prevent. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

Smaller independent oil and gas companies like W&T provide a valuable service by continuing to produce oil from leased lands in the Outer Continental Shelf that major oil and gas companies no longer wish to service. As part of their obligations to the federal government, companies who lease lands are responsible to eventually cover the costs to decommission the lands at the end of life. As a result of Obama and Biden Administration policies,[1] for the last fifteen years or so, most independent oil and gas companies like W&T are required by federal regulations to obtain surety bonds to secure these potential decommissioning obligations for the structures,

---

[1] The states of Louisiana, Texas, and Mississippi sued the Department of Interior, the agency responsible for offshore leases, over actions taken by prior administrations, including the issuance of the BOEM Rule described below. *See State of Louisiana, et al. v. Burgum et al.*, No. 2:24-cv-820 (W.D. La.). On March 25, 2025, the parties in that litigation filed a status report which indicated that in light of President Trump's Executive Order 14154, entitled *Unleashing American Energy*, 90 Fed. Reg. 8,353 (January 29, 2025), "Defendants are reviewing the [BOEM] Rule and anticipate announcing the efforts they will take to suspend, revise, or rescind the Rule." *Id.* Dkt. 108 at 2. The parties indicated that they anticipate resolving the litigation within one week. *Id.*

pipelines, and wells on lands in which they hold an interest.  Dkt. 36 ¶¶ 2, 30–34, 126.  But only a limited number of sureties are certified by the federal government to issue the required surety bonds.  *Id*. ¶¶ 19, 35.  For years, W&T has obtained the required bonds from sureties.  W&T's financial condition has not materially changed, and it has <u>never</u> defaulted on any financial obligation related to decommissioning.  Yet, in early 2024, multiple sureties that W&T had bonds with began—in rapid succession—making demands for significant sums of collateral, increases in premium rates, or both.  *Id.* ¶¶ 84–107.

What changed?  The sureties—for the first time—were all facing declining profits, *id.* ¶ 121, and unexpected bankruptcies of other companies in the industry suddenly confronted them with the possibility of financial liability that they never thought they would have to face.  Because there are substantial barriers preventing new sureties from entering the offshore bonding market, *id*. ¶¶ 123, 128, the surety market in the Gulf of America is small and cozy—industry participants know each other and meet with each other regularly at industry events.  *Id.* ¶ 121.  They have common reinsurers who they work with, and common brokers who act as middlemen that share confidential information among competitor sureties.  One other ingredient completed the perfect recipe for collusion—a new rule from the Bureau of Ocean Management (the "BOEM Rule") provided a perfect pretextual reason for demanding more onerous financial terms from their customers like W&T.  Rather than acting independently and risk losing business to competitors, the sureties chose to band together to raise their premiums and demand that their customers (including W&T) post hundreds of millions of dollars of additional collateral for already existing surety bonds.  *Id.* ¶¶ 106–107, 114, 117–18, 121–22.

W&T's allegations of collusion are not speculative—they are based on specific, well-documented events.  For example, in a presentation on November 12, 2024, representatives of

Defendants Lexon and Applied—two horizontal competitors—<u>admitted</u> that they had met to discuss recent financial losses they had suffered and had agreed to pursue a "collective" strategy to stop the downward slide in their profits. *Id.* ¶ 121. Patrick Hennesy, Lexon's National Underwriting Officer participated in the presentation and described their intent to "collectively" change their "analysis" and "terms." *Id.* ¶¶ 90, 116, 120–21. Applied's representative put their motive even more succinctly: "[E]veryone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?" *Id.* ¶ 121; *see also id.* ¶¶ 116–24. Indeed, the sureties' demands to their customers began earlier in 2024 shortly after the same industry events where the sureties' executives met. *Id.* ¶¶ 120–24. Lexon led the implementation of the conspiracy. Shortly after Lexon demanded higher premiums and called for collateral for their existing surety bonds, other sureties implemented the joint strategy as well. *Id.* ¶¶ 97–101 (Applied), 103 (U.S Specialty), 104–105 (U.S Fire). Collectively, their demands totaled approximately $250 million, far more than W&T's cash reserves. *Id.* ¶ 107. The message to the industry was loud and clear—submit to the sureties' demands, no matter how baseless, otherwise the sureties will band together and destroy you. Indeed, they boasted in their joint presentation about how they have the power to "say no" and can collectively decide not to write a "single new bond" in the Gulf. *Id.* ¶ 128. That is a group boycott.

Lexon's ever-shifting explanations for why it demanded collateral from W&T underscore the insincerity of their current position. Lexon's early pleadings expressly cited the BOEM Rule as a "factor in their decision to demand additional collateral":

> 35.   Along with W&T's worsening financial condition, another factor in Lexon's decision to demand additional collateral was a new rule, first proposed by the BOEM in June 2023 and finalized in April 2024, to determine if and how much supplemental financial assurance is required for offshore operations on the OCS. Under the Risk Management and Financial Assurance

Dkt. 14 ¶ 35; *see also* Dkt. 28 ¶¶ 42, 44, 55; Dkt. 30, at 15.  Yet now, Lexon suggests that the BOEM Rule is merely a "red herring" raised by W&T:

