IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Plaintiffs, | |
| v. | | Civil Action No. 4:24-CV-03047 |
| ENDURANCE ASSURANCE CORPORATION AND LEXON INSURANCE CO., | | |
| | Defendants. | |
| U.S. SPECIALTY INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04113 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |
| UNITED STATE FIRE INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04395 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |
| PENNSYLVANIA INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04400 |
| W&T OFFSHORE, INC., | | |
| | Defendant. | |

**PENNSYLVANIA INSURANCE COMPANY AND UNITED STATES FIRE INSURANCE COMPANY'S REPLY IN SUPPORT OF JOINT MOTION TO DISMISS**

Defendants UNITED STATES FIRE INSURANCE COMPANY ("US Fire") and PENNSYLVANIA INSURANCE COMPANY ("Penn") (US Fire and Penn are collectively referred to herein as the "Sureties") submit this Reply in support of their Joint Motion to Dismiss

[Dkt. 63] and in response to W&T Offshore, Inc. and W&T Energy VI, LLC's (collectively, "W&T") Response in opposition (the "Response") [Dkt. 76].

W&T's Response fails to cure the legal deficiencies in their First Amended Complaint for Declaratory Relief and Damages (hereinafter, the "Amended Complaint") [Dkt. 36], and therefore, the Joint Motion to Dismiss [Dkt. 63] should be granted.

## I. SUMMARY OF THE ARGUMENT

W&T's Response only highlights the fundamental flaws in its antitrust and other claims, confirming that dismissal is required. As explained previously, W&T at most alleges parallel demands for greater security by Penn and US Fire for which there is an obvious alternative explanation to W&T's conclusory allegations of conspiracy—namely, concern over W&T's financial condition and the need for greater security. Far from showing otherwise, W&T's Response fails even to account for its own prior allegations, which further confirm the grounds for such concern by (i) identifying a non-conspiratorial explanation for the Sompo[1] sureties' original demands and (ii) filing suit to block those demands on the grounds that they were excessive and damaging to the company. Penn and US Fire's demands did not occur until two months later. W&T cannot dispute that there was a credible basis for Penn and US Fire to question its financial condition when W&T itself sought judicial intervention to prevent further financial strain from collateral demands it characterized as unjustified and harmful.

These basic defects require dismissal under *Twombly*, but if anything, the problems with W&T's allegations run even deeper. Price-fixing claims, including those routinely found to be inadequate under *Twombly*, generally involve circumstances where the object of the alleged

---

[1] "Sompo" as used herein refers jointly to defendants Endurance Assurance Corporation and Lexon Insurance Co.

conspiracy at least makes economic sense—*e.g.*, enabling the conspirators to charge higher prices. The same cannot be said here where Penn and US Fire (and the other sureties) are parties with preexisting contractual relationships with W&T that all are designed to ensure W&T meets the obligations secured by the surety bonds that the various companies are providing. In such a situation, the parties do not benefit from collective demands that worsen W&T's financial condition. Rather they are harmed by them because other parties making similar demands increases the likelihood that W&T would be unable to live up to its contractual obligations. The antitrust claims must be dismissed both because they are inadequately alleged and because they are facially incoherent.

Far from addressing these fundamental flaws, W&T's Response rests on several misstatements and a basic disregard for its own allegations and key facts. First, W&T asserts it is "required by federal regulations to obtain surety bonds." That assertion is incorrect. Federal regulations permit W&T to satisfy its obligations through alternative forms of security—including 100% cash. W&T chose surety bonds because they were more economical, just as a consumer may choose to finance a purchase instead of paying in full. But having opted for the benefit of third-party credit, W&T cannot now disavow the terms it agreed to in securing that benefit.

Second, W&T entirely ignores that the Sureties first requested to be replaced on the bonds—not collateralized. This distinction is critical. The Sureties gave W&T an open invitation to test its theory of market fairness by seeking replacement bonds. If W&T truly believed the demands were unreasonable, it had a clear path to avoid posting collateral, and W&T's failure or refusal to even attempt to replace the bonds speaks volumes. Whether the market truly declined to offer alternatives, or W&T's own financial condition precluded replacement, the result is the same: this is not a conspiracy, it is a commercial reality. The Sureties simply exercised their contractual

rights—rights that explicitly contemplated market-based checks.

Third, W&T attempts to shield itself behind the four corners of its Amended Complaint, hoping the Court will disregard its prior, contradictory statements in prior pleadings and public filings. But courts in this Circuit are not required to turn a blind eye to such contradictions. As discussed in *Carrillo v. Buendia*,[2] when a litigant reverses course without explanation, courts may treat the new allegations as a sham—and should. And even apart from that line of case-law, W&T cannot dispute under *Twombly* that its own publicly made allegations provide an obvious alternative explanation to its conclusory assertions of conspiracy.

