# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

W&T OFFSHORE, INC., AND
W&T ENERGY VI, LLC,

                Plaintiffs,

v.                                     Civil Action No. 4:24-CV-03047

ENDURANCE ASSURANCE CORPORATION,
AND LEXON INSURANCE CO.

                Defendants.

_____

U.S. SPECIALTY INSURANCE
COMPANY,

                Plaintiff,

v.                                     Civil Action No. 4:24-CV-04113

W&T OFFSHORE, INC., AND
W&T ENERGY VI, LLC,

                Defendants.

UNITED STATES FIRE INSURANCE
COMPANY,

                Plaintiff,

v.                                     Civil Action No. 4:24-CV-04395

W&T OFFSHORE, INC., AND
W&T ENERGY VI, LLC,

                Defendants.

_____

PENNSYLVANIA INSURANCE
COMPANY,

                Plaintiff,

v.                                     Civil Action No. 4:24-CV-04400

W&T OFFSHORE, INC.,

                Defendant.

_____

## LEXON'S REPLY IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS W&T'S FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................... 1

II.     ARGUMENT.............................................................................................................. 5

    A.     W&T's Claims Under Section 1 of the Sherman Act are Implausible ..... 5

        1.     W&T Does Not Allege Direct or Circumstantial Evidence
            of an Agreement.................................................................................. 5

        2.     W&T Cannot Assert New Factual Allegations in its
            Opposition Brief ................................................................................ 13

        3.     W&T Does Not Plead Antitrust Injury ......................................... 15

        4.     W&T Has Not Alleged Price-Fixing ............................................... 20

    B.     W&T's State Law Claims Fail ................................................................ 21

        1.     W&T Abandoned its Texas Insurance Code Claim ..................... 21

        2.     W&T Has Not Adequately Pled a State Law Antitrust
            Claim................................................................................................... 22

        3.     W&T Has Not Adequately Pled Tortious Interference................ 22

        4.     W&T's Derivative Civil Conspiracy Claim Fails........................... 24

III.     CONCLUSION........................................................................................................ 24

## TABLE OF AUTHORITIES

**Cases**

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*,
    776 F.3d 321 (5th Cir. 2015) ............................................................... 14, 23

*Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*,
    2014 WL 12497080 (W.D. Tex. 2014) ............................................................ 8

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ............................................................... 17, 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................... 6, 10, 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................... 19, 20, 21

*Carnahan v. Argon Med. Devices, Inc.*,
    2022 WL 2392312 (E.D. Tex. 2022) ............................................................ 14

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) ............................................................... 22

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
    846 F.2d 284 (5th Cir. 1988) ............................................................ 8

*Corrosion Prevention Techs. LLC v. Hatle*,
    2020 WL 6202690 (S.D. Tex. 2020) ............................................................ 25

*Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    961 F.2d 1148 (5th Cir. 1992) ............................................................ 8

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*,
    123 F.3d 301 (5th Cir. 1997) ............................................................... 18, 19

*Ginzburg v. Mem'l Healthcare Sys.*,
    993 F. Supp. 998 (S.D. Tex. 1997) ............................................................ 19

*Hood v. Tenneco Texas Life Ins. Co.*,
    739 F.2d 1012 (5th Cir. 1984) ............................................................ 18

*In re DRAM Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) ............................................................ 13

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
    997 F. Supp. 2d 526 (N.D. Tex. 2014) ............................................................ 10

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
    158 F. Supp. 3d 544 (E.D. La. 2016) ............................................................ 6, 8

*Jebaco, Inc. v. Harrah's Operating Co.,*
    587 F.3d 314 (5th Cir. 2009) ................................................................ 19

*JSW Steel (USA) Inc. v. Nucor Corp.,*
    586 F. Supp. 3d 585 (S.D. Tex. 2022), *aff'd* 2025 WL 832801 (5th Cir. 2025) .......... 13

*Larry R. George Sales Co. v. Cool Attic Corp.,*
    587 F.2d 266 (5th Cir. 1979) ................................................................ 20

*Louisiana v. Haaland,*
    2025 WL 761743 (W.D. La. Mar. 10, 2025) ................................................ 13

*Marucci Sports, LLC v. NCAA,*
    751 F.3d 368 (5th Cir. 2014) ................................................ 5, 17, 19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ........................................................................ 14

*Mauricio v. US Postal Serv.,*
    2024 WL 4574301 (N.D. Tex. 2024) ........................................................ 23

*Meadows v. Hartford Life Ins. Co.,*
    492 F.3d 634 (5th Cir. 2007) ................................................................ 25

*N. Pac. Ry. v. United States,*
    356 U.S. 1 (1958) ............................................................................ 18

*NCAA v. Bd. of Regents of Univ. of Okl.,*
    468 U.S. 85 (1984) .......................................................................... 21

*NE Shore Techs., Inc. v. Pro. Credentials Exch., Inc.,*
    2024 WL 3446362 (S.D. Tex. 2024), *R. & R. adopted,* 2024 WL 3448014 (S.D. Tex. 2024) ........................................................................................ 24

*Norris v. Hearst Tr.,*
    500 F.3d 454 (5th Cir. 2007) ................................................................ 18

*Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018) ........................................................................ 17

*Pulse Network, L.L.C. v. Visa, Inc.,*
    30 F.4th 480 (5th Cir. 2022) ................................................................ 18

