**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Plaintiffs, | |
| v. | | Civil Action No. 4:24-CV-03047 |
| ENDURANCE ASSURANCE CORPORATION AND LEXON INSURANCE CO., | | |
| | Defendants. | |

---

| | | |
|---|---|---|
| U.S. SPECIALTY INSURANCE COMPANY, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 4:24-CV-04113 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |

---

| | | |
|---|---|---|
| UNITED STATE FIRE INSURANCE COMPANY, | | |
| | Plaintiff | |
| v. | | Civil Action No. 4:24-CV-04395 |
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | | |
| | Defendants. | |

---

| | | |
|---|---|---|
| PENNSYLVANIA INSURANCE COMPANY, | | |
| | Plaintiff | |
| v. | | Civil Action No. 4:24-CV-04400 |
| W&T OFFSHORE, INC., | | |
| | Defendant. | |

---

**PENNSYLVANIA INSURANCE COMPANY AND UNITED STATES FIRE
INSURANCE COMPANY'S JOINT OBJECTIONS TO MAGISTRATE JUDGE
PALERMO'S REPORT AND RECOMMENDATION REGARDING MOTIONS FOR
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY …………….….………………………………...…..1

II.     INTRODUCTION……………………………... ……………………………....3

III.    APPLICABLE PLEADINGS …………………………………………………4

IV.     STANDARD OF REVIEW…………...…………………………………....…...5

V.      THE R&R'S LEGAL ERROR: MISIDENTIFYING THE TRIGGER ……………….6

VI.     THE R&R EVISCERATES CORE CONTRACTUAL PROTECTIONS – WITH INDUSTRY-WIDE CONSEQUENCES………………………………...…………...……7

VII.    THE R&R NEVER ADDRESSES THE CONTRACTUAL BASIS OF THE SURETIES' DEMANDS ……………………………………………………………… 9

VIII.   THE COURT SHOULD DEFER TO THE SURETIES' DISCRETION – BUT EVEN IF IT DOES NOT, THE RECORD JUSTIFIES THEIR DECISION………..………… 11

        A.  The U.S. Fire Agreement Requires No Justification………………………… 11
        B.  The Penn Agreement Provides Triggers – All of Which are Satisfied……………12
            1.  Financial Deterioration (Trigger A: Capital & Capacity)………………12
            2.  Material Change Affecting Risk (Trigger B: Changes in Regulations and Character)……………………………………………………………13
        C.  The Sureties Exercised Their Rights Reasonably and Responsibly………………… 14
        D.  This Court Should Uphold, Not Question the Sureties' Discretion………………… 14

IX.     THE R&R'S MISSTATES THE RELIEF REQUESTED AND RELIEF ON THE WRONG SOURCE………………………………………………………………15

X.      THE R&R MISAPPREHENDS IRREPARABLE HARM – AND IGNORES CONTROLLING AUTHORITY……………………………………………...18

XI.     THE R&R RELIES ON A CASE THAT MISINTERPRETS *PADRON* AND THEREFORE MISAPPLIES THE LAW OF IRREPARABLE HARM………………..21

XII.    THE R&R MISAPPLIES THE REMAINING INJUNCTION FACTORS BY IGNORING THE CONTRACTUAL FOUNDATION FOR RELIEF……………………………….. 23

XIII.   CONCLUSION…………………………………………………….……25

<u>**TABLE OF AUTHORITIES**</u>

## CASES

*ADR Tr. Corp. v. Northpark Jt. Venture*, 958 F.2d 1313 (5th Cir. 1992)........................................ 6

*Allied World Ins. Co. v. Am. W. Steel, LLC*, No. H-17-3608, 2018 WL 6602153 (S.D Tex. Dec. 17, 2018)................................................................................................................................ 6

*Argonaut Insurance Co v Summit Concrete Inc*, No. 5:22-cv-798-LCB, 2022 WL 17819631 (N.D. Ala. Dec. 19, 2022) ........................................................................................................ 19

*Associated Indem. Corp. v. CAT Cont., Inc.*, 964 S.W.2d 276 (Tex. 1998) .................................. 6

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471 (Tex. 2019)............ 7, 18, 24

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983) ................................................................. 5, 6, 18

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004) ..................................... 10

*Fucich Contracting Inc v Shread-Kuyrkendall & Associates Inc*, No. 18-2885, 2019 WL 1755525 (E.D. La. Apr. 19, 2019)........................................................................................................ 19

*Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417 (Tex. 2000).................................................. 6

*Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951 (Tex. 1983)..................................... 6

*Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*, Civil Action No. 1:15-cv-3969-LMM, 2016 WL 8814367 (N.D. Ga. Apr. 13, 2016)................................................................................ 19, 22, 23

*ISS Aviation, Inc. v. Bell Textron, Inc.*, No. 24-1125, 2025 WL 1603616 (U.S. June 6, 2025)....... 3

*ISS Aviation, Inc. Wyo. v. Bell Textron, Inc.*, No. 24-10063, 2025 WL 400034 (5th Cir. Feb. 5, 2025) ............................................................................................................................................... 3

*Mae v. Nelson Bros. Prof'l. Real Estate, LLC*, No. 4:22-CV-3901, 2024 WL 1639733 (S.D. Tex. Apr. 16, 2024)........................................................................................................................... 5

*Merchants Bonding Co. v Arkansas Construction Solutions LLC*, No. 5:18-CV-05078, 2019 WL 452767 (W.D. Ark. 2019)...................................................................................................... 9, 19

*Merchants Bonding Co. v. Burnside*, No. 4:22-CV-3651, 2023 WL 4140455 (S.D. Tex. June 21, 2023)........................................................................................................... 9, 19, 20, 24

*Merchants Bonding Co. v. Vann Companies, LLC,* No. 22-CV-2925, 2023 WL 3018547 (D. Minn. April. 20, 2023) ...................................................................................................................... 19

*Philadelphia Indemnity Insurance Co v RKM Utility Services Inc*, No. 4:19-cv-676, 2020 WL 2541961 (E.D. Tex. May 19, 2020)......................................................................................... 19

*SureTec Insurance Co v Eternity LLC*, No.: 1:18-cv-1247-ACA, 2018 WL 6001103 (N.D. Ala. Nov. 15, 2018)............................................................................................................................. 19

*Travelers Cas. & Sur. Co. of Am. v. Samson Inv. Co.*, No. 13-CV-0156-JHP-FHM, 2013 WL 12109098 (N.D. Okla. June 17, 2013) ............................................................................... 18, 19

*Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2017 WL 9360906 (W.D. Tex. Aug. 2, 2017) .................................................................................... 19, 21, 22, 23

*Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2016 WL 1064650 (W.D. Tex. Mar. 14, 2016) ..................................................................................................... 21

*Trient Partners I, Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704 (5th Cir. 1996) ...................... 10

*United States v. Raddatz*, 447 U.S. 667 (1980)............................................................................. 5

## STATUTES

FED. R. CIV. P. 72(b)(3) .................................................................................................................. 5

**PENNSYLVANIA INSURANCE COMPANY AND UNITED STATES FIRE
INSURANCE COMPANY'S JOINT OBJECTIONS TO MAGISTRATE JUDGE
PALERMO'S REPORT AND RECOMMENDATION REGARDING MOTIONS FOR
PRELIMINARY INJUNCTION**

Defendants Pennsylvania Insurance Company ("Penn") and United States Fire Insurance Company ("U.S. Fire") (collectively, the "Sureties"), by and through their undersigned counsel, respectfully submit these Joint Objections to Magistrate Judge Palermo's Report and Recommendation, dated June 25, 2025 [Dkt. 140] (the "R&R").

