**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**



W&T OFFSHORE, INC., AND      §
W&T ENERGY VI, LLC,      §
     §
V.      §      LEAD CASE NO. 4:24-CV-3047
     §      CONSOLIDATED ACTION
ENDURANCE ASSURANCE CORPORATION,      §
AND LEXON INSURANCE CO., *ET AL.*      §
     §

---

**W&T'S RESPONSE TO PENNSYLVANIA INSURANCE COMPANY AND UNITED STATES FIRE INSURANCE COMPANY'S JOINT OBJECTIONS TO THE REPORT AND RECOMMENDATION DENYING MOTIONS FOR <u>PRELIMINARY INJUNCTIONS</u>**

# TABLE OF CONTENTS

NATURE OF PROCEEDING ................................................................................. 1

STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT ................................. 3

SUMMARY OF THE ARGUMENT ............................................................................ 3

I.      Legal Standard for a Preliminary Injunction .................................................. 3

II.     The Sureties Mischaracterize the Issue Presented to the Court .......................... 3

III.    The Sureties Failed to Meet Their Burden on Any Element ............................... 4

ARGUMENT ............................................................................................................ 5

I.      The R&R Correctly Sets Forth the Legal Standard for a Preliminary Injunction ............. 5

II.     The Sureties' Objection Mischaracterizes the Issues Presented to the Court ................... 6

        A.      A Decision on the Merits of the Contractual Dispute is Not Necessary to
                Deny a Preliminary Injunction .................................................................. 6

        B.      The Sureties are Not Seeking Relief in the Form of Replacement Bonds ............. 8

III.    The Sureties Did Not Meet Their Burden to Establish Irreparable Harm ...................... 10

        A.      Surety Case Law in the Fifth Circuit Does Not Support Injunctive Relief
                in the Absence of Immediate Harm That Cannot Be Remedied by
                Monetary Damages ................................................................................. 11

        B.      The Sureties' Status as Commercial Sureties Does Not Exempt Them from
                Failing to Meet Their Burden to Substantiate Irreparable Harm ...................... 14

        C.      There is No Harm Because There are No Claims or Liabilities on the
                Bonds and No Risk that Monetary Remedies Will Become Unavailable ........... 15

IV.     Sureties Failed to Establish Likelihood of Success on the Merits ................................ 16

V.      The Balancing of the Harms Favors W&T ........................................................ 19

VI.     Granting an Injunction Under These Circumstances Would Be Against the Public
        Interest ................................................................................................... 20

CONCLUSION ........................................................................................................ 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Jackson*,
  556 F.3d 351 (5th Cir. 2009) ...................................................5

*Clark v. Prichard*,
  812 F.2d 991 (5th Cir. 1987) ...................................................6

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
  710 F.3d 579 (5th Cir. 2013) ...................................................6

*Frequent Flyer Depot, Inc. v. American Airlines, Inc.*,
  281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) .................18

*Gray Cas. & Sur. Co. v. 3i Contracting, LLC*,
  2024 WL 1121800 (N.D. Tex. Mar. 13, 2024) .......................... *passim*

*Harco Nat'l Ins. Co. v. Gaspard & Menon Constr., LLC*,
  2025 WL 1254440 (N.D. Tex. Apr. 23, 2025) ..........................5, 11, 19

*Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*,
  2016 WL 8814367 (N.D. Ga. Apr. 13, 2016) ..........................11, 13, 14

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
  Negara*,
  335 F.3d 357 (5th Cir. 2003) ...................................................5

*Liberty Mut. Ins. Co. v. Nat'l Personnel of Tex., Inc.*,
  2004 WL 583531 (N.D. Tex. Mar. 24, 2004) ................................16

*Mae v. Nelson Bros. Prof'l. Real Estate, LLC*,
  2024 WL 1639733 (S.D. Tex. Apr. 16, 2024) (Hanen, J.) ...................7, 8

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ...................................................6

*Merchants Bonding Co. v. Burnside*,
  2023 WL 4140455 (S.D. Tex. June 21, 2023) ..............................11, 13

*Miss. Power & Light Co. v. United Gas Pipe Line*,
  760 F.2d 618 (5th Cir. 1985) ...................................................5, 6

*Travelers Cas. & Sur. Co. of Am. v. Padron (Padron I)*,
  2015 WL 1981563 (W.D. Tex. May 1, 2015) ..........................6, 10, 12

ii

*Travelers Cas. & Sur. Co. of Am. v. Padron (Padron II)*,
  2017 WL 9360906 (W.D. Tex. Aug. 2, 2017) ............................................................11, 12, 13

*Travelers Cas. & Sur. Co. of Am. v. Samson Inv. Co.*,
  2013 WL 12109098 (N.D. Okla. June 17, 2013) .......................................................11, 13, 14

*United States v. Emerson*,
  270 F.3d 203 (5th Cir. 2001) ........................................................................................10

*United States v. Raddatz*,
  447 U.S. 667 (1980) ........................................................................................................3

**Statutes**

28 U.S.C. § 636(b) ...........................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 72(b)(3) ...................................................................................................3

Plaintiffs, W&T Offshore, Inc. and W&T Energy VI, LLC (collectively, "W&T"), hereby file this Response to Pennsylvania Insurance Company ("Penn") and United States Fire Insurance Company's ("US Fire") (collectively "Sureties") Joint Objections to Magistrate Judge Palermo's Report and Recommendation ("R&R") Regarding Motions for Preliminary Injunction, Dkt. 143 ("Objection").

