GMT20241112-190002_Recording_1920x1080 - Trim

EXHIBIT
A

NATIONAL ASSOCIATION OF SURETY BOND PRODUCERS (NASBP):

OIL & GAS INDUSTRY AN UPDATE ON BOEM REGULATION

VIDEO RECORDING

FILE NAME: GMT20241112-190002_Recording_1920x1080 - Trim

DATE TAKEN: NOVEMBER 11, 2024

Transcribed By:  Sharina Fowler, CSR

1                  INDEX TO EXAMINATION

2

3                                                 PAGE

4   RECORDING                                           3

5   CERTIFICATE OF TRANSCRIPTIONIST               41

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Video recording begins.)

2              KAT SHAMAPANDE:  Welcome to This NASBP virtual seminar

3    titled:  Oil and Gas Industry, an Update on BOEM Regulations.

4    My name's Kat Shamapande, and I'll be your moderator for this

5    NASBP Virtual seminar.  We'd like to begin by thanking Old

6    Republic Surety for their generous support of NASBP's virtual

7    seminars.

8              Today's primary audio connection is streaming via your

9    computer.  As an audience member, you'll be in a listen only

10   mode throughout today's presentation.  The handouts for today's

11   session are available through the handouts tab on the virtual

12   seminar page, and I'll send a link to that handouts tab in the

13   chat area, once we get started.

14             We encourage you to submit your questions at any time

15   throughout today's virtual seminar, and we'll take questions

16   through the chat or the Q & A areas, and we'll take them both at

17   the end, as well as throughout the presentation.

18             Additionally, after completing today's virtual

19   seminar, you'll have access to a short evaluation on the virtual

20   seminar page.  It's located just below where you click to enter

21   the virtual seminar today, so please take a couple of minutes

22   and share your feedback with us there.  Today's virtual seminar

23   is being recorded, and all registrants will have access to the

24   recording later this week.

25             Now, it's my pleasure to introduce today's presenters.

1  We have with us today, John Hohlt, Senior Vice President,

2  Practice Leader, Surety Natural Resources with CAC Specialty.

3  We also have Patrick Hennessy, National Underwriting Officer

4  with Sompo Surety, and Jason Kilpatrick, Senior Vice President,

5  Energy Practice Leader with Applied Surety Underwriters.  You

6  can see the full file for all of today's presenters on the

7  virtual seminar page.

8          Now, it's my pleasure to turn the floor over to you,

9  John, so you can kick us off.

10          JOHN HOHLT:  Great.  Welcome, everyone.  As laid out

11  here, we're going to be talking about the regulation changes

12  going on at the BOEM, as it relates to financial assurance in

13  the OCS.  So Kat, if you want to jump to the next slide here,

14  we'll cover what we're going to talk about.

15          So, you know, first and foremost, you know, some of

16  you may not be familiar with this type of bond, and that's

17  completely fine.  There -- there's a lot in surety that I don't

18  know.  And so we're -- we'll lay out kind of what the parameters

19  are of this change, where is this change occurring, who's in

20  charge, give a general market update for this region of surety,

21  if you will.  And then we'll go through the specifics of the

22  proposed rule change and then the impact that it has, followed

23  by Q & A.

24          I'll also say that feel free to chime in with

25  questions in the chat.  Katherine will be monitoring the chat

1  and -- and stopping for us for questions throughout.  No problem

2  answering questions throughout, but there will also be a Q & A

3  at the end.  So without further ado, we'll jump in.

4         So what is the BOEM?  The BOEM stands for the Bureau

5  of Ocean Energy Management.  It's an agency within the

6  Department of the Interior and then is responsible for the

7  management of the United States, several different outer

8  continental shelves, OCS.  And this is the legal jurisdiction

9  that the U.S. has over these waters, for all their natural

10 resources.

11        Primarily the example of this is oil and gas.  The

12 main region for these bond requirements, what we're going to be

13 talking about today, is within The Gulf of Mexico.  The same

14 bonds also exist for a few platforms off the coast of

15 California, where we also engage with the Pacific OCS, and the

16 BOEM has jurisdiction over both.

17        It's important to potentially get to know these guys

18 as well, because we're only going to see more from that office,

19 as the U.S. continues to develop solar -- or excuse me, not

20 solar.  Wind farms offshore within the same jurisdiction and

21 this same bureau will have control over those leases and

22 payments, thereof.

23        It's important to note, the last bullet point here, is

24 that the director and the leader of the BOEM is a presidential

25 appointee.  So we have had some fluctuations with the bureau and

1  how they intend to engage the oil and gas environment, based off

2  of who that president has appointed as the director.  Every

3  region has its own director, as well as the BOEM having an

4  overall director.  So with that, we'll kind of jump in here.

5          So you may be thinking, if you're not familiar with

6  the space, well, gosh, how much really goes on.  You know, what

7  is this about?  If you were to take this same map, this map on

8  the right here is a, kind of a, snapshot of the infrastructure

9  that exists off the coast of Louisiana.  It's important to note

10  that the United States jurisdiction begins three miles offshore

11  and three miles inshore is considered state waters; except for

12  Texas, which is three leagues.  That was a negotiation way back

13  when.  But, you know, what are we talking about here?

14          If you look at this map, the, the bureau is

15  responsible for all the infrastructure and associated revenue in

16  the federally regulated waters and it's a lot more than people

17  think.  You know, approximately 30 percent of domestic

18  production, in terms of oil and gas, comes out of The Gulf of

19  Mexico.  It's a huge region of oil and gas production.  It's

20  responsible for, you know, hundreds of thousands of jobs and the

21  revenue associated with the BOEM.

22          I heard a stat one time, the revenue associated with

23  the royalties and the lease sales from the BOEM is second only

24  to the IRS.  So it's a huge source of revenue for the United

25  States government, and it's a pretty big deal.  Any other

1  comments there, Jason and Pat?

2          So one of the things I'll cover is, you know, what are

3  these types of bonds.  So the types of bonds that we're going to

4  be talking about today, we're just going to stick with the

5  government bonds.  So these are the bonds, you know, in the same

6  way that, you know, you do anything for the government.  And a

7  lot of the surety industry is led by government bonding.  The

8  same exists here.  Since this is federally owned lease

9  territory, federally owned waters, these bonds not only

10 guaranteed the decommissioning of the structure that is out

11 there, but also guaranteed payment of royalties.

12          Often it's only referred to as a decommissioning

13 guarantee, which is kind of the primary guarantee that sureties

14 are underwriting, because royalties are usually taken off the

15 top.  But, you know, these bonds are pretty extreme in nature.

16 You know, we're talking about a long tail decommissioning

17 guarantee where, you know, we're making a prediction with our

18 bond approval today for a decommissioning that might not occur

19 for 10, 20 years.

20          So not too dissimilar from those familiar with the

21 mining industry and the waste industry.  It's a lot like that in

22 terms of longevity.  These are non-cancellable instruments.  And

23 luckily, as you'll see here in a few slides, bankruptcy doesn't

24 constitute default, but boy, bankruptcy has caused quite a bit

25 of headache as of recent in this region.  So we'll go to the

1  next slide here.

2          This is a -- this is public information that was

3  collected by Haynes and Boone, a local law firm here in Houston,

4  who is very active in the bankruptcy space.  They stopped

5  running this after Q4 2021, but there's certainly been more

6  bankruptcy since then, in the last three years.  But this shows

7  both onshore and offshore, the cumulative bankruptcies in the E

8  & P space, the exploration and production space, the upstream

9  space.

10          And, you know, surety bonds exist in every way, shape,

11 and form throughout the E & P space regardless of your state of

12 operation.  And so not only with our issues in the Gulf of

13 Mexico, but, you know, this whole field of business has

14 experienced a windfall of bankruptcies and bankruptcy rulings,

15 some of which we'll touch on here later.

16          But if you go to the next slide, we can see these are

17 the prominent bankruptcies that have occurred within the OCS.

18 So this would be -- this was actually generated by the BOEM to

19 show the cause for a need to have a rule change.  You know, we

20 are kind of in unchartered territory here, in a sense that, you

21 know, we've had quite a few bankruptcies.  You know, if you

22 think about surety as a 100 year old industry, well, you know,

23 the last 10 to 20 years has been rather tumultuous for this

24 space.

25          You know, you can kind of see how these coincide with

 1  historically low periods of commodity prices.  And two of the

 2  major bankruptcies that occurred were Fieldwood and Cox, which

 3  had, you know, far reaching implications that we're still

 4  dealing with today.  But those were only as recent as 2020 and

 5  2022.  So a lot of what the industry has learned from those two

 6  bankruptcies is still being applied up the chain with, not only

 7  your field underwriters, but then your home office underwriters

 8  all the way up to, you know, reinsurance mandates.  You know,

 9  still trying to understand, okay, what is the best way to manage

10  this fall out and move forward.

11        PAT HENNESEY:  So the timeline, John, you know, one

12  way to think about it from an underwriting perspective is, up

13  until the Fieldwood and Cox bankruptcies that John just

14  referenced, it's really a low frequency -- low frequency, low

15  severity product until this timeline starts to come into play,

16  where you see more frequency, but still the lack of severity.

17  That severity came to -- came to roost with a couple of judicial

18  precedents that were set as part of the Fieldwood case.  But,

19  you know, the underwriters utilize a -- you know, a blended

20  approach of underwriting of credit and -- and asset based

21  underwriting, which, I think, Jason's going to touch on.

22        JASON KILPATRICK:  Yeah.  And to add to that, Pat and

23  John.  I mean, the -- the historic strategy was, we used to

24  utilize BK as an exit strategy, to get off these obligations.

25  Several of these accounts, they simply reorganized or they sold

GMT20241112-190002_Recording_1920x1080 - Trim

1  to a new buyer, in which all assets and liabilities were -- were

2  assumed.  Starting with Fieldwood and then Cox, there was a new

3  strategy put in place from the attorneys and consultants that

4  said, hey, you know what?  Sureties will take care of all the

5  liability.  What we'll do is create a diversive merger and

6  essentially get to cherry pick the assets and stick the sureties

7  and any predecessors with the liability.

8          Therefore, this -- this is where everyone started

9  generating heartburn trying to figure out, okay.  We used to

10  make a lot of money.  Now we're not.  So how do we move forward

11  on this space?

12          PAT HENNESEY:  Yeah.  And for people who aren't

13  familiar with this space, the -- you know, the potential, you

14  know, the liability that was out there, just on those two cases,

15  is roughly $2 billion.  We're not saying that, you know,

16  those -- those cases are very different from each other, and the

17  bond supported for both of those cases are very different.

18  We're not saying the industry is going to have $2 billion in

19  losses.  But the -- you know, there is loss activity at a higher

20  -- at a higher severity than what has historically been incurred

21  by the industry, as the underwriting methodology changed due to

22  the -- the components that Jason just walked through.

23          JOHN HOHLT:  Great.  So we'll get into the rule change

24  here on the next slide.  So obviously, you know, these bonds

25  exist to guarantee the decommissioning of these assets, so that

1 the United States taxpayer doesn't have to pay for a bankrupt

2 company's orphaned platform well, pipeline, you name it.  So,

3 you know, this is text taken directly from BOEM here, but this

4 is more or less what they came up with the proposed rule change.

5           And, you know, they -- they've seen the writing on the

6 wall, too, and they said, right, okay.  Some of this liability

7 is coming back to us.  Some of it, you know, we're worried that

8 the American taxpayer is going to have to start dishing out

9 money to take care of this.  And so what they said is, is all

10 right.  You know, we -- we've identified approximately $14.6

11 billion worth of assets for companies that are less than

12 investment grade and that's what we're trying to cover.  And

13 then, according to their estimates, there's about $6.97 billion

14 worth of new supplemental financial assurance needed and they're

15 going to try and implement, with this rule change.

16           And you could say to yourself, okay.  Great.  You

17 know, NASBP, surety underwriters and brokers, you know, gear up.

