# EXHIBIT 1 - REDACTED COPY (UNREDACTED COPY FILED UNDER SEAL)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| W&T OFFSHORE, INC., AND W&T ENERGY VI, LLC, | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § § | **CIVIL ACTION NO. 4:24-CV-3047** |
| ENDURANCE ASSURANCE CORPORATION, LEXON INSURANCE COMPANY, PENNSYLVANIA INSURANCE COMPANY, UNITED STATES FIRE INSURANCE COMPANY, APPLIED SURETY UNDERWRITERS LLC, AMYNTA HOLDINGS LLC D/B/A AMYNTA SURETY SOLUTIONS, AND INDEMCO, LP | § § § § § § § § § § § § § | |
| Defendants. | § § | |

## SECOND AMENDED COMPLAINT

W&T Offshore, Inc. ("W&T Offshore") and W&T Energy VI, LLC ("W&T Energy," and collectively with W&T Offshore, "W&T") file this Second Amended Complaint to seek declaratory relief, injunctive relief, and damages against Endurance Assurance Corporation, Lexon Insurance Company, Pennsylvania Insurance Company, United States Fire Insurance Company, Applied Surety Underwriters LLC, and Amynta Holdings LLC d/b/a/ Amynta Surety Solutions

(collectively, the "Surety Defendants"), whose cases were consolidated into this action,[1] as well as IndemCo, LP ("Broker Defendant").

*[remainder of page intentionally left blank]*

---

[1] Civil Action Nos. 4:24-cv-04113, 4:24-cv-04400, and 4:24-cv-04395 were consolidated into this action on November 22, 2024. *See* ECF 33. Thus, these parties are already joined in this action.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

    a.    Independent Oil and Gas Producers Play a Critical Role in American Energy Independence ............................................................................1

    b.    Insurance Companies Have Been Colluding on Rates and Terms for Independent Oil and Gas Producers to Increase their Own Profits ......2

    c.    This Conduct Has Harmed Competition and Violated Antitrust Laws 4

PARTIES ................................................................................................................6

OTHER RELEVANT ENTITIES AND INDIVIDUALS ..................................9

JURISDICTION AND VENUE ...........................................................................11

I.      FACTUAL BACKGROUND ......................................................................13

    a.    Oil & Gas Production in the Gulf of America ....................................13

    b.    Governmental Requirements to Operate in the OCS ..........................14

    c.    Plugging and Abandonment ("P&A") Obligations.............................15

    d.    Surety Bonds ......................................................................................16

    e.    The Role of Surety Bond Brokers ......................................................19

II.     W&T'S HISTORY OF LEADERSHIP IN THE GULF .........................21

III.    W&T'S BONDING WITH THE DEFENDANT SURETIES.................23

    a.    W&T and the Sompo Sureties.............................................................23

    b.    W&T and Penn/Applied.......................................................................25

    c.    W&T and USFIC/Amynta and its Predecessor Aspen .......................26

IV.    DEFENDANTS' ANTICOMPETITIVE SCHEME ...............................27

    a.    Direct Evidence of Collusion .............................................................27

        i.    Rate Fixing..............................................................................28

        ii.    Anticompetitive Information Sharing.....................................33

    b.    The Surety Defendants' Parallel Behavior..........................................36

        i.    The Surety Defendants agreed to use form indemnity agreements authored by the same broker. ...............................36

        ii.    The Surety Defendants implemented premium rate increases and made collateral demands to W&T and other Independents in similar amounts and at similar times...................................40

iii.  *The rate increases and collateral demands were not based on any independent triggering event or changed circumstance.* ....44

c.  Plus Factors Indicating Collusion ......................................................45

i.  *Market events between 2020 and 2024 gave sureties a strong motive to conspire and a pretext for their conspiratorial actions.* ...........................................................................................46

ii.  *An already concentrated market contracted even further, leaving it even more susceptible to collusion.* ..........................48

iii.  *The network of relationships between and among sureties and brokers further facilitated collusion.* ........................................50

iv.  *Trade associations and industry events gave sureties and brokers even further opportunities to conspire under the guise of legitimate educational and advocacy activities.* ...................52

v.  *The sureties routinely exchanged competitively sensitive information, using brokers as conduits.* ...................................57

vi.  *The sureties' actions would have been against their own self-interest unless they were coordinating.* ...................................59

vii.  *This is not the first time that several of these defendants have been accused of violating antitrust laws.* ................................60

V.  **THE RELEVANT MARKET, ANTITRUST INJURY & INTERSTATE COIMMERCE** ..........................................................................................**61**

a.  The Market for Offshore Surety Bonds ............................................61

i.  *The relevant product is surety bonds for oil and gas companies in the Gulf.* ...............................................................................61

ii.  *The relevant geographic market is nationwide.* .......................62

b.  The Surety Defendants and Other Surety Co-Conspirators Have Market Power in the Offshore Surety Bond Market ..........................63

c.  W&T's Antitrust Injury ....................................................................64

i.  *As a direct purchaser of surety bonds, W&T's injury from increased prices is classic competitive harm.* ..........................64

ii.  *The Defendants' scheme also caused other competitive harms, including decreased output and diminished competition.* ........65

d.  Interstate Commerce ........................................................................65

VI.  **OTHER VIOLATIONS** ....................................................................................**66**

a.  The Sureties' Breach of Indemnity Agreements ...............................66

*i.*     *The sureties demanded W&T pay full collateral without any triggering event.* .................................................................................66

b.     The Defendants' Interference with W&T's Other Contracts and Business Opportunities.................................................................71

*i.*     *Defendants knew their coordinated scheme would render it impossible for W&T to secure bonding.* ...................................71

*ii.*     *Defendants knew that their actions would impair financial opportunities for W&T.* ................................................................72

**CAUSES OF ACTION** ....................................................................................**73**

FIRST CLAIM.................................................................................................73

SECOND CLAIM ...........................................................................................74

THIRD CLAIM ...............................................................................................75

FOURTH CLAIM ...........................................................................................76

FIFTH CLAIM ................................................................................................77

SIXTH CLAIM................................................................................................79

SEVENTH CLAIM .........................................................................................81

EIGHTH CLAIM.............................................................................................82

**PRAYER FOR RELIEF**...................................................................................**83**

**INTRODUCTION**

1.      This case aims to end a long-running conspiracy and to stem coercive practices by a cartel of powerful insurance companies that have been directed at the nation's independent oil and gas producers.  For too long, these companies have prioritized their own profits over all else, and they have used their control over the market to set prices, dictate terms, and freeze out any company that dared to stand up to them.  These practices have suppressed and eliminated competition, and they have harmed independent oil and gas producers, U.S. taxpayers, and consumers.

      a.      **Independent Oil and Gas Producers Play a Critical Role in American Energy Independence**

2.      America's energy independence is a national priority.  Recent events have only further underscored its importance. The oil and gas reserves found beneath the Outer Continental Shelf (the "OCS") in the Gulf of America (the "Gulf") are a vital part of our Nation's energy resources.  As noted by the Secretary of the United States Department of the Interior, among others, these resources are crucial to lowering the cost of energy, reducing America's reliance on foreign oil, and providing jobs to hundreds of thousands of Americans.[2]

---

[2] *See* News Release, U.S. Department of the Interior (Apr. 10, 2025), available at https://www.doi.gov/pressreleases/interior-announces-major-increase-gulf-america-oil-and-gas-reserves.

3.    Independent oil and gas producers ("Independents") are a key part of the development and production of these resources.  W&T is an Independent that has been operating safely and reliably in the Gulf for over forty years, supplying oil and gas that benefits American consumers and paying royalties of approximately $1 billion to the United States government based on their successful extraction.  In short, when W&T and other Independents are able to operate without interference, a direct result is increased domestic oil and gas production that benefits both the United States economy and American consumers.

  **b. Insurance Companies Have Been Colluding on Rates and Terms for Independent Oil and Gas Producers to Increase their Own Profits**

4.    But for at least the last five or more years, large insurance companies have conspired for their own financial gain at the expense of W&T and other Independents, as well as the American taxpayer.  These insurers have held a critical input for Independents to operate in the Gulf—surety bonds.  "Financial assurance" such as surety bonds is required by the government to cover decommissioning obligations at the end of the productive life of a well.  Like any consumer of a product, Independents should be entitled to shop around and receive the benefit of a competitive market to get the lowest premium rates and best terms for surety bonds.

5.    Instead, emboldened by their power in a shrinking market of companies that offer these types of offshore surety bonds, the insurance companies have joined

together to align on rates and other terms for surety bonds and have forced Independents to accept their onerous terms because there are no viable alternatives. The conspiracy was simple—coordinate on general indemnity terms, raise premium rates, demand collateral, and refuse to do business with any company that does not play by their rules. According to a senior executive of one of the conspirators, if the whole surety industry stayed "disciplined" in this approach, all surety companies could continue to make money at the expense of their customers.

6.      Insurance is intended to cover losses—for example, with car insurance, you pay your premiums, and in exchange, if you crash your car, the insurance company pays to replace it. Insurance companies set premiums with the expectation that they will need to pay out on some percentage of the policies they write. But with surety bonds, the insurance companies' entire business model is based on the expectation that they will <u>never</u> incur a loss, while collecting millions of dollars in premiums nonetheless. Further, surety companies might demand that the bondholder post collateral—the equivalent of making <u>you</u> deposit the full price of a car in <u>their</u> bank account, for years, with no clear timeline for returning it, even if you are a safe driver with no history of crashes. At the same time, you are <u>still</u> required to pay premiums.

7.      In the last several years, this pure-profit business model was threatened by an unusual occurrence—some sureties were required to pay out to cover certain costs for two oil and gas operators who went bankrupt. In the face of this threat to their

3

unbounded profitability, and under the cover of other market events, sureties were motivated to find new ways to extract additional money through any means available to them.  The sureties knew that if they acted alone to raise premiums or demand collateral, Independents could shop their bonds around to a competitor surety.  Thus, absent an agreement to fix prices, the sureties could not raise prices without losing business to their competitors in the market.  So the sureties and their co-conspirators colluded to align on terms, extract artificially high premium rates, demand massive amounts of unreasonable collateral even **in the absence of any claims or losses**, and cut off access to the surety bond market to any company who did not agree to their extortionate terms.

  c. **This Conduct Has Harmed Competition and Violated Antitrust Laws**

8. The sureties' collusion and abuse of their outsized market power has stifled competition for surety bonds.  The sureties have become so emboldened by their market power that they have claimed that _they_——not the market, not the Department of the Interior, and not the oil and gas industry—can decide who gets to operate and produce oil and gas from the Gulf.  But accessing national resources to provide American consumers with affordable, domestic energy should not depend on whims of private surety companies and their desire for unfettered profits.  The ability to obtain surety bonding at a competitive price is not only W&T and other Independents' right as consumers of surety bonds, it is also critical to their ability to

acquire leases for oil & gas production. If collusion among the sureties precludes access to bonds, it will drive W&T and other Independents out of the market, harming not just W&T, but also domestic oil production and U.S. taxpayers.

9.    The nation's antitrust laws are designed to protect the economy from anticompetitive conduct. When competitors stop competing, and instead come together to agree on price-related terms, such collusive agreements are the "supreme evil" that antitrust laws seek to prevent. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Such agreements are *per se* unlawful, whether they are done openly or in secret, tacitly or expressly, directly or indirectly (i.e., through a broker), or whether they affect one person or many. No matter the motive or the reason, there are no legal justifications for price fixing.

10.    **Discovery in this case has now revealed that the Surety Defendants, the Broker Defendant, and their co-conspirators have been engaged in price fixing and other anticompetitive conduct *for years*.** Since at least as early as 2020, the Surety Defendants (aided by brokers, including but not limited to the Broker Defendant) have been sharing and coordinating with one another the premiums they charged W&T and other Independents. Every time an event threatened the sureties' profitability, they renewed their conspiratorial conduct, using industry meetings and other gatherings as cover for their coordination with competitors, and using proposed regulatory changes as pretexts to conceal their collusive conduct.

11.    This scheme not only violated the antitrust laws, but the Surety Defendants also breached their indemnity agreements with W&T, vitiated the expectations that W&T had after paying them millions of dollars in premiums and collateral over the years, interfered with W&T's ability to obtain new leases, wells, facilities, and financing, and threatened its business relationships and contracts with third parties.

12.    The Defendants' illegal conduct has harmed not only W&T, other Independents, and other operators, but also the American people and the federal government.  The behavior must be brought to an end to restore competition, and the Defendants must be required to pay for the damages their illegal actions have caused.

## PARTIES

13.    Plaintiff W&T Offshore is a corporation organized under the laws of the State of Texas with its principal place of business located in Houston, Texas.

14.    Plaintiff W&T Energy is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Houston, Texas.

15.    For purposes of this Complaint, W&T Offshore and W&T Energy are referred to collectively as "W&T."

16.    Defendant Endurance Assurance Corporation ("Endurance") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Mt. Juliet, Tennessee.  Endurance's parent company is Sompo

6

International Holdings Ltd., a member of the Sompo Holdings Inc. group of Japanese companies.

17.     Since at least 2020, Endurance has offered surety bonds to independent oil and gas operators on the OCS.

18.     Defendant Lexon Insurance Company ("Lexon") is a corporation organized under the laws of the State of Texas, with its principal place of business located in Mt. Juliet, Tennessee.  Lexon's parent company is Sompo International Holdings Ltd., a member of the Sompo Holdings Inc. group of Japanese companies.

19.     Since at least 2020, Lexon has offered surety bonds to independent oil and gas operators on the OCS.

20.     Because Lexon and Endurance have common management from their parent company, the two are collectively referred to herein as "Sompo" or "the Sompo Sureties."

21.     Defendant Pennsylvania Insurance Company ("Penn") is a corporation organized under the laws of the State of New Mexico with its principal place of business located in Omaha, Nebraska.

22.     Defendant Applied Surety Underwriters LLC ("Applied") is a company organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.  Applied was founded in 2022 and serves as a managing

general underwriter.  Applied has entered into agreements with insurance carriers that allow Applied to issue bonds under the registration of those companies.

23.    In 2023, Applied acquired the surety business of Argo Surety ("Argo").  Since at least 2020, Argo Surety offered surety bonds to independent oil and gas operators on the OCS.

24.    Since at least 2023, Applied has offered surety bonds to independent oil and gas operators on the OCS, on behalf of Penn.

25.    For purposes of this Complaint, Applied (and its predecessor Argo) and Penn are collectively referred to as "Applied."

26.    Defendant United States Fire Insurance Corporation ("USFIC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business and corporate headquarters located in Morristown, New Jersey.

27.    Defendant Amynta Holdings LLC d/b/a Amynta Surety Solutions ("Amynta") is a company organized under the laws of the State of Delaware with its principal place of business located in Glastonbury, Connecticut.  Amynta serves as a managing general underwriter.  Amynta has entered into agreements with insurance carriers that allows Amynta to issue bonds under the registration of those companies.

8

28.     In 2020, Amynta acquired the surety operations of Aspen Insurance Holdings Ltd. ("Aspen").  Since at least as early as 2018, Aspen had offered surety bonds to independent oil and gas operators on the OCS.

29.     Since at least 2020, Amynta has offered surety bonds to independent oil and gas operators on the OCS on behalf of USFIC.

30.     For purposes of this Complaint, Amynta (and its predecessor Aspen) and USFIC are collectively referred to as "Amynta."

31.     Together, Defendants Sompo, Applied, and Amynta comprise "the Surety Defendants."

32.     Defendant IndemCo, LP ("IndemCo" or "Broker Defendant") is a company organized under the laws of the State of Texas, with its principal place of business in Houston, Texas.  Since at least 2020, IndemCo has acted as a broker of surety bonds on the OCS.

33.     The Defendants' co-conspirators include certain other surety companies, brokers, and other individuals and entities who will become known during discovery.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

34.     Other companies who have offered surety bonds to independent oil and gas operators on the OCS at times during the relevant period include U.S. Specialty Insurance Company (USSIC), Philadelphia Indemnity Insurance Company

9

("PHLY"), DUAL North America ("DUAL"), RLI Insurance Company ("RLI"), Indemnity National Insurance Company ("INIC"), QBE Insurance Group ("QBE"), and Great Midwest Insurance Company (a subsidiary of Skyward Specialty Insurance). USSIC and PHLY are both owned by a Japanese group of companies referred to as the Tokio Marine Group.

35. Cobbs Allen Capital LLC d/b/a CAC Specialty ("CAC") is a company organized under the laws of the State of Delaware, with its principal place of business in Denver, Colorado. Since at least 2020, CAC has acted as a broker of surety bonds on the OCS.

36. McGriff Insurance Services LLC ("McGriff") is a company organized under the laws of North Carolina, with its principal place of business in Raleigh, North Carolina. McGriff and/or its predecessor entity has acted as W&T's "broker of record" at times during the period relevant to this complaint.

37. Patrick Hennesy is National Underwriting Officer for Sompo, a position he has held since 2019.

38. Jason Kilpatrick is Chief Underwriting Officer for Penn/Applied, a position he has held since 2023.

39. Josh Betz is President at Penn/Applied, a position he has held since 2022.

40. Mike Toppi is Chief Executive Officer at USFIC/Amynta, a position he has held since 2020.

10

41.    Hilary Killian is Regional Vice President, Surety for USFIC/Amynta, a position she has held since 2021.

42.    John Hohlt is Senior Vice President for CAC, a position he has held since 2021.

43.    Michele Tyson is Underwriting Manager for IndemCo, a position she has held since 2003.  Tyson has been described as "one of the sector's most influential and knowledgeable professionals."[3]

44.    Ed Frank is the Chief Executive Officer of IndemCo, a position he has held since the company's founding.

## JURISDICTION AND VENUE

45.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as W&T has alleged federal causes of action.  Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over W&T's claims under state law as they share a common nucleus of operative fact with the federal claims.

46.    The Court also has jurisdiction over this civil action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because this action arises under the antitrust laws of the United States.

---

[3] *See* Acrisure Website, "A 'Sure Thing' in Surety, Oil & Gas with InDemCo's Michele Tyson (Mar. 8, 2021), available at https://www.acrisure.com/news/a-sure-thing-in-surety-oil-gas-with-indemcos-michele-tyson.

11

47. This Court also concluded that federal question jurisdiction exists pursuant to the Outer Continental Shelf Lands Act ("OCS Lands Act"), 43 U.S.C. § 1331, et seq. *See* ECF No. 92 (citing 43 U.S.C. § 1349).

48. Venue is proper in this district under 28 U.S.C. § 1391 because the claims asserted in this action arose in this district and a substantial part of the events giving rise to the claims occurred in this district.

49. Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). The relevant agreement between W&T and the Sompo Sureties provides that: (i) the place of performance is Harris County, Texas; and (ii) the exclusive venue and jurisdiction for any disputes arising under that agreement lies with the federal and state courts sitting in Harris County, Texas. The relevant agreement between W&T and Applied provides that jurisdiction for any legal proceeding related thereto shall be Texas, or any state where W&T resides, has property, or performs, which includes Texas. All previously named parties have consented to the consolidation of the parties' lawsuits in this District.

50. Among other things, this civil action seeks declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure for the purpose of determining questions of actual controversy between W&T and the Defendants.

12

## I.    FACTUAL BACKGROUND

### a.    Oil & Gas Production in the Gulf of America

51.    A significant portion of the United States' crude oil production comes from extraction activities in the Gulf.

52.    The oil and gas reserves found beneath the OCS are vital to meeting the nation's energy demand, lowering the cost of energy, and reducing America's reliance on foreign oil. A tremendous amount of as-yet-undiscovered oil and gas is estimated to remain in the fields beneath the OCS—billions of barrels worth of oil and trillions of cubic feet of natural gas.[4]

53.    As Interior Secretary Doug Burgum recently stated, "America is sitting on a treasure trove of energy."[5] Obviously, unlocking these reserves is seen as a national strategic imperative. According to Secretary Burgum, "The Gulf of America is a powerhouse, and by streamlining permitting and expanding access, we're not just powering our economy—we're strengthening our national security and putting thousands of Americans back to work."[6]

---

[4] *See* BOEM, "2026 Resource Assessment Fact Sheet: Assessment of Undiscovered Oil and Gas Resources of the United States Outer Continental Shelf, 2026," available at https://www.boem.gov/oil-gas-energy/resource-evaluation/2026-assessment-undiscovered-oil-and-gas-resources-united-states.
[5] *See* News Release, U.S. Department of the Interior (Apr. 10, 2025), available at https://www.doi.gov/pressreleases/interior-announces-major-increase-gulf-america-oil-and-gas-reserves.
[6] *Id.*

54.    Virtually all large oil and gas companies ("Majors") extract oil and gas from the Gulf.  This includes Chevron, ExxonMobil, BP, and Shell.  However, smaller Independents play a crucial, often overlooked role.  Many wells, facilities, and/or leases operated by Majors are eventually transferred to Independents, whose leaner operations permit them to profitably continue extraction.

55.    According to the Independent Petroleum Association of America ("IPAA"), Independents hold 80% of the shallow-water leases in the Gulf and 75% of the deep-water leases.[7]  Their extraction efforts account for roughly 30% of oil production from the Gulf.[8]  Independents like W&T play a vital role in the production of safe, affordable, and reliable domestic energy in the United States.

### b.    Governmental Requirements to Operate in the OCS

56.    Congress passed the OCS Lands Act in 1953.  43 U.S.C. § 1331 et seq.  This statute affirmed that the United States has exclusive control over the OCS, which it defined as "all submerged lands" beyond the lands reserved to the States by the Submerged Lands Act, 43 U.S.C. § 1301 et seq., up to the edge of the jurisdiction of the United States.  *Id*. § 1331(a).

57.    The OCS Lands Act set forth a comprehensive scheme for the leasing and development of resources on the OCS.  43 U.S.C. §§ 1334 et seq.  Most relevant

---

[7]    *See* IPAA Website, "Offshore Energy," available at https://www.ipaa.org/offshore/.
[8] *Id*.

here, it specifically authorizes the Secretary of the United States Department of the Interior to issue regulations necessary to administer the statute and provide for sufficient mineral development on the OCS itself. 43 U.S.C. § 1334.

58. Compliance with these regulations is a condition of "[t]he issuance and continuance of any [OCSLA] lease." 43 U.S.C. § 1334(b).

59. In 2010, the Department of the Interior established the Bureau of Ocean Energy Management ("BOEM") to carry out conventional and renewable energy-related functions on the OCS. Dep't of the Interior Secretarial Ord. 3299 (May 19, 2010). BOEM's overarching directive is the development of offshore energy and mineral resources in an environmentally and economically responsible manner.

60. Order 3299 also established the Bureau of Safety and Environmental Enforcement ("BSEE"). *Id.* Among BSEE's primary responsibilities is to provide estimates to BOEM regarding the financial cost of estimated potential decommissioning.

c.    **Plugging and Abandonment ("P&A") Obligations**

61. Through federal statutes and regulations, the United States acts to ensure that oil and gas producers in the Gulf are financially able to meet the cleanup obligations that attach when a well or facility is decommissioned at the end of its productive life, often referred to as plugging and abandonment or "P&A" obligations. This is akin to returning the campsite to the way it was when you found it. Plugging and

abandonment obligations can be expensive, and ultimately, if all responsible entities were unable to pay those obligations, the United States government would be required to assume them as the owner of the OCS lands.

62. BSEE and BOEM work together to protect the United States from potentially incurring financial losses associated with decommissioning on the OCS in conjunction with the development of mineral and/or energy resources. One way this is accomplished is through supplemental financial assurance requirements—something BOEM's predecessor, the Minerals Management Service ("MMS"), put in place for all OCS leases and pipeline rights of way in 1997. *See* 62 Fed. Reg. 27948 (May 22, 1997).

### d.    Surety Bonds

63. Under the supplemental financial assurance requirements, Independents have been required to post surety bonds and/or other forms of security as a condition of securing or continuing a lease on the OCS. *See, e.g.*, 89 Fed. Reg. 31544 (Apr. 24, 2024). These bonds provide a safety net to ensure that oil and gas producers can satisfy their obligations to plug and appropriately abandon wells upon the expiration of the applicable lease.

64. As the Surety & Fidelity Association of America ("SFAA") explains, "a surety bond is a written agreement, often required by law, to guarantee performance or payment of another company's obligation under a separate contract or compliance

16

with a law or regulation."[9] It is a "three-party agreement between a principal (general contractor, business, or individual), the surety company (insurance company), and the obligee (government agency, private developer, or other parties)."[10] *Id.* In the context of surety bonds required by BOEM, the obligee is the United States.

65. As Sompo has stated, "[s]urety bonds are a form of financing" that "do not contemplate the surety incurring a loss." ECF No. 57 at 6. Amynta and Applied have likewise referred to surety bonds as "third-party credit." ECF No. 82 at 3.

66. Independents who require surety bonds typically enter into a General Indemnity Agreement ("GIA") with the insurance company, which sets forth the contractual relationship between the insurance company and the principal.

67. After a GIA is in place, bonds may be issued to the principal to cover specific wells, facilities, rights-of-way, easements, or leases, or to cover specific geographical areas. Bonds differ in their "penal amounts," which is essentially the maximum amount that the surety would theoretically pay out on a particular bond if an Independent failed to perform P&A obligations.

68. Pricing for individual bonds typically is expressed in relation to the total penal amount of the bond, and it has two key components. The first is the annual premium

---

[9] *See* SFAA Website, "What Is a Surety Bond?" available at https://surety.org/surety-fidelity/what-is-surety/.
[10] *Id.*

amount, also referred to as a "rate," which is usually expressed as a percentage of the penal amount of a bond. For instance, if a principal obtains a surety bond for $1 million, and the annual premium rate is 1%, the principal pays the surety $10,000 in annual premiums. The second is the collateral amount, if any, required to be paid, which is usually expressed as a dollar amount. This is also referred to as a "credit term" for the bond. The form of the collateral can vary—from cash to letters of credit to lien positions on certain assets, or, more often, nothing. Cash collateral is typically held by the surety company or a bank of its choosing, and, upon information and belief, interest on collateral is often retained by the surety, and is not paid or credited to the principal.

69. Premium rates and collateral amounts (if required) are supposed to be set by sureties independently. These are competitively sensitive terms, and, in a properly functioning market, sureties would compete with each other on these price terms to offer bonding to principals.

70. The terms of GIAs typically permit a surety to demand collateral or additional collateral when a triggering event occurs—for example, when a claim is filed against the principal. The purpose of collateral is to protect against the risk that the surety will be required to pay out of their own pocket to the bond's obligee.

71. Collateral terms—how much is required, when a surety can demand it, what form it may take—have a significant impact on the overall cost of a company's

bonding program. If an Independent, for instance, is required to post a significant portion of its decommissioning obligations upfront as collateral, it necessarily has less funding available for new leasing opportunities and other capital projects, including additional development and exploration. Typically, if collateral is provided by the principal, premium payments are still required, though they may be lowered.

72.    Sureties typically "reinsure" the surety bonds that they issue to further protect themselves against risk of loss. Reinsurers are sometimes companies within the same corporate family as the surety company, and sometimes they are third parties.

### e.    The Role of Surety Bond Brokers

73.    In the oil and gas industry, surety bonds are most often marketed and sold through intermediaries called "brokers" or "bond producers."

74.    Independents will typically designate a particular "broker of record" as their exclusive representative to engage on their behalf with regard to the handling, negotiating and placing of surety bonds for specific sureties.

75.    Sureties also utilize brokers to act on their behalf in the provision of surety bonding, including brokers who act for multiple competitor sureties.

76.    Typically, when an Independent needs to obtain a bond, it starts with its broker. The broker then reaches out to various surety companies—often referred to

as "surety markets"—to see which have capacity and interest in issuing bonding and on what terms.

77.    The brokers gain access to detailed information about both the principal's financial condition and the assets to be bonded, liaise with the surety's underwriting department, negotiate the financial terms of bonds, and manage millions of dollars in bonding spread across multiple sureties.

78.    The brokers' role as intermediaries leads to conflicting incentives.  On the one hand, brokers owe a duty to principals to get the best deal.  One the other hand, brokers depend on sureties' willingness to work with them on a repeat basis.  Further complicating the incentives, surety bond brokers are compensated by the surety companies through commission structures that increase with higher premiums.  In the offshore surety bond market, upon information and belief, brokers are paid commissions worth up to 40% of the premiums placed.

79.    This dichotomy is reflected in how brokers market themselves.  CAC, for instance, touts its "specialized approach in the Oil & Gas industry and longstanding global market relationships," promising that both "help our clients achieve holistic and cost-effective insurance and surety programs."[11]  At the same time, CAC pitches

---

[11]    CAC    Group    Website,    "Oil    &    Gas    Group,"    available    at https://cacgroup.com/industries/oil-gas/.

itself as an asset to the sureties as well, highlighting its "track record of developing profitable surety premiums."[12]

80.    During the time period relevant to this complaint, Defendant Sompo and other sureties have engaged IndemCo to act as their broker in connection with the placement of surety bonds.

81.    During the time period relevant to this complaint, Defendants Amynta and Applied have worked closely with CAC while marketing surety bonds.

## II.    W&T'S HISTORY OF LEADERSHIP IN THE GULF

82.    W&T was founded by its current CEO in 1983 with an initial investment of $12,000.  From those humble beginnings, W&T grew its expertise and stature in the Gulf, and in 2005, it became a publicly traded company.  In its forty-plus years of operating in the Gulf, it has **always** fulfilled **all** of its P&A obligations, spending well over $1 billion to do so.

83.    Since 2010, when surety bonding became required, W&T has paid over $75 million in premiums.  W&T was a good customer for sureties; it paid its premiums on time and did not miss payments.

---

[12]    *See* CAC Group Website, "Surety," available at https://cacgroup.com/capabilities/surety/.

84.    Over approximately the past decade, W&T has reduced net debt by over a billion dollars, and it has continued to strengthen its balance sheet and maintain strong liquidity.  In short, W&T has been a financially sound and stable company.

85.    For the full year 2023, W&T generated $183.2 million in Adjusted EBITDA and $63.3 million in Free Cash Flow.  In 2023, W&T redeemed all of its outstanding second lien notes due and issued new second lien notes, significantly reducing its debt and interest payments moving forward while strengthening its balance sheet. And at year-end 2023, W&T had a low leverage profile of 1.2 times Net Debt to trailing twelve months Adjusted EBITDA.

86.    In or about January 2024, W&T completed a significant acquisition of assets. While this acquisition temporarily reduced its cash balance, this acquisition was a longer-term capital investment that would ultimately strengthen the company's financial position and production capabilities.  W&T was also continuing on its trajectory to reduce debt.  W&T explained this information to each of its sureties, who were thus aware that there had been no material change in W&T's financial condition.    There were no claims on W&T's surety bonds, and there was no indication whatsoever that W&T would be unable to meet its eventual P&A obligations.

22

87. The actions of multiple sureties demanding collateral in coordinated fashion harmed W&T financially—in other words, the sureties' baseless "run on the bank" created an artificial financial crisis of their own making.

## III.    W&T'S BONDING WITH THE DEFENDANT SURETIES

### a.    W&T and the Sompo Sureties

88. In 2020, Broker IndemCo presented W&T with a general indemnity agreement titled "Payment and Indemnity Agreement No. 1380" on behalf of the Sompo Sureties. W&T executed that agreement in September 2020.

89. Since then, the Sompo Sureties have issued a number of surety bonds to W&T in connection with its P&A obligations.

90. Pursuant to Payment and Indemnity Agreement No. 1380, the Sompo Sureties issued the following surety bonds to W&T that remain in effect today:

| Bond No. | Surety | Amount |
|---|---|---|
| ZEACX226000039 | Endurance | $3,830,148.00 |
| ZEACX226000038 | Endurance | $1,482,000.00 |
| EACX226000025 | Endurance | $3,000,000.00 |
| EACX226000047 | Endurance | $2,285,584.00 |
| EACX226000044 | Endurance | $3,000,000.00 |
| EACX226000022 | Endurance | $1,461,000.00 |
| EACX226000043 | Endurance | $7,000,000.00 |
| EACX226000045 | Endurance | $125,000.00 |
| 1156846 | Lexon | $5,000,000.00 |
| 1159776 | Lexon | $3,000,000.00 |
| 1097677 | Lexon | $9,000,000.00 |
| 1152011 | Lexon | $376,688.00 |
| 1152010 | Lexon | $1,931,562.00 |

23

91.   The rights and obligations of W&T and the Sompo Sureties with respect to each of these bonds are set forth in Payment and Indemnity Agreement No. 1380, a true and correct copy of which is attached hereto as Exhibit 1.A.

92.   The Payment and Indemnity Agreement No. 1380 provides, in paragraph 3 entitled "Security":

> The Surety may at any time and from time to time hereafter, in its sole and absolute discretion, require the Principals to provide collateral, in form and amounts acceptable to the Surety (such amounts not to exceed the aggregate penalty sum of all then-issued Bonds) to secure the Principals' obligations to the Surety hereunder and/or to establish reserves to cover any actual or potential liability, claim, suit, or judgment under any Bond.

> Within thirty (30) days after the Surety has made written demand on Principals, each Principal shall execute such documents and take such further action as may be necessary in order to provide such collateral. Each Principal hereby grants to the Surety a security interest in all money and other property now or hereafter delivered by such Principal to the Surety, and all income (if any) thereon.

> If a Principal provides the Surety with a letter of credit or similar instrument, such Principal agrees that the Surety has the right to call on the same from time to time, in whole or in part and for any reason or no reason, and to hold the proceeds thereof as collateral for the obligations of the Principals hereunder.  Any collateral provided at any time by any Principal shall be available, in the discretion of the Surety, as collateral security on any or all Bonds heretofore or hereafter executed for or at the request of such Principal or any other Principal.

Ex. 1.A at ¶ 3.

93.   Both Endurance and Lexon joined in and issued surety bonds covered by the Payment and Indemnity Agreement No. 1380.   Accordingly, the Payment and

Indemnity Agreement No. 1380 governs both the relationship between W&T and Endurance and the relationship between W&T and Lexon.

### b.    W&T and Penn/Applied

94.    Since February 2023, when W&T and Applied executed a General Indemnity Agreement (the "Applied Indemnity Agreement"), Applied has issued a number of surety bonds to W&T in connection with its P&A obligations.

95.    Pursuant to the Applied Indemnity Agreement, Applied issued the following bonds to W&T on behalf of Penn that remain in effect today:

| Bond No. | Surety | Amount |
|---|---|---|
| SBP150328_001 | Applied | $1,119,122.00 |
| SBP150328_002 | Applied | $3,422,371.00 |
| SBP150328_003 | Applied | $3,839,974.00 |
| SBP150328_004 | Applied | $2,962,482.00 |

96.    The rights and obligations of W&T and Applied with respect to each of these bonds are set forth in the Applied Indemnity Agreement, a true and correct copy of which is attached hereto as Exhibit 1.B.

97.    In a striking "coincidence," similar to the Sompo Indemnity Agreement, the Applied Indemnity Agreement contains language concerning when Applied may demand collateral:

> [T]he Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to

25

discharge any Losses or to protect it from any potential or anticipated Losses.

Ex. 1.B at ¶ 4 (emphasis added).

### c.   W&T and USFIC/Amynta and its Predecessor Aspen

98.   Since 2018, when W&T executed a general agreement of indemnity, as amended by riders dated October 6, 2020, and May 21, 2021, with USFIC, Aspen, and/or Amynta (collectively the "Amynta Indemnity Agreement"), Amynta has issued a number of surety bonds to W&T in connection with its P&A obligations.

99.   W&T informed Amyta's predecessor, Aspen, in July 2018 that it was executing the general agreement of indemnity but doing so "under protest."

100.   Pursuant to the Amynta Indemnity Agreement, Amynta issued the following bonds to W&T that remain in effect today:

| Bond No. | Surety | Amount |
|---|---|---|
| 612410274 | Amynta | 16,333,000.00 |
| 612410259 | Amynta | 49,000,000.00 |
| 612410111 | Amynta | 10,045,025.00 |
| 612410074 | Amynta | 14,123,197.00 |
| 6134996232 | Amynta | 2,198,431.00 |
| 6134996313 | Amynta | 47,670.00 |
| 6134996304 | Amynta | 23,835.00 |
| 6134996295 | Amynta | 23,835.00 |
| 6134996286 | Amynta | 1,745,186.00 |
| 6134996277 | Amynta | 125,000.00 |

101.   The rights and obligations of W&T and Amynta with respect to each of these bonds are set forth in the Amynta Indemnity Agreement, a true and correct copy of which is attached hereto as Exhibit 1.C.

26

102. Like the others, the Amynta Indemnity Agreement contains language concerning when Amynta may demand collateral:

> Upon Surety's written demand, Indemnitors shall promptly deposit with Surety a clean, irrevocable letter of credit ("ILOC") on a form and from a bank acceptable to Surety, or shall provide another form of collateral acceptable to Surety (individually and collectively, the "Collateral") in the amount of any reserve Surety establishes for any existing liability or claim, and or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand. Further, Indemnitors expressly and specifically agree that Surety, in its sole discretion and for any reason, may, by written demand, require Indemnitors to provide the Surety with Collateral, as defined herein, within ten (10) days of their receipt of said demand, in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion. In the event of any increases in Surety's undischarged liability, Indemnitors shall supplement the Collateral to match the increase.

Ex. 1.C, May 21, 2021 Rider at ¶ 4.

## IV.  DEFENDANTS' ANTICOMPETITIVE SCHEME

### a.  Direct Evidence of Collusion

103. Even with the limited discovery received to date in this case, W&T has uncovered additional direct evidence of the Defendants' collusive scheme. Since at least as early as 2020, the Defendants and their co-conspirators have joined in a scheme to raise, stabilize, and/or fix the rates and financial terms for surety bonds, in part by using the Broker Defendant and others as conduits for their coordination and exchanges of confidential and competitively sensitive information. The Surety

Defendants and their co-conspirators also unlawfully agreed not to provide bonding to companies that do not agree to their rate and collateral demands.

        *i.*     *Rate Fixing*

104.  Since at least 2021, the Defendants have agreed to coordinate rate increases for common customers, including W&T.

105.  For example, on May 14, 2021, ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

106.  ███████████████████████████████████████

█████████████



107. ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████



108.  On information and belief, the Surety Defendants have regularly coordinated rate increases via broker-intermediaries on other occasions since 2021 in violation of the antitrust laws.

109.  Information regarding the precise details of their coordination is largely in the custody of the Surety Defendants and the Broker Defendant themselves, **which they have largely refused to produce**.  With that said, the casual nature of the coordination that W&T has uncovered makes it highly likely there is a great deal more for them to produce.

110.  As  an  additional  example,

30

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

111.   In November 2024, thinking they were speaking to a friendly audience of other industry participants, representatives from Sompo, Applied, and CAC admitted and affirmed their ongoing participation in the scheme during a seminar that was recorded.

112.   Patrick Hennesy of Sompo stated: "How we solve this problem of -- you know, and it's not a problem -- how we solve the opportunity so we can **collectively make money** and remain profitable on a go-forward basis is -- you know, is still being worked out. . . . **We are collectively moving that way** in terms of -- of changing our analyses, individually, and changing our terms and conditions, individually."   *See* Transcript, NASBP Presentation "Oil and Gas Industry: An Update on BOEM Regulations," Nov. 12, 2024 (hereinafter "NASBP Nov. 2024 Presentation Tr.") at 38:22–39:18 (emphasis added), a true and correct copy of which is attached as Exhibit 1.D.

