**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **W&T OFFSHORE, INC., AND** | § | |
| **W&T ENERGY VI, LLC,** | § | |
| | § | |
| | § | |
| | § | |
| **v.** | § | **LEAD CASE NO. 4:24-cv-3047** |
| | § | **CONSOLIDATED ACTION** |
| **ENDURANCE ASSURANCE** | § | |
| **CORPORATION and LEXON** | § | **ORAL ARGUMENT** |
| **INSURANCE CO., et al.** | § | **REQUESTED** |
| | § | |

**PENNSYLVANIA INSURANCE COMPANY AND UNITED STATES FIRE INSURANCE COMPANY'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND FACTS AND PROCEDURAL HISTORY ...................................4

    A.  W&T Files a Lawsuit Against Sompo Publicizing Sompo's Request for Collateral and W&T's Refusal to Comply ...................................................4

    B.  Pursuant to Unambiguous Contractual Rights, U.S. Fire and Penn Seek to be Released from Their Bonded Obligations and Demand Collateral After W&T Refuses To Comply ...........................................................................5

    C.  W&T Files An Antitrust Complaint Alleging "Direct Evidence" of A Conspiracy to Coordinate Collateral Demands ............................................5

    D.  After Discovery Confirms That W&T Had No Basis For Alleging The "Direct Evidence," the SAC Omits Those Allegations But Adds New Allegations of "Price-Fixing and Other Anticompetitive Conduct" ..........6

STANDARD OF REVIEW .............................................................................................6

ARGUMENT .....................................................................................................................8

    I.  W&T Fails to State Antitrust Claims Against Penn and U.S. Fire .................8

    A.  The SAC Fails to Plausibly Allege that Penn and U.S. Fire Conspired to Coordinate Collateral Demands Against W&T in 2024 ............................8

        1.  The SAC No Longer Contains the Purported "Direct Evidence" From the FAC.............................................................................................8

        2.  The SAC Otherwise Fails to Contain Allegations Stating a Plausible Antitrust Claim Against Penn and U.S. Fire .......................................10

            a.  *The facially-admitted facts and circumstances of the demand undermine W&T's claim of conspiracy, and W&T does nothing to show such demands would have been contrary to Penn and U.S. Fire's interests in the absence of conspiracy* ...............................11

      b.  *The market conditions alleged in the SAC further provide an obvious alternative explanation to conspiracy* .............................14

      c.  *Allegations of relationships and attendance at trade shows and market concentration are routinely rejected as enough to plausibly plead an antitrust conspiracy*........................................................17

B.  W&T Otherwise Fails to Plausibly Allege That Penn and U.S. Fire Participated in an Antitrust Conspiracy......................................................19

   1.  The SAC Fails to Identify Conduct By Penn and U.S. Fire Reflecting "Rate-Fixing" .................................................................19

   2.  W&T Otherwise Misrepresents Documents In Describing Supposed "Direct Evidence" of a "Rate-Fixing" Conspiracy .............................21

   3.  The Internally Contradictory Nature of W&T's Allegations Further Demonstrates Their Implausibility.....................................................26

II.  W&T Fails to State Claims for Breach of Contract and Declaratory Judgment......................................................................................................27

III. W&T Fails to State Claims for Tortious Interference, Civil Conspiracy, and The Texas Free Enterprise and Antitrust Act..................................................30

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Amigo Shuttle Inc. v. Port Auth. of New York & New Jersey*,
2024 WL 4628330, (S.D.N.Y. Mar. 26, 2024), *aff'd*, 2025 WL 2618862 (2d Cir. Sept. 11, 2025) ............................................................................................................9

*Anderson News, L.L.C. v. Am. Media, Inc.*,
899 F.3d 87 (2d Cir. 2018) .......................................................................................10

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
300 F.3d 620 (5th Cir. 2002) ....................................................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................6

*Associated Indem. Corp. v. CAT Contracting, Inc.*,
964 S.W.2d 276 (Tex. 1998) .....................................................................................29

*Austin Legal Video, LLC v. Deposition Sols., LLC*,
2023 WL 9107726 (W.D. Tex. Nov. 16, 2023)...................................... 8, 20, 27

*Baker v. Great N. Energy, Inc.*,
64 F. Supp. 3d 965 (N.D. Tex. 2014) .......................................................................27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007)......................................................................................................6

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
49 F.4th 520 (5th Cir. 2022).....................................................................................26

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024)......................................................................................20

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000).....................................................................................21

*Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*,
893 F. Supp. 2d 789 (N.D. Miss. 2012).....................................................................9

*Cuba v. Pylant*,
   814 F.3d 701 (5th Cir. 2016)..................................................................................31

*D'Augusta v. Am. Petroleum Inst.*,
   117 F.4th 1094 (9th Cir. 2024) .............................................................................17

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
   603 F. Supp. 3d 459 (S.D. Miss. 2022)..................................................................20

*Elepreneurs Holdings, LLC v. Benson*,
   2021 WL 5140769 (E.D. Tex. Nov. 4, 2021).........................................................31

*Hux v. S. Methodist Univ.*,
   819 F.3d 776 (5th Cir. 2016) .................................................................................29

*In re Crop Inputs Antitrust Litig.*,
   749 F. Supp. 3d 992 (E.D. Mo. 2024)....................................................................12

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022).....................................................................................20

*In re Great Lakes Dredge & Dock Co.*,
   624 F.3d 201 (5th Cir. 2010)....................................................................................7

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ............................................................................ 7, 24

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015)..........................................................10

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   997 F. Supp. 2d 526 (N.D. Tex. 2014) ............................................................ 14, 23

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
   767 F.Supp.3d 681 (N.D. Ohio 2025)............................................................. 20, 27

*In re Pool Prod. Distrib. Mkt. Antitrust Litig.*,
   988 F.Supp.2d 696 (E.D. La. 2013)........................................................................10

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009)...................................................................... 7, 14, 18

US Fire & Penn's Joint Motion to Dismiss Under Rule 12(b)(6)

*In the Matter of Fieldwood Energy LLC*,
   93 F.4th 817 (5th Cir. 2024).................................................................................15

*Int'l Constr. Prods., LLC v. Ring Power Corp.*,
   2023 WL 7127515 (11th Cir. Oct. 30, 2023)........................................................9

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010).............................................................................7

*JSW Steel (USA) Inc. v. Nucor Corp.*,
   2025 WL 832801 (5th Cir. Mar. 17, 2025)..................................................... 7, 21

*JSW Steel (USA) Inc. v. Nucor Corp.*,
   586 F. Supp. 3d 585 (S.D. Tex. 2022)..................................................... 7, 12, 18

*Komlanvi v. Sessions*,
   2018 WL 3348886 (S.D. Tex. July 9, 2018)........................................................21

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................................................... 14, 18

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015)...............................................................................7

*New England Constr., L.L.C. v. Weyerhaeuser Co.*,
   2023 WL 2401587 (5th Cir. Mar. 8, 2023).........................................................20

*Phoneternet, L.L.C. v. LexisNexis Risk Sols., Inc.*,
   816 F. App'x 909 (5th Cir. 2020)........................................................................30

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005).................................................................................7

*Pureshield, Inc. v. Allied Bioscience, Inc.*,
   2021 WL 4492861 (E.D. Tex. Sept. 30, 2021) ...................................................31

*RigUp, Inc. v. Sierra Hamilton, LLC*,
   613 S.W. 3d 177 (Tex. App. 2020) ......................................................................31

