

July 24, 2026

***Via CM/ECF & E-mail:*** *palermochambers@txs.uscourts.gov*
The Honorable Dena Hanovice Palermo
United States Magistrate Judge
515 Rusk Avenue, Room 7227
Houston, Texas 77002

      RE:   *W&T Offshore, Inc., et al. v. Endurance Assurance Corp., et al.*,
           No. 4:24-cv-3047

Dear Judge Palermo:

Defendants United States Fire Insurance Company ("U.S. Fire"), Pennsylvania Insurance Company ("Penn"), Amynta Holdings LLC d/b/a Amynta Surety Solutions ("Amynta"), and Applied Surety Underwriters LLC ("Applied") (collectively, "U.S. Fire/Penn" or "Defendants"), submit the following consolidated response to four letters filed by plaintiffs W&T Offshore, Inc. and W&T Energy VI, LLC (collectively "W&T") on July 22, 2026. *See* ECF Nos. 377–380.

As an initial matter, W&T's letters generally fail to accurately identify the actual areas of impasse. Instead, they focus on definitions of words while ignoring the actual scope of their requests in which the words appear. The definitions are relevant, but (by definition) it is the requests that govern what W&T is requesting. And as discussed herein, that scope is extraordinarily broad and vastly disproportionate to the needs of the case. Among other things, it includes over a five-year period, (i) all text messages with sureties and brokers over a five-year period regardless of subject; (ii) all records of meetings and calls with brokers and sureties over a five-year period about any subject; and (iii) all communications with sureties and brokers over a five-year period on any issue in any way related to bonds. Further, it defines "bonds" to include all onshore bonds, which are not even at issue in this case and (as discussed herein) which dwarf the number of offshore bonds. The Court should therefore rule not based on the definitions in the abstract, but instead on the scope of the requests informed by the definitions.

1



W&T makes no effort to defend that scope and scarcely even mentions it.[1]  The definitions must be considered in that context.  <u>First</u>, the Court should again reject W&T's attempt to expand the scope of discovery to include onshore bonds.  *See* ECF 380.  Such bonds are not relevant to the conspiracy alleged, and permitting the requested discovery would vastly expand the scope of the case.  When this issue was last presented, the Court excluded Penn's onshore collateral accounts from the production it ordered, and nothing has changed that would warrant reconsidering it.  ECF 248 at 3–4 (Jan. 15, 2026).

Far from expanding the case to encompass onshore bonds, the SAC alleges that the "relevant product market is the market for *offshore* surety bonds for oil and gas companies."  Second Amended Complaint ("SAC"), ECF 310 ¶ 227 (emphasis added).  The SAC also repeatedly refers to unique features of the market for offshore bonds.[2]  W&T also makes no claim to have any involvement with onshore bonds, which is unsurprising given that W&T itself is known as W&T *Offshore*, and describes itself as "an independent oil and natural gas producer active in the acquisition, exploration, and development of properties *in the Gulf of America* since 1983."  *See* https://www.wtoffshore.com/about/history (emphasis added).

The definition also would <u>vastly</u> expand the scope of the case.  To illustrate, during the expanded discovery period, U.S. Fire/Amynta issued well over 1,000 bonds, of which fewer than 60 were for offshore surety obligations in state and federal waters (tied to approximately 15 accounts).

---

[1] For example, the entire letter on the definition of "Broker" (ECF 379) does not point to a single one of the current requests that actually uses the word "Broker."  Instead, it refers only to a single prior request from an earlier set seeking identification of brokers.  Likewise, the letter on the definition of "Bonds" (ECF 380) does not quote a single request in which the term appears.

[2] SAC ¶¶ 51–62 (describing oil and gas production in the Gulf of America and the role of BOEM); ¶¶ 82–87 (purporting to describe W&T's "history of leadership in the Gulf"); ¶¶ 170–179 (bankruptcies of companies engaged in offshore operations); ¶ 181 (alleging that there are only a limited number of "companies that actually write surety bonds to cover operations in the Gulf"); ¶ 228 (describing barriers to entry in the offshore bond market).



The remaining 95+% (tied to approximately 120 accounts) guaranteed onshore oil-and-gas obligations across the lower 48 states and Alaska.

W&T's attempt to justify the inclusion of onshore bonds is made in passing, does not address (much less justify) the complexity it would add to the case, and instead is entirely conclusory and misleading. Specifically, it asserts that "merely because an 'account' has some 'onshore' aspect to it does not take it out of the realm of relevance." ECF 380 at 2. This is a non sequitur. Defendants have not excluded bonds based on whether the related operation has "some 'onshore' aspect to it." Nor does the point do anything to justify the scope of W&T's requested discovery—*i.e.*, among other things, all communications with brokers about *all* offshore and onshore bonds over a five-year period.

