THOMPSON COE

Thompson, Coe, Cousins & Irons LLP
Attorneys and Counselors

**Michael Cedillo**
**Direct Dial: 214-871-8214**
**mcedillo@thompsoncoe.com**

**Marissa Gnatek**
**Direct Dial: 214-880-2528**
**mgnatek@thompsoncoe.com**

www.thompsoncoe.com

November 9, 2026

**Via CM/ECF**
Honorable Dena Hanovice Palermo
U.S. District, Southern District of Texas
515 Rusk Avenue, Room 7727
Houston, Texas 77002

Re: *W&T Offshore, Inc., et al. v. Endurance Assurance Corp., et al.*, No. 4:24-CV-03047, In the United States District Court for the Southern District of Texas

Dear Judge Palermo:

We represent Non-Party Marsh & McLennan Agency, LLC ("Marsh Agency"), successor in interest to McGriff Insurance Services, LLC ("McGriff"). Please accept this letter submission to the Court in advance of the status conference on Tuesday, November 10, 2026, at 3:00 pm.

## I. PROCEDURAL HISTORY OF THE PARTIES' ISSUED SUBPOENAS

As you are aware, W&T Offshore, Inc. ("W&T") and United States Fire Insurance Company ("U.S. Fire") (collectively, the "Parties") have issued multiple subpoenas for documents to Marsh Agency. As a preliminary matter, Marsh Agency takes issue with the Parties' efforts to paint Marsh Agency as anything other than being diligent and cooperative.

From the point of the first issued subpoena in September 2025 (*the first of four subpoenas to follow*), Marsh Agency has been in constant communication with the Parties in support of its efforts to produce responsive documents.[1] Despite Marsh Agency's cooperation, the Parties have proceeded to burden responsive efforts by issuing additional lengthy status requests, as well as serving additional subpoenas. To date, Marsh Agency has responded to or is currently ***responding to eighty-seven (87) requests for production***.

Marsh Agency responded to W&T's first subpoena in March 2026 and produced a second wave of production in April 2026 to the Parties' collective document requests. W&T, however, did not follow up for nearly ***five months*** after Marsh Agency's responses and the Parties did not

[1] *See* **Exhibit A**, Letter dated November 6, 2026, from Marsh Agency to the Parties discussing the history of the Parties' issued subpoenas and efforts made by Marsh Agency to comply with the same.

follow up for ***four months*** after the second wave of production, which now serves as the basis for this status conference hearing.

This lengthy failure to follow up by the Parties is significant because, in the interim, the attorney with my firm that was initially handling the responses to the Parties' subpoenas has left our firm. As such, once the Parties finally got around to following up in August 2026, this communication was directed to me—this was the first time I heard about this case and the first time the Parties expressed any concerns with the previous objections and document production from months prior. In any event, I responded the ***same day*** counsel contacted me, and we scheduled a telephone conference call for the following week.

Since being contacted for the first time in August 2026, my firm has had no less than ***six conferences*** with the Parties regarding their alleged deficiency concerns. Most recently, we had telephone conferences with W&T, as well as U.S. Fire separately, on November 6, 2026. In both calls, we outlined our collection efforts, search terms used, and made clear we intended on having a ***third wave*** of production. The same was memorialized in a letter.[2]

Despite our cooperation and making clear a third wave of production is forthcoming; the Parties insist on moving forward with this status conference hearing. As communicated to the Parties in our conference calls and in writing, Marsh Agency largely has no objection to producing responsive documents. This third wave of production has been identified, collected, and is pending internal review for privilege.[3]

## II. MARSH AGENCY'S TWO MAIN OBJECTIONS TO THE SCOPE OF THE SUBPOENAS

Marsh Agency's main concern regarding the scope of the subpoenas is limited to producing (1) documents relating to surety bonds for other clients, namely other independent oil and gas operators as requested by W&T,[4] and (2) text message records for Marsh Agency employees that is inherently invasive upon their privacy.[5]

### A. Documents Pertaining to Other Clients

First, the procurement documents for surety bonds relating to non-parties contain sensitive, confidential, and proprietary information.[6] Second, all of these non-parties should be notified before any production is made so they have an opportunity to seek Court intervention given the

---

[2] *See* **Exhibit A**.
[3] *See* **Exhibit A**, P. 4 discussing Marsh Agency broadening its search for responsive documents to several custodians as opposed to just the lead producer handling the surety bonds for W&T.
[4] *See* W&T's First Served Subpoena, Requests Nos. 9-11, 14-16, 18, and 19.
[5] *See* U.S. Fire's First Served Subpoena, Requests Nos. 1-6, 8-9, 12-16, and 21-22; W&T's First Served Subpoena, Requests Nos. 4, 6-16, and 18; U.S. Fire's Second Served Subpoena, Requests Nos. 1-6, 8-9, 11-12, and 15.
[6] *See* **Exhibit B**, ¶6 Unsworn Declaration of Shane Sumrall.

sensitive nature of these requests, many of which are likely competitors of W&T.[7] Third, the efforts to even identify responsive clients necessary to respond to W&T's requests—much less collect and produce responsive documentation—would be unduly burdensome, particularly given Marsh Agency's non-party role.[8]

As the Court is well aware, when a subpoena applies to a non-party, as here, Courts "**must be sensitive to the nonparty's compliance costs**." *Leonard v. Martin*, 38 F.4th 481, 489 (5th Cir. 2022)(emphasis added). To this end, Marsh Agency ***has already incurred approximately $30,000 to date in attorney's fees responding to the subpoenas***.[9]

If Marsh Agency is required to produce documents responsive to W&T's discovery requests pertaining to Marsh Agency's clients, ***this would likely cost around $1,500,000*** because Marsh Agency will be forced to correspond with all 300 of its offices because every region has different operating systems and operating teams.[10] This estimate is based upon a very conservative estimate of $5,000 to review documents per office ($5,000 of document review per office multiplied by 300 offices amounts to $1,500,000).

**B. Exchanged Text Messages**

There is absolutely no reason why the Parties would not already be in possession of text messages exchanged between Marsh Agency and the Parties. Meanwhile, if Marsh Agency is forced to produce these text messages, which the Parties presumably already have, then Marsh Agency will have to incur the costs of downloading the text messages and reviewing the same.[11] In addition to incurring these needless costs, it will also be an inherent invasion of privacy as it would require analyzing the telephones of Marsh Agency's employees.[12]

Subject to the limitations discussed above, Marsh Agency intends to fully cooperate with the issued subpoenas that form the bases of this status conference hearing.

Sincerely,

*Michael S. Cedillo*
Michael S. Cedillo

[7] *Id*. at ¶7 ("Given the confidential and proprietary nature of the information, it is standard policy at Marsh Agency to allow clients to conduct a privilege review to determine the confidentiality of documents.").
[8] *Id*. at ¶3-5 and ¶8.
[9] *Id*. at ¶8.
[10] *Id*.
[11] *Id*. ¶9.
[12] *Id*.