> [2] W&T repeatedly seeks to focus attention on a recent BOEM regulation that imposed more stringent financial security obligations on certain operators, including W&T, contending that the regulation may be rescinded and therefore the Sureties have no need for collateral. That position is a red herring. Lexon has

Dkt. 57 n. 2; *see also id.* at 13–14 (". . . the referenced regulations have nothing to do with Lexon's entitlement to collateral.").  Because the BOEM Rule is about to be withdrawn, *see* n.1 *supra*, Lexon has now shifted its emphasis away from the Rule and onto W&T's purported worsening financial position and credit rating.  *See* Dkt. 28 ¶¶ 39, 41, 44, 55–57, 89; Dkt. 30 at 14–15, 17, 20 n.10; Dkt. 30-1 ¶ 14; Dkt. 57 at 6–8, 13–14, 19–20, 30; Dkt. 58 at 4 n.2.  But these arguments are equally baseless—W&T is financially stable and has maintained and improved its credit rating since 2023, well before Lexon issued its demand for collateral.  Dkt. 37 at 19.  The reason for these baseless justifications has become clear:  they are nothing more than pretextual excuses to cover up the real reason for the demands—a conspiracy among the sureties to increase their collective profits.

Lexon's position that it can demand company-ending amounts of collateral whenever it wants, without any reason at all, shows two things: (1) an astonishing (and incorrect) position on the contracts it entered with W&T; and (2) a company that feels confident that it will not lose business to its competitors.  Far from being baseless, W&T's complaint sets forth how Lexon has

orchestrated a conspiracy among the sureties to line their own pockets and dictate the financial terms of doing business in the offshore market.

## SUMMARY OF THE ARGUMENT

Defendants' motion confuses key concepts of antitrust law and ignores the core allegations in W&T's complaint. W&T has alleged price fixing among horizontal competitors—a *per se* unlawful violation of Section 1 of the Sherman Act. No further allegations are necessary regarding the market or the effect of the conspiracy—anticompetitive harm is presumed for per se offenses. *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958). It is beyond dispute that the customer that is the target of that anticompetitive agreement has standing to bring an antitrust claim. Even a single plaintiff who has suffered an injury or threatened injury because of an unlawful anticompetitive conduct has standing. There is no requirement that W&T must sue on behalf of all similarly situated companies, or demonstrate injury to the "market" as a whole, to have antitrust standing. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997).

W&T's First Amended Complaint alleges direct (and circumstantial) evidence describing how a group of sureties, including Defendants, conspired to change the financial terms on which they would deal with W&T and other similarly situated independent offshore oil and gas companies. The complaint sets forth with specificity the names and dates of meetings at which the sureties met and discussed their plan; it sets forth the specific dates that the sureties took action in accordance with that plan; and it provides direct quotes from one of the sureties' representatives boasting about their collective power in the surety bond market and admitting that they had sought to "collectively" change terms so they could all "make a lot of money" again going forward. *E.g.,* Dkt. 36 ¶¶ 37, 85–86, 90, 98, 103–104, 107 n.5, 119, 121–22, 124. These allegations provide ample evidence of concerted action by the sureties. *See Interstate Circuit, Inc. v. United States*,

306 U.S. 208, 227 (1939) (an invitation for collective action followed by conduct showing acceptance is sufficient to establish concerted action).

Defendants' argument that their conduct does not constitute price fixing "because W&T does not (and cannot) even explain what was fixed," Dkt. 57 at 10, further shows their misunderstanding of antitrust law. As one of the seminal cases on price fixing explained, price fixing does not require a literal price nor that it be fixed at a set level—the term "fixed" simply means that it has been "agreed upon." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940). Financial terms such as rates or calls for collateral fall squarely within the price structure of the product offered to the customer—i.e., the price of the surety offered to W&T. Defendants' protestations that their contracts with W&T allowed them to demand collateral is no defense. Not only was there no legitimate basis under the contractual terms to do so, but even if there had been a valid basis, it does not excuse collusion. To put it simply—a business may institute a contractual price increase if it acts alone in its independent business judgment, but it cannot join together with a competitor and agree that each of them will institute a price increase. Yet, that is what happened here—collective action by competitors on financing terms, and it is a classic antitrust claim.

Defendants' arguments regarding W&T's claims for tortious interference and civil conspiracy are equally meritless. The First Amended Complaint highlights that Defendants: (1) interfered with W&T's contracts and business relationships with the other sureties; and (2) engaged in a civil conspiracy to violate antitrust law, insurance law, and Texas common law.

## STANDARD OF REVIEW

In assessing a Rule 12(b)(6) motion, courts must accept the complaint's factual assertions as true and draw all reasonable inferences in favor of the claimant. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not

need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 2011 WL 3608382, at *3 (S.D. Tex. Aug. 16, 2011) (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

Thus, a claimant need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Dismissal is proper only where "it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Lane*, 529 F.3d at 557 (citing *Twombly*, 550 U.S. 544). For that reason, this Court has recognized that "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Walter v. Ports Am.*, 2011 WL 5415176, at *3 (S.D. Tex. Nov. 8, 2011) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009)).

Antitrust claims are not subject to any heightened pleading standard; a plaintiff need only plead facts to state a plausible claim. *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.").