Each of these flaws independently defeats W&T's claims. Together, they reveal the Response for what it is: an attempt to transform a contractual dispute into an antitrust claim divorced from the governing contracts, available market alternatives, and W&T's own previous allegations and representations.

## II. W&T HAS FAILED TO ALLEGE A PLAUSIBLE SECTION 1 CLAIM

Nothing in W&T's Response changes the fact that it has failed to state a plausible claim for violation of Section 1 of the Sherman Act. First, it fails to provide any direct evidence of a "meeting of the minds." Instead, it lists only conclusory assertions "on information and belief" of an agreement reached some time in 2024 along with a listing of trade association meetings. The only allegation that specifically mentions one of the Sureties (Penn), and the only meeting where W&T claims to have specific information, took place in November 2024, *after* all of the defendants had purportedly reached agreement and made their demands. Further, the quotation from that meeting does not reflect an agreement to target W&T, but rather is a general question about how to improve profits going forward. [Dkt.76, p. 12].

---

[2] No. 2:20-CV-28, 2020 WL 4584380 (S.D. Tex. Aug. 10, 2020).

Second, W&T fails to provide circumstantial evidence of conspiracy that meets the requirements of *Twombly* and *Iqbal* plausibility standard. As discussed in the Joint Motion to Dismiss, parallel conduct does not provide a basis for inferring conspiracy where (as here) there is an obvious independent basis for it. [Dkt. 63, p. 14]. W&T fails to account for the obvious independent explanation for Penn and US Fire's collateral demands—namely, their own financial analysis, coupled with the fact that Penn and US Fire did not make their demands until *after* W&T had publicly sued the Sompo entities claiming that Sompo's actions were threatening W&T's financial condition. [Dkt. 1, ¶ 64 (alleging in its original complaint that the "Sompo Sureties" demands for collateral would "plac[e] W&T in an impossible position, as complying with one demand will require W&T to breach its obligations to the other.")].

That independent interest is further shown by the fact that Penn and US Fire specifically asked to be released from the surety bond prior to demanding increased collateral [Dkt. 36, ¶ 98 and Exs. J and L]—*i.e.*, it specifically gave W&T the opportunity to release it from its obligation. W&T also previously provided its own non-conspiratorial explanation for why the Sompo Sureties would have originally made their demands—*i.e.*, that the "Sompo Sureties have, on information and belief, made the decision that they wish to exit the market for surety bonds related to the Outer Continental Shelf." [Dkt. 1, ¶ 64].

This alone demonstrates the insufficiency of W&T's allegations under *Twombly*, but if anything, W&T's allegations of conspiracy are even more deficient than allegations that themselves regularly fall short of meeting the *Twombly* standard. Even inadequate and conclusory allegations of price-fixing typically allege an economic incentive to engage in the alleged conspiracy—*i.e.*, the ability to charge higher prices without fear of being undercut by competition. The same cannot be said here where the demands of other sureties would have weakened W&T's

financial condition, its ability to meet its indemnification obligations, and its ability to pay higher premiums and post additional collateral for any or all of the sureties. As stated in the Sureties' Joint Motion to Dismiss if "W&T were forced into financial distress, the Sureties themselves would be left exposed on hundreds of millions of dollars in bonded obligations." [Dkt. 63, p. 14]. Thus, any surety that wanted to make its own demands would not have wanted other sureties to do the same because they would have wanted W&T to stay in a position to make good on its obligations.[3] W&T's allegations of conspiracy are therefore not merely inadequately alleged; they are facially nonsensical.

Relatedly, W&T has no credible answer to the point that the conspiracy alleged does not involve a price fixing or a restriction on competition at all. W&T responds that it need not allege "a specific set price" to allege price fixing. That misses the point that the complaint and harm alleged to W&T does not implicate price competition between the sureties at all. Rather it turns on the requirements of W&T's own contracts with the various sureties and what those contracts permit in terms of the right to demand increased premiums and increased collateral. If, as is the case, the Sureties have the right to demand increased collateral under their agreements because of W&T's impaired financial condition, then W&T has no grounds for complaint that they are demanding it. Conversely, if W&T could show that the contract does not permit the demands, then no conspiracy could give Penn and US Fire the ability to impose them. Either way, the question is one of contractual interpretation, not antitrust law.