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ........................................................................ 19

*Roebuck v. Dothan Sec., Inc.,*
    515 F. App'x 275 (5th Cir. 2013) ...................................................... 14, 16

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,*
    28 F.3d 1379 (5th Cir. 1994) ................................................................ 20

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ................................................................................ 10

*Southway Theatres, Inc. v. Ga. Theatre Co.*,
  672 F.2d 485 (5th Cir. 1982) ................................................................................ 11

*Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*,
  514 F. Supp. 2d 934 (W.D. Tex. 2007) .......................................................... 24

*United States v. Charles*,
  469 F.3d 402 (5th Cir. 2006) ................................................................................ 23

*United States v. Foley*,
  598 F.2d 1323 (4th Cir. 1978) ................................................................................ 7

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ................................................................................................ 22

*Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................................................ 20

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ................................................................................ 20

*Viazis v. Am. Ass'n of Orthodontists*,
  314 F.3d 758 (5th Cir. 2002) ........................................................................ 6, 10

**Other Authorities**

*Risk Management and Financial Assurance for OCS Lease and Grant Obligations*,
  89 Fed. Reg. 31,544 (Apr. 24, 2024) .............................................................. 12

Robert H. Bork, *The Antitrust Paradox* 66 (1978) .............................................. 18

## I.    INTRODUCTION

W&T's Response, Dkt. 78 ("Response"), barely engages with the legal arguments in Lexon's Motion to Dismiss, Dkt. 57, and only amplifies the deficiencies in the First Amended Complaint, Dkt. 36 (the "FAC"), by failing to point to any plausible factual allegations of a conspiracy, any intelligible theory of antitrust injury, or any cognizable theory of state-law liability.[1]

**_W&T's Complaint is Fundamentally Implausible._** Beginning with W&T's claim under Section 1 of the Sherman Act, the Response does not (and cannot) point to any direct or circumstantial evidence of a conspiracy among sureties. Instead, it points to allegations of a conspiracy that make no sense. W&T does not dispute the fact that it did not have to access the surety market. It could have used its own financial resources to satisfy regulatory financial assurance requirements associated with obtaining a permit to conduct offshore oil and gas exploration. Instead, apparently choosing to save liquidity on its balance sheet by not having to use its own cash, W&T freely chose to enter into an arm's-length contract with Lexon with respect to the issuance of surety bonds. W&T received the benefit of that arrangement by being able to secure energy exploration permits.

W&T never explains why the sureties would benefit from conspiring to bankrupt W&T with allegedly excessive collateral demands. W&T claims that by requesting

---

[1] All capitalized and abbreviated terms have the same meaning as set forth in Lexon's Motion to Dismiss, Dkt. 57 ("Motion").

additional collateral defendants can "make more money." FAC ¶ 128. But that is untrue, as W&T's own pleadings explain. Collateral is not money paid to a surety. *See* Dkt. 36-1 at ¶ 3. Collateral secures the surety against liability if the principal (here, W&T) fails to perform its obligations under the bond. *Id.*

Likewise, W&T points to a November 12, 2024 meeting as supposedly furthering the conspiracy, FAC ¶ 121, but ignores the fact that this meeting occurred *after* every defendant had made collateral demands to W&T, *id.* ¶¶ 85, 103-05; Dkt. 36-11. So, it could not serve as a means for coordinating the alleged conspiracy.

Indeed, W&T cites no evidence of a conspiratorial meeting or communication, just the unremarkable fact that sureties discussed "recent bankruptcies and" a new regulation known as "the BOEM rule." *Id.* ¶ 121. These trends "started generating heartburn" for sureties, *id.* at ¶ 121, and they sought additional collateral from W&T. *Id.* ¶¶ 85, 103-05; Dkt. 36-11. Responding to common regulatory and economic stimuli is not a conspiracy. And all that W&T can muster about supposedly conspiratorial communications is a handful of conclusory allegations that such meetings may have occurred. *Id.* ¶ 121.

W&T cites no facts that place its allegations "in a context that raises a suggestion of a preceding agreement, not merely conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Rather than posting the collateral requested by Lexon, W&T sued Lexon, seeking to prevent Lexon from making collateral demands. *See* Dkt. 1 at ¶ 75. That was a red flag for other sureties,

which sought collateral from W&T fearing that W&T would seek to shirk its contractual responsibilities to them too. *See* FAC ¶ 103 (U.S. Specialty filed suit against W&T seeking payment of collateral after W&T sued Lexon); *id.* ¶ 104 (U.S. Fire sought additional collateral from W&T after W&T sued Lexon); Dkt. 36-11 (Applied sought additional collateral from W&T after W&T sued Lexon). Other sureties making collateral demands after W&T raised their concerns is not indicative of a conspiracy.