## I.      Executive Summary

Contract law begins with the premise that agreements—particularly those negotiated by sophisticated parties—are meant to be enforced as written. That principle safeguards the predictability of commercial relationships and the efficient allocation of risk.

This case turns on enforcing just such an agreement. The Sureties bargained for the right to be released from their bonded obligations at their sole discretion. That right—clear, negotiated, and central to the transaction—formed the basis for issuing hundreds of millions in bonding capacity. It is also the foundation for the injunctive relief the Sureties now seek.

Yet the R&R never addresses that right, let alone applies it. Instead, it overrides the parties' express terms—leaving the Sureties indefinitely exposed, without the protections that made the risk commercially tolerable. If the provision is not enforced, W&T retains the full benefit of the bonds while stripping away the very protections that induced their issuance. That result not only disregards the agreements—it invites judicial revision of a deliberately structured commercial relationship.

The Indemnity Agreements contain a termination provision that allows the Sureties, in their sole discretion, to demand that W&T replace the Sureties' bonds. W&T negotiated and accepted this term—it was not boilerplate, but a material condition for extending bonding credit.

Both agreements are unambiguous:

The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors' financial condition has been or is believed to be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bond(s). In such an event, within <u>thirty (30)</u> days of receipt of the Surety's written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent written evidence of release satisfactory to the Surety, in its sole discretion. If Indemnitors fail to provide the aforementioned release, Indemnitors shall, within an additional seven (7) days, provide the Surety with collateral in the amount of 100% of all unreleased liability under the Bond(s).

Penn Indemnity Agreement [Dkt. 116, Ex. B, ¶ 12] (underline in original).

Indemnitors expressly and specifically agree that Surety, in its sole discretion and for any reason, may, by written demand, require Indemnitors to provide the Surety with Collateral . . . in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion.

U.S. Fire Indemnity Agreement [Dkt. 118, Ex. B, ¶ 3].

This is a longstanding and essential right afforded to protect commercial sureties. Unlike *contract* sureties, *commercial* sureties often support obligations that span decades—such as federal decommissioning mandates. It is neither commercially feasible nor legally required for a surety to wait for default, insolvency, or claim before acting. Modern underwriting cannot predict what financial or regulatory risks may arise in 5, 10, or 30 years. That is why this discretion exists—and why it matters now.

Here, the Sureties exercised that right. They made formal demands to be released. [Dkt. 116, Ex. C; Dkt. 118, Ex. C]. The amount of collateral was not pre-determined; it depended entirely on how many bonds W&T failed to replace. In short, W&T defined the quantum of its collateral obligation through the extent of its own breach. The more W&T resisted replacement, the greater the residual risk—and the greater its resulting duty to collateralize that exposure.

Courts evaluate collateral demands by examining their trigger. In most *contract* surety

cases, the trigger is a claim on the bond. But this case involves *commercial* suretyship—where the trigger is a bargained-for right to demand bond replacement. The Sureties' collateral demand arose only because W&T refused to honor that request. Yet the R&R never analyzes that trigger. It treats the collateral demand in a vacuum, sees no pending claims, and denies relief—without ever addressing the actual basis for the Sureties' demand or the agreements that authorized it.

Because the R&R fails to analyze, interpret, or even cite these provisions, the Sureties' contractual right to exit the risk—exercised in full compliance with the agreements—has been functionally erased. That result undermines the commercial purpose of the Indemnity Agreements and contradicts controlling law on preliminary relief in the surety context.

This Court's de novo review is not just an opportunity—it is a responsibility to correct that legal error and uphold the parties' agreement as written.

## II.  <u>Introduction</u>

This case presents a straightforward question of contract enforcement. The Indemnity Agreements at issue are unambiguous: the Sureties have the right, *in their sole discretion*, to demand release from their bonded obligations—or, failing that, to demand collateral equal to the remaining exposure. As the Fifth Circuit has repeatedly held, "in Texas, these kinds of sole-judgment or sole-discretion clauses are binding and enforceable." *ISS Aviation, Inc. Wyo. v. Bell Textron, Inc.*, No. 24-10063, 2025 WL 400034, at *6 (5th Cir. Feb. 5, 2025), *cert. denied sub nom. ISS Aviation, Inc. v. Bell Textron, Inc.*, No. 24-1125, 2025 WL 1603616 (U.S. June 6, 2025).

Yet the R&R never analyzes, interprets, or even cites the contractual language that governs this dispute. That omission distorts the legal analysis and nullifies the core right the Sureties bargained for.

While the R&R recites the general standards for injunctive relief, it never engages with the

controlling contract provision. That provision—not W&T's litigation narrative—should be the lodestar of the analysis. Instead, the R&R adopts W&T's post-hoc theory that the Sureties must wait for insolvency or an actual claim before invoking their contractual rights. But that theory appears nowhere in the Indemnity Agreements and is unsupported by applicable law.

Even W&T knows that's not the deal it made. In its recent 10-Ks, W&T disclosed to investors:

> Pursuant to the terms of our agreements with various sureties under our existing bonding arrangements, or under any future bonding arrangements we may enter into, we may be required to post collateral at any time, on demand, at the surety's sole discretion.

[Dkt. 61, 3; 62, p. 3] (W&T Offshore, Inc., Annual Report (Form 10-K) (Mar. 6, 2024), https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.htm.).

Faced with two interpretations—one rooted in the contract and W&T's own disclosures, the other a litigation-driven rewrite—the R&R chose the latter. It failed to address the Sureties' contractual demand for release and ignored the operative "sole discretion" language altogether. Instead, it found:

> The Sureties offered no evidence that Plaintiffs are insolvent, dissipating or transferring assets, preparing to file for bankruptcy, facing bond claims or even soon-to-be filed bond claims.

R&R at 12 [Dkt. 140, p. 12].

These findings are irrelevant. The Sureties are not required to wait for catastrophe before invoking their right to avoid it. That is the point of the release clause. That is what the parties agreed to. And that is what the R&R fails to enforce.