## NATURE OF PROCEEDING

W&T has operated in the Gulf of America for over 40 years.  **Never once** has a surety's *contingent liability* ever been triggered due to W&T's failure to perform plug and abandonment obligations.  Moreover, there are no current or imminent threats to W&T's viability—unless the Sureties get their way and are allowed, on an unsubstantiated basis, to call for collateral at a whim. W&T's balance sheet is stronger today than it was when the Sureties issued bonds to W&T.  The Sureties' coordinated call for collateral should be seen for what it was: a collusive effort to increase their own profits and an after-the-fact attempt to justify their behavior once they realized that W&T did not intend to cave to their unreasonable demands.

Suretyship is intended to be a mechanism to guard against losses—but the Sureties here seek to turn it into a profit-making windfall by requiring W&T to pay them over $100 million dollars in the absence of any claim, loss, liability, or risk of insolvency.  Their demands are based on nothing more than their own assertion that the contracts at issue allow them to demand any amount of collateral for any reason or no reason at all—**a disputed interpretation that goes to the heart of the merits of this case**.  The Sureties take their astonishing position one step further by asking for a preliminary injunction that would direct W&T to pay this enormous sum of money now, in the absence of any trial on the merits, and without submitting any evidence of harm, let alone irreparable harm.

In a well-reasoned and legally correct opinion, based on the evidence in the record and the applicable case law, the Court's R&R denied the preliminary injunction, finding that the Sureties had not met their burden on any of the four factors.  The R&R focused primarily on the absence of any evidence of irreparable harm to the Sureties, and although they claim legal error, the Sureties' Objection on that factor simply repeats the same arguments that the Court already considered and found insufficient.  Because the Sureties know they cannot make the requisite showing of irreparable harm, they now attempt to shift the focus of their argument to contractual interpretation issues to distract from the basic legal standards applicable to preliminary injunctions.

The Sureties suggest that the Court inappropriately attempted to displace their self-interpreted unfettered discretion to make baseless and extreme collateral demands under their contracts, and their Objection is filled with alarmist statements suggesting that the Court's ruling has single-handedly undermined the entire surety industry.  The Sureties' statements regarding the predicament they now find themselves in wholly ignores that this is a boomerang they set in motion.  Moreover, such statements by the Sureties fail to acknowledge the extreme damage their prior collateral demands have already had, not only on W&T, but also on the entire independent oil and gas industry.  Said another way, the Sureties started this unnecessary fight by exerting extreme bullying tactics; now they do not like the outcome when their conduct is finally tested in a court of law.  W&T has demonstrated its willingness to resolve these matters and deal with cooperating sureties on a reasonable go-forward basis, *see* Dkt. 132, while letting bygones be bygones.  The remaining Sureties in this litigation have simply decided to go *all in*, and they cannot be heard to complain about the impact of negative press from the R&R when they have put themselves in this position.

## STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT

The issue presented to the Court is whether to accept the findings and recommendations made by Judge Palermo in her Report and Recommendation, Dkt. 140, which denied the Sureties' motions for preliminary injunctions, Dkt. 93 & 94.  This Court reviews *de novo* any proper objections to the R&R, and "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b); *United States v. Raddatz*, 447 U.S. 667, 682 (1980).

## SUMMARY OF THE ARGUMENT

### I.     Legal Standard for a Preliminary Injunction

The R&R correctly sets forth the legal standard and elements the moving party must show for a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury to the movant outweighs the threatened harm to the non-movant; and (4) the granting of the preliminary injunction will not disserve the public interest.  A preliminary injunction is an extraordinary remedy with a high burden, particularly here, where the Sureties are seeking affirmative relief to alter the status quo rather than preserve it.  Failure to show evidence that the facts and law are clearly in their favor on any of the four elements requires denial.

### II.     The Sureties Mischaracterize the Issue Presented to the Court

The Sureties' objection improperly focuses on whether the Sureties are entitled to have their bonds replaced under the terms of the indemnity agreements with W&T, and whether the sole discretion language of the agreements should be enforced.  However, the motions for preliminary injunctive relief did not seek bond replacement—they sought to require W&T to pay $100 million to the Sureties in monetary collateral based on purely speculative and non-existent liability for claims and losses.  Further, the R&R does not make findings about the ultimate enforceability of

3

the indemnity agreements; it finds that "[t]he likelihood of success on the merits is neutral because the briefing on this element is largely speculative and the record is not clear enough to adequately assess this factor." Dkt. 140 at 5 n.5. The R&R does not preclude the Sureties from presenting evidence about their contractual interpretation claims at trial, and the Court need not decide the merits of the Sureties' contractual claims to adopt the R&R and deny preliminary injunctive relief.

### III.    The Sureties Failed to Meet Their Burden on Any Element

The R&R correctly concluded that Sureties failed to meet their burden on **any** of the four elements but focused primarily on the element of irreparable harm. The Court found that the Sureties had not put forward evidence of any harm beyond speculation, and "the Sureties offered no evidence that Plaintiffs are insolvent, dissipating or transferring assets, preparing to file for bankruptcy, facing bond claims or even soon-to-be filed bond claims." Dkt. 140 at 12. The R&R's holding is squarely in line with other district courts within the Fifth Circuit, which have entertained claims of irreparable harm only where such evidence was presented.