18 You know, it's about to be a great few years.  We have, you

19 know, 14 million -- $14 billion worth, potentially $7 billion

20 worth of new opportunities here.  How do we go about this?  And,

21 you know, there's some sentiment that it could be good for the

22 industry.  There's others that think, you know, hey, this is

23 going to be a catalyst moment that accelerates further losses

24 more than it prevents.  And so, you know, not here to make a

25 crystal ball prediction on what's going to happen one way or the

1  other.  But we can go to the next slide and give you an idea of

2  what that breakdown looks like and see what we're dealing with,

3  as the industry.

4           So you saw on that last slide, there's those two

5  pictures of tri column regulation.  It's about 140 pages of

6  that.  But if you're really to just distill it down, this is

7  what it comes to.  And -- and if you think about it in the

8  flowchart method, this is what you need to ask yourself and ask

9  your client.

10          So one, are you investment grade?  Pretty simple

11  question there.  And the definition of investment grade is BBB-

12  by S & P and Fitch, Baa3 by Moody's.  And that can either be a

13  rating that already exists, with these third party credit

14  analysis firms or it could be one that is put together on a

15  synthetic basis by BOEM, using S & P Global Credit Analytics.

16          So, you know, I think a lot of underwriters are

17  familiar with that software and that rating analysis.  But

18  generally, that's the first step.  And if you check that box,

19  you know, congratulations for you, you know, kind of no further

20  changes to the status quo.  There wasn't much talk about, okay,

21  can I release the bonds that I have, because I'm an investment

22  grade now.  BOEM was slow to answer that question, but at least

23  there's no change for you going forward.

24          So then -- okay.  So if the answer is a yes, no

25  supplemental financial assurance required.  If the answer is no,

1   you get one more test out.  And that is, you know, do you have a

2   three to one reserve to decom ratio.  Basically stating, you

3   know, does the present value of the lease that you're on, in

4   terms of oil and gas value with that specific lease, is it three

5   times greater than the decommissioning expense for that same

6   lease.  That one's a bit hairy --

7          PAT HENNESEY:  So --

8          JOHN HOHLT:  Go ahead.

9          PAT HENNESEY:  -- to put that in a different -- to put

10  that into a different couple of words.  The future value,

11  talking about how that's derived, that's the present value of

12  today -- of the future cash flows and today's dollars at a

13  discount rate, typically applied at -- at a factor of 10.  So

14  what that means is they're adding up all of the future cash

15  flows and bringing it to today's dollars, for a specific lease.

16  And that lease has a specific bond on it or decommissioning

17  amount tied to it.

18          So when you look at that three to one ratio that

19  John's talking about, it's do all of the future cash flows

20  discounted at today's dollars, equal three times as much as what

21  it costs in today's dollars to decommission that asset and if

22  so, then a bond isn't required.  It's another form of adverse

23  selection for the surety industry, that takes further

24  opportunities off the table for Jason and myself as

25  underwriters, to utilize that asset based underwriting approach

GMT20241112-190002_Recording_1920x1080 - Trim

1  on a single asset basis.

2          JOHN HOHLT:  Right.  So you -- there's -- if you look

3  at it from the other lens, you know, Pat's right.  It's an

4  adverse selection on the fact that, you know, right off the bat,

5  we're dealing with noninvestment grade companies.  Okay.  That's

6  fine.  That exists quite a lot within surety.  We can handle

7  that.  But then they take it a step further and say, right, not

8  only is this a noninvestment grade company, but the assets

9  within that company that we want you to bond are less than their

10 best.  They don't test out of this three to one reserve to decom

11 ratio.

12         A couple of other little important points as to that.

13 You know, there's all different types of estimates for, you

14 know, how do you come up with the, the decom amount?  How do you

15 come up with reserves?  You know, it's raised a lot of questions

16 on, you know, you could have three companies on the same lease,

17 each with a different value for that reserve.

18         You know, that question still remains to be answered.

19 But one question they did answer is, okay, what decommissioning

20 value are we going off of?  That is the -- the P70 value, which

21 basically means probability of 70 percent that the number

22 selected by the BOEM and it's, you know, sister bureau agency

23 BSEE, is the number chosen for that specific lease.

24         So, you know, if we -- if you run through the whole

25 thing, if you don't test out of the investment grade and if the

GMT20241112-190002_Recording_1920x1080 - Trim

1  lease itself that you own doesn't test out of the three to one

2  ratio, you then are required to place financial assurance on

3  that asset, one option that the government has given as surety.

4  And there's a three year phasing period.  This rule has already

5  been put into effect, but big asterisk that comes with that.

6  You know, there may be a change here with the new president

7  coming in January.

8          We saw a very similar situation with the second Obama

9  administration and another proposed rule change within the BOEM,

10  that then got rescinded on Trump's first presidency.  So I don't

11  know if we'll see the same thing here, but it looks and smells

12  like the same.  But we also have, you know, some pending legal

13  litigation.  You know, there have been several companies and

14  even state agencies that have sued the BOEM and the federal

15  government demanding a, you know, a temporary injunction or a

16  stay, in order to further dispute the implementation of these

17  rules.

18          So, you know, this could all be for nothing.  We don't

19  know.  But, you know, prepare for the worst and, and hope for

20  the best.  So on to the next --

21          JASON KILPATRICK:  John, something else to mention

22  real quick is, we haven't touched on it, really, but they're --

23  the private bonding in the Gulf of Mexico as well.  I believe

24  there's a couple billion dollars of private bonds out there that

25  BOEM is not taking into consideration.  And so something to be

GMT20241112-190002_Recording_1920x1080 - Trim

1    cognizant of is duplicative bonding and how -- how does that get

2    resolved.  Also, when it comes time to call the ball -- call the

3    bonds, in a distress situation, what bonds -- what bonds are

4    called first, the private bonds or the BOEM bonds and there's

5    always dispute between that.

6          JOHN HOHLT:  Yeah.  Yeah.  And good point, Jason.  You

7    know, in addition to that, you know, what Jason is talking about

8    is, you know, there's preexisting bonds in a private -- we call

9    them private bonds, meaning nongovernment related, in a

10   transaction between a buyer and a seller.  And one thing we

11   should touch on real quick here is that, Chain of Title

12   liability exists in the Gulf of Mexico.

13         So if Shell oil, you know, built and developed this

14   platform and drilled these wells in the 1960's, and it's now

15   owned by, you know, John Hohlt Energy and my company goes

16   bankrupt, you know, Shell oil is still on the hook there, even

17   going all the way back, you know, to the inception of the well.

18         And so what Jason was talking about is a solve that

19   the private companies have thought of, was, okay.  As a part of

20   my disposition of this asset, I'm going to require a private

21   bond between me and the buyer.  And there's a good chunk of

22   surety out there that exists within this private bond market

23   that is also going to be thrown into limbo, you know, with these

24   rule changes until we get kind of clear advice from the BOEM on

25   how they're going to treat other security not in their name.

1        PAT HENNESEY:  So we have an element of -- we have two

2   elements of adverse selection, as you pointed out, John,

3   associated with this new role.  One, the investment grade piece

4   and one, the individual asset piece.  Then we have the potential

5   for all of it to become not as a result of -- of Trump's

6   election to the White House.

7        We have some lack of clarity as it relates to order of

8   attribution of claims, in the claim scenario that Jason pointed

9   out.  And all of this is to say is, there's regulatory risk and

10  judicial risks associated with this space, that has been

11  swinging back and forth for the better part of eight years.  And

12  it's caused -- you know, capital does not like -- you know,

13  capital does not flock to -- to uncertainty.  In fact, it runs

14  away.  And you have this judicial and regulatory risk that's

15  been swinging back and forth.  You know, how -- how are we as

16  underwriters supposed to -- to go forward and support an

17  increase of 14, $15 billion worth of bonds in that environment?

18  And that was the ask from the BOEM to us.  Is that -- is that a

19  fair summary?

20        JOHN HOHLT:  Yeah.

21        JASON KILPATRICK:  Yes.

22        JOHN HOHLT:  And if we go to the next slide here, I

23  think we can touch further on some of that uncertainty.  So, you

24  know, listen surety is -- we all underwrite to a zero loss, but

25  it's still, you know, less than -- than perfect model.  I think

1  the industry numbers are incredible, but you have losses, and we

2  get that.  And what I think we're trying to say here is some of

3  the losses, and some of the then legal proceedings out of these

4  bankruptcies is -- is unchartered territories.

5       So Pat or Jason, if you'll want to talk about 363

6  sales, I threw the name, Judge Isgur, up there.  He is the

7  presiding bankruptcy judge for the South District of Texas,

8  where a lot of these bankruptcies have occurred.  And some of

9  the rulings that have come out of his court, you know, not only

10  give underwriters raised hairs on their neck, but it also has

11  further implications outside of just that specific bankruptcy

12  and what are we getting into now, as an industry.

13       So Pat or Jason, you all want to take either a 363

14  sale example, which I think you all touched on or -- or what's

15  kind of gone on in the world of Falcon V and surety as executory

16  contracts?

17       PAT HENNESEY:  Why don't you take --

18       JASON KILPATRICK:  I could -- no.  Go ahead, Pat.

19       PAT HENNESEY:  Why don't you take 363?

20       JASON KILPATRICK:  Yeah.  363 for no one that knows,

21  that -- that's -- that's associated with the bankruptcy code, as

22  it relates to, essentially liquidation, selling all the assets.

23  And like I had mentioned earlier, the -- the old process or the

24  old strategy was, bankruptcy was not a bad thing.  It was a way

25  for us to get off of these obligations.  You would have a bidder

1   come in via stalking horse and -- and acquire essentially all

2   the assets and liabilities.

3          In this particular case, as it relates to Fieldwood

4   and Cox, in particular, Judge Isgur decided that it's okay to

5   take -- cherry pick the assets and essentially spin off the

6   liabilities back to the predecessors.  It -- it hadn't happened

7   for 20 to 30 years, I believe, since -- since the mid-80's.  And

8   so -- and I believe someone just asked a question.  Yes, is 363,

9   Chapter 7?  Pretty much, that's part of the code, unless Pat

10  disagrees, I believe.  363 --

11          PAT HENNESEY:  Yeah.

12          JASON KILPATRICK:  -- that can be tied to any other --

13          PAT HENNESEY:  I'm not a lawyer.

14          JASON KILPATRICK:  Right.  Right.

15          PAT HENNESEY:  I'm not a lawyer, but yeah, it's --

16  it's part of a Chapter 11 proceeding.  It's a -- it's a select

17  -- it's a select liquidation proceeding inside of the broader

18  Chapter 11 reorganization.  It's a very specific element of the

19  bankruptcy code.  I'm not an attorney.

20          JASON KILPATRICK:  Correct.  Likewise.  So going back

21  to the 363 real quick.  I mean, in most cases, we -- we were

22  used to seeing, especially in the early 2000's all the way up

23  through 2014, essentially, we were seeing a bunch of simple

24  reorganizations.  Restructure the debt, maintain everything,

25  continue the -- your P & A pro -- you're plugging and

1  abandonment program, but things have changed.  And John had

2  mentioned the Southern District Court of Texas with Judge Isgur.

3  Falcon V was actually done out of, I believe, the Louisiana

4  bankruptcy courts.

5        And so point being, like -- like Pat had mentioned,

6  there's -- not only are we dealing with regulatory risk, we're

7  also dealing with -- with adverse rulings from the courts.  And

8  so those -- those are things we definitely need to be on the

9  lookout for.

10        JOHN HOHLT:  So --

11        PAT HENNESEY:  So --

12        JOHN HOHLT:  I was going to add here, on Falcon V.  So

13  this is, you know, public knowledge at this point.  And I would

14  suggest to anyone who's curious to look it up on your own time,

15  but the United States Fifth Circuit Court of Appeals, you know,

16  ruled that a surety indemnity agreement does not constitute or

17  does not qualify as an executory contract.  And basically, what

18  that means is, that the indemnity agreement doesn't survive

19  through the bankruptcy through to the new owner.