113.   John Hohlt of CAC emphasized that "**there's definitely an opportunity here for money to be made if it's done in the correct manner**."   *Id.* at 44:14–16 (emphasis added).   Hohlt also emphasized both his alignment with the sureties and their market power, stating "You know, ***we* don't have to write a single – another**

31

**bond in the Gulf of Mexico**.  And so **it's really up to us to determine**, you know, what a good client is and what a good underwriting metric is going forward.  **The ball is in *our* court**."  *Id.* at 45:2–7 (emphasis added).

114.   Jason Kilpatrick of Applied stated that ". . . the market has firmed up.  You do have certain carriers exiting the space.  And so, I mean, that -- **that does allow for higher rates**, stronger security structures.  But nonetheless, I mean, we still -- as **an industry, we -- we must stay disciplined in this approach**."  *Id.* at 45:13–19 (emphasis added).

115.   Patrick Hennesy of Sompo confirmed his agreement with Kilpatrick stating **"Yeah, I'd second that."**  *Id.* at 45:20–21 (emphasis added).

116.   Hennesy continued on to emphasize the sureties' collective commitment to profits, and their market power and ability to boycott Independents who did not bend to their rules:  "And, you know, also, I think there's a -- you know, there is a way to underwrite this that makes sense and can -- **can allow us to -- to all make money**.  The -- the -- the point of John -- that John made around we can say, no, **not everybody qualifies for a surety bond, and that is – that's good.  That's a – that's a benefit that we provide as surety underwriters**."  *Id.* at 46:4–12

ii.    *Anticompetitive Information Sharing*

117.    Since at least 2020, the Defendants have agreed to exchange confidential and competitively sensitive information about bond pricing and credit terms with one another, using brokers as intermediaries.

118.    The Surety Defendants have routinely sought and received this information from brokers, and brokers, including the Broker Defendant, have willingly provided it.

119.    This unlawful exchange of information includes detailed information about the bonding programs of Independents, including W&T.  Most critically, **the Surety Defendants and Broker Defendant have routinely exchanged information about premium rates across various surety markets**.

120.    On July 6, 2020, for instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

33

121. In January 2022, █████████████████████████████████

████████████████████████████████████████████

██████████

122. On September 11, 2023, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

123. On September 19, 2024, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

34

124. The unlawful information exchange also extended to details about the Defendant Sureties' plans to demand collateral.  Indeed, the Surety Defendants routinely requested, and in turn were provided, this information from brokers.

125. In an April 2024 email █████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████

126. On May 28, 2024, ████████████████████████████

██████████████████████████████████████████

████████████████████████████████

127. In July 2024, ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

128. On October 17, 2024, ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

35

129. On October 21, 2024, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████

130. In short, the Surety Defendants have consistently used brokers to gain access to competitively sensitive information that they should not have had.

### b. The Surety Defendants' Parallel Behavior

131. W&T has also uncovered additional evidence suggesting coordination and collusion among the Defendants. More specifically, the Surety Defendants have engaged in strikingly parallel and near-simultaneous conduct concerning the negotiation, pricing, and execution of surety bonds.

132. This parallel conduct—set forth in more detail below—cannot be explained away. When viewed in context, it further demonstrates the Defendants' unlawful scheme.

### i. *The Surety Defendants agreed to use form indemnity agreements authored by the same broker.*

133. Since at least 2020, the Surety Defendants have also aligned with respect to the language and terms of the indemnity agreements that govern their bonding relationships with oil and gas companies. They have been aided in this endeavor by IndemCo, CAC, and other brokers.

36

134. Indeed, in a November 2024 presentation sponsored by the National Association of Surety Bond Producers ("NASBP"), **Patrick Hennesy of Sompo confirmed that he and Jason Kilpatrick of Applied had worked with John Hohlt of CAC and "other brokers" to create uniformity among industry players by drafting bond forms and standardized bond language**. *See* NASBP Nov. 2024 Presentation Tr. at 42:18–43:8.

135. IndemCo has also facilitated this alignment. For years, Indemco has published a "Sample PIA" on its public-facing website (illustrated below) and has persuaded multiple competitor sureties to utilize it when making agreements with Independents:

(06/01/17)                                                                          Principal Name /PIA No. _____

## Payment and Indemnity Agreement No. _____ (SAMPLE)

THIS PAYMENT AND INDEMNITY AGREEMENT (as amended and supplemented, this "Agreement") is executed by each of the undersigned on behalf of each Principal (as defined below) for the benefit of U.S. Specialty Insurance Company (the "Surety") in connection with any bond or bonds executed or to be executed on behalf of any Principal and to induce the Surety to execute or procure the execution of such bond(s) and any extensions, modifications, or renewals thereof, additions thereto, or substitutions therefor (the "Bonds"). The term "Principal" as defined and used herein shall mean any of the undersigned individuals or entities, as well as any and all affiliates, specifically including, without limitation, all wholly or partially owned subsidiaries, divisions or affiliates, and all partnerships, ventures or co-ventures in which any of the undersigned or any wholly or partially owned subsidiary, division or affiliate has an interest or participation, whether now existing or which may hereafter be created or acquired.

IN CONSIDERATION of the execution or procurement of the Bonds, and for other good and valuable consideration, the receipt and sufficiency of which the Principals hereby acknowledge, the Principals hereby agree, for themselves, their personal representatives, successors, and assigns, jointly and severally, as follows:

136. For example, in September 2020, when IndemCo presented W&T with the Payment and Indemnity Agreement No. 1380, it included not just one surety, but it

37

joined multiple competitors to the same agreement, including Sompo, USSIC, USFIC, Great Midwest (Skyward's surety), and QBE, among others.

137.   The agreement between W&T and yet another competitor surety, while ostensibly distinct, was virtually identical to IndemCo's form version. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

138.   In December 2023, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

139.   Alignment on the agreements' terms permits competitor sureties to agree on how to enforce them as well.  IndemCo's standard PIA, for example, includes terms governing premium payments, credit terms such as collateral, and interest rates on amounts past due.

140.   In a truly competitive market, sureties would compete by negotiating bespoke agreements and flexible terms in an attempt to win business from prospective oil and

gas company customers.  And brokers would encourage that competition, pitting sureties against one another to secure the best terms for oil and gas companies.

141.  Sureties and brokers alike recognize this is the way things *should* work.  In fact, the ability to design "custom" bonding programs tailored to the unique needs of each client is a mainstay of marketing in the industry.

142.  By way of example, DUAL Insurance notes its surety "team uses an evolved approach," with the tagline "credit + engineering = custom solutions."[13]  RLI Surety claims to offer "a wide variety of distinct bond programs tailored to your customers' needs."[14]  And even Sompo has insisted it is "willing to consider a wide variety of opportunities and seek[s] to formulate creative solutions."[15]

143.  Brokers assure prospective customers they are after the same thing.  For example, IndemCo claims its "sole purpose is to help develop a bonding strategy that fits your specific surety needs."[16]

---

[13]  *See* DUAL North America, "Commercial Surety Bonds," available at https://www.dualinsurance.com/us-en/products/surety/commercial-surety#:~:text=Credit%20%2B%20engineering%20%3D%20custom%20solutions.

[14]  *See* RLI Corp., "Products & Solutions," available at https://www.rlicorp.com/surety-bonds.

[15]  *See* Sompo, "Large Commercial Surety," available at http://web.archive.org/web/20251119050938/https://www.sompo-intl.com/wp-content/uploads/Large-Commercial-Surety-North-America-SellSheet.pdf

[16]  *See* IndemCo Website, "Why IndemCo," available at https://www.indemco.com/why-indemco/.

39

144.   Since at least 2020, however, these public-facing statements have been nothing more than window dressing designed to conceal the collusive conduct that was happening behind the scenes.   Rather than competing for business through innovation and flexibility, the Surety Defendants and Broker Defendant coalesced to increase rates and broker commissions by rallying around a standard form that they deemed "good for the industry."   Confident their competitors would hold the same line, the Surety Defendants have offered these GIAs largely on a take-it-or-leave-it basis.

> ii.     *The Surety Defendants implemented premium rate increases and made collateral demands to W&T and other Independents in similar amounts and at similar times.*

145.   During the relevant period of this complaint, W&T has received premium rate increases from sureties that hold its bonds, often occurring close in time and aligning on the same rates.   For example, in 2021, multiple sureties, including the Sompo Sureties, increased W&T's rates to the same level.   Multiple sureties continued to increase their rates to W&T through approximately January 2023.

146.   Upon information and belief, rates to other Independents also increased during this time period, and in a similar fashion.

147.   In early 2023, when some rates were beginning to soften, the sureties once again saw a threat to their profits.   Financial pressures from reinsurers also contributed to the motive of the sureties to collude to increase rates.   In June 2023,

like the bankruptcies that motivated the sureties to collude, another external event occurred—BOEM published a new proposed rule that would substantially increase financial assurance requirements for Independents (the "2023 Proposed Rule").[17]

148.  The 2023 Proposed Rule not only underscored the market power of the sureties, but it also gave them the perfect pretext to disguise their discussion of increased rates and collateral requirements.  In a competitive market, an unreasonable rate increase or collateral demand would likely cause the principal to move its bonds to a competitor offering better terms—a lower rate, no collateral, or both.  **If all sureties are demanding collateral and raising rates, the principal has nowhere to go—it must either agree to unreasonable terms or lose the ability to obtain the bonding that is essential to its business operations**.

149.  Because the 2023 Proposed Rule would increase demand for bonding, and because sureties were capacity-constrained on how many bonds they could ultimately write, it was a win-win for them to drive out any companies that refused their demands, and leave as customers only those companies that would play by their rules with higher rates and collateral.

150.  In the months that followed the publication of the proposed BOEM Rule, a number of meetings and discussions among sureties took place at industry gatherings

---

[17] *See* Risk Management and Financial Assurance for OCS Lease and Grant Obligations, 88 Fed. Reg. 42136 (June 29, 2023).

and in seminars, ostensibly billed as educational updates and discussions about the impact of the proposed BOEM Rule. Bolstered by their ongoing unlawful information exchanges, and under the pretext of the proposed BOEM Rule and other pretextual reasons, the Surety Defendants were able to align with respect to collateralization strategies and demands.

151. For example, in May 2024, just after meeting with other sureties at industry meetings, Sompo informed W&T that it was going to raise its rate and require collateral.

152. In June 2024, Sompo conveyed to W&T that it was "open to working on an all surety solution." Said another way, this was going to be a painful "shake-down" for W&T.

153. On July 2, 2024, PHLY informed W&T of a rate increase and made a demand for collateral of $31 million, a demand it subsequently raised to $71 million in November. *See* PHLY Demand Letter (Nov. 13, 2024) (attached as Exhibit 1.E).

154. On July 9, 2024, exactly one week later, Sompo sent W&T a formal collateral demand that W&T immediately put up collateral of $7.5 million in cash without any underlying support or explanation. If not paid, Sompo warned, the demand would increase to the full amount of W&T's Sompo bonds, $55.9 million. *See* Sompo Demand Letter (July 9, 2024) (attached as Exhibit 1.F).

155.   On July 10, 2024, one day after Sompo's demand letter, USSIC conveyed that it was seeking a premium increase.

156.   On July 25, 2024, PHLY indicated to W&T that they █████████████████████ ██████████████████████████████████████████████████████████████

157.   Later that same month, on July 31, 2024, USSIC demanded that W&T immediately deposit $23,000,000 in collateral.  *See* USSIC Demand Letter (July 31, 2024) (attached as Exhibit 1.G).

158.   In August 2024, ████████████████████████████████████ ██████████████████████████████

159.   On September 4, 2024, Applied sought a rate increase from W&T.  Shortly thereafter, Applied declined to sign an NDA with W&T specific to that rate increase, and it increased its rate on September 23, 2024.

160.   Shortly thereafter, on October 1, 2024, Applied demanded that W&T either release it from the bonds within 30 days or provide "collateral in the amount of 100% of all unreleased liability" under the bonds: $11,343,949.00.  *See* Applied Demand Letter (October 1, 2024) (attached as Exhibit 1.H).

161.   On October 14, 2024, Amynta demanded that W&T immediately deposit $89,501,222.00 as collateral.  *See* Amynta Demand Letter (October 14, 2024) (attached as Exhibit 1.I).

43

162. In October 2024, Amynta attempted to negotiate an "all surety solution" whereby all of W&T's sureties would agree on a range for premium increases to W&T, in addition to the receipt of collateral.

163. Upon information and belief, coordinated rate increases and collateral demands were made to other Independents during the relevant period.

> iii. *The rate increases and collateral demands were not based on any independent triggering event or changed circumstance.*

164. There was no independent triggering event for these collateral demands—no imminent bankruptcy, no force majeure, and no claims on W&T's bonds whatsoever.

165. Yet, over the course of approximately 100 days, for no reason other than eyeing the hundred-plus million dollars W&T was holding on its balance sheet, six of W&T's surety bond providers collectively made collateral demands that they knew would cripple W&T, requiring it to post a quarter billion dollars in cash to collateralize P&A obligations that were years, in some cases decades from being required to be satisfied:

| Date | Surety | Collateral Demand |
|---|---|---|
| July 9, 2024 | Sompo | $55,902,578 |
| July 31, 2024 | USSIC | $23,000,000 |
| Oct. 1, 2024 | Applied | $11,343,949 |
| Oct. 14, 2024 | Amynta | $93,492,509 |
| Nov. 13, 2024 | Philly | $71,000,000 |
| | **Total** | **$253,739,036.00** |

44

166.    W&T sought to resolve the sureties' demands in good faith.  For example, W&T offered to provide collateral to the sureties in forms other than cash or letters of credit.  But the sureties held fast and **jointly refused to back down from their demands to W&T**.

167.    W&T's financial status has remained substantially the same, and in fact has improved, since these sureties issued bonds to W&T, making it evident that the calls for collateral were coordinated and any reason offered by the sureties was pretextual.

168.    In a truly competitive market, the Surety Defendants would have competed to retain W&T's bonding business and explored reasonable, individualized solutions to mitigate any perceived increase in risk.  Instead, the Surety Defendants worked together with their co-conspirators and advanced coordinated increases and demands they knew would harm W&T.  In a collusive market, if the market held firm and refused bonding to W&T, the Defendant Sureties knew that it would send a strong message to other Independents not to attempt to resist their rate increases and collateral demands.

### c.    Plus Factors Indicating Collusion

169.    Several other factors combine to suggest the Defendants' parallel conduct was the product of coordination and collusion.

45

> i.   *Market events between 2020 and 2024 gave sureties a strong motive to conspire and a pretext for their conspiratorial actions.*

170.   First, certain events between 2020 and 2024 caused changes in the surety market.  Chief among them were the high-profile bankruptcies of two independent oil and gas companies: Fieldwood Energy LLC in 2020, and Cox Operating LLC in 2023.

171.   The bankruptcy plan approved in *Fieldwood*—and later affirmed by the Fifth Circuit (*see Matter of Fieldwood Energy LLC*, 93 F.4th 817, 820 (5th Cir. 2024))—deprived sureties of subrogation rights against subsequent purchasers of oil and gas assets who later defaulted on their decommissioning obligations.

172.   How to respond to this new environment became the talk of the surety industry.  While W&T has not yet received discovery on earlier time periods, discussions about the bankruptcies were ongoing into 2024.  For example, in a June 2024 seminar sponsored by CAC, ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████   While CAC's John Hohlt was the moderator of this panel, the speakers included a cast of competitors:

Hilary Killian of Amynta, Patrick Hennesy of Sompo, Kjel Brothen of DUAL, and Josh Betz of Applied.

173. In other words, sureties and brokers recognized that *Fieldwood*, *Cox*, and other bankruptcy decisions had changed the surety bonding market; **and this shift created a clear incentive to collude**.

174. In a competitive market, increasing premiums or demanding more collateral in response to market events would be a risky endeavor, as competitors could undercut one another in an effort to take or retain share. Said another way, **absent coordination among competitors, a normal market would not have moved so quickly or so uniformly**.

175. The uptick in bankruptcies, along with a paradigm shift in how sureties were treated in the Cox and Fieldwood bankruptcy proceedings, created the incentive for sureties and brokers to change their model, but only if they could do so in a coordinated fashion—i.e., what Hohlt of CAC called "the correct manner." *See* NASBP Nov. 2024 Presentation Tr. at 44:14–16.

176. Second, the 2023 Proposed BOEM Rule—which was finalized and implemented by the outgoing Biden Administration in 2024—provided an additional opportunity to conspire.

177. This rule, entitled Risk Management and Financial Assurance for OCS Lease and Grant Obligations, would have increased the total amount of bonding required

for exploration activities in the Gulf.  But because it limited financial assurance obligations to leases with no investment-grade producer lessees or predecessor in the title chain, many in the bonding community were opposed to the 2023 Proposed Rule.

178.   The 2023 Proposed Rule notice and comment period, and ultimately the Final Rule, offered not only an opportunity to collude, therefore, but a pretext to discuss detailed perceptions about the state of the market, future intentions vis-à-vis capacity, and likely responses on pricing and credit terms.

179.   In effect, the Defendants used the 2023 Proposed Rule as an opportunity to once again come together and discuss how to "collectively" change the terms of how the "industry" would provide surety bonding in order to "make money."

> ii.    *An already concentrated market contracted even further,*
> *leaving it even more susceptible to collusion.*

180.   During the relevant time period, the already-concentrated market of companies offering surety bonding contracted even further, which facilitated collusion.

181.   While the list of government-approved surety bond companies—published in Treasury Department Circular 570—is lengthy, the subset of those companies that actually write surety bonds to cover operations in the Gulf is far more limited.

182.   Indeed, in its June 2024 seminar, ███████████████████

███████████████████████████████████████

48

█████████████████████████████████████████████

████████████████████████████████████

183. ████████████████████████████████████████

████████████████████████████████████████████

████████████████



184. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

185. The market contraction created the perfect environment for collusion: a limited field with an even smaller number of large players.

49

> iii.    *The network of relationships between and among sureties and brokers further facilitated collusion.*

186.   The surety bond market is not only concentrated but also bound together by a network of close and cross-cutting relationships that span decades.

187.   It is very common for executives at surety companies to have previously worked for a competitor surety.  For example, Patrick Hennesy, who is Sompo's National Underwriting Officer, previously worked at both PHLY and RLI.  Other senior surety officers at Sompo previously worked for QBE, Tokio Marine (USSIC/PHLY's parent), and Chubb.

188.   Jason Kilpatrick, Applied's Senior Vice President, also previously worked at RLI (where he overlapped with Hennesy for several years), and one of Applied's underwriting officers worked as a Vice President of surety at Sompo in the 2023-2024 time period.

189.   Hilary Killian of Amynta previously worked at both Everest and Argo, the latter of which was founded by Josh Betz of Applied.  And Amanda Wickman of PHLY previously worked for RLI (where she also overlapped with both Hennesy and Kilpatrick).

190.   This cross-pollination also extends to the brokers.  John Hohlt of CAC previously worked for Argo (overlapping with both Betz and Killian).  An employee of McGriff previously worked for both Amynta (where he overlapped with Mike

50

Toppi) and PHLY.  And Ed Frank, who founded IndemCo, previously worked for USSIC's parent company, Tokio Marine.

191.   In addition to their overlapping employment relationships, representatives of the Surety Defendants and the brokers also belong to the same trade associations where they serve on the same committees.

192.   Each of the Surety Defendants is a member of the Surety & Fidelity Association of America ("SFAA"), where Patrick Hennesy of Sompo and Jason Kilpatrick of Applied have served together on the Energy & Mining Working Group.

193.   Both IndemCo and CAC are members of the National Association of Surety Bond Producers ("NASBP"), and each of the Surety Defendants is an affiliate member of the same organization.  The NASBP has a Commercial Surety Committee which "emphasize[s] how Commercial Surety products can be a lucrative market for surety bond producers."[18]

194.   The Defendants relied heavily on these relationships that had been forged over decades in the industry, referring euphemistically to the competitively sensitive access they afforded as ███████

195.   In short, since at least as early as 2020, the surety bond market has not been comprised of arms-length competitors acting in their own individual interests, but of

---

[18]   *See* NASBP Website, "Committees," available at https://www.nasbp.org/networking-events/committees/.

a close-knit group of current and former colleagues, fellow committee members, and close friends doing what they collectively deemed best for "the industry."

> iv.    *Trade associations and industry events gave sureties and brokers even further opportunities to conspire under the guise of legitimate educational and advocacy activities.*

196.   These relationships did not die on the vine.  Rather, they were given every opportunity to deepen and flourish through a series of industry conferences, seminars, and social events put on by the two main trade associations: the SFAA and the NASBP.  Both SFAA and NASBP hosted numerous annual and other meetings and events each year during the relevant time period, including a joint "Legislative Fly-In" in Washington, D.C. on February 29, 2024.

197.   It was common practice for sureties to host (and pay for) brokers at their own gatherings as well.  ████████████████████████████████████

████████████████████████████████████████████████

198.   From April 30, 2024, through May 3, 2024, NASBP held its annual meeting. The meeting's theme was "ALL IN" and was sponsored by multiple competitor sureties, including Sompo, Applied, and USSIC's parent company, among others. During the course of this meeting, ████████████████████████████

████   An employee of broker McGriff and John Hohlt of CAC were among the invitees. The following night, Sompo hosted a more formal "Sompo NASBP Reception," to which Hohlt was again invited, along with employees of McGriff.

52

199.  On May 9, 2024, SFAA hosted its Annual Meeting.  Shortly after this meeting,

███████████████████████████████████████████████████████

██████████████████████████████████

200.  On or about May 7, 2024, immediately in between these two key trade association meetings, CAC announced that it would be hosting a presentation in June 2024.  █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

201.  The June 2024 presentation sponsored by CAC was entitled "BOEM Proposed Rule Changes" and was moderated by John Hohlt, with Hilary Killian of Amynta, Patrick Hennesy of Sompo, Josh Betz of Applied, and Kjen Brothen of DUAL participating as panelists.

202.  But the presentation went beyond just updating the audience on the proposed changes to BOEM regulations.  ██████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████



203. In August 2024, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

205. Another key industry meeting occurred in November 2024, a presentation sponsored by NASBP that was entitled "Oil and Gas Industry: An Update on BOEM Regulations." The three panelists were John Hohlt of CAC, Patrick Hennesy of Sompo, and Jason Kilpatrick of Applied. ████████████████████

████████████████████████

54

206.   The presentation was heavily marketed by NASBP and others.  The lineup of Hohlt, Hennesy, Kilpatrick, and ████ was especially enticing because of their stature, dominance, and influence in the industry.  ██████████████████

██████████████████████████████████████████

██████████████████████████████  **In short, when these individuals spoke, the surety industry listened**.

207.   Kilpatrick, Hennesy, and Hohlt each spoke during the presentation, and again covered far more than a simple update on BOEM regulations.  As previously set forth above, the presentation quickly became a granular strategy session spearheaded by supposed competitors.

208.   Speaking about the state of the industry generally, Kilpatrick explained that "everyone [had] started generating heartburn trying to figure out, okay, **_we_ used to make a lot of money; now _we're_ not**."  NASBP Nov. 2024 Presentation Tr. at 11:11–13 (emphasis added).  And in what emerged as a central theme, Kilpatrick asked: "So how do _we_ move forward on this space?"  _Id_. at 11:13–14.

209.   Hohlt echoed the same sentiment: "Bankruptcies have occurred.  You know, losses will be paid.  But how can we now carry forward with this industry as it looks today and kind of, you know, **what are the new terms and conditions of playing in this space**?"  _Id._ at 38:2–6 (emphasis added).

55

210. The same question was on Hennesy's mind as well: "How we solve this problem of – you know, and it's not a problem – **how *we* solve the opportunity so *we* can *collectively* make money** and remain profitable on a go-forward basis is – you know, **is still being worked out**." *Id.* at 38:22–39:2 (emphasis added). Hennesy's reframing of a "problem" as an "opportunity" is telling, as he expressly recognized that it depended on coordinated, rather than independent, action. "We are *collectively* moving that way," he explained, "in terms of – of changing *our* analyses"—before catching himself and adding "individually, and changing our terms and conditions, individually." *Id.* at 39:15–18 (emphasis added).

211. All three also made clear that they viewed the sureties as in charge. "You know, *we don't have to write a single – another bond in the Gulf of Mexico*," Hohlt pointed out, "[a]nd so **it's really up to us to determine**, you know, what a good client is and what a good underwriting metric is going forward. **The ball is in *our* court**." *Id.* at 45:2–7 (emphasis added).

212. Henessy agreed that "there is a way to underwrite this that makes sense and can – **can allow *us* to – to all make money**," adding that "*we* can say, no, not everybody qualifies for a surety bond, and that is – that's good. That's a – that's a benefit that *we* provide as surety underwriters. So not everybody receiving a bond is also a good thing." *Id.* at 46:5–13 (emphasis added). These statements

56

underscored an obvious agreement among competitor sureties not to deal with any customer who did not play by their rules.

213.   Finally, Kilpatrick underscored that "the market has firmed up [with] certain carriers exiting the space."  That "does allow for higher rates, stronger security structures," and again, he emphasized the need for competitors not to undercut each other, stating: "nonetheless, I mean, **_we_ still – as an industry, _we_ – _we_ must stay disciplined in this approach**."  *Id.* at 45:13–19 (emphasis added).

214.   In short, the November 2024 "seminar" turned into a textbook example of co-conspirators affirming their commitment to a common scheme for the industry to "stay disciplined" and toe the line so that everyone could "make money."

> *v.    The sureties routinely exchanged competitively sensitive information, using brokers as conduits.*

215.   As set forth above, the Surety Defendants routinely shared confidential and competitively sensitive information with one another—both directly and by using brokers as conduits.

216.   This competitively sensitive information included numerous aspects of the Surety Defendants' offerings on which they were purportedly competing, including premium rates, credit terms, and the language of indemnity agreements.

217.   This transparency was no oversight.  **Both the Surety Defendants and the brokers knew the information they were exchanging was confidential**.  To begin, the sureties and brokers signed various confidentiality and non-disclosure

57

agreements with W&T that encompassed pricing, costs, and other confidential information.

218.　W&T, moreover, repeatedly expressed concern that competitively sensitive information about its relationship with one surety would be leaked to another, directly or via the brokers.　For example, in January 2022, W&T reiterated this concern to Michele Tyson of IndemCo, ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

219.　And in September 2024, ███████████████████

████████████████████████████████████

████████████████████████████████████

████████

220.　If that weren't enough, the SFAA—to which all of the Surety Defendants belong—has for more than two decades maintained Antitrust Compliance Guidelines that warn:

> ***No member of the Association shall discuss rates or any element of rates***, including insurer rate levels, insurer loss cost levels, or plans for what the advisory loss cost levels ought to be for any line of insurance for any jurisdiction. Except for the activities of authorized committees, no member of the Association shall discuss any methodology for determining rates. . . .

> Members shall not discuss or disclose information on ***any competitively sensitive practices***, including pricing, bidding, underwriting guidelines, terms or conditions of coverage, product development, customers, marketing plans and agent and broker compensation.

Yet these guidelines appear to be nothing more than lip service—this is not the first case that has alleged that the SFAA has facilitated unlawful coordination among competitors. *See In re California Bail Bond Antitrust Litigation*, No. 4:19-cv-0717 (N.D. Cal.), ECF No. 513, at 3-4 (describing SFAA's role in multi-decade price-fixing conspiracy on bail bonds).

221. Despite their knowledge that sharing this type of information was improper, when the Surety Defendants received detailed information about the rates their competitors were charging, they, at best, remained silent, and indeed, actively encouraged brokers to continue to obtain and share competitively sensitive information.

> vi.  *The sureties' actions would have been against their own self-interest unless they were coordinating.*

222. Further suggesting conspiracy, the Surety Defendants' actions, along with their co-conspirators, were against their self-interest in the absence of coordination. The Surety Defendants should have been competing with one another to win and retain business. **Exchanging sensitive information about capacity, pricing, and credit terms runs counter to that goal—unless it is part of a coordinated plan to act collectively**.

223. So too, making potentially crippling collateral demands to W&T was against the interest of the Surety Defendants as it threatened millions of dollars in annual premiums by pushing W&T to the financial brink. It is not in the interest of a surety to put its longstanding customers out of business—again, unless it is part of a coordinated plan to send a message to Independents that the sureties have the power to "say, no, not everybody qualifies for a surety bond," the organization to "stay disciplined" as an industry, and the leverage to "collectively make money" at the Independents' expense. *See* NASBP Nov. 2024 Presentation Tr. at 38:24–25, 45:18–19, 46:9–10.

> vii. *This is not the first time that several of these defendants have been accused of violating antitrust laws.*

224. Certain of the Surety Defendants have been previously sued for violations of the antitrust laws. Although the violations encompassed a different product (bail bonds), the bonding industry's coordination and coziness has a history that has been recently exposed.

225. As noted above, a long-running class action alleges that on of the Sompo Sureties (Lexon), USFIC, and others conspired to fix the rate of bail bonds in California. The Third Amended Complaint in that case alleges similar collusive methods to those alleged here, including coordination through activities sponsored by the SFAA. Several motions to dismiss have been denied, Lexon recently paid to settle the claims against it, and USFIC is currently negotiating a settlement in the

case. *See generally In re California Bail Bond Antitrust Litigation*, No. 4:19-cv-0717 (N.D. Cal.).

## V.    THE RELEVANT MARKET, ANTITRUST INJURY & INTERSTATE COIMMERCE

226.   The relevant antitrust market is the nationwide market for surety bonds for oil and gas companies obtaining or taking over a lease for oil and gas exploration on the OCS of the Gulf.

### a.    The Market for Offshore Surety Bonds

#### i.    *The relevant product is surety bonds for oil and gas companies in the Gulf.*

227.   The relevant product market is the market for offshore surety bonds for oil and gas companies obtaining or taking over a lease for oil and gas exploration on the OCS of the Gulf ("offshore surety bonds").

228.   The barriers to entry for sellers participating in this market are high.  Not only must a surety bond provider be approved by the U.S. Treasury Department and included on Circular 570 (as well as licensed by the relevant state), but also the capital requirements for participation in this market are extremely high.  Moreover, due to the level of risk involved, sureties must be eligible for and able to obtain reinsurance to cover their bonding obligations.

229.   From the customer's perspective, there are few alternatives available to a surety bond if the independent oil and gas company is going to conduct exploration activities in the Gulf.  Financial assurance is required by federal law, and while

61

alternative forms of financial assurance other than surety bonds may be available for certain operations, those alternatives (such as cash escrow accounts and self-bonding) are largely not available for Independents that lack an investment grade rating or the financial statute of the Majors, especially after the Independent has purchased an asset. Allowing surety bonds as a form of acceptable financial assurance is designed to ensure that Independents can continue to participate in Gulf exploration.

*ii.    The relevant geographic market is nationwide.*

230.   The relevant geographic market for offshore surety bonds is nationwide.

231.   The Surety Defendants in this case—who ostensibly compete with one another on surety products—operate from a variety of locations across the United States.

232.   While the relevant offshore oil and gas exploration occurs on the OCS, there is no geographic limitation on where surety bonds may be written from. The only limitation is that the surety company must appear on Treasury Circular 570. To be included on that list, the surety must be licensed to operate in a U.S. state or territory, which precludes a geographic market any broader than nationwide.

**b.    The Surety Defendants and Other Surety Co-Conspirators Have Market Power in the Offshore Surety Bond Market**

233.    The market power of the Surety Defendants (and their surety co-conspirators) market power is evident from their actual ability to increase prices at various points during the relevant period.

234.    Additionally, their market power is evident from other factors as well.  For example, there are high barriers to entry for the offshore surety bond market, including capital requirements and other requirements to become a federally certified entity.

235.    The Surety Defendants and their surety co-conspirators collectively possess market power in the offshore surety bond market.  While precise market shares will be revealed through discovery, upon information and belief, the Surety Defendants and their surety co-conspirators control a substantial and dominant percentage of the relevant market.

236.    The inability of Independents to replace or move bonds is another indicator of the market power of the Surety Defendnats and their co-conspirators.

237.    And for the reasons described above, for Independents, there are functionally no close substitutes for surety bonds.

### c. W&T's Antitrust Injury

*i. As a direct purchaser of surety bonds, W&T's injury from increased prices is classic competitive harm.*

238. W&T has suffered antitrust injury as a result of the Defendants' unlawful scheme.

239. As a direct purchaser of surety bonds, W&T was injured when the Defendants conspired to increase premiums, make collateral demands, and share confidential information. W&T also suffered antitrust injury when the Defendants conspired to boycott W&T and prevent it from being able to acquire a necessary input for its offshore oil and gas operations (i.e. surety bonding).

240. These are precisely the sorts of injuries the antitrust laws were designed to redress. **The Defendants' scheme led to higher prices in the relevant market, as well as more restrictive credit terms**. It also created a substantial risk that W&T would as a result be excluded as a seller in the downstream market for petroleum and natural gas. Because surety bonding is a vital input for participation in that market, boycotting W&T by refusing to offer anything other than unreasonable and onerous credit terms is a classic exclusionary injury.

241. The Defendants' scheme also caused myriad other harms to W&T—financial and otherwise. For example, as a result of the conspiracy, W&T's stock price fell, financing opportunities contracted, business relationships were jeopardized, and the

company's growth was impaired because W&T was unable to secure critical bonding.

> ii. *The Defendants' scheme also caused other competitive harms, including decreased output and diminished competition.*

242. The Defendants' scheme also inflicted a host of other competitive harms against which the antitrust laws were intended to guard.

243. By agreeing to fix or stabilize premiums and make coordinated collateral demands, the Defendants deprived independent oil and gas companies of the benefits of robust competition, including the innovation, flexibility, and lower pricing one would expect to see in an industry whose participants are not coordinating with one another.

244. The Defendants' scheme also led to decreased output, as they agreed with one another to artificially limit supply in an attempt to drive up profits.

### d. Interstate Commerce

245. The Surety Defendants, who are federally certified, issued bonds to W&T for its operations on the federally controlled OCS. The Broker Defendant acted as an intermediary in connection with obtaining those bonds. Both the Broker Defendant and the Surety Defendants are organized and operate across many states, including Delaware, Tennessee, Texas, New Mexico, and New Jersey, and work together to issue bonds to companies like W&T throughout the United States.

246. The Defendants' conduct was in the flow of, and substantially affected, interstate trade and commerce and caused antitrust injury throughout the United States.

## VI.  OTHER VIOLATIONS

### a.  The Sureties' Breach of Indemnity Agreements

> *i.  The sureties demanded W&T pay full collateral without any triggering event.*

247. In addition to violating the antitrust laws, the Defendant Sureties' coordinated demands for rate increases and collateral were made in bad faith and were impermissible under the terms of the respective indemnity agreements.

248. Under the Sompo Indemnity Agreement, the Sompo Sureties could each individually demand collateral only "to cover any actual or potential liability, claim, suit, or judgment under any Bond."  Ex. 1.A at ¶ 3.

249. Neither at the time of the demand, nor since, has any "actual or potential" liability, claim, suit, or judgment existed "under any Bond" issued to W&T—by Sompo or anyone else.

250. At all times, W&T has complied with the Sompo Indemnity Agreement and paid all agreed-upon premiums for all bonds issued by the Sompo Sureties.  W&T has also remained solvent and capable of meeting its financial obligations.

251. There was no basis or justification—either financially or under the Sompo Indemnity Agreement—for Sompo to demand collateral from W&T.

252. Rather, Sompo's demands were in keeping with the so-called rules that had been collusively set for by the insurance industry to "collectively make money," as was the retaliatory escalation of their demands when W&T refused to submit to their unfounded demands.

253. Despite its consistent financial health, in 2024, W&T became one of Sompo's first targets in its scheme with other sureties when W&T refused to accept Sompo's demands involving assuming non-W&T bonds.

254. Specifically, Sompo had previously issued bonds to Fieldwood, prior to that company entering bankruptcy in 2020. Quarter North Energy ("QNE") subsequently acquired a portion of Fieldwood's assets, some of which were later sold to W&T.

255. As part of that transaction, W&T purchased private bonds of roughly $11 million from Applied (not from Sompo) to benefit QNE and guarantee W&T's contractual decommissioning obligations.

256. W&T had no obligation to assume Sompo's separate financial exposure caused by the Fieldwood bankruptcy. But that is exactly what Sompo demanded from W&T. On April 19, 2024, Sompo demanded that W&T replace the Fieldwood bonds despite W&T's total lack of liability. In essence, Sompo wanted W&T to bail it out of its obligations for Sompo's benefit, because as Patrick Hennesy explained

67

to W&T, Sompo could not "retain bonds in the name of Fieldwood and continue to pursu[e] legal action in relation to the Fieldwood Case."

257.  Sompo also claimed that the replacement bonds would be cheap and wouldn't affect W&T's costs with Sompo across the board: "In order to facilitate the replacement, Sompo is offering to replace the bonds on Lexon paper at a nominal rate that will be offset elsewhere in the portfolio. … [Patrick Hennesy] said he needs to do some Chinese algebra to confirm the rate, but assures that it will be cost neutral when balanced across the current program."

258.  Sompo tried to force W&T to accept a new bond amount of $7,745,000.

259.  W&T's broker reiterated Sompo's power in the offshore surety market, particularly given the new BOEM rule:

> We feel this is a good deal for W&T, as it preserves an important relationship in Sompo, and allows W&T to procure favorable terms on assuming bonds we believe BOEM will force W&T to post once the rule is in place.
>
> I recommend we move on this quickly to capture these terms before they change and create goodwill prior to the Sompo meeting in the coming weeks.

260.  But W&T was not willing to take on unnecessary liabilities and was shocked by Sompo's attempts at blackmail.

261.  On April 29, 2024, W&T informed Sompo that it did not wish to take on Sompo's other bonds or exposure.  This refusal signaled to Sompo (and thus the industry) that W&T was not willing to accede to sureties' unreasonable demands.

262.  Less than two months later, on July 9, 2024, Endurance and Lexon, through Sompo, demanded that W&T immediately pay collateral—in the amount of $7.5 million in cash—without any support or explanation—unsurprisingly, **the same amount as Sompo's replacement Fieldwood bonds it had tried to extort from W&T**.

263.  Sompo intended to use this money to rid itself of its unrelated Fieldwood liability and, if W&T refused to pay, Sompo warned it would demand the full $55.9 million in collateral from W&T.

264. Sompo's retaliation against W&T underscored why their demand for collateral was not based on a change in W&T's financial condition or any other market event.

265.  Upon information and belief, Sompo encouraged and supported other Sureties, in rapid succession, to demand additional collateral, including USSIC, Applied, Amynta, and PHLY.  They encouraged a run on the bank in an effort to bring W&T to heel with the industry.

266.  Like with Sompo, there was no triggering event or contractual basis for these collateral calls under the applicable indemnity agreements with these non-Sompo Surety Defendants.

267. Similar to the Sompo Indemnity Agreement, the Applied Indemnity Agreement requires a request for collateral to be related to actual or potential liability

69

or claims against the Surety—Applied cannot demand collateral based on speculation or collusion. *See* Ex. 1.B at ¶ 4.

268. Without support, Applied asserted that it "has determined, in its sole discretion, that [W&T's] financial condition has been or is believed to be deteriorating and/or that there has been or is believed to be other changes adversely impacting the Surety's rights under the Bonds." Ex. 1.H at 2.

269. But again, W&T's financial status has remained substantially the same (or improved) since the execution of the Applied Indemnity Agreement and the issuance of the bonds thereunder.

270. Applied has never had the right to demand collateral from W&T because: (1) no actual or potential liability against Applied exists; (2) no actual or potential loss to Applied exists; and (3) there are no actual or anticipated claims against the Applied bonds.