*Rojas v. Delta Airlines, Inc.*,
   425 F. Supp. 3d 524 (D. Md. 2019) .....................................................................12

US Fire & Penn's Joint Motion to Dismiss Under Rule 12(b)(6)

*Schafer v. State Farm Fire & Cas. Co.*,
  507 F. Supp. 2d 587 (E.D. La. 2007)....................................................................14

*Sheridan v. Marathon Petroleum Co. LLC*,
  530 F.3d 59 (7th Cir. 2008).................................................................................26

*Stone v. FINRA*,
  694 F. Supp. 3d 774 (E.D. Tex. 2023) ...............................................................31

*Stukenberg v. Abbott*,
  2017 WL 74371 (S.D. Tex. Jan. 9, 2017) ..................................................... 26, 28

*Washington Cnty. Health Care Auth., Inc v. Baxter Int'l Inc.*,
  328 F.Supp.3d 824 (N.D. Ill. 2018) ....................................................................20

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011) ...............................................................................18

## Statutes

Tex. Bus. and Comm. Code § 1.304 .......................................................................30

## Rules

Fed. R. Civ. P. 12 ..............................................................................................1, 6

Fed. R. Civ. P. 15..................................................................................................8

## INTRODUCTION

Defendants Pennsylvania Insurance Company, Applied Surety Underwriters LLC, (together "Penn") and United States Fire Insurance Company and Amynta Holdings LLC (together "U.S. Fire") respectfully move to dismiss W&T Offshore, Inc. and W&T Energy VI, LLC's (together "W&T") Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

This case began with Penn and U.S. Fire's straightforward claim that W&T breached unambiguous contractual provisions by failing to replace Penn and U.S. Fire on their surety bonds and then failing to post collateral. In response, W&T (irresponsibly) proffered what it claimed to be "direct evidence" that Defendants Endurance Assurance Corporation and Lexon Insurance Co. (together "Sompo") "formulated" a "scheme" that the parties implemented at 2024 meetings to coordinate collateral demands against W&T. W&T also claimed this was part of a more general campaign against independent oil and gas operators. The Court relied on that supposed "direct evidence" to deny Penn and U.S. Fire's motion to dismiss W&T's First Amended Complaint ("FAC").

Now, after extensive discovery into the communications between the sureties, brokers, and independent oil and gas operators, W&T has amended its complaint again, and the SAC no longer contains any so-called "direct evidence" of a collateral-demand conspiracy. Also, despite substantial discovery, W&T fails to

point to any other oil and gas operators who even received multiple collateral demands (much less pursuant to a conspiracy).

Instead, W&T now proffers only the type of allegation that the Supreme Court and a legion of federal courts have routinely held to be insufficient to state a claim for violation of section 1 of the Sherman Act—*i.e.*, conclusory assertions and conduct that is just as consistent with independent decision making. While W&T asserts that the SAC merely bolstered W&T's prior allegations on collateral demands with additional detail, that is demonstrably untrue. Disregarding its rhetoric and conclusory statements, the lengthier SAC unremarkably alleges that:

- Providing surety bonds had become riskier because of bankruptcies and judicial decisions providing that sureties' rights did not survive bankruptcy;

- The demand for surety bonds was potentially going to increase because of BOEM requirements, while available capacity had decreased because of exits from the market;

- W&T sued Sompo after Sompo demanded collateral from W&T; and

- Months later, Penn and U.S. Fire asked to be replaced on their bonds and for collateral when W&T failed to replace them.

The independent reasons for the claimed conspiratorial conduct are thus apparent on the face of the SAC.

W&T thus has turned to alleging an amorphous "rate-fixing" conspiracy supposedly involving coordinated price increases dating back to 2020. There are many defects in those allegations, but as to Penn and U.S. Fire, there is a fundamental

threshold problem: W&T fails to point to any fact plausibly establishing Penn and U.S. Fire's involvement in this newly-minted conspiracy.[1] It does not identify any price increases by Penn or U.S. Fire at all, much less facts suggesting Penn and U.S. Fire's involvement in a price-fixing conspiracy. These allegations thus even fall well short of claims that are routinely *dismissed* at the pleading stage.

If past is prelude, W&T can be expected to respond with accusations unrelated to the sufficiency of its pleading, including that Penn and U.S. Fire are trying to delay discovery. If so, that is wrong. Penn and U.S. Fire did not seek to stay discovery pending their first motion to dismiss, nor are they are seeking to do so now. They ask only that the Court schedule oral argument at its earliest convenience.

If the Court elects not to dismiss the case at this stage, then Penn and U.S. Fire will establish the lack of merit to W&T's claims at summary judgment. But litigating antirust claims through summary judgment is highly expensive and burdensome, summary judgment is more than a year away under either proposed schedule, and W&T's pleading shows it has no basis for alleging antitrust claims against Penn and U.S. Fire (and never did). Where, as here, litigants like W&T make improper use of the antitrust laws, courts routinely dismiss such complaints at the pleading stage rather than granting license for protracted and unnecessary discovery.

---

[1] As discussed in sections II and III, W&Ts' remaining claims either are premised upon the allegations of conspiracy and/or contain various other fatal defects, including in the case of W&T's "breach of contract" claim, a failure even to identify a provision of the contract that Penn and U.S. Fire "breached."

Accordingly, Penn and U.S. Fire respectfully request that the Court schedule oral argument at its earliest convenience and following that hearing, dismiss W&T's antitrust and other claims with prejudice.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.    W&T Files a Lawsuit Against Sompo Publicizing Sompo's Request for Collateral and W&T's Refusal to Comply

On August 14, 2024, W&T filed a lawsuit against Sompo.  ECF 1.  The lawsuit alleged that Sompo made demands for collateral under a bonding agreement in July 2024, in connection with over $50 million in bonds Sompo had issued in connection with W&T's obligations.  *Id.* ¶¶ 32, 43-51, 56.  W&T sought a declaratory judgment that W&T was not obliged to provide that collateral.  *Id.* ¶ 75.  With its lawsuit, W&T filed its agreement with Sompo on the public docket.  ECF 1–1.  Sompo then filed an answer and counterclaim detailing Sompo's reasons to believe that W&T's financial condition was deteriorating. ECF 14 ¶ 34.[2] The counterclaim sought collateral in the amount of Sompo's bonds ($55 million) and stated that W&T previously refused an offer that it post collateral of $7.5 million. ECF 14 ¶¶ 39, 46.

---

[2] Specifically, Sompo identified (i) massive declines in operating income, net income, and operating revenue from 2022 to 2023; (ii) W&T's own statements that it "may have difficulty paying [their] debts as they become due"; (iii) a net loss for Q1 2024 (the most recent available quarter); (iv) and negative reports from credit-reporting agents including one stating that "material default risk is present" and another revising its rating.  *Id*. ¶¶ 32, 34.

**B.    Pursuant to Unambiguous Contractual Rights, U.S. Fire and Penn Seek to be Released from Their Bonded Obligations and Demand Collateral After W&T Refuses To Comply**

Three months after W&T sued Sompo and publicized that dispute, Penn and U.S. Fire sought to enforce their contractual indemnification rights to be replaced on their surety bonds or failing that to collateral in the amount of the sureties' undischarged liability.  Under their indemnification contracts, U.S. Fire has "sole discretion" to seek to be replaced or to have collateral posted "for any reason."  SAC Ex. 1.C.  Penn has authority to seek such relief where in its "sole discretion" it determines that W&T's financial condition has deteriorated or that there has been a "change that adversely impacts the Surety's risk."[3]  SAC Ex. 1.B.  When W&T refused or failed to do so, each surety filed suit in November 2024.