Second, W&T similarly obscures the nature of the relevant impasse in critiquing the definition of "surety." *See* ECF 378. The dispute has never been about *which* sureties Defendants will search. Defendants' production under the prior complaint applied the parties' agreed search terms, which included every surety that W&T itself requested in its November 5, 2025 correspondence. *See* ECF 214 at 2 (Nov. 23, 2025) ("the Sureties are **agreeing** to produce appropriate communications with **all** of the sureties that W&T requested the parties search")(emphasis in original); ECF 377-1 at 4 (May 15, 2026) ("If W&T believes a specific surety was omitted, please identify it and we will evaluate the request."). W&T has never identified one. Defendants remain willing to search communications with that same universe of sureties under the SAC.

The dispute instead is over the scope of W&T's requests that use the term "surety"—*e.g.*, all communications with all sureties about any subject, all text messages with brokers about any subject, and all other communications with brokers about any bonds. *See* 4th Set of RFPs Nos. 1–4, 15–20. This scope sweeps well beyond the allegations in the Second Amended Complaint. Further, this Court already has rejected the contention that an allegation of conspiracy means that all such communications should be produced. Oct. 22, 2025 Hr'g Tr. 50:5–6 ("So we're not going to do all communications. Everybody knows that all communications is not an appropriate demand.").



By contrast, Defendants have agreed to expand the scope of discovery to track the allegations in the Second Amended Complaint. Under the First Amended Complaint, the alleged conspiracy was the coordination of collateral demands. The Court thus ordered production of documents tailored to that conspiracy—*i.e.*, documents related to collateral demands and premium increases tied to collateral demands. The SAC continues to allege coordination of collateral demands while also alleging coordination of price increases via brokers dating back to 2021. SAC ¶¶ 104–08, 117–23. Accordingly, Defendants have agreed to produce documents related to collateral demands and price increases, whether or not attached to a collateral demand, for the 2020-2025 time period.[3]

W&T claims this would exclude communications between sureties that, for example, stated "Dear Competitor, we must figure out how to stop losing money on bonds and make sure no one is undercutting each other." ECF 377 at 2. This is untrue because such a hypothetical communication would certainly be related to subsequent price increases and collateral demands. Further, and regardless, the point could not possibly justify the scope of discovery that W&T seeks. Any doubt about whether the Defendants' intended scope encompassed such communications could easily have been addressed as part of the meet-and-confer process and discussion of search terms. But W&T chose not to raise the concern during the meet-and-confer process and instead chose to keep it to itself for use as (specious) support in its impasse letter. The argument thus does nothing to justify the breadth of

---

[3] W&T's pricing letter suggests that Defendants have "reversed their position" since May 15, 2026, when they confirmed that the Court's October 23, 2025 order does not define the scope of discovery under the SAC. ECF 377 at 2. Penn and U.S. Fire have reversed nothing. Their position remains the one stated in the very emails W&T attaches: "we do not view the scope under the second amended complaint as confined to the scope identified in the October 23, 2025, order, which addressed discovery under the first amended complaint." ECF 377-1 at 3 (May 15, 2026); *see also id.* at 5 (May 12, 2026). Defendants' objections rest on relevance and proportionality measured against the allegations of the SAC.



W&T's proposed requests.  W&T fails to cite a single case authorizing such wide-ranging discovery.

Third, W&T devotes an entire letter to the definition of "Broker," asserting that it should not be limited just to brokers involved in rate increases or collateral demands.  ECF 379 at 2.  As an initial matter, on May 15, Defendants confirmed they would "apply any expanded time period and subject matter to McGriff, Indemco, and CAC" — the brokers addressed in the SAC — and were "prepared to meet and confer as to other brokers."  ECF 377-1 at 4.  Likewise, on May 28, 2026, Penn and U.S. Fire confirmed that they were not confining the search terms to McGriff, that they "instead used the search terms to which the parties had agreed in December," and that they were "happy to consider additional search terms if you believe they should be expanded in light of the new requests."  Ex. 1, Email from S. Kaplan to M. Lewis (May 28, 2026) ("5-28 Kaplan-Lewis email").  W&T has not proposed an alternative or identified a single additional broker.  Nor are there any allegations of nondisclosure as to Penn and U.S. Fire.  The definition of "Broker" is therefore beside the point as to Penn and U.S. Fire—it encompasses the same entities whom Defendants deal with on oil-and-gas bonds in the Gulf, and those entities are known and disclosed.  The true impasse is over the scope of the requests—*e.g.*, all text messages with all brokers about all subjects and all communications with all brokers about all bonds, onshore and offshore.  As discussed above, that scope is not addressed in W&T's letters.