## ARGUMENT AND AUTHORITIES

### I. W&T Has Sufficiently Pleaded Its Antitrust Claims[2]

#### A. Defendants' Motion Erroneously Conflates the Standards Governing When There Is an Antitrust Violation and Who Has Antitrust Standing Despite the Fifth Circuit's Guidance Distinguishing the Two

A claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires two key elements: (1) "concerted action" (2) that "unreasonably restrains trade." *Am. Needle, Inc. v. Nat'l Football*

---

[2] W&T's arguments equally apply to its state law antitrust claim under the Texas Free Enterprise and Antitrust Act. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015) ("Because

*League*, 560 U.S. 183, 186 (2010). Concerted action can be unreasonable in one of two alternative ways: (1) the agreement falls within a category that courts have deemed "*per se*" unreasonable and therefore unlawful without further inquiry, *N. Pac. Ry.*, 356 U.S. at 5; or (2) the agreement is deemed unreasonable after a detailed factual analysis under the "rule of reason" that examines the anticompetitive effects and any procompetitive justifications, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). Both claims that W&T has alleged—horizontal price fixing and group boycott— are per se unlawful.[3] *See Socony-Vacuum Oil*, 310 U.S. at 218 (price fixing per se unlawful); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 434–36 (1990) (group boycott involving horizontal competitors per se unlawful); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 (1959) (group boycott "is not to be tolerated merely because the victim is just one merchant … .").

The Fifth Circuit has made clear that for purposes of analyzing standing, courts should presume that the antitrust violation has been established. *See Doctor's Hosp. of Jefferson*, 123 F.3d at 305–306 (explaining that courts should assume that an antitrust violation has occurred when analyzing standing and cautioning against dismissing "classical" antitrust cases on standing grounds). To have standing to sue for an antitrust violation, a private plaintiff must plead an injury-in-fact of the type that the antitrust laws were intended to prevent. *See Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022).

---

the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well.").

[3] W&T alternatively included allegations to support those claims if they were evaluated under the rule of reason. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051 (E.D. Pa. 2016) (plaintiff who unsuccessfully pleads a per se claim has not waived his right to pursue a rule of reason claim), *aff'd*, 962 F.3d 719 (3d Cir. 2020); *In re Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 5871243, at *5 n.8 (N.D. Cal. Oct. 7, 2016) ("Plaintiffs in such cases often plead in the alternative by claiming that defendants' conduct ought to be considered illegal per se, but even if it is not, that it is illegal under the rule of reason.").

Defendants' motion, citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) and *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014) (Dkt. 57 at 10), however, confuses the standards governing when there is a <u>violation</u> under the Sherman Act, and antitrust <u>standing</u> under the Clayton Act. The discussion of anticompetitive harm in those cases, which Defendants refer to as harm to "market-wide competition" or "injuries to the market" (*id.*), is part of the violation, <u>not</u> standing. The Fifth Circuit has explained this common error:

> Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability. . . . And in 1984, this court explained, albeit in a motion for rehearing, that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing.

*Doctor's Hosp. of Jefferson*, 123 F.3d at 305 (citations omitted). In other words, "market harm" is not a standing requirement at all, it is an element of the substantive Section 1 claim under the Sherman Act. In horizontal price-fixing cases like this one, market harm is presumed. *See N. Pac. Ry.*, 356 U.S. at 5*.; see also Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1017 n.11 (5th Cir. 1984) ("Where a *per se* violation has occurred, the plaintiff is not required to show any anticompetitive effects; these are presumed."). Thus, following the Fifth Circuit's guidance, for purposes of assessing W&T's standing, this Court should presume that the sureties have been engaged in price fixing and a group boycott of W&T.

**B.    As a Victim Injured by *Per Se* Unlawful Anticompetitive Conduct, W&T Has Standing to Bring Its Antitrust Claims**

There is no doubt that a consumer who has been charged higher prices because of price fixing has been injured and that the injury flows from the antitrust violation. *See Doctor's Hosp. of Jefferson*, 123 F.3d at 305 ("[A]ntitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition."); *In re Aluminum Warehousing*

*Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("[C]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.").  W&T's injury is no different—the sureties' price fixing conspiracy has injured its business, its reputation, and its future viability.

From this perspective, W&T has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489.  Being "forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct" is an injury that "plainly is 'of the type the antitrust laws were intended to prevent.'"  *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick*, 429 U.S. at 489)).  Likewise, a customer suffers antitrust injury when they are "directly driven from the market by an agreement in restraint of trade." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1014 (9th Cir. 2003).  This is exactly the harm that W&T has alleged: its business is threatened to be destroyed due to a coordinated effort by the sureties to demand higher prices in the form of increased premiums and demands for tens upon tens of millions of dollars in collateral.  *See, e.g.*, Dkt. 36 ¶¶ 1, 5, 85, 98, 103–107, 122, 129, 168.