---

[3] This market-based reality was noted repeatedly by W&T in its Original Complaint. *See* Original Complaint, Dkt. 1, ¶ 61 ("The discussions with the Other Sureties have revealed that any agreement regarding alternative collateral will depend on W&T not providing cash or a letter of credit to any other surety . . ."); *Id.* ¶ 72 (W&T alleging that that such conflicting demands and "disparate actions of the Sompo Sureties, on the one hand, and the Other Sureties, on the other hand, place W&T in an impossible position, as compliance with one's demand ensures a breach of obligations to the other.").

W&T's vague and cursory discussion of "plus factors" further confirms that it has failed to plausibly allege a conspiracy under the standards of *Twombly*. W&T, for example, points to annual trade association meetings in February, April, and May 2024, followed by demands for collateral on July 2nd (by non-party, Philadelphia Indemnity Insurance Company), July 9th (Sompo), July 31st (U.S. Specialty Insurance Company), October 1st (Penn), and October 14th (US Fire). But trade association participation and similar timing alone do not make a conspiracy. *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019).

W&T also offers a single conclusory sentence that it would have been against the sureties' interests to make their demands lest they "undercut" one another. [Dkt. 76, p. 15]. As discussed above, this ignores that Penn and US Fire's actions are easily explained by their own concerns about W&T's financial condition. Each had an independent reason to make their demands after W&T had publicly stated that the Sompo entities' demands were threatening their financial condition. The explanation is further reinforced by W&T's acknowledgement that Penn and US Fire specifically asked to be released from the surety bond prior to demanding collateral [Dkt. 36, ¶ 98 and Ex. J] and [Dkt. 36, ¶ 104 and Ex. L, respectively].

W&T argues that the reasons offered by US Fire and Penn are "pretextual" because the new Bureau of Ocean Energy Management ("BOEM") Rule "did not authorize or excuse collusion" or "authorize calls for collateral or rate increases at all." [Dkt. 76, p. 16]. That is a straw man. First, Penn did not cite the BOEM rule in its October demand; it cited its determination that W&T's "financial condition has been or is believed to be deteriorating." [Dkt. 36, Ex. J]. Likewise, US Fire's discharge demand was based solely on its agreement with W&T and made no reference at all to any BOEM regulations. [Dkt. 36, Ex. L.]. And as discussed, both were justified by, among other things, W&T's own public statements from two months before that its financial condition

had been threatened. [Dkt. 1, ¶ 67]. Second, it is irrelevant whether the rule authorized increased collateral calls given that it clearly imposed greater financial burdens on W&T that the sureties could have taken into account.

Finally, W&T briefly claims the market is "highly concentrated." Allegations of high concentration, opportunities to conspire, and an alleged motive to conspire do not suffice to state a plausible conspiracy claim under *Twombly*. *See, e.g.*, *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 602, *aff'd,* No. 22-20149, 2025 WL 832801 (5th Cir. Mar. 17, 2025) (finding that conclusory allegations of a "common motive" to suppress a competitor, an oligopoly, and opportunities to conspire were insufficient to allege a conspiracy). Moreover, W&T does not even provide basic information about market share. Nor does it claim that the sureties are the only available competitors, instead referring to other "key players." *See also* note 5 *infra* (pointing to the fact that there are over 30 companies providing BOEM bonds).

### III. W&T MISCHARACTERIZES FEDERAL REGULATORY REQUIREMENTS

W&T inaccurately claims it was *forced* by regulation to obtain surety bonds. This is palpably false. Under applicable BOEM regulations (30 C.F.R. § 556.901), lessees may satisfy financial assurance obligations through various substitute instruments, including cash deposits, letters of credit, Treasury securities, or, as utilized in this case, surety bonds. W&T chose surety bonds, likely because it was a cheaper alternative preserving cash flow by paying only a fraction of the bond amount as a premium. Having accepted the benefits of third-party credit, W&T cannot now disavow its obligations. Regulatory flexibility is not coercion. W&T's attempt to reframe a commercial disagreement over collateral as an antitrust violation ignores both the governing regulations and the terms of the indemnity agreements W&T willingly accepted.

The Sureties are now asking W&T to do exactly what the federal government has always

had the right to ask for and what W&T agreed to do in the indemnity agreements it executed as consideration for the Sureties executing the bonds: post sufficient collateral.[4]

## IV. W&T OTHERWISE FAILS TO ALLEGE ANTITRUST INJURY

W&T's cursory discussion of antitrust injury ignores two critical facts. First, it has contracts with US Fire and Penn. Those contracts govern whether US Fire and Penn may charge more or demand additional collateral. Second, W&T sidesteps a critical fact: the Sureties initially asked to be replaced—not collateralized. As the Sureties highlighted in their Joint Motion to Dismiss, W&T effectively seeks to hold them prisoner to these bonds, denying any way to end the business relationship. W&T's 34-page Response [Dkt. 76] leaves unanswered the crucial question: if W&T's position is correct, how can the Sureties terminate the relationship? Under W&T's logic, they cannot.