***W&T Fails to Allege Antitrust Injury.*** W&T ignores the settled principle that antitrust law is meant to protect competition, not competitors, and to vindicate consumer welfare. Response at 5 ("There is no requirement that W&T must . . . demonstrate injury to the 'market' as a whole."). In fact, all private antitrust plaintiffs are required to plead facts that plausibly demonstrate that the defendants' alleged conduct resulted in consumer injury, whether in the form of higher prices, lower supply, or lower quality. Antitrust plaintiffs cannot simply presume that harm to them is tantamount to harm to consumers or competition. Nor can an antitrust plaintiff substitute speculation for facts with respect to alleged harm to consumers and competition. Here, reading the FAC and W&T's Response charitably, W&T presumes that if it was harmed, then all offshore exploration companies must have been harmed and, by extension, consumers were harmed too. But W&T pleads no facts supporting such a presumption, let alone facts that would make this attenuated chain of logic plausible. It does not allege that any other exploration company suffered any harm as a result of the alleged conduct, nor does it claim that any consumer of energy paid a single

cent more for their energy. Without these facts, W&T's antitrust claims should be dismissed as a matter of law for failure to plead antitrust injury.

Relatedly, W&T assumes that antitrust law requires Lexon to do business with W&T on W&T's preferred terms and that Lexon and the other sureties' refusal to do so raises a Sherman Act claim. Response at 16 (describing demands for collateral as a "conspiracy among the sureties" to "dictate the financial terms of doing business" to W&T). That is not the law. W&T cannot misuse antitrust law to renegotiate its contract because it now finds the terms of that contract not to its liking. W&T should not be allowed to pervert antitrust law into a means for evading its contractual obligations.

***W&T Does Not Allege Price-Fixing.*** To plead price-fixing, W&T had to allege that the amount of some price was fixed through an agreement to fix that price or a component of that price, an agreement to cut supply, or an agreement to use a pricing formula. But the FAC alleges nothing of the sort. At most, the FAC claims that Defendants sought radically different amounts of collateral from W&T. Setting aside the fact that collateral is not a price, this is tantamount to claiming that charging any price is price-fixing. That has never been the law.

***W&T's State Law Claims Suffer from Similar Flaws.*** W&T's state law claims are equally implausible and suffer from similar fatal legal errors. W&T did not even attempt to defend its Texas Insurance Code claim and has conceded effectively that claim must be dismissed. W&T's state law antitrust claim fails because its Sherman Act claims fail. Its conspiracy claim fails because its conspiracy allegations are implausible

for the reasons described above. Finally, W&T's tortious interference claims not only suffer from the same plausibility problems, they also fail to identify the agreement that Lexon supposedly interfered with.

For all these reasons, W&T's claims should be dismissed with prejudice.

## II.    ARGUMENT

### A.    W&T's Claims Under Section 1 of the Sherman Act are Implausible

#### 1.    W&T Does Not Allege Direct or Circumstantial Evidence of an Agreement

W&T asserts claims under Section 1 of the Sherman Act for group boycott and price-fixing. *See* FAC ¶¶ 138-49. For both causes of action, the "pivotal question is whether the concerted action was a result of an agreement between [Defendants] to unreasonably restrain trade." *Marucci*, 751 F.3d at 375. An agreement is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 374-75.

A plaintiff can plead an agreement with direct or circumstantial evidence. *Id.* Direct evidence "explicitly refers to an understanding between the alleged conspirators" and does not "depend[] on additional inferences" to establish an agreement. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (cleaned up). It must be "explicit" and is "tantamount to an acknowledgment of guilt." *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 553 (E.D. La. 2016) (cleaned up). Ambiguous statements are not "direct evidence of a conspiracy." *Id.* at 554.

Circumstantial evidence must contain more than "a bare assertion of

conspiracy." *Twombly*, 550 U.S. at 556. Instead, a plaintiff must plead facts showing (1) parallel conduct among the defendants and (2) "plus factors" that place the parallel conduct in a factual context that makes the inference of a conspiracy from that conduct plausible. *Pool Prods.*, 158 F. Supp. 3d at 544. The Response confirms that the FAC contains neither direct nor circumstantial evidence of an agreement among Defendants to demand collateral from W&T.

**No direct evidence of agreement.** W&T attempts to hide this fact by inserting a litany of supposed "direct evidence" in its Response. But that only makes this pleading failure more glaring. Response at 13-14. None of the supposed "direct evidence" cited in its opposition is direct evidence of a conspiracy. Each bulleted allegation that W&T characterizes as "direct evidence" requires an *additional inference* (which in any event would neither be plausible nor warranted) to establish an anticompetitive agreement.

Take the November 12, 2024 meeting that W&T focuses on in its Response. *See* FAC ¶ 121. That meeting occurred *after* Defendants made their collateral demands. *Id.* ¶¶ 85, 103-05; Dkt. 36-11. Thus, it was impossible for Defendants to have reached an agreement at that meeting to make collateral demands. In fact, the meeting discussed the implications that the recent 2024 Presidential Election may have on sureties. FAC ¶ 116. There is no indication in the FAC that any person who attended this meeting referred to an agreement to demand collateral from W&T. *Id.* ¶¶ 116-21.

W&T's allegations regarding the November 12, 2024 meeting are nothing like *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1978), which features prominently in

W&T's brief. Response at 13. In *Foley*, a group of competing real estate executives met at a local country club for dinner. *Id.* at 1327. During the dinner, one of the defendants announced that his firm was raising its commission rate on home sales from 6% to 7%. *Id.* The defendants discussed the rate increase during the dinner. *Id.* Soon after the dinner, each of the defendants had adopted the same 7% commission rate. *Id.* In other words, *Foley* had all the facts that W&T lacks. Unlike *Foley*, W&T cannot say that Defendants discussed collateral demands at the November 12, 2024 meeting. In fact, the FAC alleges that the Defendants discussed something else. FAC ¶ 116. Nor can W&T allege that Defendants changed their conduct after the November 12, 2024 meeting as in *Foley*. In reality, Defendants made their collateral demand *prior* to the November 12, 2024 meeting. *Id.* ¶¶ 85, 103-05; Dkt. 36-11.