### III.    <u>Applicable Pleadings</u>

As this consolidated action originated as four separate matters, the docket timeline is somewhat out of order. For the Court's convenience, the relevant pleadings are listed below:

**Penn:**

- Original Verified Complaint [Dkt. 116]
- Motion for Injunctive Relief [Dkt. 93]
- W&T's Response [Dkt. 54]
- Reply in Support of Motion for Injunctive Relief [Dkt. 62]

**US Fire:**

- First Amended Verified Complaint [Dkt. 118]
- Motion for Injunctive Relief [Dkt. 94]
- W&T's Response [Dkt. 55]
- Reply in Support of Motion for Injunctive Relief [Dkt. 61]

Additionally, the Court may consider the hearing transcript [Dkt. 136] and the post-hearing response brief filed by the Sureties [Dkt. 127].

## IV.    <u>Standard of Review</u>

This Court's review of the R&R is de novo. *See* Fed. R. Civ. P. 72(b)(3). That review extends to both legal conclusions and factual findings properly objected to by a party. *United States v. Raddatz*, 447 U.S. 667, 682 (1980).

Here, the relevant facts are largely undisputed. The Sureties' objections turn on the plain language of the Indemnity Agreements—a purely legal issue that is subject to independent judicial interpretation. "To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original).

This principle applies with particular force to indemnity and guaranty agreements, which courts routinely construe as a matter of law when the contract language is clear. As this Court has recognized, "[i]f . . . the guaranty can be given a 'certain meaning or legal interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.'" *Mae v. Nelson Bros. Prof'l. Real Estate, LLC*, No. 4:22-CV-3901, 2024 WL 1639733, at *3 (S.D. Tex. Apr. 16, 2024)

(Hanen, J.) (quoting *ADR Tr. Corp. v. Northpark Jt. Venture*, 958 F.2d 1313, 1320 (5th Cir. 1992)

(citing *Coker v. Coker*, 650 S.W.2d at 393). The Sureties respectfully submit that the governing

language here—granting them the right, in their sole discretion, to demand release or collateral—

is unambiguous. It should be enforced as written.

Because the R&R failed to engage with this operative contract language and misapplied

the legal standards governing injunctive relief, de novo review is not merely proper—it is

necessary.

### V.        The R&R's Legal Error: Misidentifying the Trigger

The Sureties do not contend that the R&R misinterprets the entire record or misstates the

law broadly. Rather, the error is narrower—but legally dispositive. This is a commercial surety

case, and it must be understood through the lens of commercial suretyship.

In both contract and commercial surety contexts, courts "construe indemnity agreements

under normal rules of contract construction." *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417,

423 (Tex. 2000) (citing *Associated Indem. Corp. v. CAT Cont., Inc.*, 964 S.W.2d 276, 284 (Tex.

1998)); *see also Allied World Ins. Co. v. Am. W. Steel, LLC*, No. H-17-3608, 2018 WL 6602153, at

*2 (S.D. Tex. Dec. 17, 2018) (citing *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951,

953 (Tex. 1983)) ("When the terms of an indemnity agreement are clear and unambiguous, Texas

law gives effect to the agreement as written."). For that reason, the Sureties cite authority from

both domains—because in each, courts enforce indemnity agreements as written.

At the same time, the Sureties acknowledge that this case arises from a distinct subset of

an already specialized field: commercial suretyship. While contract and commercial indemnity

agreements share core features—indemnity rights, settlement authority, and exoneration—they

diverge in material ways. Chief among them: commercial sureties often bargain for the right to

exit the risk in their sole discretion, particularly in long-tail, high-liability settings like oil and gas bonds.

Although the governing principles are well established, they are rarely invoked at the preliminary injunction stage—because most principals honor their contractual obligations. That context may help explain why the R&R focused on post-claim collateralization cases drawn from the contract surety context. In both domains, the relevant inquiry begins with the triggering event. But here, the R&R starts with the Sureties' collateral demand—rather than the release right that triggered it—and never engages with the actual contractual provision that controls. That omission is precisely what makes de novo review so critical here.

## VI.　The R&R Eviscerates Core Contractual Protections—With Industry-Wide Consequences

The Sureties extended hundreds of millions of dollars in surety credit on the express condition that they could, at any time, demand release from their bond obligations. If W&T failed to obtain replacement bonds, the Indemnity Agreements allowed the Sureties to demand full collateral for any remaining exposure. And, critically, the Indemnity Agreements permitted enforcement of that right through injunctive relief.

Again, the R&R never mentions that provision. By ignoring it, the R&R effectively holds that this bargained-for protection is unenforceable. As the Texas Supreme Court recognized, courts cannot rewrite agreements between sophisticated parties under the guise of public policy. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 495 (Tex. 2019).

The leading cases—*Samson*, *Burnside*, *Talbot*, and *Padron*—each recognize that a surety suffers irreparable harm when deprived of the rights it expressly bargained for. This case is a textbook example. The R&R does not merely misinterpret a clause—it functionally erases an entire paragraph of each Indemnity Agreement. And the consequences have already rippled beyond the

courthouse. Coverage of the R&R has appeared in national outlets including Yahoo, MSN.com, and Nasdaq, signaling to the market that even unambiguous exit rights may no longer be enforceable.

The irreparable harm here is not just the loss of a contractual right in this case—which alone suffices under Texas law—it is also the broader damage to the commercial surety market if that right is judicially nullified. Commercial sureties issued these bonds based on negotiated terms that provided a clear, enforceable path to exit the risk. If those provisions are disregarded, the commercial surety model becomes untenable in the offshore energy sector.

Should Texas courts decline to enforce clear termination provisions, many sureties will exit the energy bonding market altogether; [1] others will demand 100% upfront collateral. There will be no rational commercial incentive for reinsurers to continue supporting this space. If a surety cannot act until a loss materializes—or until the principal becomes insolvent—the risk becomes indefinite, unsecured, and commercially unsustainable. That is the very definition of irreparable harm—not only to the Sureties but to the broader market that depends on reliable surety-backed compliance.

The implications of adopting the R&R reach beyond the immediate impact on the Sureties and their reinsurers. As Judge Eskridge recently warned, if indemnity agreements are not enforced:

> It is likely that, over time, sureties would become reluctant to enter into such contracts at all, and those who entered into contracts with sureties might eventually become emboldened to refuse to post collateral in favor of challenging the demands in court—and waiting out the typically slow grind of the litigation process.

---

[1] The R&R leaves unanswered a fundamental question: how is a commercial surety in the energy sector supposed to exit the risk? If a clear, bargained-for right to withdraw at the surety's sole discretion is deemed unenforceable, what mechanism remains? And for a new surety evaluating this market, what additional protections could it possibly negotiate beyond what is already present in these agreements?

The practical effect of the R&R is to leave commercial sureties indefinitely bound to high-risk, long-tail obligations—without any meaningful contractual or legal off-ramp.

*Merchants Bonding Co. v. Burnside*, No. 4:22-CV-3651, 2023 WL 4140455, at *6 (S.D. Tex. June 21, 2023) (quoting *Merchants Bonding Co v Arkansas Construction Solutions LLC*, No. 5:18-CV-05078, 2019 WL 452767, *3–4 (W.D. Ark. 2019)).