While the Court need not reach any of the remaining elements to adopt the R&R, the conclusion that the Sureties had not met their burden on any of those remaining elements is also correct. The Sureties failed to address each of the elements required for specific performance of their contracts, and the plain language of the contracts favors W&T's interpretation, or is at best ambiguous. The third element, balancing of harms, clearly favors W&T—the Sureties are continuing to collect premiums from W&T for their bonds and there are no claims or imminent obligations that would trigger claims. Requiring W&T to pay $100 million in the absence of any prospect of liability would unnecessarily and inequitably burden their business. Last, the public interest would not be served where the merits can be addressed at trial, and where there are allegations that the Sureties' coordinated demands and group boycott have violated antitrust law.

# ARGUMENT

The Court's R&R does not deprive the Sureties of the opportunity to present evidence and attempt to convince a jury that their contractual interpretation is correct. But the proper interpretation of the contract is not the dispositive issue before the Court on a motion for preliminary injunction. The issue before the Court was a motion for a mandatory preliminary injunction that sought the ultimate relief in the case—an extraordinary remedy that requires the moving party to meet a high burden under a well-established, four-part legal standard. As the R&R correctly found, the Sureties failed to meet *any* aspect of their burden. Their failure to substantiate irreparable harm alone was sufficient to warrant denial of the preliminary injunction, but the Sureties failed to meet their burden on each of the necessary elements. Far from undermining either contract law or surety law, the Court's ruling is in keeping with the established precedent of the Fifth Circuit.

## I.      The R&R Correctly Sets Forth the Legal Standard for a Preliminary Injunction

As the R&R correctly sets forth, a preliminary injunction is an "an extraordinary and drastic remedy" that is not granted in the absence of clear evidence supporting relief. *Gray Cas. & Sur. Co. v. 3i Contracting, LLC*, 2024 WL 1121800, at *3 (N.D. Tex. Mar. 13, 2024) (quoting *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009)). The Sureties acknowledge as much by noting that the issues they raise "are rarely invoked at the preliminary injunction stage." Dkt. 143 at 7. The issuance of a preliminary injunction is "treated as the exception rather than the rule." *Gray*, 2024 WL 1121800, at *5 (quoting *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003)). It is a decision that rests within the sound discretion of the Court. *Harco Nat'l Ins. Co. v. Gaspard & Menon Constr., LLC*, 2025 WL 1254440, at *1 (N.D. Tex. Apr. 23, 2025) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985)). Moreover, "a mandatory preliminary injunction, which

5

is an injunction that orders an affirmative act or mandates a specific course of conduct and 'goes well beyond simply maintaining the status quo pendent lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.'" *Travelers Cas. & Sur. Co. of Am. v. Padron (Padron I)*, 2015 WL 1981563, at *5 (W.D. Tex. May 1, 2015) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

> The party seeking a preliminary injunction must establish:
>
> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury [to the movant] outweighs the threatened harm to the [non-movant]; and (4) the granting of the preliminary injunction will not disserve the public interest.

*Gray*, 2024 WL 1121800, at *3 (citing cases); *see also Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The movant must "satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction can be granted," and if the movant "fails to meet *any* of the four requirements, the court cannot grant the preliminary injunction." *Gray*, 2024 WL 1121800, at *4 (emphasis added) (citing *Mississippi Power and Light Co.*, 760 F.2d at 621; *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)).

## II.    The Sureties' Objection Mischaracterizes the Issues Presented to the Court

### A.    A Decision on the Merits of the Contractual Dispute is Not Necessary to Deny a Preliminary Injunction

The Sureties' motions for preliminary injunctions sought relief in the form of monetary collateral, inspection of books and records, and an order precluding W&T from transferring or dissipating assets. *See* Dkt. 93 at 26–27; Dkt. 94 at 33–34. However, the Sureties' Objection now tries to recast the issue before the Court as requiring a dispositive ruling on the merits of whether the contracts should be enforced, despite disputed issues about when the contracts permit the sureties to demand collateral or require replacement bonds. *Their brief does not address the legal*

6

*elements for a preliminary injunction until section ten.* The first nine sections have little or nothing to do with the relevant elements for a preliminary injunction. For example, section five asserts "Legal Error" in "Misidentifying the Trigger"; while section six suggests that the R&R "Eviscerates Core Contractual Protections" with "Industry-Wide Consequences." Section eight states that the "Court Should Defer to the Sureties' Discretion" because "the Record Justifies Their Decision." *See* Dkt. 143 at 6–7, 11. None of these arguments addresses the legal basis for the ruling in the R&R.

Further, the Sureties appear to believe that their self-interested determinations supersede the Court's, boldly stating that courts are "not equipped to second-guess commercial sureties' judgments about long-tail high-liability risk." *Id.* at 11. Sureties are not above the law and their contracts are not immune from judicial review. They must prove their case like any other litigant where the interpretation of the contractual terms is disputed—at a trial on the merits. *See* Dkt. 140, at 5 n.5 (finding that "the record is not clear enough to adequately assess [the likelihood of success on the merits].") The Sureties cite this Court's ruling in *Mae v. Nelson Bros. Prof'l. Real Estate, LLC*, 2024 WL 1639733, at *3 (S.D. Tex. Apr. 16, 2024) (Hanen, J.) in support of their argument that the Court should enforce the Sureties' preferred interpretation of the contracts, claiming that the terms are unambiguous. However, that ruling was on summary judgment—not a preliminary injunction—where the Court had found that "[m]ost of the facts of this case are undisputed." *Id.* at *1. As set forth more fully in section IV below, addressing the Sureties' likelihood of success on the merits, there are substantial disputes here, and the contractual terms are at minimum ambiguous. This Court's ruling in *Mae* thus does not support the Sureties' claim for preliminary injunctive relief, and if anything, it suggests that the ambiguous terms in the surety agreements must be construed in W&T's favor. *Id.* at *3 ("If the guaranty is ambiguous, then the

court must apply the construction most favorable to the guarantor.").