20        And we have a lot of cases right now, in the oil and

21  gas space.  Falcon V was an onshore case.  But, you know, we

22  have a lot of cases both onshore and offshore, where we have

23  surety still in place, still providing the necessary financial

24  assurance to the local government, but we have a principal on

25  the bond, who is not an indemnitor and is not paying premium,

1  but is still receiving the benefit of having that statutory

2  coverage from the preexisting surety, prior to this BK.

3       And so, you know, for obvious reasons, that was

4  contested to a very high level.  Now, I mean, you could -- it

5  could go beyond that.  It could go to the Supreme Court.  I

6  don't know where it's at.  But, you know, the Fifth Circuit

7  Court of Appeals at the state level is a pretty high court and a

8  very negative impact and negative case law that now exists out

9  there for the whole -- the surety industry to deal with.

10      You know, I don't know if this is going to come up

11 again in the world of construction or mining or waste, you know,

12 these other major surety silos, but, you know, it's not off the

13 table because of this case law.

14      Okay.  I don't know if we had any further questions to

15 that.

16      KAT SHAMAPANDE:  John, we did get another question

17 that came up.  Backing up to the new rule with the PV10

18 valuation to test out of the bonding requirement.  What kind of

19 price assumptions are backed into PV10?

20      JOHN HOHLT:  Great question.

21      KAT SHAMAPANDE:  Could leases face additional bonding

22 requirements based on the changes in the price of oil?  And if

23 so, how long lasting and/or severe would those changes need to

24 be?

25      JOHN HOHLT:  So -- so that's one of the main issues

1  with that test out is, is how, you know, we are still waiting

2  for concrete feedback from BOEM on how often are we going to be

3  retesting this?  Is there a universal price deck that everyone

4  needs to be using?  Right now, everyone can use their own price

5  deck within the laws of accounting, you know, based off how they

6  want to determine, you know, NYMEX oil and gas pricing.  And

7  then how often are you going to reset that?

8         You know, the price changes every day.  Price changes

9  every second.  You know, so -- so if we're tying a extreme bond

10  obligation to a variable, like commodity price, you kind of

11  opened Pandora's box for, you know, an unlimited amount of

12  provisions.  Pat, I don't know if you wanted to add to that.

13         PAT HENNESEY:  Yeah.  The BOEM is looking at S.E.C.

14  pricing, which, as John mentioned, is governed by GAAP

15  accounting rules, which basically says, you have the previous 12

16  -- the average of the previous 12 months pricing that -- that is

17  published by NYMEX.  And they basically add that up, divide by

18  12, and that's the price deck that they use to go forward.  And

19  lessees definitely would be facing additional bonding

20  requirements based on those prices.

21         So should price is greater, the government's setting

22  up a position where a company who does not have bonding, then

23  it's forced to post a number of bonds during a -- a down pricing

24  cycle, which makes it more challenging for that company to

25  provide the required financial assurance.  And if they do not,

GMT20241112-190002_Recording_1920x1080 - Trim

1  then it's unknown, as to whether or not the government's going

2  to shut them in and cause a bankruptcy event, which could result

3  in all of the -- the negative things that we talked about around

4  the judicial proceeding.

5       So John and public record, you know, why don't you

6  talk about the -- the comment you made and -- and the response

7  to -- to the government rules around, they could be causing the

8  problem that they're -- they're trying to prevent.

9       JOHN HOHLT:  Yeah.  You know, I -- I went on public

10 record with the -- the federal government, my response to these

11 rule changes.  And, you know, it's -- it's almost like a Greek

12 tragedy, where all the steps that the government is taking to

13 prevent this massive fallout and -- as far as decommissioning

14 obligations are concerned.  You know, these measures that

15 they're taking are -- could potentially accelerate the defaults

16 that they're trying to prevent.  You know, by putting undue

17 stress on these oil and gas companies who struck a deal 15 years

18 ago with the seller that, at the time, didn't contemplate

19 financial assurance being posted and paid for.

20      And it's really not even the premium that's

21 concerning.  It's the collateral request that would come from

22 the sureties as a part of their quotes.  You know, they didn't

23 -- they didn't factor that into their purchase and sale

24 agreement, you know, 15 years ago when this deal was struck.

25 And so it's almost as if, you know, it's a retrading of the deal

1    in that sense.

2          But on the flip side, I -- I -- you know, I can

3    understand where these sellers are coming from and saying, hey,

4    BOEM, we trusted you to only allow vetted and viable companies

5    in the Gulf Of Mexico.  And gosh, we've had 30 bankruptcies

6    since 2009.  So, you know, your -- your system isn't perfect

7    either.  And I think there is a more common ground here that can

8    be attained, but, you know, asking for this and then saying,

9    yeah, okay.  We'll have a three year phase in period.

10          I mean, a -- a three year phase in period for, you

11    know, $7 billion worth of surety from sub-investment grade

12    operators on their less than stellar assets, is -- is a bit of a

13    back-handed complement, if you will, from the BOEM on what they

14    expect here from the surety industry.

15          JASON KILPATRICK:  Hey, John, has there been a ruling

16    yet on BOEM regarding the action if these operators do not

17    provide the financial assurance in three years?

18          JOHN HOHLT:  Yeah.  I mean, you know, there's --

19    there's talk that, you know, shut ins would come.  You know, it

20    would be -- in my opinion, it would be no different than if you

21    were out of compliance, you know, with your royalty payments.

22    You know, what actions does -- what kind of sword can BOEM swing

23    when they need to swing it.  And it is, you know, shut in.  But

24    the thing with that is, you know, how do you shut in something

25    with multiple co-lessees -- and you have, you know, three that

1  are doing everything by the book and one who's not.

2          You know, so one of the things that, you know, I

3  wanted to talk about, too, in that -- that rule change I failed

4  to mention.  You know, in that first test out, Katherine, if you

5  go back, was are you investment grade?  So if you go back to the

6  waterfall, there.  There you go.  If your investment grade or if

7  one of your co-lessees is investment grade, you know.  Okay.

8  Maybe I'm writing the coattails of -- of a major here on my

9  lease.

10          One thing that's important to remember though, is, you

11  know, is that -- is that subsidiary under that major on file

12  with the BOEM, is that subsidiary investment grade?  And that's

13  kind of a big gray area to Jason.  It's like, you know, there's

14  so much gray area in this that hasn't been solved for.  And in

15  that particular case, if I'm -- if I'm on a lease with BP,

16  obviously BP parent co is investment grade, but is their Gulf of

17  Mexico subsidiary investment grade?  And -- and how does the

18  BOEM classify that?  And is that pass through going to qualify

19  for other co-lessees?  So, you know, lots to dispute here.

20          Katherine, I don't know if we had one more slide for

21  this.  There we go.  So, you know, a lot of the feedback that

22  we've been getting is, you know, from the market is, you know,

23  can I trust surety bonds as a viable instrument?  You know,

24  there's been people who have said, oh, well, you know, I've

25  heard this.  You know, hey, I -- I made a claim on a bond, and

GMT20241112-190002_Recording_1920x1080 - Trim

1  so and so is not paying me.  And it's like, well, you know, I

2  would -- I would trust the surety market.

3         Obviously, I'm biased, but I would trust the sureties

4  to pay a valid claim.  However, I think we can all agree that

5  there's a lot going on here.  You know, as it relates to these

6  particular bankruptcies, these are not just simple -- these are

7  not just simple nonpayments on a construction project where, you

8  know, a sub is showing no receipts from the general contractor.

9  It -- it's, it's highly disputed bankruptcy rulings.  It's

10 complex legal, drawn out battles between outside counsel for

11 both the bankruptcy creditors, the trustees and the obligees on

12 these bonds.

13        You know, I -- I don't want to risk the viability and

14 reputation of the surety industry, and I always kind of fight

15 for them when I get these questions.  But it's -- it's not as

16 binary as people think.  And then one of the things too, is --

17 go ahead.

18        PAT HENNESEY:  Yeah.  There's a couple of things that

19 go into that though, too, right, John?  I mean, one who is the

20 obligee on the bond?  The obligee on the bond is the United

21 States Department of the Interior.

22        JOHN HOHLT:  Right.

23        PAT HENNESEY:  So in the event that the United States

24 Department of the Interior suffers actual damages and is

25 responsible for or incurs actual costs for performing work, it

1   is as simple as the sub who hasn't been paid by the GC.

2          JOHN HOHLT:  Yeah.

3          PAT HENNESEY:  And sureties -- you know, sureties look

4   to that to -- we -- we're insurance companies, at the end of the

5   day.  Our job is to make you whole, not provide potential unjust

6   enrichment.  We're not just going to pay an allocated sum

7   because you say there's -- there's been harm.  There has to be

8   good faith investigation of a claim and looking at the merits of

9   that claim and relating that back and number one, would be our

10  dollars out of the door.

11         If dollars aren't out of the door, what are you making

12  a claim for?  So, you know, the -- I hear what you're saying in

13  terms of, you know, I've made this claim.  But in some cases,

14  sure, you've made a claim, but you haven't suffered any harm

15  yet.  That would be -- would be a response.  But generally

16  speaking, we try to avoid unjust enrichment.  We try to avoid

17  moral hazards by paying to make whole, as opposed to paying to

18  then, allowing an obligee to take funds and spend as they will.

19         JOHN HOHLT:  Right.

20         JASON KILPATRICK:  And Pat, real quick, you mentioned

21  the order of attribution earlier.  Do the -- do the predecessors

22  have rights to the BOEM bonds, in case of an adverse scenario?

23  Or should -- because we -- you and I have both experienced,

24  where BOEM has demanded a bond and then just issued those funds

25  to the predecessors to go do the work.  Shouldn't -- is that

1    what the bond is intended for?

2         PAT HENNESEY:  Well, I think if you look back to that

3    timeline you would say, no, until the current director sat in

4    front of Congress and stated that the BOEM bond would come into

5    play first.  However, there's the concept of subrogation rights

6    in surety, where in the event we pay, we get to stand in the

7    shoes.

8         And as a result of, we would have the ability to then

9    look at the whole chain of title, enforcing that chain of title,

10   to make the predecessors perform the work and -- and not, you

11   know, not receive any -- any more than -- than is owed to them;

12   which could be nothing underneath the CFR.  It's just -- which

13   is the federal code that governs the offshore continental shelf.

14        So I would state that even -- even though the current

15   sitting BOEM directors -- director stated that is -- that is

16   the -- the intent of the go forward rule.  I don't think it

17   necessarily has application from a -- a judicial standpoint,

18   until a -- a judge says yes or no.

19        JOHN HOHLT:  Yeah.  And it's put in clear black and

20   white ink within the CFR.  You know, that -- that was something

21   that we had asked for ad nauseam.  Okay.  Talk to us about

22   sinking funds.  Here's a question.  Talk to us about sinking

23   funds required by sureties that are based on current decom

24   obligations from the latest audit and then continued funding

25   based on long term estimated decommissioning cost, essentially

1  collateralizing the surety initially and on a go forward basis

2  until fully collateralized at the end of life cycles.

3           So yeah, what -- what -- that's a good anecdote there,

4  Chris.  Yeah.  And that's one way of underwriting, right?  It is

5  -- you know, I -- I think it's -- it's hard to say that, there's

6  been so many bad players in the Gulf that, you know, tomorrow's

7  production is going to pay for today's decommissioning and that

8  rule can certainly apply to very large, stout operators with

9  stable credit history and that is still a model that exists.