271. W&T's interactions with the other Sureties followed a similar patten.

272. The USSIC Indemnity Agreement is the same form as the Sompo Indemnity Agreement and similarly does not give USSIC the ability to demand collateral without actual or potential liability. However, on July 31, 2024, USSIC demanded immediate payment of $23,000,000 in collateral from W&T. *See* Ex. 1.G.

273. The same is true of the Amynta Indemnity Agreement, *see* Ex. 1.C, May 21, 2021 Rider at ¶ 4 (allowing a demand for collateral "in the amount of any reserve

Surety establishes for any existing liability or claim"), yet on October 14, 2024, Amynta demanded that W&T immediately deposit $89,501,222.00, which they later increased to $93,492,509.00 when they filed suit against W&T on November 8, 2024.

274.    So too with PHLY, which demanded collateral of $31 million on July 2, 2024, before raising its demand to $71 million on November 13, 2024.

275.    Despite the obvious bad faith of the Surety Defendants' demands, W&T sought to resolve them in good faith.  For example, W&T offered to provide collateral in forms other than cash or letter of credit.  But the Surety Defendants held fast and **jointly** refused all overtures from W&T.

276.    As noted above, W&T's financial status has remained substantially the same since the sureties issued bonds to W&T, making it abundantly evident the sureties' calls for collateral were collusive and pretextual.

      **b.**     **The Defendants' Interference with W&T's Other Contracts and Business Opportunities**

          *i.*     *Defendants knew their coordinated scheme would render it impossible for W&T to secure bonding.*

277.    The Surety Defendants were well aware that W&T could not post $250+ million in collateral immediately and all at once, and they knew that W&T would not be able to shop around in a competitive market for replacement bonds.

278. Nonetheless, they charged ahead with their scheme, and through that process, in breach of their obligations of confidentiality, each of the Surety Defendants interfered with the valid contractual relationship between their co-conspirators and W&T. Each was aware of the others' contracts, and by coming together to make demands unjustified by the terms of those agreements, each did irreparable damage to W&T's relationship with sureties and brokers on which it had previously depended.

### ii. Defendants knew that their actions would impair financial opportunities for W&T.

279. As a result of the Defendants' scheme and wrongful actions, W&T was not able to convert opportunities to take over valuable leases from Major oil companies, and potentially drill new wells, which is how W&T makes money.

280. Another harm that W&T has suffered as a result of Defendants' actions is the impairment of W&T's opportunities to re-finance.

281. Because W&T has provided financial and operational information to each of its sureties for years, the Surety Defendants were well aware of W&T's business relationships and opportunities, and the impact that their actions would have.

## CAUSES OF ACTION

### FIRST CLAIM
### Violation of Sherman Act, Section 1, 15 U.S.C. § 1
### (Price Fixing Against All Defendants)

282.   W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

283.   The Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1.

284.   Specifically, the Defendants and their coconspirators have engaged in a continuing conspiracy to increase the price terms of surety bonds, including premiums and collateral requirements.  As a result of the Defendants' conduct, prices were actually raised, fixed, maintained, and stabilized in the market.  This agreement was a *per se* violation of 15 U.S.C. § 1.  However, even if the Defendants' agreement were viewed through the quick-look or rule-of-reason lens, the anticompetitive effects of the agreement render it unlawful.

285.   The relevant product or service market is the market for the provision of federally certified surety bonds for offshore oil and gas producers, and the relevant geographic market is the United States.

73

286. The Surety Defendants and their surety co-conspirators collectively possess market power in the relevant market. Together, they control a substantial and controlling percent of the relevant market.

287. W&T has been injured and will continue to be injured in its business and property as a result of the conspiracy, which has virtually eliminated competition in the offshore surety market.

## SECOND CLAIM
### Violation of Sherman Act, Section 1, 15 U.S.C. § 1
### (Group Boycott Against Surety Defendants)

288. W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

289. The Surety Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1.

290. Specifically, the Surety Defendants engaged in a conspiracy not to deal with independent oil and gas companies, including W&T, by demanding rate and collateral terms that would effectively prevent them from obtaining government-mandated bonding that is essential to engage in offshore oil and gas production. This agreement was a *per se* violation of 15 U.S.C. § 1. However, even if the Defendants' agreement was viewed through the quick-look or rule-of-reason lens, the anticompetitive effects of the agreement render it unlawful.

74

291.   The relevant product or service market is the market for the provision of federally certified surety bonds for offshore oil and gas producers, and the relevant geographic market is the United States.

292.   The Surety Defendants and their surety co-conspirators collectively possess market power in the relevant market.   Together, they control a substantial and controlling percent of the relevant market.

293.   W&T has been injured and will continue to be injured in its business and property as a result of the conspiracy, which has virtually eliminated competition in the offshore surety market.

### THIRD CLAIM
### Violation of Sherman Act, Section 1, 15 U.S.C. § 1
### (Unlawful Information Exchange Against All Defendants)

294.   W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

295.   The Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1.

296.   Specifically, the Defendants and their coconspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the terms of offshore surety bonds.  The

75

anticompetitive effects of this agreement render it an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

297.   The relevant product or service market is the market for the provision of federally certified surety bonds for offshore oil and gas producers, and the relevant geographic market is the United States.

298.   The Surety Defendants and their surety co-conspirators collectively possess market power in the relevant market.   Together, they control a substantial and controlling percent of the relevant market.

299.   W&T has been injured and will continue to be injured in its business and property as a result of this unlawful information exchange agreement, which has virtually eliminated competition in the offshore surety market.

**FOURTH CLAIM**
**Violation of the Texas Free Enterprise and Antitrust Act, Texas Business &**
**Commerce Code § 15.05**
**(All Defendants)**

300.   W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

301.   Section 15.05(a) of the Texas Business and Commerce Code, provides "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." TEX. BUS. & COMM. CODE §15.05(a).

302.   The acts, omissions, and facts set forth above in the First Claim and Second Claim also constitute violations of Section 15.05(a) because the Defendants' illegal

conduct set forth herein has harmed trade, commerce, and competition in the oil and gas industry and federal certified surety industry in Texas.

303. W&T has been and continues to be harmed by Defendants' illegal conduct.

304. Pursuant to Section 15.21(a)(1) of the Texas Business and Commerce Code, the Sureties' unlawful conduct has been willful and flagrant which requires the Court to treble the damages awarded in connection with its violations of Section 15.05(a). *See* TEX. BUS. & COMM. CODE §15.21(a)(1). W&T is also entitled to recover its costs and reasonable attorneys' fees.

## FIFTH CLAIM
### Breach of Contract and Obligation of Good Faith
### (Surety Defendants)

305. W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

306. W&T has performed all required duties under the respective indemnity agreements with the Surety Defendants.

307. Under the Texas Business and Commerce Code, every contract imposes an obligation of good faith in its performance, and this obligation may not be disclaimed by agreement. Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

77

308. Despite W&T's compliance, Surety Defendants breached their respective indemnity agreements, failed to act with honesty-in-fact, and did not observe reasonable commercial standards of fair dealing.

309. Specifically, Surety Defendants' coordinated demands for rate increases and collateral were made in bad faith and breached the terms of the respective indemnity agreements.

310. For instance, under the Sompo Indemnity Agreement, the Sompo Sureties could each individually demand collateral only "to cover any actual or potential liability, claim, suit, or judgment under any Bond." Ex. 1.A at ¶ 3.

311. Neither at the time of the demand, nor since, has any "actual or potential" liability, claim, suit, or judgment existed "under any Bond" issued to W&T—by Sompo or anyone else.

312. There was no basis or justification—either financially or under the Sompo Indemnity Agreement—for Sompo to demand collateral from W&T.

313. Yet, in 2024, Sompo demanded that W&T assume Sompo's separate financial exposure caused by a bankruptcy unrelated to W&T.

314. When W&T refused Sompo's demands, Sompo encouraged other Sureties to demand additional collateral from W&T.

315. Similar to the Sompo Indemnity Agreement, there was no contractual basis under W&T's indemnity agreements with the non-Sompo Surety Defendants that

permitted their coordinated, unilateral collateral demands, especially since W&T's financial status remained substantially the same (and even improved in many respects).

316. Given the foregoing, the Surety Defendants' demands for collateral were done in bad faith and in breach of their respective indemnity agreements with W&T.

317. The above conduct constitutes a breach of W&T's contracts with each of the Surety Defendants.

318. Pursuant to Texas Civil Practice and Remedies Code Section 38.001, et seq., W&T is entitled to record and hereby demands its reasonable and necessary attorneys' fees and costs.

## SIXTH CLAIM
### Tortious Interference with Contracts and Business Relations
### (All Defendants)

319. W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

320. As described in this Complaint, W&T has valid existing contracts and/or business relationships with its sureties, brokers, and other entities. The Defendants have willfully and intentionally interfered with these contracts and prospective business relationships.

321.  The Defendants have induced, or attempted to induce, W&T's sureties, creditors, and other financial partners to reduce or negatively alter their business relationship with W&T.

322.  The Defendants' acts are independently tortious in that, among other things, these acts constitute violations of antitrust law.

323.  The Defendants did such acts knowing that their interference with W&T's existing contracts and prospective business relationships was certain, or substantially certain, to occur as a result of their conduct.  As discussed herein, the Defendants also acted to take W&T's business hostage and control its capital, including through unlawful demands that had no contractual or financial justification.

324.  The Defendants' interference is not privileged or justified.  As a result of the Defendants' interference with W&T's existing contracts and prospective business relationships, W&T has suffered actual damages and irreparable damages, including, among other things, loss of goodwill, damage to its reputation, and other pecuniary loss.  Based on the Defendants' unlawful interference, W&T is entitled to all proximately caused, actual damages.

325.  Additionally, W&T is entitled to exemplary damages because the Defendants' acts of interference were fraudulent and malicious.

80

## SEVENTH CLAIM
## Civil Conspiracy
## (All Defendants)

326.   W&T incorporates the allegations contained in the above paragraphs of this Complaint as if set forth fully herein.

327.   The Defendants have knowingly encouraged, participated in, and benefited from the wrongful conduct described in this Complaint.

328.   A civil conspiracy exists under the facts of this case because two or more persons have acted in collusion to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, joint communications, and joint meetings.

329.   The Defendants have engaged in a civil conspiracy to violate antitrust law.

330.   The Defendants have also conspired to engage in other tortious activity including, but not limited to, tortiously interfering with W&T's contracts and prospective business relations.

331.   The Defendants have associated together through a meeting of their minds and for a common purpose of engaging in a course of conduct, and as an ongoing and continuing organization or unit, to conduct the unlawful and tortious activities described in this Complaint.

332.   The Defendants have secretly conspired among themselves, and possibly with others to be uncovered in discovery, to devise and implement, and the Defendants have devised and implemented, wrongful and unlawful schemes to harm W&T.

81

333. The Defendants have conspired and aided and abetted each other in furtherance of these unlawful schemes. This conduct was caused, permitted, aided and abetted, and assisted by each of the Sureties in order to maintain their pattern of unlawful activity.

334. Accordingly, W&T has been, and continues to be, damaged in its business. W&T is entitled to all damages caused by this conspiracy.

**EIGHTH CLAIM**
**Declaratory Judgment**
**(Surety Defendants)**

335. A justiciable controversy exists between W&T and the Surety Defendants.

336. The parties are governed by and bound to comply with their respective indemnity agreements.

337. While the Surety Defendants' indemnity agreements impose certain obligations on W&T, they also impose obligations on the Sureties, including the obligation of good faith, fair dealing, and to not abuse rights granted under the agreements.

338. The Surety Defendants have acted to try to cripple W&T rather than exercise any valid contractual right, and they have acted to put W&T in an impossible position and squeeze W&T out of the market.

339. The Surety Defendants' demands for collateral are unreasonable in that they are not based any valid triggering event.

82

340. W&T is entitled to a judgment declaring the rights of the parties including, without limitation, the following

    a.    the Surety Defendants may not enforce their indemnity agreements such that their actions constitute an abuse of right;

    b.    the Surety Defendants' interpretation of the indemnity agreements render the agreements illusory;

    c.    the Surety Defendants' may not make an unreasonable demand for collateral;

    d.    the Surety Defendants' must accept reasonable collateral as offered by W&T;

    e.    no additional collateral is required of W&T; and

    f.    the Surety Defendants' changed business model and scheme are not legitimate grounds to demand further collateral beyond that offered by W&T.

## PRAYER FOR RELIEF

WHEREFORE, W&T Offshore, Inc., and W&T Energy VI, LLC, pray that, after due proceedings are had, this Court enter judgment in their favor and against the Sureties:

    1.    Declaring that:

a. the Surety Defendants are bound by the terms of their indemnity agreements with W&T;

b. the Surety Defendants may not enforce their indemnity agreements such that their actions constitute an abuse of right;

c. the Surety Defendants' interpretation of the indemnity agreements render the agreements illusory;

d. the Surety Defendants may not make an unreasonable demand for collateral;

e. the Surety Defendants must accept reasonable collateral as offered by W&T;

f. no additional collateral is required of W&T;

g. the Surety Defendants may not make joint demands for collateral that are inconsistent with those of each other such that W&T cannot comply with each demand;

h. the Surety Defendants' changed business model and desire to boycott companies like W&T are not legitimate grounds to demand further collateral beyond that offered by W&T;

2. Awarding W&T compensatory damages for Defendants' violations of antitrust law and Texas common law;

84

3.    Awarding treble damages against each and every Defendant found to have violated Section 1 of the Sherman Act with all such Defendants to be jointly and severally liable;

4.    Awarding treble damages against each and every Defendant found to have willfully or flagrantly violated Section 15.05 of the Texas Free Enterprise and Antitrust Act with all such Defendants to be jointly and severally liable;

5.    Awarding W&T its pre- and post-judgment interest at the highest legal rate;

6.    Awarding W&T exemplary damages to the maximum extent allowed under Texas law and the United States Constitution;

7.    Awarding W&T all costs of this proceeding, including its reasonable attorneys' fees; and

8.    Enjoining the Defendants from engaging in conduct that violates the antitrust laws;

9.    Granting all other legal and equitable relief to which W&T may be entitled.

*[Remainder of page intentionally left blank.]*

85

Respectfully submitted,

McGuireWoods LLP

/s/ Megan S. Lewis
Megan S. Lewis
*Admitted Pro Hac Vice*
mlewis@mcguirewoods.com
888 16th Street N.W., Suite 500
Washington, DC 20006
(202) 857-1716 Telephone
(202) 857-1737 Facsimile

Nicholas J. Giles
*Admitted Pro Hac Vice*
ngiles@mcguirewoods.com
800 East Canal Street
Richmond, Virginia 23219
(804) 775-4760 Telephone
(804) 698-2040 Facsimile

**ATTORNEYS FOR W&T OFFSHORE, INC. AND W&T ENERGY VI, LLC**

**OF COUNSEL:**

**Marc Tabolsky**
Texas State Bar No. 24037576
S.D. Texas Bar No. 37154
Hicks Johnson PLLC
1550 Lamar Street, Suite 1900
Houston, Texas 77010
(713) 357-5150 Telephone
(713) 357-5160 Facsimile

86

# EXHIBIT 1.A

(09/12/20 Modified)                                                                                            W&T/No. 1380

## PAYMENT AND INDEMNITY AGREEMENT No. 1380

THIS PAYMENT AND INDEMNITY AGREEMENT (as amended and supplemented, this "Agreement") is executed by each of the undersigned on behalf of each Principal (as defined below) for the benefit of U.S. Specialty Insurance Company (the "Surety") in connection with any bond or bonds executed or to be executed on behalf of any Principal and to induce the Surety to execute or procure the execution of such bond(s) and any extensions, modifications, or renewals thereof, additions thereto, or substitutions therefor (the "Bonds"). The term "Principal" as defined and used herein shall mean any of the undersigned entities, as well as all wholly owned subsidiaries, whether now existing or which may hereafter be created or acquired.

IN CONSIDERATION of the execution or procurement of the Bonds, and for other good and valuable consideration, the receipt and sufficiency of which the Principals hereby acknowledge, the Principals hereby agree, for themselves, their personal representatives, successors, and assigns, jointly and severally, as follows:

**1. Bond Premiums** The Principals shall pay to the Surety premiums and charges at the rates and at the times specified by the Surety with respect to each Bond (as the Surety may specify at any time before or after the issuance of any Bond), continuing until the Surety shall be discharged or released from any and all liability and responsibility under the Bonds, and all matters arising therefrom, and until the Surety receives evidence, satisfactory to the Surety, of such discharge or release. If any Principal fails to pay within thirty (30) days after written demand any premium or portion thereof, or fails to pay within thirty (30) days after written demand of any other sum becoming due the Surety hereunder then, unless the Principals shall, immediately upon demand therefor: (a) deliver to the Surety evidence, satisfactory to the Surety, of the discharge and release of the Surety from any and all liability and responsibility under the Bonds and all matters arising therefrom; and (b) pay to the Surety all sums owed the Surety as of the effective date of such absolute release of the Surety from said obligations, the Surety may require there be paid, and the Principals jointly and severally agree they shall forthwith pay to the Surety, an amount equal to the full penalty amount of the Bonds, to be held as collateral until: (i) all sums due and to become due to the Surety have been paid, and (ii) the Surety shall be wholly discharged and released from all liability under the Bonds.

**2. Indemnification of Surety** The Principals shall jointly and severally indemnify and keep indemnified the Surety and hold and save it harmless from and against any and all liability, damage, loss, cost, and expense of whatsoever kind or nature, including reasonable counsel and attorneys' fees which the Surety may at any time sustain or incur or in enforcing this Agreement against any Principal or in procuring or in attempting to procure the Surety's release from liability or a settlement under any Bonds. For the avoidance of doubt, the Principals, jointly and severally, acknowledge and agree that the above obligation to indemnify the Surety shall apply to any and all reasonable attorneys' fees, costs or other expenses incurred by the Surety in connection with a bankruptcy proceeding (whether voluntary or involuntary), an assignment for the benefit of creditors, a receivership (whether state, federal or otherwise) or any other similar insolvency proceeding (whether state, federal, or otherwise) of the Principals, or any one of them If the Surety deems it necessary to make an independent investigation of a claim, demand or suit, the Principals jointly and severally acknowledge and agree that all reasonable expenses attendant to such investigation, whether incurred internally or with third parties, is included as an indemnified expense.

**3. Security** The Surety may at any time and from time to time hereafter, in its sole and absolute discretion, require the Principals to provide collateral, in form and amounts acceptable to the Surety (such amounts not to exceed the aggregate penalty sum of all then-issued Bonds) to secure the Principals' obligations to the Surety hereunder and/or to establish reserves to cover any actual or potential liability, claim, suit, or judgment under any Bond. Within thirty (30) days after the Surety has made written demand on Principals, each Principal shall execute such documents and take such further action as may be necessary in order to provide such collateral. Each Principal hereby grants to the Surety a security interest in all money and other property now or hereafter delivered by such Principal to the Surety, and all income (if any) thereon. If a Principal provides the Surety with a letter of credit or similar instrument, such Principal agrees that the Surety has the right to call on the same from time to time, in whole or in part and for any reason or no reason, and to hold the proceeds thereof as collateral for the obligations of the Principals hereunder. Any collateral provided at any time by any Principal shall be available, in the discretion of the Surety, as collateral security on any or all Bonds heretofore or hereafter executed for or at the request of such Principal or any other Principal.

**4. Inspection** Until the Surety shall have been furnished with evidence of its full, final and complete discharge without loss from any and all Bonds, the Surety and its agents shall have reasonable access, at any and all reasonable times, to the financial books and records (including but not limited to reserve reports, engineering data and like information) of each Principal relevant to the obligations under this Agreement. Each individual Principal consents to the Surety's requests for, and use of, consumer credit reports and investigative consumer credit reports with respect to such Principal. Any bank, creditor, credit bureau or credit reporting agency, obligee of a Bond or other individual or entity possessing records or having information concerning the financial affairs and operations of any Principal is hereby authorized to furnish to the Surety and its agents any such records or information requested by the Surety. Each Principal will execute any additional document reasonably requested by the Surety to cause the release of such records and information.

IndemCo

(09/12/20 Modified)                                                   W&T/No. 1380

**5. Additional Sureties** If IndemCo. or the Surety shall procure any other company or companies, including but not limited to American Contractors Indemnity Company, Ironshore Indemnity Inc., Ironshore Specialty Insurance Company, Lexon Insurance Company, Bond Safeguard Insurance Company, Endurance Assurance Corporation, Endurance American Insurance Company, Great Midwest Insurance Company, North American Specialty Insurance Company, Westport Insurance Corporation, United States Fire Insurance Company, Seneca Insurance Company, Inc., and/or QBE Insurance Corporation, to execute or join with it in executing, or to reinsure any Bond, this Agreement shall inure to the benefit of such other company or companies, its or their successors and assigns, so as to give it or them a direct right of action against the Principals to enforce the provisions hereof.

**6. Evidence of Liability** An itemized statement of payments made by the Surety for any of the purposes specified herein, or the voucher or vouchers for such payments, shall be prima facie evidence of the liability of the Principals to reimburse the Surety for such payments.

**7. Additional Rights of Surety** The Surety, in its sole discretion and without notice to any Principal, is hereby authorized but not required, (a) from time to time to make or consent to any change in the Bonds (with the exception of increasing the penal amount or the obligation secured thereby) or to issue any substitutes or any renewal thereof, and this Agreement shall apply to such substituted, changed or renewed Bonds; (b) take such action as it may deem appropriate to prevent or minimize loss under the Bonds, including, but not limited to, taking steps to procure discharge from liability under the Bonds; and (c) to adjust, settle, or compromise any claim or suit arising under the Bonds and, with respect to any such claim or suit, to take any action it may deem appropriate. Any adjustment, settlement, or compromise made or action taken by the Surety shall be conclusive against and binding upon the Principals.

**8. Bond Forms** The Principals acknowledge and agree it is their sole responsibility to provide the proper forms for the Bonds to be executed by the Surety, and neither the Surety nor its agents shall have any liability whatsoever to any Principal if the Principals fail to furnish the Surety with the proper forms. It shall be the sole responsibility of the Principals to review the bond form to be executed by the Surety for any errors or omissions before delivery of any Bond to its obligee, and the Surety and its agents shall have no liability to the Principals on account of any such errors and omissions. Before requesting the Surety issue any Bond, the Principals shall obtain confirmation the proposed obligee on the Bond will accept the Surety as surety on the proposed Bond, and neither the Surety nor its agents shall have any liability whatsoever if any obligee refuses, for whatever reason, to accept the Surety as surety on any Bond. Each Principal agrees the Principals shall be solely responsible for arranging, independent of the Surety, for the timely delivery of any Bond to its obligee. The Surety and its agents shall have no liability to the Surety if the Bond is not timely delivered to any obligee for any reason whatsoever.

**9. Additional Obligations of Principals** Each Principal agrees to pay all amounts owed and/or described herein regardless of (a) the failure of any Principal to sign any application for a Bond; (b) any claim that other indemnity, security, or collateral was to have been obtained; (c) the release, return, or exchange by the Surety with or without the consent of any other Principal, of any indemnity, security, or collateral that may have been obtained, or (d) the fact that any other Principal is not bound for any reason. The Surety is expressly subrogated to all rights, if any (but if a Principal has waived its rights of subrogation against any party, such waiver shall control this Agreement), of the Principals (or any or all of them) to collect, receive, recover, and/or be reimbursed from (i) any co-owners or owners of undivided interest in any properties, wells, and leasehold interests relative to which the Bonds shall apply (collectively, the "Related Property"); (ii) any party contractually bound to pay or reimburse any Principal on account of ownership or operation of any Related Property; or (iii) any other party otherwise obligated to, or for, any Principal in any way, in connection with, or arising out of damage to any Related Property. The Surety, as subrogee, upon default of payment of any sums becoming payable hereunder by any Principal, may enforce all of the rights of the Principals in and to any such above-described claims and interests; and may pursue its remedies hereunder in its own name or in the name of the relevant Principal(s); but nothing herein shall require that the Surety pursue any such remedy or claim against any third party. Each Principal agrees, upon demand of the Surety therefor, to execute and deliver any and all appropriate further documentation evidencing and authorizing the Surety to pursue, recover, collect, and hold for its account any such claims or rights.

**10. Suits to Enforce** Separate suits may be brought hereunder as causes of action accrue, and suit may be brought against any and all of the Principals; and any suit or suits upon one or more causes of action, or against one or more of the Principals, shall not prejudice or bar subsequent suits against any other Principals on the same or any other causes of action, whether theretofore or thereafter accruing.

**11. Liability Limitation** Each Principal agrees the Surety's liability, if any, to any one or more of the Principals on account of any acts or omissions by the Surety (whether such acts or omissions arise in tort, breach of contract, or at law) arising out of or related to any Bonds or any other conduct by the Surety, **WHETHER THE SAME ARISES FROM THE NEGLIGENCE OF THE SURETY OR OTHERWISE,** shall be and is hereby expressly limited to an amount equal to the premium actually paid to the Surety for such Bond.

**12. Waiver of Notice** Each Principal hereby expressly waives notice from the Surety of any claim or demand made against the Surety or any Principal under the Bonds or of any information the Surety may receive concerning any Principal, any Bond, or any contract.

**13. No Obligation to Issue Bonds** The Surety shall have the right to decline to issue any or all Bonds applied for

IndemCo

(09/12/20 Modified)                                                                                              W&T/No. 1380

hereunder and shall have the right to withdraw from or cancel any application for a Bond at any time, all without incurring any liability to any Principal. The use of the plural term "Bonds" herein shall not be interpreted to require that the Surety issue multiple bonds or any bond whatsoever.

**14. Conflict and Modification** If any portion of this Agreement is in conflict with any law controlling the construction hereof, such portion of this instrument shall be considered to be deleted and the remainder shall continue in full force and effect.

**15. Waivers** To the maximum extent not prohibited by applicable law, each Principal hereby waives all rights to claim any of its property is exempt from levy, execution, sale, or other legal process in any action hereunder.

**16. Continuing Obligation** This Agreement is a continuing obligation of each Principal, and no Principal shall have the right to terminate its obligations for any Bonds issued during the term hereof. A Principal may terminate this Agreement as to future Bonds by notice to the Surety, but such termination as to a Principal shall in no way affect the obligation of any other Principal who has not given such notice. In order to terminate liability as to future Bonds, a Principal must notify the Surety of such termination and state in such notice the effective date (not less than 30 days after receipt thereof by the Surety) of termination of such Principal's liability for future Bonds. After the effective date of such termination, the Principal giving notice of termination shall nonetheless be liable hereunder for Bonds executed or authorized before such date and renewal, substitutions, and extensions thereof.

**17. Place of Performance and Enforcement** All obligations hereunder of each Principal is performable in, and all monies due the Surety hereunder are payable in, Harris County, Texas. This Agreement shall be construed and enforced in accordance with the laws of the state of Texas, without regard to its conflict of law rules. **EACH PRINCIPAL HEREBY IRREVOCABLY CONSENTS TO THE EXCLUSIVE VENUE AND JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN HARRIS COUNTY, TEXAS, AND DOES FURTHER WAIVE ANY AND ALL RIGHTS TO OBJECT TO SUCH VENUE OR JURISDICTION.**

**18. Rights Not Exclusive** Nothing herein-contained shall be construed to waive or abridge any right or remedy which the Surety might have if this Agreement was not executed.

**19. Other Bonds and Agreements** This Agreement shall also extend to and cover and indemnify the Surety against loss under any presently outstanding Bonds, and the obligation of the Principals hereunder, with respect to such pre-existing Bonds, shall replace the obligation of any or all of the Principals under any presently existing agreement relating to or securing such pre-existing Bonds.

**20. Joint and Several Liability** Each Principal shall be deemed to have made all of the representations, warranties, covenants, and agreements set forth herein, and each Principal shall be jointly and severally liable for each and every obligation and duty of the Principals set forth herein. A default of any Principal in the performance of any of its obligations to the Surety under this or any other agreement shall constitute a default hereunder by all Principals. Each Principal understands and agrees that the circumstances, financial or otherwise, of any one or more of the other Principals may change substantially over the term of this Agreement, and the Principals therefore agree to keep themselves fully informed as to the business activities and financial affairs of each Principal and of the risks being engaged in, so that each is always aware of the risks of hazards in continuing to act as a Principal. Each Principal expressly waives any requirement for notice from the Surety of any fact or information coming to the notice or knowledge of the Surety affecting its rights or the rights or liabilities of the Principals. If any claim or demand is made by the Surety against the Principals, or any one or more of them, by reason of the execution of a Bond, the Surety is expressly authorized to settle or compromise with any one or more of the Principals individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others and each Principal expressly waives the right to be discharged by reason of the release of one or more of the joint debtors, and hereby consents to any settlement or composition that may hereafter be made. The liability of the Principals hereunder shall not be affected by the failure of the Principals, or any one or more of them, to sign any Bond or this Agreement, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, nor the return or exchange of any collateral that may have been obtained and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

**21. Required Notices** The Principals agree to notify the Surety (a) in the event of any change, alteration, restructuring, cancellation, transfer (including, without limitation, the conveyance of a security interest), or other modification to (i) the working interest ownership of the property for which a Bond is issued, or (ii) any lease for or relating to the property for which a Bond is issued, or (b) upon becoming aware of any demand, notice, or proceeding preliminary to determining or fixing any liability, with which the Surety may be subsequently charged under any Bond.

**22. Manner of Notices** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered against receipt therefor or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed (a) in the case of a Principal, to such Principal's address set forth below and (b) in the case of the Surety, to (i) the Surety at 13403 Northwest Freeway, Houston, Texas 77040-6094, Attention: President, and (ii) IndemCo L.P. at 777 Post Oak Boulevard, Houston, Texas 77056. Such names and addresses may be changed by written notice given as provided in this Agreement. Actual notice, however given, shall always be effective.

IndemCo

(09/12/20 Modified)    W&T/No. 1380

**23. Interest** Any and all sums not paid when due shall bear interest at the lesser of (a) ten percent (10%) per annum, or (b) the maximum non-usurious rate of interest allowed by applicable law.

**24. Entire Agreement and Amendments** This Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein and may be amended or terminated only by a document executed by all parties, or their respective successors or assigns. There are no restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth herein.

**25. Headings** The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**26. Attorney's Fees** In the event any action is instituted to enforce any of the provisions of this Agreement or to recover damages for the breach of any provision hereof, the prevailing party therein shall be entitled to recover any costs or expenses incurred, including without limitation, costs of court and reasonable attorneys' fees.

**27. Number and Gender** Whenever required by the context, any reference herein to the singular shall include the plural, any reference to the plural shall include the singular, and the gender of any pronoun shall mean and include the appropriate gender, whether masculine, feminine, or neuter.

**28. Counterparts** This Agreement may be executed in multiple counterparts, and by the Principals on separate counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Delivery by telecopy or email of a signed counterpart of this Agreement shall be effective as physical delivery.

**29. Continuing Agreement** Each Principal understands and agrees (a) this Agreement is a continuing agreement to indemnify over an indefinite period; (b) Bonds may vary widely in amounts and nature, and (c) each Principal will be bound by all Bonds, and any increases in the penal limits of all Bonds. Each Principal shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of any Principal, accepted or released other agreements of indemnity or collateral from some or all of the Principals or others in connection with the procurement of Bonds, it being expressly understood and agreed by each Principal that any and all other rights which the Surety may have or acquire against such Principal or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

**30. No Conflict** Each Principal represents and warrants that neither this Agreement nor any condition relating to the issuance of any Bond shall be a breach or default in any other obligation of such Principal, specifically including, without limitation, any loan agreement.

***31. ENTIRE AGREEMENT*** **EACH PRINCIPAL REPRESENTS TO THE SURETY THAT SUCH PRINCIPAL HAS CAREFULLY READ THIS ENTIRE AGREEMENT, AND THERE ARE NO OTHER AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OR MODIFY THE OBLIGATIONS SET FORTH HEREIN. THE EFFECTIVE DATE OF THIS AGREEMENT SHALL BE THE DATE SET FORTH BELOW, REGARDLESS OF THE DATE OR DATES ON WHICH ANY PRINCIPAL MAY EXECUTE THIS AGREEMENT AND REGARDLESS OF WHETHER BONDS WERE ISSUED BY THE SURETY BEFORE OR AFTER THE EXECUTION OR EFFECTIVE DATE OF THIS AGREEMENT. THE SURETY'S ACCEPTANCE OF THIS AGREEMENT SHALL BE PRESUMED AND IS DEEMED EFFECTIVE BY ITS RECEIPT OF THIS AGREEMENT, ITS RELIANCE HEREON, OR BY ITS EXECUTION OF ANY BOND FOR THE PRINCIPALS OR ANY OF THEM, WITH OR WITHOUT THE SURETY'S SIGNATURE BEING AFFIXED THERETO.**

32. Individual Certification. Each individual signing below on behalf of any Principal certifies that (a) such individual is familiar with the organizational documents and other records of such Principal; (b) the name of such Principal as reflected below is its correct name; (c) such Principal exists and is in good standing in the jurisdiction of its organization; (d) the execution, delivery and performance of this Agreement by such Principal (1) are within its organizational power; (2) have been duly authorized by all necessary actions, and (3) do not contravene its organizational documents or any agreement binding upon it or any of its property; (e) the form of signature block for such Principal is an appropriate signature block for it; (f) such individual holds the position reflected below and is duly authorized to execute this Agreement on behalf of such Principal, and (g) this Agreement has been duly executed and delivered on behalf of such Principal.

EXECUTED effective as of _____ *September 14* _____ , 2020.

*EXECUTION ON FOLLOWING PAGE(S)*

Page 4 of 5    IndemCo

(11/25/09 W&T)                                                              W&T Energy VI, LLC; W&T Offshore, Inc. /No. 0847

**For entity as Principal:**

TYPE OF ENTITY: _Corporation_

TAXPAYER IDENTIFICATION NO.: ███████

W&T Offshore, Inc.
_____(Name of Entity)_____

BY: _____
_____(Signature)_____

PRINTED NAME: _Janet Yang_

TITLE: _Chief Financial Officer + EVP_

ADDRESS: _9 Greenway Plaza, Suite 300_

_____Houston, Texas 77046_____

This instrument was acknowledged before me on _Sept 14_, 20 _20_

by _Janet Yang_, _CFO and EVP_
_(Name of officer)_            _(Title of officer)_

of _____W&T Offshore, Inc._____
_(Name of Principal)_
on behalf of such entity.

NOTARIAL STAMP OR SEAL _Rosemary Barrios_
Notary Signature
Printed Name _ROSEMARY BARRIOS_
Notary in and for the State of _TX_
My commission expires _10_ / _13_ /20 _22_

[Notary seal: ROSEMARY BARRIOS, Notary ID #129993408, My Commission Expires October 13, 2022]

**For entity as Principal:**

TYPE OF ENTITY: _Limited Liability Company_

TAXPAYER IDENTIFICATION NO.: ███████

W&T Energy VI, LLC
_____(Name of Entity)_____

BY: _____
_____(Signature)_____

PRINTED NAME: _Janet Yang_

TITLE: _Representative_

ADDRESS: _9 Greenway Plaza, Suite 300_

_____Houston, Texas 77046_____

This instrument was acknowledged before me on _Sept. 14_, 20 _20_

by _Janet Yang_, _Representative_
_(Name of officer)_            _(Title of officer)_

of _____W&T Energy VI, LLC_____
_(Name of Principal)_
on behalf of such entity.

NOTARIAL STAMP OR SEAL _Rosemary Barrios_
Notary Signature
Printed Name _Rosemary Barrios_
Notary in and for the State of _TX_
My commission expires _10_ / _13_ /20 _22_

[Notary seal: ROSEMARY BARRIOS, Notary ID #129993408, My Commission Expires October 13, 2022]

IndemCo

# EXHIBIT 1.B

**GENERAL INDEMNITY AGREEMENT**

This General Indemnity Agreement (hereinafter "Agreement") is made and entered into by the undersigned, hereinafter referred to individually and/or collectively, as "Indemnitors", for the benefit of California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, with their principal offices at 10805 Old Mill Rd Omaha, Nebraska, 68154-2607, and for itself, its subsidiaries, affiliates, parents, co-sureties, fronting companies and/or reinsurers and their successors and assigns, whether in existence now or formed hereafter, individually and collectively, as "Surety", for the purpose of indemnifying the Surety for any Bonds (as hereinafter defined) from any and all Losses (as hereinafter defined).

## Definitions

The term "Bond(s)" shall mean any and all bonds including but not limited to surety bonds, undertakings, guarantees, or any contractual obligations, previously or hereafter executed, issued, procured, or undertaken by the Surety, whether directly or as a result of any asset purchase, merger, acquisition, or similar transaction, and any renewals or extensions thereof issued by Surety, or issued by another at the request of Surety, on behalf of Indemnitors, whether issued prior to or subsequent to the effective date of this Agreement.

The term "Indemnitors" shall mean an individual, corporation, partnership, Limited Liability Company (hereinafter called LLC), Limited Liability Partnership (hereinafter called LLP), joint venture, trust, estate or other legal entity, whether individually or jointly with others, who sign this Agreement or whose authorized representatives sign this Agreement or any other agreement that incorporates by reference the terms of this Agreement, whether the Indemnitors are individuals or entities. The Indemnitors warrant and represent that they have a material and beneficial interest in Surety's issuance of Bonds on behalf of the Indemnitors, and acknowledge that Surety would not issue such Bonds without each Indemnitors' agreement to reimburse Surety for all Losses arising under the Bonds.

The term "Losses" shall mean any and all (a.) sums paid by Surety to claimants under the Bonds, (b.) sums required to be paid to claimants by Surety but not yet, in fact, paid by Surety, by reason of execution of such Bonds, (c.) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds, including but not limited to legal fees and expenses, technical and expert witness fees and expenses, (d.) all costs and expenses incurred in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses, (e.) all accrued and unpaid premiums owing to Surety for the issuance, continuation or renewal of any Bonds and/or (f.) all other amounts payable to Surety according to the terms and conditions of this Agreement.

As an inducement to the Surety and in consideration of the Surety's execution or procurement of the Bond(s), the Surety's refraining from canceling one or more Bond(s), and/or the Surety's assumption of one or more Bond(s) and for other good and valuable consideration, the receipt and sufficiency of which the Indemnitors hereby acknowledge, the Indemnitors hereby agree, for themselves, successors, and assigns, jointly and severally, as follows:

1. **Premium.** To pay all initial and renewal premiums for each Bond, as they fall due, until Surety has been provided with competent legal evidence, in its sole discretion, that the Surety has been fully released of liability under such Bond.

2. **Indemnity.** To indemnify, hold harmless and exonerate Surety from and against any and all Losses, as well as any other expense that the Surety may incur or sustain as a result of or in connection with the furnishing, execution, renewal, continuation, or substitution of any Bond(s). Expenses include, but are not limited to: (a) the cost incurred by reason of making an independent investigation in connection with any Bond(s) or this Agreement; (b) the cost of procuring or attempting to procure the Surety's release from liability or a settlement under any Bond(s) upon or in anticipation of Losses, including the defense of any action brought in connection therewith; and (c) the cost incurred in bringing suit to enforce this Agreement against any of the Indemnitors. Payments of amounts due the Surety hereunder, including interest, shall be made immediately upon the Surety's demand.    In the event of any payment by the Surety, the Indemnitors further agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. The vouchers or other evidence of any such payment(s) made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety, and of the Surety's good faith in making the payment(s). "Good Faith," as used in this paragraph and elsewhere in this Agreement, shall be deemed to include any and all payments, Losses, attorneys' fees, and other expenses except those made with deliberate and willful malfeasance.