**C.    W&T Files An Antitrust Complaint Alleging "Direct Evidence" of A Conspiracy to Coordinate Collateral Demands**

W&T responded to this suit with an antitrust complaint alleging an agreement between the sureties to jointly demand collateral.  ECF 36 ("FAC").  In opposing Penn and U.S. Fire's subsequent motion to dismiss, W&T relied on what

---

[3] Section 4 of the rider to the U.S. Fire agreement states that the Surety, "in its sole discretion and for any reason, may, by written demand, require Indemnitors to provide the Surety with Collateral . . . within ten (10) days of their receipt of said demand, in the amount representing the total of any undischarged liability under the Bonds as determined by the Surety in its sole discretion."  SAC Ex. 1.C.  Section 12 of the Penn agreement provides that it "may, in its sole discretion, determine" that W&T's "financial condition has been or is believed to be deteriorating" and that within thirty days of Penn's written demand, W&T "shall procure the full and complete release of the Bond(s)" and failing that "shall, within an additional seven (7) days, provide the Surety with collateral in the amount of 100% of all unreleased liability under the Bond(s)."  SAC Ex. 1.B.

it later claimed was "direct evidence" that the collateral demands resulted from an antitrust conspiracy. ECF 76 at 13. The Court relied on this alleged "direct evidence" in its April 10, 2026 Order denying Penn and U.S. Fire's motion to dismiss the FAC. ECF 283 ("MTD Order") at 18–22.

**D.** **After Discovery Confirms That W&T Had No Basis For Alleging The "Direct Evidence," the SAC Omits Those Allegations But Adds New Allegations of "Price-Fixing and Other Anticompetitive Conduct"**

After discovery failed to reveal anything supporting its claim of a collateral-demand conspiracy, W&T filed the SAC which omits the supposed "direct evidence" that the surety defendants conspired at 2024 conferences to make joint collateral demands against W&T and other independent oil and gas operators. *See* Section I.A.1 *infra*. The SAC also now alleges that "the Surety Defendants, the Broker Defendant, and their co-conspirators have been engaged in price fixing and other anticompetitive conduct" since "at least as early as 2020." SAC ¶ 10.

## STANDARD OF REVIEW

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). That requires more than "labels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). In an antitrust case, "When faced with

two possible explanations for a defendant's conduct, only one of which results in liability, a plaintiff cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 595 (S.D. Tex. 2022) (quoting *Twombly*, 550 U.S. at 557), *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17, 2025).[4]  Instead, allegations of parallel conduct "'must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"  *JSW*, 2025 WL 832801 at *4 (quoting *Twombly*, 550 U.S. at 557).  Courts must accept all well-pleaded facts as true but "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010).

An antitrust complaint also must meet this pleading standard as to each defendant.  *See Austin Legal Video, LLC v. Deposition Sols., LLC*, 2023 WL

---

[4] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior."); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 908 (6th Cir. 2009) ("[P]laintiffs have failed to allege sufficient facts plausibly suggesting (not merely consistent with) an agreement in violation of § 1 of the Sherman Act because defendants' conduct 'was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.'") (quoting *Iqbal,* 556 U.S. at 680); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015) ("We cannot . . . infer an anticompetitive agreement when factual allegations 'just as easily suggest rational, legal business behavior.'") (quotation omitted); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1343 (11th Cir. 2010) ("[W]e fail to find in the complaint 'facts that are suggestive enough to render a § 1 conspiracy plausible[]' when the inference of conspiracy is juxtaposed with the inference of independent economic self-interest.").

9107726, at \*6–9 (W.D. Tex. Nov. 16, 2023) (conducting individualized assessment of allegations as to each member of an alleged boycott and stating that "Plaintiffs must plausibly allege nonconclusory facts that, if proven, would allow a reasonable jury to conclude that ***each Defendant*** agreed with others to harm Plaintiffs") (emphasis added).

## ARGUMENT

### I.    W&T Fails to State Antitrust Claims Against Penn and U.S. Fire

#### A.    The SAC Fails to Plausibly Allege that Penn and U.S. Fire Conspired to Coordinate Collateral Demands Against W&T in 2024

##### 1.  The SAC No Longer Contains the Purported "Direct Evidence" From the FAC

In opposing Penn and U.S. Fire's original motion to dismiss, W&T relied on various allegations that it claimed were "direct evidence" of an agreement to coordinate collateral demands in 2024 against W&T and other unnamed oil and gas operators.  ECF 76 at 11–12; *see also* MTD Order at 18–19, 21 (relying on the proffered "direct evidence").

Those allegations do not appear in the SAC.  Nor does W&T point to any other "direct evidence" that Penn or U.S. Fire agreed with Sompo to coordinate their collateral demands against W&T—much less against all independent oil and gas operators.  Instead, the section of the SAC labeled "Direct Evidence of Collusion" focuses on W&T's new conspiracy allegations of alleged "rate-fixing"

(addressed below).  SAC ¶¶ 103–130.

W&T now alleges only that "Upon information and belief, Sompo encouraged and supported other Sureties" to "demand additional collateral, including USSIC, Applied, Amynta, and PHLY."  SAC ¶ 265 ("They encouraged a run on the bank in order to bring W&T to heel within the industry.").  This is entirely inadequate to support a claim of conspiracy.  First, it is not "direct evidence," which is "evidence that 'is based on personal knowledge or observation and that, if true, proves a fact *without inference or presumption*."  *Int'l Constr. Prods., LLC v. Ring Power Corp.*, 2023 WL 7127515, at *4 (11th Cir. Oct. 30, 2023) (emphasis added); *see also Corr Wireless Commc'ns, L.L.C. v. AT & T, Inc.*, 893 F. Supp. 2d 789, 805 (N.D. Miss. 2012) (direct evidence must be "explicit and require[ ] no inferences to establish the proposition or conclusion being asserted.")

By contrast, allegations on "information and belief" rest on inference, not the personal knowledge required to make something "direct evidence."  *Amigo Shuttle Inc. v. Port Auth. of New York & New Jersey*, 2024 WL 4628330, at *4 (S.D.N.Y. Mar. 26, 2024), *aff'd*, 2025 WL 2618862 (2d Cir. Sept. 11, 2025) (describing acts properly alleged "upon information and belief" as those "peculiarly within the possession and control of the defendant" and those "based on factual information that makes the inference of culpability plausible").

Second, W&T's cagy allegation of "encouragement" is both conclusory and

woefully vague.  It does not allege an agreement (even in conclusory fashion), nor does it allege the nature of the supposed "encouragement and support."  If W&T had knowledge of specific acts of encouragement and support (much less acts that constituted an agreement or a basis to infer one), W&T would be able to specify what they are.  *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 721 (E.D. La. 2013) (explaining that "vague conspiracy claims rarely pass muster under Rule 8 and *Twombly*").  Its failure to do so (and its telling use of the qualifier "upon information and belief") gives the Court no basis for determining that the unnamed acts provide a plausible basis for an inference of conspiracy.[5]

### 2.  The SAC Otherwise Fails to Contain Allegations Stating a Plausible Antitrust Claim Against Penn and U.S. Fire

With no "direct evidence" of a conspiracy, a plaintiff alleging a section 1 claim must plead facts that otherwise justify an inference of conspiracy.  Where there is an "obvious alternative explanation" to an alleged conspiracy, a plaintiff fails to state a section 1 claim under *Twombly* and a legion of cases applying it.[6]

---

[5] This allegation in the SAC weakens further the already weak conclusory allegation from the FAC that Sompo "encouraged and enlisted the support of other Sureties."  FAC ¶ 86, SAC ¶ 265.  It also speaks volumes that W&T offers this weak allegation "upon information and belief" *after* receiving tens of thousands of pages of discovery, including the sureties' communications with each other, with brokers, and with other oil and gas operators.  As W&T well knows, that shows that discovery both failed to provide any evidence for its claim of a collateral-demand conspiracy and instead affirmatively refuted it by showing (among other things) that Penn and U.S. Fire did not even know of Sompo's collateral demand until after W&T made it publicly known by suing Sompo.