Fourth, as a means of assessing the burdens of W&T's requests, counsel for Defendants specifically invited counsel for W&T, as follows, to propose search terms for the wider discovery it proposed as a means of assessing the burdens in preparing Defendants' responses and objections:

> We therefore intend to evaluate each request on its merits under the standards of the Federal Rules, including the relevance to the allegations in the second amended complaint, the burdens of the request and whether it is disproportionate to the needs of the case.  In that connection, we would be happy to assess the burdens of expanded search terms that you propose as we are preparing our objections and responses and indeed, believe it would be fruitful and efficient to do so during the period we are preparing



> them. Doing so would inform our objections and responses and facilitate any further discussions during the period of their preparation.

Ex. 1, 5-28 Kaplan-Lewis email (emphasis added). W&T never proposed any expanded search terms.

Finally, W&T's letter about the definition "independent oil and gas operator" ignores how that definition operates in combination with W&T's definition of "bonds" and the content of its requests. As already discussed, the relatively discrete number of bonds securing oil and gas operations in the Gulf is dwarfed by an order of magnitude by the number of onshore bonds. It would be extraordinarily burdensome to provide pricing information for all of those bonds, which as already discussed, are not material to the case.

W&T's pursuit of broad-ranging discovery far beyond price increases for Gulf bonds also sharply contrasts with the extraordinary thinness and vagueness of its own allegations. Even though it knows what it was charged, the SAC fails to contain the standard information one would expect to see in a price-fixing complaint as to what the plaintiff was charged and when, including price-fixing complaints that are routinely dismissed at the pleading stage.[4] *See* ECF 357 at 17 note 15 (explaining that such information is routinely found even in antitrust cases that are routinely dismissed at the pleading stage).

Further, the SAC contains no evidence that Penn and U.S. Fire coordinated any price increases. Defendants have agreed to discovery for the full time period and scope alleged in the SAC to avoid undue delay in the case. Given these extraordinary weaknesses in its case, however, W&T has

---

[4] The only coordinated collateral demand it specifically alleges took place in 2024. Further, the earliest document it cites is from May 2021. *See* SAC ¶¶ 104–07 (citing one May 2021 document and then stating "On information and belief, the Surety Defendants have regularly coordinated rate increases via broker-intermediaries on other occasions since 2021 in violation of the antitrust laws"); *see also* SAC ¶ 104 ("Since at least 2021, the Defendants have agreed to coordinate rate increases for common customers, including W&T").



certainly done nothing to justify broad-ranging discovery going well beyond the complaint's allegations.

As a final note, W&T claims it is "particularly disingenuous" to point to the lack of any articulated basis for its allegations of coordinated pricing against Penn and U.S. Fire because Penn and U.S. Fire opposed unspecified discovery.[5] ECF 380 n.2.  W&T thus appears to believe it may not be called on its unsubstantiated conspiracy allegations unless it first obtains wide-ranging discovery.  W&T thus ignores two points.  First, the Court rejected W&T's discovery into price increases separate from collateral demands as "way, way too broad" based on the allegations of W&T's initial antitrust complaint.  October 22, 2025 Hearing Tr. 51:23-52:14.    Second, W&T ignores that under the Federal Rules of Civil Procedure, W&T is supposed to have a basis for things they say *before* alleging a defendant's participation in a conspiracy.

Respectfully submitted,

Samuel C. Kaplan

cc:    All counsel of record (via ECF)

---

[5] W&T also labels "false" what it claims to be Defendants' assertion that the SAC "does not contain allegations about rate increases involving them."  ECF 380 n.2.  Defendants actually assert that nothing in W&T's "new allegations of coordinated price increases" refers to "any allegedly suspicious price increases involving Penn or U.S. Fire."  ECF 357 at 15.  W&T then cites to three paragraphs from their complaint (without explanation) that all refer to alleged events in late 2024 and in no way show the point to be "false."  *See* SAC ¶ 110 (September 2024 email that W&T misrepresents by omitting the response), *see* ECF 357 at 21, ECF 365 at 16-17; SAC ¶ 159 (referring to a price increase sought by Applied after W&T refused its request to be replaced and for collateral and with no allegation that the price increase was coordinated with anyone else); SAC ¶ 162 (referring to a vague attempt to negotiate an all-surety solution after sureties had made demands with no allegation that Amynta itself sought a price increase).