Defendants' motion concedes W&T has alleged an injury-in-fact, Dkt. 57 at 12, but they suggest that the existence of a contractual injury precludes recovery for the antitrust injury—it does not.  *See*, *e.g.*, *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843, 853 (5th Cir. 2015) (affirming judgment against JSW, which was found to have both violated Section 1 of the Sherman Act and breached their contract with the plaintiff).  The cases Defendants cite stand for the unremarkable proposition that a plaintiff cannot recover antitrust damages for an injury not caused by an antitrust violation.  Dkt. 57 at 12.  But antitrust liability may be predicated on conduct that also creates a contract dispute:

Vernon is not simply claiming that Edison breached its contract.  Instead, Vernon is claiming that by preventing the purchase of electricity from Nevada Power, Edison acted anticompetitively and without a legitimate business reason.  The fact that Vernon and Edison have a contract allowing Edison to interrupt transmission "for any reason" is beside the point.  The contractual right to interrupt service does not grant Edison the freedom to act anticompetitively.

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992).[4]  That is what W&T has alleged—an antitrust injury in addition to contractual violations.

### C.    W&T Has Plausibly Alleged Concerted Action

A business may respond to a market event by increasing a contractual price if it acts alone based on its independent business judgment.  But when that business agrees with its competitors that they will each institute a price increase, that violates the antitrust laws.  *See United States v. All Star Indus.*, 962 F.2d 465, 469 (5th Cir. 1992) ("Agreements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the per se category." (quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8 (1979))); *see also id.* at 469 n.8 (citing cases).  That is what happened here—collective action among competitors to raise rates and financial terms upon which they would do business with W&T and other offshore oil and gas companies.

As set forth above, a violation of Section 1 of the Sherman Act requires: (1) concerted action (2) that unreasonably restrains trade.  Because price fixing is a *per se* unlawful offense, it is sufficient to allege that two or more competitors have joined a price-fixing conspiracy.  *See, e.g.*, *United States v. MMR Corp.*, 907 F.2d 489, 495 (5th Cir. 1990) (where defendants were charged with a *per se* violation of the Sherman Act, "it is enough that the government shows that the defendants accepted an invitation to join in a conspiracy whose object was unlawfully restraining

---

[4] *See also id.* ("We are not convinced that antitrust liability may not be predicated on conduct which also happens to create a contract dispute."); *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995) ("Certainly, an individual act of misconduct can be the gravamen of more than one wrong to a single plaintiff.").

trade" (citation omitted)).  When there is direct evidence of concerted action, a claimant does not need any additional allegations of circumstantial evidence or plus factors. *See Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, at *10 (S.D. Tex. Apr. 24, 2019) ("If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." (quoting *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010))).

Contrary to what Defendants suggest, W&T's complaint provides direct evidence of concerted action by the Defendants.  "Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a conspiracy claim." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008).  When analyzing conspiracy allegations, "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962).

Here, W&T alleges direct (and circumstantial) evidence of concerted action by the sureties to collectively increase the financial terms on which they would do business with W&T and other independent offshore oil and gas companies—whether through calls for collateral, increased rates, or both—to the detriment of the oil and gas companies.  *See, e.g.*, Dkt. 36 ¶¶ 3, 4, 37, 74, 90, 110. Concerted action under the Sherman Act can range from a written contract to a tacit agreement. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946) ("No formal agreement is necessary to constitute an unlawful conspiracy. . . .  The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in any exchange of words."); *MMR Corp.*, 907 F.2d at 495 (holding there is no requirement to prove "a formal, express agreement with all the terms precisely set out and clearly understood by

the conspirators").   Indeed, an invitation for collective action followed by conduct showing acceptance is sufficient to establish concerted action under Section 1.  *Interstate Circuit*, 306 U.S. at 227; *see also United States v. Foley*, 598 F.2d 1323, 1327 (4th Cir. 1978) (affirming antitrust convictions where at a group dinner attended by competitors, ringleader "announced that his firm was raising its commission rate from six percent to seven percent. A discussion about the rate change ensued. Within the following months each of the corporate defendants substantially adopted a seven percent commission rate.").  As set forth below, that conduct is remarkably similar to the conduct by the sureties that W&T has alleged here.

### 1.    W&T Has Alleged Sufficient Direct Evidence of Concerted Action

Defendants choose not to address the direct evidence that W&T has alleged about an agreement among the sureties, but the sureties' own words and actions describe the sureties' agreement to collectively demand increased financial terms from W&T and other offshore oil and gas companies.  For example, W&T alleges the overarching nature of the conspiracy, and that the participants met to discuss their plan to collectively increase premiums, demand collateral, and change the terms on which they would do business with their customers:

- "[I]n 2024, representatives of the Sureties and co-conspirators met to discuss their collective response to the BOEM rule and agreed to collectively change their analysis and terms at the expense of smaller companies like W&T."  Dkt. 36 ¶ 37.

- "Sompo [Lexon] formulated a scheme with all other sureties of W&T to demand roughly $250 million in collateral.  Through their demand, the Sureties planned to: (1) jointly squeeze their targets' assets; (2) jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual; and (3) jointly increase premiums, collateral, and bonding costs against their targets."  *Id*. ¶ 122.

- Lexon "encouraged and enlisted the support of other Sureties, in rapid succession, to demand additional collateral, including U.S. Specialty, Applied, and U.S. Fire."  *Id*. ¶ 86.

13

- "Sompo's [Lexon's] own representative admittedly met with other sureties in 2024 to 'collectively' change their 'analysis' and 'terms' for these companies." *Id*. ¶ 90.

- "[T]he Sureties met one or more times in 2024 to jointly increase their premiums, expedite their collateral demands, and change the terms of their contracts and dealings." *Id*. ¶ 119.