The Sureties explicitly invited W&T to seek replacement bonds with different sureties, thus allowing W&T to avoid posting collateral or renewing with the current Sureties.[5] Any asserted

---

[4] The collateral required by sureties is fundamentally distinct from the price-related conduct addressed in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980). In *Catalano*, the Court condemned a horizontal agreement among competitors to eliminate short-term trade credit, recognizing it as a covert form of price-fixing. In contrast, the collateral at issue here functions as a security interest—intended to guard against potential default on regulatory obligations—rather than as consideration for goods or services. Importantly, the collateral remains the property of W&T (subject to a security interest), may earn interest for W&T's benefit, and is returned to W&T upon exoneration of the relevant surety bonds. This differs materially from a cash payment for a commodity, where the purchaser forfeits all ownership interest and expectation of return.

[5] There are over thirty (30) active sureties writing and executing the relevant BOEM bonds in the Gulf of America. *See, e.g.*, Gulf of America Region – Property and Collateral List Reports, BOEM PROPERTY LIST AND ORPHANED LIABILITY, https://www.boem.gov/oil-gas-energy/risk-management/property-list-and-orphaned-liability (last visited April 2, 2025). In ruling on a Rule 12(b)(6) motion, "a court may take judicial notice of a fact not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' such as information on government websites." *Eagle SPE NV 1, Inc. v. Southern Highlands Dev. Corp.*, 36 F. Supp. 3d 981, 985 (D. Nev. 2014) (quoting FED. R. EVID. 201; *see, e.g., Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998–99 (9th Cir.2010) (taking

injury thus is not an antitrust injury, but rather derives from the requirements of the contract and the inability of W&T to secure better terms in the market.

W&T contends it is being "forced to pay supra-competitive prices" [Dkt. 76, p. 8], yet fails to acknowledge that both US Fire and Penn offered W&T the opportunity to replace the bonds.[6] Collateral was only demanded when W&T declined or failed to secure the requested replacements. This option to replace the bonds or modify the premium is expressly contemplated under the indemnity agreements and mirrors standard industry practice.

The alleged injury here is not the result of a boycott or collusion but arises from W&T's own failure to pursue alternatives. If W&T was unable to obtain replacement bonds, that reflects its financial condition or market standing—not any conduct by the Sureties.

Instead, W&T attempts to argue that "<u>even if</u> W&T could replace [the Sureties'] bonds," the unsupported allegation of tortious interference "greatly affected the <u>potential</u> terms" of any replacements. [Dkt. 76, p. 25] (emphasis added). This speculative assertion is an admission that W&T never tested the open market, does not know what terms it might have secured, and cannot even confirm if replacement bonds were available. Such willful avoidance of market realities is fatal to W&T's claims. Hypothetical harm based solely on conjecture cannot support a claim, and W&T should not be rewarded for its deliberate refusal to pursue alternative solutions.

W&T cannot rely on a bald allegation of tortious interference to encourage the Court to

---

judicial notice of official information posted on a governmental website, the accuracy of which was undisputed)); *see also Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

[6] In lieu of seeking immediate replacement of its bonds, Penn requested higher premiums, whereas US Fire simply sought replacement. These divergent approaches highlight commercially reasonable—and clearly independent—business decisions made by each surety. Although W&T now attempts to erase descriptive terms from its Amended Complaint, these previously admitted "disparate" actions remain, fatally undermining W&T's current allegations.

deny the Sureties' Joint Motion to Dismiss [Dkt. 63], especially when it plainly admits that it never even sought to obtain replacement bonds. It was W&T who decided to file a lawsuit against one of its sureties, putting the public, including W&T's other sureties, on notice that W&T was refusing to abide by the terms of a commercially acceptable and standard indemnity agreement. [Dkt. 1].

V.     **W&T HAS ADMITTED THAT INDEPENDENT ACTION IS LAWFUL**

One of the most important aspects of the Sureties' Joint Motion to Dismiss [Dkt. 63] was the conflicting statements made by W&T, yet W&T spends just a single paragraph addressing it. Here, W&T has been provided the opportunity to explain the differences between their first allegations in the Original Complaint [Dkt. 1] and their current allegations in the Amended Complaint [Dkt. 36], but W&T has failed to do so.