Knowing that the November 12, 2024 meeting is a thin reed that cannot bear the weight of the alleged conspiracy, W&T makes passing references to the possibility that Defendants had earlier meetings at which they discussed making collateral demands to W&T. *See* FAC ¶¶ 119, 121. But these allegations are entirely conclusory. W&T does not say when these meetings happened, who attended them, where they occurred, or what was discussed in the meetings. *Id.* It merely hypothesizes that those meetings may have happened. *Id.* But it is not plausible to infer that because an innocuous meeting concerning the implications of the 2024 Presidential Election occurred, then Defendants must have had conspiratorial meetings too. Without more, these meetings suggest only an "opportunity to conspire," which is inherently circumstantial and

insufficient. *Pool Prods.*, 158 F. Supp. 3d at 554-55.

Similarly, allegations of the dates on which individual Sureties demanded collateral suggest—at most—loosely parallel action. FAC ¶¶ 85, 98, 103, 104, 107 n.5. But even entirely parallel conduct is not direct evidence of a conspiracy. *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294 n.30 (5th Cir. 1988). W&T gives up the ghost on this argument by acknowledging that "viewed in isolation" these factual allegations may be "unremarkable or lawful"—*i.e.*, that its allegations require *further inferences* to prove an agreement. Response at 15. This is an admission that the FAC does not allege direct evidence of a conspiracy.[2]

**No circumstantial evidence of an agreement.** In its Response, W&T argues that Defendants acted in parallel by making collateral demands to W&T and that those demands are more consistent with a conspiracy because the demands were against the Defendants' unilateral economic self-interest, the Defendants had a common motive to conspire, Defendants had opportunities to conspire, Defendants provided pretextual reasons for their collateral demands, and market factors primed the offshore surety market for a conspiracy. Response at 14-21. None of those arguments hold water.

As an initial matter, Defendants did not act in parallel. Lexon demanded $7.5

---

[2] The cases W&T cites for the proposition that the FAC pleads sufficient "direct evidence" of a conspiracy are inapposite. Response at 15 (citing *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) and *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, 2014 WL 12497080, at *4 (W.D. Tex. 2014)). Both *Dillard* and *American Academy of Allergy* rely on circumstantial evidence and neither case even mentions "direct evidence."

million in additional collateral from W&T on July 9, 2024. *See* Dkt. 36-9. Rather than posting the collateral, W&T sued Lexon on August 14, 2024. *See* Dkt. 1. After W&T sued one of its sureties to avoid its collateral obligations, the other Defendants (unsurprisingly) sought additional collateral from W&T. FAC ¶ 103 (U.S. Specialty filed suit against W&T seeking payment of collateral after W&T sued Lexon); *id.* ¶ 104 (U.S. Fire sought additional collateral from W&T after W&T sued Lexon); Dkt. 36-11 (Applied sought additional collateral from W&T after W&T sued Lexon). This is not parallel conduct. Lexon responded to concerns about W&T's financial standing and regulatory uncertainty by seeking additional collateral from W&T. *See* Dkt. 36-9. On the other hand, the other Defendants responded to W&T suing Lexon by seeking additional collateral to secure them against the possibility that W&T could not decommission its offshore energy exploration facilities. Thus, Defendants did not act "similarly." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015). Instead, Defendants reacted to different events and sought different amounts of collateral at different times. *See* FAC ¶ 103-05.[3] This is not a case of Defendants taking the same actions with "slightly different timing," Response at 16; it is a case of firms responding differently to different conditions.

Even assuming that W&T had pled parallel conduct (it has not), W&T fails to allege plus factors that would demonstrate that Defendants' parallel conduct is

---

[3] Knowing that W&T filing its lawsuit on August 14, 2024 renders parallel conduct implausible, W&T omits that fact from its timeline of events. *See* Response at 14.

consistent with a conspiracy. Even if a Defendant can make a "showing of parallel business behavior . . . from which an agreement may be inferred," the alleged conduct may still "fall[] short of conclusively establishing agreement," *Twombly*, 550 U.S. at 545, if the plaintiff does not "present evidence tending to exclude the possibility of independent conduct." *Viazis*, 314 F.3d at 763. Parallel conduct "is not suspicious or suggestive of an agreement" when "common economic experience and the Complaint itself offer a natural or 'obvious explanation' for the defendants' actions." *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 537 (N.D. Tex. 2014).