If the R&R is adopted, why would any principal voluntarily seek replacement bonds? W&T's conduct answers that question: they won't, and others shouldn't. Judge Eskridge's warning became reality just days after the R&R issued. W&T publicly touted the "courage" of its "calculated" decision to breach its Indemnity Agreements, stating:

> It admittedly takes courage and calculated risk to resist collective ultimatums from surety providers, but we hope the Court's decision inspires others to follow suit in standing up to bullying tactics.
> . . .
> Never again should any oil and gas producer have to cave to unjustified collateral demands.

*See* W&T Offshore, Inc., W&T Announces Positive Court Finding Regarding Remaining Surety Provider Claims (June 30, 2025), https://www.wtoffshore.com/news-media/press-releases/detail/494/wt-announces-positive-court-finding-regarding-remaining.

This is not mere spin. It is a public call to arms—an invitation to the industry to disregard negotiated obligations and challenge surety demands in court. Throughout this Objection, the Sureties have shown how the R&R renders the release and collateral provisions meaningless. W&T's press release confirms that interpretation, encouraging others to follow its lead. If left uncorrected, the R&R invites a wave of defiance in a regulatory space that depends on enforceable surety-backed obligations; precisely the outcome these clauses were designed to avoid.

## VII.    The R&R Never Addresses the Contractual Basis of the Sureties' Demands

Despite being the central basis for the Sureties' demands, the R&R never addresses the operative "sole discretion" provisions—not in its factual background, not in any contract analysis, and not in its discussion of the preliminary injunction factors. That silence is not merely a failure

of analysis—it is a failure to acknowledge the foundation on which the Sureties' rights rest.

Rather than grappling with the actual basis of the Sureties' demands, W&T's Responses reframed the dispute around provisions that were never invoked—rendering its position effectively nonresponsive. W&T's briefs were the first indication that it not only refused to comply with the Sureties' collateral demands, but that it intended to negate the Sureties' right to terminate their bonded risk altogether. In effect, W&T sought to reframe each bond as a perpetual obligation[2]—untethered from the contractual language that gave the Sureties discretion to be replaced.

To avoid and correct this drastic reframing, the Sureties highlighted W&T attempts to side-step the "sole discretion" clause at every opportunity:

- Both demand letters were based on, and expressly quoted, the Sureties' sole discretion rights;

- W&T never meaningfully addressed the language, referencing it only once in a single block quote—without analysis;

- The Sureties' "sole discretion" was repeatedly emphasized in both Sureties' Reply briefs;

- It formed the core of the Sureties' argument at the hearing. *See* Hr'g Tr., Dkt. 136 at 8:22–9:7; 10:15-11:11; 13:12-14:5; 17:2-20; 17:21-18:21; 19:1-9; 21:22-22:19; 23:16-20; 26:20-27:25; 46:21-47:8 *W&T Offshore, Inc., v. Endurance Assurance Corporation, et al*; No. 4:24-cv-03047 (S.D. Tex. June 3, 2025); and

- It was the first issue raised in the Sureties' post-hearing response letter to the Court. *See* Dkt. 127 (First section entitled: "**Still Ignored – The Sureties' 'Sole Discretion'"**) (emphasis in original).

Given this record, the R&R's failure to even mention—let alone apply—the "sole

---

[2] The Fifth Circuit "does not favor perpetual contracts" and "presumes that [any such] contract is terminable at will." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 855 (5th Cir. 2004) (citing *Trient Partners I, Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704, 708 (5th Cir. 1996)). This Court is therefore presented with two paths: (1) enforce the Indemnity Agreements as written—holding W&T to its contractual promise to release or collateralize on demand—or (2) accept the R&R's implicit removal of the Sureties' exit right, thereby converting the bonds into indefinite obligations. But even if the Court were to view the contract as perpetual, the law provides the same answer: perpetual contracts are disfavored and treated as terminable at will—requiring W&T to obtain replacement bonds.

discretion" language is a serious legal error. At a minimum, it deprives the R&R of the analysis necessary for meaningful review. More fundamentally, it effectively nullifies a bargained-for contractual right—a result the Fifth Circuit has routinely rejected.

**VIII.**  **The Court Should Defer to the Sureties' Discretion—But Even If It Does Not, the Record Justifies Their Decision**

W&T received hundreds of millions of dollars in bonding capacity in exchange for certain promises. One such promise—confirmed publicly by W&T—was to give the Sureties the right to demand release from their bonds in their sole discretion. The purpose of that clause is to eliminate the need for courts to underwrite the principal's financial condition or speculate about future regulatory shifts. The Sureties are contractually entitled to exit the risk without proving insolvency, default, or a pending claim. That was the deal W&T struck—and the discretion it agreed to respect.

The Indemnity Agreements gave the Sureties discretion for a reason: to avoid litigation over whether their risk calculus was justified. Courts are not underwriters. They are not equipped to second-guess commercial sureties' judgments about long-tail, high-liability risk. That's why the parties agreed that discretion would rest solely with the Sureties—and why that discretion must be respected.

**A.**  **The U.S. Fire Agreement Requires No Justification**

The U.S. Fire Indemnity Agreement is unambiguous:

> Indemnitors expressly and specifically agree that Surety, in its sole discretion and for any reason, may, by written demand, require Indemnitors to provide the Surety with Collateral . . . in the amount representing the total of any undischarged liability under the Bonds, as determined by the Surety in its sole discretion.

U.S. Fire Indemnity Agreement [Dkt. 118, Ex. B, ¶ 3].

This language eliminates any requirement of proof. The entire point of a "sole discretion" clause is to allow the Surety to act preemptively—before a claim arises, before a default occurs,

and without judicial inquiry into the soundness of its business judgment.

If courts require sureties to prove *why* they exercised discretion, then the discretion is meaningless. And if courts require sureties to wait for insolvency or a bond claim before invoking it, then the provision is worse than meaningless—it is destructive.

### B.    The Penn Agreement Provides Triggers—All of Which Are Satisfied

Even if the Court were inclined to look behind the Sureties' discretion—a step the Indemnity Agreements do not require—the Penn Agreement provides two clear, contractual triggers for action:

> The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors financial condition has been or is believed to be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bonds.

Penn Indemnity Agreement [Dkt. 116, Ex. B, ¶ 12].

Both triggers are satisfied. And each aligns with long-established commercial surety underwriting standards.

In the surety industry, a principal's risk profile is evaluated through the lens of the "Three Cs": capacity, capital, and character. These pillars guide whether a surety will extend risk and how it must reassess that risk over time. The Sureties' decision to act here was driven by changes in all three.

### 1.    Financial Deterioration (Trigger A: Capital & Capacity)

- W&T's annual net income dropped from $231.1 million (2022) to $15.6 million (2023), followed by a net loss of $87.1 million (2024).[3]

- W&T's stock price fell from $4.32 per share three years ago to $1.68 per share—

---

[3] The W&T press releases were submitted in response to Magistrate Judge Palermo's pre-hearing request regarding the timing of the Sureties' collateral demands. As the Indemnity Agreements confer discretion on the Sureties, such evidence is unnecessary. But even if evidence were required, the press releases establish W&T's financial decline. They were not offered to "establish that Plaintiffs are insolvent, on the verge of declaring bankruptcy, or facing bond claims." R&R, Dkt. 140, p. 12 n.8. That standard appears nowhere in the agreements and should not be judicially imposed.

reflecting significant market deterioration.