        **B.**  <u>The Sureties are Not Seeking Relief in the Form of Replacement Bonds</u>

The Sureties further compound their mischaracterization of the issues by suggesting that the R&R "Misstates the Relief Requested And Relies On The Wrong Source." Dkt. 143 at 15. They fault the Court for jumping straight to the issue of their entitlement to collateral, suggesting instead that "[b]oth US Fire and Penn requested primary relief in the form of release from their bonds." *See id*. This attempt at redirection displays a lack of candor and an attempt to mislead the Court. **<u>Neither of the Sureties' complaints nor their preliminary injunction motions request specific performance in the form of release or replacement of bonds</u>**. Both Sureties asserted the basis for seeking injunctive relief in the form of collateral was liability for claims and losses. Penn's preliminary injunction motion states:

> For these reasons, Plaintiff, Pennsylvania Insurance Company, requests that, if necessary, the Court set this Motion for hearing at the earliest possible time and, after hearing oral arguments, issue a preliminary injunction. Specifically, the Surety requests that the preliminary injunction:
>
> 1.    Order Defendant to pay the Surety the sum of $11,343,949.00 in collateral security, representing an amount as determined by the Surety sufficient to discharge any Loss or anticipated Loss;

Dkt. 93 at 26–27. And US Fire's preliminary injunction motion likewise requests:

> For these reasons, Plaintiff, United States Fire Insurance Company, requests that, if necessary, the Court set this Motion for hearing at the earliest possible time and, after hearing oral arguments, issue a preliminary injunction. Specifically, the Surety requests that the preliminary injunction:
>
> 1. Order Defendants to pay the Surety the sum of $93,665,179.00 in cash or other collateral security acceptable to the Surety, representing an amount as determined by the Surety sufficient to discharge any loss or anticipated loss including but not limited to claims, demands, payments, damages, expenses, and costs to investigate and/or resolve claims which the Surety may at any time incur or pay by reason of or arising out of its execution or non-execution of any Bonds;

Dkt. 94 at 33. *See also* Penn Compl., Dkt. 116 at 12–13 (requesting collateral "until proof of record satisfactory to the Court is presented to establish that **all claims to which the Surety is exposed** have been liquidated and discharged" (emphasis added)); US Fire First Am. Compl., Dkt. 118 at 12–13 (same).

The Sureties' attempt to recast the issue before the Court as one of second-guessing their ability to "exit the risk" of the bonds they issued is disingenuous. However, regardless of their purported reason for seeking collateral, whether or not they will succeed in showing that they are ultimately entitled to collateral if W&T does not replace the bonds is not the salient issue in connection with a preliminary injunction. Even if that were a correct interpretation of the contractual provisions, it does not change the undisputed evidence: the Sureties asked for collateral in the form of money, in the absence of any claim or liability in the foreseeable future. *See* Dkt. 135, Tr. 11:17–19 (MR. DRY: "As far as claims, no. There wasn't then. There's still not a claim on any of these bonds."). The Sureties will be afforded the opportunity to demonstrate their entitlement to collateral at trial. Regardless, the Court correctly concluded that those undisputed facts are fatal to the Sureties' request for a preliminary injunction.

9

### III.     The Sureties Did Not Meet Their Burden to Establish Irreparable Harm

The Sureties do not address the primary basis of the R&R's ruling until page 18 of their brief—that they failed to put forward any evidence to establish irreparable harm.  Even if the Court were to assume that the Sureties' interpretation of the contracts is 100% correct (which it is not)— the Sureties **<u>still</u>** would not be entitled to the relief they requested.  It was their burden to establish each of the four prongs necessary for a preliminary injunction.  Failing on any one of the four, let alone failing on all four, requires that the Court deny a motion for preliminary injunction.  *See Gray*, 2024 WL 1121800, at *4.  The showing necessary for irreparable harm is substantial—it must be an injury that cannot be redressed by a remedy after a decision on the merits.  *Id.* at *6; *see also Padron I*, 2015 WL 1981563, at *11 (irreparable harm requires a "*presently existing actual threat*" (emphasis in original) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001))).  Irreparable harm must be more than "an unfounded fear," or the loss of a contractual right.  *Gray*, 2024 WL 1121800, at *9–11.  If such bases were sufficient, every contract dispute would merit a preliminary injunction.

The R&R correctly found that the Sureties' allegations "do not amount to more than speculation."  Dkt. 140 at 13.  The Sureties attempt to conceal the gaping deficiencies in their evidence in support of their preliminary injunction by peppering their Objection with inflammatory rhetoric, suggesting, *inter alia*, that there is now a "public call to arms" against the surety industry. Dkt. 143 at 9.  But looking past this hyperbole, the evidence of irreparable harm that the Sureties presented is still woefully inadequate.  Courts in the Fifth Circuit have entertained claims of irreparable harm only when there were active claims or costs that a surety was going to have to cover out of pocket in the absence of collateral, or when the obligor was bankrupt or might imminently become insolvent.  Nor do any of the cases support the Sureties' suggestion that a different analysis should apply to "commercial" sureties.  *Id.* at 6–7.