10          But a more popular model that's coming into place is

11 one that Chris has alluded to there is, you know, providing some

12 form of collateral upfront and then funding a sinking fund

13 either with the government or directly with the surety.  A form

14 of collateral where, essentially over the life of the property,

15 funds are put into an account or as collateral, where then at

16 the end of the life, you know, there's enough funds to cover

17 decommissioning or --

18          PAT HENNESEY:  Another --

19          JOHN HOHLT:  -- commensurate with --

20          PAT HENNESEY:  Yeah.  Another way to augment that too

21 is by incorporating any work that comes along, because it all

22 doesn't just come at once.  You have a -- you have a number of

23 different assets that have different lives and different costs

24 and different timing of plugging, abandonment and

25 decommissioning.

1          So as you're working through that portfolio of assets

2   and liabilities, you have collateral and/or performance of the

3   decommissioning that could come into play, as well.  So it's a

4   little bit of a performer pay, performer fund collateral as you

5   go along for your long term deal.

6          And that's -- John's point and I think to -- what

7   Chris is alluding to, is this is a way that we have been able to

8   work with operators and provide surety support by setting out

9   reasonable time frames to achieve the funding of decommissioning

10  and/or the performance of decommissioning, which is ultimately

11  what -- what we're guaranteeing.

12         JOHN HOHLT:  Katherine, I think that's the end of the

13  presentation, but we're, obviously, you know, open for more

14  questions or comments or --

15         KAT SHAMAPANDE:  Okay.  Well, I just want to remind

16  everyone, you can submit your questions in that chat area or in

17  the Q & A area.  And as John said, we're ready to take those

18  questions from the audience now.

19         While we're waiting for audience questions to come in,

20  I'd like just to see if each of you have any words you'd like to

21  say in closing, to kind of wrap up this topic for those that are

22  on listening.  John, is there anything you'd like to say?

23         JOHN HOHLT:  You know, I think one of the things

24  I've -- I've been talking about with the industry is that, we're

25  in a bit of a renaissance, if you will, kind of a -- a dark ages

1  before the Renaissance right now on th -- in the Gulf of Mexico

2  space and the BOEM/OCS space.  And -- and it's not too

3  dissimilar from, you know, where we were, you know, about a

4  decade ago with the coal industry.  And, you know, there was

5  still plenty of good sureties that write the coal business and a

6  ton of good operators out there in that space.  And it's a

7  resource that we still need.

8          Oil and gas is -- are two resources that we still very

9  much need.  And we're going through kind of this period of

10  reorganization.  Right.  Okay.  We got over our skis.

11  Bankruptcies have occurred.  You know, losses will be paid.  But

12  how can we now carry forward with this industry as it looks

13  today and kind of, you know, what are the new terms and

14  conditions of playing in this space?

15          KAT SHAMAPANDE:  Patrick, would you like to say

16  anything in closing or to wrap up the topic, while we're waiting

17  for questions, to see what questions might come in?

18          PAT HENNESEY:  Sure.  So the -- the rules that are put

19  out there today, the proposed rules that have now been passed,

20  there's some, you know, there's some thought around a scaling

21  back of the -- of the magnitude of impact, as a result of the

22  new president elect coming into office.  The -- you know, and --

23  and I think there will be some of that.

24          However, as John mentioned, there's still lost

25  activity out there.  There's still other challenges that were

1  outlined in this -- in this presentation, whether it be future

2  regulatory risk, whether it be future judicial risk.  How we

3  solve this problem of, you know -- and it's not a problem.  How

4  we -- how we solve the opportunity, so we can collectively make

5  money and -- and remain profitable on a go forward basis is, you

6  know, it's still being worked out.

7        But the -- the decommissioning sinking funds that --

8  that were brought up as a question, is our primary tool.  How we

9  look at this from a credit analysis perspective, I think changes

10 as an industry with looking at real, actual cost dollars of

11 decommissioning.  Looking at how those are analyzed and

12 presented by -- by our clients, and how we look at the -- the

13 totality of future cash flow of a company and how that's

14 analyzed by the surety market and related back to the

15 decommissioning costs for us to prequalify somebody's ability to

16 perform in the future, are -- are all present.

17        We are collectively moving that way in terms of -- of,

18 you know, changing our analyses individually and changing our

19 terms and conditions individually.  But as John said, oil and

20 gas are -- are extremely important to the United States, and

21 there's definitely a large tax payer risk embedded in it, which

22 makes it a -- a very strong opportunity set for the surety

23 industry to step in and -- and really kind of solve the problem

24 and -- and bridge the gap.

25        KAT SHAMAPANDE:  And Jason, before I come back to you,

1  we did have a couple of questions come in.

2        JASON KILPATRICK:  Yes.

3        KAT SHAMAPANDE:  So one of the questions we had was,

4  could you talk about how the BSEE P70 number is derived, how

5  often that P70 number is updated and what is the deterministic

6  number used in the absence of a P70 and could an increase in the

7  cost in the reclamation performance market result in additional

8  bonding requirements?

9        John, did you want to take that first?  You were

10 shaking your head.

11       JOHN HOHLT:  Yeah.  Yeah.  I think both of these,

12 that's a lot.

13       KAT SHAMAPANDE:  I know.  It is a lot.

14       JOHN HOHLT:  So real quick for everyone's -- you know,

15 we use the acronym BOEM.  BSEE is the, The Bureau Of Safety and

16 Environmental Enforcement, and they're -- think of them as the

17 sister company to BOEM.  And they provide these, these P70

18 estimates, these Probability 70 estimates for decom expenses on

19 a lease by lease basis, even on a pipeline by pipeline basis.

20       And so, you know, how often -- you know, what is that

21 deterministic number you used under P70?  You know, that's

22 clearly outlined on the -- on the BSEE website, if you want to

23 get into all that.  But how often is it redetermined?  You know,

24 right now, we're kind of at a -- a weird cycle.  You know, there

25 was a huge update about three years ago with regards to the --

1  the BSEE numbers as it related to shelf properties.  You know, I

2  should say offshore properties in shallower waters.

3          You know, we don't have clear insight from -- from the

4  government on when these numbers are going to be updated.  Is it

5  every two years, you know, to just -- let's say no costs go up,

6  but we're going to make an adjustment every two years for

7  inflation.  We don't -- we don't know.  And then could an

8  increase in these reclamation performance -- in the -- in the

9  reclamation performance market result in additional bonding?

10 Well, yeah.  I mean, if P70, in theory, is only going to go up

11 every year, you know, for inflation and other cost adjustments,

12 unless we come up with a drastically cheaper way to decommission

13 these wells.  You know, in theory, that number could go up, and

14 that would result in -- in more bonding.

15          KAT SHAMAPANDE:  Jason or Patrick, did you have

16 anything you wanted to add to that?  No?

17          JASON KILPATRICK:  No, John, nailed that one.

18          KAT SHAMAPANDE:  Okay.  Our next question that came

19 in, is in regards to indemnity.  So the surety's indemnity is

20 good up until they have to go to bankruptcy court and then it's

21 not valid, as far as the most recent judgment that we've

22 discussed.  Is -- is that a correct synopsis of -- of what we've

23 talked about or -- or is there something else there?

24          PAT HENNESEY:  I'd encourage you to go talk to a

25 lawyer.  I think there's been some -- I think there's been some

1    good -- some good analysis that's been put out about the

2    Countrymen test, as it relates to surety indemnity agreements

3    being construed as executory contracts or otherwise.

4        I would say that one of at least Sompo's takeaway is,

5    that we've worked with John and other brokers and with the SFAA

6    and the Energy Working Group that both Jason and I sit on, you

7    know, we've worked at -- you know, we've looked at utilizing

8    different bond forms and different bond language to help in that

9    cap and ultimately arrive at a -- a position that protects the

10    indemnity agreement, the -- protecting the indemnity agreement's

11    validity throughout the life cycle of the potential bankruptcy

12    and trying to avoid, you know, what would have -- you know, what

13    occurred in the Falcon V bankruptcy and, you know, limit some of

14    the -- the go forward potential damage as a result of -- of that

15    judicial outcome at -- as it stands at least today.

16        KAT SHAMAPANDE:  Did anyone want to add anything else

17    to that?  No?  Okay.  The next question we got, the -- first,

18    they just are saying that the panel has done a great job

19    articulating some of the cons that are proposed -- of the

20    proposed rule change, given the large losses in the Fieldwood

21    and Cox cases that were referenced at the start of the

22    presentation.  Are there any positives for the surety industry

23    or should the new rules be seen as a welcome development,

24    specifically in the oil and gas space?

25        JOHN HOHLT:  Yeah.  So I'll -- I'll answer a -- a part

1  of that.

2          KAT SHAMAPANDE:  Thanks, John.

3          JOHN HOHLT:  I -- I think that absolutely, I like the

4  idea of the rule and -- and the status quo is not acceptable.

5  We need kind of more clear cut direction as an industry.  And --

6  and then for our fellow, you know, clients in the space, you

7  know, who we indemnify.  So that is all very welcome.

8          I think a lot of what this proposed rule change,

9  though, has, you know, it answered a lot of questions, but it

10 also generated just as many questions as it answered.  There --

11 the positives from this rule change, yeah.  There will be new

12 surety opportunities for, you know, the brokers and producers to

13 pursue and for the underwriters to approve and underwrite.

14         You know, and there -- there's definitely an

15 opportunity here for money to be made, if it's done in the

16 correct manner.  But again, you know, it's -- it's a double

17 edged sort here, because this is a rule applicable to everyone

18 except for investment grade companies.  And so right off the

19 bat, you know, is it going to be a -- a net positive or a net

20 negative for the oil and the gas industry and for the surety

21 industry.

22         I mean, sureties, that I -- I think one of the

23 important things to point out it and that BOEM never really

24 contemplated is, you know, if they're asking us for $7 billion

25 worth of surety, you know, we could say no to all 7 billion.

GMT20241112-190002_Recording_1920x1080 - Trim

1   You know, we don't have to write a single -- another bond in the

2   Gulf Of Mexico.  And so it's -- it's really up to us to

3   determine, you know, what a good client is and what a good

4   underwriting metric is going forward.  The balls in our court.

5           KAT SHAMAPANDE:  Jason or Patrick, did you want to add

6   anything to that?

7           JASON KILPATRICK:  No.  I mean, one of the few

8   opportunities and -- and we don't look at this from -- from a

9   premium perspective.  We look at it from a risk perspective.

10  But I mean, it -- the market has firmed up.  You do have certain

11  carriers exiting the space.  And so, I mean, that -- that does

12  allow for higher rates, stronger security structures.  But

13  nonetheless, I mean, we still, as an industry, we -- we must

14  stay disciplined in -- in this approach.

15          PAT HENNESEY:  Yeah.  I second that and state, you

16  know, expertise in this space is -- is necessary to underwriting

17  it from my perspective.  You know, really understanding the --

18  the commodity volatility, looking at how that impacts you on a

19  short and long term basis.  Understanding how these rules are

20  put together and how they impact you.  Understanding what has

21  happened in the past and learning from that and going forward.

22  And, you know, also, I think there's a -- you know, there is a

23  way to underwrite this that makes sense and can allow us to --

24  to all make money.

25          The -- the point of John at -- John made around, we

1   can say, no.  Not everybody qualifies for a surety bond.  And

2   that is -- that's good.  That's a -- that's a benefit that we

3   provide as surety underwriters.  So not everybody receiving a

4   bond is -- is also a good thing.  So it's -- it's about how we

5   pre-qualify companies in -- into the space and how we protect

6   our own balance sheets or reinsurers balance sheets and, you

7   know, ultimately look at long term profitability in the space.

8           KAT SHAMAPANDE:  We did get another question that just

9   came in, as well.  With surety ultimately holding the capacity

10  that BOEM and oil and gas companies need, how would companies

11  operate if they can't obtain surety capacity?  Will the new

12  regulations then or is there the possibility that they could

13  squeeze out smaller operators making the investment grade

14  companies larger?  Does anyone have thoughts on that?

15          JOHN HOHLT:  Yeah.

16          JASON KILPATRICK:  The answer is, yes.  I mean,

17  they -- they could definitely squeeze out the smaller operators

18  and create what I -- what I -- what I define as an oligarchic

19  industry.  Where you only have select players in there who don't

20  need the bonds or don't -- have -- have no interest in working

21  with the sureties.