3. **Application.** This agreement shall apply to any and all Bond(s) furnished for or on behalf of any or all of the following as follows:
   (a)    One, some or all of the Indemnitors;
   (b)    Any joint venture or other form of common enterprise in which Indemnitors were members at the time the Bond(s) were furnished;
   (c)    Any present or future affiliate and/or subsidiary of Indemnitors;
   (d)    Any third party at the request of Indemnitors, their subsidiaries and/or affiliates

4. **Collateral Security.** The Indemnitors acknowledge that the Bonds issued on their behalf are to be secured by collateral upon demand. In lieu of fully collateralizing the Bonds prior to their issuance and in consideration for the execution and/or delivery of one or more Bonds, the Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses. If for any reason the Surety deems it necessary to increase the amount of any such deposit to cover any possible additional liability or loss, the Indemnitors shall deposit with the Surety, immediately upon the Surety's demand, an additional amount of collateral security equal to such increase. The Indemnitors acknowledge that the Surety would not issue any Bonds without the agreement of the Indemnitors to post collateral upon demand. Accordingly, the Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will suffer irreparable harm and will not have an adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement.

5. **Surety Reserve.** The Surety may, in its sole discretion, establish a reserve to cover any actual or anticipated, liability, claim, suit, judgment, or Losses under any Bond. In such event, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve, and any subsequent increase thereof, to be held by the Surety as collateral security on the Bond(s). Such funds will be used by the Surety to pay Losses or may be held by the Surety as collateral against potential future Losses. The Indemnitors hereby grant to the Surety a security interest in all money and other property now or hereafter delivered by such Indemnitors to the Surety for deposit in such reserve, and all income (if any) thereon. Any funds remaining after the Indemnitors' settlement or payment of all Losses will be returned to the Indemnitors within fifteen (15) days from the date of the Indemnitors' settlement or payment of the Losses.

ASU GIA(SPD) (04-2022)

6.  **Access to Books and Records.** In the event the Surety receives a claim under any Bond or establishes, in its sole discretion, a reserve in anticipation of incurring Losses, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors for the purpose of examining the same.

7.  **Non-Impairment of Indemnitors' Obligations.** The obligations of the Indemnitors under this Agreement shall not be impaired by and Surety shall incur no liability on account of: (a) Surety's failure or refusal to furnish Bond(s), including final Bond(s) where Surety has furnished a bid Bond; (b) Surety's consent or failure to consent to changes in the terms and provisions of any Bond, or consent or failure of consent to changes in the obligation or performance secured by any Bond; (c) the taking, failing to take, or release of security, collateral, assignment, indemnity agreements and the like, as to any Bond; (d) the release by Surety, on terms satisfactory to it, of any Indemnitors; and/or (e) the Surety's cancellation of any Bond(s).

8.  **Surety Priority.** The Indemnitors shall not seek indemnity, contribution or collection of any other outstanding obligation against any other Indemnitors or their property until the obligations of the Indemnitors to Surety under this Agreement have been satisfied in full.

9.  **Confidentiality.** The Indemnitors acknowledge that the Surety may share copies of any and all statements, agreements, financial statements and any information which it now has or may hereafter obtain concerning Indemnitors with governmental regulators, auditors, co-sureties, fronting companies, and/or reinsurers.

10. **Default.** The Indemnitors shall be in default of this Agreement if: (a) Indemnitors shall become a party in any insolvency, receivership, liquidation, or bankruptcy; (b) Any Indemnitor makes representation to the Surety by or on behalf of any of the Indemnitors that prove to have been misleading or materially false when made; (c) Indemnitors fail to provide collateral in response to a proper request made by the Surety; (d) Any Indemnitors is convicted of a felony; (e) Indemnitors breach any other provision of this Agreement.

11. **Indemnitors representations.** The Indemnitors represent and warrant to the Surety that they have a substantial, material, and/or beneficial interest in the obtaining of Bond(s) by any of the Indemnitors and in the transaction(s) for which any of the other Indemnitors have applied or will apply to the Surety for Bond(s) pursuant to this Agreement. Indemnitors represent and warrant that they have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Indemnitors further represent and warrant that their execution, delivery and performance of this Agreement does not and will not conflict with, constitute a default under, or result in a breach or violation of any of their respective organizational documents, any law, governmental rule or regulation, or any applicable order, writ, injunction, judgment or decree of any court or governmental authority, or any other agreement binding upon Indemnitors.

12. **Surety's Rights to Release of Bonds and Indemnitors' Waiver.** The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors financial condition has been or is believed to be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bond(s). In such an event, within <u>thirty (30)</u> days of receipt of the Surety's written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent written evidence of release satisfactory to the Surety, in its sole discretion. If Indemnitors fail to provide the aforementioned release Indemnitors shall, within an additional seven (7) days, provide the Surety with collateral in the amount of 100% of all unreleased liability under the Bond(s). The liability shall be determined at the time of the Surety's written demand. Collateral will be in the form of (a) an irrevocable letter of credit in form, content, and issued by a financial institution acceptable to the Surety; (b) a pledged money market account, in the form, content, and issued by a financial institution acceptable to the Surety; and/or (c) other collateral in form, content, and substance acceptable to the Surety, in its sole discretion. Collateral previously provided to the Surety may be utilized to establish compliance with this provision

    The Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will suffer irreparable harm and will not have an adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement. The Surety's failure to act to enforce its right to specific performance shall not be construed as a waiver of that right, which right may be enforced at any time at the Surety's sole discretion. Indemnitors further agree that this Collateral Requirement shall not limit or be deemed a waiver of the Surety's other rights, which it may exercise in its sole discretion, under this Agreement or otherwise to cancel Bond(s), to demand collateral, or to take any other actions the Surety deems necessary and/or prudent, in its sole discretion, to mitigate actual or potential Losses under any and all Bond(s) written in accordance with this Agreement. The exercise of such additional rights shall not be contingent upon the Surety's enforcement of this provision. Collateral to be provided to the Surety shall be sent by delivery only for overnight packages: Attn: Treasurer, Applied Surety, 10805 Old Mill Rd Omaha, NE 68154-2607.

13. **Claim Settlement.** The Surety shall have the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against the Surety or any Indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors. The Surety shall be entitled to immediate reimbursement for any and all Loss incurred under the belief it was necessary or expedient to make such payments.

14. **Demand Bonds.** The obligee or beneficiary under certain Bond(s) may make a demand for payment ("Demand") against the Bond(s). When such Demand is made the Surety must pay the amount of the Demand not to exceed the penal sum of the Bond(s), as well as all the necessary fees, within the time period required by the Demand. Under such Bond(s), the Surety, with the knowledge and consent of the Indemnitors has expressly waived all defenses to making such payment. If the Indemnitors receive notice from the Surety that a Demand has been made against the Bond(s) by the obligee or beneficiary, at least five (5) business days before payment of such Demand is due to the obligee, Indemnitors shall pay the Surety the full amount of the Demand, which amount shall not exceed the penal sum of the Bond as well as all necessary fees. Such payment will be made by wire transfer or otherwise in immediately available funds to the bank account specified in the notice provided to the Indemnitors by the Surety. The Indemnitors waive to the fullest extent permitted by applicable law, each and every right which they may have to contest such payment. Failure to make payment to the Surety as herein provided shall cause the Indemnitors to be additionally liable for any and all costs and expenses, including attorneys' fees, incurred by the Surety in enforcing this Agreement, together with interest on unpaid amounts due the Surety. Indemnitors stipulate and agree that the Surety will suffer immediate, irreparable harm and will have no adequate remedy at law should Indemnitors fail to perform this obligation, and therefore the Surety shall be entitled to specific performance of this obligation.

15. **Interest.** Any amount due to Surety under any provision of this Agreement shall accrue interest from the date of the Surety's demand at 130% of the prime rate of interest in effect on December 31st of the previous calendar year as published in the Wall Street Journal.

16. **Continuing Obligation.** This Agreement is a continuing obligation of the Indemnitors, and no Indemnitors shall have the right to terminate its obligations for any Bond(s) issued during the term hereof. The Indemnitors may terminate this Agreement as to future Bond(s) by notice to the Surety, but such termination as to the Indemnitors shall in no way affect the obligation of any other Indemnitors who have not given such notice. In order to terminate liability as to future Bond(s), Indemnitors must notify the Surety of such termination and state in such notice

the effective date (not less than thirty days after receipt thereof by the Surety) of termination of such Indemnitors' liability for future Bond(s). After the effective date of such termination, the Indemnitors giving notice of termination shall nonetheless be liable hereunder for Bond(s) executed or authorized before such date and renewal, substitutions, and extensions thereof.

17. **Survival of Indemnity.** The Indemnitors understand and agree that their obligations under this Agreement remain in full force and effect for any Bond(s) issued pursuant to this Agreement, notwithstanding that the entity on whose behalf Bond(s) were issued has been sold, dissolved or whose ownership has been otherwise altered in any way.

18. **Severability.** If any provision or portion of this Agreement shall be unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such provision or portion were omitted. This agreement is in addition to and not in lieu of any other agreement relating to the obligations described herein.

19. **Execution.** This Agreement may be executed in multiple counterparts, and by the Indemnitors on separate counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Delivery by telecopy or email of a signed counterpart of this Agreement shall be effective as physical delivery.

20. **Photocopies.** A duplicate or facsimile copy or electronic reproduction of the original of this Agreement shall have the same force and effect as the original.

21. **Non-waiver of Surety Rights.** Nothing herein-contained shall be construed to waive or abridge any right or remedy which the Surety might have if this Agreement was not executed. The Surety's failure to act to enforce any or all of its rights under this Agreement shall not be construed as a waiver of these rights.

22. **Access to Indemnitors' Information.** Indemnitors hereby expressly authorize the Surety to access credit records and to make such pertinent inquiries as may be necessary from third party sources for underwriting purposes, claim purposes and/or debt collection. To the extent required by law, Surety will, upon request, provide notice whether or not a consumer report has been requested by Surety, and if so, the name and address of consumer reporting agency furnishing the report.

23. **Separate Suits.** Separate suits may be brought hereunder as causes of action accrue, and suit may be brought against any and all of the Indemnitors; and any suit or suits upon one or more causes of action, or against one or more of the Indemnitors, shall not prejudice or bar subsequent suits against any other Indemnitors on the same or any other causes of action, whether theretofore or thereafter accruing.

24. **Notices.** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered against receipt therefore or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed to the Surety, to: Attn: Applied Surety Bond Department: P.O. Box 3646, Omaha, Nebraska 68103-0646. Such name and address may be changed by written notice given as provided in this Agreement.

25. **Choice of Law.** This Agreement shall be interpreted under the substantive law of the State of Texas, without giving effect to its choice of law principles.

26. **Choice of Forum.** In any legal proceeding brought by or against the Surety that in any way relates to this Agreement, each Indemnitor for itself and its property, irrevocably and unconditionally submits to the exclusive jurisdiction, at the sole and exclusive option of the Surety, of the courts in Texas, or any state in which any Indemnitor resides, has property, or in which any Contract is performed. Indemnitors hereby irrevocably and unconditionally submit to the jurisdiction of said courts and waive and agree not to assert any claim that they are not subject to the jurisdiction of any such court, that such proceeding is brought in an inconvenient forum or that the venue of such proceeding is improper.

27. **Collateral and Letters of Credit. If Surety has or obtains collateral or letters of credit, Surety shall not have any obligations to release collateral or letters of credit or turn over the proceeds thereof until it shall have received a written release in form and substance satisfactory to Surety with respect to each and every Bond. Any collateral or letters of credit provided to Surety by any Indemnitors or any third party, or the proceeds thereof, may be applied to any Losses.** The Surety shall not pay interest on any collateral it holds.

28. **Security Interest.** The Surety may execute or procure Bond(s) that guarantee the Indemnitors' obligations or performance under one or more contracts (each a "Bonded Contract"). The Indemnitors shall be considered in default of a Bonded Contract if any of the following occur: (a) a declaration of default by any Bonded Contract owner; (b) an actual breach or abandonment of the Bonded Contract; and/or (c) an improper diversion of Bonded Contract funds or Indemnitors' assets to the detriment of the Bonded Contract obligations.

In the event of a default under a Bonded Contract, Indemnitors grant to Surety a security interest in all equipment, machinery, inventory, materials, and all proceeds and products in connection with any Bonded Contract. This Agreement shall for all purposes constitute a Security Agreement and Financing Statement for the benefit of Surety in accordance with the Uniform Commercial Code ("UCC") and all similar statutes. In the event there is an act of default under any Bonded Contract, Indemnitors hereby irrevocably authorize Surety, without notice to any of the Indemnitors, to perfect the security interest granted herein by filing a UCC-1 and/or this Agreement or a copy or other reproduction of this Agreement. Surety may add schedules or other documents to this Agreement as necessary to perfect its rights. The failure to file or record this Agreement or any financing statement shall not release or excuse any of the obligations of Indemnitors under this Agreement. The Surety's exercise of any of its rights as a secured creditor under this Agreement shall not be a waiver of any of the Surety's legal or equitable rights or remedies, including the Surety's right of subrogation.

29. **Attorney-in-Fact.** The Indemnitors do hereby irrevocably nominate and appoint any officer of Surety as the true and lawful attorney-in-fact of the Indemnitors, with full right and authority to execute on behalf of, and sign the name of, the Indemnitors to any voucher, release, satisfaction, check, bill of sale or all or any property assigned by this Agreement to the Surety, or any other document necessary or desired to carry into effect the purpose of this Agreement. The Indemnitors hereby ratify and confirm all that such attorney-in-fact or Surety may do for the purposes set forth in this Agreement. The Indemnitors specifically agree to protect, indemnify and save and hold harmless Surety and such attorney-in-fact against any and all claims, damages, costs and expenses that may in any way arise due to the exercise of the assignments contained in this Agreement and the powers herein granted, specifically waiving any claim which the Indemnitors have or might hereafter have against Surety or its attorney-in-fact on account of anything done in enforcing the terms of this Agreement.

30. **Other Indemnity.** This Agreement is in addition to and not in lieu of any other agreements and obligations undertaken in favor of Surety, whether now existing or entered into hereafter.

31. **Amendment.** The rights and remedies afforded to Surety by the terms of this Agreement can only be impaired by a written rider to this Agreement signed by an authorized officer of the Surety.

ASU GIA(SPD) (04-2022)

32. **Special Provisions:**

33. EACH OF THE INDEMNITORS REPRESENT TO THE SURETY THAT SUCH INDEMNITORS HAVE CAREFULLY READ THIS ENTIRE AGREEMENT, AND THERE ARE NO OTHER AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OR MODIFY THE OBLIGATIONS SET FORTH HEREIN. IN TESTIMONY HEREOF WE THE INDEMNITORS HAVE SET OUR HANDS AND FIXED OUR SEALS AS SET FORTH BELOW. THE SURETY'S ACCEPTANCE OF THIS AGREEMENT SHALL BE PRESUMED AND IS DEEMED EFFECTIVE BY ITS RECEIPT OF THIS AGREEMENT, ITS RELIANCE HEREON, OR BY ITS EXECUTION OF ANY BOND FOR THE INDEMNITORS OR ANY OF THEM, WITH OR WITHOUT THE SURETY'S SIGNATURE BEING AFFIXED THERETO.

---

**IF INDEMNITOR IS A CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP, SIGN BELOW:**

Instructions:
1. If the entity is: 1) a corporation, the secretary and an authorized officer should sign on behalf of the corporation, 2) a limited liability company, the manager(s) or member(s) should sign on behalf of the LLC, 3) a partnership, the partner(s) should sign on behalf of the partnership, or 4) a trust, all trustees should sign.
2. Please provide the entity's federal tax identification number on the line provided.
3. **All signatures must be notarized and dated.**

Each of the undersigned hereby affirms to the Surety as follows: I am a duly authorized officer of the business entity Indemnitor on whose behalf I am executing this Agreement. In such capacity I am familiar with all of the documents which set forth and establish the rights which govern the affairs, power and authority of such business entity including, to the extent applicable, the certificate or articles of incorporation, bylaws, corporate resolutions and/or partnership, operating or limited liability agreements of such business entity. Having reviewed all such applicable documents and instruments and such other facts as deemed appropriate, I hereby affirm that such entity has the power and authority to enter into this Agreement and that the individuals executing this Agreement on behalf of such entity are duly authorized to do so.

Dated: __2/2/2023__

W&T Offshore, Inc.
5718 Westheimer Road, Suite 700, Houston, Texas 77057
_____
Indemnitor Name and Address

_____     _____
Signature of Authorized Officer          Seal        Signature of Authorized Officer          Seal

Federal Tax ID # _____

_____     _____
Todd Grabois, Treasurer                         Janet Yang, Executive Vice President and
                                                          Chief Financial Officer
**Print or Type Name and Title**              **Print or Type Name and Title**

ACKNOWLEDGEMENT
STATE OF __TEXAS__                County of __HARRIS__

On this __2__ day of __February__, 2023, before me personally appeared __Todd Grabois__, the __Treasurer__ of __W&T Offshore, INC__ (the "Entity") and __Janet Yang__, the __EVP & CFO__ of __W&T Offshore, INC.__ (the "Entity") acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by authority of the Entity. IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

| JESSICA ANN MEADOWS |
| Notary Public, State of Texas |
| Comm. Expires 04-07-2025 |
| Notary ID 133020755 |

_____
Jessica Ann Meadows
Notary Public residing at.
__04-07-2025__ (Commission)

ASU GIA(SPD) (04-2022)

# EXHIBIT 1.C

# RIDER TO GENERAL INDEMNITY AGREEMENT

**THIS RIDER TO THE GENERAL INDEMNITY AGREEMENT** (hereinafter, "Rider") is made and entered into this 21st day of May, 2021.

1. This Rider shall be attached to and incorporated into the Indemnity Agreement signed and dated the 5th day of November, 2013 and the Indemnity Agreement signed and dated the 10th day of July 2018 (the "Indemnity Agreement") and entered into by the Principal and Indemnitor(s) for the benefit of the Surety (where said Principal, Indemnitor(s), and Surety shall have the meanings as identified in the Indemnity Agreement, except as set forth herein).

2. The modifications herein are made in consideration of the promises contained herein, and other good and valuable consideration, receipt and the sufficiency of which is hereby acknowledged by the Principal and Indemnitor(s) who intend to be legally bound.

3. All the terms used in this Rider shall have the same meanings as used in the Indemnity Agreement, unless specifically provided otherwise in the Rider.

4. The parties desire to modify the Indemnity Agreement as follows:

> Additional Indemnity Terms. The Indemnitors shall remain bound under the terms of this Agreement even if Surety, with or without notice to or knowledge of Indemnitors, may have accepted or released other agreements of indemnity or collateral from one or more Indemnitors or others. The rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to any and all other rights, powers and remedies which Surety may have or acquire against Indemnitors or others by operation of law or otherwise. Unless expressly stated to the contrary, this Agreement is not intended to and shall not be deemed to supersede any other indemnity agreement between one or more Indemnitors and Surety. Upon Surety's written demand, Indemnitors shall promptly deposit with Surety a clean, irrevocable letter of credit ("ILOC") on a form and from a bank acceptable to Surety, or shall provide another form of collateral acceptable to Surety (individually and collectively, the "Collateral") in the amount of any reserve Surety establishes for any existing liability or claim, and or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand. Further, Indemnitors expressly and specifically agree that Surety, in its sole discretion and for any reason, may, by written demand, require Indemnitors to provide the Surety with Collateral, as defined herein, within ten (10) days of their receipt of said demand , in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion. In the event of any increases in Surety's undischarged liability, Indemnitors shall supplement the Collateral to match the increase.
>
> Surety shall have no obligation to release any Collateral provided to Surety, or remit to Indemnitors any interest or proceeds therefrom until Surety has received written releases or other documentation in form and substance satisfactory to Surety with respect to the discharge of Surety's obligations on all Bonds. Surety may apply the Collateral to any premium due, loss, cost and/or expense provided for in this Agreement. To the fullest extent allowed by law, Indemnitors waive any and all defenses or challenges to the provision of collateral pursuant to this Agreement. Indemnitors further expressly stipulate and agree that Surety will have no adequate remedy at law should Indemnitors fail to post any collateral required herein, and agree that Surety is entitled to specific performance of the obligation to post collateral.

5. As a result of the above, Indemnitors irrevocably agree to amend paragraph 3 'Additional Indemnity Terms' to include the above language in replacement of the existing clause within the original indemnity agreement.

6. All the provisions of the Indemnity Agreement not specifically modified under the provisions of this Rider shall remain in full force and effect.

**IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, have hereunder set their hands and affixed their seals as of the date first written above.

**PRINCIPAL:** W&T Offshore, Inc.

By:

Name: Janet Yang

Title: Executive Vice President and Chief Financial Officer

Date: 5/21/21

## Additional Indemnitor Signatures

**INDEMNITOR:** W&T Energy VI, LLC

By:

Name: Janet Yang

Title: Representative

Date: 5/21/21

## RIDER TO GENERAL INDEMNITY AGREEMENT

**THIS RIDER TO THE GENERAL INDEMNITY AGREEMENT** (hereinafter, "Rider") is made and entered into this 6th day of October, 2020.

1. This Rider shall be attached to and incorporated into the Aspen General Indemnity Agreement dated **November 5th, 2013** (the "Indemnity Agreement") and entered into by the Principal and Indemnitor(s) for the benefit of the Surety (where said Principal, Indemnitor(s), and Surety shall have the meanings as identified in the Indemnity Agreement, except as set forth herein).

2. The modifications herein are made in consideration of the promises contained herein, and other good and valuable consideration, receipt and the sufficiency of which is hereby acknowledged by the Principal and Indemnitor(s) who intend to be legally bound.

3. All the terms used in this Rider shall have the same meanings as used in the Indemnity Agreement, unless specifically provided otherwise in the Rider.

4. The parties desire to modify the Indemnity Agreement as follows:

   **"Surety," as defined in the Indemnity Agreement, shall include United States Fire Insurance Company ("U.S. Fire."), and its successors and/or assigns.**

5. U.S. Fire shall be entitled to exercise any and all rights and defenses under the Indemnity Agreement, as if U.S. Fire was an original Surety, as defined in the Indemnity Agreement.

6. As a result of the above, Indemnitors irrevocably appoint and designate U.S. Fire as their attorney- in- fact, with all accompanying rights as more fully set forth in the Indemnity Agreement.

7. All the provisions of the Indemnity Agreement not specifically modified under the provisions of this Rider shall remain in full force and effect.

   **IN WITNESS WHEREOF**, the undersigned, intending to be legally bound hereby, have hereunder set their hands and affixed their seals as of the date first written above.

**PRINCIPAL:** W&T Offshore, Inc.

By: _____

Name: Janet Yang

Title: Executive Vice President & Chief Financial Officer

Date: 10/28/2020

## Additional Indemnitor Signatures

**INDEMNITOR:** W&T Energy VI, LLC

By: _____

Name: Janet Yang

Title: Representative

Date: 10/28/2020



General Agreement
Of Indemnity (GAI D)
("Agreement")

ASPEN AMERICAN INSURANCE COMPANY
ASPEN INSURANCE UK LIMITED
ASPEN SPECIALTY INSURANCE COMPANY
Rocky Hill, Connecticut 06067

This Agreement is entered into effective as of the 10th day of July 2018, by each of the undersigned indemnitors, for itself (individually "Indemnitor" or which may execute any Bond on behalf of one or more Indemnitors at the request of the Aspen sureties named herein (individually or collectively "Surety").

WHEREAS an Indemnitor, in fulfillment of requirements imposed upon it or to further its business interests, may desire or be required to execute, give, or procure surety bonds, undertakings, guarantees, and other obligations, including any bond(s) predating this Agreement ("Bond" or "Bonds"), and has requested or may request Surety to write such Bonds, or to renew, continue, and/or refrain from canceling Bonds, whether in its own name or one of its subsidiary or affiliated companies, entities, divisions or operating units, alone or in concert with others.

NOW THEREFORE, in consideration of Surety executing, renewing, continuing, and/or refraining from canceling Bonds for the benefit of any Indemnitor, including all of its present and/or future owned and or controlled subsidiaries and affiliates, entities, divisions and/or operating units, whether alone or in joint venture with others, and whether or not named herein, and their successors and assigns, Indemnitors agree as follows:

1.  Payment and Cooperation. Indemnitors shall pay or cause to be paid to Surety promptly when due all agreed premium amounts. Indemnitors shall cooperate with Surety and provide Surety copies of requested documents as well as access to Indemnitors' books, records, personnel, and properties to allow Surety to: a) analyze, assess, and/or underwrite proposed bonds; b) investigate any claims against any Bonds; and/or to c) investigate at any time and as often as Surety deems appropriate, the Indemnitors' compliance with and/or status of performance of Indemnitors' obligations under this Agreement and the Bonds.

2.  Indemnity. Indemnitors shall indemnify the Surety and save it harmless from and against any and all liabilities, claims, demands, payments, losses, damages, expenses, and costs to investigate and/or resolve claims which Surety may at any time incur or pay by reason of or arising out of its execution or non-execution of any Bonds. Indemnitors shall place the Surety in funds to meet all of its liability under any Bond, promptly upon written request and before the Surety may be required to make any payment thereunder. The duty to indemnify and hold harmless also includes, without limitation, payment of Surety's losses, attorney's fees and expenses, and consultant's fees and disbursements incurred and/or paid with respect to any Bond: a) to investigate and/or resolve claims against the Bonds; b) in any action or proceeding between Indemnitors and Surety: and or c) in any action or proceeding between Surety and any third party. The duty to indemnify and hold harmless exists whether or not the claim is made against Surety as a joint and or several obligor and whether or not Indemnitors or any of them is then liable to or demanded to make a payment. A copy of the claim, demand, voucher, invoice, and/or other evidence of the potential liability of and/or payment by the Surety shall be prima facie evidence of the fact and amount of Indemnitors' liability to Surety under this Agreement.

3.  Additional Indemnity Terms. The Indemnitors shall remain bound under the terms of this Agreement even if Surety, with or without notice to or knowledge of Indemnitors, may have accepted or released other agreements of indemnity or collateral from one or more Indemnitors or others. The rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to any and all other rights, powers and remedies which Surety may have or acquire against Indemnitors or others by operation of law or otherwise. Unless expressly stated to the contrary, this Agreement is not intended to and shall not be deemed to supersede any other indemnity agreement between one or more Indemnitors and Surety. Upon Surety's written demand, Indemnitors shall promptly deposit with Surety a clean, irrevocable letter of credit ("ILOC") on a form and from a bank acceptable to Surety, or shall provide another form of collateral acceptable to Surety (individually and collectively, the "Collateral") in the amount of any reserve Surety establishes for any existing liability or claim, and or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand. Further, Indemnitors expressly and specifically agree that Surety in its sole discretion and for any reason may, by written demand, require Indemnitors to secure within 30 days the full and complete discharge of any and all Bonds ("Discharge Demand"). Within 30 days of Surety's Discharge Demand, Indemnitors shall provide the Surety collateral, as defined herein, in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion. In the event of any increases in Surety's undischarged liability, Indemnitors shall supplement the Collateral to match the increase.

    Surety shall have no obligation to release any Collateral provided to Surety, or remit to Indemnitors any interest or proceeds therefrom until Surety has received written releases or other documentation in form and substance satisfactory to Surety with respect to the discharge of Surety's obligations on all Bonds. Surety may apply the Collateral to any premium due, loss, cost and/or expense provided for in this Agreement. To the fullest extent allowed by law, Indemnitors waive any and all defenses or challenges to the provision of collateral pursuant to this Agreement. Indemnitors further expressly stipulate and agree that Surety will have no adequate remedy at law should Indemnitors fail to post any collateral required herein, and agree that Surety is entitled to specific performance of the obligation to post collateral.

4.  Defects. If any intended indemnitor fails to execute this Agreement, or if the execution hereof by any Indemnitor shall be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any Indemnitor executing this Agreement.

5.  Claim Resolution. Surety, in its sole discretion, shall have the right to resolve any claim, demand, and or assertion of liability arising out of a Bond, including claims in litigation or in another dispute resolution forum. Surety's resolution of any such claim shall be final and binding upon the Indemnitors. Indemnitors shall promptly reimburse Surety upon written demand for any payment by Surety arising from any Bond.

6.  Attorney-In-Fact. Indemnitors irrevocably appoint and designate Surety as their attorney-in-fact to execute and to deliver any assignments, documents, agreements, instruments, and/or other documents Surety deems necessary and/or prudent to enforce Surety's rights under this Agreement.

7.  Declined Bonds. Surety may decline at any time to execute any bond and Indemnitors shall make no claim to the contrary, regardless of any indication Surety may have expressed to Indemnitors or anyone else about Surety's intention to write any declined bond.

8. **Changes, Waiver of Notice.** Surety is authorized and empowered, without notice to or knowledge of Indemnitors, to assent to any change whatsoever in Bonds and/or the contracts or obligations underlying any Bonds, including but not limited to changes in the time for performance and any continuations, extensions or renewals of Bonds, the execution of any substitute or substitutes therefor with the same or different conditions, provisions and obligees, and with the same or larger or smaller penalties. Indemnitors specifically and expressly agree that they shall remain bound under the terms of this Agreement even though any such assent by Surety does or might substantially increase the liability of the Indemnitors. Indemnitors expressly waive any claim of entitlement to notice of: a) the execution of Bonds; b) acceptance of this Agreement; c) default under the Bonds or this Agreement; and/or d) any acts giving rise to or constituting a bond claim or liability of Surety under the Bonds.

9. **Prospective Termination.** This Agreement may be terminated with respect to an Indemnitor only to a limited extent, as follows: a) by a written notice from such Indemnitor; b) effective thirty (30) days after receipt by Surety of such notice from Indemnitor sent by registered mail to Surety's offices at: Aspen American Insurance Company, 175 Capital Boulevard, Rocky Hill, Connecticut 06067, ATTN: Surety, or such other address Surety may in writing provide for this purpose; and c) subject to the conditions that: i) a notice of termination shall not operate to release, terminate, modify, bar, or otherwise discharge or reduce such Indemnitor's obligations to Surety for Bonds Surety executes or approves prior to the effective date of termination under this provision; ii) termination is effective only as to such Indemnitor providing written notice of termination in accordance with this paragraph; and iii) termination has no effect upon the obligations of the other Indemnitors under this Agreement.

10. **Severability.** If any provision(s) of this Agreement shall be declared void or unenforceable for any reason, this Agreement shall not be rendered void thereby, but to the fullest extent allowed by law shall be construed and enforced with the same effect as though such provision(s) were omitted.

11. **Choice of Law and Forum.** It is mutually agreed that this Agreement is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed, and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. Indemnitors agree that all actions or proceedings arising directly or indirectly from this Agreement shall be litigated only in courts having status within the State of New York, and consent to the personal jurisdiction and venue of any local, state or federal court located therein.

12. **Demand for Payment.** Whereas, the obligee or beneficiary under certain Bond(s) may make a demand for payment ("Demand") against the Bond(s). When such Demand is made, Surety must pay the amount of the Demand, not to exceed the penal sum of the Bond(s), as well as all necessary fees, within the time period required by the Demand. Under such Bond(s), Surety, with the knowledge and consent of the Indemnitors, has expressly waived all defenses to making such payment. If the Indemnitors receive notice from the Surety that a Demand has been made against the Bond(s) by the obligee or beneficiary, Indemnitors will, at least three (3) business days before payment of such Demand is due, the obligee or beneficiary but in no event, less than 5 business days after Indemnitor's receipt of such written notice, pay Surety the full amount of the Demand, which amount shall not exceed the penal sum of the Bond, as well as all necessary fees. Such payment will be made by wire transfer or otherwise in immediately available funds to the bank account specified in the notice provided to the Indemnitors by Surety. The Indemnitors waive, solely as between Indemnitor and Surety, to the fullest extent permitted by applicable law, each and every right which they may have to contest such payment. Failure to make payment to the Surety as herein provided shall cause the Indemnitors to be additionally liable for any and all costs and expenses, including attorney's fees, incurred by Surety in enforcing this Agreement, together with interest on unpaid amounts due Surety. Interest shall accrue, commencing the date the Surety pays the amount of the Demand, at 130% of the prime rate of interest in effect on the 31st of December of the previous calendar year as published in the Wall Street Journal. Indemnitors stipulate and agree that the Surety will suffer immediate, irreparable harm and will have no adequate remedy at law should Indemnitors fail to perform this obligation, and therefore Surety shall be entitled to specific performance of this obligation.

13. **Joint and Several Obligations.** Each Indemnitor is jointly and severally bound by the terms and conditions herein, whether or not each has executed this Agreement separately or has signed in a representative capacity.

14. **Electronic Transmission, Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all Indemnitors. This Agreement bearing the signature of the Indemnitors shall be valid, effective, and enforceable whether received by the Surety as an original or as an electronic or facsimile transmission.

IN WITNESS WHEREOF, Indemnitors have signed this Agreement effective as of the date stated above in the first paragraph of this Agreement.

Signing Instructions: Corporate Indemnitors must sign by both the corporate secretary and another corporate officer; Limited Liability Companies must sign by the managing member(s) or official(s); Partnerships must sign by a managing partner; Individuals must sign individually.

Each of the undersigned hereby expressly represents and affirms to Surety with respect to any business entity in whose behalf he or she is executing this Agreement as an Indemnitor that he or she: 1) is a corporate secretary or duly authorized officer, manager, official, or partner of the business entity; 2) is familiar with the documents setting forth and establishing the rights governing the affairs, powers, and authority of such business entity including, as applicable, the certificate or articles of incorporation or organization, bylaws, corporate resolutions, partnership, and/or limited liability agreements of the business entity; 3) has reviewed all such applicable documents and instruments and such other facts deemed appropriate; 4) has established for himself or herself that the business entity has the power and authority to enter into this Agreement for its intended purposes, and 5) is duly authorized by the business entity to execute this Agreement on its behalf. Complete Below Where Applicable

LIMITED LIABILITY COMPANY INDEMNITOR: W&T Energy VI, LLC    Indemnitor #1

Tax ID #:
Address: Nine Greenway Plaza, Suite 300, Houston, TX 77046

By:
Name: Tracy W. Krohn
Title: CEO

## ACKNOWLEDGMENT

State of Texas
County of Harris

On this 10th day of July, 2018, before me personally appeared Tracy W. Krohn, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the CEO of Limited Liability Company Indemnitor (the "LLC"); b) executed the above Agreement on behalf of the LLC as the free and voluntary act and deed of said LLC for the uses and purposes stated therein; and c) that he or she signed his or her name thereto under the express authority of the LLC.

ARGELIA CISNEROS
Notary ID # 124924671
My Commission Expires
July 28, 2020

(Signature of Notary Public)
My Commission expires July 28, 2020

CORPORATE INDEMNITOR: W&T Offshore, Inc.    Indemnitor #2

W&T Offshore, Inc., for itself and for and on behalf of all of its subsidiary and affiliated companies, entities, divisions, and or operating units, related limited liability companies, partnerships, and any other business venture or entity, however denominated, whether alone or in joint venture with others, wherever located and however structured or named, whether or not named herein, and whether created before or after the date of this Agreement, as if they were named herein and had signed below, and their successors and assigns, whether the succession or assignment occurs voluntarily or by operation of law.

Tax ID #:
Address: Nine Greenway Plaza, Suite 300, Houston, TX 77046-0908

By:                          (Seal)            First of two required signatures
Name: Tracy W. Krohn
Title: CEO

By:                                          Second of two required signatures
Name: Shahid Ghauri
Title: General Counsel

## ACKNOWLEDGMENT

State of Texas
County of Harris

On this 10th day of July, 2018, before me personally appeared Tracy W. Krohn, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the CEO of Corporate Indemnitor; b) executed the above Agreement on behalf of the Corporate Indemnitor as the free and voluntary act and deed of said Corporate Indemnitor for the uses and purposes stated therein; c) knows the seal of said Corporate Indemnitor; d) on oath stated that the seal affixed thereto is such seal and that it was so affixed by the order of the Board of Directors or controlling authority of said Corporate Indemnitor; and e) that he or she signed his or her name thereto by like order.

ARGELIA CISNEROS
Notary ID # 124924671
My Commission Expires
July 28, 2020

(Signature of Notary Public)
My Commission expires July 28, 2020

## ACKNOWLEDGMENT

State of Texas
County of Harris

On this 10th day of July, 2018, before me personally appeared Shahid Ghauri, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the General Counsel of Corporate Indemnitor; b) executed the above Agreement on behalf of the Corporate Indemnitor as the free and voluntary act and deed of said Corporate Indemnitor for the uses and purposes stated therein; c) knows the seal of said Corporate Indemnitor; d) on oath stated that the seal affixed thereto is such seal and that it was so affixed by the order of the Board of Directors or controlling authority of said Corporate Indemnitor; and e) that he or she signed his or her name thereto by like order.

ARGELIA CISNEROS
Notary ID # 124924671
My Commission Expires
July 28, 2020

(Signature of Notary Public)
My Commission expires July 28, 1020



General Agreement
Of Indemnity  (GAI D)
("Agreement")

**ASPEN AMERICAN INSURANCE COMPANY**
Aspen Specialty Insurance Company
Rocky Hill, Connecticut 06067

This Agreement is entered into effective as of the 5 day of November, 2013 by each of the undersigned indemnitors, for itself and its successors and assigns (individually "Indemnitor" or "Bond Principal" and collectively "Indemnitors" or "Bond Principals") in favor of Aspen American Insurance Company, Aspen Specialty Insurance Company, their successors and or assigns, and any co-surety, reinsurer, and/or any other company which may execute any Bond on behalf of the Indemnitors at the request of the Aspen sureties named herein (individually or collectively "Surety").

**WHEREAS** an Indemnitor, in fulfillment of requirements imposed upon it or to further its business interests, may desire or be required to execute, give, or procure surety bonds, undertakings, guarantees, and other obligations, including any bond(s) predating this Agreement ("Bond" or "Bonds"), and has requested or may request Surety to write Bonds, or to renew, continue, and/or refrain from canceling Bonds, whether in its own name or one of its subsidiary or affiliated companies, entities, divisions or operating units, alone or in concert with others.

**NOW THEREFORE**, in consideration of Surety executing, renewing, continuing, and/or refraining from canceling Bonds for the benefit of any Indemnitor, including all of its present and/or future owned and/or controlled subsidiaries and affiliates, entities, divisions and/or operating units, whether alone or in joint venture with others, and whether or not named herein, and their successors and assigns, Indemnitors agree as follows:

1.  **Payment and Cooperation.** Indemnitors shall pay or cause to be paid to Surety promptly when due all agreed premium amounts. Indemnitors shall cooperate with Surety and provide Surety copies of requested documents as well as access to Indemnitors' books, records, personnel, and properties to allow Surety to: a) analyze, assess, and/or underwrite proposed bonds; b) investigate any claims against any Bonds; and/or to c) investigate at any time and as often as Surety deems appropriate, the Indemnitors' compliance with and/or status of performance of Indemnitors' obligations under this Agreement and the Bonds.

2.  **Indemnity.** Indemnitors shall indemnify the Surety and save it harmless from and against any and all liabilities, claims, demands, payments, losses, damages, expenses, and costs to investigate and/or resolve claims which Surety may at any time incur or pay by reason of or arising out of its execution or non-execution of any Bonds. Indemnitors shall place the Surety in funds to meet all of its liability under any Bond, promptly upon written request and before the Surety may be required to make any payment thereunder. The duty to indemnify and hold harmless also includes, without limitation, payment of Surety's losses, attorney's fees and expenses, and consultant's fees and disbursements incurred and/or paid with respect to any Bond: a) to investigate and/or resolve claims against the Bonds; b) in any action or proceeding between Indemnitors and Surety; and/or c) in any action or proceeding between Surety and any third party. The duty to indemnify and hold harmless exists whether or not the claim is made against Surety as a joint and or several obligor and whether or not Indemnitors or any of them is then liable to or demanded to make a payment. A copy of the claim, demand, voucher, invoice, and/or other evidence of the potential liability of and/or payment by the Surety shall be prima facie evidence of the fact and amount of Indemnitors' liability to Surety under this Agreement.