[6] *See* note 4 *supra* and note 10 *infra*.  *See also Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 112 (2d Cir. 2018) (it made "perfect business sense" for defendants to independently reject the bankrupt plaintiff's raised prices); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *41 (S.D.N.Y. Aug. 4, 2015) (where banks "universally felt pressure" within the London Interbank Offer Rate system, banks' parallel conduct did not create an inference of conspiracy).

Stripped of rhetoric and conclusory statements, W&T fails to state any facts giving rise to a plausible inference of conspiracy with respect to the 2024 collateral demands. Instead, all of the facts alleged are fully consistent with (and even strongly favor) the conclusion that Penn and U.S. Fire chose on their own to make collateral demands months after *W&T* revealed Sompo's demand by filing a lawsuit and only after W&T failed to replace both Penn and U.S. Fire.[7]

> a. *The facially-admitted facts and circumstances of the demand undermine W&T's claim of conspiracy, and W&T does nothing to show such demands would have been contrary to Penn and U.S. Fire's interests in the absence of conspiracy*

The basic facts of the sureties' collateral demands are that (i) Sompo made a $7.5 million demand along with other alternatives; (ii) W&T chose to sue Sompo in response; (iii) Sompo counterclaimed to require W&T to post the full $55 million of collateral owed alleging W&T's financial condition was deteriorating and detailing the basis for their concern; (iv) several months after W&T sued Sompo, Penn and U.S. Fire asked to be replaced on their bonds and failing that, demanded collateral.

Far from warranting an inference of conspiracy, the obvious alternative explanation is that, having seen Sompo make its own $55 million collateral

---

[7] W&T itself uses the term "run on the bank" to describe what happened. SAC ¶ 265. That is a telling characterization given that "run on the bank" is a paradigmatic instance of how individuals *acting on their own* can exhaust a bank's assets.

demand, Penn and U.S. Fire acted independently to protect their own interests first by asking to be replaced on their own bonds and then seeking collateral when W&T refused to do so.  W&T does nothing to show that such a judgment would have been against Penn and U.S. Fire's interests if they were acting independently.[8] In fact, W&T's original complaint itself acknowledged the link between Sompo's demand and Penn and U.S. Fire's independent interests.  ECF 1 ¶ 67 (stating that "complying with" Sompo's demand would "require W&T to breach its obligations to the other" sureties).

W&T asserts only that it would have been against the sureties' interests *to conspire* by putting their customers out of business through a total of $250 million in collateral demands.  SAC ¶ 223 ("It is not in the interest of a surety to put its longstanding customers out of business"); ¶ 277 ("The Surety Defendants were well aware that W&T could not post $250+ million in collateral immediately and all at once").  W&T thus dodges the question relevant for the *Twombly* analysis— *i.e.*, whether it would be against Penn and U.S. Fire's interests to demand collateral, *on their own*, (i) *after* Sompo had made its own demand for $55 million;

---

[8] *See JSW Steel*, 586 F. Supp. at 596 (granting motion to dismiss section 1 claim and identifying as a "plus factor" "actions that would be against the defendant's self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert"); *see also Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 543 (D. Md. 2019) (granting motion to dismiss where plaintiff failed to "rule out the possibility" that conduct was in defendant's self-interest in the absence of conspiracy); *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d 992, 1005, 1014 (E.D. Mo. 2024), *aff'd,* 172 F.4th 570 (8th Cir. 2026) (finding "impermissible group pleading" did not "plausibly rebut the inference that Defendants' conduct served their respective individual, legitimate business interests").

(ii) in the face of various concerns with W&T's financial condition; and (iii) *after* W&T either refused or failed to replace them on their bonds upon request. W&T does not even attempt to show it was against Penn and U.S. Fire's interests to make their own collateral demands independently under those circumstances.

W&T's assertions even show that, if anything, it is *conspiracy* that would have been irrational. Having made its own collateral demand, Sompo would have had no incentive to encourage other sureties to do the same, much less to enter into an unlawful agreement for them to do so. The SAC asserts that the sureties were incentivized to do so to:

> "send a message to Independents that the sureties have the power to 'say, no, not everybody qualifies for a surety bond,' the organization to 'stay disciplined' as an industry, and the leverage to 'collectively make money' at the Independents' expense."

SAC ¶ 223. This is not just conclusory (which alone makes it insufficient under *Twombly*). It also is economically senseless. U.S. Fire had over ***$93 million in bonds*** for which it would lose protection if W&T was driven into bankruptcy, and Penn had over $11 million. It is farcical to suggest that Penn and U.S. Fire would sacrifice these funds to use W&T to send an ephemeral "message to Independents"—much less Independents against whom W&T fails to show any joint collateral demands. The far simpler (and ineluctable) explanation is that, once Sompo made its demand, they independently wanted to be replaced on the bonds, and failing that, wanted security for their bonds.

Other facts likewise affirmatively undermine the inference of conspiracy. First, Sompo on its own chose to make the initial collateral demand. This alone forecloses W&T's suggestion that a surety would not have chosen to make a collateral demand by itself.[9] Second, the information about Sompo's demand, W&T's refusal, and Sompo's counterclaim was all publicly available, and W&T was the one who chose to make it publicly available with its lawsuit. *Third*, Penn and U.S. Fire only made collateral demands *after* W&T failed to replace them on the bonds at their request. Thus, far from "eyeing the hundred-plus million dollars W&T was holding on its balance sheet," Penn and U.S. Fire no longer wanted to be a party to those bonds at all. SAC ¶ 165.

> b. *The market conditions alleged in the SAC further provide an obvious alternative explanation to conspiracy*

The SAC further points to various market conditions that are precisely the type of market conditions that courts have repeatedly recognized as providing an explanation *for independent action*.[10] That begins with various conditions that

---

[9] The FAC appeared to allege that Sompo's collateral demand was the outgrowth of a conspiracy, *see* Appendix A; FAC ¶¶ 84–91. However, the SAC alleges that the alleged encouragement and support only came after Sompo made its demands and W&T refused. SAC ¶ 314 ("*When* W&T refused Sompo's demands, Sompo encouraged other Sureties to demand additional collateral from W&T") (emphasis added).