- "The Sureties and their representatives, including Mr. Hennesy and Mr. Kilpatrick, continued meeting throughout 2024 to further plan and execute their scheme." *Id*. ¶ 124.

- "As admitted during the [November 12, 2024] Sompo-Applied Presentation, Sompo's [Lexon's] and Applied's representatives . . . agree[d] to fix new terms against companies like W&T, and pursue a 'collective' strategy to benefit the surety industry. According to Applied, '[E]veryone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?" *Id*. ¶ 121.

- The November 2024 meeting "was not the first time W&T's sureties met to discuss their scheme, nor their last: they meet regularly to collude and profit against companies like W&T, including through NASPB's and SFAA's events." *Id*.

Moreover, W&T not only provides facts regarding the parties' agreement, it also alleges the dates the Defendants discussed their plan for concerted action as well as the specific dates they carried out their plans:

- February 29, 2024 SFAA-NASBP Legislative Meeting. *Id*. ¶¶ 121, 124.

- April 30-May 3, 2024 NASBP Annual Meeting. *Id*.

- May 9, 2024 SFAA Annual Meeting. *Id*.

- July 2, 2024 Philadelphia Insurance Company demands collateral. *Id*. ¶ 107 n.5.

- July 9, 2024 Lexon demands collateral. *Id*. ¶ 85.

- July 31, 2024 U.S. Specialty demands collateral. *Id*. ¶ 103.

- October 1, 2024 Applied demands collateral and increased premiums. *Id*. ¶ 98 & Ex. J.

- October 14, 2024 U.S. Fire demands collateral. *Id*. ¶ 104.

14

That the sureties did not make their collateral demands in perfect unison is irrelevant (particularly in the context of a Rule 12(b)(6) motion). "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227. Nor is it relevant that individual acts viewed in isolation may be unremarkable or lawful—it is black letter conspiracy law that "[a]cts that are by themselves wholly innocent acts may be part of the sum of the acts that make up a conspiracy to restrain trade in violation of the Sherman Act." ABA Model Jury Instructions in Criminal Antitrust Cases, Chapter 3.D, Conspiracy Explained.

W&T's specific, well pled, factual allegations about meetings, statements, and coordinated demands are more than parallel conduct—they are direct evidence of invitation, acceptance, and ongoing agreement among the sureties. *See, e.g.*, *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) (holding that plaintiffs' pleadings were sufficient because in addition to simply alleging that a conspiracy existed, the complaint indicated that the defendants met and collectively agreed on a method of manipulating the relevant market); *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, 2014 WL 12497080, at *4 (W.D. Tex. Sept. 8, 2014) ("Here, however, Plaintiffs have alleged more than parallel conduct. They allege particular discussions, meetings, agreements, and joint undertakings among Defendants related to the development of a 'standard of care' and the advocacy of that 'standard of care' to primary care physicians and third-party payors.").

## 2. W&T Has Also Alleged Sufficient Circumstantial Evidence of Concerted Action

Because W&T's direct evidence is sufficient to establish concerted action, there is no need to evaluate the existence of any "plus factors" under *Twombly*. "[P]lus factors need be pled only

when a plaintiff's claims of conspiracy rests on parallel conduct." *Kjessler*, 2019 WL 3017132, at

*10 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010)).

But even if viewed through this lens, W&T has provided sufficient allegations to plausibly

establish a conspiracy.  Given the direct evidence of the conspiracy, one would expect to also find

evidence of parallel conduct.  There is.  Around the same time in mid-2024, the sureties demanded

unprecedented, excessive collateral and increased premiums.  *E.g.*, Dkt. 36 ¶¶ 5, 85, 87, 90, 92,

98, 101, 103–107; *see SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015)

("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted

'similarly.'"); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243

(3d Cir. 1993) (affirming that parallel behavior was established through similar conduct even

where "the defendants did not use the same prices or run their internal business operations

identically").  These demands are tied to the conspiracy's entire purpose: to impose higher prices

and more onerous financial terms on their customers via the sureties' agreement not to compete

against one another on price or terms.  As W&T has alleged, the sureties were motivated by

declining profits to use the new BOEM Rule as a pretext for them to collectively impose higher

prices and more onerous collateral terms on independent oil and gas companies like W&T.  Dkt.

36 ¶¶ 86, 90, 112, 114, 116–18; 121.

That some sureties may have followed slightly different timing to effectuate their

coordinated demands for payment does not undermine the plausibility of the alleged agreement.

*See, e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (disagreeing

with the district court's holding that the plaintiff's "conspiracy claim was implausible because [the]

defendants had a variety of reactions" and instead finding that "the key parallel conduct allegation

was that all of the publisher and distributor defendants ceased doing business with [the plaintiff]"

16

(alterations added; quotation marks, emphasis, and citation omitted)); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) ("[T]he Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct.").  Indeed, slight differences in timing or methods can reflect consciousness of guilt and an attempt to conceal the conspiracy.  *See SD3, LLC*, 801 F.3d at 428 (noting "if the defendants employed different courses of action, then their conspiracy might better avoid detection").