Instead, W&T, without explanation, merely seeks refuge within the four corners of its Amended Complaint [Dkt. 36], urging the Court to ignore contradictory assertions made in prior pleadings and public filings. To begin with, and as already discussed, W&T's assertions about the rationale for the sureties' actions at a minimum confirm that there are obvious alternative explanations for conspiracy that warrant dismissal under *Twombly*.

Moreover, courts in this Circuit are not obligated to overlook such glaring inconsistencies. When a party reverses its factual position without justification, courts may rightfully deem the revised allegations a sham. More specifically, when a contradiction is so egregious the court has discretion to disregard such statements. *Carrillo v. Buendia*, No. 2:20-CV-28, 2020 WL 4584380, at *5 (S.D. Tex. Aug. 10, 2020). Indeed, W&T previously acknowledged that sureties are entitled to act based upon their own "independent business judgment." This admission fatally undermines their newly minted conspiracy claim, rendering it unsustainable.

Further, *Carrillo* establishes that a plaintiff cannot assert a diametrically opposed version

of facts without explanation and expect those new allegations to be credited. *See Carrillo v. Buendia*, No. 2:20-CV-28, 2020 WL 4584380, at *5 (S.D. Tex. Aug. 10, 2020). W&T's prior statements, including SEC filings and court pleadings, confirm that (i) W&T's sureties, including US Fire and Penn, made disparate and conflicting collateral demands—both of which came ***after*** W&T filed its initial lawsuit against Sompo, (ii) the demands were triggered by different timelines and justifications, and (iii) W&T itself reported that these demands were not consistent or coordinated.

*Carrillo* reinforces that where W&T's amended allegations conflict with its own prior characterizations, the Court may consider those inconsistencies in weighing plausibility.

W&T's reliance on authority suggesting that this Court need not choose between "two plausible inferences" ignores that W&T itself previously supplied an alternative, plausible inference for the various defendants' "disparate" and reactionary behavior. W&T cannot now credibly resist dismissal on plausibility grounds after having itself introduced the obvious independent explanation—the Sureties' reaction to W&T's deteriorating financial condition and W&T's own lawsuit filing. And that is even assuming W&T had alleged a plausible inference of conspiracy to begin with, which—as set forth above—they plainly have not under *Twombly*.

Even if the Court relies solely on allegations in the Amended Complaint, as previously discussed, dismissal remains appropriate. Courts routinely dismiss antitrust claims based on parallel conduct where the plaintiff's allegations themselves suggest an "obviously reasonable response to a common external stimulus or business problem." *See, e.g., Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1009 (N.D. Cal. 2013).

## VI. PLAINTIFFS' REMAINING CLAIMS ARE MERITLESS

W&T's claims under the Texas Insurance Code remain legally barred, as suretyship is not insurance under established Fifth Circuit and Texas precedent. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist.* No. 1, 908 S.W.2d 415, 418 (Tex. 1995). W&T has no answer to this point. W&T's civil conspiracy, declaratory judgment, and tortious interference claims are derivative of its antitrust claim and fail for the same reasons. Further, to the extent its declaratory judgment claim is not coextensive, it is merely an attempt to litigate prospective defenses to a breach of contract action and also is a purely state law claim over which the Court lacks jurisdiction (once W&T's federal claims are dismissed as the law requires).

## VII. CONCLUSION

W&T has failed to state a claim for relief. W&T's Response [Dkt. 76] to the Sureties' Joint Motion to Dismiss [Dkt. 63] confirms that the Amended Complaint [Dkt. 36] is based on nothing more than speculation, economic frustration, and strategic litigation—not unlawful conduct.

For the foregoing reasons and those stated in the Joint Motion to Dismiss [Dkt. 63], all claims against United States Fire Insurance Company and Pennsylvania Insurance Company should be dismissed with prejudice.

**[remainder of page intentionally left blank, signature page follows]**

RESPECTFULLY SUBMITTED this 7th day of April, 2025.

                                        */s/ Ryan D. Dry*
Ryan D. Dry
Texas Bar No. 24050532
S.D. Tex. Bar No. 618363
Steven K. Cannon
Texas Bar No. 24086997
S.D. Tex Bar No. 3356957
**DRY LAW, PLLC**
909 18th Street
Plano, TX 75074
(972) 797-9510 Tele/Fax
rdry@drylaw.com
scannon@drylaw.com

***ATTORNEYS FOR PENNSYLVANIA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY***

## CERTIFICATE OF SERVICE

I hereby certify that, on April 7, 2025, a true and correct copy of the foregoing document was filed and served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas on those parties registered to receive electronic notice.

                                        */s/ Ryan D. Dry*
Ryan D. Dry