Here, W&T's asserted plus factors are contrary to economic common sense, and the FAC provides an obvious explanation for W&T's actions. While W&T claims that it would be against Defendants' unilateral economic self-interest to increase their collateral demands, the opposite is true. Each Defendant had an economic self-interest in ensuring that it has sufficient collateral to decommission W&T's offshore energy exploration facilities if W&T did not have the financial ability to decommission those facilities. *See* FAC ¶¶ 2, 28, 117. If new regulations expand the scope or cost of those decommissioning efforts, then it makes economic sense for a surety to demand additional collateral. Likewise, if an energy exploration company shows signs of financial distress, it makes sense for a surety to ask for more collateral because it is more likely that the surety will be on the hook for the decommissioning costs. That is exactly what happened here, and the FAC pleads facts suggesting just such an obvious explanation. Although W&T argues in a conclusory faction that these reasons were a

"pretext," the FAC concedes that Defendants sought additional collateral from W&T because Defendants believed that regulatory changes and W&T's financial health necessitated additional collateral. *Id.* ¶¶ 3, 88, 99, 111-13. W&T's declining financial condition meant that it was in each Surety's self-interest to race—*i.e.*, compete—to demand collateral from W&T before it was unable to make payment. As a result, the FAC's alleged parallel conduct does not support an inference of conspiracy. *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1982) ("[T]he inference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the [defendants'] independent business judgment.").

While the Defendants' collateral demands are consistent with their unilateral decision making, the overall conspiracy that W&T alleges makes no economic sense. Collateral is not paid to a surety; it is used to secure the surety against the possibility that it may be required to decommission the principal's offshore energy exploration facilities. FAC ¶¶ 2-3, 117; Dkt. 36-9 at ¶ 3. Simultaneously demanding excessive collateral may bankrupt the principal and puts sureties in the worst possible position— being required to decommission offshore facilities without sufficient collateral to offset those costs. It makes no sense that alleged conspirators would set out to harm themselves.

Nor is it the case that BOEM Rule was a pretext. The gist of W&T's argument on this point is that when Lexon requested additional collateral from W&T on July 9, 2024, it should have known that legal challenges to that rule would succeed or that a

new Presidential administration would take office and rescind the rule. Response at 4, 18. Sureties are not clairvoyants, and, at any rate, Lexon's actions were consistent with its unilateral economic self-interest. On April 24, 2024, the Bureau of Ocean Energy Management issued a final rule requiring oil and gas lessees on the offshore continental shelf to obtain financial assurance bonds covering the potential future liability for decommissioning their structures. *See Risk Management and Financial Assurance for OCS Lease and Grant Obligations*, 89 Fed. Reg. 31,544 (Apr. 24, 2024). That rule became effective on June 29, 2024, and portions of the rule would take effect over time in 2025. *Id.* On June 17, 2024, a group of industry organizations and States filed suit challenging the rule. *See Louisiana v. Haaland*, 2025 WL 761743, at *5 (W.D. La. Mar. 10, 2025). On March 10, 2025, the district court denied that motion but held that the parties should "present their best possible proof" on issues relevant to the preliminary injunction standard "in a contradictory hearing." *Id.* at *6. And although W&T claims that the rule "is about to be withdrawn," Response at 4, it has not been withdrawn. Certainly, Lexon was right to factor this regulatory uncertainty into the amount of collateral it requested from W&T. Moreover, although it is not required to provide a rationale under the parties' contract, Lexon had ample reasons separate and apart from the BOEM rule to demand collateral, as explained in Lexon's counterclaim and opening brief.

All that leaves W&T with are the unremarkable facts that the alleged surety market is concentrated and that there are trade association meetings for sureties. Response 18-20. "[C]ommon attendance at trade association meetings is insufficient to

infer a conspiracy." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 597 (S.D. Tex. 2022), *aff'd* 2025 WL 832801 (5th Cir. 2025). Likewise, market concentration is economically ambiguous—it is consistent with both collusion and competition. *In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022) (affirming dismissal).

Therefore, this hodgepodge of ambiguous and nonsensical pleadings is not sufficient to "nudge" W&T's conspiracy theory "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "Any conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331 (5th Cir. 2015). That is exactly what occurred here. Lexon's alleged conduct is consistent with its independent business judgment, and W&T's alleged conspiracy is contrary to economic common sense. The alleged conspiracy is implausible, and the § 1 claims should be dismissed.

## 2.    W&T Cannot Assert New Factual Allegations in its Opposition Brief

Recognizing that its claims are woefully deficient, W&T improperly seeks in effect to amend its Complaint by asserting new factual allegations for the first time in its Response. *See Roebuck v. Dothan Sec., Inc.*, 515 F. App'x 275, 280 (5th Cir. 2013) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a

motion to dismiss.") (quotation omitted); *see also Carnahan v. Argon Med. Devices, Inc.*, 2022 WL 2392312, at *4 (E.D. Tex. 2022) (same). The following new allegations, which are wholly conclusory and speculative, appear nowhere in its Complaint and, as explained below, do not salvage W&T's claims even if considered by the Court:

| W&T's Argument in Response | No Corresponding Allegation in FAC |
|---|---|
| The Sureties coordinate "increased premium rates and other financial terms" of surety bonds to "other offshore producers." Response at 1. | The FAC does not identify any other companies that were allegedly charged higher premiums or received demands for collateral. |
| The Sureties have "common reinsurers" and "common brokers" that "share confidential information among competitor sureties." *Id.* at 2. | The FAC contains no allegation that the Sureties have common reinsurers or brokers, or that any such entities share confidential information between competing Sureties. |
| "Lexon demanded higher premiums" from W&T. *Id.* at 3. | The FAC only names one Surety, Applied, that it alleges attempted to increase W&T's premiums. FAC ¶ 98. |
| The Sureties' alleged anticompetitive conduct resulted in W&T paying supra-competitive prices. *Id.* at 10. | The FAC does not allege that W&T paid Lexon supra-competitive prices. |
| Lexon was motivated to collude in order to stop the decline of its profits. *Id.* at 18. | The FAC does not allege that Lexon's profits have declined. |
| Lexon "acknowledged" that it lacked a contractual basis to demand collateral from W&T. *Id.* at 19 (citing FAC ¶¶ 116-18). | The cited paragraphs contain no such admission that Lexon lacked a contractual basis to demand collateral from W&T. |
| The FAC describes "in detail the collusion that occurred" at a November 12, 2024 trade association meeting. *Id.* at 20 (citing FAC ¶¶ 116-18, 121). | The FAC does not allege anything that the Sureties agreed upon at this meeting, and the Sureties made their demands for collateral before this meeting occurred. |
| The Sureties "agree[d] to demand millions of dollars in additional capital." *Id.* at 23. | The FAC does not allege "additional" collateral the Sureties demanded above the amounts provided for in their agreements with W&T. |

W&T cannot run from its threadbare pleadings. In deciding Lexon's Motion, the Court "is limited to the allegations set forth in the [FAC]." *Roebuck*, 515 F. App'x at 280. The Complaint is what matters, and W&T's Complaint is fundamentally lacking. Moreover, even if the Court were to consider these allegations, the FAC still should be dismissed as a matter of law. These conclusory assertions add nothing to plausibly suggest Lexon joined a conspiracy to unreasonably restrain trade or that such a restraint harmed competition or consumers. W&T still cannot show that a single other bonded offshore energy company posted any additional collateral, paid a dollar more in premiums, or could not access the alleged surety market. W&T cannot show that any consumer paid anything more for energy due to the alleged conspiracy. And W&T still cannot plead a conspiracy that makes any sense. W&T cannot do any of this because it is impossible to plead those facts. Even with W&T's newly-minted facts, the FAC is irretrievably flawed; it should be dismissed with prejudice.

### 3.    W&T Does Not Plead Antitrust Injury

W&T misunderstands both Lexon's argument and Fifth Circuit law concerning antitrust injury. Lexon argues that the FAC fails to plead antitrust injury as a *substantive element* of W&T's antitrust claims, not merely as a component of antitrust standing. Motion at 9-12. Despite devoting pages of its response to this technical point, W&T never explains why it matters. It does not. Regardless of whether antitrust injury is a substantive element of W&T's claims or a part of antitrust standing, W&T had to plead facts plausibly demonstrating an injury to competition arising from the challenged

anticompetitive conduct. It did not do so, nor does the Response suggest otherwise. All that W&T suggests is harm to W&T from Lexon's assertion of contractual rights, which does not allege anticompetitive harm to the market and consumers as a matter of law.

More specifically, it is black letter law that harm to competition is a substantive element of every Section 1 claim. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *see also Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014) ("Only injuries to the market are cognizable."). W&T concedes as much. Response at 9 ("[M]arket harm" is "an element of [a] substantive Section 1 claim under the Sherman Act."). For W&T's Section 1 claims to survive a motion to dismiss, the FAC must allege that Lexon's conduct caused harm to a market or to competition. *Marucci*, 751 F.3d at 376; *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.").

While W&T throws around a lot of antitrust buzzwords and historical case law about the *per se* rule, that does not make a bit of difference. Even if W&T's antitrust claims were construed as *per se* claims, W&T still has to plead antitrust injury. The Supreme Court expressly rejects the "suggestion that no antitrust injury need be shown where a *per se* violation is involved." *Atl. Richfield*, 495 U.S. at 341. As the Court explained, the *per se* rule is merely a "method[] of determining whether a restraint is 'unreasonable,'" and it "does not indicate whether a private plaintiff has suffered antitrust injury." *Id.* at 342 (citation omitted); *see also Norris v. Hearst Tr.*, 500 F.3d 454,

16

465 n.16 (5th Cir. 2007) (The "antitrust injury requirement [is] applicable where [the] underlying violation is [a] per se violation of Section 1 of the Sherman Act[.]") (citation omitted). W&T does not get a free pass simply because it now believes that it is pleading a *per se* case. *See* Response at 5, 8-9. Nor do the cases W&T cites stand for that proposition. *See N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958) (explaining that *per se* claims do not require an "elaborate inquiry" as to the alleged antitrust injury, not that a plaintiff alleging such violations does not have to plead *any* antitrust injury); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1017 n.11 (5th Cir. 1984) (explaining that for a *per se* violation the court need not weigh an alleged restraint's procompetitive effects against its anticompetitive harms). And to the extent that they could be construed to hold otherwise, all of those cases predate the Supreme Court's decision in *Atlantic Richfield*, which put this issue to rest. *Atl. Richfield*, 495 U.S. at 341-42. Antitrust injury is a mandatory element of every antitrust claim, and W&T has to plead facts plausibly demonstrating antitrust injury. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 306 (5th Cir. 1997)).