- W&T's public admissions of capital constraints: "The disparate actions of the Sompo Sureties, on the one hand, and the Other Sureties, on the other hand, place W&T in an impossible position, as compliance with one's demand ensures a breach of obligations to the other." [W&T's Original Complaint, Dkt. 1, ¶ 72].

These facts reflect significant decline in both capital (financial strength) and capacity (future ability to meet long-tail liabilities). The Penn Agreement allows the Sureties to act when such deterioration is observed—or even believed to be underway.

## 2. Material Change Affecting Risk (Trigger B: Changes in Regulations and Character)

The second prong of the Penn Agreement is also clearly met—on two fronts:

- **Regulatory Change**: W&T has judicially admitted that the BOEM rule fundamentally alters the risk landscape. In its Response, it argued: "To be clear, Penn Insurance's demands—and the similar demands at issue in the recently consolidated cases—stem not from a change within W&T, but rather a recent Bureau of Ocean Energy Management ('BOEM') Rule." [Dkt. 54, pp. 8]. W&T also acknowledges that this new BOEM "Rule requires sureties to demand collateral on existing bonds." [Dkt. 54, p. 14]. In its effort to deflect attention from its own financial condition, W&T walks directly into the contractual trigger. The Sureties' discretion includes the right to act when there has been or is believed to be a regulatory change that adversely impacts their risk. W&T's Response—by emphasizing that very change—confirms the basis for the Sureties' demand. If W&T had ever acknowledged the "sole discretion" language in its Responses, it would have understood the legal significance of its own admission. But by ignoring it, W&T inadvertently concedes the very condition that entitles the Sureties to relief.

- **Character Shown Through Litigation Conduct**: After the bonds were issued, W&T adopted litigation positions directly at odds with the Indemnity Agreements. In its dispute with the Sompo Sureties, W&T challenged the enforceability of a $7.5 million collateral demand, asking a court to deem it unreasonable and seeking a declaring that W&T—not Sompo—should be awarded the discretion to decide the *form* and *amount* of collateral.

These changes—the proposed BOEM Rule and W&T's public repudiation of similarly accepted contract terms—directly affects the Sureties' actual and perceived risk. It undermines the contractual predictability and promises on which surety underwriting depends. And it satisfies the

Penn Agreement's second trigger: a "change that adversely impacts" the Surety's risk under the bonds.

### C.   The Sureties Exercised Their Rights Reasonably and Responsibly

Even if this Court were inclined to "look behind" the Sureties' exercise of its contractual right of "sole discretion" it would find the Sureties' decisions commercially reasonable, factually supported, and consistent with standard industry practice.

In sum, no evidence was required, but W&T's own conduct and pleadings supplied it. Yet the R&R does not mention any of this. It overlooks both the discretion and the Sureties' rationale for exercising their rights. And it ignores W&T's own recognition—both contractual and public—that this discretion exists.

The result is a ruling that second-guesses the very business judgment that the Indemnity Agreements vested in the Sureties—without ever explaining why.[4]

### D.   This Court Should Uphold, Not Question the Sureties' Discretion

The purpose of the "sole discretion" clause is precisely to avoid judicial second-guessing. Courts are not underwriters; they do not sit in judgment of a surety's risk calculus. The clause exists to eliminate the need for courts to determine when a surety's concern is "justified." If the Surety's discretion must now be second-guessed in court, the right becomes illusory.

Here, W&T has publicly admitted that it cannot the collateralize its sureties. It publicly

---

[4] The R&R's treatment of the Sureties' evidence is flawed in two ways. First, even in *contract surety* cases—where the surety guarantees specific performance of a principal—courts do not require a showing of asset dissipation, insolvency, or imminent default to enforce collateral provisions. They enforce the contract as written. That is even more true in the commercial surety context, where bonds cover high-dollar, long-tail risks, and preemptive exits are standard underwriting tools.

Second, even if evidence were required (which the "sole discretion" clauses negate), the Court made no effort to analyze the contract language that governs that determination. Once again, the operative provisions of the Indemnity Agreements were ignored.

---

sued one of its sureties over a $7.5 million collateral demand that it deemed to be unreasonable. It sought a declaration from the courts that it should have the right to determine the quantum and form of collateral.

If the Sureties' "sole discretion" is taken away from them, how long must the Sureties wait? Do they sit back and hope that W&T can turn itself around financially? How many lawsuits does W&T need to file asking courts to re-write its indemnity agreements? If one is not enough, how many?

These are not rhetorical flourishes—they are the logical outcome of the R&R's reasoning. Neither W&T nor the Court offers any answer. That silence reveals the flaw in the R&R's approach: it leaves the Sureties exposed, indefinitely, with no clear trigger for relief and no way to exit the risk they contracted to avoid.

## IX.    The R&R Misstates The Relief Requested And Relies On The Wrong Source

By jumping straight to the collateral demand, the R&R incorrectly asserts that the Sureties requested collateral "sufficient to protect the Sureties from loss in connection with the bonds." [Dkt. 140, p. 3, citing Dkt. 36, ¶¶ 2. 92-107]. But that citation points not to the Sureties' filings, but to W&T's Amended Complaint—misstating both the source and substance of the relief sought. The actual request was precise and conditional: the Sureties sought collateral only if W&T failed to procure replacements, and only in the amount of unreleased exposure.

Both U.S. Fire and Penn requested primary relief in the form of release from their bonds, as permitted under the indemnity agreements. U.S. Fire Mot. for Prelim. Inj., Dkt. 94, ¶ 15; Penn Mot. for Prelim. Inj., Dkt. 93, ¶ 21. Only if W&T refused or failed to obtain substitute bonds did the Sureties demand collateral—and even then, only for the value of the bonds that remained outstanding.

As U.S. Fire explained in its Reply brief:

> US Fire's discharge demand clearly establishes that W&T must obtain the release of all of the bonds within 10 days, and—only if they fail to do so—is the requirement triggered to provide US Fire with collateral equal to the penal sum of all outstanding bonds.

[Dkt. 61, p. 4].

Likewise, Penn wrote:

> Penn's demand was tied to W&T's refusal or inability to replace and release Penn's Bonds. . . . By failing to act, W&T triggered its obligation to provide collateral for the full amount of the undischarged liability.

[Dkt. 62, p. 5].

These were not generalized demands to safeguard against hypothetical losses. They were contractually triggered obligations under specific "sole discretion" provisions that W&T refused to honor. The R&R's citation to W&T's pleading in place of the Sureties' actual briefing compounds the failure to engage with the controlling contract language and results in a distorted view of the remedy requested.