A. <u>Surety Case Law in the Fifth Circuit Does Not Support Injunctive Relief in the Absence of Immediate Harm That Cannot Be Remedied by Monetary Damages</u>

The Sureties grossly misstate the holdings of the "leading cases" they suggest support an injunction, *see* Dkt. 143 at 7: *Travelers Cas. & Sur. Co. of Am. v. Padron (Padron II)*, 2017 WL 9360906 (W.D. Tex. Aug. 2, 2017); *Merchants Bonding Co. v. Burnside*, 2023 WL 4140455 (S.D. Tex. June 21, 2023); *Int'l Fidelity Ins. Co. v. Talbot Constr., Inc.*, 2016 WL 8814367, at *7 (N.D. Ga. Apr. 13, 2016); *Travelers Cas. & Sur. Co. of Am. v. Samson Inv. Co.*, 2013 WL 12109098, at *1 (N.D. Okla. June 17, 2013).  None of those cases support the issuance of an injunction on the evidentiary record the Sureties presented here.  The Sureties conveniently ignore the recent *Harco* and *Gray* cases out of the Northern District of Texas, cases which squarely support the denial of a preliminary injunction in circumstances similar to this lawsuit, confining their mentions of those cases to a single footnote.  *See* Dkt. 143 at 21 n.8.

In *Harco*, the plaintiff surety company sought a preliminary injunction for collateral of approximately $6 million where it had only incurred damages in an amount of approximately $1,000 because it "anticipate[d] los[s]es."  *Harco Nat'l Ins. Co. v. Gaspard & Menon Constr., LLC*, 2025 WL 1254440, at *2 (N.D. Tex. Apr. 23, 2025).  Posting that amount of collateral "would prevent [Defendant] from qualifying for the credit/loans it needs to continue its business operations."  *Id.*  The court found that none of the preliminary injunction factors favored the surety, and in particular, concluded that there was no irreparable harm, finding that "Plaintiff's only injury is a financial harm, which is only anticipated."  *Id.*  Thus, the court concluded that "[w]hile Plaintiff may be able to prevail at the end of this litigation, equitable relief in the form of a preliminary injunction is not available."  *Id.*

Likewise, the plaintiff surety in *Gray* sought a preliminary injunction for collateral, based on evidence it presented that it had received claims or was facing losses in the amount over

$500,000. *Gray Cas. & Sur. Co. v. 3i Contracting, LLC*, 2024 WL 1121800, at *1 (N.D. Tex. Mar. 13, 2024). The defendant did not appear and thus the motion was not opposed, *see id.* at 3, but the court still found that none of the preliminary injunction factors favored the surety and denied the motion. It found that "Plaintiff's sweeping statements regarding its likelihood of success are insufficient to show that all requirements for the relief sought have been satisfied." *Id.* at *6. On irreparable harm, the court considered and rejected arguments almost verbatim to those the Sureties presented here, namely that "its contractual bargained-for right to prejudgment collateralization will be forever lost and rendered meaningless." *Id.* at *9. The court concluded that "Plaintiff's argument that—the mere nature of this action being a surety action involving an indemnity agreement is sufficient to satisfy the irreparable harm requirement for injunctive relief—is similarly unpersuasive." *Id.*

The Sureties contend that Judge Palermo's "misreading" of *Padron II*, 2017 WL 9360906, led the Court to an "incorrect conclusion that a surety must show asset dissipation or impending insolvency to warrant injunctive relief." Dkt. 143 at 21. But that is not what the R&R concluded. As Judge Palermo noted during the hearing, she had carefully reviewed the *Padron* case, Dkt. 135, Tr. 46:13, and the R&R accurately describes the case and reaches the conclusion that "the Sureties offered no evidence that Plaintiffs are insolvent, dissipating or transferring assets, preparing to file for bankruptcy, **facing bond claims or even soon-to-be filed bond claims.**" Dkt. 140 at 12 (emphasis added).

That holding squarely comports with *Padron I and Padron II*, in which the court denied two motions for preliminary injunctions to post collateral, even when the surety had "created a serious question [as to] whether [the defendants were] capable of fulfilling their obligations under the Indemnity Agreement." *Padron II*, 2017 WL 9360906, at *8. The Sureties concede that the

eventual injunction was granted in connection with a third motion, Dkt. 143 at 21, **only after the surety presented evidence of $12.7 million in open bond claims, that the defendants' net worth had substantially declined, that the defendants were insolvent or nearly so, and that the defendants were depleting their assets.** *Padron II*, 2017 WL 9360906, at *9–11. The Sureties make the bold suggestion that "such evidence was not legally required," Dkt. 143 at 22, but the fact that court did not grant the first two preliminary injunctions without this evidence suggests otherwise. Further, the "unique rights" of sureties, *id.*, were not the basis of the *Padron II* ruling. As the Sureties themselves admit, the court was persuaded by the "present exposure to liability," the "risk that, should Indemnitors become insolvent, the surety will be left as a general unsecured creditor," and "impending risks of liability **once a claim has been made on the bond[s].**" *Id.* (quoting *Padron II*, 2017 WL 9360906, at *10) (emphasis added).