22          So yeah, there -- there is risk there.  And -- and

23  also adding, adding to that real quick before we run out of

24  time.  Pat alluded to it earlier, the regulatory and judicial

25  risk, but we also need to -- we're talking about depleting

GMT20241112-190002_Recording_1920x1080 - Trim

1    assets here.

2          So if these companies aren't able to replace those

3    reserves, who's going to want to invest hundreds of million

4    dollars with an adversarial regulatory and legal environment?

5    So I mean, there're -- there are definitely concerns, and

6    private equity firms and investors don't want to fund plugging

7    and abandonment expenses up front.  So those are things we have

8    to be concerned with.

9          KAT SHAMAPANDE:  All right.  Well, it looks like those

10   are all the questions we've gotten so far from the audience.

11   Jason, did you want to say anything in closing, since we didn't

12   get to you before?

13         JASON KILPATRICK:  No.  I -- I just added it right

14   there, so.

15         KAT SHAMAPANDE:  Okay.  All right.  Well, I just want

16   to thank all of you, John, Jason, and Patrick, for being on with

17   us today and just sharing information on these updates.  And I

18   want to thank everyone that was on and attended, as well.  And I

19   just want to remind you to take a couple of minutes and complete

20   that evaluation of today's virtual seminar.

21         Again, as I mentioned before, it is available on that

22   virtual seminar page.  It's located directly below the link you

23   used to enter either the live virtual seminar today or to access

24   the recording.  Your feedback is extremely important to NASBP

25   staff and the editorial planning group, as we put together

GMT20241112-190002_Recording_1920x1080 - Trim

1  future educational offerings.

2          So please just take a couple minutes and make sure to

3  put your feedback in there.  That does conclude this NASBP

4  virtual seminar.  You may now disconnect.  Thanks everyone.

5                  (Video recording ends.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GMT20241112-190002_Recording_1920x1080 - Trim

CERTIFICATE OF TRANSCRIBER

1

2

3          I, Sharina Fowler, do hereby certify that I was

4   authorized to transcribe the foregoing recorded proceeding; and

5   that the transcript is a true and accurate transcription, to the

6   best of my ability, taken while listening to the provided

7   recording.

8

9          I FURTHER CERTIFY that I am not of counsel or

10  attorney for either or any of the parties to said proceedings,

11  nor in any way interested in the events of this cause, and that

12  I am not related to any of the parties thereto.

13

14

15          Dated this 21st day of July, 2025.

16

17          *Sharina Fowler*

18

19          Sharina Fowler, CSR

20

21

22

23

24

25

**$**

**$14**
  11:19
**$14.6**
  11:10
**$15**
  17:17
**$2**
  10:15,18
**$6.97**
  11:13
**$7**
  11:19  24:11
  36:24

**1**

**10**
  7:19  8:23
  13:13
**100**
  8:22
**11**
  19:16,18
**12**
  22:15,16,18
**14**
  11:19  17:17
**140**
  12:5
**15**
  23:17,24
**1960's**
  16:14

**2**

**20**
  7:19  8:23
  19:7
**2000's**
  19:22
**2009**
  24:6

**2014**
  19:23
**2020**
  9:4
**2021**
  8:5
**2022**
  9:5

**3**

**30**
  6:17  19:7
  24:5
**363**
  18:5,13,19,
  20  19:8,10,
  21

**7**

**7**
  19:9  36:25
**70**
  14:21  33:18

**A**

**abandonment**
  20:1  29:24
  39:7
**ability**
  28:8  32:15
**absence**
  33:6
**absolutely**
  36:3
**accelerate**
  23:15
**accelerates**
  11:23
**acceptable**
  36:4
**access**
  3:19,23
  39:23

**account**
  29:15
**accounting**
  22:5,15
**accounts**
  9:25
**achieve**
  30:9
**acquire**
  19:1
**acronym**
  33:15
**action**
  24:16
**actions**
  24:22
**active**
  8:4
**activity**
  10:19  31:25
**actual**
  26:24,25
  32:10
**ad**
  28:21
**add**
  9:22  20:12
  22:12,17
  34:16  35:16
  37:5
**added**
  39:13
**adding**
  13:14  38:23
**addition**
  16:7
**additional**
  21:21  22:19
  33:7  34:9
**Additionally**
  3:18
**adjustment**
  34:6
**adjustments**
  34:11

**administratio
n**
  15:9
**ado**
  5:3
**adversarial**
  39:4
**adverse**
  13:22  14:4
  17:2  20:7
  27:22
**advice**
  16:24
**agencies**
  15:14
**agency**
  5:5  14:22
**ages**
  30:25
**agree**
  26:4
**agreement**
  20:16,18
  23:24  35:10
**agreement's**
  35:10
**agreements**
  35:2
**ahead**
  13:8  18:18
  26:17
**allocated**
  27:6
**allowing**
  27:18
**alluded**
  29:11  38:24
**alluding**
  30:7
**American**
  11:8
**amount**
  13:17  14:14
  22:11
**analyses**
  32:18

analysis
  12:14,17
  32:9 35:1
Analytics
  12:15
analyzed
  32:11,14
and/or
  21:23 30:2,
  10
anecdote
  29:3
answering
  5:2
Appeals
  20:15 21:7
applicable
  36:17
application
  28:17
applied
  4:5 9:6
  13:13
apply
  29:8
appointed
  6:2
appointee
  5:25
approach
  9:20 13:25
  37:14
approval
  7:18
approve
  36:13
approximately
  6:17 11:10
area
  3:13 25:13,
  14 30:16,17
areas
  3:16
arrive
  35:9
articulating
  35:19

asset
  9:20 13:21,
  25 14:1 15:3
  16:20 17:4
assets
  10:1,6,25
  11:11 14:8
  18:22 19:2,5
  24:12 29:23
  30:1 39:1
assumed
  10:2
assumptions
  21:19
assurance
  4:12 11:14
  12:25 15:2
  20:24 22:25
  23:19 24:17
asterisk
  15:5
attained
  24:8
attended
  39:18
attorney
  19:19
attorneys
  10:3
attribution
  17:8 27:21
audience
  3:9 30:18,19
  39:10
audio
  3:8
audit
  28:24
augment
  29:20
average
  22:16
avoid
  27:16 35:12

---

**B**

Baa3
  12:12
back
  6:12 11:7
  16:17 17:11,
  15 19:6,20
  25:5 27:9
  28:2 31:21
  32:14,25
back-handed
  24:13
backed
  21:19
Backing
  21:17
bad
  18:24 29:6
balance
  38:6
ball
  11:25 16:2
balls
  37:4
bankrupt
  11:1 16:16
bankruptcies
  8:7,14,17,21
  9:2,6,13
  18:4,8 24:5
  26:6 31:11
bankruptcy
  7:23,24 8:4,
  6,14 18:7,
  11,21,24
  19:19 20:4,
  19 23:2
  26:9,11
  34:20 35:11,
  13
based
  6:1 9:20
  13:25 21:22
  22:5,20
  28:23,25

basically
  13:2 14:21
  20:17 22:15,
  17
basis
  12:15 14:1
  29:1 32:5
  33:19 37:19
bat
  14:4 36:19
battles
  26:10
BBB-
  12:11
begin
  3:5
begins
  3:1 6:10
benefit
  21:1 38:2
biased
  26:3
bidder
  18:25
big
  6:25 15:5
  25:13
billion
  10:15,18
  11:11,13,19
  15:24 17:17
  24:11 36:24,
  25
binary
  26:16
bit
  7:24 13:6
  24:12 30:4,
  25
BK
  9:24 21:2
black
  28:19
blended
  9:19
BOEM
  3:3 4:12

5:4,16,24
6:3,21,23
8:18 11:3
12:15,22
14:22 15:9,
14,25 16:4,
24 17:18
22:2,13
24:4,13,16,
22 25:12,18
27:22,24
28:4,15
33:15,17
36:23 38:10
**BOEM/OCS**
31:2
**bond**
4:16 5:12
7:18 10:17
13:16,22
14:9 16:21,
22 20:25
22:9 25:25
26:20 27:24
28:1,4 35:8
37:1 38:1,4
**bonding**
7:7 15:23
16:1 21:18,
21 22:19,22
33:8 34:9,14
**bonds**
5:14 7:3,5,
9,15 8:10
10:24 12:21
15:24 16:3,
4,8,9 17:17
22:23 25:23
26:12 27:22
38:20
**book**
25:1
**Boone**
8:3
**box**
12:18 22:11
**boy**
7:24

**BP**
25:15,16
**breakdown**
12:2
**bridge**
32:24
**bringing**
13:15
**broader**
19:17
**brokers**
11:17 35:5
36:12
**brought**
32:8
**BSEE**
14:23 33:4,
15,22 34:1
**built**
16:13
**bullet**
5:23
**bunch**
19:23
**bureau**
5:4,21,25
6:14 14:22
33:15
**business**
8:13 31:5
**buyer**
10:1 16:10,
21

_____

C

**CAC**
4:2
**California**
5:15
**call**
16:2,8
**called**
16:4
**cap**
35:9

**capacity**
38:9,11
**capital**
17:12,13
**care**
10:4 11:9
**carriers**
37:11
**carry**
31:12
**case**
9:18 19:3
20:21 21:8,
13 25:15
27:22
**cases**
10:14,16,17
19:21 20:20,
22 27:13
35:21
**cash**
13:12,14,19
32:13
**catalyst**
11:23
**caused**
7:24 17:12
**causing**
23:7
**CFR**
28:12,20
**chain**
9:6 16:11
28:9
**challenges**
31:25
**challenging**
22:24
**change**
4:19,22 8:19
10:23 11:4,
15 12:23
15:6,9 25:3
35:20 36:8,
11
**changed**
10:21 20:1

**changing**
32:18
**Chapter**
19:9,16,18
**charge**
4:20
**chat**
3:13,16 4:25
30:16
**cheaper**
34:12
**check**
12:18
**cherry**
10:6 19:5
**chime**
4:24
**chosen**
14:23
**Chris**
29:4,11 30:7
**chunk**
16:21
**Circuit**
20:15 21:6
**claim**
17:8 25:25
26:4 27:8,9,
12,13,14
**claims**
17:8
**clarity**
17:7
**classify**
25:18
**clear**
16:24 28:19
34:3 36:5
**click**
3:20
**client**
12:9 37:3
**clients**
32:12 36:6
**closing**
30:21 31:16
39:11

co-lessees
  24:25 25:7,
  19
coal
  31:4,5
coast
  5:14 6:9
coattails
  25:8
code
  18:21 19:9,
  19 28:13
cognizant
  16:1
coincide
  8:25
collateral
  23:21 29:12,
  14,15 30:2,4
collateralize
  d
  29:2
collateralizi
  ng
  29:1
collected
  8:3
collectively
  32:4,17
column
  12:5
commensurate
  29:19
comment
  23:6
comments
  7:1 30:14
commodity
  9:1 22:10
  37:18
common
  24:7
companies
  11:11 14:5,
  16 15:13
  16:19 23:17
  24:4 27:4

36:18 38:5,
  10,14 39:2
company
  14:8,9 16:15
  22:22,24
  32:13 33:17
company's
  11:2
complement
  24:13
complete
  39:19
completely
  4:17
completing
  3:18
complex
  26:10
compliance
  24:21
components
  10:22
computer
  3:9
concept
  28:5
concerned
  23:14 39:8
concerns
  39:5
conclude
  40:3
concrete
  22:2
conditions
  31:14 32:19
congratulatio
  ns
  12:19
Congress
  28:4
connection
  3:8
cons
  35:19
consideration