3.  **Additional Indemnity Terms.** Indemnitors shall remain bound under the terms of this Agreement even if Surety, with or without notice to or knowledge of Indemnitors, may have accepted or released other agreements of indemnity or collateral from one or more Indemnitors or others. The rights, powers, and remedies given Surety under this Agreement shall be and are in addition to any and all other rights, powers and remedies which Surety may have or acquire against Indemnitors or others by operation of law or otherwise. Unless expressly stated to the contrary, this Agreement is not intended to and shall not be deemed to supersede any other indemnity agreement between one or more Indemnitors and Surety. Upon Surety's written demand, Indemnitors shall promptly deposit with Surety a clean, irrevocable letter of credit ("ILOC") on a form and from a bank acceptable to Surety, or shall provide another form of collateral acceptable to the Surety (individually and collectively, the "Collateral") in the amount of any reserve Surety establishes for any existing liability or claim, and/or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand. Further, Indemnitors expressly and specifically agree that Surety in its sole discretion and for any reason may by written demand require Indemnitors to secure within thirty (30) days the full and complete discharge of any and all Bonds ("Discharge Demand"). Within thirty-seven (37) days of Surety's Discharge Demand, Indemnitors shall provide to Surety Collateral as defined herein in the amount representing the total of any undischarged liability under the Bonds as determined by Surety in its sole discretion. In the event of any increases in Surety's undischarged liability, Indemnitors shall supplement the Collateral to match the increase.

    Surety shall have no obligation to release any Collateral provided to Surety, or remit to Indemnitors any interest or proceeds therefrom until Surety has received written releases or other documentation in form and substance satisfactory to Surety with respect to the discharge of Surety's obligations on all Bonds. Surety may apply the Collateral to any premium due, loss, cost and/or expense provided for in this Agreement. To the fullest extent allowed by law, Indemnitors waive any and all defenses or challenges to the provision of collateral pursuant to this Agreement. Indemnitors further expressly stipulate and agree that Surety will have no adequate remedy at law should Indemnitors fail to post any collateral required herein, and agree that Surety is entitled to specific performance of the obligation to post collateral.

4.  **Defects.** If any intended indemnitor fails to execute this Agreement, or if the execution hereof by any Indemnitor shall be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any Indemnitor executing this Agreement.

5.  **Claim Resolution.** Surety, in its sole discretion, shall have the right to resolve any claim, demand, and/or assertion of liability arising out of a Bond, including claims in litigation or in another dispute resolution forum. Surety's resolution of any such claim shall be final and binding upon Indemnitors. Indemnitors shall promptly reimburse Surety upon written demand for any payment by Surety arising from any Bond.

6.  **Attorney-In-Fact.** Indemnitors irrevocably appoint and designate Surety as their attorney-in-fact to execute and to deliver any assignments, documents, agreements, instruments, and/or other documents Surety deems necessary and/or prudent to enforce Surety's rights under this Agreement.

7.  **Declined Bonds.** Surety may decline at any time to execute any bond and Indemnitors shall make no claim to the contrary, regardless of any indication Surety may have expressed to Indemnitors or anyone else about Surety's intention to write any declined bond.

8.  **Changes, Waiver of Notice.** Surety is authorized and empowered, without notice to or knowledge of Indemnitors, to assent to any change whatsoever in Bonds and/or the contracts or obligations underlying any Bonds, including but not limited to changes in the time for performance and any continuations, extensions or renewals of Bonds, the execution of any substitute or substitutes therefor with the same or different conditions, provisions and obligees, and with the same or larger or smaller penalties. Indemnitors specifically and expressly agree that they shall remain bound under the terms of this Agreement even though any such assent by Surety does or might substantially increase the liability of Indemnitors. Indemnitors expressly waive any claim of entitlement to notice of: a) the execution of Bonds; b) acceptance of this Agreement; c) default under the Bonds or this Agreement; and/or d) any acts giving rise to or constituting a bond claim or liability of Surety under the Bonds.

9. **Prospective Termination.** This Agreement may be terminated with respect to an Indemnitor only to a limited extent, as follows: a) by a written notice from such Indemnitor; b) effective thirty (30) days after receipt by Surety of such notice from Indemnitor sent by registered mail to Surety's offices at: Aspen American Insurance Company, 175 Capital Boulevard, Rocky Hill, Connecticut 06067, ATTN: Surety, or such other address Surety may in writing provide for this purpose; and c) subject to the conditions that: i) a notice of termination shall not operate to release, terminate, modify, bar, or otherwise discharge or reduce such Indemnitor's obligations to Surety for Bonds Surety executes or approves prior to the effective date of termination under this provision; ii) termination is effective only as to the Indemnitor providing written notice of termination in accordance with this paragraph; and iii) termination has no effect upon the obligations of the other Indemnitors under this Agreement.

10. **Severability.** If any provision(s) of this Agreement shall be declared void or unenforceable for any reason, this Agreement shall not be rendered void thereby, but to the fullest extent allowed by law shall be construed and enforced with the same effect as though such provision(s) were omitted.

11. **Choice of Law and Forum.** It is mutually agreed that this Agreement is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed, and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. Indemnitors agree that all actions or proceedings arising directly or indirectly from this Agreement shall be litigated only in courts having status within the State of New York, and consent to the personal jurisdiction and venue of any local, state or federal court located therein.

12. **Joint and Several Obligations.** Each Indemnitor is jointly and severally bound by the terms and conditions herein, whether or not each has executed this Agreement separately or has signed in a representative capacity.

13. **Electronic Transmission, Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all Indemnitors. This Agreement bearing the signature of the Indemnitors shall be valid, effective, and enforceable whether received by the Surety as an original or as an electronic or facsimile transmission.

IN WITNESS WHEREOF, Indemnitors have signed this Agreement effective as of the date stated above in the first paragraph of this Agreement.

Signing Instructions: Corporate Indemnitors must sign by both the corporate secretary and another corporate officer; Limited Liability Companies must sign by the managing member(s) or official(s); Partnerships must sign by a managing partner; Individuals must sign individually.

Each of the undersigned hereby expressly represents and affirms to the Surety with respect to the business entity on whose behalf he or she is executing this Agreement as an Indemnitor, that he or she: 1) is a corporate secretary or duly authorized officer, manager, official, or partner of the business entity; 2) is familiar with the documents setting forth and establishing the rights governing the affairs, powers, and authority of such business entity including, as applicable, the certificate or articles of incorporation or organization, bylaws, corporate resolutions, partnership, and/or limited liability agreements of the business entity; 3) has reviewed all such applicable documents and instruments and such other facts deemed appropriate; 4) has established for himself or herself that the business entity has the power and authority to enter into this Agreement for its intended purposes, and 5) is duly authorized by the business entity to execute this Agreement on its behalf. **COMPLETE BELOW WHERE APPLICABLE**

**LIMITED LIABILITY COMPANY INDEMNITOR:**

Indemnitor #1
W&T Energy VI, LLC
Tax ID #: ▮▮▮▮▮▮
Nine Greenway Plaza, Suite 300
Houston, Texas 77046

By: _____

Name: Thomas F. Getten
Title: Representative

ACKNOWLEDGMENT

State of Texas

County of Harris

On this 5 day of November, 2013, before me personally appeared Thomas F. Getten, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the Representative     of Limited Liability Company Indemnitor (the "LLC"); b) executed the above Agreement on behalf of the LLC as the free and voluntary act and deed of said LLC for the uses and purposes stated therein; and c) that he or she signed his or her name thereto under the express authority of the LLC.

_____
(Signature of Notary Public)
My Commission expires: July 28, 2016

ARGELIA CISNEROS
My Commission Expires
July 28, 2016

CORPORATE INDEMNITOR:
Indemnitor #2
W&T Offshore, Inc.
Tax ID #: ████████
Nine Greenway Plaza, Suite 300
Houston, TX 77046-0908

*(Seal)*

By: ~~John D. Gibbons~~          First of two required signatures

Name: John D. Gibbons
Title:  Senior Vice President

By: ~~Thomas F. Getten~~          Second of two required signatures

Name: Thomas F. Getten
Title:  Secretary

## ACKNOWLEDGMENT

State of Texas

County of Harris

On this 5 day of November, 2013, before me personally appeared John D. Gibbons, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the Senior Vice President       of Corporate Indemnitor ; b) executed the above Agreement on behalf of the Corporate Indemnitor as the free and voluntary act and deed of said Corporate Indemnitor for the uses and purposes stated therein; c) knows the seal of said Corporate Indemnitor; d) on oath stated that the seal affixed thereto is such seal and that it was so affixed by the order of the Board of Directors or controlling authority of said Corporate Indemnitor; and e) that he or she signed his or her name thereto by like order.

ACKNOWLEDGMENT

(Signature of Notary Public)
My Commission expires: July 28, 2016

ARGELIA CISNEROS
My Commission Expires
July 28, 2016

State of Texas

County of Harris

On this 5 day of November, 2013, before me personally appeared Thomas F. Getten, to me known or proven to be the person represented, who being by me duly sworn, deposes and says that he or she: a) is the Secretary       of Corporate Indemnitor ; b) executed the above Agreement on behalf of the Corporate Indemnitor as the free and voluntary act and deed of said Corporate Indemnitor for the uses and purposes stated therein; c) knows the seal of said Corporate Indemnitor; d) on oath stated that the seal affixed thereto is such seal and that it was so affixed by the order of the Board of Directors or controlling authority of said Corporate Indemnitor; and e) that he or she signed his or her name thereto by like order.

(Signature of Notary Public)
My Commission expires: July 28, 2016

ARGELIA CISNEROS
My Commission Expires
July 28, 2016

# EXHIBIT 1.D

Page 1

TRANSCRIPT OF RECORDING
Oil and Gas Industry
An Update on BOEM Regulations.Mp3

Page 3

located just below where you clicked to enter the virtual seminar today so please take a couple of minutes and share your feedback with us there.

Today's virtual seminar is being recorded and all registrants will have access to the recording later this week.

Now it's my pleasure to introduce today's presenters. We have with us today John Hohlt, Senior Vice President, Practice Leader, Surety, Natural Resources with CAC Specialty.

We also have Patrick Hennesy, National Underwriting Officer with Sompo Surety.

And Jason Kilpatrick, Senior Vice President, Energy Practice Leader with Applied Surety Underwriters.

You can see the full bios for all of today's presenters on the virtual seminar page. Now it's my pleasure to turn the floor over to you, John, so you can kick us off.

JOHN HOHLT: Great. Welcome everyone. As laid out here, we're going to be talking about the regulation changes going on in BOEM, as it relates to financial assurance and the OCS. So, Kate, if you would, jump to the next slide here. We'll cover what we're going to talk

Page 2

(Beginning of recording.)

KATE SHAMAPANDE: Welcome to this NASBP virtual seminar titled: Oil and Gas Industry An Update on BOEM Regulations. My name is Kate Shamapande and I'll be your moderator for this NASBP virtual seminar.

We'd like to begin by thanking Old Republic Surety for their generous support of NASBP's virtual seminars. Today's primary audio connection is streaming via your computer. As an audience member, you'll be in a listen-only mode throughout today's presentation.

The handouts for today's session are available through the handouts tab on the virtual seminar page. And I'll send a link to that handouts tab in the chat area once we get started.

We encourage you to submit your questions at any time throughout today's virtual seminar and we'll take questions through the chat or the Q&A areas, and we'll take them both at the end as well as throughout the presentation.

Additionally, after completing today's virtual seminar, you'll have access to a short evaluation on the virtual seminar page. It's

Page 4

about.

So, you know, first and foremost, you know, some of you may not be familiar with this type of bond. And that's completely fine. There's a lot of surety that I don't know. And so we'll lay out kind of what the parameters are of this change. Where is this change occurring? Who's in charge? Give the general market update for this region of surety, if you will. And then we'll go through the specifics of the proposed rule change and then the impact that it has followed by a Q&A.

I'll also say that feel free to chime in with questions in the chat. Katherine will be monitoring the chat and stopping us for questions throughout. No problem answering questions throughout, but there will also be a Q&A at the end.

So without further ado, we'll jump in.

So what is the BOEM? The BOEM stands for the Bureau of Ocean Energy Management. It's an agency within the Department of the Interior and it is responsible for the management of United States' several different outer continental shelves, OCS. And this is the legal jurisdiction that the US has over these waters for all their

Page 5

natural resources.  A primary example of this is oil and gas.

The main region for these bond requirements that we're going to be talking about today is within the Gulf of Mexico. The same bonds also exist for a few platforms off the coast of California, where we also engage with the Pacific OCS and the BOEM has jurisdiction over both.

It's important to potentially get to know these guys as well, because we're only going to see more from that office as the U.S. continues to develop solar -- or, excuse me, not solar -- wind farms offshore within this same jurisdiction and this same Bureau will have control over those leases and payments thereof.

It's important to note -- the last bullet point here is that the director and the leader of the BOEM is a presidential appointee, so we have had some fluctuations with -- with the Bureau and how they intend to engage the oil and gas environment based off of who that president has appointed as the director.  Every region has its own director as well as the BOEM having an overall director.  So with that, we'll kind of jump in here.

Page 6

So you -- you may be thinking -- if you're not familiar with the space -- well, gosh, how much really goes on, you know?  What is this about?  If you were to take this same map -- this map on the right here is a -- kind of a snapshot of the infrastructure that exists off the coast of Louisiana.

It's important to note that the United States' jurisdiction begins three miles offshore and three miles inshore is considered State waters, except for Texas, which is three leagues. That was a negotiation way back when.

But, you know, what are we talking about here? If you look at this map, the Bureau is responsible for all the infrastructure and associated revenue in the federally -- federally-regulated waters.  And it's a lot more than people think. You know, approximately 30% of domestic production in terms of oil and gas comes out of the Gulf of Mexico. It's a huge region of -- of oil and gas production. It's responsible for, you know, hundreds of thousands of jobs.  And the revenue associated with the BOEM -- I heard a stat one time -- the revenue associated with the royalties and the lease sales from the BOEM is

Page 7

second only to the IRS. So it's a huge source of revenue for the United States Government and it's a pretty big deal.

Any other comments there, Jason and Pat?

So one of the things I'll cover is -- is, you know, what are these types of bonds?  So the types of bonds that we're going to be talking about today -- we're just going to stick with the government bonds. So these are the bonds, you know, in the same way that, you know, you do anything for the government, a lot of the surety industry is led by government bonding. The same exists here.

Since this is federally-owned leased territory, federally-owned waters, these bonds not only guarantee the decommissioning of the structure that is out there, but also guarantee payment of royalties. Often it's only referred to as a decommissioning guarantee, which is kind of the primary guarantee that those sureties are underwriting, because royalties are usually taken off the top.  But, you know, these bonds are pretty extreme in nature. You know, we're talking about a long tail decommissioning guarantee where,

Page 8

you know, we're making a -- a prediction with our bond approval today for decommissioning that might not occur for 10, 20 years.  So not too dissimilar from those familiar with the mining industry, the waste industry.  It's a lot like that in terms of longevity. These are non-cancellable instruments. And luckily -- as you'll see here in a few slides -- bankruptcy doesn't constitute default, but, boy, bankruptcy has caused quite a bit of headache as of recent in this region.

So we'll go to the next slide here. This is a -- this is public information that was collected by Haynes & Boone, a local law firm here in Houston who is very active in the bankruptcy space. They stopped running this after Q4 2021, but there's certainly been more bankruptcies since then in the last three years.  But this shows both onshore and offshore the cumulative bankruptcies in the E&P space, the exploration and production space, the upstream space.

And, you know, surety bonds exist in every way, shape and form throughout E&P space, regardless of your state of operation.  And so not only with our issues in the Gulf of Mexico, but, you know, this whole field of business has

Page 9

experienced a windfall of bankruptcies and bankruptcy rulings, some of which we'll touch on here later.

But if you go to the next slide, we can see these are the prominent bankruptcies that have occurred within the OCS. So this would be -- this was actually generated by the BOEM to show the cause for a need to have a rule change. You know, we are kind of in unchartered territory here in a sense that, you know, we've had quite a few bankruptcies. You know, if you think about surety as a 100-year-old industry, well, you know, the last 10 to 20 years has been rather tumultuous for this space.

You know, you can kind of see how these coincide with historically low periods of -- of commodity prices. And -- and two of the major bankruptcies that occurred were Fieldwood and Cox, which had, you know, far reaching implications that we're still -- still dealing with today, but those were only as recent as 2020 and 2022. So a lot of what the industry has learned from those two bankruptcies is still being applied up the chain with -- with not only your field underwriters, but then your home office

Page 10

underwriters, all the way up to, you know, reinsurance mandates, you know, still trying to understand, okay, what is the best way to manage this fallout moving forward.

PATRICK HENNESY: So this timeline, John, you know, one way to think about it from an underwriting perspective is up until the Fieldwood and Cox bankruptcy that John just referenced, it's really a low frequency, a low -- low frequency, low severity product until this timeline starts to come into play where you see more frequency, but still the lack of severity. That severity came to -- came to roost with a couple of -- of judicial precedents that were set as part of the Fieldwood case.

But, you know, the underwriters utilize a -- you know, a blended approach for underwriting of credit and -- and asset-based underwriting, which I think Jason is going to touch on.

JASON KILPATRICK: Yeah. And -- and to add to that, Pat and John, I mean, the -- the historic strategy was we used to utilize BK as an exit strategy to get off these obligations. Several of these accounts, they simply reorganized

Page 11

or -- or they sold to a new buyer in which all assets and liabilities were -- were assumed.

Starting with Fieldwood, and then Cox, there -- there was a new strategy put in place from the attorneys and consultants that said, Hey, you know what? Sureties will take care of all the liability. What we'll do is create a divisive merger and essentially get to cherry pick the assets and stick the sureties and any predecessors with the liability. Therefore, this -- this is where everyone started generating heartburn trying to figure out, okay, we used to make a lot of money; now we're not. So how do we move forward on this space?

PATRICK HENNESY: Yeah. And -- and for people who aren't familiar with this space, the -- you know, the -- the potential, you know, the liability that was out there just on those two cases is roughly $2 billion. We're not saying that's -- you know, those -- those cases are very different from each other. And the bonds supportive for -- for both of those cases are very different. We're not saying the industry is going to have $2 billion of losses, but the -- you know, there is loss activity at a higher -- at a higher

Page 12

severity than what has historically been incurred by the industry as -- as the underwriting methodology changed due to the -- the -- the components that Jason just walked through.

JOHN HOHLT: Great. So we'll get into the rule change here on the next slide.

So, obviously, you know, these -- these bonds exist to guarantee the decommissioning of these assets so that the United States taxpayer doesn't have to pay for a bankrupt company's orphaned platform, well, pipeline, you name it. So, you know, this is text taken directly from BOEM here. But this is more or less what they came up with as the proposed rule change. And, you know, they've seen the writing on the wall, too. And they said, right, okay, some of this liability is coming back to us. Some of it -- you know, we're worried that the American taxpayers are going to have to start dishing out money to take care of this.

And so what they said is -- is, all right, you know, we've identified approximately $14.6 billion worth of assets for companies that are less than investment grade and that's what we're trying to cover. And according to their

Page 13

estimates, there's about $6.97 billion worth of new supplemental financial assurance needed and they're going to try to implement it with this rule change.

And you could say to yourself, okay, great, you know, NASBP, surety underwriters and brokers, you know, gear up, you know, it's about to be a great few years. We have, you know, 14 million -- $14 billion worth -- potentially $7 billion worth of new opportunities here. How do we go about this?

And, you know, there's -- there's some sentiment that it could be good for the industry. There's others that think, you know, hey, this is going to be a catalyst moment that accelerates further losses more than it prevents. And so, you know, I'm not here to make a crystal ball prediction on what's going to happen one way or the other, but we can go to the next slide and give you an idea of what that breakdown looks like and look and see what we're dealing with as the industry.

So you saw in that last slide there was those two pictures of tri column regulation. There's about 140 pages of that. But if you were

Page 14

really to just distill it down, this is what it comes to. And -- and if you think about it in a flowchart method, this is what you need to ask yourself and ask your client.

So, One, are you investment grade? Pretty simple question there. And the definition of investment grade is -BBB by S&P and Fitch, Baa3 by Moody's. And that can either be a rating that already exists with these third-party credit analysis firms; or, it could be one that is put together on a synthetic basis by BOEM using S&P Global Credit Analytics. So, you know, I think a lot of underwriters are familiar with that software and that rating analysis. But generally that's the first step. And if you check that box, you know, congratulations for you, you know, kind of no further changes to the status quo.

There wasn't much talk about, okay, can I release the bonds that I have because I'm investment grade now? BOEM was slow to answer that question. But at least there is no change for you going forward. So then -- okay.

So if the answer is, Yes, no supplemental financial assurance required. If the answer is, No, you get one more test out and that

Page 15

is, you know, do you have a 3-to-1 reserve to decom ratio. Basically stating, you know, does the present value of the lease that you're on in terms of oil and gas value with that specific lease, is it three times greater than the decommissioning expense for that same lease? That one's a bit hairy.

PATRICK HENNESY: So to put that in -- to put that into a different couple of words, the future value, talking about how that's derived, that's the present value of today -- of the future cash flows in today's dollars at a discount rate typically applied at -- at a factor of 10.

So what that means is they're adding up all the future cash flows and bringing it to today's dollars for a specific lease. And that lease has a specific bond on it or decommissioning amount tied to it. So when you look at that 3-to-1 ratio that John's talking about, it's do all of the future cash flows discounted to today's dollars equal three times as much as what it costs in today's dollars to decommission that asset? And if so, then a bond is required. It's another form of adverse selection for the surety industry that takes further opportunities off the table for

Page 16

Jason and myself as underwriters to utilize that asset-based underwriting approach on a single asset basis.

JOHN HOHLT: Right. So there's -- if you look at it from the other lens, you know, Pat's right. It's an adverse selection on the fact that, you know, right off the bat we're dealing with non-investment grade companies, okay? That's fine. That exists quite a lot within surety. We can handle that. But then they take it a step further and say, right, not only is this a non-investment grade company, but the assets within that company that we want you to bond are less than their best -- they don't test out of this 3-to-1 reserve to decom ratio.

A couple of other little important points as to that, you know, there's all different types of estimates for, you know, how do you come up with the -- the decom amount? How do you come up with reserves? You know, it's raised a lot of questions on -- you know, you could have three companies on the same lease, each with a different value for that reserve. You know, that question still remains to be answered. But one question they did answer is, okay, what decommissioning

Page 17

value are we going off of?  That is the -- the P70 value, which basically means probability of 70% that the number selected by the BOEM and its, you know, sister bureau agency, BSEE, is -- is the number chosen for that specific lease.

So, you know, if we -- if you run through the whole thing, if you don't test out of the investment grade and if the lease itself that you own doesn't test out of the 3-to-1 ratio, you then are required to place financial assurance on that asset. One option that the government has given is surety.  And there's a three-year phase-in period.

This rule has already been put into effect, but a big asterisk that comes with that, you know, there may be a change here with the new president coming in January. We saw a very similar situation with the second Obama administration and another proposed rule change within the BOEM that then got rescinded upon Trump's first presidency. So I don't know if we'll see the same thing here, but it -- it looks and smells like the same.

But we also have, you know, some pending legal litigation.  You know, there have been several companies and even State agencies

Page 18

that have sued the BOEM and the Federal Government demanding, you know, a temporary injunction or a stay in order to further dispute the implementation of these rules.

So, you know, this could all be for nothing. We don't know. But, you know, prepare for the worst and hope for the best.

So on to the next --

JASON KILPATRICK:  John, something -- something else to mention real quick is -- we haven't touched on it really -- but there's the private bonding in the Gulf of Mexico as well. I believe there's a couple billion dollars of private bonds out there that BOEM is not taking into consideration. And so something to be -- to be cognizant of is duplicative bonding and how does that get resolved?  Also, when it comes time to call the bonds -- call the bonds in a distressed situation, what bonds -- what bonds are called first?  The private bonds or the BOEM bonds?  And there's always dispute between that.

JOHN HOHLT: Yeah.  Yeah.  And good point, Jason.

You know, in addition to that, you know, what Jason is talking about is, you know,

Page 19

there's preexisting bonds and a private -- we call them private bonds, meaning non-government related, in a transaction between a buyer and a seller.

And one thing we should touch on real quick here is that chain of title liability exists in the Gulf of Mexico. So if Shell Oil, you know, built and developed this platform and drilled these wells in the 1960s, and it's now owned by, you know, John Hohlt Energy, and my company goes bankrupt, you know, Shell Oil is still on the hook there even going all the way back, you know, to the inception.

And so what Jason was talking about is -- is a solve that the private companies have thought of was, okay, as a part of my disposition of this asset, I'm going to require a private bond between me and the buyer.  And there's a good chunk of surety out there that exists within this private bond market that is also going to be thrown into limbo, you know, with these rule changes, until we get kind of clear advice from the BOEM on how they're going to treat other surety not in their name.

PATRICK HENNESY: So we have an element

Page 20

of -- we have two elements of adverse selection, as you pointed out, John, associated with this new rule.

One, the investment grade piece and, one, the individual asset piece. Then we have the potential for all of it to become not, as a result of -- of Trump's election to the White House. We have some lack of clarity as it relates to order of attribution of claims in the claim scenario that Jason pointed out. And all of this to say is there's regulatory risk and judicial risk associated with this space that has been swinging back and forth for the better part of eight years.

And it's caused -- capital does not like -- you know, capital does not flock to the uncertainty. In fact, it runs away. And you have this judicial and regulatory risk that's been swinging back and forth. You know, how are we, as underwriters, supposed to -- to go forward and -- and support an increase of 14, $15 billion worth of bonds in that environment? And that was the ask from the BOEM to us so that -- is that a fair summary.

JOHN HOHLT: Yes.

JAMES KILPATRICK: Yes.

Page 21

JOHN HOHLT: And if we go to the next slide here, I think we can touch further on some of that uncertainty.

So, you know, listen, surety is -- we all underwrite to a zero loss, but it's still, you know, less than the perfect model. I think the industry numbers are incredible, but you have losses and we get that. And what I think we're trying to say here is some of the losses and some of the then legal proceedings out of these bankruptcies is unchartered territory.

So Pat or Jason, do you-all want to talk about 363 Sale through the main judge, Judge Isgur up there? He is the presiding bankruptcy judge for the South District of Texas, where a lot of these bankruptcies have occurred. And some of the rulings that have come out of his court, you know, not only give underwriters raised hairs on their neck, but it also has further implications outside of just that specific bankruptcy. And what are we getting into now as an industry?

So, Pat or Jason, do you-all want to take either a 363 Sale example, which I think you all touched on; or, what's kind of gone on in the world of Falcon V and surety as executory

Page 22

contracts?

JASON KILPATRICK: Well, I think -- go ahead, Pat.

PATRICK HENNESY: Why don't you take 363.

JASON KILPATRICK: Yeah. 363, for no one that knows, that's -- that's associated with the bankruptcy code as it relates to essentially liquidation, selling all the assets. And like I mentioned earlier, the old process or the old strategy was bankruptcy was not a bad thing. It was a way for us to get off these obligations. You would have a bidder come in via stalking horse and -- and acquire essentially all the assets and liabilities.

In this particular case, as it relates to Fieldwood and Cox, in particular, Judge Isgur decided that it's okay to take -- cherry pick the assets and essentially spin off the liabilities back to the predecessors. It -- it hadn't happened for 20 to 30 years, I believe, since -- since the mid '80s. And so -- and I believe someone just asked a question -- yes. It is 363, Chapter 7, pretty much that's part of the code -- unless Pat disagrees -- I believe. 363 I don't

Page 23

think can be tied to any other --

PATRICK HENNESY: I'm not a lawyer.

JASON KILPATRICK: Right. Right.

PATRICK HENNESY: I'm not a lawyer, but, yeah, it's part of a Chapter 11 proceeding. It's a -- it's a select -- it's a select liquidation proceeding inside of a broader Chapter 11 reorganization, a very specific element of the bankruptcy code. I'm not an attorney.

JASON KILPATRICK: Correct. Likewise.

So going back to the 363 real quick, I mean, in most cases, we -- we were used to seeing -- especially in the early 2000s, all the way up through 2014, essentially, we were seeing a bunch of simple reorganizations, restructure the debt, maintain everything, continue the -- your P&A program, your plugging and abandonment program. But things have changed.

And John had mentioned the Southern District Court of Texas with Judge Isgur. Falcon V was actually done out of, I believe, the Louisiana bankruptcy court. And so point being, like -- like Pat had mentioned, there's -- not only are we dealing with regulatory risk, we're also dealing with -- with adverse rulings from the courts. And

Page 24

so those -- those are things we definitely need to be on the lookout for.

JOHN HOHLT: So -- so I was going to add here on Falcon V, so this is, you know, public knowledge at this point. And I would suggest anyone who's curious to look it up on your own time.

But the United States Fifth Circuit Court of Appeals, you know, ruled that a surety indemnity agreement does not constitute or does not qualify as an executory contract. And basically what that means is that the indemnity agreement doesn't survive through the bankruptcy through to the new owner. And we have a lot of cases right now in the oil and gas space -- Falcon V was an onshore case. But, you know, we have a lot of cases -- both onshore and offshore -- where we have surety still in place, still providing the necessary financial assurance to the local government, but we have a principal on the bond who is not an indemnitor and is not paying premium, but is still receiving the benefit of having that statutory coverage from the preexisting surety prior to this day.

And so, you know, for obvious reasons,

Page 25

that was contested to a very high level. Now, I mean, you could -- it could go beyond that. It could go to the Supreme Court. I don't know where it's at. But, you know, Fifth Circuit Court of Appeals at the state level is a pretty high court and a very negative impact, and negative case law that now exists out there for the whole of the surety industry to deal with.

You know, I don't know if this is going to come up again in the world of construction or mining or waste, you know, these other major surety silos. But, you know, it's not off the table because of this case law.

Okay. I don't know if we had any further questions to that.

KATE SHAMAPANDE: John, we did get another question that came up.

Backing up to the new rule with the PV10 valuation to test out of the bonding requirement, what kind of price assumptions are backed into PV10?

JOHN HOHLT: Great question.

KATE SHAMAPANDE: Could lessees face additional bonding requirements based on the changes in the price of oil; and if so, how long

Page 26

lasting and/or severe would those changes need to be?

JOHN HOHLT: So -- so that's one of the main issues with that test out is -- is how -- you know, we are still waiting for concrete feedback from BOEM on how often are we going to be retesting this? Is there a universal price deck that everyone needs to be using? Right now everyone can use their own price deck within the laws of accounting, you know, based off of how they want to determine, you know, NYMEX oil and gas pricing.

And then how often are you going to reset that? You know, the price changes every day, price changes every second, you know, so -- so if we're tying an extreme bond obligation to a variable like commodity price, you kind of open Pandora's box for, you know, an unlimited amount of revisions.

I don't know if you want to add to that.

PATRICK HENNESY: Yeah. The BOEM is looking at SEC pricing, which, as John mentioned, is governed by GAAP accounting rules, which basically says you add the previous 12 -- the

Page 27

average of the previous 12 months pricing that -- that is published by NYMEX, and they basically add that up, divide by 12, and that's the price deck that they use to go forward. And lessees definitely would be facing additional bonding requirements based on those prices.

So should prices crater the government is setting up a position where a company who does not have bonding then is forced to post a number of bonds during a down pricing cycle, which makes it more challenging for that company to provide the required financial assurance. And if they do not, then it's unknown as to whether or not the government is going to shut them in and cause a bankruptcy event, which could result in all of the negative things that we talked about around the judicial proceedings.

So, John, it's in the public record, you know, why don't you talk about the comment you made in response to the government rules around, it could be causing the problem that they're trying to prevent?

JOHN HOHLT: Yeah. You know, I went on public record with the Federal Government with my response to these rule changes. And, you know,

Page 28

it's -- it's almost like a Greek tragedy where all the steps that the government is taking to prevent this massive fallout, as far as decommissioning obligations are concerned, you know, these measures that they're taking are -- could potentially accelerate the defaults that they're trying to prevent, you know, by putting undue stress on these oil and gas companies who struck a deal 15 years ago with the seller that at the time didn't contemplate financial assurance being posted and paid for.

And it's really not even the premium that's concerning. It's the collateral request that would come from the sureties as a part of their quotes. You know, they didn't -- they didn't factor that into their purchase and sale agreement, you know, 15 years ago when this deal was struck. And so it's almost as if, you know, it's a retraining of the deal in that sense.

But on the flip side, I -- you know, I can understand where these sellers are coming from and saying, Hey, BOEM, we trusted you to only allow vetted and viable companies into the Gulf of Mexico. And, gosh, we've had 30 bankruptcies since 2009, so, you know, your system isn't perfect

Page 29

either. And I think there is a more common ground here that could be attained. But, you know, asking for this and then saying, you know, okay, we'll have a three-year phase-in period -- I mean, a three-year phase-in period for, you know, $7 billion worth of surety from subinvestment grade operators on their less than stellar assets is a bit of a backhanded compliment, if you will, from the BOEM on what they expect here from the surety industry.

JASON KILPATRICK: Hey, John, has there been a ruling yet on BOEM regarding the action if these operators do not provide the financial assurance in three years?

JOHN HOHLT: Yeah. I mean, you know, there's -- there's talk that, you know, shut-ins would come. You know, it would be -- in my opinion, it would be no different than if you were out of compliance, you know, with your royalty payments. You know, what actions does -- what kind of sword can BOEM swing when they need to swing it? And it is, you know, shut-in. But the thing with that is, you know, how do you shut in something with multiple co-lessees and you have, you know, three that are doing everything by the

Page 30

book and one who's not, you know.

So one of the things that, you know, I wanted to talk about, too, and that -- that rule change I failed to mention, you know, that first test out -- Katherine, if you go back -- was, are you investment grade? So if you go back to the waterfall there. There you go. If you're investment grade or if one of your co-lessees is investment grade, you know, okay, maybe I'm riding the coattails of -- of a major here on my lease. One thing that's important to remember, though, is, you know, is that -- is that subsidiary under that major on file with the BOEM? Is that subsidiary investment grade? And that's kind of a big gray area, too, Jason.

It's like, you know, there's so much gray area in this that hasn't been solved for. And in that particular case, if I'm -- if I'm on a lease with BP, obviously BP's parent Corp is investment grade, but is their Gulf of Mexico subsidiary investment grade? And how does the BOEM classify that? And is that passthrough going to qualify for other co-lessees? So, you know, lots to dispute here.

Katherine, I don't know if we had one

Page 31

more slide for -- there we go.

So, you know, a lot of the feedback that we've been getting is -- you know, from the market is, you know, can I trust surety bonds as a viable instrument? You know, there's been people who have said, Oh, well, you know, I've heard this; you know, Hey, I made a claim on a bond and so and so is not paying me. And it's like, well, you know, I would -- I would trust the surety market -- obviously I'm biased -- but I would trust the sureties to pay a valid claim; however, I think we can all agree that there's a lot going on here, you know, as it relates to these particular bankruptcies.

These are not just simple -- these are not just simple non-payments on a construction project where, you know, a sub is -- is showing no receipts from a general contractor. It's -- it's highly disputed bankruptcy rulings. It's complex, legal, drawn out battles between outside counsel for both the bankruptcy creditors, the trustees, and the obligees on these bonds.

You know, I don't want to risk the viability and reputation of the surety industry, and I always kind of fight for them when I get

Page 32

these questions, but it's -- it's not as binary as people think.

And then one of the things, too, is -- go ahead.

PATRICK HENNESY: Yeah. There's a couple of things that go into that though, too, right, John?

I mean, one, who is the obligee on the bond? The obligee on the bond is the United States Department of the interior. So in the event that the United States Department of the Interior suffers actual damages and is responsible for or incurs actual costs for performing work, it is as simple as the sub who hasn't been paid by the GC.

And sureties -- you know, sureties look to that to -- we're insurance companies at the end of the day. Our job is to make you whole, not provide potential unjust enrichment. We're not just going to pay an allocated sum because you say there's -- there's been harm. There has to be good faith investigation of a claim and looking at the merits of that claim and relating that back.

And No. 1 would be: Are dollars out of the door? If dollars aren't out of the door,

Page 33

what are you making a claim for?  So, you know, I hear what you're saying in terms of, you know, I've made this claim.  But in some cases, sure, you've made a claim, but you haven't suffered any harm yet would be -- would be a response.

But generally speaking we try to avoid unjust enrichment. We try to avoid moral hazard by paying to make whole as opposed to paying to then allow an obligee to take funds and spend as they will.

JASON KILPATRICK: Right.

Pat, real quick, you mentioned the order of attribution earlier. Do the -- do the predecessors have rights to the BOEM bonds in case of an adverse scenario?  Or should -- because we -- we -- you and I have both experienced where BOEM has demanded a bond and then just issued those funds to the predecessors to go do the work. Shouldn't -- is that what the bond is intended for?

PATRICK HENNESY: Well, I think if you look back to that timeline you would say, No, until the current director got in front of Congress and stated that the BOEM bond would come into play first.

Page 34

However, there's the concept of subrogation rights in surety where in the event we pay, we get to stand in -- in the shoes, and as a result of, we would have the ability to then look at the whole chain of title enforcing that chain of title to make the predecessors perform the work and -- and not -- you know, not receive any -- any more than is owed to them, which could be nothing underneath the CFR, which is the Federal code that governs the offshore continental shelf.

So I would say that even -- even though the current sitting BOEM director -- director stated that is -- that is the -- the intent of the go-forward rule, I don't think it necessarily has application from a judicial standpoint until a judge says yes or no.

JOHN HOHLT: Yeah. And it's put in clear black ink within the CFR. You know, that -- that was something that we had asked for ad nauseam.

Okay. Talk to us about sinking funds -- here's a question:  Talk to us about sinking funds required by sureties that are based on current decom obligations from the latest audit, and then continued funding based on

Page 35

long-term estimated decommissioning costs. Essentially collateralizing the surety initially and on a go-forward basis to fully collateralize the end of life cycle.

So, yeah, what -- what -- that's a good anecdote there, Chris. Yeah. And that's one way of underwriting, right? It is -- you know, I think it's hard to say that there's been so many bad players in the Gulf that, you know, tomorrow's production is going to pay for today's decommissioning. And that rule can certainly apply to very large stout operators with stable credit history and that is still a model that exists.

But a more popular model that's coming into place is one that Chris has alluded to which is, you know, providing some form of collateral upfront and then funding a sinking fund, either with the government or directly with the surety, a form of collateral, where essentially over the life of the property funds are put into an account or as collateral where then at the end of the life, you know, there's enough funds to cover decommissioning or other commiserate with --

PATRICK HENNESY: And another -- another way to augment that, too, is by

Page 36

incorporating any work that comes along.  Because it all doesn't just come at once. You have a -- you have a number of different assets that have different lives and different costs and different timing of plugging and abandonment and decommissioning.

So as you're working through that portfolio of assets and liabilities, you have collateral and/or performance of the decommissioning that could come into play as well. So it's a little bit of a perform or pay -- perform or fund collateral as you go along for your long-term deal.

And that's John's point.  And I think what Chris is alluding to is this is a way that we have been able to work with operators and provide surety support by setting out reasonable time frames to achieve the funding of decommissioning and/or the performance of decommissioning, which is ultimately what -- what we're guaranteeing.