[10] *See In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.,* 997 F. Supp. 2d at 537 ("common economic experiences" offered an "obvious" explanation for defendants' common measures against price competition); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 596 (E.D. La. 2007) (the "strong economic incentive to keep payouts low" after Hurricane Katrina provided a "natural" explanation of defendants' parallel conduct); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 908 (market changes "due to technological advances in airline ticket purchasing" likely explained parallel conduct among airlines); *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) (banks' parallel exit from the auction rate securities market "made perfect business sense"

---

would have independently made Penn and U.S. Fire more vigilant about enforcing their collateral rights.  These include three recent oil and gas company bankruptcies with a collective $1.8 billion in surety liabilities, accompanied by decisions providing that sureties' rights did not survive bankruptcy.  The SAC itself describes this landscape as a "paradigm shift" that "deprived sureties of subrogation rights against subsequent purchasers of oil and gas assets who later defaulted on their decommissioning obligations."  SAC ¶¶ 170–75; *see In the Matter of Fieldwood Energy LLC*, 93 F.4th 817, 820, 825 (5th Cir. 2024).  *See also* SAC Ex. 1.D at 11:3–10 (Applied's Jason Kilpatrick in November 2024 explaining that in both the Fieldwood and Cox bankruptcies, the companies were permitted "to create a divisive merger and essentially get to cherry pick the assets and stick the sureties and any predecessors with the liability").  Further demonstrating the industry's increased riskiness, the SAC identifies several carriers who had exited the industry.  SAC ¶ 182.

The recent bankruptcies and decisions alone would have provided each surety with ample *independent* incentive to vigorously enforce their collateral rights at the slightest sign of trouble—here a $55 million collateral demand by Sompo—well in advance of any bankruptcy.  W&T attempts to spin these facts as

---

as a common reaction to a collapsing market).

favorable to its position, but offers only bolded and underlined ipse dixit—namely, that the bankruptcies and related decisions "created a clear incentive to collude." SAC ¶ 173.  Such conclusory statements cannot establish an inference of conspiracy under *Twombly* and its progeny, and W&T nowhere provides any basis for disputing that these conditions also would have strengthened the sureties' *independent* interests in asserting their contractual rights following another surety's $55 million collateral demand.

The SAC also points to various other market conditions that—under basic principles of economics—would have increased the sureties' *independent* ability and incentive to demand more favorable terms on their bonds.  Specifically, W&T alleges that the BOEM rule would "substantially increase financial assurance requirements for Independents" and thus "*increase demand for bonding*."  SAC ¶¶ 147–49 (emphasis added).  At the same time, again according to W&T, supply had decreased because of the departure of other carriers from the market.  SAC ¶ 149 ("sureties were capacity-constrained on how many bonds they could ultimately write"); ¶ 182 (identifying industry departures).  Under the law of supply and demand, increased riskiness, decreased supply, and increased demand would naturally have been expected to strengthen sureties' *independent* ability and incentive to be more selective and demand better terms.

W&T nowhere disputes these standard economic principles.  Instead, it

---

states the facts and then adds the conclusory statement that the BOEM rule provided "a perfect pretext to disguise their discussion of increased rates and collateral requirements."  SAC ¶ 148.[11]  Again, this is pure ipse dixit which can neither repeal the law of supply and demand nor avoid the fact that its own allegations provide classic reasons why the sureties had both the ability and incentive to act independently.  *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104–05 (9th Cir. 2024) (upholding dismissal of antitrust complaint based on the recognition that it was not "hard to see why Defendants may have chosen to cut oil production" in light of a drastic decrease in demand for oil).

> c. *Allegations of relationships and attendance at trade shows and market concentration are routinely rejected as enough to plausibly plead an antitrust conspiracy*

W&T is otherwise left with allegations that, it is well-established, do not provide a basis for inferring an antitrust conspiracy at the pleading stage— specifically, that the industry had become more concentrated and that industry participants knew each other and met at trade shows.  Courts regularly conclude at the pleading stage that parallel conduct in a highly concentrated market can easily

---

[11] As another example of W&T's penchant for ipse dixit, it declares that any conduct it claims to be part of the conspiracy would not happen in a competitive market.  *E.g.*, SAC ¶ 174 ("absent coordination among competitors, a normal market would not have moved so quickly or so uniformly").  This particular conclusory pronouncement notably fails to identify what precisely moved "quickly or so uniformly" after the bankruptcies and decision.  It therefore does not even begin to support W&T's ipse dixit that the unspecified movement was suspiciously quick.  The terms of W&T's bonds had long been in place, and Penn and U.S. Fire took months to make their collateral demands after W&T made public Sompo's collateral demands.  W&T hopes no one will notice when it offers unsupported conclusory statements.

be explained as independent conduct.[12]  Likewise, courts recognize that "common attendance at trade association meetings is insufficient to infer a conspiracy" and that plaintiffs must provide "factual support" that those conversations at trade association and industry events "were for the intent and purpose of reaching an agreement to unreasonably restrain trade." *JSW Steel*, 586 F. Supp. 3d at 597.

The SAC alleges no such facts.  Instead as discussed above, it replaces the prior allegations with the allegation that Sompo "encouraged and supported" the demands with no explanation of what that means or facts to support it.  Otherwise, it simply lists the meetings with brief descriptions that include no facts at all justifying the inference that their purpose was to conspire to make joint collateral demands or fix rates.  SAC ¶¶ 196–204.  The only meeting it discusses in any detail is the November 2024 virtual seminar, which it badly misrepresents and which reveals no factual support for its claim of conspiracy.  *See* § I(B)(2) *infra*.

---

[12] *See, e.g., Mayor & City Council of Baltimore*, 709 F.3d at 139 (same) (finding allegations of a "highly concentrated" market to "lead to only one plausible inference: these are 'actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement.'") (quotation omitted); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 898, 903 (affirming dismissal of antitrust claim, and explaining that "conscious parallelism" is both "not in itself prohibited " and  "a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions.") (quoting *Twombly*, 550 U.S. at 554) (internal quotation marks omitted); *see also White v. R.M. Packer Co.*, 635 F.3d 571, 580, 586 (1st Cir. 2011) (holding at summary judgment that mere "parallelism, whether stipulated or proven, does not even create a prima facie conspiracy case" and that one "does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.'") (cleaned up).

---

**B.      W&T Otherwise Fails to Plausibly Allege That Penn and U.S. Fire Participated in an Antitrust Conspiracy**

1.   The SAC Fails to Identify Conduct By Penn and U.S. Fire Reflecting "Rate-Fixing"

W&T's new "rate-fixing allegations" do not state an antitrust claim against Penn and U.S. Fire because they do not even make clear what is being alleged against Penn and U.S. Fire—even in inadequate conclusory fashion.[13] Instead, the SAC is entirely vague about who increased W&T's prices to what and when.  And it does not point to any allegedly suspicious price increases involving Penn or U.S. Fire.  Instead, it refers in one instance to two sureties who were not U.S. Fire and Penn, and otherwise generally refers to unidentified "sureties."[14]

This caginess is highly telling.  W&T knows what it was charged and by whom, and W&T's deliberate vagueness therefore almost certainly reflects its knowledge that the actual details of the prices will not help its position because it will show variation in pricing and thus fail to show even parallel conduct.

---

[13] Nothing in this motion should be construed as suggesting W&T has alleged a plausible conspiracy against other defendants.  It has not.  However, because at least one other defendant has chosen not to file a motion to dismiss, Penn and U.S. Fire do not raise defects of the new allegations that are common to and involve documents of other defendants to avoid prematurely addressing issues that the Court need not reach at this stage to conclude that W&T has failed to allege valid section 1 claims against Penn and U.S. Fire.