Although unnecessary given the direct evidence of Defendants' unlawful conduct, W&T's complaint also alleges multiple "plus factors" that demonstrate that the sureties' acts were not mere parallel conduct.  The plus factors present here include the sureties taking actions that would be against their individual self-interests if they were acting independently, but consistent with their self-interests if they were acting in concert; a common motive; pretextual reasons; and a small market with high barriers to entry and opportunities to collude.  *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022).

### a.   Demands for Collateral and Price Increases Would Be Against Defendants' Self-Interest Acting Independently

The sureties would lose business if they demanded collateral or raised prices unilaterally. This is because other federally certified sureties could then undercut them by offering better terms. But the sureties knew that because they dominated the Gulf of America offshore surety market, they could reap higher profits if they joined forces.  Dkt No. 36 ¶ 122 (attempting to "jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual"); *id.* ¶ 128 ("[Sureties] claim they can 'collectively' make more money and remain profitable by 'collectively' agreeing to change their 'analysis' and 'terms' against companies like W&T.").

17

**b.      Defendants' Common Motive**

The sureties had a common motive to collude—stopping the decline of their profits and offsetting other losses. *Id*. ¶ 128 (sureties "can 'collectively' make more money and remain profitable by 'collectively' agreeing to change their 'analysis' and 'terms' against companies like W&T."). W&T's allegations are substantiated by Defendants' own words. During the November 2024 presentation by Lexon and Applied, they admitted "that Sompo's [Lexon's] and Applied's representatives had previously met to discuss recent bankruptcies and the BOEM rule, agree to fix new terms against companies like W&T, and pursue a 'collective' strategy to benefit the surety industry." In particular, Applied stated that the sureties decided that they had to work together to stop their declining profits. *Id.* ¶ 121 (Applied representative stating, "[E]veryone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?").

It is no defense to price fixing for Defendants to claim they did it to protect their investments from losses, *see United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088 (5th Cir. 1978), nor to prevent "ruinous competition," *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 346 (1982) (quoting *Socony-Vacuum Oil*, 310 U.S. at 221). In fact, any "attempt to justify a conspiracy to raise prices 'on the basis of the potential threat that competition poses . . . is nothing less than a frontal assault on the basic policy of the Sherman Act.'" *United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)).

**c.      Defendants' Pretextual Reasons for Their Conduct**

To conceal their illegal scheme motivated by their desire to gain profits through price fixing, the Defendants gave pretextual reasons for their conduct. Dkt 36 ¶ 114 ("the Sureties nevertheless used BOEM's rule as a pretext to collectively and in concerted fashion demand nearly

18

$250 million from W&T"). In particular, the Defendants claimed that the BOEM Rule (which only applied to newly issued surety bonds) somehow authorized them to increase premiums and demand additional collateral for existing bonds. *Id*. It did not.

The BOEM Rule also did not authorize or excuse collusion among competitors. At the November 12, 2024 meeting, representatives of Defendants and Applied specifically discussed requiring collateral and acknowledged that neither the BOEM rule nor their contracts provided a basis for those demands. *Id*. ¶¶ 116–18; *see also id*. ¶¶ 52–54, 70–74, 85–89, 96–101, 103, 105, 108–109, 112–15. Thus, as previously discussed, not only is Defendants' reliance on the BOEM Rule pretextual for the increases themselves, but it also demonstrates the existence of an initial coordinated pretextual narrative to conceal the conspiracy's existence.

### d. Offshore Surety Market Is Highly Concentrated with Ample Opportunities for Sellers to Collude and High Barriers to Entry to Keep New Participants Out

The "offshore surety market in the United States is heavily concentrated and controlled by the Sureties and other key players." *Id*. ¶ 35. The market for federally certified offshore surety bonds "has high barriers to entry and high concentration due to capital requirements, risk tolerance, and government relations." *Id*. ¶ 123. "The Sureties have had power in the relevant market during the entire relevant time due to their substantial share of this market and substantial barriers such as capital requirements and government regulations that prevent others from readily entering the relevant market." *Id*. ¶ 128. "The Sureties and their cohorts claim they can "'say no,' even to the federal government. They claim they can jointly decide to not write a 'single new bond' in the Gulf of Mexico." *Id*. And "there are no close economic and/or functional substitutes for these federally certified surety bonds." *Id*. ¶ 126.

Not only is the Gulf of America surety market consolidated, but the overlapping associations, meetings, and relationships make collusion plausible. *Id*. ¶ 35 (the sureties "are all

part of and/or actively support similar trade associations, including The Surety & Fidelity Association of America ('SFAA')"); ¶ 36 (sureties "participate in regular meetings around the nation to respond to industry threats and jointly influence government decisions"); ¶ 37 ("The Sureties' opportunities for collusion continue[] through major annual events, conferences, and meetings each year, with companies like Sompo [Lexon] and Applied entrenched in trade associations and actively seeking to influence other sureties to follow their lead."); ¶¶ 123–24 (the sureties have opportunities to collude at industry and social events with key decision-makers and industry leaders (discussing examples); also listing meetings held "soon before the Sureties began jointly demanding immediate collateral from W&T in rapid succession"; influence over surety trade associations like SFAA and NASBP, including through Mr. Hennesy, Chairman of SFAA's Energy Subcommittee, and Mr. Kilpatrick, a member of and contributor to SFAA and NASBP).