In addition, antitrust injury is different from Article III standing—it requires facts demonstrating an "injury of the type the antitrust laws were intended to prevent" and which "reflect[s] the anti-competitive effect either of the violation or of anticompetitive acts made possible by the violation." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 319 (5th Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

17

U.S. 477, 489 (1977)). The injuries that the antitrust laws were meant to prevent are harm to markets and consumers that result in higher prices, lower supply, lower quality, or stunted innovation. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting Robert H. Bork, *The Antitrust Paradox* 66 (1978)) (referring to this as the "consumer welfare" standard); *Doctor's Hosp. of Jefferson*, 123 F.3d at 306 (the antitrust laws are designed to "ensure[] that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors."). Thus, to allege antitrust injury, "an antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services and not just his own welfare." *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (cleaned up).

The FAC alleges nothing like that. Indeed, W&T commits two critical errors.

***First***, W&T has not alleged harm to competition, consumers, or any company besides itself. The FAC is premised on the notion that alleged harm to W&T can stand in for harm to market-wide competition and consumer welfare. That is not the case. The Fifth Circuit warns antitrust plaintiffs that "predominate focus on [their] own injury is misguided because antitrust laws protect competition, not competitors." *Marucci*, 751 F.3d at 376. Here, despite the Response's conclusory suggestion that other unidentified companies may have been harmed by the alleged conspiracy, *see* Response at 1, 11, 13, the FAC provides no facts to support that assumption. Mere "[s]peculation about anticompetitive effects is not enough." *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d

1379, 1385 (5th Cir. 1994); *see also Marucci*, 751 F.3d at 377 (affirming dismissal where plaintiff "fail[ed] to provide the identity of the 'new market entrants' or demonstrate when and how" they were harmed). A complaint should not be a mystery novel. W&T should have explained with non-conclusory facts how competition and consumers were harmed. It did not, and that is where its antitrust claims should end.

**Second**, the FAC does not allege W&T suffered an "injury of the type the antitrust laws were intended to prevent." *Brunswick,* 429 U.S. at 489. To the extent that the FAC alleges anything, it alleges that W&T made a deal that it no longer wants to honor. But companies are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (internal citation omitted). A disagreement about parties' relative contractual rights is not an antitrust violation and does not give rise to an injury that may be remedied under antitrust law. *See Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 274 (5th Cir. 1979). Courts should not, as W&T urges here, "act as central planners, identifying the proper price, quantity, and other terms of dealing." *Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). That is a role, Justice Scalia rightly noted, "for which they are ill suited." *Id.* W&T's injuries do not "flow[]" from any supposed antitrust violation. *Brunswick Corp.,* 429 U.S. at 489. The alleged harm—paying collateral demands—results from Lexon's independent enforcement of its contract with W&T, *regardless* of any action taken by any other surety. *Brunswick Corp.*, 429 U.S. at 489 (antitrust injury "should reflect the anticompetitive

effect either of the violation or of anticompetitive acts made possible by the violation."). Plaintiffs cannot use antitrust claims to adjudicate a contract dispute. That is all W&T is doing here. W&T's antitrust claims should be dismissed.[4]

### 4.    W&T Has Not Alleged Price-Fixing

W&T claims to allege that "the sureties entered into an agreement with one another to increase premiums and demand additional collateral." Response at 22. But the FAC makes no such non-conclusory allegation. And W&T's conclusory allegation that the Sureties "jointly increase[d] premiums, collateral, and bonding costs," FAC ¶¶ 4, 122, is entirely unsupported as to Lexon. For instance, the FAC *never alleges* that Lexon increased its premiums; the only Surety W&T alleges increased its premiums is Applied. FAC ¶ 98; Response at 14 (alleging only that Applied "increased premiums").

Even assuming the Sureties agreed to simultaneously demand collateral—which they did not—such conduct would not constitute an agreement to fix prices or output under Section 1. *See NCAA v. Bd. of Regents of Univ. of Okl.*, 468 U.S. 85, 109-10 (1984) (equating "an agreement not to compete in terms of price or output" with classic price-fixing subject to *per se* analysis). As Lexon explains in its Motion, the act of *demanding collateral—i.e.*, security in the event of default—is fundamentally different than *fixing the amount* of collateral at a specified rate, range, or level.

---

[4] Lexon does not argue that an alleged contractual injury "precludes recovery" for an alleged antitrust injury. Response at 10. Rather, as Lexon explains, *see* Motion at 12, W&T's claims arise from Lexon's exercise of its right to demand collateral under Payment and Indemnity Agreement No. 1380 (the "Agreement").

W&T misunderstands the relevant case law, which explains that price-fixing concerns only the fixing of price *amounts* either through explicit price fixing, cutting supply, or agreeing on pricing ranges or formulas. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (prices are considered fixed "if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices."). The Response misreads *Catalano* as suggesting that an antitrust defendant may fix some term other than a component of price affecting an "amount[]." Response at 23 (citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-49 (1980)). In *Catalano*, the court explained that "[a]n agreement to terminate the practice of giving credit" constitutes price-fixing because the credit terms—which include credit *rates*—contain a "value" that "must be characterized as an inseparable part of the price." *Catalano*, 446 U.S. at 648. Here, the FAC's allegations that Lexon breached the Agreement's terms regarding *demanding collateral* does not implicate the "value" or "amount" of the collateral and is therefore not "an inseparable part of the price." For this additional reason W&T's price-fixing claim must be dismissed with prejudice.