Despite the clarity of the Indemnity Agreements and the Sureties' specific demands, W&T constructs a straw man argument—asserting that no claims have been made on the bonds—in an effort to frame the Sureties' collateral demands as unreasonable. W&T then relies on authority drawn primarily from *contract* surety indemnity agreements[5], which follow a different model than

---

[5] As stated previously, the Sureties did not limit their argument to commercial surety cases. They also cited contract surety cases such as *Padron*, *Burnside*, and *Talbot*—and with good reason. These cases, while arising in the contract context, stand for enduring principles that apply equally here: namely, that a surety's right to secure itself against future loss through collateral is enforceable in equity, and that the loss of that right constitutes irreparable harm.

Indeed, suretyship—whether contract or commercial—has long been recognized as a relationship where equitable rights arise before a loss is realized. Courts applying centuries-old doctrines like *quia timet* have repeatedly upheld a surety's ability to protect itself against anticipated exposure. *Padron* and *Burnside* are modern expressions of this foundational rule, adapted to the present-day business environment. These cases were cited not as square analogs to commercial suretyship, but because they articulate the principles that have always animated equitable relief for sureties: the need to act proactively, and the inadequacy of post-default remedies.

the *commercial* surety agreements before this Court.

The distinction is significant. Contract suretyship generally involves bonds tied to performance or payment under construction contracts. These obligations are typically project-based and finite in duration. Importantly, contract sureties are often secondarily protected by undisbursed construction funds held by the obligee, which can be used to offset losses in the event of default. It is true that many indemnity agreements in the contract surety context condition the surety's right to demand collateral on the existence or threat of claims—and the collateral awarded in those cases reflects that structure and the unambiguous language of *those* agreements.

But this is a *commercial* surety case, and the risk profile is fundamentally different. Commercial sureties guarantee compliance with legal or regulatory obligations, including environmental decommissioning under federal law, licenses, leases, and other long-tail obligations—where the underlying assets remain in use and steadily decline in value. These risks are indefinite in duration, highly sensitive to regulatory changes, and exposed to increasing liability over time. And unlike construction suretyship, there are no offsetting contract funds held in reserve. The financial burden of plugging and abandonment is not hypothetical—it is inevitable. This is not auto insurance, where some drivers may never have an accident. Every well must eventually be plugged. The only uncertainty is when—and whether a viable principal will be around when that time comes.

That is the very purpose of the "sole discretion" clause: to give commercial sureties the ability to exit the risk before it matures into unrecoverable loss. It is not an ancillary right—it is the core protection that distinguishes commercial suretyship from other risk-bearing relationships. When W&T refused to cooperate—and the R&R failed to enforce that right—the Sureties were stripped of the very protections that made the bonded risk commercially tolerable in the first place.

That framework is reflected in *Travelers Cas. & Sur. Co. of Am. v. Samson Inv. Co.*, where the court enforced a nearly identical discretionary release provision:

> As relevant to the current application, the Indemnity Agreement provides that upon Traveler's demand Samson will obtain Travelers' full and complete discharge from the bonds and provide written evidence of the discharge satisfactory to Travelers in its sole discretion. If Samson fails to obtain Traveler's discharge and provide satisfactory written evidence of the discharge, Samson agreed to provide an irrevocable letter of credit to Travelers equal to the undischarged liability under the bonds.

*Travelers Cas. & Sur. Co. of Am. v. Samson Inv. Co.*, No. 13-CV-0156-JHP-FHM, 2013 WL 12109098, at *1 (N.D. Okla. June 17, 2013).

The Indemnity Agreements here contain comparable language, which the R&R did not analyze (nor did it address the commercial case cited directly on point).

Providing the Sureties "sole discretion" means exactly what it says – the parties agreed the Sureties could decide when risk levels warranted an exit or collateral, without second-guessing by W&T or the courts. There is no ambiguity here.   And this language should be analyzed and construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." (emphasis in original)); *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 494 (Tex. 2019) ("Given the plain, unambiguous language of the consent-to-assign provision, we conclude that Barrow-Shaver has the absolute obligation to obtain Carrizo's consent, and Carrizo has no obligation as to when, how, or why it may withhold its consent to assign.").

## X.     The R&R Misapprehends Irreparable Harm—And Ignores Controlling Authority

The R&R concludes that "[t]he Sureties . . . do not assert that denial of a preliminary injunction will result in any non-monetary damages." [Dkt. 140, p. 13]. That is flatly incorrect. The Sureties explained at length—and with substantial supporting case law—that denial of

injunctive relief would deprive them of the contractual protections they specifically bargained for. *See, e.g.,* U.S. Fire Mot. for Prelim. Inj., Dkt. 94; Penn Mot. for Prelim. Inj., Dkt. 93. That deprivation constitutes irreparable harm.

In *Merchants Bonding Co. v. Burnside*, No. 4:22-CV-3651, 2023 WL 4140455 (S.D. Tex. June 21, 2023)—a recent Southern District of Texas opinion that was neither cited nor discussed in the R&R—Judge Eskridge explained the unique nature of suretyship and the weight of authority in support:

> The Surety will suffer irreparable injury if the injunctive relief is not granted. Under ordinary circumstances, a party's ability to be fully compensated in the form of an award for the full amount of its damages means that the harm is not irreparable. *Merchants Bonding Co v. Arkansas Construction Solutions LLC*, 2019 WL 452767, * 3–4 (WD Ark). But a surety's rights that flow from the indemnity agreement are unique as compared to a generic contract. *Id.* "The majority of courts that have addressed the issue have agreed that, in light of the unique nature of a collateralization agreement, a court should compel its specific performance through a preliminary injunction." *Vann Companies*, 2023 WL 3018547 at *4; see also *Talbot Construction*, 2016 WL 8814367 at *7 (collecting cases); *Arkansas Construction Solutions*, 2019 WL 452767 at *5; *Padron*, 2017 WL 9360906 at *10; *Argonaut Insurance Co v Summit Concrete Inc*, 2022 WL 17819631, *3 (ND Ala); *Philadelphia Indemnity Insurance Co v RKM Utility Services Inc*, 2020 WL 2541961 (ED Tex); *Fucich Contracting Inc v Shread-Kuyrkendall & Associates Inc*, 2019 WL 1755525 (ED La); *SureTec Insurance Co v Eternity LLC*, 2018 WL 6001103 (ND Ala); *Travelers Casualty & Surety Co of America v Samson Investment Co*, 2013 WL 12109098 (ND Okla).

*Merchants Bonding Co. v. Burnside*, No. 4:22-CV-3651, 2023 WL 4140455, at *4–5 (S.D. Tex. June 21, 2023) (citations in original)

On the issue of monetary loss, Judge Eskridge found:

> The *Indemnitors* have argued that the dispute with the Surety is a temporary and monetary one that can be remedied through the award of interest to the Surety. But here, the "issue is not simply one of monetary loss: it is about the right of a surety to the immediate, contracted-for payment of collateral . . . "It follows that it would not make Merchants whole to order [the Indemnitors] to pay a money judgment at

the end of this litigation. This is because, at that point, Merchants would have lost its contractual right to the immediate payment of collateral—which is a form of specific relief that only a preliminary injunction can provide."