The *Merchants Bonding* case provides another example of the evidence necessary to issue preliminary injunctive relief to a surety—losses and risk of insolvency. The defendant, Burnside Services, Inc. (BSI), was a construction company that primarily dealt with the excavation, site development, and grading of athletic fields, golf courses, and other construction projects. *Merchants Bonding*, 2023 WL 4140455, at *1. It was undisputed that claims had been made against BSI, BSI had ceased its operations, and BSI had filed for Chapter 7 bankruptcy. *Id.* at *2. Following BSI's bankruptcy, the surety demanded collateral for the reserve it established related to the bonds and the pending claims that the surety received after BSI's bankruptcy. *Id.*

The remaining two cases that the Sureties contend are "leading cases," *Talbot* and *Samson*, are out-of-circuit cases with no precedential authority. But even in the *Talbot* case, the evidentiary record showed that claims had been made. There, defendant Talbot entered into an agreement with Fidelity regarding payment bonds issued in connection with multiple construction projects in

13

Georgia and Alabama. *Talbot*, 2016 WL 8814367, at *1. Fidelity received claims alleging that Talbot was failing to meet obligations to subcontractors and suppliers. *Id.* at *2. The Court thus entered an injunction requiring Talbot to post an amount covering claims already paid and anticipated to be paid, totaling $335,000. *Id.* at *8–9, 11.

In *Samson*, the surety requested discharge from the bonds, and defendant Samson did obtain replacement bonds, but did not provide sufficient documentation that some of the replacement bonds fully discharged Travelers' liability. *Samson*, 2013 WL 12109098, at *1 (N.D. Okla. June 17, 2013), *report and recommendation adopted*, 2013 WL 12109099 (N.D. Okla. July 3, 2013). The Court ordered that Samson post collateral in the form of a letter of credit equal to the undischarged liability. *Id.* at *2–3. Unlike here, there was no dispute about the triggering event or right to collateralization, and unlike here, there was no allegation of Traveler's participation in an antitrust conspiracy that would have impaired or precluded Samson from obtaining replacement bonds.

B. The Sureties' Status as Commercial Sureties Does Not Exempt Them from Failing to Meet Their Burden to Substantiate Irreparable Harm

Perhaps realizing that the case law overwhelmingly does not support their position, the Sureties attempt to distance themselves from "contract" surety cases by suggesting that "commercial" sureties are different—relying purely on the argument of counsel and neither case law nor evidence in the record. *See* Dkt. 143 at 16–17. Contrary to their assertion, there is nothing unique about commercial surety contracts that requires a different analysis of irreparable harm, nor basic contractual interpretation principles. The Sureties suggest that the harm is the "broader damage to the commercial surety market" if their "right [to exit] is judicially nullified." Dkt. 143 at 8. But the Court should reject the Sureties' attempt to recharacterize their failure to put forward any evidence to meet their burden as judicial activism. The Court has not nullified anything—it

has simply ruled that Sureties must face a trial on the merits before determining what relief, if any, is appropriate.  Moreover, an intangible harm to the surety industry generally was not advanced in the Sureties' preliminary injunction motions, nor is it a legally sufficient basis to establish irreparable harm being suffered by them.  At most, such considerations would go to the element of public interest, which W&T will address below.

> **C.** <u>There is No Harm Because There are No Claims or Liabilities on the Bonds and No Risk that Monetary Remedies Will Become Unavailable</u>

Despite the Sureties' rhetoric, **zero plus zero is still zero**.  Sureties have suffered no harm, let alone irreparable harm.  The Sureties are continuing to collect premiums from W&T simply for holding the bonds.  The wells are still operational and years away from decommissioning.  There are no claims on the Sureties' bonds.  W&T has been operational for forty years and has never defaulted on its decommissioning obligations.  W&T maintained a "Stable" rating from Fitch.  **<u>There is no evidence whatsoever of dissipation of assets or risk of insolvency</u>**.  *See generally* Dkt. 54 and 55 (W&T's Verified Responses).

The Sureties attempt to paint a picture that they might face the sudden unexpected circumstance that "a claim materializes or W&T defaults."  Dkt. 143 at 20.  But the speculative nature of the "risk" of a claim in the absence of any actual exposure cannot form the basis of irreparable harm.  *Gray*, 2024 WL 1121800, at *11.  Not only is there no evidence of any imminent claim or liability, but the Sureties' bonds themselves outline a process for claims that undermines their suggestion that they may become liable with no warning.  At minimum, there would be a written notice of default by the obligee and an opportunity for W&T to cure any default before any claim would reach the surety.  Further, the fact that the Sureties are still in the same posture today— no losses and no claims—as when they filed their preliminary injunction motions over eight months ago, and will likely be in the same posture seeking the same relief at the time of trial,

15

strongly suggests that no contractual right has been lost, nor have they suffered any irreparable harm for which monetary relief would be inadequate.

## IV.    Sureties Failed to Establish Likelihood of Success on the Merits

The significant disagreement between the parties regarding the correct contractual interpretation alone indicates that there are disputed issues that must be tried on their merits. The relief that the Sureties are seeking is one of specific performance, which is remedy in equity that is within the Court's discretion based on equitable considerations. A party is entitled to specific performance only if:

> (1) the contract is reasonably certain, unambiguous, and based on valuable consideration; (2) the contract is fair in every section, void of misrepresentation, misapprehension, fraud, mistake, imposition, or surprise; (3) the parties are so situated that specific performance will not be harsh or oppressive; and (4) the party seeking specific performance must come into court with clean hands.