15:25
considered
  6:11
constitute
  7:24 20:16
construction
  21:11 26:7
construed
  35:3
consultants
  10:3
contemplate
  23:18
contemplated
  36:24
contested
  21:4
continental
  5:8 28:13
continue
  19:25
continued
  28:24
continues
  5:19
contract
  20:17
contractor
  26:8
contracts
  18:16 35:3
control
  5:21
correct
  19:20 34:22
  36:16
cost
  28:25 32:10
  33:7 34:11
costs
  13:21 26:25
  29:23 32:15
  34:5
counsel
  26:10
Countrymen

35:2
couple
  3:21 9:17
  13:10 14:12
  15:24 26:18
  33:1 39:19
  40:2
court
  18:9 20:2,15
  21:5,7 34:20
  37:4
courts
  20:4,7
cover
  4:14 7:2
  11:12 29:16
coverage
  21:2
Cox
  9:2,13 10:2
  19:4 35:21
create
  10:5 38:18
credit
  9:20 12:13,
  15 29:9 32:9
creditors
  26:11
crystal
  11:25
cumulative
  8:7
curious
  20:14
current
  28:3,14,23
cut
  36:5
cycle
  22:24 33:24
  35:11
cycles
  29:2

---

**D**

---

damage
  35:14
damages
  26:24
dark
  30:25
day
  22:8 27:5
deal
  6:25 21:9
  23:17,24,25
  30:5
dealing
  9:4 12:2
  14:5 20:6,7
debt
  19:24
decade
  31:4
decided
  19:4
deck
  22:3,5,18
decom
  13:2 14:10,
  14 28:23
  33:18
decommission
  13:21 34:12
decommissioni
ng
  7:10,12,16,
  18 10:25
  13:5,16
  14:19 23:13
  28:25 29:7,
  17,25 30:3,
  9,10 32:7,
  11,15
default
  7:24
defaults
  23:15

define
  38:18
definition
  12:11
demanded
  27:24
demanding
  15:15
Department
  5:6 26:21,24
depleting
  38:25
derived
  13:11 33:4
determine
  22:6 37:3
deterministic
  33:5,21
develop
  5:19
developed
  16:13
development
  35:23
direction
  36:5
directly
  11:3 29:13
  39:22
director
  5:24 6:2,3,4
  28:3,15
directors
  28:15
disagrees
  19:10
disciplined
  37:14
disconnect
  40:4
discount
  13:13
discounted
  13:20
discussed
  34:22

dishing
  11:8
disposition
  16:20
dispute
  15:16 16:5
  25:19
disputed
  26:9
dissimilar
  7:20 31:3
distill
  12:6
distress
  16:3
District
  18:7 20:2
diversive
  10:5
divide
  22:17
dollars
  13:12,15,20,
  21 15:24
  27:10,11
  32:10 39:4
domestic
  6:17
door
  27:10,11
double
  36:16
drastically
  34:12
drawn
  26:10
drilled
  16:14
due
  10:21
duplicative
  16:1

---

**E**

---

earlier

18:23 27:21
  38:24
early
  19:22
edged
  36:17
editorial
  39:25
educational
  40:1
effect
  15:5
elect
  31:22
election
  17:6
element
  17:1 19:18
elements
  17:2
embedded
  32:21
encourage
  3:14 34:24
end
  3:17 5:3
  27:4 29:2,16
  30:12
ends
  40:5
Energy
  4:5 5:5
  16:15 35:6
Enforcement
  33:16
enforcing
  28:9
engage
  5:15 6:1
enrichment
  27:6,16
enter
  3:20 39:23
environment
  6:1 17:17
  39:4

**Environmental**
33:16
**equal**
13:20
**equity**
39:6
**essentially**
10:6 18:22
19:1,5,23
28:25 29:14
**estimated**
28:25
**estimates**
11:13 14:13
33:18
**evaluation**
3:19 39:20
**event**
23:2 26:23
28:6
**everyone's**
33:14
**excuse**
5:19
**executory**
18:15 20:17
35:3
**exist**
5:14 8:10
10:25
**exists**
6:9 7:8
12:13 14:6
16:12,22
21:8 29:9
**exit**
9:24
**exiting**
37:11
**expect**
24:14
**expense**
13:5
**expenses**
33:18 39:7
**experienced**
8:14 27:23

**expertise**
37:16
**exploration**
8:8
**extreme**
7:15 22:9
**extremely**
32:20 39:24

---

**F**

**face**
21:21
**facing**
22:19
**fact**
14:4 17:13
**factor**
13:13 23:23
**failed**
25:3
**fair**
17:19
**faith**
27:8
**Falcon**
18:15 20:3,
12,21 35:13
**fall**
9:10
**fallout**
23:13
**familiar**
4:16 6:5
7:20 10:13
12:17
**farms**
5:20
**federal**
15:14 23:10
28:13
**federally**
6:16 7:8,9
**feedback**
3:22 22:2
25:21 39:24

**40:3**
**feel**
4:24
**fellow**
36:6
**field**
8:13 9:7
**Fieldwood**
9:2,13,18
10:2 19:3
35:20
**fight**
26:14
**figure**
10:9
**file**
4:6 25:11
**financial**
4:12 11:14
12:25 15:2
20:23 22:25
23:19 24:17
**fine**
4:17 14:6
**firm**
8:3
**firmed**
37:10
**firms**
12:14 39:6
**Fitch**
12:12
**flip**
24:2
**flock**
17:13
**floor**
4:8
**flow**
32:13
**flowchart**
12:8
**flows**
13:12,15,19
**fluctuations**
5:25

**forced**
22:23
**foremost**
4:15
**form**
8:11 13:22
29:12,13
**forms**
35:8
**forward**
9:10 10:10
12:23 17:16
22:18 28:16
29:1 31:12
32:5 35:14
37:4,21
**frames**
30:9
**free**
4:24
**frequency**
9:14,16
**front**
28:4 39:7
**full**
4:6
**fully**
29:2
**fund**
29:12 30:4
39:6
**funding**
28:24 29:12
30:9
**funds**
27:18,24
28:22,23
29:15,16
32:7
**future**
13:10,12,14,
19 32:1,2,
13,16 40:1

## G

**GAAP**
  22:14
**gap**
  32:24
**gas**
  3:3 5:11
  6:1,18,19
  13:4 20:21
  22:6 23:17
  31:8 32:20
  35:24 36:20
  38:10
**GC**
  27:1
**gear**
  11:17
**general**
  4:20 26:8
**generally**
  12:18 27:15
**generated**
  8:18 36:10
**generating**
  10:9
**generous**
  3:6
**give**
  4:20 12:1
  18:10
**Global**
  12:15
**good**
  11:21 16:6,
  21 27:8 29:3
  31:5,6 34:20
  35:1 37:3
  38:2,4
**gosh**
  6:6 24:5
**governed**
  22:14
**government**
  6:25 7:5,6,7
  15:3,15

  20:24 23:7,
  10,12 29:13
  34:4
**government's**
  22:21 23:1
**governs**
  28:13
**grade**
  11:12 12:10,
  11,22 14:5,
  8,25 17:3
  24:11 25:5,
  6,7,12,16,17
  36:18 38:13
**gray**
  25:13,14
**great**
  4:10 10:23
  11:16,18
  21:20 35:18
**greater**
  13:5 22:21
**Greek**
  23:11
**ground**
  24:7
**group**
  35:6 39:25
**guarantee**
  7:13,17
  10:25
**guaranteed**
  7:10,11
**guaranteeing**
  30:11
**Gulf**
  5:13 6:18
  8:12 15:23
  16:12 24:5
  25:16 29:6
  31:1 37:2
**guys**
  5:17

## H

**hairs**
  18:10
**hairy**
  13:6
**handle**
  14:6
**handouts**
  3:10,11,12
**happen**
  11:25
**happened**
  19:6 37:21
**hard**
  29:5
**harm**
  27:7,14
**Haynes**
  8:3
**hazards**
  27:17
**head**
  33:10
**headache**
  7:25
**hear**
  27:12
**heard**
  6:22 25:25
**heartburn**
  10:9
**HENNESEY**
  9:11 10:12
  13:7,9 17:1
  18:17,19
  19:11,13,15
  20:11 22:13
  26:18,23
  27:3 28:2
  29:18,20
  31:18 34:24
  37:15
**Hennessy**
  4:3

**hey**
  10:4 11:22
  24:3,15
  25:25
**high**
  21:4,7
**higher**
  10:19,20
  37:12
**highly**
  26:9
**historic**
  9:23
**historically**
  9:1 10:20
**history**
  29:9
**Hohlt**
  4:1,10 10:23
  13:8 14:2
  16:6,15
  17:20,22
  20:10,12
  21:20,25
  23:9 24:18
  26:22 27:2,
  19 28:19
  29:19 30:12,
  23 33:11,14
  35:25 36:3
  38:15
**holding**
  38:9
**home**
  9:7
**hook**
  16:16
**hope**
  15:19
**horse**
  19:1
**House**
  17:6
**Houston**
  8:3
**huge**
  6:19,24

33:25
**hundreds**
  6:20 39:3

_____

**I**

**idea**
  12:1 36:4
**identified**
  11:10
**impact**
  4:22 21:8
  31:21 37:20
**impacts**
  37:18
**implement**
  11:15
**implementatio
n**
  15:16
**implications**
  9:3 18:11
**important**
  5:17,23 6:9
  14:12 25:10
  32:20 36:23
  39:24
**inception**
  16:17
**incorporating**
  29:21
**increase**
  17:17 33:6
  34:8
**incredible**
  18:1
**incurred**
  10:20
**incurs**
  26:25
**indemnify**
  36:7
**indemnitor**
  20:25
**indemnity**
  20:16,18

34:19 35:2,
10
**individual**
  17:4
**individually**
  32:18,19
**industry**
  3:3 7:7,21
  8:22 9:5
  10:18,21
  11:22 12:3
  13:23 18:1,
  12 21:9
  24:14 26:14
  30:24 31:4,
  12 32:10,23
  35:22 36:5,
  20,21 37:13
  38:19
**inflation**
  34:7,11
**information**
  8:2 39:17
**infrastructur
e**
  6:8,15
**initially**
  29:1
**injunction**
  15:15
**ink**
  28:20
**ins**
  24:19
**inshore**
  6:11
**inside**
  19:17
**insight**
  34:3
**instrument**
  25:23
**instruments**
  7:22
**insurance**
  27:4

**intend**
  6:1
**intended**
  28:1
**intent**
  28:16
**interest**
  38:20
**Interior**
  5:6 26:21,24
**introduce**
  3:25
**invest**
  39:3
**investigation**
  27:8
**investment**
  11:12 12:10,
  11,21 14:25
  17:3 25:5,6,
  7,12,16,17
  36:18 38:13
**investors**
  39:6
**IRS**
  6:24
**Isgur**
  18:6 19:4
  20:2
**issued**
  27:24
**issues**
  8:12 21:25

_____

**J**

**January**
  15:7
**Jason**
  4:4 7:1 9:22
  10:22 13:24
  15:21 16:6,
  7,18 17:8,21
  18:5,13,18,
  20 19:12,14,
  20 24:15
  25:13 27:20

32:25 33:2
  34:15,17
  35:6 37:5,7
  38:16 39:11,
  13,16
**Jason's**
  9:21
**job**
  27:5 35:18
**jobs**
  6:20
**John**
  4:1,9,10
  9:11,13,23
  10:23 13:8
  14:2 15:21
  16:6,15
  17:2,20,22
  20:1,10,12
  21:16,20,25
  22:14 23:5,9
  24:15,18
  26:19,22
  27:2,19
  28:19 29:19
  30:12,17,22,
  23 31:24
  32:19 33:9,
  11,14 34:17
  35:5,25
  36:2,3 37:25
  38:15 39:16
**John's**
  13:19 30:6
**judge**
  18:6,7 19:4
  20:2 28:18
**judgment**
  34:21
**judicial**
  9:17 17:10,
  14 23:4
  28:17 32:2
  35:15 38:24
**jump**
  4:13 5:3 6:4
**jurisdiction**
  5:8,16,20