JOHN HOHLT: Katherine, I think that's the end of the presentation.  But we're obviously, you know, open for more questions or comments or --

KATE SHAMAPANDE:  Okay.  Well, I just

Page 37

want to remind everyone you can submit your questions in that chat area or in the Q&A area. And as John said, we're ready to take those questions from the audience now.

While we're waiting for audience questions to come in, I'd like just to see if each of you have any words you'd like to say in closing to kind of wrap up this topic for those that are on listening.

John, is there anything you'd like to say?

JOHN HOHLT: You know, I think one of the things I've been talking about with the industry is that we're in a bit of a Renaissance, if you will, kind of a Dark Ages before the Renaissance right now in the Gulf of Mexico space and the BOEM and OCS space. And it's not too dissimilar from, you know, where we were, you know, about a decade ago with the coal industry. And, you know, there are still plenty of good sureties that write the coal business and a ton of good operators out there in that space. And it's a resource that we still need. Oil and gas is -- are two resources that we still very much need. And we're going through kind of this period of

Page 38

reorganization, right? Okay. We got over our skis. Bankruptcies have occurred. You know, losses will be paid. But how can we now carry forward with this industry as it looks today and kind of, you know, what are the new terms and conditions of playing in this space?

KATE SHAMAPANDE: Patrick, would you like to say anything in closing or to wrap up the topic while we're waiting for questions -- see what questions might come in?

PATRICK HENNESY: Sure. So the rules that are put out there today, the proposed rules that have now been passed, there's some -- you know, there's some thought around a scaling back of the magnitude of impact as a result of the new President Elect coming into office. The -- you know, and I think there will be some of that.

However, as John mentioned, there's still lots of activity out there. There's still other challenges that were outlined in this -- in this presentation whether it be future regulatory risk, whether it be future judicial risk. How we solve this problem of -- you know, and it's not a problem -- how we solve the opportunity so we can collectively make money and remain profitable on a

Page 39

go-forward basis is -- you know, is still being worked out.

But the -- the decommissioning sinking funds that -- that were brought up as a question is a primary tool. How we look at this from a credit analysis perspective, I think changes in the industry with looking at real actual cost dollars of decommissioning, looking at how those are analyzed and presented by -- by our clients, and how we look at the -- the totality of future cash flow of a company and how that's analyzed by the surety market and relate it back to the decommissioning costs, for us to pre-qualify somebody's ability to perform in the future are -- are all present. We are collectively moving that way in terms of -- of changing our analyses, individually, and changing our terms and conditions, individually.

But as John said, oil and gas are extremely important to the United States, and there's definitely a large taxpayer risk embedded in it, which makes it a very strong opportunity set for the surety industry to step in and really kind of solve the problem and bridge the gap.

KATE SHAMAPANDE: And, Jason, before I

Page 40

come back to you, we did have a couple of questions come in.

So one of the questions we had was, Could you talk about how the BSEE P70 number is derived? How often that P70 number is updated? And what is the deterministic number used in the absence of a P70? And could an increase in the cost in the reclamation performance market result in additional bonding requirements?

John, did you want to take that first? You are shaking your head.

JOHN HOHLT: Yeah. Yeah. I think both of these -- that's a lot.

KATE SHAMAPANDE: I know. It is a lot.

JOHN HOHLT: So real quick, for everyone's -- you know, we use the acronym BOEM. BSEE is the Bureau of Safety and Environmental Enforcement, and they are -- think of them as the sister company to BOEM. And they provide these -- these P70 estimates, these probability 70 estimates for decom expenses on a lease-by-lease basis, even on a pipeline-by-pipeline basis.

And so, you know, how often -- you know, what is that deterministic number that's used under P70? You know, that's clearly outlined

Page 41

on the -- on the BSEE website if you want to get into all of that.

But how often is it redetermined? You know, right now we're kind of at a weird cycle. You know, there is a huge update about three years ago with regards to the -- to the BSEE numbers as it related to shelf properties. You know, I should say offshore properties in shallow waters. You know, we don't have clear insight from -- from the government on when these numbers are going to be updated. Is it every two years, you know, to just -- let's say no costs go up, but we're going to make an adjustment every two years for inflation? We don't -- we don't know.

And then, could an increase in these reclamation performance -- can the reclamation performance market result in additional bonding? Well, yeah. I mean, it's -- P70 in theory is only going to go up every year, you know, for inflation and other cost adjustments, unless we come up with a drastically cheaper way to decommission these wells. You know, in theory, that number could go up and that would result in more bonding.

KATE SHAMAPANDE: Jason or Patrick, did you have anything you wanted to add to that?

Page 42

JASON KILPATRICK: No. No. John nailed that one.

KATE SHAMAPANDE: Okay.

Our next question that came in is in regards to indemnity. So the surety's indemnity is good up until they have to go to bankruptcy court and then it's not valid as far as the most recent judgment that we've discussed. Is -- is that a correct synopsis of -- of what we've talked about or is there something else there?

PATRICK HENNESY: I'd encourage you to go talk to a lawyer, but I think there's been some -- I think there's been some good -- some good analysis that's been put out about the Countryman test as it relates to surety indemnity agreements being construed as executory contracts or otherwise.

I would say that one of -- at least some of the takeaways that we've worked with, John and other brokers, and with the SFAA and the Energy Working Group that both Jason and I sit on, you know, we've worked out -- you know, we've looked at utilizing different bond forms and different bond language to help end that cap and ultimately arrive at a position that protects the

Page 43

indemnity agreement -- protecting the indemnity agreement's validity throughout the life cycle of a potential bankruptcy and trying to avoid, you know, what would have -- you know, what occurred in the Falcon V bankruptcy, and, you know, limit some of the -- the go forward potential damage as a result of that judicial outcome as it stands at least today.

KATE SHAMAPANDE: Does anyone want to add anything else to that?

No? Okay.

The next question we got -- at first they just are saying that the panel has done a great job articulating some of the cons that are proposed -- of the proposed rule change. Given the large losses in the Fieldwood and Cox cases that were referenced at the start of the presentation, are there any positives for the surety industry or should the new rules be seen as a welcomed development specifically in the oil and gas space?

JOHN HOHLT: Yeah, so I'll answer a part of that.

KATE SHAMAPANDE: Thanks, John.

JOHN HOHLT: I think that absolutely I

Page 44

like the idea of a rule and the status quo is not acceptable. We need kind of more clearcut direction as an industry and then -- and then for our fellow, you know, clients in the space, you know, who we indemnify. So that is all very welcome. I think a lot of what -- this proposed rule change, though, has, you know, answered a lot of questions, but it also generated just as many questions as it answered.

There -- the positives from this rule change, yeah, there will be new surety opportunities for, you know, the brokers and producers to pursue and for the underwriters to approve and underwrite, you know. And there's definitely an opportunity here for money to be made if it's done in the correct manner.

But, again, you know, it's -- it's a double-edged sword here because this is a rule applicable to everyone except for investment grade companies. And so right off the bat, you know, is it going to be a net positive or a net negative for the oil and gas industry and for the surety industry? I mean, sureties -- I think one of the important things to point out and that BOEM never really contemplated is, you know, if they're

Page 45

asking us for $7 billion worth of surety, you know, we could say no to all $7 billion. You know, we don't have to write a single -- another bond in the Gulf of Mexico. And so it's really up to us to determine, you know, what a good client is and what a good underwriting metric is going forward. The ball is in our court.

KATE SHAMAPANDE: Jason or Patrick, did you want to add anything to that?

JASON KILPATRICK: No. I mean, one of the few opportunities -- and we don't look at this from -- from a premium perspective. We look at it from a risk perspective. But, I mean, the market has firmed up. You do have certain carriers exiting the space. And so, I mean, that -- that does allow for higher rates, stronger security structures. But nonetheless, I mean, we still -- as an industry, we -- we must stay disciplined in this approach.

PATRICK HENNESY: Yeah, I'd second that, and state, you know, expertise in this space is -- is necessary in underwriting it, from my perspective. You know, really understanding the -- the -- the commodity volatility, looking at how that impacts in a short and long-term basis,

Page 46

understanding how these rules are put together and how they impact you, understanding what has happened in the past and learning from that and going forward. And, you know, also, I think there's a -- you know, there is a way to underwrite this that makes sense and can -- can allow us to -- to all make money.

The -- the -- the point of John -- that John made around we can say, no, not everybody qualifies for a surety bond, and that is -- that's good. That's a -- that's a benefit that we provide as surety underwriters. So not everybody receiving a bond is also a good thing. So it's -- it's about how we pre-qualify companies into the space and how we protect our own balance sheets, our reinsurers' balance sheets, and ultimately look at long-term profitability in this space.

KATE SHAMAPANDE: We did get another question that just came in as well.

With surety ultimately holding the capacity that BOEM and oil and gas companies need, how would companies operate if they can't obtain surety capacity? Will the new regulations then -- or, is there the possibility that they could

Page 47

squeeze out smaller operators making the investment grade companies larger?

Does anyone have thoughts on that?

JASON KILPATRICK: Yeah. The answer is, Yes. I mean, they could definitely squeeze out the smaller operators and create what -- what I -- what I define as an oligarchic industry where you only have select players in there who don't need the bonds or don't have -- have no interest in working with the surety. So, yeah, there is risk there.

And also adding -- adding to that real quick before we run out of time -- Pat alluded to it earlier -- the regulatory and judicial -- judicial risk. But we also need to -- we're talking about depleting assets here so if these companies aren't able to replace those reserves, who's going to want to invest hundreds of millions of dollars with an adversarial regulatory and legal environment?

So, I mean, there -- there -- there are definitely concerns. And private equity firms and investors don't want to fund plugging and abandonment expenses upfront, so those are things we have to be concerned with.

Page 48

KATE SHAMAPANDE: All right. Well, it looks like those are all the questions we've gotten so far from the audience.

Jason, did you want to say anything in closing, since we didn't get to you before?

JASON KILPATRICK: No, I just added it right there so --

KATE SHAMAPANDE: All right. Well, I just want to thank all -- all of you, John, Jason and Patrick, for being on with us today and just sharing information on these updates. I want to thank everyone that was on and attended as well. And I just want to remind you to take a couple of minutes and complete that evaluation of today's virtual seminar. Again, as I mentioned before, it is available on that virtual seminar page. It's located directly below the link you used to enter either the live virtual seminar today or to access the recording. Your feedback is extremely important to NASBP staff and the editorial planning group as we put together future educational offerings, so, please, just take a couple of minutes and make sure to put your feedback in there.

That does conclude this NASBP virtual

Page 49

seminar. You may now disconnect. Thanks everyone.
(End of recording.)

Page 50

REPORTER'S CERTIFICATION
TRANSCRIPT OF RECORDING
Oil and Gas Industry
An Update on BOEM Regulations.Mp3

I, SHAUNA L. BEACH, CCR, RDR, CRR, Certified Shorthand Reporter in and for the State of Texas, do hereby certify to the following:

I certify that the foregoing is a true and correct transcription to the best of my ability of audio recording Oil and Gas Industry an Update on BOEM Regulations.Mp3.

I further certify I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this 11th day of December, 2024.

Page 51

*Shauna Beach*

SHAUNA L. BEACH, CSR #8408
Expiration Date: 12/31/2026
The SB Company
Texas Firm #11077
1980 Post Oak Boulevard, Suite 100
Houston, Texas 77056
www.shaunabeach.com

# EXHIBIT 1.E



A Member of the Tokio Marine Group

**Surety Claims Department**
P.O. Box 3636
Bala Cynwyd, PA 19004

November 13, 2024

**VIA FEDERAL EXPRESS & EMAIL**

W&T Offshore, Inc.
c/o Todd E. Grabois, Vice President & Treasurer
5718 Westheimer Road, Suite 700
Houston, TX 77057

Re: Surety: **Philadelphia Indemnity Insurance Company**
Principal: **W&T Offshore, Inc.**

Dear Mr. Grabois:

This demand is submitted on behalf of Philadelphia Indemnity Insurance Company ("PIIC" or "Surety"), and is directed to your attention as one of the signatories (as Treasurer) to the General Indemnity Agreement ("GIA") dated September 11, 2020, which W&T Offshore, Inc. ("W&T") executed in favor of PIIC. A copy of the GIA is attached. This demand supersedes PIIC's prior demand of July 2, 2024, which was directed to W&T's agent, McGriff Insurance Services, LLC, wherein PIIC requested that W&T provide PIIC with collateral in the amount of $31 million. To date, W&T has not complied with that prior demand and, thus, is in breach of its obligations to PIIC under the GIA.

Pursuant to the GIA, W&T agreed to, among other things:

**3. INDEMNITY** – Principals and Indemnitors agree to indemnify and hold harmless Surety from and against any Liability & Loss sustained or incurred: (a) by reason of having executed or being requested to execute any and all Bonds; (b) by failure of Principals or Indemnitors to perform or comply with any of the covenants or conditions of this Agreement or any other agreement between Surety and Principal or Indemnitors; and (c) in enforcing any of the covenants or conditions of this Agreement or any other agreement between Surety and Principal or Indemnitors….

**4. POSTING OF COLLATERAL** – Principals and Indemnitors agree to deposit collateral immediately upon demand by Surety in an amount equaling any and/or all of the following…. (f) an amount Surety determines (at Surety's sole discretion) is sufficient to collateralize or pay any outstanding Bond obligations and all liability in connection with any Bond if Principals and Indemnitors are unable to produce the full and complete discharge of Surety from its Bonds upon Surety's request…. The Principals and Indemnitors shall be obligated to deposit the amount of collateral demanded by Surety regardless of whether they dispute

*An email response to this correspondence is preferred, including the transmission of requested documentation.

Philadelphia Consolidated Holding Corp. ▪ Philadelphia Indemnity Insurance Company ▪ Philadelphia Insurance Company ▪ Maguire Insurance Agency, Inc.



A Member of the Tokio Marine Group

**Surety Claims Department**
P.O. Box 3636
Bala Cynwyd, PA 19004

their liability for any Liability & Loss or potential Liability & Loss or assert any defenses to the validity or enforcement of this Agreement…. In the event that Principals and Indemnitors fail to deposit the amount of cash collateral required under this provision, Surety may, in its sole discretion, direct the Principals and Indemnitors to deposit alternate forms of collateral security acceptable to Surety. Principal and Indemnitors acknowledge that their duty to deposit collateral under this Paragraph is specifically enforceable because Surety lacks an adequate remedy at law and their failure to deposit collateral with Surety as required by this Paragraph will cause irreparable harm to as to justify injunctive relief compelling deposit of collateral. Surety agrees to refund any unused portion of collateral, without any interest or other damages for loss of use of such funds, upon the termination of all liability of Surety on all Bond and the full performance of all of the Principals and Indemnitors of all obligations under this Agreement.

At W&T's request, and in reliance upon W&T's execution of the GIA, PIIC executed several Bonds[1] on behalf of W&T. As of this date, there are at least 24 open Bonds wherein PIIC's undischarged liability totals $71,217,145, as follows:

| Bond No. | Bond Amount | Obligee |
|---|---|---|
| PB01626000245 | $26,000,000.00 | U.S. Department of Interior, Bureau of Ocean Energy Management ("BOEM") |
| PB01626000246 | $1,083,078.98 | Texas General Land Office |
| PB01626000247 | $358,851.00 | BOEM |
| PB01626000248 | $705,215.00 | BOEM |
| PB01626000249 | $4,000,000.00 | Chevron USA Inc. |
| PB01626000257 | $2,850,000.00 | U.S. Department of Interior ("US DOI") |
| PB01626000258 | $347,500.00 | US DOI |
| PB01626000259 | $347,500.00 | US DOI |
| PB01626000266 | $600,000.00 | US DOI |
| PB01626000267 | $2,845,000.00 | US DOI |
| PB01626000268 | $ 215,000.00 | US DOI |
| PB01626000269 | $1,500,000.00 | Anadarko US Offshore LLC |
| PB01626000252 | $25,000 | BLM |
| PB01626000270 | $2,886,000.00 | US DOI |
| PB01626000271 | $11,034,000.00 | US DOI |

---

[1] Undefined capitalized terms used in this letter shall have the same meaning as set forth in the GIA.

*An email response to this correspondence is preferred, including the transmission of requested documentation.

Philadelphia Consolidated Holding Corp. ▪ Philadelphia Indemnity Insurance Company ▪ Philadelphia Insurance Company ▪ Maguire Insurance Agency, Inc.


## PHILADELPHIA
### INSURANCE COMPANIES

A Member of the Tokio Marine Group

**Surety Claims Department**
P.O. Box 3636
Bala Cynwyd, PA 19004

| | | |
|---|---|---|
| PB01626000272 | $5,600,000.00 | Anadarko US Offshore LLC |
| PB01626000273 | $2,123,000.00 | US DOI |
| PB01626000274 | $1,400,000 | Anadarko US Offshore LLC |
| PB01626000275 | $750,000 | US DOI |
| PB01626000276 | $2,002,000 | Anadarko US Offshore LLC |
| PB01626000277 | $1,500,000 | Anadarko US Offshore LLC |
| PB01626000278 | $2,350,000 | US DOI |
| PB01626000279 | $347,500 | US DOI |
| PB01626000280 | $347,500 | US DOI |

Pursuant to Paragraph 4(f) of the GIA, PIIC hereby demands that, within ten (10) days of the date of this letter, W&T either: (a) produce the full and complete discharge of PIIC from all liability in connection with the Bonds set forth in the above table immediately above this paragraph, or (b) deposit **$71,217,145** in collateral with PIIC, which represents PIIC's undischarged liability in connection with such Bonds (or such less amount as may remain in open liability if one or more of the above-listed Bonds is reduced or discharged). Such collateral may be in the form of cash, a clean irrevocable letter of credit, or such other collateral as may be acceptable to PIIC (in PIIC's sole discretion). Please note that after PIIC is fully collateralized, if any of the Bonds are reduced or discharged, PIIC will agree to reduce, release and return such collateral in amounts commensurate with the amounts by which PIIC's undischarged liability is reduced.

Your prompt attention to this demand is requested. If W&T is unable to comply with this demand, in whole or in part, we request that you contact us to discuss W&T's intentions. PIIC understands that other sureties have issued similar demands and is willing to consider proposals from W&T to address its obligations to PIIC and W&T's other sureties. However, if W&T does not honor its contractual obligations under the GIA and comply with this demand, and W&T does not make other arrangements with PIIC, PIIC will take all actions necessary to protect its interests, including, but not limited to, filing suit for breach of the GIA, as well as injunctive relief for specific performance pursuant to Section 4 of the GIA. We note that PIIC's legal fees and costs of enforcement of PIIC's rights are expressly recoverable pursuant to the terms of the GIA.

*An email response to this correspondence is preferred, including the transmission of requested documentation.

Philadelphia Consolidated Holding Corp. • Philadelphia Indemnity Insurance Company • Philadelphia Insurance Company • Maguire Insurance Agency, Inc.



A Member of the Tokio Marine Group

**Surety Claims Department**
P.O. Box 3636
Bala Cynwyd, PA 19004

As is customary, PIIC reserves all rights, claims and defenses.

Very truly yours,

*Andrew S. Kent*

Andrew S. Kent

Encl.

cc:     MCGRIFF (via email only)
        Brian Kantar, Esq. (via email only)

*An email response to this correspondence is preferred, including the transmission of requested documentation.

Philadelphia Consolidated Holding Corp. • Philadelphia Indemnity Insurance Company • Philadelphia Insurance Company • Maguire Insurance Agency, Inc.

# EXHIBIT 1.F

 SOMPO

July 9th, 2024

**Via FedEx to all Addressees and email to:** Ashley Koletar <Akoletar@McGriff.com>

Tracy Krohn - CEO
W&T Offshore, Inc.
5718 Westheimer Rd # 700
Houston, Texas 77057

Re: Discharge Demand and Collateral Demand Notice for W&T Offshore, Inc., and W&T Energy VI, LLC

Pursuant to Section 3 of the executed Payment and Indemnity Agreement (No. 1380) effective September 14, 2020 (the "Indemnity Agreement"), Endurance Assurance Corporation, Endurance American Insurance Company, Lexon Insurance Company, and Bond Safeguard Insurance Company, all Sompo International companies, (the "Surety") formally demands **Seven Million Five Hundred Thousand Dollars ($7,500,000.00)** of collateral (the "Collateral") or partial collateral relative to Surety's remaining open exposure. The Collateral shall be transferred to Surety's possession within thirty (30) days of your receipt of this letter and no later than <u>August 9, 2024</u>, via the instructions below in Exhibit B.

This demand shall not limit or be deemed a waiver of the Surety's other rights (which it may exercise in its sole discretion) under the executed Amended and Restated Agreement of Indemnity or otherwise to cancel bonds, to demand collateral, or to take any other actions Surety deems necessary and/or prudent, in its sole discretion, to mitigate actual or potential loss under any and all bonds written in accordance with the Indemnity Agreements previously executed.

Regards,

Pat Hennesy
Senior Vice President
Sompo International

**Sompo**
**12890 Lebanon Rd**
**Mt. Juliet, TN 37122**
**(615) 553-9587**



**Exhibit A**

**Bond Schedule:**

| Bond Number | Principal Name | Obligee Name | Bond Amount | Current Effective Date | Expiration Date |
|---|---|---|---|---|---|
| EACX226000022-04 | W & T Energy VI LLC | US Department of Interior | $1,461,000.00 | 9/15/2023 | 9/15/2024 |
| EACX226000025-04 | W & T Energy VI LLC | US Department of Interior | $3,000,000.00 | 11/5/2023 | 11/5/2024 |
| 1156846-07 | W & T Energy VI LLC | US Department of Interior | $5,000,000.00 | 5/4/2024 | 5/4/2025 |
| 1097677-10 | W & T Energy VI LLC | US Department of Interior | $9,000,000.00 | 6/3/2024 | 6/3/2025 |
| 1159776-03 | W & T Energy VI LLC | US Department of Interior | $3,000,000.00 | 12/20/2023 | 12/20/2024 |
| EACX226000038-03 | W & T Energy VI LLC | US Dept of Interior | $1,482,000.00 | 1/10/2024 | 1/10/2025 |
| EACX226000039-03 | W & T Energy VI LLC | US Dept. of the Interior | $3,830,148.00 | 1/10/2024 | 1/10/2025 |
| EACX226000040-03 | W & T Energy VI LLC | US Dept of Interior | $13,126,457.00 | 1/10/2024 | 1/10/2025 |
| EACX226000044-02 | W & T Energy VI LLC | US Dept. of the Interior | $3,000,000.00 | 10/1/2023 | 10/1/2024 |
| 1136949-08 | W&T Offshore Inc | United States Department of the Interior | $1,166,860.00 | 9/9/2023 | 9/9/2024 |
| 1136950-08 | W&T Offshore Inc | United States Department of the Interior | $117,279.00 | 9/9/2023 | 9/9/2024 |
| 1152010-07 | W&T Offshore Inc | Woodside Energy USA Incoprorated | $1,931,562.00 | 1/8/2024 | 1/8/2025 |
| 1152011-07 | W&T Offshore Inc | Woodside Energy USA Incoprorated | $376,688.00 | 1/8/2024 | 1/8/2025 |
| EACX226000043-03 | W&T Offshore Inc | Exxon Mobile Corporation et al | $7,000,000.00 | 6/1/2024 | 6/1/2025 |
| EACX226000045-01 | W&T Offshore Inc | Railroad Commission of Texas | $125,000.00 | 3/1/2023 | 8/1/2024 |
| EACX226000047-02 | W&T Offshore Inc | US Dept of Interior | $2,285,584.00 | 6/7/2024 | 6/7/2025 |

**Total Sompo Liability: $55,902,578.00**

(Additional Pages Follow)

**Sompo**
**12890 Lebanon Rd**
**Mt. Juliet, TN 37122**
**(615) 553-9587**



**Exhibit B**

**Collateral Options**

**Wire Transfer** – Please use the following instructions



**Letter of Credit** – The Surety requires that the issuing bank meet certain underwriting criteria. Once the bank is determined and agreed upon, the bank must use the Surety's letter of credit format (wording provided below). Upon execution, the original letter of credit must be sent to the attention of Collateral Management at 12890 Lebanon Rd., Mt. Juliet, TN 37122.

(Additional Pages Follow)

**Sompo**
**12890 Lebanon Rd**
**Mt. Juliet, TN 37122**
**(615) 553-9587**

 SOMPO

## Exhibit B (Continued)

Irrevocable Letter of Credit Standard Wording

MUST BE ON BANK LETTERHEAD WITH BANK ADDRESS AND PHONE NUMBER

(ISSUE DATE)
OUR LETTER OF CREDIT NO.: XXXX-XXXXXX

BENEFICIARY:

BOND SAFEGUARD INSURANCE COMPANY AND/OR
LEXON INSURANCE COMPANY,
ENDURANCE AMERICAN INSURANCE COMPANY,
ENDURANCE ASSURANCE CORPORATION
12890 LEBANON ROAD
MOUNT JULIET, TN 37122
ATTENTION: BOND DEPARTMENT

WE HAVE ESTABLISHED THIS IRREVOCABLE LETTER OF CREDIT NO. XXXX-XXXXXX ("LETTER OF CREDIT") IN YOUR FAVOR FOR THE ACCOUNT OF _____ FOR DRAWING UP TO THE AGGREGATE AMOUNT OF USD_____ AND 00/100 UNITED STATES DOLLARS) EFFECTIVE IMMEDIATELY AND EXPIRING AT OUR OFFICE AT [ISSUING BANK NAME AND ADDRESS], WITH OUR CLOSE OF BUSINESS ON [EXPIRATION DATE]. EXCEPT WHEN THE AMOUNT OF THIS IRREVOCABLE LETTER OF CREDIT IS INCREASED, THE CREDIT CANNOT BE MODIFIED OR REVOKED WITHOUT YOUR WRITTEN CONSENT.

WE HEREBY UNDERTAKE TO PROMPTLY HONOR YOUR SIGHT DRAFT(S) DRAWN ON US IN YOUR FAVOR, FOR ALL OR ANY PART OF THIS LETTER OF CREDIT, IF PRESENTED AT OUR OFFICE AT [ISSUING BANK NAME AND ADDRESS], ON OR BEFORE THE EXPIRY DATE OR ANY AUTOMATICALLY EXTENDED DATE.

THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF THE NAMED BENEFICIARY, INCLUDING WITHOUT LIMITATION, ANY LIQUIDATOR, REHABILITATOR, RECEIVER OR CONSERVATOR.

EXCEPT AS STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY AGREEMENT, REQUIREMENT, CONDITION OR QUALIFICATION. OUR OBLIGATION UNDER THIS LETTER OF CREDIT SHALL BE OUR INDIVIDUAL OBLIGATION, IN NO WAY CONTINGENT UPON REIMBURSEMENT OR OUR ABILITY TO PERFECT ANY LIEN OR SECURITY INTERESTS WITH RESPECT THERETO.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ONE (1) YEAR FROM THE EXPIRATION DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO ANY EXPIRATION DATE WE SHALL SEND NOTICE TO YOU BY LETTER SENT CERTIFIED MAIL TO YOUR ADDRESS SET FORTH ABOVE THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT EXTENDED FOR ANY SUCH ADDITIONAL PERIOD.

ALL DRAFTS MUST BE MARKED: "DRAWN UNDER [ISSUING BANK NAME] LETTER OF CREDIT NO. XXXX-XXXXXX."

ANY ONE BENEFICIARY OR COMBINATION OF BENEIFICIARIES, ACTING INDIVIDUALLY OR COLLECTIVELY, MAY DRAW ON THIS LETTER OF CREDIT IN FULL OR IN PART, AND ANY ACTION TAKEN BY ANY OR ALL BENEFICIARIES HEREUNDER SHALL BIND EACH OF THEM.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE ICC UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS PUBLICATION NO. 600 (2007 REVISION) ("UCP 600"). TO THE EXTENT THAT APPLICABLE PROVISIONS OF UCP 600 ARE NOT IN CONFLICT, IN WHICH CASE THE PROVISIONS OF UCP 600 SHALL PREVAIL, THIS LETTER OF CREDIT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK. NOTWITHSTANDING ARTICLE 36 OF UCP600, IF THIS LETTER OF CREDIT EXPIRES DURING AN INTERRUPTION OF OUR BUSINESS AS DESCRIBED IN SAID ARTICLE 36, THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THE LETTER OF CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF OUR BUSINESS.

PLEASE ADDRESS ALL CORRESPONDENCE REGARDING THIS LETTER OF CREDIT TO THE [ISSUING BANK NAME AND ADDRESS], INCLUDING THE LETTER OF CREDIT NUMBER MENTIONED ABOVE.

[ISSUING BANK NAME
* 2 authorized signatures required

BY: _____          BY: _____
Name:                                Name:
Title:                               Title:

**Sompo**
**12890 Lebanon Rd**
**Mt. Juliet, TN 37122**
**(615) 553-9587**

# EXHIBIT 1.G

 **TOKIO MARINE**
**HCC**

**Surety Group**
801 S. Figueroa Street Suite 700
Los Angeles, CA 90017 USA
Tel: 310-649-0990

July 31, 2024

*VIA EMAIL & CERTIFIED MAIL*

Mr. Tracy Krohn, Chairman & CEO  Mr. Sameer Parasnis, EVP & CFO
W&T Offshore, Inc.  W&T Offshore, Inc.
5718 Westheimer Road, Suite 700  5718 Westheimer Road, Suite 700
Houston, TX 77057  Houston, TX 77057
*tracy@wtoffshore.com*  *sparasnis@wtoffshore.com*

Re:    Principals:         **W&T Offshore, Inc. & W&T Energy VI, LLC**

**Request for Collateral as Security**

Dear Mr. Krohn & Mr. Parasnis:

The enclosed September 14, 2020 Payment and Indemnity Agreement ("Agreement") was executed by W&T Offshore, Inc. and W&T Energy VI, LLC (*collectively,* "W&T") as Principals and in favor of U.S. Specialty Insurance Company ("USSIC"). USSIC issued various bonds in reliance on the Agreement. Currently, there is $111,803,169.70 of outstanding surety bond exposure issued on behalf of W&T.

Paragraph 3 of the Agreement titled Security provides:

"The Surety may at any time and from time to time hereafter, in its sole and absolute discretion, require the Principals provide, in form and amounts acceptable to the Surety (such amounts not to exceed the aggregate penalty sum of all then-issued Bonds) to secure the Principals' obligations to the Surety hereunder and/or to establish reserves to cover any actual or potential liability, claim, suit or judgment under any Bond. Within thirty (30) days after the Surety has made written demand on Principals, each Principal shall execute such documents and take such further action as may be necessary in order to provide such collateral."

By way of this letter and in accordance with the terms of the Agreement, USSIC respectfully requests that W&T as Principal provide collateral security in the total amount of $23,000,000.00 due on or before September 1, 2024.

Upon receipt of this letter, please contact me to discuss this request. USSIC reserves all its rights and defenses under the Bonds, the Agreement, the law or otherwise.

Very Truly Yours,

Brian J. Steele
On behalf of U.S. Specialty Insurance Company
Direct Dial: (860) 284-4625
E-mail: bsteele@tmhcc.com

Enclosures -- September 14, 2020 Payment and Indemnity Agreement

# EXHIBIT 1.H

RYAN DRY
PARTNER
972.797.9511 TELEPHONE
972.797.9510 FACSIMILE
rdry@drylaw.com



October 1, 2024

**VIA CMRRR: 9414811898765488269776**
**FIRST CLASS REGULAR MAIL**
W&T Offshore, Inc.
5718 Westheimer Rd., Ste. 700
Houston, TX 77057

**VIA CMRRR:  9414811898765488269653**
**FIRST CLASS REGULAR MAIL**
W&T Offshore, Inc.
c/o C T Corporation System
1999 Bryan St., Ste. 900
Dallas, TX 75201

Re:    Principal:        W&T Offshore, Inc. ("Principal" and/or "Indemnitor")
        Surety:         Pennsylvania Insurance Company (the "Surety")
        Obligee:       QuarterNorth Energy LLC ("Obligee")
        Bond Nos.:    SBP150328_001, SBP150328_002, SBP150328_003, and
                          SBP150328_004 (the "Bonds")

Dear Principal:

Please be advised that this firm and the undersigned have been retained as counsel for the above-referenced Surety. This correspondence is being sent to provide notice that the Principal is in default of its obligations to the Surety and demand that the Principal procure the full and complete release of the above-referenced Bonds within thirty (30) days of receipt of this letter.

On or about February 2, 2023, W&T Offshore, Inc. executed that certain General Indemnity Agreement (the "Indemnity Agreement") agreeing, *inter alia*:

To hold harmless and exonerate Surety from and against any and all Losses, as well as any other expense that the Surety may incur or sustain as a result of or in connection with the furnishing, execution, renewal, continuation, or substitution of any Bond(s).

Pursuant to paragraph 4 of the Indemnity Agreement the Principal and/or Indemnitors further acknowledged and agreed to the following:

The Indemnitors acknowledge that the Bonds issued on their behalf ***are to be secured by collateral upon demand***. In lieu of fully collateralizing the Bonds prior to their issuance and in consideration for the execution and/or delivery of one or more Bonds, the Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such

amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses.

A copy of the Indemnity Agreement is enclosed for your reference. The term "Losses" is defined in the Indemnity Agreement as any one or more of the following:

(a.) sums paid by Surety to claimants under the Bonds, (b.) sums required to be paid to claimants by Surety but not yet, in fact, paid by Surety, by reason of execution of such Bonds, (c.) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds, including but not limited to legal fees and expenses, technical and expert witness fees and expenses, (d.) all costs and expenses incurred in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses, (e.) all accrued and unpaid premiums owing to Surety for the issuance, continuation or renewal of any Bonds and/or (f.) all other amounts payable to Surety according to the terms and conditions of this Agreement.

As of the date of this letter, there is **$357,355.10** in accrued and unpaid premium owing to the Surety for the issuance, continuation, and/or renewal of the above-referenced Bonds. Copies of these invoices are enclosed for your reference and immediate payment.

The Indemnity Agreement provides the Surety with an unequivocal right of exoneration and to be released from the Bonds by the Principal and its Indemnitors. Specifically, paragraph 12 of the Indemnity Agreement, entitled "**Surety's Rights to Release of Bonds and Indemnitors' Waiver**" provides, in relevant part, that:

The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors financial condition has been or is believed to be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's right under the Bond(s). In such an event within thirty (30) days of receipt of Surety's written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent evidence of release satisfactory to the Surety, in its sole discretion.

In accordance with paragraph 12 of the Indemnity Agreement, the Surety has determined, in its sole discretion, that the Principal's financial condition has been or is believed to be deteriorating and/or that there has been or is believed to be other changes adversely impacting the Surety's rights under the Bonds. Accordingly, the Principal is hereby demanded to procure the full and complete release of the above-referenced Bonds and provide competent evidence of the bond releases to the Surety. Competent evidence of release satisfactory to the Surety shall include a written release from the obligee on each bond, expressly reference the Surety and bond number, and release the Surety from all liability on the bond, including past, present, and future.

If the Principal fails to provide the Surety with the aforementioned releases, the Principal "shall, within seven (7) days, provide the Surety with collateral in the amount of 100% of all unreleased liability under the Bond(s)." Please be advised that, at present, there is **$11,343,949.00** in unreleased liability under the Bonds.

The Principal's failure to comply with this demand will result in the Surety promptly taking any and all action necessary to protect its interests, including but not limited to filing suit for breach of the Indemnity Agreement as well as injunctive relief for specific performance of the collateral deposit provision in the Indemnity Agreement. As you have been previously advised and should be aware, the legal fees and costs of enforcement are expressly recoverable under the Indemnity Agreement. While the Surety's legal fees to date have been minimal, those amounts will increase significantly should further action be required. Therefore, the Principal is strongly encouraged to comply with this demand.

This letter is not an act to collect, assess or recover a claim against a debtor or any other party that has filed for bankruptcy or to which the automatic stay of 11 U.S.C. § 362 might apply. Any and all claims that the Surety asserts against that party will be properly asserted in compliance with the Bankruptcy Code in the bankruptcy proceeding.

Please be advised that any and all of the Surety's rights, defenses, and interests at law, in equity, under the Bonds, pursuant to the Indemnity Agreement or otherwise, including but not limited to the rights to demand additional collateral, access the Principal's books and records, and/or file a UCC-1, are expressly reserved. Furthermore, we trust that you understand the joint and several indemnity obligations of the Principal and Indemnitors to the Surety.

Your prompt attention to this matter is required. Please do not hesitate to contact me if you have any questions.

Sincerely,

Ryan D. Dry, Esq.

Encls.
cc:    (*via E-mail, w/ Encls.*)
       McGriff Koletar (akoletar@mcgriff.com)
       Ryan Varela (rvalera@mcgriff.com)
       Jaimie Morrison (Jaimie.Morrison@mcgriff.com)

**GENERAL INDEMNITY AGREEMENT**

This General Indemnity Agreement (hereinafter "Agreement") is made and entered into by the undersigned, hereinafter referred to individually and/or collectively, as "Indemnitors", for the benefit of California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, with their principal offices at 10805 Old Mill Rd Omaha, Nebraska, 68154-2607, and for itself, its subsidiaries, affiliates, parents, co-sureties, fronting companies and/or reinsurers and their successors and assigns, whether in existence now or formed hereafter, individually and collectively, as "Surety", for the purpose of indemnifying the Surety for any Bonds (as hereinafter defined) from any and all Losses (as hereinafter defined).

## Definitions

The term "Bond(s)" shall mean any and all bonds including but not limited to surety bonds, undertakings, guarantees, or any contractual obligations, previously or hereafter executed, issued, procured, or undertaken by the Surety, whether directly or as a result of any asset purchase, merger, acquisition, or similar transaction, and any renewals or extensions thereof issued by Surety, or issued by another at the request of Surety, on behalf of Indemnitors, whether issued prior to or subsequent to the effective date of this Agreement.

The term "Indemnitors" shall mean an individual, corporation, partnership, Limited Liability Company (hereinafter called LLC), Limited Liability Partnership (hereinafter called LLP), joint venture, trust, estate or other legal entity, whether individually or jointly with others, who sign this Agreement or whose authorized representatives sign this Agreement or any other agreement that incorporates by reference the terms of this Agreement, whether the Indemnitors are individuals or entities. The Indemnitors warrant and represent that they have a material and beneficial interest in Surety's issuance of Bonds on behalf of the Indemnitors, and acknowledge that Surety would not issue such Bonds without each Indemnitors' agreement to reimburse Surety for all Losses arising under the Bonds.

The term "Losses" shall mean any and all (a.) sums paid by Surety to claimants under the Bonds, (b.) sums required to be paid to claimants by Surety but not yet, in fact, paid by Surety, by reason of execution of such Bonds, (c.) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds, including but not limited to legal fees and expenses, technical and expert witness fees and expenses, (d.) all costs and expenses incurred in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses, (e.) all accrued and unpaid premiums owing to Surety for the issuance, continuation or renewal of any Bonds and/or (f.) all other amounts payable to Surety according to the terms and conditions of this Agreement.

As an inducement to the Surety and in consideration of the Surety's execution or procurement of the Bond(s), the Surety's refraining from canceling one or more Bond(s), and/or the Surety's assumption of one or more Bond(s) and for other good and valuable consideration, the receipt and sufficiency of which the Indemnitors hereby acknowledge, the Indemnitors hereby agree, for themselves, successors, and assigns, jointly and severally, as follows:

1. **Premium.** To pay all initial and renewal premiums for each Bond, as they fall due, until Surety has been provided with competent legal evidence, in its sole discretion, that the Surety has been fully released of liability under such Bond.