[14] *See* SAC ¶¶ 105–08 (referring to price increases involving other sureties); SAC ¶ 145 (alleging that "in 2021, multiple sureties, including the Sompo Sureties, increased W&T's rates to the same level" and "[m]ultiple sureties continued to increase their rates to W&T through approximately January 2023"); *id.* (stating that W&T "has received premium rate increases from sureties" "[d]uring the relevant period of this complaint" that supposedly "often occur[ed] close in time and align[ed] on the same rates"). The Court should take note that this allegation does not allege that even these unspecified sureties increased W&T's rates to the same level.  SAC ¶ 108.

---

But regardless of its reasons, such pleading is entirely inadequate to allege Penn and U.S. Fire's participation in a "rate-fixing" conspiracy. At "the pleading stage" in an antitrust case, "each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396–97 (2d Cir. 2024). A "complaint must specify how these defendants" were "involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants." *Austin Legal Video, LLC*, 2024 WL 5184485, at *5 (internal quotations omitted and cleaned up). W&T fails to do so for Penn and U.S. Fire. And given that it fails even to allege parallel price increases by Penn and U.S. Fire, W&T necessarily does nothing to allege facts creating a plausible inference that they increased rates in a manner justifying an inference of conspiracy. Instead, the pleading is so inadequate that it fails even to rise to the level of cases that allege specific parallel conduct by specific defendants but are routinely *dismissed* by courts for failure to allege facts sufficient to infer that the parallel conduct resulted from conspiracy.[15]

---

[15] *See, e.g., David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 464–65 (S.D. Miss. 2022), *aff'd sub nom. New England Constr., L.L.C. v. Weyerhaeuser Co.*, 2023 WL 2401587 (5th Cir. Mar. 8, 2023) **(**holding that "Plaintiffs merely point to Defendants' parallel conduct of raising lumber prices at the same time to show the existence of an agreement or conspiracy; such a general allegation is insufficient to plead a Section 1 claim"); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.,* 28 F.4th 42, 47–53 (9th Cir. 2022) (affirming dismissal of a complaint alleging specific semiconductor output reduction in the last half of 2016, reduced expenditures over a two-month period, and "drastically increased" prices over a two-year period); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F.Supp.3d 681, 699–703 (N.D. Ohio 2025) (dismissing complaints alleging "a 'series of coordinated and parallel price increases'" ranging from approximately 5–12% documented on a monthly basis over a three-year period); *Washington Cnty. Health Care Auth., Inc v. Baxter Int'l Inc.*, 328

W&T's reply in support of its motion to amend shows it has no coherent response to the inadequacy of its rate-fixing allegations against Penn and U.S. Fire. Instead, W&T responds: "Perhaps Penn and USFIC do not realize that they are jointly and severally liable for the entire conspiracy, including the actions of their coconspirators." ECF 297 at 7. This is a blustery and obvious dodge. The fact that co-conspirators are jointly and severally liable says *nothing* about what is necessary to plausibly allege that defendants were co-conspirators in the first place.

      2.  W&T Otherwise Misrepresents Documents In Describing Supposed "Direct Evidence" of a "Rate-Fixing" Conspiracy

W&T fails to present any "direct evidence" of Penn or U.S. Fire's involvement in the supposed "rate-fixing" conspiracy (whatever its supposed parameters). W&T purports to list its "direct evidence of collusion" for its "rate-fixing" conspiracy at SAC ¶¶ 103–130. Even apart from the basic failure described above, nothing in that section implicates Penn or U.S. Fire in a conspiracy. ████████████████████████

████████████████████████████████████

████████ *See* SAC ¶ 110; Ex. 1.[16] ████████████

---

F.Supp.3d 824, 829–30 (N.D. Ill. 2018) (dismissing a complaint alleging closely timed pairs of voluntary IV saline recalls, specific prices increases of 36% for the United State government and a 200–300% increase for private customers).

[16] On a motion to dismiss, courts may consider "documents that a defendant attaches to a motion to dismiss" even if they are not attached to the complaint, "if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *see also Komlanvi v. Sessions*, 2018 WL 3348886, at *2 (S.D. Tex. July 9, 2018). Here, W&T misleadingly quotes the email contained in Ex. 1 and proffers it as "direct evidence" of a conspiracy.

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

████████████████   By selectively excerpting the email and failing to inform the Court that it did not even involve W&T, W&T misleads the court.

W&T further demonstrates the lack of any plausible basis for an antitrust conspiracy by misrepresenting the statements made at a November 2024 virtual seminar. W&T claims that representatives from Sompo, Applied, and CAC "admitted and affirmed their ongoing participation in the scheme during a seminar that was recorded" in November 2024.[17] SAC ¶ 111. W&T also calls the meeting a "textbook example of co-conspirators affirming their commitment to a common scheme." SAC ¶ 214.

The transcript of the seminar shows it was nothing of the sort. The seminar was titled "Oil and Gas Industry, an Update on BOEM Regulations." That is what it provides—a primer on BOEM and the nature of the surety bonds, the impact of

---

*JSW Steel*, 2025 WL 832801, at *5 n.5 (holding that "when there is a conflict between allegations in a pleading and exhibits" to a motion to dismiss referenced in a complaint, "it is well-settled that the exhibits control").

[17] The "scheme" appears to refer back to the allegation on "information and belief" made three paragraphs before that the sureties "regularly coordinated rate increases via broker-intermediaries on other occasions since 2021 in violation of the antitrust laws." SAC ¶ 108.

industry bankruptcies and the related judicial decisions, and the impact of the new BOEM rule.[18] SAC Ex. 1.D. Illustrating immediately that this was not a meeting of hardened conspirators, it begins with the question "What is the BOEM?" and the statement "Some of you may not be familiar with this type of bond, and that's completely fine." *Id.* at 4:3–4, 4:19.[19]

W&T misrepresents its contents by stitching together W&T's own bolded conclusory statements with bolded quotations taken out of context to create a false impression of what the speakers said at the meeting. While the Court did not have the transcript when it decided the original motion to dismiss, it need not credit W&T's mischaracterizations now that it does. *See In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 531 (N.D. Tex. 2014) (rejecting plaintiff's cherry-picking of statements at trade conferences in evaluating section 1 claim at the pleading stage).

For example, W&T bolds and underlines the statement that "Patrick Hennesy of Sompo confirmed that he and Jason Kilpatrick of Applied had worked with John Hohlt of CAC and 'other brokers' to create uniformity among industry

---

[18] The presenter further states "we'll lay out what the parameters are of this change, where is this change occurring, who's in charge, give a general market update for this region of surety, if you will. And then we'll go through the specifics of the proposed rule change and then the impact that it has, followed by Q&A." SAC Ex. 1.D at 3:20–4:11.

[19] W&T refers to the seminar in multiple paragraphs at two different sections of the SAC. *See* SAC ¶¶ 111-116; 208-213. As discussed in footnote 16 supra, such documents may be considered in evaluating a motion to dismiss.

players by drafting bond forms and standardized bond language." SAC ¶ 134 (citing SAC Ex. 1.D at 42:18–43:8) (emphasis omitted). But W&T quotes only the words "other brokers." It omits the remainder of the sentence, which read in full, refers to a specific working group's efforts to develop language enabling indemnity agreements to survive bankruptcy in response to judicial decisions providing that they did not.[20] Such language (i) is not at issue in this case, (ii) targeted a common legal challenge facing the industry (iii) would if anything have made it easier to provide surety bonds to oil and gas operators by reducing the risk of doing so.[21]

As a second example, W&T plucks the words "we must stay disciplined in this approach" and then sprinkles the word "disciplined" throughout its complaint. *See* SAC ¶¶ 5, 114, 213, 214, 223. W&T thus tries to create the false impression that the speaker was talking about rate-fixing. Read in context, however, the "approach" referred to sound industry underwriting practices that account for the increased riskiness of the bonds in light of the various market realities discussed above. *See* SAC Ex. 1.D at 45:10–45:19. To conceal this fact,

---

[20] *See* SAC Ex. 1.D 42:18–43:8 (citing efforts to work with brokers to utilize "different bond forms and different bond language to help in that cap *and ultimately arrive at a position that protects the indemnity agreement — protecting the indemnity agreement's validity throughout the life cycle of the potential bankruptcy and trying to avoid, you know, what would have — you know, what occurred in the Falcon V bankruptcy*") (emphasis added).