Defendants attempt to dismiss the allegations regarding the sureties' associations, meetings, and relationships as mere membership in trade associations. Dkt. 57 at 18.  But to the contrary, W&T's allegations describe in detail the collusion that occurred at one of those very trade association meetings—the November NASBP meeting.  *Id.* ¶¶ 116–18; 121.  With this additional insight into what was discussed, the additional meetings of the same trade association close in time to the collateral demands take on far more significance than "mere membership." Regardless, the opportunities to conspire are just one among several plus factors.

These allegations are sufficient to show the "plus factors" that indicate that the sureties' behavior is not merely parallel conduct.  *See, e.g.*, *Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, at *11 ("Kurji's January 2016 statement recognizing the declining profits in the CPP industry suggests Defendants shared a common motive to conspire."); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 450 (E.D. Pa. 2018) ("Declining prices or profits in a market

make price competition more than usually risky and collusion more than usually attractive." (internal quotation marks omitted)); *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320 (6th Cir. 2014) (showing that "the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy" is a plus factor); *Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.*, 2020 WL 4050243, at *7 (E.D. La. Jul. 17, 2020) (plausible allegations of collusion where insurers acted against self-interest to ensure that the dominant players in each market were denying claims to limit reimbursement expenses with minimal loss of customers).

At this stage, the Defendants' alternative—and consistently shifting—explanations about economic rationales cannot overcome what W&T alleged in its complaint. "'The question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" *Acad. of Allergy & Asthma in Primary Care*, 2020 WL 4050243, at *7 (quoting *Anderson News*, 680 F.3d at 189). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* (quoting *Anderson News*, 680 F.3d at 185). "The Court must accept the plaintiff's version of events, so long as that version is plausible, and it may not dismiss the complaint 'merely because [it] finds a different version more plausible.'" *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013) (quoting *Anderson News*, 680 F.3d at 185).

**D.    W&T Has Properly Alleged Price Fixing, Which Is a *Per Se* Unreasonable Restraint of Trade**

Having adequately pleaded concerted action by the sureties, the complaint sufficiently sets forth the second element of an antitrust violation—an unreasonable restraint of trade. As set forth above, price fixing is *per se* unlawful and does not require further pleading to demonstrate its

21

anticompetitive harm or effect.  *See Socony-Vacuum Oil*, 310 U.S. at 218 (price fixing per se unlawful); *N. Pac. Ry.*, 356 U.S. at 5; *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) (explaining that through the *per se* rule, "the Supreme Court declared what must automatically be treated as unreasonable").

Defendants have not suggested that horizontal price fixing is not a per se violation as a matter of law.  Rather, Defendants argue only that "W&T has not alleged that the Sureties fixed the price of anything—collateral payments, premiums, or any other component of price."  Dkt. 57 at 18 (emphasis omitted).  But Defendants attack a straw man by reciting a laundry list of things that they did not "fix," *id.* at 19, and ignore the express allegations of what the sureties did agree to fix with respect to premiums and collateral, along with Supreme Court precedent that expressly rejects a narrow or literal reading of the words "price" and "fixed."  *Socony-Vacuum Oil Co.*, 310 U.S. at 221 ("Any combination which tampers with price structures is engaged in an unlawful activity.").  As the Court explained, terms are "fixed because they are agreed upon."  *Id.* at 222.  It does not matter "that the prices . . . were not fixed in the sense that they were uniform and inflexible."  *Id.*  And the precise "machinery employed by a combination for price-fixing is immaterial."  *Id.* at 223; *see also United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 690–91 (7th Cir. 1961) (unlawful agreement among gasoline retailers not to give trading stamps).

The Defendants attempt to excuse their conduct by suggesting that W&T "merely alleges that the Sureties demanded additional collateral or increased premiums under separate, preexisting contracts with W&T."  Dkt. 57 at 19.  But Defendants' argument ignores both the allegations of W&T's complaint as well as antitrust law.  In particular, W&T alleges that the sureties entered into an agreement with one another to increase premiums and demand additional collateral from W&T and other oil and gas companies.  That the sureties attempted to pretextually justify their

conduct by relying on their individual contracts is irrelevant given that Defendants admitted in November 2024 that they had met and reached this agreement.

Defendants' argument is wrong as a matter of law as well because the Defendants' concerted action is what the Sherman Act prohibits.  The Supreme Court has noted that even when competitors entered into an agreement to adhere to prices and terms that they had previously announced independently is illegal price fixing.  *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648–49 (1980) (describing as unlawful "an agreement to adhere to previously announced prices and terms of sale, even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement" (citing *Sugar Institute v. United States*, 297 U.S. 553, 601–602 (1936))).  The sureties' collective agreement to change the financial terms of their product—regardless of whether those terms themselves were unreasonable or perfectly lawful—is unlawful price fixing.  *Id.* at 647 ("It is no excuse that the prices fixed are themselves reasonable.").