### B.    W&T's State Law Claims Fail

#### 1.    W&T Abandoned its Texas Insurance Code Claim

W&T did not even bother to defend its Texas Insurance Code claim. "[A] party's failure to defend a claim in [its] response to a motion to dismiss constitutes

abandonment." *Mauricio v. US Postal Serv.*, 2024 WL 4574301, at *4 (N.D. Tex. 2024). Here, the Response states only that Lexon "engaged in a civil conspiracy to violate . . . insurance law," Response at 6, and that the FAC "adequately pleaded facts supporting W&T's . . . claim under the Texas Insurance Code," *id.* at 25. A few sentence fragments are a poor substitute for legal argument. W&T abandoned this claim. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) (argument raised in "[a] single conclusory sentence in a footnote" was abandoned).

### 2. W&T Has Not Adequately Pled a State Law Antitrust Claim

W&T does not seriously contest the fact that if its Sherman Act claim fails, its state antitrust claim must fail too. And that is the case here. W&T's state antitrust claim fails for the same reasons as its federal antitrust claims because, as W&T acknowledges, Response at 7-8 n.2, the Sherman Act and Texas Free Enterprise and Antitrust Act are analyzed under the "same standards." *Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015).

### 3. W&T Has Not Adequately Pled Tortious Interference

Unable to support its tortious interference claims with the deficient allegations underlying its antitrust claims, W&T resorts (again) to rewriting the FAC and baldly misrepresenting the Motion.[5] For instance, contrary to the Response's assertion, ¶ 86

---

[5] The Motion argues that Lexon cannot "interfere with its own contract" with W&T because Lexon is not a stranger to *its own* contract. Motion at 23. W&T stretches all belief and credibility by arguing that this statement amounts to a concession Lexon views itself "as a collective unit with the other sureties" and does "not even believe" it is a stranger to the other sureties' contracts. Response at 25.

of the FAC does not plead that Lexon *willfully and intentionally* interfered with W&T's contracts with other sureties. At most, this conclusory allegation made "on information and belief" merely suggests that Lexon "encouraged" other sureties to exercise their *legitimate contractual rights* to demand collateral. But inducing another "to do what it already had a right to do under [a] contract" cannot support tortious interference "so long as it served a legitimate purpose." *Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*, 514 F. Supp. 2d 934, 945 (W.D. Tex. 2007).

The FAC also fails to allege that Lexon interfered with any contract or prospective business relationship between W&T and another entity. W&T does not *identify by name* a single surety, creditor, business partner, or customer whose contract or prospective business relationship Lexon interfered with. *NE Shore Techs., Inc. v. Pro. Credentials Exch., Inc.*, 2024 WL 3446362, at *4 (S.D. Tex. 2024), *R. & R. adopted*, 2024 WL 3448014 (S.D. Tex. 2024) (dismissing tortious interference claim where plaintiff did "not identify a specific contract that was subject to interference"); *Corrosion Prevention Techs. LLC v. Hatle*, 2020 WL 6202690, at *4 (S.D. Tex. 2020) (tortious interference with prospective business relationships requires that a plaintiff "describe the specifics of a proposed agreement that never came to fruition."). Even taking as true W&T's *new allegation* that Lexon's actions had a negative "ripple effect" on W&T's business, Response at 24, this does not plausibly show that Lexon *intentionally* acted in a manner that proximately caused harm to any contract or business relationship. As such, W&T's tortious interference claims should be dismissed with prejudice.

### 4. W&T's Derivative Civil Conspiracy Claim Fails

W&T argues that it "does not proffer a 'derivative' conspiracy" claim. Response at 25. As such, W&T either admits that this claim should be dismissed, or simply misunderstands the law. "Under Texas law, civil conspiracy is a derivative tort" which requires that a plaintiff "state a separate underlying claim on which the court may grant relief." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007). But for the reasons stated *supra* and in the Motion, W&T has not plausibly pled an underlying claim. Moreover, the Response does not even respond to Lexon's arguments that the FAC fails to allege the remaining elements of this claim. Motion at 24-25. W&T's civil conspiracy claim must therefore be dismissed with prejudice.

## III. CONCLUSION

Counts 2-7 of the FAC should be dismissed with prejudice.

Dated: April 7, 2025                    Respectfully submitted,

                                        **VINSON & ELKINS LLP**

                                        */s/ Jason M. Halper*
                                        Jason M. Halper*
                                        Sara E. Brauerman*
                                        1114 Avenue of the Americas, 32nd Floor
                                        New York, NY 10036
                                        Tel.: (212) 237-0000
                                        Fax: (212) 237-0100
                                        jhalper@velaw.com
                                        sbrauerman@velaw.com

                                        Alyx E. Eva
                                        Texas Bar No. 24116334
                                        Federal ID No. 3544812
                                        Sarah Smati

24

Texas Bar No. 24137198
Federal ID No. 3895036
845 Texas Avenue, Suite 4700
Houston, Texas 77002-2947
Tel.: (713) 758-2060
Fax: (713) 615-5068
aeva@velaw.com
ssmati@velaw.com

*Admitted pro hac vice*

**ATTORNEYS FOR ENDURANCE
ASSURANCE CORPORATION AND
LEXON INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2025, I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

<u>/s/ Jason M. Halper</u>
Jason M. Halper