With this *understanding* in mind, the Surety would suffer irreparable injury and lose the "peace of mind" it bargained for with Indemnitors if the Court denies the injunctive relief.

*Id*. (citations omitted, emphasis added).

Despite the "majority of courts" protecting the rights of sureties, the R&R focuses instead of monetary and speculative harm. That conclusion is legally flawed and factually disconnected from the purpose of the injunction the Sureties seek. It also contradicts the weight of authority—including precedent from this District—that makes clear the loss of a bargained-for contractual right to collateral or release constitutes irreparable harm.

This Court should likewise follow the majority. When a court declines to enforce a surety's right to be released or collateralized, that right is permanently lost. No damages award can substitute for the lost opportunity to avoid risk before a claim or insolvency arise.

A commercial surety's right to demand collateral or be released from risk is structurally and substantively no different from a secured lender's right to accelerate repayment or seize collateral under the terms of a loan agreement. Courts routinely enforce those rights in real time—through injunctive or declaratory relief—because to do otherwise would render the secured party's protection meaningless. The same principle applies here. If sophisticated lenders are entitled to enforce collateral rights without waiting for loss, so too are commercial sureties. Their risk controls are not hypothetical—they are part of the bargain.

Without an injunction, the Sureties' bargained-for protections are permanently lost. Once a claim materializes or W&T defaults, the Sureties lose their contractually guaranteed priority—and are thrust into line alongside other unsecured creditors. That is precisely the outcome two

sophisticated parties contractually agreed to prevent.

The R&R never engages with that logic. It treats the Sureties' harm as speculative, ignoring the commercial reality that these rights exist precisely so that sureties can use its business judgment to request off of a risk before it is too late.

## XI.    The R&R Relies On A Case That Misinterprets *Padron* And Therefore Misapplies The Law Of Irreparable Harm

The R&R adopts W&T's argument based on a decision involving 3i Construction[6], which in turn relies on a misreading of *Travelers Cas. & Sur. Co. of Am. v. Padron*, 2017 WL 9360906 (W.D. Tex. Aug. 2, 2017). That misreading permeates the R&R's analysis of irreparable harm— leading to the incorrect conclusion that a surety must show asset dissipation or impending insolvency to warrant injunctive relief.

Specifically, the R&R asserts that *Padron* "based its irreparable harm finding in part on evidence that the defendant indemnitors were likely dissipating assets, insolvent, or both." [Dkt. 140, pp. 11–12]. But *Padron* says no such thing.

Counsel for the Sureties was retained in *Padron* after the district court had denied two prior injunction requests. In its second denial, the court found that Travelers "provide[d] no evidentiary support by affidavit, sworn declaration, or authenticated business records that Defendants' financial situation is a presently existing actual threat." *Travelers Cas. & Sur. Co. of Am. v. Padron*,

---

[6] The *Samson* and *Burnside* matters were decided after a full evidentiary hearing. The *Padron* opinion occurred after oral argument. Yet the R&R relies in part on *Gray Cas. & Sur. Co. v. 3i Contracting, LLC*, No. 3:23-CV-2511-L, 2024 WL 1121800, at *3 (N.D. Tex. Mar. 13, 2024) a case that is procedurally and substantively distinguishable. The *3i Constr.* ruling was issued after the surety merely requested a hearing—it was not based on a full evidentiary record or adversarial briefing. The defendant never appeared nor responded to the Complaint or Motion.

The R&R also cites *Harco National Insurance Co. v. Ventec Holdings LLC*, No. 3:23-cv-01463 (N.D. Tex.), but that decision likewise lacks persuasive value. *Harco* was decided without a hearing, and its opinion contains no discussion of *Padron*, *Talbot*, *Burnside*, or any of the prevailing cases recognizing irreparable harm in the surety context. Notably, since the *Harco* order issued, the surety is facing millions of dollars in new claims, has incurred over a million dollars in actual losses, and is in the process of refiling its motion for injunctive relief.

No. 5:15-CV-200-DAE, 2016 WL 1064650, at *8 (W.D. Tex. Mar. 14, 2016).

When Travelers renewed its motion, it supplemented the record but made clear that such evidence was not legally required. The goal was to avoid a pyrrhic victory in which an injunction was granted, but required proof of dissipation of assets as a condition for future injunctions.

The final opinion reflects that approach. Judge Ezra wrote a carefully drafted opinion that placed no such conditions on future sureties. Judge Ezra held that financial evidence merely "further compound[ed]" the irreparable harm already established:

> At the hearing and through the briefing, [the Surety] has shown that Defendants' financial situation is a presently existing actual threat . . . further compounding the irreparable harm to [the Surety] if it does not receive injunctive relief by way of specific enforcement of the collateral security provision.

*Padron*, 2017 WL 9360906, at *10.

The actual basis for the ruling appears in the court's discussion of the surety's unique rights under the indemnity agreement:

> [I]n finding irreparable harm and granting injunctive relief, courts protect . . . three interests of the surety: the bargained-for benefit of collateral security, avoidance of present exposure to liability during pending litigation against indemnitors, and avoidance of risk that, should Indemnitors become insolvent, the surety will be left as a general unsecured creditor, frustrating the purpose of the indemnity agreement."

*Id.* at *10 (quoting *Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*, Civil Action No. 1:15-cv-3969-LMM, 2016 WL 8814367, at *7 (N.D. Ga. Apr. 13, 2016)).

Judge Ezra continued, "These three surety interests are very clearly at stake here, and the Court finds that Travelers undisputedly 'bargained for a collateral security clause to protect it from impending risks of liability once a claim has been made on the bond[s].'" *Id.*

The court had already determined that the surety was entitled to equitable relief to protect the benefit of its collateral rights. The defendants' financial condition was not necessary to the

conclusion—it merely supported it.

Notably, the controlling holding appears in the court's dedicated "Conclusions on Irreparable Harm" section, which makes no mention of dissipation of assets or insolvency:

> Therefore, similar to the court's finding in, for example, *Talbot Construction, Inc.*, the Court finds that Travelers would be irreparably harmed without injunctive relief because it has no adequate remedy at law for a breach of the collateral security provision, "either for recovering for its actual losses or for protecting itself against future losses due to claims on the bonds." See 2016 WL 8814367, at *7. Just as the surety did in *Talbot Construction, Inc.*, Travelers here "specifically sought protection against present exposure to liability on bonds through contractual language requiring deposit of collateral 'on demand,'" and therefore, "[d]amages available after trial and judgment, even if including costs and interest, are of little use" to Travelers "when it is responsible for investigating, defending, and paying claims on bonds in the present." *See id.* Accordingly, Travelers has clearly shown a substantial threat of irreparable harm.

*Id.* at *11 (citations in original).