*See Liberty Mut. Ins. Co. v. Nat'l Personnel of Tex., Inc.*, 2004 WL 583531, at *2 (N.D. Tex. Mar. 24, 2004) (citing Texas law).

The Sureties' brief presents a tangled web of arguments based on policy, historical norms, and factual questions about whether or not "triggers" were met, but it does not address the legal requirements for specific performance or evidence in the record that would support such a remedy. There is even an open question as to what state's law applies to the US Fire contract.[1] It is far from clear that the Sureties' interpretation of the indemnity contracts that gives them unbounded discretion is correct. Even if the sureties were correct in their newly advanced argument that the triggering event for the collateral was the demand for replacement bonds, they concede that "[t]he

---

[1] W&T agreed that for purposes of the Court's ruling on the preliminary injunction, it would not contest the application of Texas law. Dkt. 135, June 3, 2025 Hr'g Tr. at 6:16–23. But the plain language of the US Fire indemnity agreement and the US Fire's own briefing initially relied upon New York law, Dkt. 94 at 15, and W&T has reserved the right to raise choice of law issues at a later stage of the litigation.

record is silent on whether W&T could not obtain replacement sureties . . . ." Dkt. 143 at 25. They complain that "W&T never addresses the Sureties' actual demand for replacement bonds." *Id.* But it was the Sureties' burden to put forward evidence on every element—not W&T's. They have thus failed to meet their burden to establish a "substantial likelihood of success on the merits." *See Gray*, 2024 WL 1121800, at *6 (holding that "Plaintiff's failure to identify specific evidence that supports each of the elements for its contract claim and request for specific performance under applicable state law precludes a finding that it has satisfied its burden of establishing a substantial likelihood of succeeding on the merits.").

Moreover, the thrust of the merits of the Sureties' contractual claims is that the plain language of the contracts allows them to request full collateralization at any time, for any reason, and in their sole discretion. **But both the Sureties' contracts tie collateralization demands to losses, liabilities, claims, or expenses.** *See* Dkt. 36-10, Penn General Indemnity Agreement ¶ 4 (collateral can be demanded "as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses."); *id.* at Definitions ("The term "Losses" shall mean any and all (a.) sums paid by Surety to claimants under the Bonds, (b.) sums required to be paid to claimants by Surety, but not yet, in fact, paid by Surety, by reason of execution of such Bonds, (c.) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds . . . ."); Dkt. 36-14, US Fire General Agreement of Indemnity ¶ 3 (collateral may be demanded "in the amount of any reserve Surety establishes for any existing liability or claim, and or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand"). Not only does the Sureties' interpretation

conflict with the plain language of their contracts, but an interpretation of the contracts that allows them to demand collateral without any predicate would render them illusory and the original consideration meaningless. *See Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App.—Fort Worth 2009, pet. denied) ("A contract that lacks mutuality of obligation is illusory and void and thus unenforceable. . . .  A promise is illusory when it fails to bind the promisor who retains the option of discontinuing performance without notice.").

The Sureties make the alarmist—and inaccurate—suggestion that either the Court or W&T is trying to "negate the Sureties' right to terminate their bonded risk altogether."  Dkt. 143 at 10. Setting aside the fact that the denial of a preliminary injunction does not conclusively decide the merits of the contractual dispute, the sureties' ever-shifting explanations of why they demanded collateral underscore the pretextual nature of their requests.  First, it was the BOEM rule.  Then, it was W&T's purportedly worsening financial condition.  Now, it is because the sureties wanted to "exit the risk"—despite the fact that the "risk" of any liability on W&T's bonds has not changed, or if anything, has lessened in light of W&T's strengthening financial position and the current status of the BOEM rule.[2]

Contrary to the Sureties' unfounded allegations, there is no suggestion that W&T intends to refuse to work with sureties who operate in good faith—as evidenced by W&T's settlement with U.S. Specialty Insurance Company.  *See* Dkt. 132.  W&T has not, and is not, suggesting that surety providers cannot negotiate provisions that allow them to exit bonds—but the long-term nature and certainty of the bonds is precisely the consideration that is bargained for in the contract

---

[2] The Sureties' statement that W&T has "acknowledge[d]" that the BOEM rule "requires sureties to demand collateral on existing bonds," Dkt. 143 at 13, is extremely misleading.  The statement in that quote was not made by W&T, nor did W&T adopt it—it was cited for an entirely different point in W&T's brief related to irreparable harm.  *See* Dkt. 54 at 8.

and the structure set up by the regulatory environment in which both parties operate. W&T must be able to procure replacement bonds, which depends on a properly functioning competitive bond market. Here, the Sureties' unclean hands preclude them from prevailing on any claim brought in equity.

The Sureties suggest the R&R's "failure to even mention—let alone apply—the 'sole discretion' language is a serious legal error." Dkt. 143 at 10–11. But that is a question of contract interpretation, and the R&R did address the likelihood of success on the merits, finding that the record was insufficiently developed and therefore the Sureties had not met their burden on that factor either. Dkt. 140 at 5 n.5. The Sureties make a profound leap of logic in their objection by suggesting that "sole discretion" allows them to act preemptively "and without judicial inquiry into the soundness of its business judgment." Dkt. 143 at 11–12. The R&R does not second-guess the Sureties' discretion, justifications for its behavior, risk assessments, or business model—the Court exercised its proper function by reviewing the evidence the Sureties presented and concluding that they did not meet their burden under the relevant law.