6:10

---

**K**

---

**Kat**
  3:2,4 4:13
  21:16,21
  30:15 31:15
  32:25 33:3,
  13 34:15,18
  35:16 36:2
  37:5 38:8
  39:9,15
**Katherine**
  4:25 25:4,20
  30:12
**kick**
  4:9
**Kilpatrick**
  4:4 9:22
  15:21 17:21
  18:18,20
  19:12,14,20
  24:15 27:20
  33:2 34:17
  37:7 38:16
  39:13
**kind**
  4:18 6:4,8
  7:13 8:20,25
  12:19 16:24
  18:15 21:18
  22:10 24:22
  25:13 26:14
  30:21,25
  31:9,13
  32:23 33:24
  36:5
**knowledge**
  20:13

---

**L**

---

**lack**
  9:16 17:7
**laid**
  4:10

**language**
  35:8
**large**
  29:8 32:21
  35:20
**larger**
  38:14
**lasting**
  21:23
**latest**
  28:24
**law**
  8:3 21:8,13
**laws**
  22:5
**lawyer**
  19:13,15
  34:25
**lay**
  4:18
**leader**
  4:2,5 5:24
**leagues**
  6:12
**learned**
  9:5
**learning**
  37:21
**lease**
  6:23 7:8
  13:3,4,6,15,
  16 14:16,23
  15:1 25:9,15
  33:19
**leases**
  5:21 21:21
**led**
  7:7
**legal**
  5:8 15:12
  18:3 26:10
  39:4
**lens**
  14:3
**lessees**
  22:19

**level**
  21:4,7
**liabilities**
  10:1 19:2,6
  30:2
**liability**
  10:5,7,14
  11:6 16:12
**life**
  29:2,14,16
  35:11
**Likewise**
  19:20
**limbo**
  16:23
**limit**
  35:13
**link**
  3:12 39:22
**liquidation**
  18:22 19:17
**listen**
  3:9 17:24
**listening**
  30:22
**litigation**
  15:13
**live**
  39:23
**lives**
  29:23
**local**
  8:3 20:24
**located**
  3:20 39:22
**long**
  7:16 21:23
  28:25 30:5
  37:19 38:7
**longevity**
  7:22
**looked**
  35:7
**lookout**
  20:9
**loss**
  10:19 17:24

**losses**
  10:19 11:23
  18:1,3 31:11
  35:20
**lost**
  31:24
**lot**
  4:17 6:16
  7:7,21 9:5
  10:10 12:16
  14:6,15 18:8
  20:20,22
  25:21 26:5
  33:12,13
  36:8,9
**lots**
  25:19
**Louisiana**
  6:9 20:3
**low**
  9:1,14
**luckily**
  7:23

---

**M**

---

**made**
  23:6 25:25
  27:13,14
  36:15 37:25
**magnitude**
  31:21
**main**
  5:12 21:25
**maintain**
  19:24
**major**
  9:2 21:12
  25:8,11
**make**
  10:10 11:24
  27:5,17
  28:10 32:4
  34:6 37:24
  40:2
**makes**
  22:24 32:22

37:23
making
  7:17 27:11
  38:13
manage
  9:9
management
  5:5,7
mandates
  9:8
manner
  36:16
map
  6:7,14
market
  4:20 16:22
  25:22 26:2
  32:14 33:7
  34:9 37:10
massive
  23:13
meaning
  16:9
means
  13:14 14:21
  20:18
measures
  23:14
member
  3:9
mention
  15:21 25:4
mentioned
  18:23 20:2,5
  22:14 27:20
  31:24 39:21
merger
  10:5
merits
  27:8
method
  12:8
methodology
  10:21
metric
  37:4

Mexico
  5:13 6:19
  8:13 15:23
  16:12 24:5
  25:17 31:1
  37:2
mid-80's
  19:7
miles
  6:10,11
million
  11:19 39:3
mining
  7:21 21:11
minutes
  3:21 39:19
  40:2
mode
  3:10
model
  17:25 29:9,
  10
moderator
  3:4
moment
  11:23
money
  10:10 11:9
  32:5 36:15
  37:24
monitoring
  4:25
months
  22:16
Moody's
  12:12
moral
  27:17
move
  9:10 10:10
moving
  32:17
multiple
  24:25

**N**

nailed
  34:17
name's
  3:4
NASBP
  3:2,5 11:17
  39:24 40:3
NASBP's
  3:6
National
  4:3
natural
  4:2 5:9
nature
  7:15
nauseam
  28:21
necessarily
  28:17
neck
  18:10
needed
  11:14
negative
  21:8 23:3
  36:20
negotiation
  6:12
net
  36:19
non-
cancellable
  7:22
nonetheless
  37:13
nongovernment
  16:9
noninvestment
  14:5,8
nonpayments
  26:7
note
  5:23 6:9

number
  14:21,23
  22:23 27:9
  29:22 33:4,
  5,6,21 34:13
numbers
  18:1 34:1,4
NYMEX
  22:6,17

**O**

Obama
  15:8
obligation
  22:10
obligations
  9:24 18:25
  23:14 28:24
obligee
  26:20 27:18
obligees
  26:11
obtain
  38:11
obvious
  21:3
occur
  7:18
occurred
  8:17 9:2
  18:8 31:11
  35:13
occurring
  4:19
Ocean
  5:5
OCS
  4:13 5:8,15
  8:17
offerings
  40:1
office
  5:18 9:7
  31:22
Officer
  4:3

offshore
  5:20 6:10
  8:7 20:22
  28:13 34:2
oil
  3:3 5:11
  6:1,18,19
  13:4 16:13,
  16 20:20
  21:22 22:6
  23:17 31:8
  32:19 35:24
  36:20 38:10
oligarchic
  38:18
one's
  13:6
onshore
  8:7 20:21,22
open
  30:13
opened
  22:11
operate
  38:11
operation
  8:12
operators
  24:12,16
  29:8 30:8
  31:6 38:13,
  17
opinion
  24:20
opportunities
  11:20 13:24
  36:12 37:8
opportunity
  32:4,22
  36:15
opposed
  27:17
option
  15:3
order
  15:16 17:7
  27:21

orphaned
  11:2
outcome
  35:15
outer
  5:7
outlined
  32:1 33:22
owed
  28:11
owned
  7:8,9 16:15
owner
  20:19

_____

        P

P70
  14:20 33:4,
  5,6,17,21
  34:10
Pacific
  5:15
pages
  12:5
paid
  23:19 27:1
  31:11
Pandora's
  22:11
panel
  35:18
parameters
  4:18
parent
  25:16
part
  9:18 16:19
  17:11 19:9,
  16 23:22
  35:25
party
  12:13
pass
  25:18
passed

  31:19
past
  37:21
Pat
  7:1 9:11,22
  10:12 13:7,9
  17:1 18:5,
  13,17,18,19
  19:9,11,13,
  15 20:5,11
  22:12,13
  26:18,23
  27:3,20 28:2
  29:18,20
  31:18 34:24
  37:15 38:24
Pat's
  14:3
Patrick
  4:3 31:15
  34:15 37:5
  39:16
pay
  11:1 26:4
  27:6 28:6
  29:7 30:4
payer
  32:21
paying
  20:25 26:1
  27:17
payment
  7:11
payments
  5:22 24:21
pending
  15:12
people
  6:16 10:12
  25:24 26:16
percent
  6:17 14:21
perfect
  17:25 24:6
perform
  28:10 32:16

performance
  30:2,10 33:7
  34:8,9
performer
  30:4
performing
  26:25
period
  15:4 24:9,10
  31:9
periods
  9:1
perspective
  9:12 32:9
  37:9,17
phase
  24:9,10
phasing
  15:4
pick
  10:6 19:5
pictures
  12:5
piece
  17:3,4
pipeline
  11:2 33:19
place
  10:3 15:2
  20:23 29:10
planning
  39:25
platform
  11:2 16:14
platforms
  5:14
play
  9:15 28:5
  30:3
players
  29:6 38:19
playing
  31:14
pleasure
  3:25 4:8
plenty
  31:5

plugging
  19:25 29:24
  39:6
point
  5:23 16:6
  20:5,13 30:6
  36:23 37:25
pointed
  17:2,8
points
  14:12
popular
  29:10
portfolio
  30:1
position
  22:22 35:9
positive
  36:19
positives
  35:22 36:11
possibility
  38:12
post
  22:23
posted
  23:19
potential
  10:13 17:4
  27:5 35:11,
  14
potentially
  5:17 11:19
  23:15
Practice
  4:2,5
pre-qualify
  38:5
precedents
  9:18
predecessors
  10:7 19:6
  27:21,25
  28:10
prediction
  7:17 11:25

preexisting
  16:8 21:2
premium
  20:25 23:20
  37:9
prepare
  15:19
prequalify
  32:15
present
  13:3,11
  32:16
presentation
  3:10,17
  30:13 32:1
  35:22
presented
  32:12
presenters
  3:25 4:6
presidency
  15:10
president
  4:1,4 6:2
  15:6 31:22
presidential
  5:24
presiding
  18:7
pretty
  6:25 7:15
  12:10 19:9
  21:7
prevent
  23:8,13,16
prevents
  11:24
previous
  22:15,16
price
  21:19,22
  22:3,4,8,10,
  18,21
prices
  9:1 22:20
pricing
  22:6,14,16,

23
Primarily
  5:11
primary
  3:8 7:13
  32:8
principal
  20:24
prior
  21:2
private
  15:23,24
  16:4,8,9,19,
  20,22 39:6
pro
  19:25
probability
  14:21 33:18
problem
  5:1 23:8
  32:3,23
proceeding
  19:16,17
  23:4
proceedings
  18:3
process
  18:23
producers
  36:12
product
  9:15
production
  6:18,19 8:8
  29:7
profitability
  38:7
profitable
  32:5
program
  20:1
project
  26:7
prominent
  8:17
properties
  34:1,2

property
  29:14
proposed
  4:22 11:4
  15:9 31:19
  35:19,20
  36:8
protect
  38:5
protecting
  35:10
protects
  35:9
provide
  22:25 24:17
  27:5 30:8
  33:17 38:3
providing
  20:23 29:11
provisions
  22:12
public
  8:2 20:13
  23:5,9
published
  22:17
purchase
  23:23
pursue
  36:13
put
  10:3 12:14
  13:9 15:5
  28:19 29:15
  31:18 35:1
  37:20 39:25
  40:3
putting
  23:16
PV10
  21:17,19

─────────

Q

Q4
  8:5

**qualifies**
  38:1
**qualify**
  20:17 25:18
**question**
  12:11,22
  14:18,19
  19:8 21:16,
  20 28:22
  32:8 34:18
  35:17 38:8
**questions**
  3:14,15 4:25
  5:1,2 14:15
  21:14 26:15
  30:14,16,18,
  19 31:17
  33:1,3 36:9,
  10 39:10
**quick**
  15:22 16:11
  19:21 27:20
  33:14 38:23
**quo**
  12:20 36:4
**quotes**
  23:22

---

**R**

**raised**
  14:15 18:10
**rate**
  13:13
**rates**
  37:12
**rating**
  12:13,17
**ratio**
  13:2,18
  14:11 15:2
**reaching**
  9:3
**ready**
  30:17
**real**
  15:22 16:11

**19:21 27:20**
**32:10 33:14**
**38:23**
**reasonable**
  30:9
**reasons**
  21:3
**receipts**
  26:8
**receive**
  28:11
**receiving**
  21:1 38:3
**recent**
  7:25 9:4
  34:21
**reclamation**
  33:7 34:8,9
**record**
  23:5,10
**recorded**
  3:23
**recording**
  3:1,24 39:24
  40:5
**redetermined**
  33:23
**referenced**
  9:14 35:21
**referred**
  7:12
**region**
  4:20 5:12
  6:3,19 7:25
**registrants**
  3:23
**regulated**
  6:16
**regulation**
  4:11 12:5
**regulations**
  3:3 38:12
**regulatory**
  17:9,14 20:6
  32:2 38:24
  39:4