2. **Indemnity.** To indemnify, hold harmless and exonerate Surety from and against any and all Losses, as well as any other expense that the Surety may incur or sustain as a result of or in connection with the furnishing, execution, renewal, continuation, or substitution of any Bond(s). Expenses include, but are not limited to: (a) the cost incurred by reason of making an independent investigation in connection with any Bond(s) or this Agreement; (b) the cost of procuring or attempting to procure the Surety's release from liability or a settlement under any Bond(s) upon or in anticipation of Losses, including the defense of any action brought in connection therewith; and (c) the cost incurred in bringing suit to enforce this Agreement against any of the Indemnitors. Payments of amounts due the Surety hereunder, including interest, shall be made immediately upon the Surety's demand.    In the event of any payment by the Surety, the Indemnitors further agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. The vouchers or other evidence of any such payment(s) made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety, and of the Surety's good faith in making the payment(s). "Good Faith," as used in this paragraph and elsewhere in this Agreement, shall be deemed to include any and all payments, Losses, attorneys' fees, and other expenses except those made with deliberate and willful malfeasance.

3. **Application.** This agreement shall apply to any and all Bond(s) furnished for or on behalf of any or all of the following as follows:
   (a)    One, some or all of the Indemnitors;
   (b)    Any joint venture or other form of common enterprise in which Indemnitors were members at the time the Bond(s) were furnished;
   (c)    Any present or future affiliate and/or subsidiary of Indemnitors;
   (d)    Any third party at the request of Indemnitors, their subsidiaries and/or affiliates

4. **Collateral Security.** The Indemnitors acknowledge that the Bonds issued on their behalf are to be secured by collateral upon demand. In lieu of fully collateralizing the Bonds prior to their issuance and in consideration for the execution and/or delivery of one or more Bonds, the Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses. If for any reason the Surety deems it necessary to increase the amount of any such deposit to cover any possible additional liability or loss, the Indemnitors shall deposit with the Surety, immediately upon the Surety's demand, an additional amount of collateral security equal to such increase. The Indemnitors acknowledge that the Surety would not issue any Bonds without the agreement of the Indemnitors to post collateral upon demand. Accordingly, the Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will suffer irreparable harm and will not have an adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement.

5. **Surety Reserve.** The Surety may, in its sole discretion, establish a reserve to cover any actual or anticipated, liability, claim, suit, judgment, or Losses under any Bond. In such event, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve, and any subsequent increase thereof, to be held by the Surety as collateral security on the Bond(s). Such funds will be used by the Surety to pay Losses or may be held by the Surety as collateral against potential future Losses. The Indemnitors hereby grant to the Surety a security interest in all money and other property now or hereafter delivered by such Indemnitors to the Surety for deposit in such reserve, and all income (if any) thereon. Any funds remaining after the Indemnitors' settlement or payment of all Losses will be returned to the Indemnitors within fifteen (15) days from the date of the Indemnitors' settlement or payment of the Losses.

ASU GIA(SPD) (04-2022)

6. **Access to Books and Records.** In the event the Surety receives a claim or demand on any Bond or establishes, in its sole discretion, a reserve in anticipation of incurring Losses, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitors for the purpose of examining the same.

7. **Non-Impairment of Indemnitors' Obligations.** The obligations of the Indemnitors under this Agreement shall not be impaired by and Surety shall incur no liability on account of: (a) Surety's failure or refusal to furnish Bond(s), including final Bond(s) where Surety has furnished a bid Bond; (b) Surety's consent or failure to consent to changes in the terms and provisions of any Bond, or consent or failure of consent to changes in the obligation or performance secured by any Bond; (c) the taking, failing to take, or release of security, collateral, assignment, indemnity agreements and the like, as to any Bond; (d) the release by Surety, on terms satisfactory to it, of any Indemnitors; and/or (e) the Surety's cancellation of any Bond(s).

8. **Surety Priority.** The Indemnitors shall not seek indemnity, contribution or collection of any other outstanding obligation against any other Indemnitors or their property until the obligations of the Indemnitors to Surety under this Agreement have been satisfied in full.

9. **Confidentiality.** The Indemnitors acknowledge that the Surety may share copies of any and all statements, agreements, financial statements and any information which it now has or may hereafter obtain concerning Indemnitors with governmental regulators, auditors, co-sureties, fronting companies, and/or reinsurers.

10. **Default.** The Indemnitors shall be in default of this Agreement if: (a) Indemnitors shall become a party in any insolvency, receivership, liquidation, or bankruptcy; (b) Any Indemnitor makes representation to the Surety by or on behalf of any of the Indemnitors that prove to have been misleading or materially false when made; (c) Indemnitors fail to provide collateral in response to a proper request made by the Surety; (d) Any Indemnitors is convicted of a felony; (e) Indemnitors breach any other provision of this Agreement.

11. **Indemnitors representations.** The Indemnitors represent and warrant to the Surety that they have a substantial, material, and/or beneficial interest in the obtaining of Bond(s) by any of the Indemnitors and in the transaction(s) for which any of the other Indemnitors have applied or will apply to the Surety for Bond(s) pursuant to this Agreement. Indemnitors represent and warrant that they have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein. Indemnitors further represent and warrant that their execution, delivery and performance of this Agreement does not and will not conflict with, constitute a default under, or result in a breach or violation of any of their respective organizational documents, any law, governmental rule or regulation, or any applicable order, writ, injunction, judgment or decree of any court or governmental authority, or any other agreement binding upon Indemnitors.

12. **Surety's Rights to Release of Bonds and Indemnitors' Waiver.** The Surety may, in its sole discretion, determine one or more of the following: (a) the Indemnitors financial condition has been or is believed to be deteriorating; or (b) there has been or is believed to be some other change that adversely impacts the Surety's risk under the Bond(s). In such an event, within <u>thirty (30)</u> days of receipt of the Surety's written demand, the Indemnitors shall procure the full and complete release of the Bond(s) by providing competent written evidence of release satisfactory to the Surety, in its sole discretion. If Indemnitors fail to provide the aforementioned release Indemnitors shall, within an additional seven (7) days, provide the Surety with collateral in the amount of 100% of all unreleased liability under the Bond(s). The liability shall be determined at the time of the Surety's written demand. Collateral will be in the form of (a) an irrevocable letter of credit in form, content, and issued by a financial institution acceptable to the Surety; (b) a pledged money market account, in the form, content, and issued by a financial institution acceptable to the Surety; and/or (c) other collateral in form, content, and substance acceptable to the Surety, in its sole discretion. Collateral previously provided to the Surety may be utilized to establish compliance with this provision

The Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will suffer irreparable harm and will not have an adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement. The Surety's failure to act to enforce its right to specific performance shall not be construed as a waiver of that right, which right may be enforced at any time at the Surety's sole discretion. Indemnitors further agree that this Collateral Requirement shall not limit or be deemed a waiver of the Surety's other rights, which it may exercise in its sole discretion, under this Agreement or otherwise to cancel Bond(s), to demand collateral, or to take any other actions the Surety deems necessary and/or prudent, in its sole discretion, to mitigate actual or potential Losses under any and all Bond(s) written in accordance with this Agreement. The exercise of such additional rights shall not be contingent upon the Surety's enforcement of this provision. Collateral to be provided to the Surety shall be sent by delivery only for overnight packages: Attn: Treasurer, Applied Surety, 10805 Old Mill Rd Omaha, NE 68154-2607.

13. **Claim Settlement.** The Surety shall have the right, in its sole discretion, to determine for itself and Indemnitors whether any claim, demand or suit brought against the Surety or any Indemnitor in connection with or relating to any Bond shall be paid, compromised, settled, tried, defended or appealed, and its determination shall be final, binding and conclusive upon the Indemnitors. The Surety shall be entitled to immediate reimbursement for any and all Loss incurred under the belief it was necessary or expedient to make such payments.

14. **Demand Bonds.** The obligee or beneficiary under certain Bond(s) may make a demand for payment ("Demand") against the Bond(s). When such Demand is made the Surety must pay the amount of the Demand not to exceed the penal sum of the Bond(s), as well as all the necessary fees, within the time period required by the Demand. Under such Bond(s), the Surety, with the knowledge and consent of the Indemnitors has expressly waived all defenses to making such payment. If the Indemnitors receive notice from the Surety that a Demand has been made against the Bond(s) by the obligee or beneficiary, at least five (5) business days before payment of such Demand is due to the obligee, Indemnitors shall pay the Surety the full amount of the Demand, which amount shall not exceed the penal sum of the Bond as well as all necessary fees. Such payment will be made by wire transfer or otherwise in immediately available funds to the bank account specified in the notice provided to the Indemnitors by the Surety. The Indemnitors waive to the fullest extent permitted by applicable law, each and every right which they may have to contest such payment. Failure to make payment to the Surety as herein provided shall cause the Indemnitors to be additionally liable for any and all costs and expenses, including attorneys' fees, incurred by the Surety in enforcing this Agreement, together with interest on unpaid amounts due the Surety. Indemnitors stipulate and agree that the Surety will suffer immediate, irreparable harm and will have no adequate remedy at law should Indemnitors fail to perform this obligation, and therefore the Surety shall be entitled to specific performance of this obligation.

15. **Interest.** Any amount due to Surety under any provision of this Agreement shall accrue interest from the date of the Surety's demand at 130% of the prime rate of interest in effect on December 31st of the previous calendar year as published in the Wall Street Journal.

16. **Continuing Obligation.** This Agreement is a continuing obligation of the Indemnitors, and no Indemnitors shall have the right to terminate its obligations for any Bond(s) issued during the term hereof. The Indemnitors may terminate this Agreement as to future Bond(s) by notice to the Surety, but such termination as to the Indemnitors shall in no way affect the obligation of any other Indemnitors who have not given such notice. In order to terminate liability as to future Bond(s), Indemnitors must notify the Surety of such termination and state in such notice

the effective date (not less than thirty days after receipt thereof by the Surety) of termination of such Indemnitors liability for future Bond(s). After the effective date of such termination, the Indemnitors giving notice of termination shall nonetheless be liable hereunder for Bond(s) executed or authorized before such date and renewal, substitutions, and extensions thereof.

17. **Survival of Indemnity.** The Indemnitors understand and agree that their obligations under this Agreement remain in full force and effect for any Bond(s) issued pursuant to this Agreement, notwithstanding that the entity on whose behalf Bond(s) were issued has been sold, dissolved or whose ownership has been otherwise altered in any way.

18. **Severability.** If any provision or portion of this Agreement shall be unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such provision or portion were omitted. This agreement is in addition to and not in lieu of any other agreement relating to the obligations described herein.

19. **Execution.** This Agreement may be executed in multiple counterparts, and by the Indemnitors on separate counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Delivery by telecopy or email of a signed counterpart of this Agreement shall be effective as physical delivery.

20. **Photocopies.** A duplicate or facsimile copy or electronic reproduction of the original of this Agreement shall have the same force and effect as the original.

21. **Non-waiver of Surety Rights.** Nothing herein-contained shall be construed to waive or abridge any right or remedy which the Surety might have if this Agreement was not executed. The Surety's failure to act to enforce any or all of its rights under this Agreement shall not be construed as a waiver of these rights.

22. **Access to Indemnitors' Information.** Indemnitors hereby expressly authorize the Surety to access credit records and to make such pertinent inquiries as may be necessary from third party sources for underwriting purposes, claim purposes and/or debt collection. To the extent required by law, Surety will, upon request, provide notice whether or not a consumer report has been requested by Surety, and if so, the name and address of consumer reporting agency furnishing the report.

23. **Separate Suits.** Separate suits may be brought hereunder as causes of action accrue, and suit may be brought against any and all of the Indemnitors; and any suit or suits upon one or more causes of action, or against one or more of the Indemnitors, shall not prejudice or bar subsequent suits against any other Indemnitors on the same or any other causes of action, whether theretofore or thereafter accruing.

24. **Notices.** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered against receipt therefore or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed to the Surety, to: Attn: Applied Surety Bond Department: P.O. Box 3646, Omaha, Nebraska 68103-0646. Such name and address may be changed by written notice given as provided in this Agreement.

25. **Choice of Law.** This Agreement shall be interpreted under the substantive law of the State of Texas, without giving effect to its choice of law principles.

26. **Choice of Forum.** In any legal proceeding brought by or against the Surety that in any way relates to this Agreement, each Indemnitor for itself and its property, irrevocably and unconditionally submits to the exclusive jurisdiction, at the sole and exclusive option of the Surety, of the courts in Texas, or any state in which any Indemnitor resides, has property, or in which any Contract is performed. Indemnitors hereby irrevocably and unconditionally submit to the jurisdiction of said courts and waive and agree not to assert any claim that they are not subject to the jurisdiction of any such court, that such proceeding is brought in an inconvenient forum or that the venue of such proceeding is improper.

27. **Collateral and Letters of Credit. If Surety has or obtains collateral or letters of credit, Surety shall not have any obligations to release collateral or letters of credit or turn over the proceeds thereof until it shall have received a written release in form and substance satisfactory to Surety with respect to each and every Bond. Any collateral or letters of credit provided to Surety by any Indemnitors or any third party, or the proceeds thereof, may be applied to any Losses.** The Surety shall not pay interest on any collateral it holds.

28. **Security Interest.** The Surety may execute or procure Bond(s) that guarantee the Indemnitors' obligations or performance under one or more contracts (each a "Bonded Contract"). The Indemnitors shall be considered in default of a Bonded Contract if any of the following occur: (a) a declaration of default by any Bonded Contract owner; (b) an actual breach or abandonment of the Bonded Contract; and/or (c) an improper diversion of Bonded Contract funds or Indemnitors' assets to the detriment of the Bonded Contract obligations.

In the event of a default under a Bonded Contract, Indemnitors grant to Surety a security interest in all equipment, machinery, inventory, materials, and all proceeds and products in connection with any Bonded Contract. This Agreement shall for all purposes constitute a Security Agreement and Financing Statement for the benefit of Surety in accordance with the Uniform Commercial Code ("UCC") and all similar statutes. In the event there is an act of default under any Bonded Contract, Indemnitors hereby irrevocably authorize Surety, without notice to any of the Indemnitors, to perfect the security interest granted herein by filing a UCC-1 and/or this Agreement or a copy or other reproduction of this Agreement. Surety may add schedules or other documents to this Agreement as necessary to perfect its rights. The failure to file or record this Agreement or any financing statement shall not release or excuse any of the obligations of Indemnitors under this Agreement. The Surety's exercise of any of its rights as a secured creditor under this Agreement shall not be a waiver of any of the Surety's legal or equitable rights or remedies, including the Surety's right of subrogation.

29. **Attorney-in-Fact.** The Indemnitors do hereby irrevocably nominate and appoint any officer of Surety as the true and lawful attorney-in-fact of the Indemnitors, with full right and authority to execute on behalf of, and sign the name of, the Indemnitors to any voucher, release, satisfaction, check, bill of sale or all or any property assigned by this Agreement to the Surety, or any other document necessary or desired to carry into effect the purpose of this Agreement. The Indemnitors hereby ratify and confirm all that such attorney-in-fact or Surety may do for the purposes set forth in this Agreement. The Indemnitors specifically agree to protect, indemnify and save and hold harmless Surety and such attorney-in-fact against any and all claims, damages, costs and expenses that may in any way arise due to the exercise of the assignments contained in this Agreement and the powers herein granted, specifically waiving any claim which the Indemnitors have or might hereafter have against Surety or its attorney-in-fact on account of anything done in enforcing the terms of this Agreement.

30. **Other Indemnity.** This Agreement is in addition to and not in lieu of any other agreements and obligations undertaken in favor of Surety, whether now existing or entered into hereafter.

31. **Amendment.** The rights and remedies afforded to Surety by the terms of this Agreement can only be impaired by a written rider to this Agreement signed by an authorized officer of the Surety.

32. **Special Provisions:**

33. EACH OF THE INDEMNITORS REPRESENT TO THE SURETY THAT SUCH INDEMNITORS HAVE CAREFULLY READ THIS ENTIRE AGREEMENT, AND THERE ARE NO OTHER AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OR MODIFY THE OBLIGATIONS SET FORTH HEREIN. IN TESTIMONY HEREOF WE THE INDEMNITORS HAVE SET OUR HANDS AND FIXED OUR SEALS AS SET FORTH BELOW. THE SURETY'S ACCEPTANCE OF THIS AGREEMENT SHALL BE PRESUMED AND IS DEEMED EFFECTIVE BY ITS RECEIPT OF THIS AGREEMENT, ITS RELIANCE HEREON, OR BY ITS EXECUTION OF ANY BOND FOR THE INDEMNITORS OR ANY OF THEM, WITH OR WITHOUT THE SURETY'S SIGNATURE BEING AFFIXED THERETO.

---

**IF INDEMNITOR IS A CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP, SIGN BELOW:**

Instructions:
1. If the entity is: 1) a corporation, the secretary and an authorized officer should sign on behalf of the corporation, 2) a limited liability company, the manager(s) or member(s) should sign on behalf of the LLC, 3) a partnership, the partner(s) should sign on behalf of the partnership, or 4) a trust, all trustees should sign.
2. Please provide the entity's federal tax identification number on the line provided.
3. **All signatures must be notarized and dated.**

Each of the undersigned hereby affirms to the Surety as follows: I am a duly authorized officer of the business entity Indemnitor on whose behalf I am executing this Agreement. In such capacity I am familiar with all of the documents which set forth and establish the rights which govern the affairs, power and authority of such business entity including, to the extent applicable, the certificate or articles of incorporation, bylaws, corporate resolutions and/or partnership, operating or limited liability agreements of such business entity. Having reviewed all such applicable documents and instruments and such other facts as deemed appropriate, I hereby affirm that such entity has the power and authority to enter into this Agreement and that the individuals executing this Agreement on behalf of such entity are duly authorized to do so.

Dated: _2/2/2023_

W&T Offshore, Inc.
5718 Westheimer Road, Suite 700, Houston, Texas 77057
_____
**Indemnitor Name and Address**

_____        _____
**Signature of Authorized Officer**        **Seal**

_Todd Grabois, Treasurer_
_____
**Print or Type Name and Title**

_____        _____
**Signature of Authorized Officer**        **Seal**

**Federal Tax ID #** [REDACTED]

_Janet Yang, Executive Vice President and Chief Financial Officer_
_____
**Print or Type Name and Title**

---

**ACKNOWLEDGEMENT**
**STATE OF** _TEXAS_                **County of** _HARRIS_

On this _2_ day of _February_, _2023_, before me personally appeared _Todd Grabois_, the _Treasurer_ of _W&T Offshore, INC_ ( the "Entity") and _Janet Yang_, the _EVP & CFO_ of _W&T Offshore, INC._ (the "Entity") acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by authority of the Entity. IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

_Jessica Ann Meadows_
_____
Notary Public residing at.
_04-07-2025_ (Commission)

JESSICA ANN MEADOWS
Notary Public, State of Texas
Comm. Expires 04-07-2025
Notary ID 133020755

ASU GIA(SPD) (04-2022)



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

PERFORMANCE BOND

Bond Number SBP150328_001

KNOW ALL MEN BY THESE PRESENTS:

That we, W&T Offshore, Inc. with its principal office at 5718 Westheimer Road, Suite 700, Houston, TX 77057 (hereinafter called the "Principal"), and Pennsylvania Insurance Company with an office at 10805 Old Mill Rd., Omaha, NE 68103 (hereinafter called the "Surety"), are held and firmly and irrevocably bound unto QuarterNorth Energy LLC with an office at 3737 Buffalo Speedway, Suite 800, Houston, TX 77098 (hereinafter called the "Obligee"), in the amount of One Million One Hundred Nineteen Thousand One Hundred Twenty-Two and No/100 Dollars ($1,119,122.00), lawful money of the United States of America, reduced only as expressly provided for herein (hereinafter called the "Penal Sum"), for the payment of which Penal Sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, the Principal has entered into that certain Purchase and Sale Agreement with the Obligee effective September     ᘔ0    ,2023 (as may be amended from time to time, hereinafter called the "Agreement"), which Agreement is by this reference made a part hereof and which provides for the sale and assignment, from the Obligee to the Principal, of the interests of the Obligee in the oil and gas leases and properties described in Exhibit "A" to the Agreement, including oil and gas leases covering submerged lands and offshore waters in Outer Continental Shelf in Federal waters of the U.S. (hereinafter called the "Leases"), on which are situated the wells, pipelines, platforms and other structures located on the Leases (such pipelines, platforms and other structures located on the Leases hereafter "Infrastructure") described in Exhibit "A" to the Agreement, a copy of which is attached hereto and made a part hereof (hereinafter collectively called the "Subject Wells and Infrastructure"), and for the purpose of this Performance Bond, includes the Subject Wells and Infrastructure listed in Addendum 1 to this Performance Bond located in the Breton Sound 25 Field, with all rights and obligations in connection therewith, and also provides for the assignment to the Principal of all wells, platforms, facilities, equipment, pipelines and personal property existing on the Leases as of the date of the Agreement; and

WHEREAS, the Principal and Surety agree that notwithstanding the subsequent termination or expiration of the Leases, whether by operation of law or otherwise, or any failure of the Principal to pay any premium or provide any security to surety, this bond shall remain in full force and effect until all of the P&A Obligations (as defined in the Agreement) of this Principal under the Agreement have been truly and faithfully performed and fully discharged in accordance with 30 CFR 250 Subpart Q (as may be amended or modified hereafter), or this bond is otherwise released pursuant to the terms hereof or the Agreement; and

WHEREAS, the Principal has promised to deliver to the Obligee a performance bond substantially in the form hereof to secure the P&A Obligations with respect to the Leases; and

WHEREAS, the Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, including those in the nature of this bond and the liabilities hereunder, which certificate has not been revoked; and

WHEREAS, the Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this bond or any liability hereunder; and does hereby agree and consent that such



service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder:

NOW THEREFORE, for the mutual covenants hereunder and good and valuable consideration which the parties acknowledge as being received and, the Principal and the Surety agree as follows:

The Surety hereby guarantees the full and faithful payment and performance by the Principal of the P&A Obligations with respect to the Leases, including but not limited to, to the extent constituting P&A Obligations, the obligation to plug and abandon all wells, removal of all platforms and other offshore structures, and to restore and remediate the leasehold premises at the termination thereof, in full compliance with and in accordance with the terms of the Leases and the rules and regulations now or hereafter existing of the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Louisiana Department of Natural Resources, the Louisiana Department of Environmental Quality, or any other agency or successor agency, authority or body having jurisdiction or authority over the Leases, or any operations thereon (collectively, a "Government Agency"), not to exceed the Penal Sum.

PROVIDED, HOWEVER, whenever the Principal shall present written evidence that the P&A Obligations with respect to a Subject Well and Infrastructure have been satisfactorily performed (which written evidence may be in the form of (i) the outstanding decommissioning obligation on the BOEM database being zero, then the Penal Sum of this obligation shall be reduced by an amount equal to the reduction of the plugging and abandonment liability set forth on Schedule 9(b) to the Agreement with respect to each Subject Well and Infrastructure, or (ii) written evidence issued from a State reefing agency accepting the Infrastructure into the Rigs-to-Reef program.

PROVIDED, FURTHER THAT, that to the extent the Principal may be liable for any expenses, fees, penalties, damages (either direct, indirect or consequential) other than the obligation described above, or to the extent the Obligee may incur any of its own attorneys' fees or court costs or other expenses of litigation in the event of a contest over the Surety's denial of the obligation (or any part thereof), the maximum obligation of the Surety under this bond shall be limited to the Penal Sum, reduced as expressly provided for herein.

FURTHER, If the Obligee is ordered by the proper Government Agency to perform any of the P&A Obligations required of the Principal, then upon performance of the obligation by the Obligee, the Surety agrees to pay to the Obligee the actual costs incurred by the Obligee for such performance in an amount up to, but not exceeding the Penal Sum of this bond, reduced as provided for herein.

FURTHERMORE, it is agreed that the Surety shall have no obligation to the Principal, the Obligee, or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity by reason of acts or omissions which are covered by the Principal's general liability insurance, products liability insurance, completed operations insurance or any other insurance. In no event shall the Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the Penal Sum of this bond.

It is further agreed that the Surety shall not be liable for any specifications respecting the procurement of or coverage provided by any insurance, nor shall the Surety be liable under any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in prosecuting the work to be performed under the Agreement with respect to the Leases.

Should the Principal fail to carry out its obligations to bear the cost and expense for any P&A Obligations with respect to the Subject Wells and Infrastructure, the Obligee may present to the Surety a written notice that the Principal is in default of its obligation under the terms of the Agreement with respect to such P&A Obligations and

**APPLIED** SURETY UNDERWRITERS | APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

such condition has persisted for thirty (30) days after written notice of such default has been given by certified mail to the Principal and to the Surety, the Surety shall, within thirty (30) days of such presentation: 1) pay to the Obligee an amount equal to the incurred charges for such P&A Obligations to an amount up to, but not exceeding the penal amount of this obligation and the penal amount of the obligation shall be further reduced by the amount of such payment; or 2) commence and complete the necessary operations to plug and abandon the remaining Subject Wells and Infrastructure and remove all other equipment and facilities and any necessary restorations as set forth in the Leases.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the aforementioned P&A Obligations, said operations shall continue until such time as the obligations expressly set forth in the Leases have been met, thereby reducing or satisfying the Penal Sum as expressly set forth herein.

Any suit under this bond must be instituted before the expiration of one (1) year from the date on which a default by the Principal, as detailed herein, falls due, and subject to the one year time limitation, the Surety consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Leases or of the Exhibits attached thereto shall release the Principal and the Surety or any of them from their liability under this bond, notice to the Surety of any such amendment or supplement being hereby waived, except to the extent that is expressly herein provided.

No assignment of the Leases by the Principal, its successors and assigns, and no delay, neglect or failure of the Obligee to proceed promptly to enforce the Leases or to proceed promptly in the premises in case of any default on the part of the Principal shall in any degree relieve the Principal and the Surety or any of them of their obligations under this bond.

HOWEVER, if upon assignment of the Leases or any Subject Wells and Infrastructure and facilities thereon by the Principal, its successors or assigns, the Principal shall cause its assignee to post security, in the form of a bond or other security reasonably acceptable to Obligee in the amount of and covering the same obligations as stated herein, then the Obligee will accept such security in lieu of this bond and issue an unconditional release of this bond within sixty (60) days of such acceptance of such bond or other security.

No right or action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee, their heirs, executors, administrators or successors.

The Obligee will release this bond within a reasonable time period, but in no instance longer than thirty (30) days after receipt of satisfactory evidence (e.g., a report from the proper Government Agency that has determined the P&A Obligations have been satisfied in full and that Principal and Obligee shall have no further obligation relating thereto) of the Principal's full and faithful performance and compliance with the obligations of this bond; or upon receipt of a replacement bond, Letter of Credit or other security acceptable to the Obligee.



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

IN WITNESS WHEREOF, the Principal, Surety, and Obligee have executed this instrument under their several seals effective this __20th__ day of September, 2023, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

W&T Offshore, Inc.
Principal

By: _____

Name: Jonathan Curth

Title: Executive Vice President, General Counsel and Secretary

Pennsylvania Insurance Company
Surety

By: _____

Name: Vickie Lacy

Title: Attorney-In-Fact

# Addendum 1

## *TO BE ATTACHED AND MADE PART OF PERFORMANCE BOND*

## Bond No. SBP150328_001

Wells

| Field | Asset Name | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| Breton Sound 25 | BRETON SOUND 025 #A001 | G31442 | 177264005300 | 25.00% | 19.38% |

Platforms

| Field | Asset Name | Block | Lease | ID | WI |
|---|---|---|---|---|---|
| Breton Sound 25 | BS 25 A | BS 25 | OCS-G 31442 | A | 25.00% |

Pipelines

| Field | Asset Name | Block | Lease | ROW | WI |
|---|---|---|---|---|---|
| Breton Sound 25 | BS 25 19080 | BS 25 | OCS-G 31442 | LEASE TERM | 25.00% |
| Breton Sound 25 | BS 25 18960 | BS 25 | | OCS-G 29219 | 25.00% |

California Insurance Company · Continental Indemnity Company · Illinois Insurance Company · Pennsylvania Insurance Company

*10805 Old Mill Road · Omaha, Nebraska 68154*

## POWER OF ATTORNEY NO.   MGFHOU01_0323

KNOW ALL MEN BY THESE PRESENTS: That the California Insurance Company, duly organized and existing under the laws of the State of California and having its principal office in the County of San Mateo, California, and Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, corporations duly organized and existing under the laws of the State of New Mexico and having their principal office in the County of Santa Fe, New Mexico does herby nominate, constitute and appoint:

Ashley Koletar, Heather Noles, Joseph R. Aulbert, Marc W. Boots, Maria D. Zuniga, Richard Covington, Ryan Varela, Vickie Lacy, Dylan Young, Stephanie Moore Harold

Its true and lawful agent and attorney-in-fact, to make, execute, seal and deliver for and on its behalf as surety, and its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship (NOT INCLUDING bonds without a fixed penalty or financial guarantee) provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

"Unlimited"

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company.**

"RESOLVED, That the President, Senior Vice President, Vice President, Assisted Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney of the Company, qualifying the attorney or attorneys named in given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer the 16th day of August 2023.

California Insurance Company, Continental Indemnity Company, Illinois Insurance Company, Pennsylvania Insurance Company

By _____

Jeffrey A. Silver, Secretary

STATE OF NEBRASKA
COUNTY OF DOUGLAS SS:

On this 16th day of August A.D. 20 23, before me a Notary Public of the State of Nebraska, in and for the County of Douglas, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of the same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.
IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Douglas, the day and year first above written.

GENERAL NOTARY - State of Nebraska
LINDA S. DAVIS
My Comm. Exp. September 1, 2027

_____
(Notary Public)

I, the undersigned Officer of the **California Insurance Company**, a California Corporation of Foster City, California, **Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** New Mexico Corporations of Santa Fe, New Mexico, do herby certify that the original POWER OF ATTORNEY of which the foregoing is full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the 2nd day of September , 2023

_____
Jeffrey A. Silver, Secretary



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE, 68154

PERFORMANCE BOND

Bond Number SBP150328_002

KNOW ALL MEN BY THESE PRESENTS:

That we, W&T Offshore, Inc. with its principal office at 5718 Westheimer Road, Suite 700, Houston, TX 77057 (hereinafter called the "Principal"), and Pennsylvania Insurance Company with an office at 10805 Old Mill Rd., Omaha, NE 68103 (hereinafter called the "Surety"), are held and firmly and irrevocably bound unto QuarterNorth Energy LLC with an office at 3737 Buffalo Speedway, Suite 800, Houston, TX 77098 (hereinafter called the "Obligee"), in the amount of Three Million Four Hundred Twenty-Two Thousand Three Hundred Seventy-One and No/100 Dollars ($3,422,371.00), lawful money of the United States of America, reduced only as expressly provided for herein (hereinafter called the "Penal Sum"), for the payment of which Penal Sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, the Principal has entered into that certain Purchase and Sale Agreement with the Obligee effective September  20  ,2023 (as may be amended from time to time, hereinafter called the "Agreement"), which Agreement is by this reference made a part hereof and which provides for the sale and assignment, from the Obligee to the Principal, of the interests of the Obligee in the oil and gas leases and properties described in Exhibit "A" to the Agreement, including oil and gas leases covering submerged lands and offshore waters in Outer Continental Shelf in Federal waters of the U.S. (hereinafter called the "Leases"), on which are situated the wells, pipelines, platforms and other structures located on the Leases (such pipelines, platforms and other structures located on the Leases hereafter "Infrastructure") described in Exhibit "A" to the Agreement, a copy of which is attached hereto and made a part hereof (hereinafter collectively called the "Subject Wells and Infrastructure"), and for the purpose of this Performance Bond, includes the Subject Wells and Infrastructure listed in Addendum 1 to this Performance Bond located in the Ship Shoal 301 Field, with all rights and obligations in connection therewith, and also provides for the assignment to the Principal of all wells, platforms, facilities, equipment, pipelines and personal property existing on the Leases as of the date of the Agreement; and

WHEREAS, the Principal and Surety agree that notwithstanding the subsequent termination or expiration of the Leases, whether by operation of law or otherwise, or any failure of the Principal to pay any premium or provide any security to surety, this bond shall remain in full force and effect until all of the P&A Obligations (as defined in the Agreement) of this Principal under the Agreement have been truly and faithfully performed and fully discharged in accordance with 30 CFR 250 Subpart Q (as may be amended or modified hereafter), or this bond is otherwise released pursuant to the terms hereof or the Agreement; and

WHEREAS, the Principal has promised to deliver to the Obligee a performance bond substantially in the form hereof to secure the P&A Obligations with respect to the Leases; and

WHEREAS, the Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, including those in the nature of this bond and the liabilities hereunder, which certificate has not been revoked; and

WHEREAS, the Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this bond or any liability hereunder; and does hereby agree and consent that such



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder:

NOW THEREFORE, for the mutual covenants hereunder and good and valuable consideration which the parties acknowledge as being received and, the Principal and the Surety agree as follows:

The Surety hereby guarantees the full and faithful payment and performance by the Principal of the P&A Obligations with respect to the Leases, including but not limited to, to the extent constituting P&A Obligations, the obligation to plug and abandon all wells, removal of all platforms and other offshore structures, and to restore and remediate the leasehold premises at the termination thereof, in full compliance with and in accordance with the terms of the Leases and the rules and regulations now or hereafter existing of the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Louisiana Department of Natural Resources, the Louisiana Department of Environmental Quality, or any other agency or successor agency, authority or body having jurisdiction or authority over the Leases, or any operations thereon (collectively, a "Government Agency"), not to exceed the Penal Sum.

PROVIDED, HOWEVER, whenever the Principal shall present written evidence that the P&A Obligations with respect to a Subject Well and Infrastructure have been satisfactorily performed (which written evidence may be in the form of (i) the outstanding decommissioning obligation on the BOEM database being zero, then the Penal Sum of this obligation shall be reduced by an amount equal to the reduction of the plugging and abandonment liability set forth on Schedule 9(b) to the Agreement with respect to each Subject Well and Infrastructure, or (ii) written evidence issued from a State reefing agency accepting the Infrastructure into the Rigs-to-Reef program.

PROVIDED, FURTHER THAT, that to the extent the Principal may be liable for any expenses, fees, penalties, damages (either direct, indirect or consequential) other than the obligation described above, or to the extent the Obligee may incur any of its own attorneys' fees or court costs or other expenses of litigation in the event of a contest over the Surety's denial of the obligation (or any part thereof), the maximum obligation of the Surety under this bond shall be limited to the Penal Sum, reduced as expressly provided for herein.

FURTHER, If the Obligee is ordered by the proper Government Agency to perform any of the P&A Obligations required of the Principal, then upon performance of the obligation by the Obligee, the Surety agrees to pay to the Obligee the actual costs incurred by the Obligee for such performance in an amount up to, but not exceeding the Penal Sum of this bond, reduced as provided for herein.

FURTHERMORE, it is agreed that the Surety shall have no obligation to the Principal, the Obligee, or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity by reason of acts or omissions which are covered by the Principal's general liability insurance, products liability insurance, completed operations insurance or any other insurance. In no event shall the Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the Penal Sum of this bond.

It is further agreed that the Surety shall not be liable for any specifications respecting the procurement of or coverage provided by any insurance, nor shall the Surety be liable under any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in prosecuting the work to be performed under the Agreement with respect to the Leases.

Should the Principal fail to carry out its obligations to bear the cost and expense for any P&A Obligations with respect to the Subject Wells and Infrastructure, the Obligee may present to the Surety a written notice that the Principal is in default of its obligation under the terms of the Agreement with respect to such P&A Obligations and



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha. NE. 68154

such condition has persisted for thirty (30) days after written notice of such default has been given by certified mail to the Principal and to the Surety, the Surety shall, within thirty (30) days of such presentation: 1) pay to the Obligee an amount equal to the incurred charges for such P&A Obligations to an amount up to, but not exceeding the penal amount of this obligation and the penal amount of the obligation shall be further reduced by the amount of such payment; or 2) commence and complete the necessary operations to plug and abandon the remaining Subject Wells and Infrastructure and remove all other equipment and facilities and any necessary restorations as set forth in the Leases.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the aforementioned P&A Obligations, said operations shall continue until such time as the obligations expressly set forth in the Leases have been met, thereby reducing or satisfying the Penal Sum as expressly set forth herein.

Any suit under this bond must be instituted before the expiration of one (1) year from the date on which a default by the Principal, as detailed herein, falls due, and subject to the one year time limitation, the Surety consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Leases or of the Exhibits attached thereto shall release the Principal and the Surety or any of them from their liability under this bond, notice to the Surety of any such amendment or supplement being hereby waived, except to the extent that is expressly herein provided.

No assignment of the Leases by the Principal, its successors and assigns, and no delay, neglect or failure of the Obligee to proceed promptly to enforce the Leases or to proceed promptly in the premises in case of any default on the part of the Principal shall in any degree relieve the Principal and the Surety or any of them of their obligations under this bond.

HOWEVER, if upon assignment of the Leases or any Subject Wells and Infrastructure and facilities thereon by the Principal, its successors or assigns, the Principal shall cause its assignee to post security, in the form of a bond or other security reasonably acceptable to Obligee in the amount of and covering the same obligations as stated herein, then the Obligee will accept such security in lieu of this bond and issue an unconditional release of this bond within sixty (60) days of such acceptance of such bond or other security.

No right or action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee, their heirs, executors, administrators or successors.

The Obligee will release this bond within a reasonable time period, but in no instance longer than thirty (30) days after receipt of satisfactory evidence (e.g., a report from the proper Government Agency that has determined the P&A Obligations have been satisfied in full and that Principal and Obligee shall have no further obligation relating thereto) of the Principal's full and faithful performance and compliance with the obligations of this bond; or upon receipt of a replacement bond, Letter of Credit or other security acceptable to the Obligee.



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha. NE. 68154

IN WITNESS WHEREOF, the Principal, Surety, and Obligee have executed this instrument under their several seals effective this ___2o̅ᵗʰ___ day of September, 2023, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

W&T Offshore, Inc.
Principal

By: _____

Name: ___Jonathan Curth___

Title: Executive Vice President, General Counsel and Secretary

Pennsylvania Insurance Company
Surety

By: _____

Name: Vickie Lacy

Title: Attorney-In-Fact

APPLIED SURETY UNDERWRITERS

# Addendum 1

## *TO BE ATTACHED AND MADE PART OF PERFORMANCE BOND*

## Bond No. SBP150328_002

Wells

| Field | Asset Name | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| Ship Shoal 301 | SHIP SHOAL 301 #A001 | G10794 | 177124044301 | 100.00% | 79.33% |
| Ship Shoal 301 | SHIP SHOAL 301 #A002 | G10794 | 177124053200 | 100.00% | 79.33% |
| Ship Shoal 301 | SHIP SHOAL 301 #A004 | G10794 | 177124063100 | 100.00% | 79.33% |
| Ship Shoal 301 | SHIP SHOAL 301 #A005 | G10794 | 177124068500 | 100.00% | 79.33% |

Platforms

| Field | Asset Name | Block | Lease | ID | WI |
|---|---|---|---|---|---|
| Ship Shoal 301 | SS 301 A | SS 301 | OCS-G 10794 | A | 100.00% |

Pipelines

| Field | Asset Name | Block | Lease | ROW | WI |
|---|---|---|---|---|---|
| Ship Shoal 301 | SS 300 11050 | SS 301 | | OCS-G 16055 | 100.00% |

California Insurance Company · Continental Indemnity Company · Illinois Insurance Company · Pennsylvania Insurance Company

*10805 Old Mill Road · Omaha, Nebraska 68154*

## POWER OF ATTORNEY NO.    MGFHOU01_0323

KNOW ALL MEN BY THESE PRESENTS: That the California Insurance Company, duly organized and existing under the laws of the State of California and having its principal office in the County of San Mateo, California, and Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, corporations duly organized and existing under the laws of the State of New Mexico and having their principal office in the County of Santa Fe, New Mexico does herby nominate, constitute and appoint:

Ashley Koletar, Heather Noles, Joseph R. Aulbert, Marc W. Boots, Maria D. Zuniga, Richard Covington, Ryan Varela, Vickie Lacy, Dylan Young, Stephanie Moore Harold

Its true and lawful agent and attorney-in-fact, to make, execute, seal and deliver for and on its behalf as surety, and its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship (NOT INCLUDING bonds without a fixed penalty or financial guarantee) provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

"Unlimited"

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company.