[21] Such a task is also more generally what a trade association would be expected to do. Proposal of language developed by trade associations and subsequent adoption also does not violate the antitrust laws. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (stating that allegations that brokers issued disclosure statements following a trade association's model language did "not plausibly imply that each broker acted other than independently when it decided to incorporate" the association's proposal).

W&T omits the speaker's preceding statement that "we don't look at this from –

from a premium perspective.  We look at it from a risk perspective."  *Id*. at 45:11–

13.  Moreover, even the language quoted by W&T shows that the speaker was

stating that the ability to raise rates would naturally result from decreased supply,

*not* conspiracy.  *Id*.  ("You do have certain carriers exiting the space.  And so, I

mean *that* – that does allow for higher rates.")  W&T thus not only takes the

statement out of context—it uses it to make precisely the opposite point of the one

the speaker was making.  And further confirming that the subject was underwriting

practices, the next speaker stated "Yeah, I'd second that, and state, you know,

*expertise in this space is – is necessary in underwriting it, from my perspective*."

*Id*. at 45:20–21 (emphasis added).

As a third example, W&T emphasizes the statement "we don't have to write

a single—another bond in the Gulf of Mexico" and "it's really up to us to

determine, you know, what a good client is, and what a good underwriting metric

is."  SAC ¶ 113.  The speaker here is addressing the BOEM's failure to consider

that the industry as a whole might not have the ability or appetite to take on all of

the new surety bonds that the proposed rule would require given the various factors

that elevated the risks of doing so.  SAC Ex. 1.D at 44:17–45:2 (pointing out that

the rule only applied to non-investment grade bonds and stating "I think one of the

important things to point out and that BOEM never really contemplated, you know,

if they're asking us for $7 billion worth of surety, you know, we could say no to all 7 billion"). Again, W&T omits this context.[22]

### 3. The Internally Contradictory Nature of W&T's Allegations Further Demonstrates Their Implausibility

The internal contradictions in W&T's "rate-fixing" allegations further demonstrate the inadequacy of its pleading. On one hand, it alleges a price-fixing conspiracy dating back to "at least as early as 2020" or "since at least 2021." *See* SAC ¶¶ 10, 103, 104, 145. Yet it also alleges "some rates were beginning to soften" in early 2023 and that the 2023 BOEM proposed rule gave the sureties "the perfect pretext to disguise their discussion of increased rates and collateral requirements." SAC ¶¶ 147–48. W&T makes no attempt to explain why rates were softening or why a pretext was needed to raise rates in the presence of a price-fixing conspiracy that supposedly was already in effect. Such allegations further show how W&T is simply making things up as it goes along and slapping the label of conspiracy on any set of facts it sees even in the absence of any coherent basis for doing so.[23]

---

[22] W&T also fails to inform the Court that it made the same observation in a letter to the Secretary of the Interior in 2023. Ex. 2 at 8 ("BOEM must consider the possibility that a bond/surety market of the size … simply may not exist or may alter the risk profiles of such sureties to such an extent that they may be unwilling to provide additional bonding."). Courts may take judicial notice of public admissions. *See e.g.*, *Stukenberg v. Abbott*, 2017 WL 74371, at *3 (S.D. Tex. Jan. 9, 2017) (collecting cases).

[23] *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 596 (7th Cir. 2008) (affirming dismissal of antitrust complaint because plaintiffs' "theory, as pleaded in the complaint and explained in the plaintiffs' briefs and argument, makes no sense"); *see also BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 527–28, 531 (5th Cir. 2022) (noting contradictions between plaintiff's allegations of collusion and the timeline of events and concluding that the facts alleged "don't tell a

## II.    W&T Fails to State Claims for Breach of Contract and Declaratory Judgment

W&T's claim for breach of contract should likewise be dismissed.  First, the "general rule" is that "a plaintiff suing for breach of contract must point to a specific provision in the contract that was breached by the defendant."  *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 971 (N.D. Tex. 2014) (collecting cases) (internal quotation marks and citation omitted).  W&T fails to do so.  It fails even to cite a single provision from the U.S. Fire contract, instead quoting only a partial sentence from one of the provisions in Sompo's contract.  SAC ¶¶ 310–11.  It thus nowhere accounts for the plain language of that contract, which authorized U.S. Fire to demand to be replaced on the surety bonds—and failing that for collateral— "in its sole discretion and for any reason."  SAC Ex. 1.C, Ex. 1.I.

W&T likewise nowhere accounts for the plain language of the Penn contract.  It asserts that the Penn contract "requires a request for collateral to be related to actual or potential liability or claims against the Surety."  SAC ¶¶ 267, 311.  Yet it ignores the actual contractual language providing that Penn "may, in its sole discretion, determine" that W&T's "financial condition has been or is believed

---

coherent story"); *Austin Legal Video, LLC v. Deposition Sols.*, LLC, 2024 WL 5184485, at *5 (W.D. Tex. July 19, 2024) (dismissing antitrust claim because the allegations against defendant were "belied by other facts in the complaint"); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d at 742 (in dismissing antitrust claims, noting that surviving a motion to dismiss "demands a clear explanation of how" plaintiffs' enumerated plus factors "interrelate to plausibly allege collusion" and the complaint "fail[ed] to provide this connective narrative").

to be deteriorating" or that there has been a "change that adversely impacts the Surety's risk" and then seek collateral if W&T fails to obtain Penn's release from the surety bonds within a prescribed period of time.  SAC Ex.1.B ¶ 12.

W&T's litigation assertions also contravene in its own prior assertions about those provisions in the securities filing that preceded Sompo's first collateral demand—*i.e.*, "Pursuant to the terms of our agreements with various sureties under our existing bonding arrangements, or under any future bonding arrangements we may enter into, *we may be required to post collateral at any time, on demand, at the surety's sole discretion*."[24]  This is a classic admission against intent.

Additionally, even if W&T had pointed to a provision of the contracts showing that Penn and U.S. Fire's collateral rights are more limited (which it cannot), it would not matter because demanding more than is due under a contract is not a basis for a claim of breach by W&T.  The allegation that a contract does not authorize a particular collateral demand at most would provide a basis for a defense to a collateral demand, not an offensive claim for breach of contract.

W&T also alleges that Penn and U.S. Fire violated "an obligation of good faith in its performance" that it asserts to be present in "every contract" under Texas law.  SAC ¶ 307.  This claim fails first because it is based on the allegation

---

[24] W&T Offshore, Inc., Annual Report (Form 10-K) (Mar. 6, 2024), p. 24, https://www.sec.gov/Archives/edgar/data/1288403/0001558370-24-014923-index.html.  Courts may take judicial notice of public admissions.  *See e.g.*, *Stukenberg v. Abbott*, 2017 WL 74371, at *3 (S.D. Tex. Jan. 9, 2017) (collecting cases).

that the Sureties collateral demands" were "coordinated."  SAC ¶ 309

("Specifically, Surety Defendants' coordinated demands for rate increases and

collateral were made in bad faith . . .").  That claim therefore fails for the same

reasons as their section 1 claims. *See* Section I *supra*.