Defendants further emphasize that their product should be viewed as "financing."  Dkt. 57 at 1, 15.  Agreements between competitors related to financing, like credit terms, are squarely within the definition of price fixing.  *See Catalano*, 446 U.S. at 648.  There is no support for the sureties' contention that "[p]rice-fixing claims only concern fixing amounts."  Dkt. 57 at 20.  In *Catalano*, the Court held that an "agreement to terminate the *practice* of giving credit" is a price-fixing agreement because "[i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time."  446 U.S. at 648 (emphasis added).  The same logic applies to an agreement to demand millions of dollars in additional collateral—it is tantamount to increasing the price the oil and gas company must pay for bonds.  Dkt. 36 ¶¶ 1, 4, 90, 114, 119, 122 (alleging that the

Sureties jointly demanded unprecedented and excessive collateral not based on actual or potential liability).[5]

## II.    W&T Has Properly Pled a Claim for Tortious Interference

As discussed above, W&T's antitrust claims against Defendants are detailed and more than plausible (which is all that is required at the Rule 12(b)(6) stage).   Defendants further argue that W&T has not identified an agreement with which Defendants interfered, and that the Indemnity Agreement cannot be the contract since Defendants are not "stranger[s]" to it.   Dkt. 57 at 23. Defendants' arguments miss the mark.   Rather, W&T alleges that each Defendant interfered with W&T's contracts with other sureties, as well as W&T's business prospective business relationships with those sureties.   Though the various indemnity agreements at issue often possess similar terms (which the sureties imposed using their market power), they are exclusively between W&T and those individual entities.   Thus, Defendants were "strangers" to these agreements, and Defendants were well aware of W&T's contractual and business relationships with the other sureties.   This is clearly established in W&T's First Amended Complaint: "As part of its scheme, upon information and belief, Sompo [Lexon] apparently encouraged and enlisted the support of other Sureties, in rapid succession, to demand additional collateral, including U.S. Specialty, Applied, and U.S. Fire."   Dkt. 36 ¶ 86.

Additionally, W&T's First Amended Complaint also explains how Defendants used their market power to economically harm W&T's business.   *Id.* ¶¶ 92–129.   Their actions have had a detrimental ripple effect across W&T's business, including its existing and prospective business

---

[5] Notably, Texas courts do not order collateralization without a "triggering" event, such as proof of a company's impending bankruptcy or open, active claims on the bonds, and Defendants have failed to cite a single case to the contrary.  *See Endurance Assurance Corp. v. Axon Power & Gas LLC*, 2020 WL 3792259, at *1 (N.D. Tex. July 6, 2020) (denying Defendant Endurance's request for collateralization since the alleged harm was not irreparable but rather "strictly financial").

relationships with its customers, financial institutions, and other ancillary entities. W&T highlights this point in the following allegation: "The Sureties, including Sompo [Lexon], have induced, or attempted to induce, W&T's sureties, creditors, and other financial partners to reduce or negatively alter their business relationship with W&T." *Id.* ¶ 165. Indeed, Defendants' arguments show that they view themselves as a collective unit with the other sureties, to the point Defendants do not even believe they are "strangers" to those separate agreements. With this mentality, it is no surprise the Defendants conspired to violate the antitrust laws.

## III.    W&T Has Properly Pled a Civil Conspiracy Claim

Despite Defendants' assertions, W&T does not proffer a "derivative" conspiracy because W&T's counterclaims are valid: "The Sureties have engaged in a civil conspiracy to violate antitrust law, insurance law, and other Texas common law." If anything, Defendants' arguments are derivative of their antitrust arguments: as explained *above*, W&T has identified (1) two or more persons, (2) a common objective to be accomplished, (3) a meeting of the minds regarding that objective, (4) one or more unlawful, overt acts in furtherance of the conspiracy, and (5) resulting damages. Therefore, W&T has pled a claim for civil conspiracy.

## CONCLUSION

W&T has sufficiently pled an antitrust violation and antitrust standing. W&T has further adequately pleaded facts supporting W&T's (1) claim under the Texas Insurance Code; (2) tortious interference claim; and (3) civil conspiracy claim. Defendants' partial motion to dismiss should therefore be denied.[6] W&T further requests all other relief to which it is entitled.

---

[6] Defendants suggest that W&T's claims should be dismissed with prejudice. There is no basis to do so. If the court finds the factual allegations in the complaint deficient in any way, W&T requests leave to amend. *See Hernandez v. W. Tex. Treasures Est. Sales, L.L.C.*, 79 F.4th 464, 468 (5th Cir. 2023) ("[L]eave to amend should be liberally granted, when the plaintiff might be able to state a claim based on the underlying facts and circumstances.").

Dated: March 31, 2025

Respectfully submitted,

McGuireWoods LLP

*/s/ Yasser A. Madriz*
Yasser A. Madriz
**Attorney-in-Charge**
Texas State Bar No. 24037015
S.D. Texas Bar No. 39080
ymadriz@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile

**ATTORNEYS FOR W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC**

**OF COUNSEL:**
**Jason Huebinger**
Texas State Bar No. 24065460
S.D. Texas Bar No. 1717237
jhuebinger@mcguirewoods.com
**Miles O. Indest**
Texas State Bar No. 24101952
S.D. Texas Bar No. 3070349
mindest@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002


and

**J. Brent Justus**
bjustus@mcguirewoods.com
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219

**Megan Lewis**
*Pro Hac Vice Pending*
mlewis@mcguirewoods.com

McGuireWoods LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 31, 2025, the foregoing pleading was filed electronically using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

*/s/ Yasser A. Madriz*
Yasser A. Madriz