That is the takeaway from *Padron*: the inability to enforce collateral provisions constitutes irreparable harm. The R&R, relying on a distorted chain of precedent, failed to apply this principle. It should not be adopted.

## XII.    The R&R Misapplies The Remaining Injunction Factors By Ignoring The Contractual Foundation For Relief

The R&R's discussion of the remaining injunction factors—likelihood of success, balance of harms, and public interest—is confined to a single footnote. That limited analysis adopts W&T's framing and fails to engage with the core basis for the requested relief: the unambiguous "sole discretion" provision in the Indemnity Agreements.

Once the contract is interpreted correctly, each of the remaining factors supports an injunction:

- **Likelihood of Success on the Merits**: The Indemnity Agreements are clear. W&T agreed to secure release of the bonds at the Sureties' sole discretion, and failing that, to post collateral in the amount of the undischarged bond amounts. W&T

refused. That is a breach. This is not a fact-intensive dispute; it is a case about enforcing unambiguous contract language. W&T even acknowledged in its 10-K that "we may be required to post collateral at any time, on demand, at the surety's sole discretion." That acknowledgment removes any plausible ambiguity—and confirms the Sureties' likelihood of success.

- **Balance of Harms**: W&T claims that posting collateral is burdensome. But that burden is one it expressly agreed to bear. The Sureties, by contrast, face unsecured exposure to tens or hundreds of millions of dollars in bond obligations—exposure they bargained to avoid.

  As courts have recognized, the freedom to allocate risk through contract is a protectable interest. Equity does not favor shielding a party from the consequences of breaching the very agreement it used to obtain bonding capacity. *Merchants Bonding Co. v. Burnside*, No. 4:22-CV-3651, 2023 WL 4140455, at *5 (S.D. Tex. June 21, 2023)("There is no doubt that collateralizing the Surety in the amount of $38,136,936.62 would be a burden, but ultimately, it is a burden the Indemnitors explicitly bargained when they executed the Indemnity Agreement.")

  Enforcing the Sureties' contractual right to exit the risk or obtain collateral does not undermine the energy sector—it reinforces it. The requested injunction promotes commercial certainty and preserves the viability of decommissioning bonds in a shifting regulatory environment.

  Even if the R&R was influenced by policy concerns about potential burdens on W&T, the Texas Supreme Court has made clear that such considerations cannot override the parties' agreed terms. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 495 (Tex. 2019) ("We recognize the important public policy favoring the exploration and development of oil and gas. . . However, we refuse to extend that public policy in favor of rewriting agreements between experienced, sophisticated parties.") (internal citations omitted).

- **Public Interest**: The public interest lies in upholding contracts as written—particularly in regulated markets like offshore oil and gas where surety bonds are essential tools for regulatory compliance. Courts have repeatedly held that enforcing indemnity agreements in real time promotes commercial stability and protects the surety system as a whole. *See Burnside*, *Padron*, *Talbot*. Declining to enforce those agreements, by contrast, risks distorting the market by inviting indemnitors to breach until judgment. If sureties cannot rely on indemnity agreements to limit their exposure, they will either exit the market or charge prohibitively high premiums. That, in turn, hurts the broader public interest by making it harder for energy companies to get the bonds needed to operate (ironically undermining BOEM's goal of ensuring decommissioning obligations are secured). Thus, granting the injunction supports a stable surety market and continued oil-and-gas operations under the rule of law.

  In short, enforcing this contract term isn't just technically correct—it also sends a

message that courts will uphold the reliability of contracts even amid shifting regulatory winds. The Court need not resolve regulatory policy—only enforce the private law framework that the parties voluntarily adopted. This approach ensures judicial efficiency by resolving the dispute on the basis of unambiguous contract terms.

W&T's response to these points is premised on its mistaken belief that a claim on the bond is a precondition to enforcing release or collateral provisions. *See, e.g.* W&T's Response to Penn's Motion for Injunctive Relief [Dkt. 54, p. 21] ("The Indemnity Agreement clearly states that Penn Insurance may only demand collateral for existing liability. That is not the case here, so it cannot succeed in its request for specific performance.").

That premise is wrong—contractually and legally. The Indemnity Agreements say nothing about tying collateral to existing claims. They give the Sureties discretion to demand collateral if W&T fails to provide a release.

W&T never addresses the Sureties' actual demand for replacement bonds. The record is silent on whether W&T could not obtain replacement sureties or—as its press release suggest—simply refused. Either way, the obligation to post collateral was triggered by its own breach.

The R&R fails to engage with any of this. It ignores the contract's central provision and invents conditions—like asset dissipation or insolvency—that appear nowhere in the Indemnity Agreements.

This Court should correct that legal error. As the Fifth Circuit has made clear, courts must enforce unambiguous contracts as written. An objection is warranted to ensure the contract's terms are honored in full—without judicial amendment or re-interpretation

## XIII.   Conclusion

In sum, the Sureties respectfully ask this Court to do what the law requires: enforce the contract as written and protect the benefit of the bargain. Upholding the Sureties' bargained-for rights will reaffirm that commercial agreements—especially those negotiated in regulated

industries—mean what they say, even amid shifting regulatory winds, and can be relied upon by the industry in negotiating the allocation of financial and other risks.

The requested relief is narrow, specific, and grounded squarely in contract. It does not alter the parties' bargain—it ensures its enforcement, exactly as agreed. W&T promised to obtain bond releases upon demand or, failing that, to provide collateral. That promise should be honored.

The rule of law is best served when courts give effect to unambiguous agreements. That principle—and the integrity of the commercial surety market—deserve this Court's protection. This case requires no judicial innovation—only the discipline to enforce commercial promises. In honoring the parties' agreements, the Court safeguards both the agreements and the marketplace they serve.  The Sureties are entitled to enforcement of the Indemnity Agreements as a matter of law.

For these reasons, the Court should reject Judge Palermo's Report and Recommendation [Dkt. 140] and grant the Sureties' motions for injunctive relief [Dkt. 93 & 94]. That result aligns with the Fifth Circuit's longstanding principle that courts must give effect to all unambiguous contract provisions.

**[SIGNATURE PAGE FOLLOWS]**

RESPECTFULLY SUBMITTED this 2nd day of July, 2025.

/s/ Ryan D. Dry
Ryan D. Dry
Texas Bar No. 24050532
S.D. Tex. Bar No. 618363
Steven K. Cannon
Texas Bar No. 24086997
S.D. Tex Bar No. 3356957
**DRY LAW, PLLC**
909 18th Street
Plano, TX 75074
(972) 797-9510 Tele/Fax
rdry@drylaw.com
scannon@drylaw.com

***ATTORNEYS FOR PENNSYLVANIA
INSURANCE COMPANY AND UNITED
STATES FIRE INSURANCE COMPANY***

## CERTIFICATE OF SERVICE

I hereby certify that, on July 2, 2025, a true and correct copy of the foregoing document was filed and served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas on those parties registered to receive electronic notice.

/s/ Ryan D. Dry
Ryan D. Dry