## V.    The Balancing of the Harms Favors W&T

As set forth above, there is no credible harm to the Sureties—the $100 million dollars in collateral would not be used to pay any claim or liability; it would go into their bank accounts where it would presumably earn interest for the Sureties, potentially for decades. The Sureties suggest that there is no harm to W&T because it will put W&T in the position it bargained for under the indemnity agreements. But that argument is circular—the very point of W&T's lawsuit is that unfounded collateral demands are **not** what it bargained for. There is no basis for placing an undue burden on W&T that would baselessly and needlessly cause substantial financial strain on W&T's ability to operate. *See Harco*, 2025 WL 1254440, at *2.

The impact of the Sureties' unfounded collateral demands to W&T has been drastic. Any

19

alleged "worsening" of W&T's financial condition can be *directly* attributed to the Sureties' collusive behavior—it is an artificial crisis that they manufactured as a mechanism to broadcast their power over independent oil and gas producers like W&T. But even baseless demands have real consequences and damages. W&T has sustained material, measurable damages and reputational harm as a direct result of the sureties' conduct that is at issue in this litigation. For example, the sureties' actions at issue in this litigation have caused significant damage to W&T's stock price, as evidenced by comparing the significant decrease in W&T's stock when the press release regarding this lawsuit was made to the uptick in stock price upon the public announcement of a settlement with one of the defendant sureties, which unlocked nearly $185 million in recovered equity. Thus, the balance of equities weighs against compounding the harm to W&T.

## VI.    Granting an Injunction Under These Circumstances Would Be Against the Public Interest

W&T does not dispute that the public interest is served by judicial enforcement of lawful contracts. However, the Sureties' Objection makes clear their disdain for any judicial review of their interpretation of their own contracts, going as far as telling the Court that **it** should defer to **their** discretion. Dkt. 143 at 11. It does not serve the public interest to allow a private entity to declare its own immunity from judicial interpretation and enforcement of contractual obligations. The public interest is served by having an effective bond relationship, not one that is illusory and that serves only the Sureties' interest in making more money.

Further, the government has chosen to allow the mechanism of bonding to enable companies like W&T to maximize production of domestic oil and gas. It is an intentional feature of the regulatory regime to allow bonding in amounts that exceed a company's present cash flow or reserves, since decommissioning obligations on wells are not all due at the same time. W&T structured its business to allow for this long-term liability, and it has been following the rules of

the industry.  But now sureties want to rewrite those rules and use their market power to raise rates and squeeze out operators that they do not want to work with.  This is not just speculation—the sureties revealed this intention at an industry presentation in November 2024, referenced in W&T's First Amended Complaint, Dkt. 36 at ¶¶ 116–121, in which an underwriting executive from Penn (Jason Kilpatrick) participated.  Comments made at that event confirm this intent:

> "You know, we don't have to write a single -- another bond in the Gulf of Mexico. And so it's really up to us to determine, you know, what a good client is and what a good underwriting metric is going forward.  The ball is in our court."

- John Hohlt, Senior Vice President, CAC Specialty

> " . . . But, I mean, the market has firmed up.  You do have certain carriers exiting the space.  And so, I mean, that -- that does allow for higher rates, stronger security structures.  But nonetheless, I mean, we still -- as an industry, we -- we must stay disciplined in this approach."

- Jason Kilpatrick, Senior Vice President, Applied Surety Underwriters

> "Yeah, I'd second that. . . .  And, you know, also, I think there's a -- you know, there is a way to underwrite this that makes sense and can -- can allow us to -- to all make money.  The -- the -- the point of John -- that John made around we can say, no, not everybody qualifies for a surety bond, and that is – that's good. That's a – that's a benefit that we provide as surety underwriters.  So not everybody receiving a bond is also a good thing."

- Patrick Hennesy, National Underwriting Officer, Sompo Surety

W&T was not aware at the time of the initial collateral demands that this type of collusion was occurring.  To enhance their own profits, the Sureties were abusing collateral provisions that were intended to be invoked only in the face of claims or a good faith assessment of material change of financial risks.  The message was clear:  pay up or get out of the Gulf.  Where there are plausible allegations of collusion surrounding the collateral demands, it would be against the public interest to fault W&T for failing to replace bonds and compound the harm from the anticompetitive conduct by requiring it to pay the Sureties' extortionate demands.

## **CONCLUSION**

The Sureties have failed to meet their burden on any of the necessary elements for a preliminary injunction, and the Court should adopt the reasoning and conclusions of the R&R denying their motions.

Respectfully submitted,

McGuireWoods LLP

*/s/ Yasser A. Madriz*
Yasser A. Madriz
***Attorney-in-Charge***
Texas State Bar No. 24037015
S.D. Texas Bar No. 39080
ymadriz@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002
(832) 255-6361 Telephone
(832) 214-9931 Facsimile

**ATTORNEYS FOR W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC**

22

**OF COUNSEL:**

**Jason Huebinger**
Texas State Bar No. 24065460
S.D. Texas Bar No. 1717237
jhuebinger@mcguirewoods.com
**Miles O. Indest**
Texas State Bar No. 24101952
S.D. Texas Bar No. 3070349
mindest@mcguirewoods.com
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002

and

**J. Brent Justus**
bjustus@mcguirewoods.com
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219

**Megan Lewis**
mlewis@mcguirewoods.com
McGuireWoods LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 16, 2025, Plaintiffs filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case.

*/s/ Yasser A Madriz*
Yasser A. Madriz