**reinsurance**
  9:8
**reinsurers**
  38:6
**related**
  16:9 32:14
  34:1
**relates**
  4:12 17:7
  18:22 19:3
  26:5 35:2
**relating**
  27:9
**release**
  12:21
**remain**
  32:5
**remains**
  14:18
**remember**
  25:10
**remind**
  30:15 39:19
**renaissance**
  30:25 31:1
**reorganizatio
n**
  19:18 31:10
**reorganizatio
ns**
  19:24
**reorganized**
  9:25
**replace**
  39:2
**Republic**
  3:6
**reputation**
  26:14
**request**
  23:21
**require**
  16:20
**required**
  12:25 13:22
  15:2 22:25
  28:23

**requirement**
  21:18
**requirements**
  5:12 21:22
  22:20 33:8
**rescinded**
  15:10
**reserve**
  13:2 14:10,
  17
**reserves**
  14:15 39:3
**reset**
  22:7
**resolved**
  16:2
**resource**
  31:7
**resources**
  4:2 5:10
  31:8
**response**
  23:6,10
  27:15
**responsible**
  5:6 6:15,20
  26:25
**Restructure**
  19:24
**result**
  17:5 23:2
  28:8 31:21
  33:7 34:9,14
  35:14
**retesting**
  22:3
**retrading**
  23:25
**revenue**
  6:15,21,22,
  24
**rights**
  27:22 28:5
**risk**
  17:9,14 20:6
  26:13 32:2,
  21 37:9

38:22,25
**risks**
  17:10
**role**
  17:3
**roost**
  9:17
**roughly**
  10:15
**royalties**
  6:23 7:11,14
**royalty**
  24:21
**rule**
  4:22 8:19
  10:23 11:4,
  15 15:4,9
  16:24 21:17
  23:11 25:3
  28:16 29:8
  35:20 36:4,
  8,11,17
**ruled**
  20:16
**rules**
  15:17 22:15
  23:7 31:18,
  19 35:23
  37:19
**ruling**
  24:15
**rulings**
  8:14 18:9
  20:7 26:9
**run**
  14:24 38:23
**running**
  8:5
**runs**
  17:13

———————
         S
———————

**S.E.C.**
  22:13
**Safety**
  33:15

**sale**
  18:14 23:23
**sales**
  6:23 18:6
**sat**
  28:3
**scaling**
  31:20
**scenario**
  17:8 27:22
**security**
  16:25 37:12
**select**
  19:16,17
  38:19
**selected**
  14:22
**selection**
  13:23 14:4
  17:2
**seller**
  16:10 23:18
**sellers**
  24:3
**selling**
  18:22
**seminar**
  3:2,5,12,15,
  19,20,21,22
  4:7 39:20,
  22,23 40:4
**seminars**
  3:7
**send**
  3:12
**Senior**
  4:1,4
**sense**
  8:20 24:1
  37:23
**sentiment**
  11:21
**session**
  3:11
**set**
  9:18 32:22

**setting**
  22:21 30:8
**severe**
  21:23
**severity**
  9:15,16,17
  10:20
**SFAA**
  35:5
**shaking**
  33:10
**shallower**
  34:2
**Shamapande**
  3:2,4 21:16,
  21 30:15
  31:15 32:25
  33:3,13
  34:15,18
  35:16 36:2
  37:5 38:8
  39:9,15
**shape**
  8:10
**share**
  3:22
**sharing**
  39:17
**sheets**
  38:6
**shelf**
  28:13 34:1
**Shell**
  16:13,16
**shelves**
  5:8
**shoes**
  28:7
**short**
  3:19 37:19
**show**
  8:19
**showing**
  26:8
**shows**
  8:6

**shut**
  23:2 24:19,
  23,24
**side**
  24:2
**silos**
  21:12
**similar**
  15:8
**simple**
  12:10 19:23
  26:6,7 27:1
**simply**
  9:25
**single**
  14:1 37:1
**sinking**
  28:22 29:12
  32:7
**sister**
  14:22 33:17
**sit**
  35:6
**sitting**
  28:15
**situation**
  15:8 16:3
**skis**
  31:10
**slide**
  4:13 8:1,16
  10:24 12:1,4
  17:22 25:20
**slides**
  7:23
**slow**
  12:22
**smaller**
  38:13,17
**smells**
  15:11
**snapshot**
  6:8
**software**
  12:17
**solar**
  5:19,20

sold
  9:25
solve
  16:18 32:3,
  4,23
solved
  25:14
somebody's
  32:15
Sompo
  4:4
Sompo's
  35:4
sort
  36:17
source
  6:24
South
  18:7
Southern
  20:2
space
  6:6 8:4,8,9,
  11,24 10:11,
  13 17:10
  20:21 31:2,
  6,14 35:24
  36:6 37:11,
  16 38:5,7
speaking
  27:16
Specialty
  4:2
specific
  13:4,15,16
  14:23 18:11
  19:18
specifically
  35:24
specifics
  4:21
spend
  27:18
spin
  19:5
squeeze
  38:13,17

stable
  29:9
staff
  39:25
stalking
  19:1
stand
  28:6
standpoint
  28:17
stands
  5:4 35:15
start
  11:8 35:21
started
  3:13 10:8
Starting
  10:2
starts
  9:15
stat
  6:22
state
  6:11 8:11
  15:14 21:7
  28:14 37:15
stated
  28:4,15
States
  5:7 6:10,25
  11:1 20:15
  26:21,23
  32:20
stating
  13:2
status
  12:20 36:4
statutory
  21:1
stay
  15:16 37:14
stellar
  24:12
step
  12:18 14:7
  32:23

steps
  23:12
stick
  7:4 10:6
stopped
  8:4
stopping
  5:1
stout
  29:8
strategy
  9:23,24 10:3
  18:24
streaming
  3:8
stress
  23:17
strong
  32:22
stronger
  37:12
struck
  23:17,24
structure
  7:10
structures
  37:12
sub-
investment
  24:11
submit
  3:14 30:16
subrogation
  28:5
subsidiary
  25:11,12,17
sued
  15:14
suffered
  27:14
suffers
  26:24
suggest
  20:14
sum
  27:6

summary
  17:19
supplemental
  11:14 12:25
support
  3:6 17:16
  30:8
supported
  10:17
supposed
  17:16
Supreme
  21:5
sureties
  7:13 10:4,6
  23:22 26:3
  27:3 28:23
  31:5 36:22
  38:21
surety
  3:6 4:2,4,5,
  17,20 7:7
  8:10,22
  11:17 13:23
  14:6 15:3
  16:22 17:24
  18:15 20:16,
  23 21:2,9,12
  24:11,14
  25:23 26:2,
  14 28:6
  29:1,13 30:8
  32:14,22
  35:2,22
  36:12,20,25
  38:1,3,9,11
surety's
  34:19
survive
  20:18
swing
  24:22,23
swinging
  17:11,15
sword
  24:22

synopsis
  34:22
synthetic
  12:15
system
  24:6

_____

      T
_____

tab
  3:11,12
table
  13:24 21:13
tail
  7:16
takeaway
  35:4
takes
  13:23
taking
  15:25 23:12,
  15
talk
  4:14 12:20
  18:5 23:6
  24:19 25:3
  28:21,22
  33:4 34:24
talked
  23:3 34:23
talking
  4:11 5:13
  6:13 7:4,16
  13:11,19
  16:7,18
  30:24 38:25
tax
  32:21
taxpayer
  11:1,8
temporary
  15:15
term
  28:25 30:5
  37:19 38:7
terms
  6:18 7:22

13:4 27:13
31:13 32:17,
19
territories
  18:4
territory
  7:9 8:20
test
  13:1 14:10,
  25 15:1
  21:18 22:1
  25:4 35:2
Texas
  6:12 18:7
  20:2
text
  11:3
thanking
  3:5
theory
  34:10,13
there're
  39:5
thereof
  5:22
thing
  14:25 15:11
  16:10 18:24
  24:24 25:10
  38:4
things
  7:2 20:1,8
  23:3 25:2
  26:16,18
  30:23 36:23
  39:7
thinking
  6:5
thought
  16:19 31:20
thoughts
  38:14
thousands
  6:20
threw
  18:6

thrown
  16:23
tied
  13:17 19:12
time
  3:14 6:22
  16:2 20:14
  23:18 30:9
  38:24
timeline
  9:11,15 28:3
times
  13:5,20
timing
  29:24
title
  16:11 28:9
titled
  3:3
today
  3:21 4:1
  5:13 7:4,18
  9:4 13:12
  31:13,19
  35:15 39:17,
  23
today's
  3:8,10,15,
  18,22,25 4:6
  13:12,15,20,
  21 29:7
  39:20
tomorrow's
  29:6
ton
  31:6
tool
  32:8
top
  7:15
topic
  30:21 31:16
totality
  32:13
touch
  8:15 9:21
  16:11 17:23

touched
  15:22 18:14
tragedy
  23:12
transaction
  16:10
treat
  16:25
tri
  12:5
Trump's
  15:10 17:5
trust
  25:23 26:2,3
trusted
  24:4
trustees
  26:11
tumultuous
  8:23
turn
  4:8
tying
  22:9
type
  4:16
types
  7:3 14:13
typically
  13:13

_____

      U
_____

U.S.
  5:9,19
ultimately
  30:10 35:9
  38:7,9
uncertainty
  17:13,23
unchartered
  8:20 18:4
underneath
  28:12
understand
  9:9 24:3

**understanding**
  37:17,19,20
**underwrite**
  17:24 36:13
  37:23
**underwriters**
  4:5 9:7,19
  11:17 12:16
  13:25 17:16
  18:10 36:13
  38:3
**underwriting**
  4:3 7:14
  9:12,20,21
  10:21 13:25
  29:4 37:4,16
**undue**
  23:16
**United**
  5:7 6:10,24
  11:1 20:15
  26:20,23
  32:20
**universal**
  22:3
**unjust**
  27:5,16
**unknown**
  23:1
**unlimited**
  22:11
**update**
  3:3 4:20
  33:25
**updated**
  33:5 34:4
**updates**
  39:17
**upfront**
  29:12
**upstream**
  8:8
**utilize**
  9:19,24
  13:25
**utilizing**
  35:7

**V**

**valid**
  26:4 34:21
**validity**
  35:11
**valuation**
  21:18
**variable**
  22:10
**vetted**
  24:4
**viability**
  26:13
**viable**
  24:4 25:23
**Vice**
  4:1,4
**video**
  3:1 40:5
**virtual**
  3:2,5,6,11,
  15,18,19,21,
  22 4:7
  39:20,22,23
  40:4
**volatility**
  37:18

**W**

**waiting**
  22:1 30:19
  31:16
**walked**
  10:22
**wall**
  11:6
**wanted**
  22:12 25:3
  34:16
**waste**
  7:21 21:11
**waterfall**
  25:6

**waters**
  5:9 6:11,16
  7:9 34:2
**website**
  33:22
**week**
  3:24
**weird**
  33:24
**wells**
  16:14 34:13
**white**
  17:6 28:20
**Wind**
  5:20
**windfall**
  8:14
**words**
  13:10 30:20
**work**
  26:25 27:25
  28:10 29:21
  30:8
**worked**
  32:6 35:5,7
**working**
  30:1 35:6
  38:20
**world**
  18:15 21:11
**worried**
  11:7
**worst**
  15:19
**worth**
  11:11,14,19,
  20 17:17
  24:11 36:25
**wrap**
  30:21 31:16
**write**
  31:5 37:1
**writing**
  11:5 25:8

**Y**

**year**
  8:22 15:4
  24:9,10
  34:11
**years**
  7:19 8:6,23
  11:18 17:11
  19:7 23:17,
  24 24:17
  33:25 34:5,6