"RESOLVED, That the President, Senior Vice President, Vice President, Assisted Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney of the Company, qualifying the attorney or attorneys named in given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer the 16th day of August 2023.

California Insurance Company, Continental Indemnity Company, Illinois Insurance Company, Pennsylvania Insurance Company

By _____
                                        Jeffrey A. Silver, Secretary

STATE OF NEBRASKA
COUNTY OF DOUGLAS SS:

On this 16th day of August A.D. 2023, before me a Notary Public of the State of Nebraska, in and for the County of Douglas, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of the same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.
IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Douglas the day and year first above written.

GENERAL NOTARY - State of Nebraska
LINDA S. DAVIS
My Comm. Exp. September 1, 2027

_____
(Notary Public)

I, the undersigned Officer of the California Insurance Company, a California Corporation of Foster City, California, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, New Mexico Corporations of Santa Fe, New Mexico, do herby certify that the original POWER OF ATTORNEY of which the foregoing is full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the 20₂ day of September, 2023

_____
                                        Jeffrey A. Silver, Secretary



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE, 68154

PERFORMANCE BOND

Bond Number SBP150328_003

KNOW ALL MEN BY THESE PRESENTS:

That we, W&T Offshore, Inc. with its principal office at 5718 Westheimer Road, Suite 700, Houston, TX 77057 (hereinafter called the "Principal"), and Pennsylvania Insurance Company with an office at 10805 Old Mill Rd., Omaha, NE 68103 (hereinafter called the "Surety"), are held and firmly and irrevocably bound unto QuarterNorth Energy LLC with an office at 3737 Buffalo Speedway, Suite 800, Houston, TX 77098 (hereinafter called the "Obligee"), in the amount of Three Million Eight Hundred Thirty-Nine Thousand Nine Hundred Seventy-Four and No/100 Dollars ($3,839,974.00), lawful money of the United States of America, reduced only as expressly provided for herein (hereinafter called the "Penal Sum"), for the payment of which Penal Sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, the Principal has entered into that certain Purchase and Sale Agreement with the Obligee effective September  28       ,2023 (as may be amended from time to time, hereinafter called the "Agreement"), which Agreement is by this reference made a part hereof and which provides for the sale and assignment, from the Obligee to the Principal, of the interests of the Obligee in the oil and gas leases and properties described in Exhibit "A" to the Agreement, including oil and gas leases covering submerged lands and offshore waters in Outer Continental Shelf in Federal waters of the U.S. (hereinafter called the "Leases"), on which are situated the wells, pipelines, platforms and other structures located on the Leases (such pipelines, platforms and other structures located on the Leases hereafter "Infrastructure") described in Exhibit "A" to the Agreement, a copy of which is attached hereto and made a part hereof (hereinafter collectively called the "Subject Wells and Infrastructure"), and for the purpose of this Performance Bond, includes the Subject Wells and Infrastructure listed in Addendum 1 to this Performance Bond located in the South Marsh Island 41 Field,  with all rights and obligations in connection therewith, and also provides for the assignment to the Principal of all wells, platforms, facilities, equipment, pipelines and personal property existing on the Leases as of the date of the Agreement; and

WHEREAS, the Principal and Surety agree that notwithstanding the subsequent termination or expiration of the Leases, whether by operation of law or otherwise, or any failure of the Principal to pay any premium or provide any security to surety, this bond shall remain in full force and effect until all of the P&A Obligations (as defined in the Agreement) of this Principal under the Agreement have been truly and faithfully performed and fully discharged in accordance with 30 CFR 250 Subpart Q (as may be amended or modified hereafter), or this bond is otherwise released pursuant to the terms hereof or the Agreement; and

WHEREAS, the Principal has promised to deliver to the Obligee a performance bond substantially in the form hereof to secure the P&A Obligations with respect to the Leases; and

WHEREAS, the Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, including those in the nature of this bond and the liabilities hereunder, which certificate has not been revoked; and

WHEREAS, the Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this bond or any liability hereunder; and does hereby agree and consent that such

**APPLIED** SURETY UNDERWRITERS | APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder:

NOW THEREFORE, for the mutual covenants hereunder and good and valuable consideration which the parties acknowledge as being received and, the Principal and the Surety agree as follows:

The Surety hereby guarantees the full and faithful payment and performance by the Principal of the P&A Obligations with respect to the Leases, including but not limited to, to the extent constituting P&A Obligations, the obligation to plug and abandon all wells, removal of all platforms and other offshore structures, and to restore and remediate the leasehold premises at the termination thereof, in full compliance with and in accordance with the terms of the Leases and the rules and regulations now or hereafter existing of the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Louisiana Department of Natural Resources, the Louisiana Department of Environmental Quality, or any other agency or successor agency, authority or body having jurisdiction or authority over the Leases, or any operations thereon (collectively, a "Government Agency"), not to exceed the Penal Sum.

PROVIDED, HOWEVER, whenever the Principal shall present written evidence that the P&A Obligations with respect to a Subject Well and Infrastructure have been satisfactorily performed (which written evidence may be in the form of (i) the outstanding decommissioning obligation on the BOEM database being zero, then the Penal Sum of this obligation shall be reduced by an amount equal to the reduction of the plugging and abandonment liability set forth on Schedule 9(b) to the Agreement with respect to each Subject Well and Infrastructure, or (ii) written evidence issued from a State reefing agency accepting the Infrastructure into the Rigs-to-Reef program.

PROVIDED, FURTHER THAT, that to the extent the Principal may be liable for any expenses, fees, penalties, damages (either direct, indirect or consequential) other than the obligation described above, or to the extent the Obligee may incur any of its own attorneys' fees or court costs or other expenses of litigation in the event of a contest over the Surety's denial of the obligation (or any part thereof), the maximum obligation of the Surety under this bond shall be limited to the Penal Sum, reduced as expressly provided for herein.

FURTHER, If the Obligee is ordered by the proper Government Agency to perform any of the P&A Obligations required of the Principal, then upon performance of the obligation by the Obligee, the Surety agrees to pay to the Obligee the actual costs incurred by the Obligee for such performance in an amount up to, but not exceeding the Penal Sum of this bond, reduced as provided for herein.

FURTHERMORE, it is agreed that the Surety shall have no obligation to the Principal, the Obligee, or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity by reason of acts or omissions which are covered by the Principal's general liability insurance, products liability insurance, completed operations insurance or any other insurance. In no event shall the Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the Penal Sum of this bond.

It is further agreed that the Surety shall not be liable for any specifications respecting the procurement of or coverage provided by any insurance, nor shall the Surety be liable under any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in prosecuting the work to be performed under the Agreement with respect to the Leases.

Should the Principal fail to carry out its obligations to bear the cost and expense for any P&A Obligations with respect to the Subject Wells and Infrastructure, the Obligee may present to the Surety a written notice that the Principal is in default of its obligation under the terms of the Agreement with respect to such P&A Obligations and



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

such condition has persisted for thirty (30) days after written notice of such default has been given by certified mail to the Principal and to the Surety, the Surety shall, within thirty (30) days of such presentation: 1) pay to the Obligee an amount equal to the incurred charges for such P&A Obligations to an amount up to, but not exceeding the penal amount of this obligation and the penal amount of the obligation shall be further reduced by the amount of such payment; or 2) commence and complete the necessary operations to plug and abandon the remaining Subject Wells and Infrastructure and remove all other equipment and facilities and any necessary restorations as set forth in the Leases.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the aforementioned P&A Obligations, said operations shall continue until such time as the obligations expressly set forth in the Leases have been met, thereby reducing or satisfying the Penal Sum as expressly set forth herein.

Any suit under this bond must be instituted before the expiration of one (1) year from the date on which a default by the Principal, as detailed herein, falls due, and subject to the one year time limitation, the Surety consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Leases or of the Exhibits attached thereto shall release the Principal and the Surety or any of them from their liability under this bond, notice to the Surety of any such amendment or supplement being hereby waived, except to the extent that is expressly herein provided.

No assignment of the Leases by the Principal, its successors and assigns, and no delay, neglect or failure of the Obligee to proceed promptly to enforce the Leases or to proceed promptly in the premises in case of any default on the part of the Principal shall in any degree relieve the Principal and the Surety or any of them of their obligations under this bond.

HOWEVER, if upon assignment of the Leases or any Subject Wells and Infrastructure and facilities thereon by the Principal, its successors or assigns, the Principal shall cause its assignee to post security, in the form of a bond or other security reasonably acceptable to Obligee in the amount of and covering the same obligations as stated herein, then the Obligee will accept such security in lieu of this bond and issue an unconditional release of this bond within sixty (60) days of such acceptance of such bond or other security.

No right or action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee, their heirs, executors, administrators or successors.

The Obligee will release this bond within a reasonable time period, but in no instance longer than thirty (30) days after receipt of satisfactory evidence (e.g., a report from the proper Government Agency that has determined the P&A Obligations have been satisfied in full and that Principal and Obligee shall have no further obligation relating thereto) of the Principal's full and faithful performance and compliance with the obligations of this bond; or upon receipt of a replacement bond, Letter of Credit or other security acceptable to the Obligee.



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd  Omaha, NE  68154

IN WITNESS WHEREOF, the Principal, Surety, and Obligee have executed this instrument under their several seals effective this __2nd__ day of September, 2023, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

W&T Offshore, Inc.
Principal

By: _____

Name: Jonathan Curth

Title: Executive Vice President, General Counsel and Secretary

Pennsylvania Insurance Company
Surety

By: _____

Name: Vickie Lacy

Title: Attorney-In-Fact

# Addendum 1

### *TO BE ATTACHED AND MADE PART OF PERFORMANCE BOND*

## Bond No. SBP150328_003

Wells

| Field | Asset Name | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| South Marsh Is. 41 | SOUTH MARSH IS 040 #B005 | G13607 | 177074085700 | 100.00% | 79.33% |
| South Marsh Is. 41 | SOUTH MARSH IS 041 #016 | G01192 | 177074091800 | 100.00% | 79.33% |
| South Marsh Is. 41 | SOUTH MARSH IS 041 #B002 | G01192 | 177074084901 | 100.00% | 79.33% |
| South Marsh Is. 41 | SOUTH MARSH IS 041 #B003 | G01192 | 177074085300 | 100.00% | 79.33% |
| South Marsh Is. 41 | SOUTH MARSH IS 041 #B004 | G01192 | 177074085400 | 100.00% | 79.33% |
| South Marsh Is. 41 | SOUTH MARSH IS 041 #B006 | G01192 | 177074087600 | 100.00% | 79.33% |

Platforms

| Field | Asset Name | Block | Lease | ID | WI |
|---|---|---|---|---|---|
| South Marsh Is. 41 | SM 40 B | SM 40 | RUE OCS-G 30342 | B | 100.00% |
| South Marsh Is. 41 | SM 40 JA | SM 40 | RUE OCS-G 30352 | JA | 100.00% |

Pipelines

| Field | Asset Name | Block | Lease | ROW | WI |
|---|---|---|---|---|---|
| South Marsh Is. 41 | SM 40 14292 | SM 40 | | OCS-G 28816 | 100.00% |
| South Marsh Is. 41 | SM 40 14293 | SM 40 | | OCS-G 28817 | 100.00% |
| South Marsh Is. 41 | SM 40 14294 | SM 40 | | OCS-G 28818 | 100.00% |
| South Marsh Is. 41 | SM 40 14295 | SM 40 | | OCS-G 28819 | 100.00% |

California Insurance Company · Continental Indemnity Company · Illinois Insurance Company · Pennsylvania Insurance Company

*10805 Old Mill Road · Omaha, Nebraska 68154*

## POWER OF ATTORNEY NO.    MGFHOU01_0323

KNOW ALL MEN BY THESE PRESENTS: That the California Insurance Company, duly organized and existing under the laws of the State of California and having its principal office in the County of San Mateo, California, and Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, corporations duly organized and existing under the laws of the State of New Mexico and having their principal office in the County of Santa Fe, New Mexico does herby nominate, constitute and appoint:

Ashley Koletar, Heather Noles, Joseph R. Aulbert, Marc W. Boots, Maria D. Zuniga, Richard Covington, Ryan Varela, Vickie Lacy, Dylan Young, Stephanie Moore Harold

its true and lawful agent and attorney-in-fact, to make, execute, seal and deliver for and on its behalf as surety, and its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship (NOT INCLUDING bonds without a fixed penalty or financial guarantee) provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

"Unlimited"

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company.**

"RESOLVED, That the President, Senior Vice President, Vice President, Assisted Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney of the Company, qualifying the attorney or attorneys named in given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF, **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer the 16th day of August 2023.

California Insurance Company, Continental Indemnity Company, Illinois Insurance Company, Pennsylvania Insurance Company

By _____
Jeffrey A. Silver, Secretary

STATE OF NEBRASKA
COUNTY OF DOUGLAS SS:

On this 16th day of August A.D. 2023, before me a Notary Public of the State of Nebraska, in and for the County of Douglas, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of the same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.
IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Douglas, the day and year first above written.

> GENERAL NOTARY - State of Nebraska
> LINDA S. DAVIS
> My Comm. Exp. September 1, 2027

_____
(Notary Public)

I, the undersigned Officer of the **California Insurance Company,** a California Corporation of Foster City, California, **Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** New Mexico Corporations of Santa Fe, New Mexico, do herby certify that the original POWER OF ATTORNEY of which the foregoing is full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the 22^ day of September, 2023

_____
Jeffrey A. Silver, Secretary



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha, NE. 68154

PERFORMANCE BOND

Bond Number SBP150328_004

KNOW ALL MEN BY THESE PRESENTS:

That we, W&T Offshore, Inc. with its principal office at 5718 Westheimer Road, Suite 700, Houston, TX 77057 (hereinafter called the "Principal"), and Pennsylvania Insurance Company with an office at 10805 Old Mill Rd., Omaha, NE 68103 (hereinafter called the "Surety"), are held and firmly and irrevocably bound unto QuarterNorth Energy LLC with an office at 3737 Buffalo Speedway, Suite 800, Houston, TX 77098 (hereinafter called the "Obligee"), in the amount of Two Million Nine Hundred Sixty-Two Thousand Four Hundred Eighty-Two and No/100 Dollars ($2,962,482.00), lawful money of the United States of America, reduced only as expressly provided for herein (hereinafter called the "Penal Sum"), for the payment of which Penal Sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, the Principal has entered into that certain Purchase and Sale Agreement with the Obligee effective September ___20___,2023 (as may be amended from time to time, hereinafter called the "Agreement"), which Agreement is by this reference made a part hereof and which provides for the sale and assignment, from the Obligee to the Principal, of the interests of the Obligee in the oil and gas leases and properties described in Exhibit "A" to the Agreement, including oil and gas leases covering submerged lands and offshore waters in Outer Continental Shelf in Federal waters of the U.S. (hereinafter called the "Leases"), on which are situated the wells, pipelines, platforms and other structures located on the Leases (such pipelines, platforms and other structures located on the Leases hereafter "Infrastructure") described in Exhibit "A" to the Agreement, a copy of which is attached hereto and made a part hereof (hereinafter collectively called the "Subject Wells and Infrastructure"), and for the purpose of this Performance Bond, includes the Subject Wells and Infrastructure listed in Addendum 1 to this Performance Bond located in the Vermillion 78 Field, with all rights and obligations in connection therewith, and also provides for the assignment to the Principal of all wells, platforms, facilities, equipment, pipelines and personal property existing on the Leases as of the date of the Agreement; and

WHEREAS, the Principal and Surety agree that notwithstanding the subsequent termination or expiration of the Leases, whether by operation of law or otherwise, or any failure of the Principal to pay any premium or provide any security to surety, this bond shall remain in full force and effect until all of the P&A Obligations (as defined in the Agreement) of this Principal under the Agreement have been truly and faithfully performed and fully discharged in accordance with 30 CFR 250 Subpart Q (as may be amended or modified hereafter), or this bond is otherwise released pursuant to the terms hereof or the Agreement; and

WHEREAS, the Principal has promised to deliver to the Obligee a performance bond substantially in the form hereof to secure the P&A Obligations with respect to the Leases; and

WHEREAS, the Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, including those in the nature of this bond and the liabilities hereunder, which certificate has not been revoked; and

WHEREAS, the Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this bond or any liability hereunder; and does hereby agree and consent that such



service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder:

NOW THEREFORE, for the mutual covenants hereunder and good and valuable consideration which the parties acknowledge as being received and, the Principal and the Surety agree as follows:

The Surety hereby guarantees the full and faithful payment and performance by the Principal of the P&A Obligations with respect to the Leases, including but not limited to, to the extent constituting P&A Obligations, the obligation to plug and abandon all wells, removal of all platforms and other offshore structures, and to restore and remediate the leasehold premises at the termination thereof, in full compliance with and in accordance with the terms of the Leases and the rules and regulations now or hereafter existing of the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Louisiana Department of Natural Resources, the Louisiana Department of Environmental Quality, or any other agency or successor agency, authority or body having jurisdiction or authority over the Leases, or any operations thereon (collectively, a "Government Agency"), not to exceed the Penal Sum.

PROVIDED, HOWEVER, whenever the Principal shall present written evidence that the P&A Obligations with respect to a Subject Well and Infrastructure have been satisfactorily performed (which written evidence may be in the form of (i) the outstanding decommissioning obligation on the BOEM database being zero, then the Penal Sum of this obligation shall be reduced by an amount equal to the reduction of the plugging and abandonment liability set forth on Schedule 9(b) to the Agreement with respect to each Subject Well and Infrastructure, or (ii) written evidence issued from a State reefing agency accepting the Infrastructure into the Rigs-to-Reef program.

PROVIDED, FURTHER THAT, that to the extent the Principal may be liable for any expenses, fees, penalties, damages (either direct, indirect or consequential) other than the obligation described above, or to the extent the Obligee may incur any of its own attorneys' fees or court costs or other expenses of litigation in the event of a contest over the Surety's denial of the obligation (or any part thereof), the maximum obligation of the Surety under this bond shall be limited to the Penal Sum, reduced as expressly provided for herein.

FURTHER, If the Obligee is ordered by the proper Government Agency to perform any of the P&A Obligations required of the Principal, then upon performance of the obligation by the Obligee, the Surety agrees to pay to the Obligee the actual costs incurred by the Obligee for such performance in an amount up to, but not exceeding the Penal Sum of this bond, reduced as provided for herein.

FURTHERMORE, it is agreed that the Surety shall have no obligation to the Principal, the Obligee, or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity for any loss suffered by the Principal, the Obligee or any other person or entity by reason of acts or omissions which are covered by the Principal's general liability insurance, products liability insurance, completed operations insurance or any other insurance. In no event shall the Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the Penal Sum of this bond.

It is further agreed that the Surety shall not be liable for any specifications respecting the procurement of or coverage provided by any insurance, nor shall the Surety be liable under any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in prosecuting the work to be performed under the Agreement with respect to the Leases.

Should the Principal fail to carry out its obligations to bear the cost and expense for any P&A Obligations with respect to the Subject Wells and Infrastructure, the Obligee may present to the Surety a written notice that the Principal is in default of its obligation under the terms of the Agreement with respect to such P&A Obligations and



APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha. NE. 68154

such condition has persisted for thirty (30) days after written notice of such default has been given by certified mail to the Principal and to the Surety, the Surety shall, within thirty (30) days of such presentation: 1) pay to the Obligee an amount equal to the incurred charges for such P&A Obligations to an amount up to, but not exceeding the penal amount of this obligation and the penal amount of the obligation shall be further reduced by the amount of such payment; or 2) commence and complete the necessary operations to plug and abandon the remaining Subject Wells and Infrastructure and remove all other equipment and facilities and any necessary restorations as set forth in the Leases.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the aforementioned P&A Obligations, said operations shall continue until such time as the obligations expressly set forth in the Leases have been met, thereby reducing or satisfying the Penal Sum as expressly set forth herein.

Any suit under this bond must be instituted before the expiration of one (1) year from the date on which a default by the Principal, as detailed herein, falls due, and subject to the one year time limitation, the Surety consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Leases or of the Exhibits attached thereto shall release the Principal and the Surety or any of them from their liability under this bond, notice to the Surety of any such amendment or supplement being hereby waived, except to the extent that is expressly herein provided.

No assignment of the Leases by the Principal, its successors and assigns, and no delay, neglect or failure of the Obligee to proceed promptly to enforce the Leases or to proceed promptly in the premises in case of any default on the part of the Principal shall in any degree relieve the Principal and the Surety or any of them of their obligations under this bond.

HOWEVER, if upon assignment of the Leases or any Subject Wells and Infrastructure and facilities thereon by the Principal, its successors or assigns, the Principal shall cause its assignee to post security, in the form of a bond or other security reasonably acceptable to Obligee in the amount of and covering the same obligations as stated herein, then the Obligee will accept such security in lieu of this bond and issue an unconditional release of this bond within sixty (60) days of such acceptance of such bond or other security.

No right or action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee, their heirs, executors, administrators or successors.

The Obligee will release this bond within a reasonable time period, but in no instance longer than thirty (30) days after receipt of satisfactory evidence (e.g., a report from the proper Government Agency that has determined the P&A Obligations have been satisfied in full and that Principal and Obligee shall have no further obligation relating thereto) of the Principal's full and faithful performance and compliance with the obligations of this bond; or upon receipt of a replacement bond, Letter of Credit or other security acceptable to the Obligee.

 **APPLIED** SURETY UNDERWRITERS | APPLIED SURETY UNDERWRITERS
10805 Old Mill Rd. Omaha. NE. 68154

IN WITNESS WHEREOF, the Principal, Surety, and Obligee have executed this instrument under their several seals effective this ___20__ day of September, 2023, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

W&T Offshore, Inc.
Principal

By: _____

Name: Jonathan Curth

Title: Executive Vice President,
General Counsel and Secretary

Pennsylvania Insurance Company
Surety

By: _____

Name: Vickie Lacy

Title: Attorney-In-Fact

# Addendum 1

## *TO BE ATTACHED AND MADE PART OF PERFORMANCE BOND*

## Bond No. SBP150328_004

Wells

| Field | Asset Name | Lease Number | API | WI | NRI |
|---|---|---|---|---|---|
| Vermilion 78 | VERMILION 078 #A001 | G04421 | 177054077800 | 100.00% | 83.33% |
| Vermilion 78 | VERMILION 078 #A002 ST2 | G04421 | 177054047903 | 100.00% | 83.33% |
| Vermilion 78 | VERMILION 078 #A003 ST2 | G04421 | 177054102402 | 100.00% | 83.33% |

Platforms

| Field | Asset Name | Block | Lease | ID | WI |
|---|---|---|---|---|---|
| Vermilion 78 | VR 78 A | VR 78 | OCS-G 4421 | A | 100.00% |

Pipelines

| Field | Asset Name | Block | Lease | ROW | WI |
|---|---|---|---|---|---|
| Vermilion 78 | VR 78 20794 | VR 78 | | OCS-G 29576 | 100.00% |

California Insurance Company · Continental Indemnity Company · Illinois Insurance Company · Pennsylvania Insurance Company

*10805 Old Mill Road · Omaha, Nebraska 68154*

## POWER OF ATTORNEY NO.    MGFHOU01_0323

KNOW ALL MEN BY THESE PRESENTS: That the California Insurance Company, duly organized and existing under the laws of the State of California and having its principal office in the County of San Mateo, California, and Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, corporations duly organized and existing under the laws of the State of New Mexico and having their principal office in the County of Santa Fe, New Mexico does herby nominate, constitute and appoint:

Ashley Koletar, Heather Noles, Joseph R. Aulbert, Marc W. Boots, Maria D. Zuniga, Richard Covington, Ryan Varela, Vickie Lacy, Dylan Young, Stephanie Moore Harold

Its true and lawful agent and attorney-in-fact, to make, execute, seal and deliver for and on its behalf as surety, and its act and deed any and all bonds, contracts, agreements of indemnity and other undertakings in suretyship (NOT INCLUDING bonds without a fixed penalty or financial guarantee) provided, however, that the penal sum of any one such instrument executed hereunder shall not exceed the sum of:

"Unlimited"

This Power of Attorney is granted and is signed and sealed under and by the authority of the following Resolution adopted by the Board of Directors of **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company.**

"RESOLVED, That the President, Senior Vice President, Vice President, Assisted Vice President, Secretary, Treasurer and each of them hereby is authorized to execute powers of attorney, and such authority can be executed by use of facsimile signature, which may be attested or acknowledged by any officer or attorney of the Company, qualifying the attorney or attorneys named in given power of attorney, to execute in behalf of, and acknowledge as the act and deed of the **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** all bond undertakings and contracts of suretyship, and to affix the corporate seal thereto."

IN WITNESS WHEREOF. **California Insurance Company, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company,** has caused its official seal to be hereunto affixed and these presents to be signed by its duly authorized officer the 16th day of August 2023.

California Insurance Company, Continental Indemnity Company, Illinois Insurance Company, Pennsylvania Insurance Company

By _____
Jeffrey A. Silver, Secretary

STATE OF NEBRASKA
COUNTY OF DOUGLAS SS.

On this 16th day of August A.D. 20 23, before me a Notary Public of the State of Nebraska, in and for the County of Douglas, duly commissioned and qualified, came THE ABOVE OFFICER OF THE COMPANY, to me personally known to be the individual and officer described in, and who executed the preceding instrument, and he acknowledged the execution of the same, and being by me duly sworn, deposed and said that he is the officer of the said Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and the said Corporate seal and his signature as officer were duly affixed and subscribed to the said instrument by the authority and direction of the said corporation, and that Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand, and affixed my Official Seal at the County of Douglas, the day and year first above written.

GENERAL NOTARY - State of Nebraska
LINDA S. DAVIS
My Comm. Exp. September 1, 2022

_____
(Notary Public)

I, the undersigned Officer of the California Insurance Company, a California Corporation of Foster City, California, Continental Indemnity Company, Illinois Insurance Company and Pennsylvania Insurance Company, New Mexico Corporations of Santa Fe, New Mexico, do herby certify that the original POWER OF ATTORNEY of which the foregoing is full, true and correct copy is still in full force and effect and has not been revoked.

IN WITNESS WHEREOF, I have hereunto set my hand, and affixed the Seal of said Company, on the 30th day of September , 20 23

_____
Jeffrey A. Silver, Secretary



| INVOICE NO. 111197 | DATE: 09/17/2024 |
|---|---|

**TO:**
Ryan Varela
McGriff - Houston
10100 Katy Freeway, Suite 400
Houston, TX 77043
rvarela@mcgriff.com
713-273-2697

**FROM:**
Applied Surety Underwriters, LLC
10805 Old Mill Road
Omaha, NE 68154
meross@auw.com
973-714-1652

---

**W&T Offshore - SBP150328_001 - Drilling, Plugging or Operating Oil, Gas, Water, or Mineral Wells or Leases Renewal**

| | | |
|---|---|---|
| Premium Due from Insured: | $ | 39,170.00 |
| Underwriting & Administrative Fee: | $ | 7,834.00 |
| Taxes and Surcharges: | $ | - |
| Commission Due Agency: | $ | 11,751.00 |

**Net Premium Due:**    $    **35,253.00**

**Premium Due Date:**    **9/27/2024**

| Bond Amount: | $1,119,122.00 |
|---|---|
| Rate: | 3.50% |
| Fee: | 20.00% |
| Commission: | 30.00% |

| Bond No: | SBP150328_001 | | Effective Date: | 9/19/2024 |
|---|---|---|---|---|
| | | | Billing Expiration: | 9/18/2025 |

**Principal:**    W&T Offshore, Inc
5718 Westheimer Road, Suite 700
Houston, TX 77057

**Surety:**    Pennsylvania Insurance Company
10805 Old Mill Road
Omaha, NE 68154

---

**Make Checks Payable to:**    Applied Risk Services, Inc.
10805 Old Mill Road
Omaha, NE 68154

**Wire Transfer/ACH:**    Security National Bank
1120 S 101st
Omaha, NE 68124
Beneficiary: Applied Risk Services, Inc.



If you have questions or need assistance, please email info@surety.auw.com



| **INVOICE NO. 111198** | **DATE: 09/17/2024** |

**TO:**
Ryan Varela
McGriff - Houston
10100 Katy Freeway, Suite 400
Houston, TX 77043
rvarela@mcgriff.com
713-273-2697

**FROM:**
Applied Surety Underwriters, LLC
10805 Old Mill Road
Omaha, NE 68154
meross@auw.com
973-714-1652

---

**W&T Offshore - SBP150328_002 - Drilling, Plugging or Operating Oil, Gas, Water, or Mineral Wells or Leases
Renewal**

| | | |
|---|---|---|
| Premium Due from Insured: | $ | 119,783.00 |
| Underwriting & Administrative Fee: | $ | 23,956.60 |
| Taxes and Surcharges: | $ | - |
| Commission Due Agency: | $ | 35,934.90 |

**Net Premium Due:**  $ **107,804.70**

**Premium Due Date:**  **9/27/2024**

| | |
|---|---|
| Bond Amount: | $3,422,371.00 |
| Rate: | 3.50% |
| Fee: | 20.00% |
| Commission: | 30.00% |

**Bond No:**  SBP150328_002

**Effective Date:**  9/19/2024
**Billing Expiration:**  9/18/2025

**Principal:**  W&T Offshore, Inc
5718 Westheimer Road, Suite 700
Houston, TX 77057

**Surety:**  Pennsylvania Insurance Company
10805 Old Mill Road
Omaha, NE 68154

---

**Make Checks Payable to:**  Applied Risk Services, Inc.
10805 Old Mill Road
Omaha, NE 68154

**Wire Transfer/ACH:**  Security National Bank
1120 S 101st
Omaha, NE 68124
Beneficiary: Applied Risk Services, Inc.

If you have questions or need assistance, please email info@surety.auw.com



| **INVOICE NO. 111199** | **DATE: 09/17/2024** |
|---|---|

**TO:**
Ryan Varela
McGriff - Houston
10100 Katy Freeway, Suite 400
Houston, TX 77043
rvarela@mcgriff.com
713-273-2697

**FROM:**
Applied Surety Underwriters, LLC
10805 Old Mill Road
Omaha, NE 68154
meross@auw.com
973-714-1652

| W&T Offshore - SBP150328_003 - Drilling, Plugging or Operating Oil, Gas, Water, or Mineral Wells or Leases |
|---|
| Renewal |

| | | |
|---|---|---|
| Premium Due from Insured: | $ | 134,399.00 |
| Underwriting & Administrative Fee: | $ | 26,879.80 |
| Taxes and Surcharges: | $ | - |
| Commission Due Agency: | $ | 40,319.70 |

**Net Premium Due:**      $    **120,959.10**

**Premium Due Date:**      **9/27/2024**

| Bond Amount: | $3,839,974.00 |
|---|---|
| Rate: | 3.50% |
| Fee: | 20.00% |
| Commission: | 30.00% |

| Bond No: | SBP150328_003 | | Effective Date: | 9/19/2024 |
|---|---|---|---|---|
| | | | Billing Expiration: | 9/18/2025 |

**Principal:**     W&T Offshore, Inc
5718 Westheimer Road, Suite 700
Houston, TX 77057

**Surety:**     Pennsylvania Insurance Company
10805 Old Mill Road
Omaha, NE 68154

**Make Checks Payable to:**     Applied Risk Services, Inc.
10805 Old Mill Road
Omaha, NE 68154

**Wire Transfer/ACH:**     Security National Bank
1120 S 101st
Omaha, NE 68124
Beneficiary: Applied Risk Services, Inc.

If you have questions or need assistance, please email info@surety.auw.com



| INVOICE NO. 111200 | DATE: 09/17/2024 |
|---|---|

**TO:**
Ryan Varela
McGriff - Houston
10100 Katy Freeway, Suite 400
Houston, TX 77043
rvarela@mcgriff.com
713-273-2697

**FROM:**
Applied Surety Underwriters, LLC
10805 Old Mill Road
Omaha, NE 68154
meross@auw.com
973-714-1652

W&T Offshore - SBP150328_004 - Drilling, Plugging or Operating Oil, Gas, Water, or Mineral Wells or Leases
**Renewal**

| | | |
|---|---|---|
| **Premium Due from Insured:** | $ | 103,687.00 |
| **Underwriting & Administrative Fee:** | $ | 20,737.40 |
| **Taxes and Surcharges:** | $ | - |
| **Commission Due Agency:** | $ | 31,106.10 |

**Net Premium Due:**          $    93,318.30

**Premium Due Date:**               9/27/2024

| | |
|---|---|
| **Bond Amount:** | $2,962,482.00 |
| **Rate:** | 3.50% |
| **Fee:** | 20.00% |
| **Commission:** | 30.00% |

**Bond No:**     SBP150328_004

**Effective Date:**     9/19/2024
**Billing Expiration:**     9/18/2025

**Principal:**     W&T Offshore, Inc
5718 Westheimer Road, Suite 700
Houston, TX 77057

**Surety:**     Pennsylvania Insurance Company
10805 Old Mill Road
Omaha, NE 68154

**Make Checks Payable to:**     Applied Risk Services, Inc.
10805 Old Mill Road
Omaha, NE 68154

**Wire Transfer/ACH:**     Security National Bank
1120 S 101st
Omaha, NE 68124
Beneficiary: Applied Risk Services, Inc.

If you have questions or need assistance, please email info@surety.auw.com

# EXHIBIT 1.I



Bonds Written on
Allegheny Casualty Company
Aspen American Insurance Company
Aspen Insurance UK Limited
QBE UK LTD
QBE Europe SA/NV
United States Fire Insurance Company

180 Glastonbury Blvd.,
Suite 304
Glastonbury, CT 06033

October 14, 2024

***Via Federal Express and Email to*** [tracy@wtoffshore.com](mailto:tracy@wtoffshore.com)

W&T Offshore, Inc.
W&T Energy VI, LLC
5718 Westheimer Road
Suite 700
Houston, Texas 77057
Attention: Tracy W. Krohn, CEO

Re: Discharge Demand to Indemnitors W&T Offshore, Inc. and W&T Energy VI, LLC (hereinafter collectively, "Indemnitors"

Dear Indemnitors:

On or about November 5, 2013, and July 10, 2018, W&T Offshore, Inc. and W&T Energy VI, LLC executed General Agreements of Indemnity, each as amended by Rider To General Indemnity Agreement dated October 6, 2020, and each amended by Rider To General Indemnity Agreement dated May 21, 2021, (collectively, the "GAI") for the benefit of United States Fire Insurance Company, Aspen American Insurance Company, Aspen Specialty Insurance Company, of their successors and/or assigns, etc. (the "Surety").  A copy of the GAI, as amended, is appended hereto as Exhibit "A".

In reliance on the GAI, The Surety issued and/or maintained the surety bonds which are listed below:

| Bond # | Principal | Obligee | Penalty |
|--------|-----------|---------|---------|
| 612410274 | W & T Offshore, Inc | MARUBENI OIL & GAS | $16,333,000 |
| 612410259 | W & T Offshore, Inc | Conoco Phillips Company, a Delaware corporation | $49,000,000 |
| 612410111 | W & T Offshore, Inc | US DEPARTMENT OF THE INTERIOR BOEM LA | $10,045,025 |
| 612410074 | W&T Energy VI LLC | UNITED STATES DEPARTMENT OF THE INTERIOR | $14,123,197 |
| | | | **$89,501,222** |

At present, the total penal sum of all outstanding surety bonds issued by the Surety pursuant to the GAI is USD **$89,501,222**.

Pursuant to the GAI, the Surety has the right, at its sole discretion, to demand full discharge and release of all of the outstanding bonds, and to further require that the Indemnitors provide the Surety with collateral sufficient to cover any and all undischarged liability under the bonds. The GAI provides in pertinent part:

> **Additional Indemnity Terms**. The Indemnitors shall remain bound under the terms of this Agreement even if Surety, with or without notice to or knowledge of Indemnitors, may have accepted or released other agreements of indemnity or collateral from one or more Indemnitors or others. The rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to any and all other rights, powers and remedies which Surety may have or acquire against Indemnitors or others by operation of law or otherwise. Unless expressly stated to the contrary, this Agreement is not intended to and shall not be deemed to supersede any other indemnity agreement between one or more Indemnitors and Surety. Upon Surety's written demand, Indemnitors shall promptly deposit with Surety a clean, irrevocable letter of credit ("ILOC') on a form and from a bank acceptable to Surety, or shall provide another form of collateral acceptable to Surety (individually and collectively, the "Collateral') in the amount of any reserve Surety establishes for any existing liability or claim, and or any expenses associated therewith, whether or not any assertion or payment of such liability, claim, or expense has been made at the time of the Surety's demand. ***Further, Indemnitors expressly and specifically agree that Surety in its sole discretion and for any reason may, by written demand, require Indemnitors to provide the Surety with Collateral, as defined herein, within ten (10) days of their receipt of said demand, in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion.*** In the event of any increases in Surety's undischarged liability, Indemnitors shall supplement the Collateral to match the increase.
>
> Surety shall have no obligation to release any Collateral provided to Surety, or remit to Indemnitors any interest or proceeds therefrom until Surety has received written releases or other documentation in form and substance satisfactory to Surety with respect to the discharge of Surety's obligations on all Bonds. Surety may apply the Collateral to any premium due, loss, cost and/or expense provided for in this Agreement. To the fullest extent allowed by law, Indemnitors waive any and all defenses or challenges to the provision of collateral pursuant to this Agreement.  Indemnitors further expressly stipulate and agree that Surety will have no adequate remedy at law should Indemnitors fail to post any collateral required herein, and agree that Surety is entitled to specific performance of the obligation to post collateral. (*emphasis added*)

A satisfactory bond release must be in writing signed by an authorized representative of the obligee, name the surety bond by number and provide that the surety is released of all liability under the bond, past, present and future.  Should you fail to obtain the release of all of the bonds listed above within ten days of the date of this letter, i.e., by October 24, 2024, you must provide the Surety with either a clean Letter of Credit on the Surety's form or cash collateral equal to the penal sum of all then outstanding bonds, i.e., **$89,501,222**.

Please contact the undersigned to advise how you intend to discharge your obligations to the Surety. Please be aware that in the event the Indemnitors fail or refuse to comply with this demand, the Surety will be left with no choice but to immediately pursue any and all remedies available to it under the GAI in order to protect its rights and interests.

In closing, please be advised that any and all of the Surety's rights and defenses at law and in equity, under the Bonds, the GAI or otherwise are expressly reserved by this letter and in the future. Furthermore, we trust you understand the joint and several indemnity obligations of the Principal and Indemnitors to the Surety.

Very truly yours,

United States Fire Insurance Company

By: _____
    Michael Toppi
    Chief Executive Officer


Cc:    Ashley Koletar, McGriff Insurance Services, Inc.