Further, Texas does not recognize any independent claim for breach of an

"obligation of good faith" or "fair dealing" except "in an extremely narrow class of

cases" featuring a "special relationship" that is "earmarked by specific

characteristics including: long standing relations, an imbalance of bargaining

power, and significant trust and confidence shared by the parties." *E,g., Hux v. S.*

*Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016).[25]  W&T pleads no such

relationship here, and the bond surety–principal relationship does not impose an

implied duty of good faith.  *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964

S.W.2d 276, 280–82 (Tex. 1998).  Nor could it otherwise allege such a relationship

when the underlying contracts at issue provide for among other things, the right of

the sureties to be replaced on the surety bonds based on determinations made in

their "sole discretion."

Finally, even if not fully redundant of Penn and U.S. Fire's claim for breach

of contract (as the Court previously found), W&T is not entitled to the declaratory

---

[25] W&T asserts a "good faith duty" under the "Texas Business and Commerce Code" but identifies no specific code provision upon which it is relying.  SAC ¶ 307.  If W&T is referring to Tex. Bus. and Comm. Code § 1.304, that provision is part of Texas' UCC and thus applies only to the sale of goods.

relief it seeks under the plain language of the contract. Enforcing the collateral terms according to the plain language does not render the agreements "illusory" any more than a secured lending arrangement is "illusory" because the collateral is provided up front rather than in the surety's "sole discretion." *See* SAC ¶ 340(c). Nor is there any basis for W&T's attempt to rewrite the contracts with vaguer terms to substitute for the contractual language for which the parties bargained.[26]

### III. W&T Fails to State Claims for Tortious Interference, Civil Conspiracy, and The Texas Free Enterprise and Antitrust Act

W&T's claim for tortious interference fails first for the same reason that its antitrust claims fail. The interference about which the plaintiff complains must be an independent tort that is an unlawful act. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (dismissing for "absence of an unlawful act"); *Phoneternet, L.L.C. v. LexisNexis Risk Sols., Inc.*, 816 F. App'x 909, 914 (5th Cir. 2020). The only alleged tortious conduct are the alleged antitrust violations, which as discussed above are not plausibly alleged. W&T's civil conspiracy claim fails for the same reason as does its claim for violation of the Texas Free Enterprise and Antitrust Act.

---

[26] *See* SAC ¶¶ 340(a), 340(1)(b), (d), (h) (seeking judgment that Penn and U.S. Fire should not be able to act in a way that is an "abuse of right," should not be able to make an "unreasonable demand," and should not be able to offer a "changed business model" and "desire to boycott companies" as the basis for demanding "further collateral").

W&T's claims for tortious interference also fail because a claim of tortious interference with existing contracts requires identifying "a contract subject to interference," *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016), and a claim for tortious interference with prospective business relationships requires proving "there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party," *Stone v. FINRA*, 694 F. Supp. 3d 774, 789 (E.D. Tex. 2023).  This means identifying *with specificity* the exact contract or business relationship with which a defendant interfered.  *Elepreneurs Holdings, LLC v. Benson*, 2021 WL 5140769, at *6 (E.D. Tex. Nov. 4, 2021) ("To prevail on a claim for tortious interference with contract, a plaintiff must present evidence that the defendant interfered with a specific contract.") (citing *RigUp, Inc. v. Sierra Hamilton, LLC*, 613 S.W. 3d 177, 190 (Tex. App. 2020)) (cleaned up); *Pureshield, Inc. v. Allied Bioscience, Inc.*, 2021 WL 4492861, at *3 (E.D. Tex. Sept. 30, 2021) (The "reasonable probability element" requires plaintiffs to "*describe the specifics of a proposed agreement that never came to fruition.*") (emphasis added) (collecting cases).

W&T's interference claims fail on both of those fronts.  The contracts or business relationships W&T alleges are limited to "contracts and/or business relationships with its sureties, brokers, and other entities" (SAC ¶ 320) and "business relationships" with "sureties, creditors, and other financial partners"

---

(SAC ¶ 321). Such pleading is plainly inadequate—there is no identification of who the supposed counterparties or potential counterparties are, no description of the status of any contractual relationship (or potential one) at any time over the years of allegations the SAC (vaguely) covers, or any allegations of how Penn or US Fire's conduct might affect them. Additionally, to the extent the SAC's mention of "relationships with its sureties" is meant to encompass Sompo, W&T provides no indication of how Penn or US Fire's collateral demands after Sompo made its demand could have interfered with any W&T-Sompo surety agreement.

## CONCLUSION

For the foregoing reasons, W&T's claims against Penn and U.S. Fire should be dismissed with prejudice. Penn and U.S. Fire also respectfully request oral argument on this motion.

RESPECTFULLY SUBMITTED this 5th day of June, 2026.

/s/ Samuel C. Kaplan

Samuel C. Kaplan
*Admitted pro hac vice*
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
Email: skaplan@bsfllp.com
Telephone: (202) 274-1163

Ryan D. Dry
Texas Bar No. 24050532
S.D. Tex. Bar No. 618363
Steven K. Cannon
Texas Bar No. 24086997
S.D. Tex Bar No. 3356957

**DRY LAW, PLLC**
909 18th Street
Plano, TX 75074
(972) 797-9510 Tele/Fax
rdry@drylaw.com
scannon@drylaw.com

*ATTORNEYS FOR PENNSYLVANIA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY*

**Appendix A: Proffered Allegations of 'Direct Evidence' From First Amended Complaint That Do Not Appear in the Second Amended Complaint**

- FAC ¶ 37: In "2024, representatives of the Sureties and co-conspirators met to discuss their collective response to the BOEM rule and agreed to collectively change their analysis and terms at the expense of smaller companies like W&T."
- FAC ¶ 90: "Sompo's own representative admittedly met with other sureties in 2024 to 'collectively' change their 'analysis' and 'terms' for these companies.")
- FAC ¶ 119: "[T]he Sureties met one or more times in 2024 to jointly increase their premiums, expedite their collateral demands, and change the terms of their contracts and dealings."
- FAC ¶ 121: Sompo and Penn "admitted" at the November 2024 virtual seminar that Sompo and Penn representatives "agree[d] to *fix* new terms against companies like W&T" (emphasis added). The November 2024 virtual seminar "was not the first time W&T's sureties met to discuss their scheme, nor their last: they meet regularly to collude and profit against companies like W&T, including through NASPB's and SFAA's events."
- FAC ¶ 122: "Sompo formulated a scheme with all other sureties of W&T to demand roughly $250 million in collateral. Through their demand, the Sureties planned to: (1) jointly squeeze their targets' assets; (2) jointly force their targets to accept commercially unreasonable terms it would not otherwise accept with any individual; and (3) jointly increase premiums, collateral, and bonding costs against their targets."
- FAC ¶ 124: "The Sureties and their representatives, including Mr. Hennesy and Mr. Kilpatrick, continued meeting throughout 2024 to further plan and execute their scheme."

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 5, 2026, a true and correct copy of the foregoing document was filed and served by the Electronic Case Filing System for the United States District Court for the Southern District of Texas on those parties registered to receive electronic notice.

*/s/ Samuel C. Kaplan*
Samuel C. Kaplan
